**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | : | |
| IN RE: PE CORPORATION SECURITIES | : | Master File No. 3:00CV705(CFD) |
| LITIGATION | : | |
| | : | DECEMBER 29, 2003 |
| | : | |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

SIMPSON THACHER & BARTLETT LLP       DAY, BERRY & HOWARD LLP
425 Lexington Avenue                 One Canterbury Green
New York, NY  10017                  Stamford, CT 06901
(212) 455-2000                       (203) 977-7300
(212) 455 2502 (fax)                 (203) 977-7301 (fax)

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 5

ARGUMENT ................................................................................................ 14

I.      THE PREDOMINANCE REQUIREMENT IS NOT SATISFIED BECAUSE AN
        OVERWHELMING NUMBER OF PROPOSED CLASS MEMBERS HAD
        KNOWLEDGE OF THE ALLEGED OMISSION ............................................ 15

        A.      U.S. and U.K. Government Policy on the Release of Genomics Data was
                Publicly Disclosed Years Prior to the Secondary Offering ............................. 16

        B.      The Inability of Celera and the Human Genome Project to Agree on
                Collaboration was Public Knowledge Prior to the Offering ............................. 19

II.     THE PROPOSED REPRESENTATIVES' CLAIMS ARE NOT TYPICAL OF
        THE CLASS ................................................................................. 22

        A.      The Class Cannot be Certified Because the Proposed Representatives do
                not Have Claims Under Section 12(a)(2) ............................................. 23

                1.      The Defendants Did Not Sell Celera Stock to Proposed Class
                        Representatives Vinh Vuong and David Berlin ................................ 23

                2.      Neither Vuong Nor Berlin Purchased Celera Stock Pursuant to a
                        Prospectus ........................................................... 25

        B.      The Proposed Representatives Cannot Show that Damaged Shares Were
                Purchased in the Secondary Offering. ............................................... 26

                1.      Plaintiffs Cannot Show That They Purchased Celera Stock Issued
                        in the Secondary Offering ............................................... 27

                        a.      Vinh Vuong ..................................................... 31

                        b.      David Berlin .................................................... 33

III.    THE PROPOSED CLASS REPRESENTATIVES DO NOT SATISFY THE
        ADEQUACY REQUIREMENT OF RULE 23(A) ......................................... 34

        A.      Vinh Vuong ............................................................... 35

        B.      David Berlin ............................................................... 37

CONCLUSION ......................................................................................... 39

## Table of Authorities

### Cases

*Adair v. Bristol Technology Systems*, 179 F.R.D. 126 (S.D.N.Y. 1998) ............................... 28, 29

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................... 16, 22

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52 (2d Cir. 2000) ......................... 16

*Broussard v. Meineke Discount Muffler Shops, Inc.* 155 F.3d 331 (4th Cir. 1998) .................... 34

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ...................................... 14

*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 49 (2d Cir. 1991) .................................. 23

*Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628 (3d Cir. 1989) ................................................ 24

*Credit Suisse First Boston Corp. v. ARM Fin. Group.,* No. 99 CIV 12046, 2001
    WL 300733 (S.D.N.Y. March 28, 2001) ......................................................................... 24

*Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255 (S.D.N.Y. 1985) ...................................... 35, 38

*DeMaria v. Andersen*, 153 F. Supp. 2d 300 (2d Cir. 1998) ............................................... 28, 30

*Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125 (S.D.N.Y. 2003) .......................... 16, 34

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .................................................................. 15

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .................................................................. 29

*Feiner v. SS&C Tech. Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999) ........................................ 24, 28

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    903 F.2d 176 (2d Cir. 1990) ....................................................................... 22, 23, 34

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ........................................... 15, 22

*Gustafson v. Alloyd Co.,* 513 U.S. 561 (1995) .......................................................26, 27, 28, 29

*Hallet v. Li & Fung, Ltd.,* No. 95 Civ. 8917, 1997 WL 621111 (S.D.N.Y. Oct. 6,
    1997)........................................................................................................................... 22

*In re AMF Bowling Sec. Litig.,* No. 99 Civ. 3023, 2002 WL 461513 (S.D.N.Y.
    Mar. 26, 2002)............................................................................................................. 25

*In re College Bound Consol. Litig.*, No. 93 Civ. 2348, 1994 WL 172408
    (S.D.N.Y. May 4, 1999) ............................................................................................... 30

*In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130 (D.N.J. 1984), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir. 1988) .......................................................... 15

*In re Elscint Ltd. Sec. Litig.*, 674 F.Supp. 374 (D. Mass. 1987) .................................. 15

*In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61 (D. Conn. 1998) ......................... 28

*In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......................... 16

*In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998) ................................ 26

*In re Oxford Health Plans, Inc., Sec. Litig.*, 191 F.R.D. 369 (S.D.N.Y. 2000) .......................... 15

*In re Quarterdeck Office Systems, Inc. Sec. Litig.*, No. CV 92-3970-DWW (GHK), 1993 WL 623310 (C.D. Cal. Sept. 30, 1993) .......................................... 15, 31

*In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 1997 WL 576023 (S.D.N.Y. Sept. 15, 1997) ........................................................................................ 28

*Kirkwood v. Taylor*, 590 F. Supp. 1375 (D. Minn. 1984), *aff'd*, 760 F.2d 272 (8th Cir. 1985) ...................................................................................................... 30

*Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646 (S.D.N.Y. 1986) .................................. 20, 21

*Kline v. Wolf*, 88 F.R.D. 696 (S.D.N.Y. 1981) ...................................................... 34, 38

*Koenig v. Benson*, 117 F.R.D. 330 (E.D.N.Y. 1987) ................................................ 34, 35

*Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tx. 2002) ...................................... 31

*Landy v. Price Waterhouse*, 123 F.R.D. 474 (S.D.N.Y. 1989) ...................................... 22

*Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983) .................................................... 34

*Martin v. Shell Oil Co.*, 198 F.R.D. 580 (D. Conn. 2000) .......................................... 14

*McKernan v. United Technologies Corp.*, 120 F.R.D. 452 (D. Conn. 1988)............................. 15

*Norman, D.D.S., P.C. v. ARCS Equities Corp.*, 72 F.R.D. 502 (S.D.N.Y. 1976) ........................ 38

*Pinter v. Dahl*, 486 U.S. 622 (1988) ................................................................ 23, 25

*Reese v. Arrow Financial Services, LLC*, 202 F.R.D. 83 (D. Conn. 2001) .......................... 14, 15

*Rice v. Windsor Indus.*, No. 85 C 4196, 1986 WL 2728 (N.D. Ill. Feb. 27, 1986) ...................... 31

*Saslaw v. Askari*, No. 95 Civ. 7641, Fed. Sec. L. Rep. 99,461, 1997 WL 221208 (S.D.N.Y. Apr. 25, 1997) .............................................................................. 28

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996), *superceded by statute as discussed in Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) ........................................................................................................ 24

*Sicinski v. Reliance Funding Corp.*, 82 F.R.D. 730 (S.D.N.Y. 1979) ......................... 35

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir. 1982) ...................................... 15

*Walker v. Asea Brown Boveri, Inc.*, 214 F.R.D. 58 (D. Conn. 2003) ........................... 16

*Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir.1989) ...................... 25

## Statutes

15 U.S.C. § 77d(4) ...................................................................................................... 26

15 U.S.C. § 77k(a) .......................................................................... 16, 26-30, 32, 33, 37

15 U.S.C. § 77k(e) ....................................................................................................... 37

15 U.S.C. § 77k(g) ....................................................................................................... 28

15 U.S.C. § 77l .............................................................................................................. 23

15 U.S.C. § 77l(a)(2) .................................................................... 16, 23, 25, 27, 28

## Rules

Fed. R. Civ. P. 23(a) ..................................................................... 14-16, 21, 32, 34, 35

## Other Authority

7A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE, § 1766, at 310-11 ................ 34

H.R. Rep. No. 73-85, at 16 ........................................................................................... 29

James M. Landis, *The Legislative History of the Securities Act of 1933*, 28 GEO. WASH. L. REV. 29 (1959) ......................................................................................................... 29

Louis Loss & Joel Seligman, FUNDAMENTALS OF SECURITIES REGULATION 74-75 (4th ed. 2001) ....................................................................................................... 24

Paul C. Curnin and Christine M. Ford, *The Critical Issue of Standing Under Section 11 of the Securities Act of 1933*, FORDHAM JOURNAL OF CORPORATE AND FINANCIAL LAW, 6 Fordham J. Corp. & Fin. L. 155 (2001) ....................................... 30, 31

Defendants PE Corporation (n/k/a/ Applera Corporation),[1] Tony L. White, Dennis L. Winger and Vikram Jog ("Defendants"), by their attorneys, Day, Berry & Howard LLP and Simpson Thacher & Bartlett LLP, respectfully submit this memorandum of law, together with the Affidavit of Terence J. Gallagher dated December 29, 2003, and the exhibits thereto, in opposition to Plaintiffs' motion for class certification.

## PRELIMINARY STATEMENT

Plaintiffs' proposed Rule 23(b)(3) class cannot be certified because an overwhelming percentage of the proposed class members were aware, or at least on notice of, the alleged untruth or omission at the time they purchased Celera stock.  U.S. Government policy on genomic data release was publicly known for *years prior to* the secondary public offering of Celera common stock conducted on or about February 29, 2000 (the "Secondary Offering"). Discussions between Celera and the Human Genome Project ("HGP") concerning a potential collaboration were likewise a matter of public record well *prior to the Secondary Offering*. Accordingly, common questions will not predominate at a trial of this action.  Instead, trial of this action will focus almost entirely on individualized questions concerning <u>each</u> <u>purchaser's</u> <u>knowledge</u> of the alleged omission.

