## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | **:** | |
| | **:** | |
| **IN RE: PE CORPORATION SECURITIES** | **:** | Master File No. 3:00CV705(CFD) |
| **LITIGATION** | **:** | |
| | **:** | FEBRUARY 17, 2004 |
| | **:** | |

## PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
One Pennsylvania Plaza - 49th Floor
New York, New York 10119
(212) 594-5300

HURWITZ & SAGARIN, LLC
147 N. Broad Street, P.O. Box 112
Milford, Connecticut  06460
(203) 877 - 8000

## I.    PRELIMINARY STATEMENT

As set forth in Lead Plaintiffs David Berlin's ("Berlin") and Vinh Vuong's ("Vuong")(collectively "Plaintiffs") opening memorandum, all of the prerequisites of Fed. R. Civ. P. 23 (a) and (b)(3) have been met and this case should be certified as a class action.  In their opposition, Defendants[1] do not suggest that this action does not meet most of Rule 23(a)'s requirements.  Defendants do not challenge that the proposed Class is so numerous that joinder is impracticable, that there are questions of law and fact that are common to the Class, and that a class action is superior to any other available method for resolving this controversy.  Therefore, with respect to almost all of the requirements of Rule 23, there is no dispute whatsoever that Plaintiffs have met their burden of demonstrating that certification of this case as a class action is appropriate.

Defendants, however, argue that the action should not be certified because common questions of law and fact do not predominate and because Plaintiffs are not adequate representatives and their claims are not typical of the other members of the Class.  Remarkably, Defendants' arguments totally ignore controlling Second Circuit authority regarding whether "tracing" is allowed in the claims under Section 11 of the Securities Act of 1933[2] ("Section 11"), 15 U.S.C. 77k(a), and regarding the level of sophistication needed to be a class representative.[3]

Defendants' predominance argument, which alleges that certain class members had knowledge of the very information Plaintiffs alleged was omitted from the February 29, 2000 Secondary Offering's ("Secondary Offering") Registration Statement and Prospectus

---

[1] PE Corporation (n/k/a Applera Corporation), Tony L. White, Dennis L. Winger and Vikrom Jog will be referred to collectively as "Defendants."

[2] *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003).

[3] *Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. 2000).

(collectively the "Offering Materials"), raises a "truth on the market" defense that cannot properly be considered prior to the completion of fact and expert discovery and certainly not at the class certification stage.  Even if it were proper to consider such a defense at this stage, Defendants' predominance argument is based on their subjective interpretation of the facts and on assumptions concerning the dissemination of information that are unsupported by the factual record.  Therefore, at best, Defendants' argument that investors knew the facts that Plaintiffs allege were not disclosed depends entirely on the resolution of issues of fact that can only be accomplished at trial.

Defendants' typicality arguments are predicated on Defendants' erroneous positions that (i) Plaintiffs do not have standing to bring a Section 12(a)(2) of the Securities Act of 1933 ("Section 12(a)(2)"), 15 U.S.C. § 77l, claim against Defendants and (i) Plaintiffs did not purchase shares in, nor traceable to, the Secondary Offering.  Defendants' first typicality argument entirely ignores this Court's ruling on Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint ("Amended Complaint").  In that motion, Defendants argued that Plaintiffs did not have standing to sue Defendants under Section 12(a)(2) because Celera stock was sold pursuant to a firm commitment underwriting.  Defendants' Motion to Dismiss was fully briefed by the parties and oral argument was had before the Court on this very issue.  Subsequently, Defendants' Motion to Dismiss was denied in its entirety. Accordingly, as there has been no intervening change in the controlling law nor new evidence adduced concerning this issue, the law of the case doctrine prevents Defendants from re-litigating this question.

Similarly, Defendants' second typicality argument completely ignores ***controlling*** Second Circuit case law rejecting Defendants' claim that only those who purchased stock in the public offering, and not aftermarket purchasers, are entitled to sue under Section 11.  Indeed, the

Second Circuit in *DeMaria*, rejected the very argument Defendants make here based on the plain language of Section 11.  Nonetheless, Berlin purchased his stock ***in*** the Secondary Offering and has submitted a certification pursuant to the Private Securities Litigation Reform Act of 1995, Pub L. No. 104-67, 109 Stat. 737 ("PSLRA") that confirms that purchase.  Nothing more is required for class certification to be granted.

Finally, Defendants argue that Plaintiffs are not adequate representatives because they are not familiar with the facts, or the procedural posture, of the case.  However, attacks on the adequacy of a class representative based on Plaintiffs' purported ignorance are particularly inappropriate in complex securities litigations such as this one.  Indeed, in determining adequacy of representation, courts generally focus on the adequacy of the counsel that the representative has retained, rather than the qualifications of the individual representative.  *See Baffa*, 222 F.3d at 60-61.

As demonstrated below, the Court should certify this case as a class action under Rule 23 and appoint Berlin and Vuong as class representatives.

## II.     COMMON QUESTIONS OF LAW OR FACT PREDOMINATE OVER INDIVIDUAL ISSUES

### A.     Defendants' Predominance Challenge Goes Only to the Merits of Plaintiffs' Claims, Which is Improper on a Motion for Class Certification

"[C]lass treatment is generally well-suited to securities-fraud cases."  *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB), 2003 WL 21672085, at *1 (S.D.N.Y. July 16, 2003).  Indeed, courts have repeatedly held that securities cases that allege Section 11 claims:

> are particularly well-suited to class treatment and satisfy the commonality requirement of Rule 23(a)(2).  This is so because Section 11 claims require only a material misstatement or omission in a Registration Statement to prove liability.  In Section 11 cases, typically the only individual issue is a calculation of the damages which each individual class member suffered.

*Levitan v. McCoy*, No. 0065096, 2003 WL 1720047, at *4 (N.D. Ill. Mar. 31, 2003) (citations omitted).

Nevertheless, Defendants argue that Rule 23(b)(3)'s predominance requirement is not satisfied because some of the class members purportedly learned from news articles that: (1) Celera and the HGP had discussed collaborating to sequence the human genome map; and (2) the two entities did not ultimately join forces because of HGP's data release policy.  Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, dated December 29, 2003 ("Def. Mem.") at 4, 8-10, 19-21.  There are at least three reasons why this argument does not demonstrate a lack of predominance.

First, the predominance inquiry does not test the truth of fact-based allegations.  *See, e.g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  Indeed, in determining whether common issues predominate, this Court is required to examine the allegations of Plaintiffs' Complaint, but ***not*** inquire into the merits of Plaintiffs' case.  *See Martin v. Shell Oil Co.*, 198 F.R.D. 580, 590 (D. Conn. 2000); *Kallus v. Gen. Host Corp.*, CIV. No. B-87-160, 1988 WL 124074, at *3 (D. Conn. June 30, 1988); *Seidman v. Stauffer Chem. Corp.*, Civ. No. B-84-543 (TFGD), 1986 WL 9803, at *3 (D. Conn. Jan. 17, 1986).  Because Defendants' predominance challenge does no more than raise a fact question about what unidentified absent class members knew at a certain time, it is ***per se*** insufficient to establish lack of predominance.

Second, since Plaintiffs' claims are based on uniform misrepresentations and omissions in Celera's Offering Materials, the predominance requirement is plainly satisfied.  *See, e.g., Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 54 (D. Conn. 2000) (predominance requirement easily met where all class members' claims arise from a common document); *Freedman v. Value Health, Inc.*, 190 F.R.D. 33, 34, 36-37 (D. Conn. 1999) (predominance requirement met where

defendants failed to disclose material information in registration statement filed in connection with a merger).

Third, in a fraud on the market case like this one, Defendants' predominance argument raises a "truth on the market" defense on the claim that absent class members purportedly knew that: (1) Celera and the HGP had discussed a collaboration; and (2) the two entities did not ultimately join forces because of HGP's data release policy. Def. Mem. at 4, 8-10, 19-21. However, because consideration of Defendants' "truth on the market" defense is not proper at the class certification stage, Defendants' argument should be rejected. *Schaffer v. Timberland Co.*, Civ. No. 94-634-JD, 1996 U.S. Dist. LEXIS 5372, at *29-30 (D.N.H. Mar. 19, 1996)(rejecting truth on the market defense at class certification stage); *Weinberger v. Thornton*, 114 F.R.D. 599, 606 (S.D. Cal. 1986)(deferring, at the class certification stage, truth on the market defense determination to trier of fact). *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)(finding that class certification was proper even though "there was a substantial question of fact for the jury whether the December 1970 press release had cured the market").

Indeed, faced with the "truth on the market" defense issue at the class certification stage, the court in *Schaffer* stated:

> To truncate the class period . . . the court would need to conclude, at a minimum, that the September 13, 1994, announcement effectively ***cured any prior fraud on the market*** . . . . Thus, the court is at present in "a situation where a serious question remains as to the weight to be accorded the information said to be available [on or about September 13, 1994], and . . . this is an issue that can only be properly resolved at trial[,]" or, at least, at a later stage in the case.

