**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


IN RE: PE CORPORATION SECURITIES     :    MASTER FILE NO.
LITIGATION                           :    3:00-CV-705(CFD)
                                          : 
                                          :    MAY 13, 2004
                                          :
                                          :


**DEFENDANTS' POST-HEARING MEMORANDUM OF LAW IN FURTHER**
**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1

This memorandum corrects certain erroneous assertions made by Plaintiffs at the May 6, 2004 class certification hearing. With respect to the law, Plaintiffs' counsel argued that Defendants' predominance argument could only succeed if a sufficient number of Celera shareholders were "eavesdropping" on the December 29, 1999 meeting at Dulles Airport between Celera and the Human Genome Project – and that no amount of pre-offering publicity could ever raise predominance concerns. With respect to the facts, Plaintiffs' counsel argued that information contained in the March 6, 2004 Los Angeles Times article was not known to Celera investors prior to the Secondary Offering, and that Celera's stock price dramatically declined when the L.A. Times article was published. Plaintiffs are wrong on both fronts.

On the law, courts have held that extensive public disclosure of matters allegedly omitted from securities filings raises the possibility that defendants can establish a defense against individual class members, *i.e.,* that common questions do not predominate. *See Zimmerman v. Bell,* 800 F.2d 386, 390 (4th Cir. 1986); *see also Klein v. A.G. Becker Paribas, Inc.,* 109 F.R.D. 646, 652 (S.D.N.Y. 1986) (Goettel, J.); Def. Opp. Br. at 16-23.

Plaintiffs' factual arguments are similarly without merit. As explained more fully below, Plaintiffs allege that the L.A. Times article revealed critical information that should have been disclosed in the Prospectus. The substance of the L.A. Times article comprises three allegedly significant facts: (1) Celera and the HGP discussed a potential collaboration to complete the human genome sequence; (2) the "sticking point" in the discussions stemmed from the HGP's long-held policy of requiring immediate data release; and (3) the negotiations between Celera and the HGP had not resulted in an agreement, and the discussions remained ongoing. As shown in the tables in Point I below, all three of these facts were publicly disclosed

2

prior to the Secondary Offering in numerous national news publications and widely discussed in internet chat rooms. Further, Defendants contention that Celera investors were aware of the collaboration discussions between Celera and the HGP is not mere speculation. As shown in Point I.C., at least some Celera investors (or potential investors) were actually discussing the articles cited by Defendants' on an internet message board prior to the Secondary Offering.

Moreover, contrary to Plaintiffs' assertion, publication of the L.A. Times article did not cause a decline in Celera's stock price. In fact, on March 6, 2004, Celera's stock price opened at $229.63 and closed at $247.00 – an *increase* of more than 7%. An efficient market, such as the New York Stock Exchange, incorporates new information instantaneously. The increase in Celera's stock demonstrates that the market was already aware of the information contained in the L.A. Times article, or that it was immaterial.

As the Court recognized at the hearing, §§ 11 and 12 of the Securities Act provide Defendants with *a complete affirmative defense* if they can establish that purchasers of Celera stock knew of the alleged omission at the time of the Secondary Offering. Defendants have provided a substantial record demonstrating that some substantial percentage of the proposed class was undoubtedly aware of the key facts that Plaintiffs contend were omitted from the Prospectus. Furthermore, as Plaintiffs themselves acknowledged, if a class is certified under Rule 23(b)(3), this Court will effectively deprive Defendants of their affirmative defense under §§ 11 and 12 because absent class members are not parties to the litigation and cannot ordinarily

be compelled to appear at trial.[1]  Defendants respectfully request that the Court deny Plaintiffs'

motion for class certification.[2]

**ARGUMENT**

Plaintiffs bear the burden of demonstrating that the requirements of Rule 23 have

been satisfied.  *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).

In assessing whether Plaintiffs have met their burden, courts should probe "behind the pleadings

before coming to rest on the certification question," and consider evidence presented by the

parties on the maintainability of the class action."  *Gen. Tel. v. Falcon,* 457 U.S. 147, 160 (1982).

**I.     THE KEY FACTS SET FORTH IN THE MARCH 6 L.A. TIMES ARTICLE WERE WIDELY DISSEMINATED IN MAJOR NEWS PUBLICATIONS PRIOR TO THE SECONDARY OFFERING**

Plaintiffs allege that the L.A. Times article revealed material information that

should have been disclosed in the Prospectus for the Secondary Offering.  Compl., ¶¶ 24, 26, 39.

