1
2                UNITED STATES DISTRICT COURT
3                   DISTRICT OF CONNECTICUT
4    _____
                                                   )
5    IN RE PE CORPORATION SECURITIES               )
     LITIGATION                                    )
                                                   )
6                                                  )
     Master File No. 3:00CV-705 (CFD)              )
7    _____)
8
9            Videotaped deposition of HAROLD VARMUS
10   held at 430 East 67th Street, New York, New
11   York, on Wednesday, September 15, 2004,
12   commencing at 9:03 a.m., before Peter Ledwith,
13   Legal Video Specialist, and James W. Johnson,
14   Registered Professional Reporter and a Notary
15   Public of the State of New York.
16
17
18
19
20
21
22
23
24
25

1                        Varmus
2       A.    I don't specifically recall, no.
3       Q.    Is there any reason to believe that you
4  did not receive this e-mail?
5             MR. REGAN:  Objection to form.
6       A.    The only reason might be that at about
7  that time I was traveling to New York to, for that,
8  the occasion I referred to earlier, which I was
9  going to meet the faculty at this place, at the
10 annual Christmas party, and I don't recall exactly
11 when I traveled, and in those days I didn't have a
12 Blackberry and I wouldn't have had a way to receive
13 the mail until I got back to Washington, so I
14 don't, I don't know whether I received it at the
15 time.
16            I would probably have received it at
17 some point.
18      Q.    Do you recall whether you received this
19 a few days after?
20      A.    Presumably.  I wasn't here very long.  I
21 was only here for a few days.
22      Q.    Take a look at the first sentence.  It
23 says, "Thank you all for your thoughtful comments
24 on the conference call last Monday."
25            Does this refresh your recollection

1                        Varmus
2    whether you would have participated in a conference
3    call with at least one or more of the individuals
4    listed on this e-mail on Monday, December 6th?
5         A.    I don't recall.  There were many
6    conference calls I was on.  I was probably on a
7    few, but not all.
8         Q.    And when you say there were many
9    conference calls, do you --
10        A.    I'm saying that because the G5 leaders
11   who were represented here spoke frequently.  There
12   was at least one weekly work meeting, and other
13   conversations as well.  I was not a party to all of
14   them.
15        Q.    Would these conference calls that you
16   just testified to, would they have concerned the
17   proposed collaboration with The Human Genome --
18        A.    I don't know.
19        Q.    -- Project with Celera?
20        A.    I wouldn't know.  I wasn't party to
21   them. The weekly calls were mainly working calls.
22   Whether they would have included a reference to
23   this, you'd have to ask someone else.
24        Q.    Let's go to the second sentence of that
25   paragraph.  Let's, actually, take the second

1                          Varmus

2   sentence for a second.  Let's see if this refreshes

3   your recollection concerning a phone call that you

4   would have perhaps been on that day, although you

5   testified you were in New York at the time.

6        A.   No, I said I wasn't sure when I came to

7   New York.  I have to go back and consult my travel

8   schedule.

9        Q.   Would this refresh your recollection,

10  though, the second sentence, as to whether or not

11  you participated in a call at noon, December 8th?

12       A.   I don't remember.

13       Q.   If you could go to the third sentence,

14  it says, "Harold's opportunity to see Arnie Levine

15  on Friday afternoon provides a chance for an

16  exploratory conversation about whether the model

17  outlined in our discussion has a realistic chance

18  of being acceptable to Celera."

19            Do you recall whether or not your

20  objective at the meeting was specifically to

21  present to Arnie Levine a model that had been

22  discussed among your members, the members of the

23  group?

24       A.   I --

25            MR. REGAN:  Objection to the form of the

1                       Varmus
2    whether the opportunities were real.
3         Q.    If you'll look at the proposed agenda,
4    do you recall who formulated this proposed agenda?
5         A.    I, I don't know for certain, but I would
6    presume it was Francis.
7         Q.    Of all the individuals involved in this,
8    would you say that he was probably the most
9    involved in all of this?
10              MR. REGAN:    Objection to the form.
11        A.    I'm not sure what you mean by "all of
12   this."
13        Q.    Well, the collaborat -- the
14   negotiations, the talk that had been going on for
15   the past months.
16        A.    No.  Initially Eric Lander was the most
17   involved.
18        Q.    And after Eric Lander do you recall who
19   would have been most involved?
20        A.    Well, Francis was the nominal director
21   of The Human Genome Project, so it would be
22   perfectly appropriate that he would be viewed as
23   the leader of our team of four.
24        Q.    So you didn't take part in, in
25   preparing, in drafting this proposed agenda?

1                        Varmus

2       A.    I was asked to comment on it.  I -- I --
3  I didn't draft it.
4       Q.    Did you ever discuss this proposed
5  agenda or this outline for, for the meeting with
6  Dr. Levine at any time?
7             MR. REGAN:  Objection to the form.
8       A.    I -- I would certainly doubt it.  If I
9  had any conversations with Dr. Levine between --
10 well, except for the conversation after -- that was
11 relatively before.
12      Q.    The December 22nd conversation?
13            MR. REGAN:  Objection to the form.
14      Q.    Or the December 10th conversation?
15      A.    The December -- well, I'm thinking of
16 the most recent before the 27th, and that would
17 have been the conversation that was alluded to in
18 the e-mail that we just discussed.  Well, and the
19 recollection of discussing the agenda.
20      Q.    Is it fair to say that -- and now I'm
21 directing your attention to the "Shared Principles"
22 document, which is referenced here in this e-mail.
23            MR. REGAN:  Object -- sorry.
24            MR. RAMIREZ:  Can I ask the question.
25            MR. REGAN:  Yes.

