1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF CONNECTICUT

3

4      In re PE Corporation Securities Litigation

5                          Master File No. 3:00CV705(CFD)

6

7      DEPOSITION OF ROBERT H. WATERSTON, M.D., Ph.D.

8

9      Taken on behalf of the Plaintiff

10     August 17, 2004

11

12     BE IT REMEMBERED THAT, pursuant to the Washington Rules of

13     Civil Procedure, the deposition of ROBERT H. WATERSTON,

14     M.D., Ph.D. was taken before Kathleen Knowlton, a

15     Certified Shorthand Reporter, # 29906, and a Notary Public

16     for the State of Washington, on August 17, 2004,

17     commencing at the hour of 9:22 a.m., the proceedings being

18     reported at 1001 Fourth Avenue, Suite 2550, Seattle,

19     Washington.

20

21

22

23

24

25

1   don't remember the -- I don't remember the specific
2   contents of those specific phone call.
3           BY MR. WEISS:
4       Q.  Do you recall at that time whether Mr. Sulston
5   indicated whether he'd had a particular preference for not
6   going ahead in the collaboration with Celera or, you know,
7   improving discussions towards that end?
8           MR. REGAN:  Objection to the form.
9           THE WITNESS:  I can't -- I don't remember
10  specifically with regard to the response to this mail.  I
11  mean, John was generally very skeptical of the situation.
12  He wasn't dead set against it.  He was -- he wanted to
13  make sure that whatever agreement actually was a realistic
14  one and looked after everybody's interests.
15          I mean, I view our discussions as sort of a way,
16  a sounding board to represent so that we thoroughly aired
17  the issues on both sides.
18          BY MR. WEISS:  7.
19          (Whereupon, an e-mail from Bob Waterston to
20  jmcphers@alu sent 11/24/99 was marked as Exhibit-7 for
21  identification.)
22      Q.  Dr. Waterston, please take a look at what's been
23  marked as Plaintiff's Exhibit 7, which is Bates range RW
24  00388 through 393.
25          (The witness reviews the exhibit.)

1   A.   Yes.

2   Q.   Have you seen this document before?

3   A.   Again, I wrote it. I mean, I -- it's my e-mail.

4   Q.   Do you recall if you were asked by others to

5   write this or you just wrote it of your own volition?

6   A.   I don't recall.

7   Q.   Your conclusion in the -- on the last page of

8   the document is, "Thus, of the two probable options I

9   remain most comfortable staying the course and dealing

10  with Celera as we are rather than joining them and having

11  to deal with them as collaborators."

12       You see that?

13  A.   Uh-huh.

14  Q.   Did your opinion on that ever change between the

15  time you wrote this and the December 29th meeting?

16       MR. REGAN: Objection to the form.

17       THE WITNESS: Not in substance. I vacillated

18  some as to how comfortable I was with -- with trying to

19  reach an agreement with Celera.

20       BY MR. WEISS:

21  Q.   But you never came to the opinion where you

22  thought reaching an agreement was more preferable than

23  staying the course?

24       MR. REGAN: Objection to the form.

25       THE WITNESS: I think -- I mean, for instance,

1   at the time of the meeting I was -- I was actually

2   optimistic in the days before the meeting that -- that

3   some -- something worthwhile could come from it.

4          BY MR. WEISS:

5       Q.   And what was the source of that optimism?

6       A.   It's hard to say in retrospect.  I think that

7   the nature of the statement that we had crafted tended

8   to -- tended to reassure me on a number of the points that

9   I was concerned about.  But -- but it was unclear -- I

10  mean, that was a statement that had been developed on our

11  side, and it wasn't clear how it was going to be received

12  altogether.

13      Q.   So your optimism was not based on any feedback

14  from Celera; is that fair to say?

15      A.   Well, my understanding was that -- that I think

16  that Celera had seen, if not the specifics, at least had

17  been made aware of some of the substance of the -- of what

18  we were writing.  And -- and that was -- that was really

19  the basis for the meeting.

20         MR. REGAN:  Could I ask one more question just

21  for clarification.  The writing that you're referring to,

22  is that the document that was ultimately labeled the

23  shared principles document?

