UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

IN RE PE CORPORATION SECURITIES LITIGATION )

Master File No. 3:00CV-705 (CFD) )

Videotaped deposition of HAROLD VARMUS held at 430 East 67th Street, New York, New York, on Wednesday, September 15, 2004, commencing at 9:03 a.m., before Peter Ledwith, Legal Video Specialist, and James W. Johnson, Registered Professional Reporter and a Notary Public of the State of New York.

Varmus

Q. Let me show you a document that perhaps can refresh your recollection on when you became involved.

MR. RAMIREZ: I'd like to mark this as Plaintiff's Exhibit Number 1.

(Varmus Exhibit 1, E-Mail dated October 4, 1999 from Richard J. Roberts to Eric Lander, Bates Stamped WI0001-2, marked for identification.)

Q. And Plaintiff's Exhibit Number 1 is an e-mail which bears Bates numbers WI00011 through 0002, and it is an e-mail from Dr. Richard J. Roberts to Eric Lander dated October 4th, 1999. The subject is Celera.

A. Mm hmm.

Q. If you could, just take time to look at this, but in particular I'm going to focus you to the second paragraph, so for my question it's not going to be relevant that you read the entire e-mail.

A. Right, okay.

Q. I want you to go about halfway down the second paragraph.

A. Mm hmm?



Varmus

Q. And the sentence that I want you to look at, it reads, "You should also be aware that Arnie Levine would be quite enthusiastic and will be having an extensive meeting with Harold Varmus very soon. That might be a good opportunity to sound Harold out."

Does this refresh your recollection as to when you first became involved in discussing a potential collaboration with Celera?

A. Not particularly, because I, I don't recall knowing anything about the, about this, these discussions, and, you know, I hadn't -- I know that by mid-November I was aware of them, and this issue of having incentive meetings with Arnie is very, is rather nonspecific.

You must understand that at that time Arnie and I were having very, very frequent conversations, because I had decided sometime in August of 1999 that I would almost certainly take this job.

In fact, Arnie Levine was one of the first people who knew I was going to take this job, and on -- I believe it was October 7th, approximately that I came to New York to make a



Varmus

public announcement that I was going to take the job, so over the period of from late August until I arrived, and of course after as well, Arnie and I, as testimony has already established, were old friends, met frequently to talk about the partnership that would exist between our two institutions.

Q. Do you know who Richard J. Roberts is?

A. Yes.

Q. And who is Dr. Roberts?

A. Dr. Roberts is a well known molecular biologist who won a Nobel Prize for his work on splicing. I've known him for certainly close to 30 years, because he also was important in the development of so-called restriction enzymes, bacterial enzymes that cut DNA in certain ways, and it's very important in cloning technology.

He was initially at Cold Spring Harbor, and then went to work for a biotechnology company in Massachusetts -- and New England Biotechnology is the address from which he sent this message -- and won a Nobel Prize for his work, and we remained in touch over a variety of issues over the years.

Q. Do you know who Eric Lander is?



Varmus

A. Yes.

Q. Could you tell us briefly how you know Eric Lander.

A. I can't remember initially -- oh, I do know how I meet Eric initially. I was on sabbatical at the Whitehead Institute in 1989/89 and Eric was then a young faculty member, extremely smart, and we became friendly then and he was until recently the director of the Whitehead Institute sequencing center. It's then, it's now become a new institute, the Broad Institute.

He was the head of the Whitehead Institute sequencing center, one of the major sequencing centers in The Human Genome Project.

Q. Do you have any reason to believe that what's contained here in Dr. Roberts' e-mail to Eric Lander concerning your conversations with Arnie Levine, do you have any reason to believe that it would be inaccurate?

MR. REGAN: Objection to the form.

MS. WONG: I have an objection to the form.

A. Maybe you can rephrase the question.

Q. I'll withdraw it.

Varmus

these were the notes that were sent on November 14th that you showed me already.

Q. Those would be what was referred to as the summary of conversations?

A. Correct.

MR. REGAN: Objection to the form.

Q. It says that he would circulate them to Celera before our call, before your call or the group's call on Saturday.

Do you recall if he ever circulated this summary of conversations to Celera?

MR. REGAN: Objection to the form.

A. Do I recall? I, I would -- do you mean --

Q. Do you recall hearing, do you recall hearing --

A. You can see that the Exhibit 2 was apparently sent to Craig Venter, just based on the address on the summary. I, I don't, I don't, I would have no way of knowing whether they were, whether any further versions were sent to Celera.