It is absolutely critical to understand that this is not a typical securities case in which an issuer is accused of manipulating financial statements or misrepresenting financial performance.  Instead, this case involves one of the most widely publicized scientific advances in

---

[1]     Since the filing of this litigation, PE Corporation has changed its name to Applera Corporation ("Applera").  The equity securities of PE Corporation were comprised of two tracking stocks representing the company's principal business units – Applied Biosystems and Celera.  This case concerns a secondary public offering of Celera stock and, accordingly, this memorandum will use the term "Celera" to refer to the defendant issuer in this case.  Technically, however, the issuer was PE Corporation.

recent years.  And it is the weakest kind of securities case — an omissions case.  In other words, Plaintiffs do not allege that Defendants told lies, but rather that they omitted certain information, in this case information that was already known and in the newspapers for months.

In 1999 and 2000, Celera was engaged in "mapping the human genome," *i.e.,* determining the sequence of DNA molecules that make up a human chromosome.  Many believe that mapping the human genome will lead to historical advances in drug discoveries and individualized medical care.  The HGP is a research organization funded in significant part by the United States National Institutes of Health ("NIH") and the United States Department of Energy ("DOE").  The HGP, like Celera, was also engaged in sequencing the human genome. The efforts of Celera and the HGP were widely covered in the press, which often portrayed the two parties as being in a "race" to sequence the genome.

Since the inception of the HGP in 1991, its policy, and the policy of its backers in the U.S. and U.K. Governments, had been that genomic sequencing research should be made freely available to the public.  That policy was formalized in a 1996 agreement among government-funded genomics researchers in what became known as the "Bermuda Accord." The Bermuda Accord, or free access policy, was widely reported in national news services and in publicly-issued government statements on numerous occasions from 1996 through the completion of the sequencing effort in June 2000.  Most significantly, weeks prior to the Secondary Offering, President Clinton stated in a roundtable interview with USA Today, the Chicago-Tribune and the Los Angeles Times that:

> "[T]he basic sequencing information of the genome should be made public, and should be publicly available to scientists and researchers, to all people in private sector business and . . . I think most scientists and researchers believe the basic information ought to be as broadly shared as possible."

President Clinton's statement was undoubtedly known to most of the investors who purchased Celera stock in the Secondary Offering a few short weeks later.

As the sequencing effort neared completion in late 1999 and early 2000, Celera and the HGP had sporadic and preliminary discussions concerning the possibility of collaborating on mapping the human genome. These discussions, which did not result in a formal collaboration, were reported by major news services throughout the country prior to the Secondary Offering. For example, in a November 1999 story, the New York Times reported on the collaboration discussions and quoted Francis Collins, director of the NIH, as stating "while discussions have been held, the public consortium's policy on immediately releasing data would be hard to change." Countless Celera investors must have read the New York Times article, as they must have read President Clinton's statement, and learned of the status of collaboration discussions.

On February 29, 2000, Celera conducted the Secondary Offering. In connection with the offering, Celera filed a registration statement and prospectus that extensively discussed the risks of an investment in Celera stock. Plaintiffs nonetheless allege that the Prospectus was false or misleading because it failed to adequately disclose that to effectuate its policy favoring free release of genomics data, the United States Government was going to take "retaliatory and punitive" actions against Celera because the discussions between Celera and the HGP did not result in an agreement to collaborate.[2] Plaintiffs further contend that Celera failed to disclose that the retaliatory and punitive actions by the U.S. Government would have an adverse impact on Celera's business plans.

---

[2] Presumably, the retaliatory and punitive actions included denying Celera intellectual property rights.

Plaintiffs move to certify a class pursuant to Rule 23(b)(3) consisting of "all persons who purchased [Celera] common stock in a Secondary Public Offering conducted by PE Corporation ("PE") on or about February 29, 2000 and who were damaged thereby."  The proposed class cannot be certified for several reasons.

First, Rule 23(b)(3) requires, *inter alia,* that "questions of law or fact common to the members of the class predominate over questions affecting individual members."  The "predominance" requirement is not satisfied in this case because some substantial percentage of the "individual members" of the proposed class knew of the information that Plaintiffs contend Celera failed to disclose.  At a minimum, all members of the class who read The L.A. Times, The Chicago-Tribune and/or USA Today were aware of President Clinton's policy statement on genomics research.  All members of the class who read The New York Times were aware of the collaboration discussions between Celera and the HGP.  Defendants will be required to call each individual class member at trial to establish the affirmative defense that purchasers of Celera stock had actual knowledge of the alleged omission.

Second, Plaintiffs' proposed class cannot be certified because the proposed representatives – Vinh Vuong and David Berlin – do not satisfy the prerequisites of a class action set forth in Rule 23(a).  In particular, Vuong and Berlin are subject to unique defenses, and their claims are therefore not typical of the class.  Neither Vuong nor Berlin has a Section 12(a)(2) claim because neither purchased stock from a Defendant in this case by means of the Prospectus. With respect to the Section 11 claim, Vuong lacks standing because he is an aftermarket purchaser and because he cannot show he purchased Celera stock in the Secondary Offering. Berlin may also be aftermarket purchaser lacking standing, but he has refused to produce in discovery complete trade confirmations showing purchases of Celera stock prior and subsequent

to the Secondary Offering in accounts he controls.  At the very least, Berlin cannot show he purchased shares in the Secondary Offering.

Finally, Vuong and Berlin are not adequate class representatives.  Both have abdicated their responsibility to supervise and direct this litigation on behalf of the proposed class.  Vuong was not even aware that the HGP was a government-funded entity that was engaged in sequencing the human genome – the most basic element of Plaintiffs' case.  Berlin has refused to provide basic discovery into Celera stock purchases made in accounts that he controls.

For the foregoing reasons, and for the reasons explained more fully below, Plaintiffs' motion for class certification should be denied.

## STATEMENT OF FACTS

### *U.S. and U.K. Government Policy on the Public Release of Genomics Information*

Many people believe that genomics research will lead to critical advances in medicine and health care in the near and long-term future.  First Amended Consolidated Class Action Complaint ("Complaint" or "Compl.") at ¶ 16.  The U.S. Government and the U.K. Government hold the position that basic human genomic sequence information should be freely available and in the public domain to encourage research and maximize its benefit to society.  Compl. at ¶ 19.  This position has been publicly known for many years.  The timeline below sets forth significant public disclosures regarding the U.S. and U.K. data release policy:

- **1991** - The National Human Genome Research Institute (NHGRI) and the Department of Energy jointly developed a data release policy that called for release of data and materials within 6 months of their generation. *See* (Gallagher Aff., Ex. A).

- **November 23, 1993** - Harold Varmus, former director of the National Institutes of Health, stated in a 1993 interview "I'm not opposed to patenting the fruits of biological research.  In many

cases it undoubtedly fosters industrial development, which is what we're trying to in many cases . . . . [b]ut the thing I feel most strongly about is that we don't end up impeding the research process by patenting things that were paid for by public money." *Varmus: The View From Bethesda*, SCIENCE, Nov. 23, 1993, available at 1993 WL 12230986 (Gallagher Aff., Ex. B).

- **February 25-28, 1996** - The International Human Genome Sequencing Consortium adopted the "Bermuda Principles" or "Bermuda Accord" that expressly called for the automatic, rapid release of sequence assemblies of 1-2 kb or greater to the public domain. *See* Bermuda Accord Press Release, available at http://www.gene.ucl.ac.uk/hugo/bermuda.htm (Gallagher Aff., Ex. C). To implement the Bermuda Principles, in April 1997 the NHGRI adopted a data release policy that called upon those of its grantees engaged in large-scale genomic DNA sequencing to release DNA sequence assemblies of 2 kb or greater within 24 hours of their generation.

- **March 7, 1997** – The HGP mandated that all labs receiving grants commit to rapid public data release, stating "[m]andatory data release as described above will be made a condition of the award for any grant funded by NHGRI for large-scale human sequencing." 1997 HGP Press Release, available at http://www.genome.gov/10000910#old (Gallagher Aff., Ex. D).

- **March 23, 1999** – An article in The Daily Telegraph notes that "John Sulston, the Sanger Centre's director, feels very strongly that, while pharmaceutical companies may patent treatments based on genetic knowledge, it is vital that the knowledge itself should remain public. James Watson, the first head of the Human Genome Project, fought bitterly with Mr. Venter in the early 1990s in defense of the same principles." *Acid Test: The Most Wonderful Event in History?*, THE DAILY TELEGRAPH, March 23, 1999, available at 1999 WL 14028501 (Gallagher Aff., Ex. E).

- **June 21, 1999** – U.S. News & World Report observed that "Francis Collins, U.S. director of the $2 billion-plus Human Genome Project, is 'absolutely committed' to public release of the data." *Outlook,* U.S. NEWS & WORLD REPORT, June 21, 1999, available at 1999 WL 8432965 (Gallagher Aff., Ex. F).

- **July 1, 1999** - The HGP reiterated its public release policy, stating that "[i]n conformity with the existing spirit and philosophy of the Human Genome Project (HGP), and in response to the recommendations of advisors and the expressed wishes of the

community, NHGRI policies are intended to make DNA sequence information available as rapidly and freely as possible." 1999 HGP Press Release, available at http://www.genome.gov/10001802 (Gallagher Aff., Ex. G).

- **September 20, 1999** – An article in The Guardian reported that "Tony Blair and Bill Clinton are negotiating an Anglo-American agreement to protect the 100,000 genes that control the human body and provide the catalysts for medical advance." The article further reported that discussions focused on how to "turn the Bermuda accord – an informal agreement to release all research without claiming patents – into a full inter-government agreement." David Hencke, Rob Evans, and Tim Radford, *Blair and Clinton Push to Stop Gene Patents,* THE GUARDIAN, Sept. 20, 1999, available at 1999 WL 25731030 (Gallagher Aff., Ex. H).