*Schaffer,* at *30, *citing In re W. Union Sec. Litig.*, 120 F.R.D. 629, 641 (D.N.J. 1988) (emphasis added) (alteration in original). Moreover, as noted by the Second Circuit, "[t]he truth-on-the-market defense is intensely fact-specific," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d

Cir. 2000), and may not be properly decided during the early stages of litigation.  *See id.* (may be

properly "decided at later stages of litigation after the parties ha[ve] presented substantial

evidence").  "The question of whether, and when, the market had received enough information to

counteract the allegedly misleading statements is best resolved on a summary judgment motion

or at trial . . . ."  *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 WL 22953163, at *9

(S.D.N.Y. Dec. 15, 2003).  *See In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y.

1994)(concluding that "fact-intensive inquiry" concerning truth on the market defense "is not

appropriate at the summary judgment stage," but better left for trial).

      Nevertheless, even if the Court were to delve into the merits of Defendants' "truth on the

market" defense (which it should not), Defendants' argument fails because the news articles

Defendants rely upon simply do not establish that these two facts were public knowledge.

Importantly, their defense does not meet this Circuit's requirement that "the corrective

information must be conveyed to the public '***with a degree of intensity and credibility sufficient***

***to counter-balance effectively any misleading information created by***' the alleged

misstatements."  *Ganino*, 228 F.3d at, 167, *quoting In re Apple Computer Sec. Litig.*, 886 F.2d

1109, 1116 (9th Cir. 1989) (emphasis added).

      Specifically, Defendants point to five news articles claimed to support the conclusion that

the Class Members knew Celera and the HGP were negotiating a collaboration, but that their

talks failed when Celera was denied long-term rights to the human genomic map.  Def. Mem. at

9-10.  However, a close review of these articles reveals that Defendants are relying heavily on

poetic license.

      At the outset, Defendants' claim that these articles resulted in the nationwide

dissemination and understanding of any facts, much less those at issues here, is far from

convincing given that two of these five articles concern an earlier experiment to map fruit fly

genes and are *not* primarily addressed to the human genome project. *Id.*[4]  In addition, where two

of these articles ran only in *local* newspapers, and two more appeared *only* on an Internet news

forum, it is unlikely that a substantial number of class members had access to the information,

much less read it or based their investment decisions on it.

Further, taken separately or as a whole, these five articles say no more than that a

collaboration between Celera and the HGP ***might be possible***,[5] and that questions about who has

rights to the genomic data (and/or when that date might be publicly released) ***might become an***

***issue*** in these negotiations. *Id.*[6]  Perhaps most importantly, ***none of these articles says that***

***discussions between Celera and the HGP had actually failed because the two entities were***

***unable to agree on how to share rights to the human genome map***. *Id.*[7]

---

[4]     *See* Leslie Roberts, *The Lords of the Flies*, U.S. NEWS & WORLD REPORT, Sept. 20, 1999, 1999 WL 8433394; Daniel Q. Haney, *Genes of Fruit Fly Unraveled*, ASSOCIATED PRESS ONLINE, Feb. 18, 2000, 2000 WL 14321780.

[5]     *See, e.g., Genome Project Will Finish a Year Early*, STAR-TRIBUNE, Oct. 6, 1999, 1999 WL 7512393 ("Completing the massive mapping project next year, [Venter] said, is a 'very aggressive time scale' that will depend on collaboration between the federal government's Human Genome Project and [Celera]"). Interestingly enough, the title of one of Defendants' articles suggests that a  collaboration was unlikely.  *See No Rush to Collaborate*, ST. LOUIS POST-DISPATCH, Nov. 21, 1999, 1999 WL 3055801.

[6]     *See*, *e.g.*, *Human Genome Rivals May Unite*, ASSOCIATED PRESS ONLINE, Nov. 14, 1999, 1999 WL 28139386 ("the public consortium's policy on immediately releasing its data would be hard to change . . ."); *No Rush to Collaborate*, ST. LOUIS POST-DISPATCH, Nov. 21, 1999, 1999 WL 3055801 ("What stands in the way of collaboration is disagreement over who has rights to the genome data.").

[7]     In an attempt to remedy this obvious shortcoming, Defendant's memorandum discusses the HGP's "position" on the public release of genomic information in some detail.  *See* Def. Mem. at 5-8.  This position, as Defendants explain, is that genomic information was to be "freely available."  *Id*.  However, none of these sources addressed (or can be considered to have made public) the omission at the heart of Plaintiffs' Complaint: ***that Celera's negotiations with the HGP broke down in December 1999 because Celera insisted on having exclusive rights to the human genome map for five years while the HGP was only offering a 6-12 month period of exclusivity***.

Since the articles Defendants reference did not widely disseminate the information omitted from Defendant's Offering Materials, they do not support the existence of an affirmative defense that defeats the existence of predominance in this case.

**B.     Defendants' Predominance Challenge Completely Ignores the Majority of Material Misrepresentations and/or Omissions Pled in the Complaint**

Plaintiffs' Complaint alleges that Celera misrepresented and/or failed to disclose at least seven material facts in its Offering Materials.  These misrepresented facts are: (1) that Celera and HGP discussed combining their efforts to complete the human genome mapping project; (2) that these discussions broke off when HGP refused to grant Celera exclusive rights to the genomic map for an extended period; (3) that Celera portrayed its business plan and strategies in an unrealistically positive light; (4) that Celera was competing with the HGP and NIH; (5) that Celera was not likely to be able to obtain patents on genomic discoveries; (6) the fact that Celera was "not competing" with the HGP; and (7) the risk factors facing Celera.  *Id*. at ¶¶ 24, 36-48.[8] As set out above, while Celera attempts to address *two* of these facts, albeit incompletely, it does not even discuss – much less refute – the premise that these remaining allegations are common to the claims of all Class Members and support a finding of predominance.  Under these circumstances, particularly where the remaining five allegations all relate to uniform misrepresentations and omissions in Celera's Offering Materials, a finding of predominance would certainly be appropriate.  *See Macarz*, 193 F.R.D. at 54; *Freedman*, 190 F.R.D. at 34, 36-37.

Defendants further claim that *Klein v. A.G. Becker Paribas, Inc.*, 109 F.R.D. 646 (S.D.N.Y. 1986), stands for the proposition that "common questions will not predominate at the

---

[8] "¶ __" refer to paragraphs of the Amended Complaint.

trial of this action." *See* Def. Mem. at 20-21. There are at least three flaws in this reasoning. First, it is important to note that, on facts substantially similar to the instant case, the *Klein* court actually *granted* the Plaintiffs' class certification motion.[9] *Klein*, 109 F.R.D. at 653.

Second, *Klein* does not address or discuss the predominance requirement for class certification and, thus, cannot provide any special insight into whether this requirement is met in the instant case. *Id.* In fact, only one paragraph in the *Klein* decision addresses Rule 23(b), and that paragraph does not contain a single mention of the predominance requirement. *Id.*

Third, the reasoning that led the *Klein* court to limit the class period does not establish a lack of predominance in this case. In *Klein*, the court limited the class definition to people who purchased CDI shares between July 8, 1983 (the offering date) and July 28, 1983 (the date by which CDI's press release setting out the information omitted from its prospectus had become public knowledge). *Id.* at 652-53. The court justified its decision by explaining that "[t]hose who purchased [their shares] after July 28, 1983, certainly had access to substantial additional information." *Id.* at 652. This result – proper in *Klein* because the court could identify a specific date by which CDI, itself, made public statements providing the specific information claimed to be missing from its prospectus – has no bearing on the instant case.

---

[9]     *Klein* concerns a company called Computer Devices, Inc. ("CDI"). On July 8, 1983, CDI held a public offering for its shares. *Id.* at 648. In advance of this offering, CDI published a prospectus that revealed the general risks of CDI's business, but did not disclose that: CDI's hardware was not compatible with most software currently on the market; CDI had sustained a recent quarterly loss of $3.7 million; or that CDI was planning to reduce its manufacturing workforce by 20 percent. *Id.* Plaintiffs purchased CDI shares at the offering without the benefit of this information, which was not known to the general public at the time of the offering. *Id.* On July 25, 1983, CDI issued a press release that revealed the material information that had been omitted from its prospectus. *Id.* This information was picked up by news sources and disseminated to the public during the period from July 28, 1983 to August 15, 1983, during which time CDI's shares lost more than half their value. *Id.*

Significantly, at no time did Celera issue any contemporaneous press release or public statement correcting the misrepresentations in its Offering Materials. Of the few articles that reported on the possible collaboration between Celera and the HGP, none of them divulged that Celera was demanding exclusive use of the genomic data for an extended term, much less that the HGP had already refused Celera's demand. *Id.* Further, Defendants have not come forward with *any* proof that the numerous other facts alleged to have been omitted from the Offering Materials were made public in any manner. *Id.* Since Celera did not publicly disseminate information that corrected the omissions in its Offering Materials, there is no basis for applying this aspect of *Klein*, and no support for finding a lack of predominance with respect to Plaintiffs' claims.