More specifically, Plaintiffs assert that Celera should have disclosed that:  (1) Celera and the

Human Genome Project engaged in collaboration discussions; (2) the parties disagreed over the

appropriate timing of genomic data release; and (3) the parties failed to reach a collaboration

agreement, but continued to hold periodic discussions.  *Id.*  These facts, however, had already

---

[1]     *See McCarthy v. Paine Webber Group,* 164 F.R.D. 309, 313 (D. Conn. 1996) (citing Manual for Complex Litigation § 30.232 (3rd ed. 1995).

[2]     In addition to Plaintiffs' failure to meet Rule 23(b)(3)'s predominance requirement, class certification should also be denied for all the reasons set forth in Defendants' opposition and sur-reply briefs and during oral argument.

4

been disclosed in numerous newspaper and magazine articles prior to the Secondary Offering and were discussed in on-line chat rooms.[3]

> **A.    Prior To The Secondary Offering, Multiple News Sources Reported On The Collaboration Discussions Between Celera And The Human Genome Project**

Plaintiffs' allege that the "discussions between Celera and the Human Genome Project were not widely known by the public..." (Compl. ¶ 24) and that Celera should have disclosed that it had "engaged in, *and was continuing to engage in*, discussions with the Human Genome Project concerning collaborating on completing the mapping of the human genome." Compl. ¶ 39(a).  As shown below, the collaboration negotiations were widely disseminated in the media prior to the Secondary Offering.

| March 6 Los Angeles Times Article | Media Disclosures Prior to Secondary Offering[4] |
|---|---|
| Celera and the Human Genome Project discussed a potential collaboration. | "**Talk of collaboration** has flared among rivals pursuing one of biology's highest goals."<br><br>"But **merger talks that began last year** have petered out."<br><br>"[T]here was much **speculation last year that Celera and the public consortium would pool their resources**.  There has been little sign of progress on this front…"<br><br>"Yet, **negotiations on joining the efforts** have stalled, largely over when and how results would be released." |

---

[3]     Plaintiffs' counsel argued at the hearing that if the Court accepted Defendants predominance argument, a class action could never be certified in a Securities Act case.  As explained in Defendants' opposition and sur-reply briefs, however, this is a unique case in which the alleged omission involved one of the most widely publicized events in scientific history.  This case can be distinguished from other securities cases because the specific facts alleged to be omitted were discussed in numerous media publications prior to the offering.

[4]     Defendants' Opposition to Plaintiffs' Motion for Class Certification provided the Court with 21 articles and press releases addressing the substance of the L.A. Times article.  The quotations set forth herein are taken from those articles and nine *additional* articles listed in Appendix A.  Defendants will of course provide the Court with copies of these additional articles upon request.

5

| March 6 Los Angeles Times Article | Media Disclosures Prior to Secondary Offering[4] |
|---|---|
| | "The accelerated schedule for completion of the human genome depends on **collaboration between Celera and the HGP**." <br><br> "The public and private rivals racing to decode the human genetic blueprint are **discussing collaborating on the effort**." <br><br> "Representatives from Celera . . . made overtures to the international, public group of academic researchers **suggesting the two groups collaborate.**" <br><br> "Venter has proposed **teaming up**." |

**B.    Prior To The Secondary Offering, Multiple News Sources Reported That Celera And The HGP Were Unable To Reach An Agreement Due To Differences On The Timing Of Data Release, But Continued To Negotiate**

Plaintiffs' allegations relating to the parties' differences of opinion on data release – "how quickly deciphered portions of the code could be released" – were similarly reported prior to the L.A. Times article and the Secondary Offering.  Compl., ¶25.  According to the Los Angeles Times, data release was the "sticking point" on a potential collaboration.  Gallagher Aff., Ex. N.  The following articles published prior to the Secondary Offering similarly reported that data release would be a stumbling block to a collaboration:

| March 6 Los Angeles Times Article | Media Disclosures Prior to Secondary Offering |
|---|---|
| "The sticking point was over how quickly deciphered portions of the code would be released." <br><br> "Leaders of the publicly funded effort wanted to continue their practice of immediate release with no strings attached." <br><br> "The two sides were unable to | "The trick [to a collaboration] will be **merging [HGP's] policy of making data public so all scientists can work with it and [Celera's] need to make profits to satisfy shareholders**." <br><br> "Collins and other **HGP scientists are concerned about how and when data would be released** if there were to be a collaboration on the human." <br><br> "[Michael] Morgan [of the Wellcome Trust] is still **firmly committed to the policy of publishing data nightly** … This might limit collaboration with profit-minded Celera." |