1                        Varmus
2              MR. RAMIREZ:  Thanks.
3        Q.    Is it fair to say that what was
4   contained in the "Shared Principles" document --
5        A.    You're referring to the shared, the
6   document that is here?
7        Q.    Yes.
8        A.    Which is amended --
9        Q.    Appears in many forms.
10       A.    -- truncated and slightly changed.
11       Q.    I think we can use this version of it,
12  and, if you could, just take a quick look and make
13  sure.
14       A.    Mm hmm, yes.
15       Q.    Is it fair to say that what was
16  contained in this "Shared Principles" document
17  attached to this e-mail, that this was, that the
18  content of it would not have come as a shock to
19  individuals on the Celera side?
20             MR. REGAN:  Objection to the form.
21       A.    I, I don't know.  I mean, a shock?  I
22  would assume not, but -- after all, you know, it is
23  not so different from the November 14th document
24  you showed me that, that was addressed to Craig
25  Venter, among other people.

```
 1                       Varmus
 2              You know, there are some significant
 3   changes, for example, something that the very first
 4   statement reflects the reconciliation of views, of
 5   slightly different views that I've expressed to you
 6   in testimony, because I said I agreed with the
 7   general principles initially or meant with some of
 8   them.
 9              And then later on you elicited from me
10   the opinion which I did have that it would have
11   been very difficult for Celera to develop a
12   complete genome sequence on its own without,
13   without resource to the, without recourse to the
14   human genome sequence.
15              And so now it says that each has the
16   capacity to generate substantial coverage of the
17   human genome, as opposed to saying developing the
18   sequence of the human genome, so there obviously
19   have been changes which -- I don't know if Craig
20   had seen these before or not, so it's difficult for
21   me to answer.
22              I don't know, I don't know how many
23   versions of it he saw, or I believed, or I had
24   reason to believe he may have seen that first
25   version September 14th.
```

1                       Varmus
2       Q.   Well, putting aside that, the fact that
3  Craig Venter was on that November 14th version of
4  the document, were the general ideas that were
5  included in the, in this "Shared Principles"
6  document, and in particular joint publication, data
7  release and public relations, were those matters
8  that you had discussed with Arnie Levine throughout
9  the months leading up to the meeting?
10           MR. REGAN:  Objection to the form.
11      A.   I think it's reasonable to assume that
12 these would have been the topics I would have
13 highlighted as matters for discussion.  I don't
14 believe we had detailed discussion on how they
15 might be adjudicated.
16      Q.   Were there general discussions?
17           MR. REGAN:  Objection to the form.
18      A.   Yes.
19      Q.   We're finally arriving at the meeting,
20 so it shouldn't be too much longer, and let me just
21 start out by asking you, on December 29th, 1999 do
22 you recall meeting with members of the Celera side?
23      A.   Certainly.
24      Q.   And prior to the meeting did you meet
25 with members of the public side to discuss anything

```
 1                      Varmus
 2   concerning --
 3       A.    I don't remember any significant
 4   conversations.  I remember the trip to the airport
 5   very well.
 6             I happened to be on a, to be interviewed
 7   on NPR, so I remember that, and when I arrived
 8   there were some other people who had been driving
 9   at the same time and during that interview with
10   Susan Danburg (ph), so there was joking about that,
11   and I don't remember any substantive conversations
12   before, before the meeting, but that roots the
13   conversation pretty clearly in my memory.
14       Q.    Do you recall who attended the meeting
15   on the Celera side?
16       A.    Yes.
17       Q.    And who were the individuals there?
18       A.    Craig Venter and Paul Gilman, Arnie
19   Levine, and then Tony White arrived late.
20       Q.    And on the public side?
21       A.    Myself, Bob Waterston, Francis Collins
22   and Martin Bobrow.
23       Q.    I've been wondering how that was
24   pronounced, Martin Bobrow.
25             And how did the, how did the meeting
```

1                        Varmus

2  begin, if you recall?

3       A.   It's difficult to say.  It certainly

4  began, as I recall, Francis took the lead in the

5  conversation, and there was some general discussion

6  on both sides of where the two efforts were, and an

7  outlining of the consensus document, but I don't

8  have detailed recollection of how the meeting

9  began, but it certainly began in a positive mode.

10      Q.   What, if anything, do you recall being

11 discussed concerning a joint publication?

12      A.   Certainly it was discussed.  In general,

13 we went through the various points, and, and

14 frankly the whole, the whole tenor was, seemed

15 more, more open to negotiation than it did after

16 Tony White arrived.

17      Q.   Okay.

18      A.   The character of the meeting had changed

19 when Tony appeared.

20      Q.   Do you recall what specifically Tony

21 raised during the meeting that led you to believe

22 that the tenor changed?

23      A.   Well, there was a more overt recognition

24 that, that the company was, you know, beholden to

25 its stockholders, that the company had a large

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                        ) Ss

6    COUNTY OF NEW YORK  )

7

8            I, JAMES W. JOHNSON, a Registered

9    Professional Reporter and Notary Public within

10   and for the State of New York, do hereby

11   certify:

12           That HAROLD VARMUS, the witness whose

13   deposition is hereinbefore set forth, was duly

14   sworn by me and that such deposition is a true

15   record of the testimony given by such witness.

16           I further certify that I am not related

17   to any of the parties to this action by blood

18   or marriage and that I am in no way interested

19   in the outcome of this matter.

20           IN WITNESS WHEREOF I have hereunto set

21   my hand this 20th day of September 2004.

22

23                    _____

                               JAMES W. JOHNSON

24                      Registration #01J05000925

                      Commission Expires 9/4/2006

25