24         THE WITNESS:  Yes, that would be -- I think that

25  was what it was called.

```
 1              BY MR. WEISS:  Please mark that as Exhibit 8.
 2              (Whereupon, an e-mail from Francis Collins to
 3   Bob Waterston sent 24 Nov 1999 was marked as Exhibit-8 for
 4   identification.)
 5        Q.    Dr. Waterston, please review Plaintiff's Exhibit
 6   8, which is Bates range RW 359 through 361.
 7              (The witness reviews the exhibit.)
 8        A.    Yes.
 9        Q.    Have you seen this e-mail before?
10        A.    Again, I don't recall specifically, but I --
11   it's something I sent, so I clearly saw it.
12        Q.    Do you know who --
13        A.    And I remember the things of this nature.
14        Q.    Do you know whose comments are in the capital
15   letters?
16        A.    I don't, actually.  I presume -- I presume
17   they're from Francis, but I don't know.
18        Q.    On page --
19        A.    They could be mine.  I mean, I don't know.  This
20   has been circulated back and forth, I presume.  And I
21   don't know who they came from.  Although it says
22   somebody -- at least one of them says -- it could be,
23   "Leave it to me to suggest language."  I don't know.  They
24   were all made by one person.
25        Q.    Okay.  On page 2 in the section regarding data
```

```
 1   release --
 2       A.   Uh-huh, yes.
 3       Q.   A little up from the bottom of the page, you see
 4   where it says,
 5            "The media will carry a license to protect
 6       Celera from the data on the media being transferred
 7       to and incorporated in commercial databases competing
 8       with Celera's business as a database supplier."
 9            Do you see that?
10       A.   Yes.
11       Q.   And you see the discussion or the text in
12   capital letters that's after that?
13       A.   Yes.
14       Q.   Do you recall having discussions regarding what
15   the public's opening position should be in negotiations
16   with Celera regarding this time period?
17            MR. REGAN:  Objection to the form.
18            THE WITNESS:  I think -- I mean, I don't recall
19   any -- those specific discussions.  I think that the text
20   that's here is probably representative of our thinking.
21            BY MR. WEISS:
22       Q.   When you say "our thinking," you mean the
23   collective thinking of the public side?
24       A.   Of the -- of the -- of the several of us
25   involved in this -- in this negotiating team.
```

```
 1                (The witness reviews the exhibit.)
 2       A.   Okay.
 3       Q.   Do you recall receiving this e-mail?
 4       A.   Again, it's -- I'm included in the to list, so I
 5  got it and read it.
 6       Q.   Was it your expectation after the December 29th
 7  meeting that there would be shortly thereafter further
 8  discussions among the parties?
 9       A.   Yes.  The idea was that there would be some
10  follow up, explorations.
11       Q.   Have you had the opportunity to read the second
12  paragraph of the e-mail?  It says, "I also attach."
13       A.   Uh-huh.
14       Q.   Does this refresh your recollection as to
15  whether there was any discussion among the public-effort
16  participants as to whether there should be a public
17  statement regarding the negotiations or discussions?
18            MR. REGAN:  Object to the form.
19            THE WITNESS:  I mean, it clearly happened.  I
20  was not involved in it.  And so I -- but I don't recall.
21  I just don't recall this being a central issue.
22            BY MR. WEISS:
23       Q.   Do you ever have -- do you recall any
24  discussions with anyone as to what publics participants'
25  response should be if they were contacted by the press
```

1  regarding the discussions between the public and Celera?

2          MR. REGAN:  Object to the form.

3          THE WITNESS:  I -- again, I don't recall

4  anything.  I presume from the content of this, and I would

5  infer that we -- we must have agreed that we would say "No

6  comment."  But I don't know if we specifically talked

7  about strategies of dealing with the press.

8          BY MR. WEISS:

9      Q.  Do you have any specific recollection that you

10 agreed to say "No comment" or you're just assuming that?

11     A.  I just don't know.  It just was not a focus of

12 my attention.

13     Q.  Do you recall if there were -- actually,

14 withdrawn.  Were you still -- was the public side still

15 having their weekly phone calls during this time period?

16     A.  Yes.

17     Q.  And do you recall if after the December 29th

18 meeting the Celera negotiations continued to come up

19 during the weekly phone calls?

20         MR. REGAN:  Object to the form.

21         THE WITNESS:  I think that while it was

22 initially raised in the group, it rapidly became the

23 focused on the sub -- the discussions became targeted to

24 the subgroup.  And I don't -- in general, it was not a

25 major focus of those calls.

1            Francis may have reported generically, as he
2   puts in here, or in one of his e-mails about -- about
3   them. But the specific discussions happened in the
4   subgroups, as I recall.
5            BY MR. WEISS:
6       Q.   26.
7            (Whereupon, an e-mail from Francis Collins to
8   Martin Bobrow sent 1/23/00 was marked as Exhibit-26 for
9   identification.)
10           Please review Exhibit 26, which is RW 238 to
11  239.
12           (The witness reviews the exhibit.)
13      A.   Okay.
14      Q.   Do you recall receiving this e-mail?
15      A.   Yes, I do now.
16      Q.   Were there any discussions among the group after
17  December 29th as to why it was taking so long -- actually,
18  withdrawn.
19           Was there ever any discussions after December
20  29th as to when the next meeting with Celera should be?
21      A.   I mean, I think there was -- there was dismay
22  that it was so difficult for Francis to contact Celera at
23  all, people from Celera.
24      Q.   And was there ever any discussion about whether
25  the public effort should break off, you know --

# CERTIFICATE

I, Kathleen Knowlton, do hereby certify that pursuant to the Rules of Civil Procedure, the witness named herein appeared before me at the time and place set forth in the caption herein; that at the said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 20th day of August, 2004.

_____   10/15/04
Signature                 Expiration Date