Q. Now, if you look at -- there's this e-mail on November 17th, where there seem to be, you know, some communications between Dr. Collins,



Varmus

yourself and Eric Lander, and then there is the e-mail on the 19th between you and Dr. Waterston, and that e-mail refers to a talk that you had the night before.

A. Mm hmm.

Q. With, at the very least, Waterston, Dr. Waterston.

My question is, at this point in time how often was the public side communicating amongst each other concerning a proposed collaboration with Celera?

A. I think this was, this is probably the first conversation that I had with Bob about it. We didn't speak that often.

Q. Do you recall the conversations becoming more frequent as time went by?

A. No.

MR. REGAN: Objection to the form.

Q. Do you recall how often you might have spoken a week starting in late November through late December?

A. With whom?

Q. With your side, to begin with. With the various individuals on the public side.



Varmus

A. I can't recall precisely. That was a very busy time for me. I was contemplating a move to New York. I doubt whether I had further private conversations with, with Waterston. I probably spoke with Francis a few times, because he was nearby.

Q. If you can turn to the second page, and if you can take a look at the last paragraph under the number two, if you could read that paragraph to yourself.

Does this refresh your recollection as to whether you knew by this time -- and that's, this is around November, late November 1999 -- that Celera was looking to obtain or impose restrictions on any merged data up until 2005?

MR. REGAN: Objection to form, lacks foundation.

A. I think you need to rephrase the question. I, I don't understand that.

Q. Sure, I can clarify that.

At any time during this timeframe, the November 19th, November 17th to November 19th time period, had anyone communicated to you, if you recall, whether Celera was looking to obtain



Varmus

exclusivity over any data that would come out of a proposed collaboration?

A. I don't recall any conversation of that kind. It would have been intuitively obvious that Celera is going to, would be interested in some kind of exclusivity, because they were, this is a business.

MR. RAMIREZ: I'd like to mark this as Plaintiff's Exhibit Number 6.

(Varmus Exhibit 6, Memo dated November 24, 1999, Bates Stamped V12-17, marked for identification.)

Q. Now, it is a document that bears Bates numbers V12 through V17. If you could, take a look at that, Dr. Varmus, please. The date on this document is November 24th, 1999.

Do you recall whether any of the points raised in this particular document were discussed during the November 20th, 1999 meeting which -- conference call which was held on Saturday?

MR. REGAN: Objection to the form.

A. I would have no way of recollecting that. It's a long time ago. It's a fair presumption some of them were, but I don't know

Varmus

and general public statements made by Sanger Centre and the Wellcome Trust that they would have had concerns about it, just as many of us on the American team did.

Q. If you'd look at the, I guess we're now at the third line, towards the end, and the sentence starts, "I'm getting a bit more outside feedback about the situation -- the speculation on why Celera is pushing us now is that PE recognizes that they have or will soon have gotten just about all they are going to get of commercial value from the shotgun sequencing effort."

Do you recall whether the speculation that was discussed in this e-mail, whether that was something that you shared?

MR. REGAN: Objection to the form.

A. I don't recall.

Q. Do you recall ever hearing about this particular reason why Celera was pushing for a collaboration?

MR. REGAN: Objection to the form, lacks foundation.

A. No.

Q. If we go down -- let's see, that would



Varmus

be two more lines, the third line down from that sentence -- there's a sentence that starts, "This makes the most sense to me of any explanations I have heard."

Other than this reason for why Celera might have been pushing, or this proposed reason why Celera might have been pushing for sequencing the human genome, do you recall if you heard of any other reasons why Celera might be pushing for a proposed collaboration at or about December 3rd?

MR. REGAN: Objection to the form of the question.

A. I would say only that at least statements were made by them that they were tired of the adverse publicity. That might be one reason.

MR. RAMIREZ: I'd like to mark this as Plaintiff's Exhibit 9.

(Varmus Exhibit 9, E-Mail dated December 7, 1999 from Michael Morgan, Bates Stamped WI0010-12, marked for identification.)

Q. If you could, take a look at this document, Dr. Varmus. It's a document Bates stamped WI0010 through 12, and in particular I'm



Varmus

going to ask you questions concerning the last paragraph on the first page.

If I can direct your attention -- well, first off, you can see this is an e-mail from Dr. Michael Morgan to various individuals, including you.

A. Mm hmm.

Q. Who is Dr. Morgan?

A. Michael Morgan is, was a manager of the of the Sanger Sequencing Centre. I'm not sure what his precise title was, but he's a senior member of the Wellcome Trust. I've known him for some years, not very well, but he was certainly called upon to negotiate within The Human Genome Project on behalf of Sanger Centre.