- **October 13, 1999** - Dr. Lander, head of one of the HGP's largest sequencing centers, stated: "[I]t's unambiguously the case that information about the human genome has to be freely available to everyone in the world, to scientists, to non-scientists. It has to be viewed as a public right to have that information . . . the core information at the heart of the genome, the genes, the variation, the circuitry ought to be out there on the web for all to see." , *Transcript of Eighth Millennium Evening at the White House: Informatics Meets Genomics,* U.S. NEWSWIRE , Oct. 13, 1999, available at 1999 WL 22282379 (Gallagher Aff., Ex. I).

- **October 25, 1999** - The "British-led effort" to negotiate a deal that would formalize the Bermuda accord was again reported in October 1999. *See* Julian Borger, *US Bid to Own Gene Rights: Plan to Profit from 'Human Blueprint' May Force Action,* THE GUARDIAN, Oct. 25, 1999, available at 1999 WL 25740884 (Gallagher Aff., Ex. J).

- **November 17, 1999** – The Los Angeles Times reported that "[l]ast December, the top science advisors to British Prime Minister Tony Blair and President Clinton began working to turn what is known as the Bermuda Accord – an informal agreement to release all research on human genes without claiming patents – into a more formal Anglo-American agreement to ban patents on all 140,000 known human genes. Those negotiations have failed so far, and patent law revisions now in Congress skirt the touchy issue of whether life forms should be patentable at all." *Patenting of Genes: Big Money,* LOS ANGELES TIMES, NOV. 11, 1999, available at 1999 WL 26193534 (Gallagher Aff., Ex. K).

- **February 1, 2000** – An industry journal reported that "William A. Haseltine, chairman and chief executive officer of Human Genome Sciences, Inc. said the company agrees with President Clinton's reported opposition to broad patents covering the human genetic code as well as his reported support for patenting 'scientific discoveries and developments that have a clear and desirable benefit.'" *Human Genome Sciences Agrees with Clinton Patent Views,* BIOTECH PATENT NEWS, Feb. 1, 2000, available at 2000 WL 14596933 (Gallagher Aff., Ex. L).

- **February 11, 2000** – *<u>President Clinton</u>* stated "I basically agree with the guidance that the Patent Office has now announced, that they believe that the broad information, the basic sequencing information of the genome should be made public, and should be publicly available to scientists and researchers, to all people in private sector business and . . . I think the patenting should be for specific discoveries and developments that have a clear and definable benefit . . . But I think most scientists and researchers believe the basic information ought to be as broadly shared as possible. And then when people develop something that has a specific use and commercial benefit, and the kind of thing that has to be done and should properly be done in the private sector, then that ought to be patentable." Transcript of Interview set forth in Weekly Compilation of Presidential Documents, *Interview with Chicago Tribune, the Los Angeles Times and USA Today,* Feb. 14, 2000, available at 2000 WL 13130614; *Genome Project: Clinton Calls for Public Access to Code,* AMERICAN HEALTH LINE, Feb. 11, 2000; Peter G. Gosselin, *Clinton Urges Public Access to Genetic Code,* LOS ANGLES TIMES, Feb. 11, 2000, available at 2000 WL 2209813; Naftali Bendavid, *Internet, Genetics on Clinton's Mind,* CHICAGO TRIBUNE, Feb. 11, 2000, available at 2000 WL 3635455 (Gallagher Aff., Ex. M).

### *Discussions Between Celera and the HGP Regarding Collaboration*

Plaintiffs allege that Celera and the HGP discussed the potential for the two entities to coordinate their efforts to complete the sequencing of the human genome at a meeting on December 29, 1999. *See* Compl. at ¶ 25. According to the March 6, 2000 Los Angeles Times article that reported on the December 29 meeting, the HGP needed to cooperate with Celera because Celera's advanced sequencing techniques were proving so effective that Celera was clearly going to be the first to sequence the human genome. The article states:

9

> The public side had entered into talks with Celera because it was
> under pressure from the scientific community to finish the
> decoding process as quickly as possible.  Cooperation [with
> Celera] was seen as the best route to this goal.
>
> According to people familiar with the negotiations between the
> two sides, scientific leaders, including [Dr. Harold] Varmus, a
> Nobel Prize winner and then still head of NIH, concluded last fall
> that *Celera's techniques were proving so effective that the publicly
> funded effort had to consider cooperating with [Celera].*

Peter G. Gosselin and Paul Jacobs, *Rush to Crack Genetic Code Breeds Trouble*, THE LOS

ANGELES TIMES, Mar. 6, 2000 (Gallagher Aff. Ex. N) (emphasis added).

Many investors in Celera's Secondary Offering were aware or on notice of the

collaboration discussions between Celera and the HGP, and the fact that those discussions had

not resulted in an agreement due to the HGP's data release policy.  The discussions were

reported in several national news sources well before the Secondary Offering:

- **September 15, 1999** – U.S. News & World Report observed
  that the collaboration between Celera and government-funded
  researchers on the fruit fly "might just provide a model for how
  the intensely competitive and sometimes acrimonious scientific
  factions can somehow work together to finish the human effort
  faster and cheaper."  Leslie Roberts, *The Lords of the Flies:
  From an Odd Scientific Alliance, a Genetic Milestone,* U.S.
  NEWS & WORLD REPORT, Sept. 20, 1999, available at 1999 WL
  8433394 (Gallagher Aff., Ex. O).

- **October 6, 1999** -  The Star-Tribune reported that "[t]he
  accelerated schedule for completion of the human genome
  depends on collaboration between Celera and the HGP."
  *Genome Project Will Finish a Year Early,* STAR-TRIBUNE, Oct.
  6, 1999, available at 1999 WL 7512393 (Gallagher Aff., Ex.
  P).

- **November 14, 1999** – The Associated Press reported that
  "[t]he public and private rivals racing to decode the human
  genetic blueprint are discussing collaborating on the effort, the
  New York Times reported Sunday...While discussions have
  been held, the public consortium's policy on immediately
  releasing data would be hard to change, said Dr. Francis

Collins, head of the National Institutes of Health's arm of the project." *Human Genome Rivals May Unite,* ASSOCIATED PRESS ONLINE Nov. 14, 1999, available at 1999 WL 28139386 (Gallagher Aff., Ex. Q).

- **November 21, 1999 –** The St. Louis Post-Dispatch reported that "[t]he race to map the human genome took a new turn in recent weeks.  Representatives from Celera, a privately owned for-profit company, have made overtures to the international, public group of academic researchers suggesting the two groups collaborate.  What stands in the way of collaboration is disagreement over who has rights to the genome data." *No Rush to Collaborate,* ST. LOUIS POST-DISPATCH, Nov. 21, 1999, available at 1999 WL 3055801 (Gallagher Aff., Ex. R).

- **February 18, 2000** – The Associated Press Online reported that "[t]he National Center for Human Genome Research uses a different approach than the government-backed effort to learn the genetic blueprint.  Venter has proposed teaming up, although the timing of releasing the data to the public has been a sticking point."  Venter is quoted as saying "It hasn't happened, but we are optimistic that the result of the tremendous Drosophila experience will help the human collaboration get off the ground."  Daniel Q. Haney, *Genes of Fruit Fly Unraveled*, ASSOCIATED PRESS ONLINE, February 18, 2000, available at 2000 WL 14321780 (Gallagher Aff., Ex. S).

Also reported in the national news was the fact that, contrary to Plaintiffs assertion that collaboration discussions between Celera and the HGP broke down at the December 29, 1999 meeting (and that Celera failed to include this key fact in its prospectus and registration statement), those discussions continued well into March, after the date of the Secondary Offering.

- **March 6, 2000** – The Los Angeles Times reported that the HGP and Celera were engaged in ongoing negotiations through March 2000, at which time the HGP sent a letter to Celera rejecting its collaboration proposal ("[t]he letter . . . was sent to the company last week") and that "[t]he two sides were unable to bridge their differences since the Dec. 29 session and were clearly still at loggerheads Sunday."  Gallagher Aff., Ex. N.

Ironically, Plaintiffs cite this very article as the basis of their contention that this December 29, 1999 meeting signaled the breakdown of negotiations, and that the purported breakdown should have been disclosed to potential purchasers in the Secondary Offering. *See* Compl. at ¶ 25.

**The Proposed Class Representatives**

Plaintiffs seek to have two individuals appointed as class representatives. Very significantly, no institutional investors have sought to become lead plaintiffs or class representatives in this case.

<u>Vinh Vuong</u>

In February and March 2000, Vinh Vuong purchased a total of 8,000 shares of Celera stock on margin at an average price of $246.21 per share, for a total investment of $1,969,750. *See* deposition transcript of Vinh Vuong, dated November 5, 2003 ("Vuong Tr.") at 48:12-25, Exs. 1-3 to the Vuong Deposition.[3] Vuong executed all of his Celera stock purchases through a trading website run by Dreyfus Corporation. *See* Vuong Tr. at 33:20-34:4.

Of Vuong's 8,000 total shares, 6,000 were purchased prior to the Secondary Offering. Vuong purchased 5,000 shares of Celera stock at prices ranging from $230 to $268 per share on February 25, 2000. *See id.* at 32:14-25, Ex. 1 to Vuong Deposition. Vuong purchased an additional 1,000 shares over the Dreyfus website on February 28, 2000 at $237.75 per share. *See id.* at 40:5-21, Ex. 2 to Vuong Deposition. On March 1, 2000, Vuong purchased 2000 shares at $236 per share. *See id.* at 42:3-19, Ex. 3 to Vuong Deposition. Although Vuong purchased Celera stock on March 1, 2000, he admitted that he never saw the registration statement or

---

[3]    Excerpts of the deposition of Vinh Vuong and the exhibits thereto cited in this memorandum are attached as Exhibit T to the Gallagher Affidavit.

prospectus at issue in this case until after the complaint was filed.  *See id.* at 44:12-21.  Vuong did not purchase stock from any of the Defendants in this case and did not purchase at the offering price.