### III. THE PROPOSED REPRESENTATIVES' CLAIMS ARE TYPICAL OF THE CLASS

Defendants argue that Plaintiffs' claims are not typical of the class. Defendants' arguments, however, are either unsupported by this Circuit's case law or the factual record, or both. Accordingly, they should be rejected. First, Defendants improperly argue that Plaintiffs lack standing to pursue claims against Defendants under Section 12(a)(2). As detailed below, this argument is not supported by this Circuit's case law and, importantly, was already rejected by the Court in connection with Defendants' Motion to Dismiss the Amended Complaint. The law of the case doctrine prevents Defendants from re-litigating this issue.

Second, Defendants argue that Plaintiffs' claims are not typical because they cannot establish that their shares were purchased in the Secondary Offering. In making this argument, Defendants disregard this Circuit's well-established rule that Section 11 claims may be brought by aftermarket purchasers who can trace their shares to a public offering. *DeMaria*, 318 F.3d at 178. Defendants also distort the factual record which no doubt establishes that (i) Berlin bought

100 shares in the Secondary Offering and (ii) Vuong's 2,000 shares, purchased just a day after the Offering, are certainly traceable to the Offering. Accordingly, Defendants' arguments that Plaintiffs lack typicality should be rejected.

### A.    This Court Already Held that Plaintiffs Have Standing to Bring Claims Under Section 12(a)(2)

Defendants argue that Plaintiffs do not have standing to bring Section 12(a)(2) claims against Defendants, and accordingly, they cannot meet Rule 23's typicality requirement. Defendants' argument, however, does not really address typicality, but is a veiled attempt to reargue their failed motion to dismiss Plaintiffs' Section 12(a)(2) claim. That is because if the Court accepts Defendants' argument that they cannot be held liable under Section 12(a)(2) because Celera shares were sold in a firm commitment underwriting, then *no one* would have standing to bring Section 12(a)(2) claims against Defendants. Defendants already raised this argument in their motion to dismiss Plaintiffs' amended complaint. There, Defendants' argued that only the Secondary Offering's underwriters could be sued under Section 12(a)(2). By its denial of Defendants' Motion to Dismiss on March 31, 2003, the Court rejected these arguments and held that Plaintiffs did have standing to bring Section 12(a)(2) claims against Defendants.

The law of the case doctrine, while discretionary, provides that Defendants cannot re-litigate an issue once the Court has ruled thereon. *See, e.g., United States v. Stanley*, 54 F.3d 103, 108 (2d Cir. 1995); *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). A party is only allowed to re-contest issues if there is either (i) intervening change in the controlling law; (ii) new evidence adduced; or (iii) the ruling was clear error. *Applera Corp. v. MJ Research, Inc.*, No. 3:98CV1201 (JBA), 2004 WL 97634, at *1 (D. Conn. Jan. 20, 2004). Thus, this Court should not waste judicial resources and give Defendants a second bite at the apple. Defendants have not alleged (i) that there was an intervening change in

the controlling law, (ii) nor that there has been any new evidence adduced, (iii) nor that there was clear error in the prior decision. Rather Defendants simply ignore the prior ruling of this Court and now attempt to re-litigate the Section 12(a)(2) standing question. Because the Court's prior decision that Plaintiffs have standing to bring Section 12(a)(2) is controlling, Defendants' arguments should be rejected.

Even if the Court were to reconsider its prior ruling (which it should not), the law is well-settled that liability attaches to issuers under Section 12(a)(2) even when their shares are sold through a firm commitment underwriting. Liability under Section 12(a)(2) of the Securities Act applies to "[a]ny person who . . . offers or sells a security." 15 U.S.C. § 77l. Thus, Defendants' argument that they should not be considered statutory sellers under Section 12(a)(2) because they did not pass title directly to Berlin or Vuong, (Def. Mem. at 24), should again be rejected.

Importantly, it should be noted that the case law upon which Defendants rely has been directly rejected in later decisions within this Circuit for conflicting with the Supreme Court's holding in *Pinter v. Dahl*, 486 U.S. 622, 654-55 (1988).[10]  Indeed, following *Pinter*, statutory seller cases in this Circuit have imposed liability without any regard for whether the shares at issue were conveyed pursuant to a firm commitment underwriting. *In re Twinlab Corp. Sec.*

---

[10] In *Pinter*, the Plaintiff, an oil and gas producer, sold unregistered securities to Dahl and other purchasers Dahl had recruited. *Pinter*, 486 U.S. at 622. Dahl was thought not to have received any financial benefit for his role in the sales. *Id*. When the venture failed, Dahl and other buyers sued for rescission. *Id*. Pinter counter-claimed, asserting statutory seller liability against Dahl for his role in the sales. *Id*. at 628. In determining whether Dahl was subject to Section 12 liability, the Supreme Court held that, "[t]he language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id*. at 647. Because the Court could not identify sufficient information in the record to determine whether Dahl had indeed acted without any financial interest, it remanded the case for further proceedings. *Id*. at 654. However, the Supreme Court's statutory seller definition has been adopted in many subsequent decisions.

*Litig.*, 103 F. Supp. 2d 193, 204 (E.D.N.Y. 2000), involved a securities fraud claim brought by investors against officers and directors of a company engaged in the business of providing health foods and vitamins. *Id*. at 196. The defendants moved to dismiss, in part, because they had sold the stock at issue by a firm commitment underwriting. *Id*. at 204. There, as here, the defendants argued that a lack of privity insulated them from Section 12 liability. *Id*. This argument was soundly rejected on the basis that "Twinlab's privity argument is substantially undercut by development of the law in this circuit following the Supreme Court's decision in Pinter." Id.

Thus, in this Circuit, statutory seller liability is imposed (regardless of whether shares have passed by a firm commitment underwriting) on one who: (1) solicits a purchase of securities; and (2) is motivated by a desire to serve his own financial interests or those of the securities owner. *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *In re Twinlab*, 103 F. Supp. 2d at 204; *Milman v. Boxhill Sys. Corp.*, 72 F. Supp. 2d 220, 229-30 (S.D.N.Y. 1999); *Feiner v. SS&C Tech. Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999). Both of these criteria are met here.

First, Defendants solicited the sale of Celera stock by "participating in the preparation of the false and misleading prospectus." This is sufficient for liability under Section 12 because a prospectus is, itself, a solicitation for the offering. *In re Twinlab*, 103 F. Supp. 2d at 205 (party's mere participation in preparation of a misleading prospectus is sufficient solicitation under Section 12(a)(2)); *Capri*, 856 F.2d at 478 (allegations that "Murphy and GCC prepared and circulated the prospectus to plaintiffs, . . . and that the prospectus omitted material facts which significantly affected the risk undertaken by the investors" sufficient to allege solicitation); *In re Am. Bank Note Holographics*, 93 F. Supp. 2d 424, 439-40 (S.D.N.Y. 2000) (complaint alleging that defendant participated in "preparation of the false and misleading Registration Statement

and Prospectus and participating in 'road shows' to promote" the stock was sufficient to allege solicitation).

Second, Defendants had a financial motivation for soliciting the sale of Celera shares: Defendants were to receive $820.3 million in net proceeds from the offering, and had an underwriters "over-allotment option" for another $123.2 million. ¶¶ 23, 34; Prospectus at p. 5. Thus, Defendants not only received a huge financial benefit from the sale of their shares, but they had an additional financial incentive to insure that all of the shares in the initial offering would be sold. This is more than sufficient to support Plaintiffs ability to sue under Section 12(a)(2). *See In re Twinlab*, 103 F. Supp. 2d at 204 (allegations that Twinlab stood to gain more than $300 million in capital from Secondary Offering are sufficient to meet the second prong of Pinter); *Milman*, 72 F. Supp. 2d at 230.

Defendants cite *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023, 2002 WL 461513, at *5-6 (S.D.N.Y. Mar. 25, 2002), in support of their argument that Plaintiffs' Section 12(a)(2) claims are not typical of absent Class members. Plaintiffs there brought Section 11, 12 and 15 of the Securities Act of 1933 claims against the defendant company and several of its officers, shareholders and underwriters. *Id.* at *1. For several reasons, Defendants' reliance on this case is misplaced. First, it is unclear whether the damaged shares in that case were sold through a firm commitment underwriting. If they were, then *AMF Bowling* would actually support Plaintiffs' position since in finding that the plaintiff's Section 12 claim was not typical of the class, the court **did not rule that such claims could not lie against the defendant company and its officers** (*see id*. at 17-21); a position which Defendants here advocate. Second, *AMF Bowling* is obviously not binding precedent on this Court. Finally, Plaintiffs would note that the *AMF Bowling* decision is certainly in the minority camp on this issue, and has not been cited by any other court for the proposition Defendants advocate here.

Accordingly, as already decided by this Court, Berlin and Vuong, as purchasers of Celera stock in, or traceable to, the Secondary Offering, have standing to bring Section 12(a)(2) claims against Defendants, and therefore their claims are typical of all absent class members.