6

| bridge their differences in conversations since the Dec. 29 session and were clearly still at loggerheads Sunday [March 3, 2000]." | "No one knows yet whether the **two projects will ultimately merge their data in a way that will be useful to scientists**, but some researchers seem pessimistic about the outcome." "The **sticking point** is those patents, and the **insistence of the public project's leaders that Celera make all its data available immediately**, rather than sitting on it for months." "[T]he suggestion is that **the two organization's policies on disclosure and access to the DNA data are the key obstacles**." **"Negotiations on joining the efforts have stalled, largely over when and how results would be released."** |
| --- | --- |

It is not relevant whether the substance is true. It is only relevant that these articles disclose exactly what Plaintiffs claim was omitted from the prospectus. These substantial disclosures make the knowledge of each of the purported class members a central issue in this case. *See Klein v. A.G. Becker Paribas, Inc.,* 109 F.R.D. at 652 (Goettel, J.). Since common questions do not predominate, this case cannot be certified as a class action under Rule 23(b)(3). *See Zimmerman v. Bell,* 800 F.2d at 390 (affirming denial of motion for class certification in securities case because "'[t]he extensive public disclosure of matters allegedly omitted . . . raises the possibility that defendants can establish a defense against individual class members'").

**C.    Celera Shareholders Were Actually Aware Of The Potential Collaboration And The Dispute Over Data Release**

"The Motley Fool" is an extremely popular investment advice service known for, *inter alia,* its website and its nationally syndicated newspaper column and radio show. It maintains message boards dedicated to particular stocks, where investors can discuss their thoughts and concerns about the stock. An examination of the Celera message board at The Motley Fool from November 1, 1999 through March 30, 2000 reveals that actual or potential Celera investors – the proposed class members – read and discussed some of the news articles

7

Defendants' cite as evidence that the alleged omissions were publicly disclosed prior to the Secondary Offering.

On December 15, 1999, one user forwarded the December 14, 1999 article published in The Houston Chronicle entitled *Public, Private Gene Mappers May Pool Their Efforts*. *See* Posting from AFHII to boards.fool.com (Dec. 15, 1999). The user quoted a paragraph of the article regarding collaboration. *Id.* Similarly, a user forwarded the January 11, 1999 New York Times article that discusses the possibility of collaboration. *See* Posting from oswanski to boards.fool.com (Jan. 11, 2000). On November 15, 1999, one user commented on the November 14, 1999 article published in the New York Times, entitled *Talk of Collaboration on Decoding of the Genome*. *See* Posting from heihojin to boards.fool.com (Nov. 15, 1999). He states that "[t]he article implied that Collins was being insistent on immediate public release of the data. I trust that Venter, as president of Celera, is opposed to this." *Id.* The postings to this extremely popular message board are not speculation: Celera investors read the articles, knew of the potential for collaboration, and understood the difficulties associated with such a collaboration.

**D.    The Details Of The December 29 Meeting Are Not Material**

Plaintiffs will undoubtedly assert that neither the Prospectus nor the pre-Secondary Offering articles disclosed various details concerning the December 29 meeting, such as who attended, when the meeting was held, where the meeting was held, and what tactical positions each side asserted during each individual negotiating session. "Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement. Not every such business conversation gives rise to legal obligations." *Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir. 1988). The Supreme Court has long

8

admonished issuers not to "bury shareholders in an avalanche of trivial information." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448 (1976). That a particular meeting took place on December 29, that it took place at Dulles Airport, or that one party used a particular negotiating tactic is precisely the type of immaterial information that the Supreme Court indicated should not be included in offering materials.