Q. And do you recall receiving this e-mail at or about December 7th, 1999?

A. This specific e-mail, I don't recall this e-mail specifically.

Q. Is there any reason to doubt that you would not have received it, being that you're --

A. No.

MR. REGAN: Objection to form.

A. No, just that I know that December 7th



Varmus

is about the time that I was coming up here to New York to have an event with the faculty of my new institution, what would be my new institution, and I was probably a bit distracted by that, but there's no reason to believe I wouldn't have received it.

Q. If we could go down to the last paragraph on that first page, it says, "We agree that Harold Varmus and Arnie Levine should have exploratory talks, to decide if there is the possibility of a deal, before substantive discussions begin with Celera Genomics."

Do you recall how it was decided that you would be representing the public effort in exploratory talks with Arnie Levine?

MR. REGAN: Objection to the form of the question.

A. There was no referendum on my candidacy. There was -- but I had, I was viewed as being a fully, fully aware of the views of the members of the genome project, in a position of authority, and -- but in, but, as I said before, not a hands-on player, but as a well informed advisor and proponent of The Human Genome Project

Varmus

in whom the Wellcome Trust had confidence because I had negotiated with them before, and, and obviously I pushed to represent the NIH and its labs.

And it was known that I was on extremely good terms with Arnold Levine, who was a senior advisor to Celera, and that we saw each other frequently and that if there were any possibility of having a discussion to see whether a, an open discussion of a proposed collaboration was reasonable to have, that it would be a reasonable way to proceed.

Q. Do you recall when, when they described the term "exploratory talks," do you recall what specifically you were asked to explore with Arnie Levine?

MR. REGAN: Objection to the form.

A. I can't say exactly what the term means, but it was, I assume it was known to Francis and to Michael that I would be seeing Arnie because I was coming to New York, I saw him every trip here, and that we would have a discussion about whether a meeting, a face-to-face meeting would be, would be worth having. There was no intention that I would be negotiating at that stage.



Varmus

MR. REGAN: Can we take a short break before you move on. Is this a good time?

MR. RAMIREZ: I think this would be a good time.

THE VIDEOGRAPHER: The time is 10:36 a.m. We're going off the record.

(Recess taken.)

THE VIDEOGRAPHER: 10:43 a.m. On the record. Beginning of tape number two.

MR. RAMIREZ: I'd like to mark this as Plaintiff's Exhibit 10, a document bearing Bates numbers WI0015 through 0020.

(Varmus Exhibit 10, E-Mail dated December 8, 1999 from Francis Collins, Bates Stamped WI0015-20, marked for identification.)

Q. Dr. Varmus, if you could, please take a look at this document, and in particular I'm going to be focusing on the first page, specifically the first paragraph of the e-mail.

This is, appears to be an e-mail from Francis Collins to a group of individuals including you, Dr. Varmus, and it's dated Wednesday, December 8, 1999.

Do you recall receiving this e-mail?



Varmus

A. I don't specifically recall, no.

Q. Is there any reason to believe that you did not receive this e-mail?

MR. REGAN: Objection to form.

A. The only reason might be that at about that time I was traveling to New York to, for that, the occasion I referred to earlier, which I was going to meet the faculty at this place, at the annual Christmas party, and I don't recall exactly when I traveled, and in those days I didn't have a Blackberry and I wouldn't have had a way to receive the mail until I got back to Washington, so I don't, I don't know whether I received it at the time.

I would probably have received it at some point.

Q. Do you recall whether you received this a few days after?

A. Presumably. I wasn't here very long. I was only here for a few days.

Q. Take a look at the first sentence. It says, "Thank you all for your thoughtful comments on the conference call last Monday."

Does this refresh your recollection



Varmus

whether you would have participated in a conference call with at least one or more of the individuals listed on this e-mail on Monday, December 6th?

A. I don't recall. There were many conference calls I was on. I was probably on a few, but not all.

Q. And when you say there were many conference calls, do you --

A. I'm saying that because the G5 leaders who were represented here spoke frequently. There was at least one weekly work meeting, and other conversations as well. I was not a party to all of them.

Q. Would these conference calls that you just testified to, would they have concerned the proposed collaboration with The Human Genome --

A. I don't know.

Q. -- Project with Celera?

A. I wouldn't know. I wasn't party to them. The weekly calls were mainly working calls. Whether they would have included a reference to this, you'd have to ask someone else.

Q. Let's go to the second sentence of that paragraph. Let's, actually, take the second