Vuong sold all of his Celera stock less than three weeks later after receiving a margin call from his broker.  Specifically, on March 16, 2000, Vuong sold his entire investment in Celera (8,000 shares) at prices ranging from $125 to $137 per share.  *See id.* at 50:4-7, Ex. 6 to Vuong Deposition.  Thus, 75% of the stock Vuong sold on March 16 could not possibly have been issued in the Secondary Offering.

Importantly, in connection with his motion to be appointed lead plaintiff, Vuong submitted a sworn certification as required by the Private Securities Litigation Reform Act.  *See id.* at 63:12-19, Ex. 8 to Vuong Deposition.  That certification is inaccurate, as Vuong admitted in his deposition, the effect of which is to overestimate potential damages in this case.  Specifically, while Vuong stated in his certification that Schedule A listed all purchases and sales during the proposed class period, that schedule only discloses that Vuong sold 4,000 shares of Celera stock at $125 per share.  The remaining 4,000 shares sold at $137 per share are not disclosed.  At his deposition Vuong testified that the certification was inaccurate.

> Q:  Mr. Vuong, you sold 8,000 shares on March 16, correct?
> A:  Yes.
> Q:  The certification that we've marked as Vuong Exhibit 8 says
> that you sold 4,000 shares on March 16?
> A.  Yes.
> Q:  That is not accurate?
> A:  Correct.

Vuong Tr. at 71:14-22.

Because damages under Section 11 are measured by the difference between the amount paid for the security and the value for which it was sold, disclosing only those shares

sold at the lower price inflates the damages that would be owed Vuong if Plaintiffs prevailed in this lawsuit. In reality, there is no way Vuong can verify whether the shares he purchased subsequent to the Secondary Offering were in fact sold for $125 per share.

*David Berlin*

David Berlin's Celera purchases are much less clear. Berlin purchased 100 shares of Celera stock on February 29, 2000 at a price of $225 per share in an account held in his own name. *See* deposition transcript of David Berlin, dated November 11, 2003 ("Berlin Tr.") at 50:20-51:3, Ex. 1 to the Berlin deposition.[4] Berlin did not receive a copy of the prospectus until after his purchase and has never seen the registration statement. *See* Berlin Tr. at 57:8-11.

Berlin also controls two accounts held in his children's names pursuant to the Uniform Gifts to Minors Act (the "UGTMA accounts"). *See id*. at 38:17-22. Berlin testified that he purchased Celera stock prior to, and possibly after, the Secondary Offering in these UGTMA accounts. *See id*. at 63:23-64:16. He also testified that he believes he sold the Celera stock held in the UGTMA accounts at some point, but that he could not be certain of the date on which this occurred and could not confirm that these accounts no longer hold Celera stock. *See id*. at 72:19-73:3; 133:25-134:9.

Defendants requested that Berlin produce the trade confirmations for these Celera purchases, but Plaintiffs refused to cooperate. *See id*. at 73:4-7; Letter from Carlos F. Ramirez to William R. Regan, dated December 3, 2003 ("Ramirez Letter").[5] In addition, the confirmation for the February 29, 2000 trade produced by Mr. Berlin indicates that there is a reverse side to

---

[4]    Excerpts of the deposition of David Berlin and exhibits thereto cited in this memorandum are attached as Exhibit U to the Gallagher Affidavit.

[5]    The Ramirez Letter is attached as Exhibit V to the Gallagher Affidavit.

the document.  Mr. Berlin has been unable to produce this, however, as of the date of this

opposition.  *See* Berlin Tr. at 51:4-52:11; Ramirez Letter.

## ARGUMENT

Rule 23(a) sets forth the four well-known prerequisites to a class action.  The rule

provides that "one or more members of a class may sue or be sued as representative parties on

behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2)

there are questions of law or fact common to the class; (3) the claims or defenses of the

representative parties are typical of the claims or defenses of the class; and (4) the representative

parties will fairly and adequately represent the interests of the class.  *See* Fed. R. Civ. P. 23(a).

If the four prerequisites are satisfied, a class action may be maintained if it

qualifies under one of the three categories of permissible class actions set forth in Rule 23(b).  In

this case, Plaintiffs move for certification of a Rule 23(b)(3) class, which provides that a class

may be certified if:

> the court finds that the questions of law or fact common to the
> class predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for the fair and efficient adjudication of the controversy.
> The matters pertinent to the findings include:  (A) the interest of
> members of the class in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any
> litigation concerning the controversy already commenced by or
> against members of the class; (C) the desirability or undesirability
> of concentrating the litigation in the particular forum; and (D) the
> difficulties likely to be encountered in the management of a class
> action.

Plaintiffs bear the burden of demonstrating that the requirements of Rule 23 have been satisfied.

*See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999); *Reese v. Arrow

Financial Services, LLC,* 202 F.R.D. 83, 90 (D. Conn. 2001); *Martin v. Shell Oil Co.,* 198 F.R.D.

580, 590 (D. Conn. 2000).

The court must undertake a "rigorous analysis" to determine whether the prerequisites of class certification have been met and may not rely on any presumption that class certification is appropriate. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155, 160 (1982); *McKernan v. United Technologies Corp.*, 120 F.R.D. 452, 553 (D. Conn. 1988). This rule applies with full force in securities cases. *See, e.g., In re Quarterdeck Office Systems, Inc. Sec. Litig.*, No. CV 92-3970-DWW (GHK), 1993 WL 623310, at *2 (C.D. Cal. Sept. 30, 1993) (denying certification in Section 11 case where lead plaintiffs' claims were subject to unique defenses and thus were not typical of the class); *In re Elscint Ltd. Sec. Litig.*, 674 F.Supp. 374, 382 (D. Mass. 1987) (denying certification in Section 11 case due to predominance of tracing difficulties).

While courts are not permitted to resolve substantial, disputed factual issues at the class certification stage, *see*, *e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), they do have an "obligation to rest certification under Rule 23 on something more than the pleadings." *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982); *Reese v. Arrow Financial Services, LLC*, 202 F.R.D. 83, 82 (D. Conn. 2001); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984) ("[A] court must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints."), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir. 1988). Accordingly, determinations of the suitability of the proposed class period and class definition should be based on more than the allegations set forth in a complaint. *See In re Oxford Health Plans, Inc., Sec. Litig.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000).

## I.    THE PREDOMINANCE REQUIREMENT IS NOT SATISFIED BECAUSE AN OVERWHELMING NUMBER OF PROPOSED CLASS MEMBERS HAD KNOWLEDGE OF THE ALLEGED OMISSION

Rule 23(b)(3) requires that common issues predominate. The requirement that plaintiffs establish predominance is "more stringent" and "far more demanding" than proving the

commonality required by Rule 23(a). *Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125,

138 (S.D.N.Y. 2003); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 609, 623-624 (1997).

The predominance requirement is not satisfied where the defendants have made a *prima facie*

showing that an affirmative defense "threatens to become the focus of the litigation." *Walker v.*

*Asea Brown Boveri, Inc.,* 214 F.R.D. 58, 64 (D. Conn. 2003), *quoting Baffa v. Donaldson, Lufkin*

*& Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000).

Defendants have an affirmative defense in this case if they can demonstrate that

the purchasers of Celera stock in the Secondary Offering (*i.e.*, the proposed class) were aware of

the alleged omission. Section 11 of the Securities Act of 1933 provides that purchasers of

securities issued pursuant to a false or misleading registration statement may sue the specified

class of defendants "unless it is proved that at the time of such acquisition [the purchaser] knew

of such untruth or omission." 15 U.S.C. § 77k(a). Similarly, under Section 12(a)(2) of the

Securities Act, a person who acquires a security by means of a false or misleading prospectus

may assert a claim against his or her immediate seller *only* if the purchaser did not know of such

untruth or omission. *See* 15 U.S.C. 77l(a)(2); *see also In re Initial Public Offering Sec. Litig.,*

241 F. Supp. 2d 281, 345 (S.D.N.Y. 2003).

**A.     U.S. and U.K. Government Policy on the Release of Genomics Data was
        Publicly Disclosed Years Prior to the Secondary Offering**

From its inception, the HGP and its U.S. and U.K. government sponsors adopted

the policy that genomics research should be made publicly available. For example, in a 1991

press release, the HGP "called for release of data and materials within 6 months of their

generation." *See* 1991 Press Release (Gallagher Aff., Ex. A). Later, the HGP modified its

policy, calling for accelerated data release within twenty four hours of generation. *See* Bermuda

Accord (Gallagher Aff., Ex. C).

That the United States government strongly supported free and prompt release of genomics data was no secret; it was repeatedly reported in major national newspapers. For example, the journal "Science" quoted Harold Varmus, former director of the NIH, as stating "the thing I feel most strongly about is that we don't end up impeding the research process by patenting things that were paid for by public money." *Varmus: The View From Bethesda*, SCIENCE, Nov. 23, 1993, available at 1993 WL 12230986 (Gallagher Aff., Ex. B). U.S. News & World Report quoted Francis Collin, Varmus' successor at NIH, as stating that the HGP was "absolutely committed" to public data release. *Outlook,* U.S. NEWS & WORLD REPORT, June 21, 1999, available at 1999 WL 8432965 (Gallagher Aff., Ex. F).

Approximately six months prior to the Secondary Offering, the Guardian, a U.K. newspaper, reported that President Clinton and Prime Minister Tony Blair were negotiating to turn the Bermuda Accord into a formal international agreement between the two countries. *See* David Hencke, Rob Evans, and Tim Radford, *Blair and Clinton Push to Stop Gene Patents,* THE GUARDIAN, Sept. 20, 1999, available at 1999 WL 25731030 (Gallagher Aff., Ex. H). The Los Angeles Times reported on the very same negotiations in November 1999. *See*, *Patenting of Genes: Big Money,* LOS ANGELES TIMES, Nov. 7, 1999, available at 1999 WL 26193534 (Gallagher Aff., Ex. K).