### B.    The Proposed Representatives Purchased Celera Stock Issued In, or Traceable, to the Secondary Offering

Defendants argue that this Court should disregard this Circuit's well-established rule that aftermarket purchasers who can trace their shares to a public offering have standing to bring Section 11 claims. Relying, in part, on *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), Defendants argue that tracing is improper. Remarkably, Defendants all but ignore the Second Circuit's decision in *DeMaria*, 318 F.3d 177, which firmly rejected the very arguments against tracing that Defendants make here:

> Defendants' reliance on *Gustafson* and the legislative history of the 1933 Act is misplaced.
>
> * * *
>
> . . . *Gustafson* involved § 12 of the 1933 Act, not § 11. Because the wording of the two provisions is distinctly different, we find the specific teachings of *Gustafson* with respect to who may sue to be inapplicable.

The court in *DeMaria* went on to hold that "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." *Id*. at 178. In spite of this, Defendants argue that "the language of the statute, the legislative history of the 1933 Act and policy considerations confirm that Section 11 is limited to purchasers in a public offering." Def. Mem. at 28. Defendants' arguments, however, have been unequivocally rejected by controlling case law in the Second Circuit and, accordingly, should be rejected.

In *DeMaria*, the court held that Section 11's straightforward language clearly allows for tracing. 318 F.3d at 176-77. It provides that "any person acquiring" a security that is the subject

15

of a misleading registration statement "may . . . sue" the issuer, any underwriter, or other categories of persons identified in Section 11(a)(1)-(5).  15 U.S.C. 77k(a).  As the Second Circuit explained in *DeMaria*, "[w]e can find no reason why 'any' as used in § 11 should not be read as the equivalent of 'every' such that every person who acquires a security issued pursuant to an allegedly defective registration statement has standing to use under § 11."  318 F.3d at 176.[11]

Defendants argue that Section 11's provisions on calculating damages "makes sense only if standing under Section 11 is restricted to initial *purchasers* . . . ."  Deft. Mem. at 28-29.  To the contrary, analyzing Section 11's damages provisions, the Second Circuit in *DeMaria* stated:

> In addition, subsections (e) and (g) of § 11 limit the damages that may be recovered to "the price at which the security was offered to the public." *Id*. § 77k(e)-(g). This express limitation on the recoverable damages would be redundant if only those who had purchased in the offering (i.e., at the initial offering price) could recover, because their potential damages would be limited in any event to the price they had paid in the offering.

318 F.3d at 177.  *See also Lee*, 294 F.3d at 977 ("It would be unnecessary to limit the price [under Section 11(e)] to no more than the price offered to the public if the cause of action were limited to participants in the initial public offering.  Similarly, Section 11(g) -- which expressly caps the maximum amount recoverable to the price offered to the public -- would likewise be superfluous if only those who participated in the initial public stock offering could bring a § 11

---

[11]  Appellate courts in other circuits are in agreement.  *Hertzberg v. Dignity Partners*, 191 F.3d 1076, 1080 (9th Cir. 1999) (The limitation on "any person" is that he or she must have purchased 'such security.'  Clearly, this limitation only means that the person must have purchased a security issued under that, rather than some other, registration statement.") *citing Barnes v. Osofsky*, 373 F.2d 269, 271 (2d Cir. 1967); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)("[T]he natural reading of 'any person acquiring such security' is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement."); *Lee v. Ernst & Young*, LLP, 294 F.3d 969, 976-77 (8th Cir. 2002)("we read § 11's plain language to state unambiguously that a cause of action exists for any person who purchased a security that was originally registered under the allegedly defective registration statement -- so long as the security was indeed issued under that registration statement and not another").

claim."); *Joseph*, 223 F.3d at 1159 ("aftermarket purchasers who pay more than the offering price for their securities are the only people who could have losses which exceed the price at which the securities were offered to the public"); *Hertzberg*, 191 F.3d at 1080 (§ 11(e) "would be unnecessary if only a person who bought in the actual offering could recover").

In *DeMaria*, the defendants, like Defendants here, argued that the legislative history of the 1933 Act did not permit tracing. 318 F.3d at 177. The court rejected this argument finding that "where the statutory terms are clear, our inquiry is at an end. . . . [T]he phrase 'any person acquiring such security' is plain on its face. Thus, we have no need to turn to extrinsic sources to determine § 11's meaning." *Id.* (citation omitted). In sum, in light of *DeMaria*, which is controlling authority on the issue, Defendants' request that tracing not be recognized by this Court should be wholly rejected.

Defendants finally argue, in the alternative, that even if tracing conferred aftermarket purchasers with standing to bring Section 11 claims, Berlin and Vuong are nevertheless unable to trace their shares to the Secondary Offering. Def. Mem. at 30. Defendants' arguments, however, should be rejected because they are inappropriate on a motion for class certification. First, whether Plaintiffs' shares can be traced to the Secondary Offering is an issue of fact for trial. As noted by the court in *In re Lilco Sec. Litig.*, 111 F.R.D. 663, 671 (E.D.N.Y. 1986):

> In the instant case, determining whether a Plaintiff owned "old" or "new" common stock does not merit denial of the motion for class certification, because tracing is a question of fact reserved for trial. At this stage of the lawsuit, the Court is concerned primarily with the efficient management of judicial resources and creating a fair opportunity for a few parties to represent all others similarly situated, not with success on the merits at trial.

(citation omitted). *See also In re Sterling Foster & Co.,Sec. Litig.*, 222 F. Supp. 2d 216 (E.D.N.Y. 2002)(refusing to rule on Defendants' argument that Plaintiffs could not trace shares to a Secondary Offering because they concerned the merits of the claims); *In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264, 267 (N.D. Cal. 1987)(rejecting proposition that Plaintiffs must

17

establish that their shares are traceable to a public offering in order to meet Rule 23(a)'s typicality requirement). Indeed, where, as here, Plaintiffs' claims are based on the same offering materials as all other class members, issues of tracing become secondary and should not form the basis for denial of class certification. *Schwartz v. Celestial Seasonings*, 178 F.R.D. 545, 554 n.4 (D. Colo. 1998)("The common question of whether the registration statement was materially misleading predominates over any secondary tracing issues that might be encountered."). Moreover, the decisions cited by Defendants on the issue of tracing are either not instructive or not controlling. For example, in several of the cases they cite, the courts did not undertake an analysis of Lead Plaintiffs' purchases to determine whether ***in fact*** their shares could be traced to the offering, *See In re College Bound Consolidated Litig.*, No. 93 Civ. 2348 (MBM), 1994 WL 172408, at *2 (S.D.N.Y. May 4, 1994) and *Rice v. Windsor*, No. 85 C 4196, 1986 WL 2728 (N.D. Ill. Feb. 27, 1986); others had the benefit of considering expert testimony on the issue, *see Krim v. pcOrder.com*, 210 F.R.D. 581, 586 (W.D. Tex. 2002); others decided the issue at the summary judgment stage after merits and expert discovery had been completed, *Kirkwood v. Taylor*, 590 F. Supp. 1375 (D. Minn. 1984); while others are simply not controlling. *In re Quartedeck Office Sys., Inc. Sec. Litig.*, No. CV 92-3970-DWW(GHKx), 1993 WL 623310 (C.D. Cal. Sep. 30, 1993).

In any event, the Court need not even reach the issue of tracing with respect to either Plaintiff, and nevertheless grant Plaintiffs' motion for class certification, because Berlin clearly bought directly in the Secondary Offering. In fact, in *In re Data Access Systems Securities Litigation*, 103 F.R.D. 130, 145 (D.N.J. 1984), *rev'd on other grounds*, 843 F.2d 1527 (3d Cir. 1988), the court certified a Section 11 case with facts almost identical to the present case. There a single plaintiff was proposed as class representative of a Section 11 subclass that had purchased shares in a secondary offering. *Id*. The plaintiff there, like plaintiff Berlin, bought

18

shares "in" the offering. *Id*. In the context of typicality, the defendants argued that because the

plaintiff purchased shares "in" the offering, he could not represent aftermarket purchasers whose

shares were merely traceable to the offering. The defendants also argued, like Defendants here,

that because there were shares outstanding at the time of secondary offering, that it would be

almost impossible to trace the shares of aftermarket purchasers. *Id*. 145-46. The court flatly

rejected the defendants' argument:

> Although the tracing of stock could conceivably present some problems, that is a merits
> issue which is not appropriate for consideration on this class certification motion. It
> would be wholly improper for the court to deny a class certification motion simply
> because a plaintiff might have difficulties in proving his case. A plaintiff at the
> certification stage need not prove his case, but must only show that the Rule 23
> requirements have been met.
>
> *   *   *
>
> The court also holds that the fact that plaintiff Stone was an original purchaser and not an
> aftermarket purchaser does not render him atypical. Neither does it present a
> predominance of individual questions over the common questions.