## II. CELERA'S STOCK PRICE ACTUALLY *INCREASED* MORE THAN SEVEN PERCENT THE DAY THE L.A. TIMES ARTICLE WAS PUBLISHED

During the hearing, Plaintiffs' counsel asserted that the substance of the L.A. Times article could not have been known to the market prior to the Secondary Offering because Celera's stock declined when the article was published. Plaintiffs are, once again, wrong on the facts. The most compelling evidence that the information set forth in the L.A. Times article was already known to the market, or not material, is that Celera's stock price actually *increased* the day the article was published.[5] Celera issued stock in the Secondary Offering on February 29, 2000 at $225 per share. As shown in the graph below, on Friday, March 3, 2000, Celera's stock price closed at $234.50. The L.A. Times article was published on Monday morning, March 6, 2000.[6] On that day, Celera's stock price actually *increased* to a post-offering peak of $247 per

---

[5]    It is well settled that courts in the Second Circuit may take judicial notice of well-publicized stock prices. *See Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 167 n.8 (2d Cir. 2000).

[6]    The London Financial Times, which is available hours before the New York Stock Exchange opens, also published an article on March 6, 2000 discussing the December 29 meeting. *See* Carlos Grande, *Talks Breakdown Sparks Fresh Genome Race,* FINANCIAL TIMES (March 6, 2000).

9

share – an increase of 5% over the March 3, 2000 ($234.50) closing price and 7% over the

March 6 opening price ($229).[7]

**Celera Closing Stock Price February 28, 2000 – March 6, 2000**



Celera is traded on the New York Stock Exchange ("NYSE").  Courts have long

held that the NYSE is a well-developed and efficient market that incorporates new publicly

available information about a given security *immediately*.  *See Oran v. Stafford,* 226 F.3d 275,

282 (3d Cir. 2000) ("immediately"); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410,

1425 (3d Cir. 1997) ("immediately"); *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 454

n.7 (N.D. Ala. 2003) ("immediately").  It is a market reality that a stock's price will not change

---

[7]       Putting aside whether the 7% increase in Celera's stock price was sufficiently significant to show that the market viewed the L.A. Times article as positive, it is indisputable that the absence of a decline, whether statistically significant or otherwise, demonstrates that the either the market was already aware of the information set forth in the L.A. Times article, or considered it immaterial.

10

upon the release of "confirmatory information." *Greenberg v. Crossroads Sys., Inc.,* No. 03-50311, 2004 WL 624766, at *4 (5th Cir. April 14, 2004)(copy attached as Exhibit B).[8]

<u>CONCLUSION</u>

For the foregoing reasons, Defendants PE Corporation (n/k/a as Applera Corporation), Tony White, Dennis Winger, and Vikram Jog respectfully request that this Court deny Plaintiffs' motion for class certification.

Respectfully submitted,

OF COUNSEL:

Michael J. Chepiga (CT 01173)
Robert A. Bourque (CT 05269)
William M. Regan (CT 25100)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
(212) 455 2502 (fax)
mchepiga@stblaw.com

DEFENDANTS PE CORPORATION,
TONY L. WHITE, DENNIS L. WINGER
and VIKRAM JOG

By: _____
Stanley A. Twardy, Jr. (CT 05096)
Thomas D. Goldberg (CT 04836)
Terence J. Gallagher (CT 22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
(203) 977-7300
(203) 977-7301 (fax)
tdgoldberg@dbh.com(e-mail)

---

[8]     Defendants do not contend that Celera's stock price did not decline in 2000 – only that it did not decline in response to publication of the L.A. Times article. From the end of March 2000 through the end of December 2000, Celera's stock price declined in connection with the well-publicized downturn in the biotechnology market.

     This is to certify that a copy of the foregoing was sent via overnight courier, postage prepaid, this 13th day of May, 2004, to:

| | |
|---|---|
| J. Daniel Sagarin, Esq. | Sanford P. Dumain, Esq. |
| David A. Slossberg, Esq. | Carlos F. Ramirez, Esq. |
| Brian C. Fournier, Esq. | Milberg Weiss Bershad & Schulman LLP |
| Hurwitz & Sagarin, LLC | One Penn Plaza – 49th Floor |
| 147 N. Broad Street | New York, NY 10119 |
| P.O. Box 112 | |
| Milford, CT 06460 | |
| | Lead Counsel for Plaintiffs |
| Liaison Counsel | |

 

_____

       Terence J. Gallagher