In October 1999, Dr. Lander, head of one of the HGP's largest sequencing centers, reiterated the HGP's policy on genomics research, stating that "it's unambiguously the case that information about the human genome has to be freely available to everyone in the world, to scientists, to non-scientists. It has to be viewed as a public right to have that information." *Transcript of Eighth Millennium Evening at the White House: Informatics Meets Genomics,* U.S. NEWSWIRE, Oct. 13, 1999 (Gallagher Aff., Ex. I).

Most significantly, on February 11, 2000, President Clinton himself publicly confirmed the government's policy on genomics data release, stating:

> I basically agree with the guidance that the Patent Office has now announced, that they believe that the broad information, the basic sequencing information of the genome should be made public, and should be publicly available to scientists and researchers, to all people in private sector business and . . . I think the patenting should be for specific discoveries and developments that have a clear and definable benefit . . . But I think most scientists and researchers believe the basic information ought to be as broadly shared as possible.  And then when people develop something that has a specific use and commercial benefit, and the kind of thing that has to be done and should properly be done in the private sector, then that ought to be patentable.

Transcript of Interview set forth in Weekly Compilation of Presidential Documents, *Interview with Chicago Tribune, the Los Angeles Times and USA Today,* Feb. 14, 2000, available at 2000 WL 13130614 (Gallagher Aff., Ex. M).  President Clinton's remarks were widely reported.  *See Genome Project:  Clinton Calls for Public Access to Code,* AMERICAN HEALTH LINE, Feb. 11, 2000; Peter G. Gosselin, *Clinton Urges Public Access to Genetic Code,* LOS ANGLES TIMES, Feb. 11, 2000, available at 2000 WL 2209813; Naftali Bendavid, *Internet, Genetics on Clinton's Mind,* CHICAGO TRIBUNE, Feb. 11, 2000, available at 2000 WL 3635455 (Gallagher Aff., Ex. M).

The Secondary Offering occurred on February 29, 2000.  Two weeks later, President Clinton and Tony Blair issued the Joint Statement, which reiterated the U.S. and U.K. policy that had been publicly known for years.  The Joint Statement provided, *inter alia:*

> To realize the full promise of this research, raw fundamental data on the human genome, including the human DNA sequence and its variations, should be made freely available to scientists everywhere.  Unencumbered access to this information will promote discoveries that will reduce the burden of disease, improve health around the world, and enhance the quality of life for all humankind.  Intellectual property protection for gene-based inventions will also play an important role in stimulating the development of important new health care products.

> We applaud the decision by scientists working on the Human
> Genome Project to release raw fundamental information about the
> human DNA sequence and its variants rapidly into the public
> domain, and we commend other scientists around the world to
> adopt this policy.

Gallagher Aff., Ex. W.

Plaintiffs contend that the Joint Statement came as a surprise and revealed <u>for</u> <u>the</u>
<u>first</u> <u>time</u> that the U.S. and U.K. Governments supported the rapid release of genomic research
data.  Compl. at ¶ 30.  At trial Celera has a due process right to call each purchaser in the
Secondary Offering and elicit testimony as to whether the purchaser was aware of the widely-
reported U.S. and U.K. Government policy prior to the Secondary Offering.  As demonstrated,
given the widespread publicity of that policy, some overwhelming percentage of the class will be
subject to this defense.

**B.     The Inability of Celera and the Human Genome Project to Agree on
Collaboration was Public Knowledge Prior to the Offering**

Plaintiffs also contend that Celera failed to disclose the fact that it discussed a
potential collaboration with the HGP, and that the discussion did not result in an agreement
because of the Government's policy favoring free and immediate release of genomics data.  *See*
Compl. at ¶ 24-25.   The discussions with the HGP, however, were also a matter of public record
long before the Secondary Offering.

For example, in November 1999, The New York Times and the Associated Press
reported that discussions between Celera and the HGP had been held, and that Francis Collins of
the HGP had no intention of changing the government's policy on free data release.  *See Human
Genome Rivals May Unite,* ASSOCIATED PRESS ONLINE, Nov. 14, 1999, available at 1999 WL
28139386 (Gallagher Aff., Ex. Q).  On February 18, 2000, approximately 10 days prior to the
Secondary Offering, the St. Louis Post Dispatch interviewed Celera's President, Craig Venter,

and reported that "Venter has proposed teaming up [with the HGP], although the timing of releasing the data to the public has been a sticking point." *See* Daniel Q. Haney, *Genes of Fruit Fly Unraveled*, ASSOCIATED PRESS ONLINE, Feb. 18, 2000, available at 2000 WL 14321780 (Gallagher Aff., Ex. S).

That these discussions were ongoing as far as mid-March 2000 (after the Secondary Offering) was also reported in the national news. The Los Angeles Times reported on March 6, 2000 that the HGP and Celera were engaged in continuing negotiations up until early March 2000 at which time the HGP sent a letter to Celera rejecting its collaboration proposal ("[t]he letter . . . was sent to the company last week"). Gallagher Aff., Ex. N. Ironically, in their Complaint, Plaintiffs rely on this very article to support their claim that collaboration discussions between Celera and the HGP broke down at the December 29, 1999 meeting (and that Celera failed to include this key fact in its prospectus and registration statement). *See* Compl. at ¶ 25. And yet, the article clearly states that discussions were still ongoing in March ("[t]he two sides were unable to bridge their differences since the Dec. 29 session and were clearly still at loggerheads Sunday."). *Id.*

\* \* \*

Plaintiffs' proposed class cannot be certified because common questions will not predominate at trial of this action. *Klein v. A.G. Becker Paribas Inc.,* 109 F.R.D. 646 (S.D.N.Y. 1986) is directly on point. In *Klein,* Computer Devices, Inc. ("CDI") conducted an initial public offering on or about July 8, 1983. Plaintiffs alleged, *inter alia,* that CDI failed to disclose in its registration statement that a new product was not compatible with most software then available in the market, and that CDI had sustained a substantial operating loss in the preceding quarter.

*Id.* at 648.  News reports published on July 25, 26 and 28, 1983 revealed the alleged omissions to the public.  Plaintiffs brought claims under the Securities Act and proposed to extend a Section 11 class beyond July 28, 1983 – the date of the last article publicly disclosing the alleged omission.  *Id.* at 652.

The *Klein* Court refused to extend the class beyond July 28 because the claims of purchasers prior to that date were not typical of those who purchased after – and with knowledge of – the July 28 article.  The court stated:

> In order to prevail on a Section 11 claim, a plaintiff must be able to prove that he purchased stock issued and sold pursuant to a deficient registration statement, and that he did not have knowledge of the deficiency . . . This same requirement applies to a Section 12(2) claim . . . Those who purchased after July 28, 1983 certainly had access to substantial additional information.  ***Their knowledge of allegedly omitted information is a central issue to the inquiry in a section 11 or 12(2) claim.***  This issue, however, does not exist for those shareholders who purchased before July 25, 1983, and thus did not have access to the same information.

*Id.* at 652 (internal citations omitted) (emphasis added).[6]

In *Klein*, only a portion of the putative class members purchased stock after the public disclosure of the allegedly omitted information.  The argument against class certification is even stronger here, where every member of the proposed class purchased Celera stock in the Secondary Offering after the alleged omission was reported in national newspapers.  Individualized issues concerning each purchaser's knowledge of (i) government policy on data release and (ii) collaboration discussions between Celera and the HGP will become the distracting "central issue" at trial of this matter.  Accordingly, Plaintiffs proposed class does not satisfy the predominance requirement of Rule 23(b)(3).

---

6      Moreover, the *Klein* court expressly found that its ruling did not involve an inappropriate inquiry into the merits of the plaintiffs' claim.  *Id.* at 652 n.11.

## II.    THE PROPOSED REPRESENTATIVES' CLAIMS ARE NOT TYPICAL OF THE CLASS

In *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990), the Second Circuit set forth the circumstances under which the court should deny class certification when the proposed representatives' claims are not typical of the proposed class:

> While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which ***threaten to become the focus*** of the litigation. Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.

*Id.* at 180 (citations omitted) (emphasis added). Moreover, defendants "need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense.'" *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111 at *3 (S.D.N.Y. Oct. 6, 1997) (*quoting Landy v. Price Waterhouse*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).

The typicality and adequacy inquiries tend to merge. The Rule 23(a) adequacy inquiry "serves to uncover conflicts of interest between named parties and the class," requiring that a class representative "'possess the same interest and suffer the same injury' as [absent] class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-626 (1997). The typicality inquiry looks to whether "the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157, n.13 (1982). A class representative's preoccupation with issues not general to the class inevitably harms the class and

precludes both "the typicality of the representative's claims [and] the adequacy of its representation." *Gary Plastic*, 903 F.2d at 180. The proposed class cannot be certified under these standards.

**A.    The Class Cannot be Certified Because the Proposed Representatives do not Have Claims Under Section 12(a)(2)**

Section 12(a)(2) of the 1933 Act imposes liability on:

> Any person who . . . offers or sells a security . . . *by means of a prospectus* or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading . . . *to the person purchasing such security from him*."

15 U.S.C. § 77l (emphasis added). Neither Vuong nor Berlin have Section 12 claims against Celera or the individual defendants because (i) they did not purchase Celera stock from any of the named defendants and/or (ii) Celera stock was not sold to them "by means of a prospectus." 15 U.S.C. § 77l(a)(2). As such, they cannot serve as representatives of a Section 12 class.