*Id*. at 146. *See also Charal v. Pierce*, No. CV-81-0042, 1981 U.S. Dist. LEXIS 17497, at *22

(E.D.N.Y. Nov. 3, 1981)(difficulties with tracing shares will not preclude class certification

"since to do so would not result in protection of the claims of the class, but rather their . . .

summary elimination from the lawsuit [of absent class members] without an opportunity to

explore the factual and legal issues on which a resolution of the question may ultimately turn.").

　　　Berlin clearly bought in the Secondary Offering. On February 29, 2000 (the date of the

Secondary Offering), Berlin bought 100 shares of Celera common stock at $225 (the price at

which the stock was offered for sale in the Secondary Offering). Berlin Trade Confirmation at p.

1 (a true and correct copy of which is attached as Exhibit F to the Affidavit of Brian C.

Fournier). The purchase was made directly from Morgan Stanley Dean Witter ("Morgan

Stanley"), a co-lead underwriter of the Secondary Offering, not from a stock exchange. *See*

Berlin Trade Confirmation at p. 2 (listing DWR, i.e., Morgan Stanley, as principal seller under

19

heading entitled "[Stock] Exchange Where Executed").  Importantly, his trade confirmation shows that he bought pursuant to the (defective) prospectus.  *See* Berlin Trade Confirmation at p. 2 (listing that shares were sold pursuant to "prospectus/official statement" under heading entitled "Execution Code").  Nothing more is required.  Clearly, Berlin purchased in the Secondary Offering and has standing to bring the alleged claims, both for himself and as representative of the class.

Despite the overwhelming evidence that establishes that Berlin purchased his shares in the Secondary Offering, Defendants nevertheless argue that he may be an aftermarket purchaser lacking standing under Section 11.  Def. Mem. at 33-34.  They base this argument on the fact that Berlin purchased other shares of Celera stock for his children's Uniform Gift To Minors Act ("UGTMA") accounts prior to the Secondary Offering, and because he has failed to produce the backside of his trade confirmation.  Both arguments are meritless.  First, any purchases of Celera stock that he made for his children's UGTMA accounts, which he testified were purchased before the Secondary Offering (*id*. at 63-64), are ***wholly irrelevant*** to his Section 11, 12 and 15 claims.  Indeed, Defendants do not cite any legal authority, nor are Plaintiffs aware of any, that support the proposition that shares that are not the subject of the litigation are relevant to any class certification issue.

Second, as demonstrated above, the back of Berlin's confirmation (attached hereto as Exhibit A) confirms that he bought his shares in the Secondary Offering and pursuant to the Prospectus.  Accordingly, because Berlin has standing to bring the alleged claims on behalf of himself and absent class members, and he will not be subject to any unique defenses that may threaten to become the focus of the litigation, class certification should be granted.

**C.      Whether Vuong's Shares are Traceable to the Secondary Offering Cannot be Properly Determined at This Stage of the Litigation**

Because, as noted above, Berlin bought his shares in the Secondary Offering, the Court need not make a factual determination at the class certification stage concerning whether Vuong's shares are traceable to the Secondary Offering, and may nevertheless grant Plaintiffs' Motion for Class Certification.  Assuming, however, that the Court finds such a determination is proper at this stage, the Court would conclude that it cannot properly make that determination with the relatively undeveloped evidentiary record on this issue.  Indeed, only after the completion of expert discovery will the parties possess enough evidence to present to the Court on the issue of traceability.  Also, because, as conceded by Defendants, there exist several recognized methods of tracing (*see* Def. Mem. at 31), expert evidence will certainly be presented by the parties as to which method should apply in this case; however, expert discovery is not scheduled to commence until months from now.

For example, an expert would testify that there are numerous methods by which shares can be traced.  There are the "direct tracing," "fungible mass," "contraboker" or "heritage" methods; and an expert opinion as to which is the preferred method will be essential.  Also, Defendants will surely argue that shares that are held in "street name" will not be traceable to the Secondary Offering.  However, an expert can nevertheless, through the examination of stock transfer records and use of recognized statistical methodology, render an opinion to a reasonable degree of statistical certainty that an investor's shares are traceable to a specific offering.

Nevertheless, presuming that the evidentiary record before this Court is sufficiently developed for the Court to make a factual determination regarding whether Plaintiffs can trace their shares to the Secondary Offering (which Plaintiffs argue is not), the Court would find that Plaintiffs have produced enough evidence for a genuine issue of fact to exist as to whether

Plaintiffs' shares were purchased in, or are traceable to, Secondary Offering. Accordingly, determination of this factual issue should be left to a jury at trial.

In particular, Vuong purchased his shares on March 1, 2000, just **one** day after the Secondary Offering. Deposition Transcript of Vihn Vuong, dated November 5, 2003 ("Vuong Tr.") at 42. His trade confirmation reflects that the prospectus was mailed to him by separate cover. *Id*. at 43. Although he testified at his deposition, that he had not received a prospectus, *id*., surely in light of the length of time that has passed, Vuong could very well have forgotten that a prospectus was sent to him. Indeed, a genuine issue of fact exists concerning whether Vuong's shares were purchased in, or are traceable to, the Secondary Offering. This issue cannot be decided at the class certification stage, but only at a much later stage of the litigation and only after fact and expert discovery is completed.

In any event, the Court has the power to grant class certification and revisit that grant if problems arise with respect to the case's ability to proceed as a class action. *See* Fed. R. Civ. P. 23(c)(1)(granting courts power to conditionally certify class actions). In this case in particular, where expert discovery has not yet commenced, a grant of class certification, subject to being reviewed at a later time to address any issues concerning tracing, is particularly appropriate. *Ventura v. N.Y. City Health & Hosps. Corp.*, 125 F.R.D. 595, 602 (S.D.N.Y. 1989)(certifying class subject to revisiting grant after discovery concerning numerosity requirement was completed).

## IV.    DEFENDANTS' ATTACKS ON THE PROPOSED REPRESENTATIVES' ADEQUACY ARE UNAVAILING

### A.    The Proposed Representatives Meet This Circuit's Adequacy Requirements

Defendants also argue that Plaintiffs do not satisfy the adequacy requirements of Rule 23(a). In doing so, they argue for far higher requirements for meeting adequacy than those

required by the Second Circuit and also distort the factual record.  Defendants' arguments are without merit and should be rejected.

The Second Circuit applies the traditional test for adequacy of representation: (i) that the representative have no obvious conflict of interest with other members of the class; and (ii) that the representative's counsel be qualified, experienced and capable of handling the litigation. *Baffa*, 222 F.3d at 60-61.  In addition, class certification may be denied only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."  *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)(citation omitted).  Finally, the standard for adequacy of "representation does not require a high level of understanding of the action;" *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356 (S.D.N.Y. 2002); thus, a representative can meet the adequacy requirements of Rule 23(a) by establishing that he or she "understand[s] the key principles of the litigation and is relying on counsel's expertise in securities law." *Id.* at 357.  Courts throughout the country are in agreement on this issue.  *In re Resources America Sec. Litig.*, 202 F.R.D. 177, 187 (E.D. Pa. 2001) ("It is unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim.  It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims."); *In re VMS Sec. Litig.*, 136 F.R.D. 466, 478 (N.D. Ill. 1991) ("The vast majority of judges . . . recognize that plaintiffs in securities fraud class actions need not have a detailed understanding of their complaint and may rely on the knowledge and expertise of their attorneys in prosecuting their securities fraud claims."); *Ross v. BankSouth, N.A.*, Nos. CV 85-PT-0444-S, CV85-PT-1044-S, 1986 WL 2702, at *2, (N.D. Ala. Feb. 25, 1986) ("[t]he court will give short shrift to the 'lack of understanding' argument . . .  Most plaintiffs . . . rely on the

23

knowledge, advice and expertise of their attorneys."); *Grossman v. Waste Management, Inc.*, 100

F.R.D. 781, 790 (N.D. Ill. 1984) ("Plaintiffs need not know all the ins and outs of a case in order

to be proper class representatives; they are entitled to rely upon their lawyers."); *Cromer Fin.

Ltd. v. Berger*, 205 F.R.D. 113, 124 (S.D.N.Y. 2001) ("The Supreme Court has 'expressly

disapproved of attacks on the adequacy of a class representative based on the representative's

ignorance.")(citation omitted).

Tellingly, Defendants do not attempt to establish that either Berlin or Vuong have any

obvious conflicts of interests with other members of the class.  Berlin and Vuong both purchased

stock pursuant to the false and misleading Offering Materials.  Thus, in establishing Defendants'

liability, Berlin and Vuong will have to prove the same wrongdoing as the other Class members.

Additionally, having suffered substantial monetary losses as a result of the securities law

violations alleged in the Complaint, Plaintiffs are committed to the vigorous prosecution of this

action.

Instead, Defendants argue, among other things, that Plaintiffs are inadequate because they

allegedly do not understand the factual allegations or the procedural issues in the case.[12]  Def.