**1.    The Defendants Did Not Sell Celera Stock to Proposed Class Representatives Vinh Vuong and David Berlin**

In *Pinter v. Dahl,* 486 U.S. 622 (1988), the Supreme Court recognized that the language of Section 12 imposes "liability on only the buyer's immediate seller" and that "remote purchasers are precluded from bringing actions against remote sellers." *Id.* at 644 n. 21.[7] To qualify as an immediate seller, a defendant must (1) pass title, "or other interest," in a security to a plaintiff, or (2) "successfully solicit[] the purchase [of a security]." *Id.* at 642, 647. Because Celera and the individual defendants did neither of these things, they are remote sellers against whom a Section 12 claim cannot be brought.

---

[7]    Although *Pinter* involved a case brought under § 12(1) (now § 12(a)(1)), the Second Circuit has held that *Pinter* applies equally to cases brought under § 12(2) (now § 12(a)(2)). *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 49 (2d Cir. 1991).

First, Celera and the individual defendants are not sellers under the *Pinter* test because they did not pass title of the Celera stock to either Vuong or Berlin. The underwriting at issue here was a "firm commitment underwriting."[8] In a firm commitment underwriting, "the issuer of the securities sells all of the shares to be offered to one or more underwriters," and "[i]nvestors thus purchase shares in the offering directly from the underwriters (or broker-dealers who purchase from the underwriters), not directly from the issuer." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996), *superceded by statute as discussed in Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999); *see also Credit Suisse First Boston Corp. v. ARM Fin. Group.*, No. 99 CIV 12046, 2001 WL 300733, at *10 (S.D.N.Y. March 28, 2001). In cases involving firm commitment underwritings, plaintiffs have standing under 12(a)(2) to sue only the underwriters from whom they purchased securities. *See Feiner v. SS&C Tech. Inc.*, 47 F. Supp. 2d 250, 254-55 (D. Conn. 1999); *Credit Suisse,* 2001 WL 300733, at *10. As the Prospectus makes clear, the Secondary Offering of Celera stock was done pursuant to a "firm commitment" underwriting agreement. *See* Prospectus at 94-95.

Second, Section 12 liability does not extend to an issuer, an underwriter or any other person unless the issuer, underwriter or other person directly and personally solicited the buyer. *See Shaw*, 82 F.3d at 1215; *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628,636 (3d Cir. 1989). A company's remote involvement in a sales transaction or its mere participation in

---

[8]    Companies can distribute their securities by means of a firm commitment underwriting or through an underwriter that undertakes to use its "best efforts." In contrast to a "firm commitment," the "best efforts" underwriter "instead of buying the issue from the company and reselling it as a principal, sells it for the company as an agent." Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 74-75 (4th ed. 2001). Therefore, in a "firm commitment" underwriting the underwriter acts as a principal earning a profit. In a "best efforts" arrangement the underwriter acts as an agent earning a commission. *Id*. at 75.

preparing the prospectus does not subject it to Section 12 liability.  *Pinter,* 486 U.S. at 651 n. 27;

*See Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir. 1989).

        *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023, 2002 WL 461513, at *5-6

(S.D.N.Y. Mar. 26, 2002) is directly on point.  In *AMF*, considering Section 11 and 12 claims,

the court denied class certification to a proposed class representative who purchased stock in an

unsolicited transaction, from a source *other than the named defendants*, after the initial public

offering, and who never received a prospectus.  The court held that plaintiff did "not have

standing to file a Section 12 claim against defendants, and his claims are not 'typical of the

claims of the class.'"  *Id.* (internal citations omitted).   The same is true here.  Vinh Vuong

testified that he purchased all of his Celera stock through unsolicited transactions with an online

broker, Dreyfus.  He did not purchase any stock from Celera or any of the individual defendants.

*See* Vuong Tr. at 33:20-34:4.  Nor did Defendants directly solicit the sale of Celera stock.  While

David Berlin purchased his Celera stock through one of the Underwriters, *see* Berlin Tr. at

50:20-51:3, Ex. 1 to Berlin Deposition, that Underwriter is not a defendant in this action.

Because neither Vuong nor Berlin purchased securities directly from the Defendants, neither can

assert a Section 12 claim against them.

        **2.**        **Neither Vuong Nor Berlin Purchased Celera Stock Pursuant to a Prospectus**

        Section 12(a)(2) imposes liability on persons who sold securities "by means of a

prospectus" that contained material misrepresentations or omissions.  15 U.S.C. § 77l(a)(2).  No

one sold Celera stock to Vuong or Berlin "by means of a prospectus." As Vuong admitted at his

deposition, he never received a copy of the Prospectus when he purchased his Celera securities

through an unsolicited transaction on the Dreyfus website. *See* Vuong Tr. at 43:12-19.[9]

Importantly, because Vuong's purchases of Celera stock were unsolicited trades in the secondary

market, Dreyfus was under no obligation to deliver a prospectus. Section 4(4) of the Securities

Act, 15 U.S.C. § 77d(4), provides an exemption from Section 5's requirement that a prospectus

be delivered in connection with a sale of securities for "brokers' transactions executed upon

customers' orders on any exchange or in the over-the-counter market but not the solicitation of

such orders." Because the Supreme Court has held that "liability under Section 12(2) cannot

attach unless there is an obligation to distribute the prospectus in the first place, *Gustafson v.*

*Alloyd Co*., 513 U.S. 561, 571 (1995), Vuong's Section 12(a)(2) claim must fail.

Similarly, David Berlin did not receive a copy of the prospectus until after his

purchase and has never seen the registration statement. *See* Berlin Tr. at 57:8-14. Thus,

according to the plain language of Section 12, no sale "by means of a prospectus" ever took

place and his Section 12 claim must fail.

## B.    The Proposed Representatives Cannot Show that Damaged Shares Were Purchased in the Secondary Offering

Section 11 provides causes of action for misstatements and omissions in a

registration statement. *See* 15 U.S.C. § 77k(a). For their Section 11 claim to be typical of the

class, Vuong and Berlin must demonstrate that they purchased Celera stock issued pursuant to

the registration statement filed in connection with Celera's February 29, 2000 Secondary

Offering. *See In re MobileMedia Sec. Litig*., 28 F. Supp. 2d 901, 923 (D.N.J. 1998). Neither can

do so. Vuong purchased the majority of his shares of Celera stock prior to the Secondary

Offering and cannot show that his remaining purchase was of stock issued in the Secondary

---

9    Vuong never even saw the Prospectus until after the commencement of this litigation.
     *See id.* at 44:12-15

Offering. Berlin purchased stock in an account held in his own name on February 29, 2000. However, he also made multiple purchases and sales of Celera stock in other accounts he controls – including transactions before and after the Secondary Offering. But Berlin has refused to produce documentation of these transactions. Based on his failure to provide elemental discovery, Defendants will seek an adverse inference that Berlin's purchases were not part of the Secondary Offering.

1.    **Plaintiffs Cannot Show That They Purchased Celera Stock Issued in the Secondary Offering**

In *Gustafson v. Alloyd Company, Inc.*, 513 U.S. 561 (1995), the United States Supreme Court held that Section 12(a)(2) did not afford a remedy to a buyer challenging misrepresentations allegedly made in a private sale transaction. *Id.* at 578.[10] *Gustafson*'s holding applies with equal force to Section 11. *Id. at* 571-572 (noting that Section 12(a)(2)'s "statutory neighbo[r]," Section 11, applies only to new public offerings). Even the dissenters in *Gustafson* conceded that Section 11 was limited to public offerings. *See id.* at 600 n.4 ("There is no dispute that [Sections 11 and 12(1)] apply only to public offerings — or, to be precise, to transactions subject to registration.") (Ginsburg, J., dissenting).

---

[10]    In support of its holding, the Supreme Court noted that: (i) Section 12(a)(2) provides an express cause of action against sellers who make material misstatements "by means of a prospectus" *id.* at 564 (quoting Section 12(a)(2)), defined as a document prepared by an issuer in conjunction with a public offering. *Id.* at 569; (ii) the "primary innovation" of the 1933 Act was the creation of registration and disclosure obligations in connection with public offerings, not the creation of "vast additional liabilities" — i.e., regulation of the secondary market. *Id.* at 561-62; (iii) it was highly unlikely that Congress intended to grant the extraordinary remedy of rescission under Section 12 with no requirement of proof of fraud, to buyers in the secondary market, which would have the "practical effect" of giving buyers an "option to rescind," thereby "impairing the stability" of the securities market. *Id.* at 578

Following *Gustafson*, courts within this Circuit properly limited Section 11 to initial purchasers. *See In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 1997 WL 576023, at *6 (S.D.N.Y. Sept. 15, 1997) (holding that "the standing principles the Supreme Court announced in *Gustafson* apply equally to Section 11 claims" where aftermarket purchasers acquired their shares just four days after the initial public offering); *Saslaw v. Askari*, No. 95 Civ. 7641, Fed. Sec. L. Rep. ¶ 99,461, 1997 WL 221208, at *7 (S.D.N.Y. Apr. 25, 1997) (stating that Justice Ginsburg's rationale in *Gustafson* provides a "very persuasive" reason for extending the *Gustafson* holding to Section 11).

Despite this clear and logical ruling, courts in this Circuit have introduced confusion into this area of the law by relying on *Adair v. Bristol Technology Systems,* 179 F.R.D. 126, 131 (S.D.N.Y. 1998), which erroneously found that *Gustafson* was limited to Section 12 and that purchasers who can trace their securities back to a defective registration statement have standing under Section 11. *See DeMaria v. Andersen,* 153 F. Supp. 2d 300, 309 (2d Cir. 1998); *Feiner v. SS&C Technologies, Inc.,* 47 F. Supp. 2d 250, 251-52 (D. Conn. 1999); *In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 66-67 (D. Conn. 1998). Those cases hold that an aftermarket purchaser has standing under Section 11 if they can "trace their securities to a registered offering." *In re Fine Host*, 25 F. Supp. 2d at 66. This majority position should not be followed because in addition to the reasons cited in support of *Gustafson*, *see supra*, n.10, the language of the statute, the legislative history of the 1933 Act and policy considerations confirm that Section 11 is limited to purchasers in a public offering.