Mem. at 35-38.  In *Baffa*, 222 F.3d at 61, the Second Circuit disapproved of attacks on a

proposed class representative's adequacy based on the representative's ignorance.  Finding that

the district court in that case had "misapplied the adequacy rules," by "seiz[ing] on a myopic

view of the knowledge requirement," the court approved of the class representative's adequacy

when he understood, (i) "the nature of his proposed role in the litigation and . . . willingness to

carry it forward," (ii) which of his investments were the subject of the litigation, (iii) that he and

---

[12] In addition, Defendants baselessly accuse Berlin of not having complied with his discovery
obligations, and Vuong of having filed an inaccurate certification.

others had sustained losses to the alleged fraud, and (iv) that he could continue to rely on the

expert advice of others on legal and accounting matters.  *Id*. at 62.  Certainly, as demonstrated

below, Plaintiffs here meet and indeed exceed these minimal requirements of adequacy.

Thus, because "in the context of complex securities litigation, attacks on the adequacy of

the class representative . . . are rarely appropriate," *County of Suffolk v. Long Island Lighting

Co.*, 710 F. Supp. 1407, 1416 (E.D.N.Y. 1989), courts generally focus on the adequacy of the

counsel that the representative has retained, rather than the qualifications of the individual

representative, in determining whether Rule 23(a)(4) has been satisfied.  *See, e.g., In re TCS/DW

N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 341 (S.D.N.Y. 1996).  Here, Plaintiffs

are represented by counsel who are thoroughly experienced in federal securities litigation and

have the ability and willingness to protect the interests of the Class.  *See Modell v. Eliot Sav.

Bank*, 139 F.R.D. 17, 23 (D. Mass. 1991) (approving of lead counsel because lead counsel was

"familiar with and experienced in this type of litigation"); *In re TCW/DW*, 941 F. Supp. at 341

("this Court is in agreement with 'the recent trend in this district [in complex securities cases] to

assess the adequacy of the representative's attorney rather than the personal qualification of the

named Plaintiff.'") (citation omitted).  Lead Counsel (Milberg Weiss Bershad Hynes & Lerach

LLP) and Liaison Counsel (Hurwitz & Sagarin, LLC), both of which were approved by this

Court, are highly experienced in complex securities class actions and have successfully

prosecuted numerous securities class action suits throughout the country.  *See generally In re

Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 50 (S.D.N.Y. 1998) (stating that co-lead

counsel, including Milberg Weiss Bershad Hynes & Lerach LLP, are "competent,"

"experienced," and "qualified" counsel who "will work together to maximize recovery for the

proposed class").  Accordingly, Plaintiffs, as demonstrated below, will fairly and adequately

protect the interests of the class.

### 1.     David Berlin

By way of personal background, Berlin is a resident of New York and business owner who devotes his time to the pursuit of, and training individuals in, the ancient martial art of T'ai Chi Chuan.[13]  Berlin obtained a Bachelor's Degree in Political Science from the State University of New York's College of Fredonia in 1976.  Deposition Transcript of David Berlin, dated November 11, 2003, ("Berlin Tr.") at 9.  After graduating from college, he went to work as a one-third partner at Select Building Supply Incorporated; a wholesale supplier of building materials.  *Id*. at 11-12.  After Select Building, he briefly owned a business which imported doors from Spain and Portugal.  *Id*. at 15.  Now, Berlin is the president of T'ai Chi Chuan Associates where he trains the employees of corporations and public institutions in the art of T'ai Chi Chuan.  *Id*. at 14, 16.

Berlin bought 100 shares of Celera common stock at a price of $225 for a total investment of $22,500, which he still holds (at a value of approximately $1550).  *Id*. at 50.  By the time that Berlin filed his original complaint on April 18, 2000, less than one month after his purchase, he had already lost approximately $14,800 of his investment in Celera stock.

Of significance to this Court's adequacy analysis, Berlin is familiar with the key principles of the litigation and has actively participated in the litigation of the case.  For example, Berlin's testimony establishes that he understands the Amended Complaint's key allegation:

> My understanding is that there was information that was omitted from the prospectus when the Secondary Offering was brought that would have changed the whole bringing of the secondary and the price that it was brought at.  Because it has come to my knowledge that Celera was involved in negotiations with the federal government to collaborate jointly on this project and those negotiations which were key broke down approximately four to six weeks before this secondary was brought and there have been --

---

[13] As described by Berlin at this deposition, T'ai Chi Chuan is a form of martial art concerning "the gathering, the refining and the circulating of . . . energy for health."  *Id*. at 19.

there was made no mention as to this breakdown and as a result of that that knowledge would have been made available to the general public this stock offering would have been severely damaged certainly at the price it was bought.

Berlin Tr. at 116-17.  Berlin was also knowledgeable about Celera's business model.  *Id*. at 121.

Berlin is also familiar with the procedural aspects of the case.  He testified that he was knowledgeable about the class action process, (*id*. at 113) ("It is a suit brought . . . by certain class of investors against a company, investors and/or stockholders that own a stock in the company."), and he knew what types of investors comprised the Class (*id*. at 113)("The individuals that purchased Celera stock on their Secondary Offering.").  Most important, Berlin testified that he understood what his responsibilities were if appointed class representative: "To put best efforts forward to protect the people under the class action as well as to monitor the on-goings of my attorney as well in the betterment of the class action lawsuit."  *Id*. at 113-14.

Berlin has also actively participated in this case from the outset; indeed it was Berlin who initiated one of the six cases originally filed against Defendants.  Berlin testified that he reviewed drafts of the original complaint before it was filed, (*id*. at 89); complied with Defendants' discovery requests by producing (i) all documents in his possession concerning his purchase of Celera common stock in the Secondary Offering, (*id*. at 50-52, 108-09), and (ii) his participation in a prior securities class action, (*id*. at 96); regularly confers with counsel regarding the progress of the litigation, (*id*. at 104); and was aware that Defendants had filed a motion to dismiss the complaint.  *Id*. at 115.  Moreover, in addition to providing deposition testimony, he testified that he was prepared to give testimony at trial.  *Id*. at 126

Nevertheless, Defendants argue that Berlin "demonstrates lack of knowledge of this lawsuit."  Def. Mem. at 38.  They do so by selectively quoting from the record.  For example, they argue that Berlin did not know that a motion to dismiss was filed.  *Id*. at 38 (stating Berlin "does not know whether a motion to dismiss has been filed").  The record proves otherwise: "Q

27

[by Defendants' counsel]:  Are you aware of whether a motion to dismiss was filed in this case?  A: Yes I am."  *Id.* at 115.  They also attempt to support their argument that Berlin purportedly lacks knowledge of the litigation by improperly concentrating on his inability to understand ***purely*** legal terms and procedures.  Def. Mem. at 38 *citing* Berlin Tr. at 92, 103-04.  Courts, however, are in agreement that Plaintiffs do not have to understand every intricate legal and procedural detail of a litigation, and can nevertheless qualify as class representative.  *Baffa*, 222 F.3d at 60-61.  *See also supra* Section IV.A at 22-23.  Defendants also argue that Berlin is not adequate because he has failed to "fully cooperate with discovery and produce all information relating to his activities in Celera stock."  Def. Mem. at 33-34.  However, the record does not at all support Defendants' argument.  Indeed the record is clear that Berlin produced all information in his possession concerning the ***only*** shares that he purchased pursuant to the Secondary Offering.  Berlin Tr. at 50.  He also produced documents concerning a different securities litigation in which he was a plaintiff.  *Id.* at 96.  Moreover, Defendants' argument that Berlin was required to produce information concerning shares purchased for his children's UGTMA accounts, which were not purchased in, nor are traceable to, the Secondary Offering, is also without merit.  Indeed, Defendants do not provide any legal support for this proposition, nor can they provide a logical explanation as to how this information is relevant to Plaintiffs' claims in this case.  Besides, if Berlin had purchased his children's shares from the Secondary Offering, he would undoubtedly want to recover damages on those shares and would have certainly produced proof of those transactions.

### 2.    Vinh Vuong

By way of personal background, Vuong is a postal worker who has worked for the U.S. Postal Service in California for the past 19 years.  Prior to joining the Postal Service, Vuong obtained an Associates degree in Business Administration from Riverside City College in 1985.

Vuong Tr. at 7. Vuong put himself through college by working part-time at a Chinese food restaurant. *Id*. at 9. Shortly after graduation, Vuong joined the Postal Service as a letter carrier, where he is employed until this day. *Id*. at 10.

As recounted by Vuong during his deposition, he amassed a substantial amount of money through investing in the stock market since 1987 (*id*. at 50); ***all of which he lost on his investment in Celera stock***. Vuong bought 2000 shares of Celera common stock traceable to the Secondary Offering at a price of $236 for a total investment of $472,000, which he sold at $125 a share. *Id*. at 69-70.