First, damages under Section 11 shall not "exceed the price at which the security was offered to the public." 15 U.S.C. § 77k(g). This limitation on damages makes sense only if standing under Section 11 is restricted to initial purchasers -- an aftermarket purchaser who

acquired shares at a price inflated significantly above the offering price would not be made whole under Section 11.[11]  Second, the 1933 Act was created in response to the catastrophic economic events in this country after 1929.  As noted in *Gustafson*, the relevant Report of the House Committee on Interstate and Foreign Commerce explicitly states:  "[t]he bill affects only new offerings of securities . . . ."  *Gustafson*, 513 U.S. at 580 (citing H.R. Rep. No.  73-85, at 5).  The House Committee also noted "the restriction of the bill's application to new offerings."  *Id* at 7.[12]

      Third, as detailed in *Gustafson,* expanding the scope of Section 11 would vitiate Section 10(b) of the 1934 Act and Rule 10b-5.  Those provisions govern secondary market trading and require proof of scienter and reliance.  *See Ernst & Ernst v. Hochfelder*, 425 U.S.

---

[11]    The *Adair* Court noted in support of its holding that the language of Section 11(a) grants standing to purchasers who purchase securities twelve months after the effective date of the registration statement in certain circumstances.  *Adair*, 179 F.R.D. at 132-33.  However, it is simply untrue that one who purchases a security twelve months after the effective date *must be* an aftermarket purchaser.  The drafters of the statute explicitly recognized that some offerings last more than *one year*.  *See* H.R. Rep. No.  73-85, at 16 ("[g]enerally speaking, the *average* public offering has been distributed *within a year* . . ." (emphasis added)).

[12]    The *Adair* Court points to a comment by the Committee that the civil remedies afforded by Section 11 were available "regardless of whether buyers bought their securities at the time of the original offer or at some later date . . . ." in support of its contention that Congress intended to grant standing to investors who purchased after the opening day of an offering.  *See, e.g.*, *Adair*, 179 F.R.D at 132 (quoting H.R. Rep. No.  73-85, at 5).  However, purchasing after the opening day of an IPO is *not* the equivalent of purchasing in the secondary market.  Rather, Congress intended that purchasers who bought after the opening day would have standing, *but only if they bought in the offering.*  James Landis, one of the principal drafters of the 1933 Act, explained that the concern was the dissemination of securities from the issuer through underwriters to the public, and not subsequent aftermarket trading.  James M. Landis, *The Legislative History of the Securities Act of 1933*, 28 Geo. Wash. L. Rev. 29, 36 (1959).  Thus, the drafters of the 1933 Act were not focusing on when a purchaser purchased securities but rather *from whom* the investor purchased and a lone provision that may be construed otherwise cannot support a broad extension of Section 11.

185 (1976). Affording standing to aftermarket purchasers under Section 11 of the 1933 Act would impose strict liability on issuers with respect to transactions in the secondary market – a draconian result unwarranted by the language of the statute or judicial precedent. Finally, there is no justification rooted in necessity, fairness or common sense to extend the protections of Section 11, which regulate disclosure in a registration statement, to purchasers in the secondary market who have a remedy under Section 10(b). If aftermarket purchasers believe themselves to be aggrieved, Congress has provided a remedy under Section 10(b) and Rule 10b-5. *See* Paul C. Curnin and Christine M. Ford, *The Critical Issue of Standing Under Section 11 of the Securities Act of 1933*, FORDHAM JOURNAL OF CORPORATE AND FINANCIAL LAW, 6 Fordham J. Corp. & Fin. L. 155 (2001).

Even if the Court disagrees with Defendants' contention that aftermarket purchasers do not have standing under Section 11, Plaintiffs still do not have standing under that section because they cannot prove they purchased shares in or even traceable to the Secondary Offering. *See DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (Section 11 claim is available to those "who purchased under the allegedly defective registration statement – so long as the security was indeed issued under that registration statement and not another").

Accordingly, Plaintiffs must "trace" their Celera shares to the allegedly defective registration statement issued in connection with the Secondary Offering. *Id*. at 176. Courts have cautioned in far simpler cases that tracing is "difficult as a practical matter." *In re College Bound Consol. Litig.*, No. 93 Civ. 2348, 1994 WL 172408, at *2 (S.D.N.Y. May 4, 1999). Although courts have provided little guidance on acceptable methods of tracing, courts generally follow the "direct trace" method whereby standing is conferred only when the stock at issue "is directly purchased in the underwritten public offering." *Kirkwood v. Taylor*, 590 F. Supp. 1375

(D. Minn. 1984), *aff'd*, 760 F.2d 272 (8th Cir. 1985).[13]  In essence, the Plaintiffs must prove

such facts as "who purchased what, when the purchase occurred, and from whom."  *Rice v.*

*Windsor Indus.*, No. 85 C 4196, 1986 WL 2728 (N.D. Ill. Feb. 27, 1986).  *See also* Curnin and

Ford, *The Critical Issue of Standing Under Section 11 of the Securities Act of 1933*, 6 Fordham J.

Corp. & Fin. L. 155 (2001) (outlining four methods of "tracing" including: (1) direct trace, (2)

fungible mass, (3) contrabroker, and (4) heritage, and discussing difficulties inherent in each).

        Plaintiffs' burden to prove they purchased their Celera shares in the Secondary

Offering is compounded here where shares were already in the open market prior to the

Secondary Offering.  Under these circumstances, courts have found it is nearly impossible to

verify that shares are traceable to any particular offering and have denied class certification on

those grounds.  *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tx. 2002) (denying class

certification where statistical probability greater than 90% that stock which investors had

purchased was issued pursuant to initial or secondary offering registration statements); *In re*

*Quarterdeck Office System, Inc. Sec. Litig*, No CV 92-3970-DWW (GHK), 1993 WL 623310

(C.D. Cal. Sept. 30, 1993) (court could not assume all shares trading in the market were issued in

the IPO where shares issued in an IPO supplemented a market of unregistered shares trading

pursuant to Rule 144).

### a.     Vinh Vuong

        Vuong purchased a total of 8,000 shares of Celera stock, none of which Plaintiffs

can show were purchased in or traceable to the Secondary Offering.  Vuong's first two purchases

---

[13]     Indicia documenting trace would include "an indication of interest by the broker on
        behalf of the customer, the customer's receipt of a preliminary prospectus with a legend
        in red ink (called a 'red herring'), a notation on the purchase order ticket showing
        purchase in the offering, purchase at the offering price, lack of commission, language

of Celera stock were 5000 shares on February 25, 2000 (on margin) at prices ranging from $230 to $268 per share and 1000 shares on February 28, 2000 (on margin at a $237.75 per share). Vuong Tr. at 32:14-25, 40:5-21; Ex. 1 to Vuong Deposition.[14] These transactions were made *prior* to the Secondary Offering and therefore cannot possibly form the basis of a Securities Act claim. In fact, Celera's final Form S-3 Registration Statement and Prospectus were not even filed with the SEC and did not become effective until February 29, 2000.

Vuong's March 1, 2000 purchase of 2,000 shares of Celera stock was clearly an aftermarket purchase. As such, he has no standing under Section 11. Even if this Court finds that aftermarket purchasers have standing under that section, Vuong cannot trace this purchase to the Secondary Offering. Specifically, Vuong purchased all 2,000 shares at $236 per share; the share price pursuant to the Secondary Offering was $225. *See* Vuong Tr. at 42:3-19; Ex. 1 to Vuong Deposition. All of Vuong's shares were purchased through unsolicited sales on Dreyfus' online brokerage website (s*ee* Vuong Tr. at 33:20-34:4) — not even one share was purchased from Celera, the individual defendants or the Underwriters. Vuong also testified that, prior to commencement of the litigation, he never saw the prospectus or the registration statement, but rather relied solely on Investor's Business Daily, America Online and CompuServe's websites for investment information. *See* Vuong Tr. at 44:12-21; 14:3-14; 14:25-15:10. Vuong's tracing problems subject him to a unique defense that threatens to become a focus of the litigation. That

---

regarding the prospectus on the confirmation slip, and special coding of the transaction by the brokerage firm." *Id* at 1378.

[14] Vuong's purchases were made in unsolicited transactions though online broker Dreyfus and not through any of the Underwriters of the Secondary Offering. *See* Vuong Tr. at 33:20-34:4.

Vuong's claims and defenses are atypical of those of the class renders him unqualified to act as class representative under Fed. R. Civ. P. 23(a)(3).

> **b.     David Berlin**

David Berlin may also be an aftermarket purchaser lacking standing under Section 11. His trading history is unclear however, and he has refused to produce in discovery trade confirmations for several purchases of Celera stock. Berlin testified that he controls two accounts held in his children's names pursuant to the UGTMA accounts and that he purchased Celera stock in these UGTMA accounts *prior* to the Secondary Offering. *See* Berlin Tr. at 38:17-22; 63:23-64:16.[15] At the deposition, Defendants requested that Berlin produce the trade confirmations for these purchases, but counsel for Plaintiffs refused. *See* Berlin Tr. at 73:4-7; Ramirez Letter (Gallagher Aff., Ex. V).[16] Accordingly, Berlin cannot meet his burden of demonstrating to this Court that his Section 11 claim is typical of the class.