Like Berlin, Vuong is an adequate representative because he is familiar with the key principles of the litigation and has actively participated in the litigation of the case. Vuong is knowledgeable concerning all of the parties in the case, including the Individual Defendants (and their respective positions at Celera) and co-lead Plaintiff Berlin, (Vuong Tr. at 28); he understands what a class action is (*id*. at 93); what members make up the Class (id. at 94); and was aware that Defendants' motion to dismiss the amended complaint had been denied (id. at 100). Importantly, Vuong understands the Amended Complaint's central allegation:

> The business model of Celera is surrounding gene -- human genome sequencing. And with that information, with the completion of the map, I believe Celera would make a lot of profit. But there were talks between Celera and the government about the human genome map, but the talks broke down between Celera and the government before the date of the Secondary Offering. The government believed that they would -- with the completion of the map, that it should be free to all, the public. But Celera wanted five years exclusive rights for -- to the map so they can charge a fee. But that was not disclosed in the prospectus.

*Id*. at 86-87. Indeed, Vuong's knowledge of the facts of this case is far beyond what is required to be found an adequate class representative.

In addition, Vuong has actively participated in the litigation of this case. Indeed, it was Vuong who contacted Class Counsel and hired them to represent him as Lead Plaintiff for the

Class.  *Id*. at 66.  Vuong has also complied with Defendants' discovery requests by producing all documents in his possession concerning his transactions in Celera common stock, (*id*. at 31, 40, 42, 72), and has kept informed of the progress of the litigation by communicating with Class Counsel by telephone and mail on over a dozen occasions.  *Id*. at 96.  Importantly, Vuong understands his duties to the Class:  "I have to make sure that my attorneys are doing their job.  And I have to look out for the best interest of the class members."  *Id*. at 95.  Vuong also testified that he would be willing to share, if necessary, in paying the expenses of litigating this case.  *Id*. at 101.  Also, in addition to flying in from California to New York to give deposition testimony, Vuong testified that he would be willing to testify at trial if necessary.  *Id*. at 102-03.

Nevertheless, Defendants argue that he is unfamiliar with the facts of the case and the procedural issues.  Defendants argue that Vuong lacked knowledge on such technical details as the proposed class period and that he did not review drafts of documents before they were filed.  Def. Mem. at 36.  The law is clear, however, that Plaintiffs do not have to have know every intricate detail in a case and can rely on their attorneys to prosecute the day-to-day litigation of the case.  *Baffa*, 222 F.3d at 60-61, *Koenig v. Benson*, 117  F.R.D. 330, 337 (E.D.N.Y. 1987) ("Courts have repeatedly acknowledged that the named plaintiffs rely on attorneys to be their strategists, because in complex litigation, the plaintiffs are unlikely to demonstrate mastery of the intricate details.")(citations omitted).

Like with Berlin, Defendants selectively quote from his deposition transcript to create the appearance that he is not knowledgeable about the litigation.  For example, Defendants argue that Vuong testified that he did not authorize the filing of the complaint.  Def. Mem. at 36.  The record, however, is clear.  "Q [by Defendants' counsel]:  Did you, in fact, authorize the filing of the first amended consolidated class action complaint?  A:  Yes."  Vuong Tr. at 121.

Finally, Defendants argue that Vuong is inadequate because he allegedly filed an inaccurate certification. Specifically, they state that Vuong's certification is inaccurate because although he "stated under oath that [sic] Schedule A to the certification listed all purchases and sales during the ***proposed class period***," he omitted his sale of 4,000 shares. Deft. Mem. at 36 (emphasis added). However, Defendants' argument is based on a tortured interpretation of the record, lacks common sense and, frankly, is disingenuous. First, Defendants certainly know that there is no class period ***per se*** in this case and, instead, Plaintiffs are seeking to represent anyone who bought shares in, or traceable to, the Secondary Offering. Thus, as required by the PSLRA, Vuong's certification listed only the purchase and sale of securities that are the subject of the litigation, i.e., only those shares that were purchased in, or traceable to, the Secondary Offering. Accordingly, Vuong listed his purchase of 2,000 shares in the Secondary Offering.[14]

Vuong then listed the very first sale of shares that he made after this purchase. That sale of 4,000 shares at $125 occurred on March 16, 2000. Later that day, Vuong made two other sales of Celera stock of 1,000 and 3,000 shares, respectively. Thus, for purposes of filling out his certification, Vuong assumed that he sold the 2,000 shares that he purchased in the Secondary Offering in the first sale of 4,000 shares. Accordingly, Vuong did not list the other sales of 1,000 and 3,000 shares that Defendants complain about because they are not relevant to his claims in this case.

More important, the minor inaccuracies on Plaintiffs' certifications cannot form a basis to block their approval as class representatives. Here, as in *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002):

---

[14] Vuong already owned 6,000 shares of Celera stock prior to the Secondary Offering.

> [Defendants] contend that certain admitted errors on the part of Plaintiffs and their
> counsel in connection with proceedings relating to the appointment of lead Plaintiffs
> evince either dishonesty or lack of diligence and should therefore preclude a
> determination that Plaintiffs are adequate representatives of the class under the counsel
> prong of the adequacy analysis. . . .  [However,] [c]onflicts such as [these] . . . are present
> in almost every large, complex securities case.  Deeming them an appropriate basis for
> the denial of class certification would be inconsistent with Court of Appeals' strongly
> favorable view of the class action device in securities cases generally.

*See also Seidman v. Am. Mobile Sys. Inc.*, 157 F.R.D. 354, 362 (E.D. Pa. 1994) (rejecting

Defendants' allegations of inconsistencies between class representative's deposition testimony

and declaration regarding stock purchases).

        Defendants also argue that Vuong is inadequate because he has attempted to overstate his

losses and because he cannot verify at what price he sold the shares he purchased from the

Secondary Offering.  As detailed above, Vuong's certification was filled out correctly and, thus,

he has not attempted to overstate his losses.  In addition, at the class certification stage, contrary

to what Defendants would have this Court believe, Vuong is not required to prove his damages

in order to be deemed an adequate representative.  Indeed, "[t]o foreclose potential members

from the class because of an asserted inability to prove damages at [class certification] stage of

the litigation would transform inappropriately the class action motion into a motion for summary

judgment as to a subclass of members."  *Kallus v. General Host Corp.* at 1988 WL 124074, at *4

(Daly, Ch. J.).  *See also Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y.

2001)("It is well-established that individual questions with respect to damages will not defeat

class certification or render a proposed representative inadequate unless that issue creates a

conflict which goes to the heart of the lawsuit.") *quoting In re AM Int'l, Inc. Sec. Litig.*, 108

F.R.D. 190, 196 (S.D.N.Y. 1985).  Accordingly, because Vuong meets Rule 23(a)'s adequacy

requirement, he should be appointed as class representative.

## V.     CONCLUSION

For the reasons set forth above, and the reasons set forth in Lead Plaintiffs' opening

memorandum, Lead Plaintiffs respectfully request that this action be certified as a class action

under Fed. R. Civ. P. 23(a) and (b)(3) behalf of the Class defined herein, and that Lead Plaintiffs

be certified as the representative of the Class.

Respectfully submitted,

By:_____
          J. Daniel Sagarin (CT04289)
          David A. Slossberg (CT13116)
          Brian C. Fournier (CT16272)
**HURWITZ & SAGARIN, LLC**
147 N. Broad Street, P.O. Box 112
Milford, Connecticut  06460
(203) 877 - 8000
**Liaison Counsel for Lead Plaintiffs**

**MILBERG WEISS BERSHAD
   HYNES & LERACH LLP**
Sanford P. Dumain (CT08138)
Carlos F. Ramirez (CT25340)
One Pennsylvania Plaza
49th Floor
New York, New York 10119
(212) 594-5300

**Lead Counsel for Lead Plaintiffs**

**CERTIFICATION**

This is to certify that a copy of the foregoing was served on February 17, 2004, by facsimile and FedEx, postage prepaid, to the following:

Stanley A. Twardy, Jr.                          Michael J. Chepiga
Thomas D. Goldberg                          William M. Regan
Terrence J. Gallagher                          Simpson Thacher & Bartlett LLP
Day, Berry & Howard LLP                  425 Lexington Avenue
One Canterbury Green                          New York, NY 10017
Stamford, CT 06901

                                                              Counsel for Defendants

Liaison Counsel


                          _____
                                        David A. Slossberg

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   COMMON QUESTIONS OF LAW OR FACT PREDOMINATE OVER
      INDIVIDUAL ISSUES ...........................................................................................3

      A.    Defendants' Predominance Challenge Goes Only to the Merits of
            Plaintiffs' Claims, Which is Improper on a Motion for Class Certification...........3

      B.    Defendants' Predominance Challenge Completely Ignores the Majority of
            Material Misrepresentations and/or Omissions Pled in the Complaint .................8

III.  THE PROPOSED REPRESENTATIVES' CLAIMS ARE TYPICAL OF THE
      CLASS ................................................................................................................10

      A.    This Court Already Held that Plaintiffs Have Standing to Bring Claims
            Under Section 12(a)(2) ...............................................................................11