Berlin apparently did purchase 100 shares of Celera stock on February 29, 2000 at a price of $225 per share in a transaction arranged by his broker. *See* Berlin Tr. at 50:20-51:3; Ex. 1 to Berlin Deposition. The confirmation for that trade produced by Mr. Berlin indicates, however, that there is a reverse side to the document which Mr. Berlin has been unable to produce this as of the date of this motion. *See* Berlin Tr. at 51:4-52:11; Ramirez Letter. The

---

[15]     He also testified that he believes he sold the Celera stock held in the UGTMA accounts at some point, but that he could not be certain of the date on which this occurred and could not confirm that these accounts no longer hold Celera stock. Berlin Tr. at 72:19-73:3; 133:25-134:9.

[16]     This was not the first time Defendants requested such information. Defendants' requests for the production of documents relating to class certification asked for "[a]ll documents concerning each purchase, or other acquisition, of any security of PE Corp. . . by Plaintiffs," yet Plaintiffs failed to produce any information on Berlin's pre-offering purchases. The first time Defendants learned of these purchases was at Berlin's deposition.

document purportedly contains the terms and conditions of Berlin's February 29, 2000 sale, which would indicate whether Berlin purchased in or <u>after</u> the Secondary Offering. His refusal or inability to produce the trade confirmation means that Plaintiffs cannot satisfy their burden under Rule 23(a).

## III.     THE PROPOSED CLASS REPRESENTATIVES DO NOT SATISFY THE ADEQUACY REQUIREMENT OF RULE 23(a)

The adequacy inquiry rests on "basic due process," which "requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard v. Meineke Discount Muffler Shops, Inc.* 155 F.3d 331, 338 (4th Cir. 1998). There is a "danger that absent class members will suffer" where their interests diverge from those of the class representatives. Thus, plaintiffs with "interests that are antagonistic to the proposed class members" are inadequate class representatives. *Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125, 138 (S.D.N.Y. 2003); accord *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990; *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983).

A class representative is a fiduciary to the class and bears a responsibility to comply with discovery requests, *see Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) to possess a basic knowledge of the facts, *see Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987), and to participate to some minimal degree in the lawsuit "to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney." 7A Wright, Miller & Kane, Federal Practice and Procedure, § 1766, at 310-11. When addressing issues of atypicality and inadequacy of proposed class representatives, the court must feel certain that the class representatives will discharge their fiduciary obligations by fairly and adequately protecting the interests of the class. *See Koenig*, 117 F.R.D. at 333-4. Both proposed representatives

Vuong and Berlin, whose failings are symptomatic of the underlying failings of the Complaint, are inadequate class representatives under these standards.

A.    **Vinh Vuong**

Courts have specifically denied certification where the proposed class representative is unfamiliar with the suit or the facts in the complaint or when serious questions about his lack of credibility arise. *See Koenig*, 117 F.R.D. at 338. In *Koenig*, plaintiffs sued defendant Mission Insurance Group alleging securities violations based on omissions and misrepresentations in defendant's annual report. In considering defendant's challenge to the adequacy of proposed class representative Koenig, the Court found Koenig inadequate because "his understanding of the basic cause of action is weak and [ ] Koenig admits confusion or lack of knowledge frequently in his deposition." *Id*. at 337. For example, the Court noted that Koenig was "not sure exactly what insurance Mission actually sells." *Id*. Such factors suggested his inability to exercise independent control over his attorney rendering him an inadequate representative under Rule 23(a)(3). *Id. See also Darvin v. Int'l Harvester Co.,* 610 F. Supp. 255, 256 (S.D.N.Y. 1985) (finding proposed class representative unsuitable because he demonstrated a serious lack of familiarity with the suit); *Sicinski v. Reliance Funding Corp*., 82 F.R.D. 730, 734 (S.D.N.Y. 1979) (plaintiff lacked personal knowledge about facts in complaint).

Vinh Vuong's deposition testimony shows his complete and utter unfamiliarity with the case. Throughout his deposition, Vuong was unable to describe basic factual details critical to the litigation, including Celera's business, the Government's involvement in the HGP, and the role of each in mapping the human genome:

> Q: What is the Human Genome Project?
> A. What is the Human Genome Project. It is a project to map the genetic code - the human genetic code.
> (objection omitted)
> Q: Who engaged in the project?

A:  I thought it was just Celera.

Vuong Tr. at 119:14-19.

Nor is Vuong aware of the basic procedural issues and progress of the case, admitting that: (i) he did not know what the proposed class period was (Vuong Tr. at 69:20-21); (ii) he had never seen the Complaint prior to its being filed (Vuong Tr. at 85:6-9); (iii) he did not authorize the filing of the Complaint or provide any factual information for the purpose of putting it together (Vuong Tr. at 85:12-19); (iv) he had not read the prospectus until a "few days" prior to his deposition (Vuong Tr. at 87:18-22); (v) he does not review drafts of documents prior to their being filed on behalf of all plaintiffs (Vuong Tr. at 97:6-13); and (vii) he was completely unaware of the ongoing discovery dispute between the parties, including Defendant's Motion for Protective Order, Plaintiff's Response and Magistrate Smith's Order on those issues (Vuong Tr. at 98:19-99:21; 100:16-20).

Finally and significantly, in connection with his motion to be appointed lead plaintiff, Vuong submitted a sworn certification as required by the Private Securities Litigation Reform Act. *See id.* at 63:12-19, Ex. 8 to Vuong Deposition.  That certification is inaccurate, as Vuong admitted in his deposition.  The effect of the inaccuracy is to overestimate potential damages in this case.  Specifically, in his certification, Vuong stated under oath that Schedule A to the certification listed all purchases and sales during the proposed class period.  However, Schedule A only states that Vuong sold 4,000 shares of Celera stock at $125 per share.  Nowhere are the remaining 4,000 shares sold at $137 per share disclosed.  At his deposition Vuong testified that the certification was inaccurate.

Q:  Mr. Vuong, you sold 8,000 shares on March 16, correct?
A:  Yes.
Q:  The certification that we've marked as Vuong Exhibit 8 says that you sold 4,000 shares on March 16?

> A.  Yes.
> Q:  That is not accurate?
> A:  Correct.

Vuong Tr. at 71:14-22.

Under Section 11, damages are "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and ... the value thereof as of the time ... suit was brought."  15 U.S.C. § 77k(e).  Disclosing only those shares sold at the lower price inflates the damages that would be owed Vuong if Plaintiffs prevailed in this lawsuit, as damages would be measured by the difference between $225 and $125, rather than the difference between $225 and $137.  In reality, there is no way Vuong can verify that whether the shares he purchased subsequent to the Secondary Offering were in fact sold for $125 per share.  When asked to explain the discrepancy, Plaintiffs' counsel instructed Mr. Vuong not to answer the question on the ground of attorney work product.  *See id.* at 71:17-72:7.

This inaccurate certification and Vuong's complete and utter lack of understanding of the case, both substantively and procedurally, demonstrate his lack of credibility, his inability to exercise independent control over his attorney and his overall inadequacy to serve as a class representative in this case.

**B.    David Berlin**

Berlin has also proven his unsuitability as class representative because of his failure to cooperate fully in discovery and produce all information relating to his trading activities in Celera stock, including his failure to provide documentation of trades of Celera stock in accounts that he controls and in which he directs trading activities.  Berlin also provided incomplete documentation of the one trade he did identify.  *See supra*, Section II.B.1.b.  Berlin's failure to provide basic discovery creates unique defenses which Defendants can raise against him and renders him inadequate.  *See Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257

(S.D.N.Y. 1985) (plaintiff who failed to comply with reasonable discovery requests was not a suitable to fulfill the fiduciary obligations of a class representative); *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) ("failure to comply with proper discovery inquiry may be considered on the issue as to whether a class representative lives up to his fiduciary obligation."); *Norman, D.D.S., P.C. v. ARCS Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) ("One who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted.").

Like Vuong, Berlin also demonstrates a lack of knowledge of this lawsuit. For example, Berlin testified that: (i) he does not know what the proposed class period is (Berlin Tr. at 92:24-25); (ii) he is unaware of whether a trial date has been set (Berlin Tr. 103:19-21); (iii) he does not know whether a motion to dismiss has been filed in this matter (Berlin Tr. at 104:25-104:3); and (iv) he does not know if any motions relating to discovery have been filed (Berlin Tr. 104:4-7). All of these factors render Berlin an inadequate and unsuitable class representative.

## CONCLUSION

For the foregoing reasons, Defendants PE Corporation (n/k/a as Applera Corporation). Tony White, Dennis Winger, and Vikram Jog respectfully request that this Court deny Plaintiffs' motion for class certification.

Respectfully submitted,

OF COUNSEL:

Michael J. Chepiga (CT 01173)
Robert A. Bourque (CT 05269)
William M. Regan (CT 25100)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017
(212) 455-2000
(212) 455 2502 (fax)
mchepiga@stblaw.com

DEFENDANTS PE CORPORATION,
TONY L. WHITE, DENNIS L. WINGER
and VIKRAM JOG

By: _____
Stanley A. Twardy, Jr. (CT 05096)
Thomas D. Goldberg (CT 04836)
Terence J. Gallagher (CT 22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
(203) 977-7300
(203) 977-7301 (fax)
tdgoldberg@dbh.com(e-mail)

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was sent via overnight courier, postage prepaid, this 29th day of December, 2003, to:

| | |
|---|---|
| Margaret E. Haering, Esq. | Sanford P. Dumain, Esq. |
| J. Daniel Sagarin, Esq. | Carlos F. Ramirez, Esq. |
| Hurwitz & Sagarin, LLC | Milberg Weiss Bershad Hynes & Lerach LLP |
| 147 N. Broad Street | One Penn Plaza – 49th Floor |
| P.O. Box 112 | New York, NY 10119 |
| Milford, CT 06460 | |
| | |
| Liaison Counsel | Lead Counsel for Plaintiffs |

_____
Terence J. Gallagher