      B.    The Proposed Representatives Purchased Celera Stock Issued In, or
            Traceable, to the Secondary Offering ............................................................15

      C.    Whether Vuong's Shares are Traceable to the Secondary Offering Cannot
            be Properly Determined at This Stage of the Litigation .....................................21

IV.   DEFENDANTS' ATTACKS ON THE PROPOSED REPRESENTATIVES'
      ADEQUACY ARE UNAVAILING.............................................................................22

      A.    The Proposed Representatives Meet This Circuit's Adequacy
            Requirements ...........................................................................................22

            1.    David Berlin.............................................................................26

            2.    Vinh Vuong..............................................................................28

V.    CONCLUSION.....................................................................................................33

i

## TABLE OF AUTHORITIES

**Page**

*Ansoumana v. Gristede's Operating Corp.*,
  201 F.R.D. 81 (S.D.N.Y. 2001) ............................................................................32

*Applera Corp. v. MJ Research, Inc.*,
  No. 3:98CV1201 (JBA),
  2004 WL 97634 (D. Conn. Jan. 20, 2004) ...........................................................11

*Baffa v. Donaldson*,
  222 F.3d 52 (2d Cir. 2000)........................................................................ *passim*

*Barnes v. Osofsky*,
  373 F.2d 269 (2d Cir. 1967)..................................................................................16

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988)..................................................................................13

*Charal v. Pierce*,
  No. CV-81-0042,
  1981 U.S. Dist. LEXIS 17497 (E.D.N.Y. Nov. 3, 1981).......................................18

*County of Suffolk v. Long Island Lighting Co.*,
  710 F. Supp.1407 (E.D.N.Y. 1989) ......................................................................25

*Cromer Fin. Ltd. v. Berger*,
  205 F.R.D. 113, 2001). D.N.Y. 2001 ....................................................................24

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003).................................................................... *passim*

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)................................................................................................4

*Feiner v. SS&C Tech. Inc.*,
  47 F. Supp. 2d 250 (D. Conn. 1999) ....................................................................13

*Freedman v. Value Health, Inc.*,
  190 F.R.D. 33 (D. Conn. 1999)..........................................................................4, 8

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154, 228 F.3d at 167 ...........................................................................5, 6

*Grossman v. Waste Management, Inc.*,
  100 F.R.D. 781 (N.D. Ill. 1984)......................................................................24, 27

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).........................................................................................13

*Hertzberg v. Dignity Partners*,
    191 F.3d at 1080 (9th Cir.)........................................................................16, 17

*Hicks v. Morgan Stanley & Co.*,
    No. 01 Civ. 10071 (HB),
    2003 WL 21672085 .........................................................................................3

*In re AM Int'l, Inc. Secs. Litig.*,
    108 F.R.D. 190 (S.D.N.Y. 1985) ...................................................................32

*In re Am. Bank Note Holographics*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000).............................................................13

*In re AMF Bowling Sec. Litig.*,
    No. 99 Civ. 3023,
    2002 WL 461513 (S.D.N.Y. Mar. 25, 2002) ................................................14

*In re Apple Computer Sec. Litig*,
    886 F.2d 1109 (9th Cir. 1989) .........................................................................6

*In re College Bound Consolidated Litig.*,
    No. 93 Civ. 2348 (MBM),
    1994 WL 172408, at *2 (S.D.N.Y. May 4, 1994)..........................................18

*In re Columbia Sec. Litig.*,
    155 F.R.D. 466 (S.D.N.Y. 1994) .....................................................................6

*In re Data Access Systems Secs. Litig.*,
    103 F.R.D. 130 (D.N.J. 1984),
    *rev'd on other grounds*, 843 F.2d 1527 (3d Cir. 1988).............................18

*In re Globalstar Sec. Litig.*,
    No. 01 Civ. 1748 (SHS),
    2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ..............................................6

*In re Honeywell Int'l Inc. Sec. Litig.*,
    211 F.R.D. 255 (D.N.J. 2002).......................................................................32

*In re Lilco Secs. Litig.*,
    111 F.R.D. 663 (E.D.N.Y. 1986) ...................................................................17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    82 F.R.D. 42 (S.D.N.Y. 1998) .......................................................................25

*In re Quartedeck Office Sys., Inc. Secs. Litig.*,
  No. CV 92-3970-DWW(GHKx),
  1993 WL 623310 (C.D. Cal. Sep. 30, 1993)...........................................................18

*In re Resources America Sec. Litig.*,
  202 F.R.D. 177 (E.D. Pa. 2001)...........................................................................23

*In re Seagate Techs. Secs. Litig.*,
  115 F.R.D. 264 (N.D. Cal. 1987).........................................................................17

*In re Sterling Foster & Co., Inc., Secs. Litig.*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...............................................................17

*In re TCS/DW North Am. Gov. Income Trust Sec. Litig.*,
  941 F. Supp. 326 (S.D.N.Y. 1996).....................................................................25

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
  209 F.R.D. 353 (S.D.N.Y. 2002) .......................................................................23

*In re Twinlab Corp. Secs. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) .................................................12, 13, 14

*In re VMS Sec. Litig.*,
  136 F.R.D. 466 (N.D. Ill. 1991)....................................................................23, 27

*In re W. Union Sec. Litig.*,
  120 F.R.D. 629 (D.N.J. 1988)...............................................................................5

*Joseph v. Wiles*,
  223 F.3d, 1155 (10th Cir. 2000) ....................................................................16, 17

*Kallus v. Gen. Host Corp.*,
  CIV. No. B-87-160,
  1988 WL 124074 (D. Conn. June 30, 1988)....................................................4, 32

*Kirkwood v. Taylor*,
  590 F. Supp. 1375 (D. Minn. 1984).....................................................................18

*Klein v. A.G. Becker Paribas, Inc.*,
  109 F.R.D. 646 (S.D.N.Y. 1986) .................................................................8, 9, 10

*Koenig v. Benson*,
  117 F.R.D. 330 (E.D.N.Y. 1987)........................................................................30

*Krim v. pcOrder.com*,
  210 F.R.D. 581 (W.D. Tx. 2002).........................................................................18

*Lee v. Ernst & Young, LLP*,
  294 F.3d 969 (8th Cir. 2002) ..............................................................................16

iv

*Levitan v. McCoy*, No. 0065096,
  2003 WL 1720047 (N.D. Ill. Mar. 31, 2003) ..........................................................4

*Macarz v. Transworld Sys., Inc.*,
  193 F.R.D. 46 (D. Conn. 2000) ...................................................................4, 8

*Martin v. Shell Oil Co.*,
  198 F.R.D. 580 (D. Conn. 2000) .......................................................................4

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995) ...........................................................................23

*Milman v. Boxhill Sys. Corp.*,
  72 F. Supp. 2d 220, 229-30 (S.D.N.Y. 1999) .............................................13, 14

*Modell v. Eliot Sav. Bank*,
  139 F.R.D. 17 (D. Mass. 1991) ........................................................................25

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ........................................................................................12

*Rice v. Windsor*, No. 85 C 4196,
  1986 WL 2728 (N.D. Ill. Feb. 27, 1986) .........................................................18

*Ross v. BankSouth, N.A.*,
  Nos. CV 85-PT-0444-S, CV85-PT-1044-S,
  1986 WL 2702, (N.D. Ala. Feb. 25, 1986) ...............................................23, 27

*Schaffer v. Timberland Co.*, Civ. No. 94-634-JD,
  1996 U.S. Dist. LEXIS 5372 (D.N.H. Mar. 19, 1996) .......................................5

*Schwartz v. Celestial Seasonings*,
  178 F.R.D. 545 (D. Co. 1998) ..........................................................................18

*Seidman v. American Mobile Sys. Inc.*,
  157 F.R.D. 354 (E.D. Pa. 1994) .......................................................................32

*Seidman v. Stauffer Chem. Corp.*, Civ. No. B-84-543 (TFGD),
  1986 WL 9803 (D. Conn. Jan. 17, 1986) ...........................................................4

*Sirota v. Solitron Devices, Inc.*,
  673 F.2d 566 (2d Cir. 1982) ..............................................................................5

*United States v. Stanley*,
  54 F.3d 103 (2d Cir. 1995) ..............................................................................11

*Ventura v. New York City Health & Hospitals Corp.*,
  125 F.R.D. 595, 602 (S.D.N.Y. 1989) ..............................................................22

v

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992).........................................................................11

*Weinberger v. Thornton*,
   114 F.R.D. 599 (S.D. Cal., 1986) ...................................................................5

*Wilson v. Saintine Exploration & Drilling Corp.*,
   872 F.2d 1124 (2d Cir. 1989)..........................................................................13

## STATUTES

15 U.S.C. § 77k(a) .............................................................................................1, 16

15 U.S.C. § 77k (e)-(g) ...........................................................................................16

15 U.S.C. § 77l..................................................................................................2, 12

Pub L. No. 104-67, 109 Stat. 737…….. ....................................................................3

## RULES

Fed. R. Civ. P. 23 ........................................................................................ *passim*