UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re PE Corporation Securities Litigation | : | |
| | : | Master File No. 3:00 CV 705 (CFD) |
| | : | |
| | : | DECEMBER 21, 2004 |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 8

ARGUMENT ................................................................................................. 21

I.      PLAINTIFFS HAVE FAILED TO IDENTIFY A FALSE OR MISLEADING STATEMENT IN THE PROSPECTUS. .......................................................... 22

     A.      The Discussions Regarding Potential Interactions Between Celera and the HGP Were Disclosed in the Prospectus .................................................. 22

     B.      The December 29 Meeting Was Neither Material Nor Adverse ............. 23

     C.      The December 29 Meeting Did Not Lead to Retaliatory or Punitive Government Action ................................................................................ 27

     D.      The December 29 Meeting Had No Effect on Celera's Business Plan ..... 30

II.      THE CHALLENGED STATEMENTS ARE PROTECTED BY THE REFORM ACT SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE........... 31

     A.      The Allegedly Misleading Statements Are Forward-Looking ................ 32

     B.      Celera's Forward-Looking Statements Are Protected by Both Prongs of the Safe Harbor ................................................................................ 34

     C.      Celera's Forward-Looking Statements Are Protected By the Bespeaks Caution Doctrine ................................................................................. 37

III.      PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT DEFENDANTS ARE SECTION 12 SELLERS ......................................................................... 37

     A.      Celera and the Individual Defendants Did Not Pass Title to Plaintiffs ..... 38

     B.      Celera and the Individual Defendants Did Not Solicit the Purchase of Celera Shares ...................................................................................... 39

CONCLUSION ............................................................................................... 40

i

## TABLE OF AUTHORITIES

**Error! No table of authorities entries found.Error! No table of authorities entries found.Error! No table of authorities entries found.**

## PRELIMINARY STATEMENT

To best understand Plaintiffs' claim, it is helpful to take a step back and put this suit in context. Like many shareholder suits, the Plaintiffs' complaint was prompted by a decline in a public company's stock price – in this case, that of the Celera Genomics Group ("Celera"). Celera is a business formed by PE Corporation in 1998 to develop and commercialize genomic information. At the time Celera was formed, the media and the stock market were acutely interested in technology companies in general, and in biotechnology companies in particular. This interest caused a substantial increase in Celera's stock price in late 1999 and early 2000 – the very peak of the "dot com bubble" – from $15.31 per share on September 1, 1999 to $244 per share on February 29, 2000.

On March 14, 2000, President Clinton and Prime Minister Tony Blair issued a joint statement on genomics research (the "Joint Statement") that was widely misinterpreted as changing intellectual property law to the detriment of biotechnology companies. The entire biotechnology market immediately declined. The NASDAQ Biotech Index declined from its peak of 1,596 on March 6, 2000 to 1,177 the day after the Joint Statement. Celera's stock price likewise declined from its peak of $244 per share to $146 per share the day after the Joint Statement. In an effort to stem this decline, President Clinton issued a subsequent statement clarifying that he had no intention of changing intellectual property law.

Notwithstanding President Clinton's clarification, Plaintiffs ginned up this securities action in an attempt to profit from the downturn in the biotechnology market, relying on nothing more than a solitary news article. On March 6, 2000, approximately one week before the Joint Statement, the *Los Angeles Times* published an article about a December 29, 1999 meeting between Celera and the Human Genome Project ("HGP"), a research organization funded in significant part by U.S. government agencies, that was, like Celera, sequencing the

human genome. The article stated that the two sides discussed a range of possible interactions, but did not reach an agreement.[1]

Plaintiffs attempt to craft a securities law claim by (i) mischaracterizing every aspect of the December 29 meeting and (ii) inventing a connection between the meeting and the Joint Statement. More specifically, Plaintiffs' far-fetched theory of this case is that Celera should have disclosed in connection with a stock offering that the United States and the United Kingdom were going to issue the Joint Statement or otherwise punish Celera because Celera did not reach an agreement to work with the HGP on December 29. The remainder of this memorandum details why Plaintiffs' claim is as implausible in fact as it is in theory.

Plaintiffs commenced this action against Tony White, Dennis Winger, Vikram Jog (collectively, the "Individual Defendants") and PE Corporation in April 2000 alleging that the registration statement and prospectus (together, the "Prospectus") prepared in connection with a February 29, 2000 secondary public offering (the "Secondary Offering") of Celera common stock were false and misleading in violation of the Securities Act of 1933 because they did not disclose the December 29 meeting.[2] On October 5, 2001, Defendants filed a motion to dismiss Plaintiffs' First Amended Complaint (the "Complaint"). On April 1, 2003, the Court denied that motion without discussion and without prejudice to filing a summary judgment motion. Defendants now move for summary judgment because discovery has confirmed what

---

[1]     It is particularly strange that Plaintiffs cite the discussions between Celera and the HGP as the basis for a non-disclosure claim, since those discussions were widely followed in the media prior to the Secondary Offering. *See* Statement of Facts, Section D(2), *infra*; *see also* Defendants' Post-Hearing Memorandum of Law in Further Opposition to Plaintiffs' Motion for Class Certification, May 13, 2004, at 3-7.

[2]     PE Corporation is now known as Applera Corporation. At the time of the Secondary Offering, PE Corporation had two tracking stocks: PE Corp. – Celera Genomics Group and PE Corp. – PE Biosystems Group. This case relates solely to the Secondary Offering of PE Corp. – Celera

Defendants knew from the outset – what Plaintiffs have is stock price decline; what they do not have is a legitimate cause of action.[3]

Based solely on the *Los Angeles Times* article, Plaintiffs allege that "Celera and the Human Genome Project had ongoing discussions concerning [a] proposed collaboration that culminated" in the December 29 meeting, and that the "bargaining quickly broke down" at the meeting because "Celera wanted at least five years of exclusive rights to license the data produced by the merging of the two sides' efforts to commercial users."  (Compl. at ¶ 25.)  The undisputed evidence demonstrates that Plaintiffs' speculations concerning the December 29 meeting are, quite simply, wrong in every possible respect.

*The December 29 Meeting – "A Relatively Minor Side Show"* [4]

At the outset, Plaintiffs are wrong when they allege that the discussions between Celera and the Human Genome Project "were never referenced in any fashion in the Company's public filings or press releases and certainly were not disclosed in the Prospectus for the Secondary Offering."  (Compl. at ¶ 24.)  The Prospectus expressly discloses that Celera "has sought to coordinate its efforts with those funded by the U.S. government."  Summary judgment should be granted for Defendants on this basis alone because this disclosure plainly encompasses any particular conversation or meeting, including the December 29 meeting.

_____

Genomics Group common stock.  Accordingly, for the sake of clarity, this memorandum refers to the issuer as "Celera" although the issuer was technically PE Corporation.

[3]     Defendants' motion is timely filed in accordance with the schedule set forth in the parties' Rule 26(f) report, which was so ordered by the Court on June 12, 2003.  Section V(F) of the report provides that a party may move for summary judgment at any time after the close of fact discovery, but no later than 45 days after the close of expert discovery.  Fact discovery closed on October 20, 2004 and expert discovery has not yet commenced.

[4]     For the Court's convenience, Appendix A to this memorandum lists the individuals who participated in the effort to sequence the human genome and the discussions between Celera and the HGP.

Beyond the dispositive fact that the alleged omission was actually disclosed, the central premise of Plaintiffs' entire case – that the December 29 meeting was material and adverse to Celera – is patently incorrect.  First, contrary to Plaintiffs' allegation, Celera did not attend the December 29 meeting to negotiate the terms of a "proposed collaboration."  The uncontradicted evidence establishes that *the HGP* attended the meeting to explore whether the two sides might agree on a formal collaboration, *i.e.,* a complete merger of their respective sequencing programs.  Celera, on the other hand, attended the December 29 meeting merely to explore whether the two sides could reduce the adversarial media rhetoric that had characterized their relationship, and whether the parties might agree to simultaneously publish their scientific papers analyzing the human genome.  As Dr. Arnold Levine, a member of Celera's Scientific Advisory Board, testified, "*the two sides didn't even agree on the substance of the meeting, the content of the meeting or the agenda for the meeting.*"

Second, Plaintiffs erroneously allege that the December 29 meeting was the "culmination" of discussions between Celera and the HGP.  The evidence establishes just the opposite.  According to a December 28, 1999 email from the HGP to Dr. Craig Venter, President of Celera, the meeting was nothing more than an "*exploratory and general*" conversation.  Dr. Venter confirmed that the December 29 meeting was "*the first face to face and first formal discussion*" between Celera and the HGP.

Third, as Plaintiffs recently admitted, the December 29 meeting was simply one in a series of discussions between Celera and the HGP concerning a range of potential interactions.[5]

---

[5]    In support of their motion to compel the testimony of Dr. Francis Collins, Plaintiffs represented to the Court that "post-December 29, 1999 negotiations [between Celera and the HGP] culminated with Drs. Venter and Collins appearing together on the cover of *Time* [in June 2000]."  Plaintiffs' Reply Memorandum in Further Support of Plaintiffs' Motion to Compel the Testimony of Dr. Francis Collins, Nov. 19, 2004, at 2.

Celera and the HGP continued their sporadic discussions after the December 29 meeting and, contrary to Plaintiffs' "break down" allegation, ultimately agreed to: (i) simultaneously announce the completion of a draft genome sequence; (ii) reduce the adversarial media rhetoric; and (iii) publish their scientific papers simultaneously.

Finally, Plaintiffs' characterization of the December 29 meeting as a particularly important event in the course of discussions between Celera and the HGP is flatly contradicted by members of *both* organizations, who testified that it was insignificant:

- Dr. Venter testified that the discussions with the HGP were "a relatively minor side show;"

- Dr. Levine testified that "there's nothing about that meeting that's special;"

- Dr. Harold Varmus, former director of the National Institutes of Health ("NIH"), testified that discussions with Celera "were not the dominant events in my life;"

- Dr. Robert Waterston, a member of the HGP, testified that the meeting "hadn't produced anything useful."

Summary judgment should be granted for Defendants because the federal securities laws do not require disclosure of insignificant, non-productive meetings. To do so would risk burying shareholders in an "avalanche of trivial information," contrary to Supreme Court guidance.

In addition to mischaracterizing the December 29 meeting, Plaintiffs assert that their distorted version of the December 29 meeting should have been disclosed in the Prospectus because either (a) the United States and the United Kingdom would punish Celera as a result of the meeting (the "retaliation theory") or (b) Celera's business plan was doomed to fail because of the December 29 meeting (the "business plan theory"). Both theories are nothing more than unsubstantiated speculation.

*The Retaliation Theory*

The Complaint asserts that as a result of the meeting and alleged break down in negotiations, "Celera was at an increased and substantial risk that the United States and United Kingdom would take aggressive and punitive actions against Celera in order to ensure immediate and free access to the map of the human genome and its variants." (Compl. at ¶ 26.)[6] Plaintiffs further fantasize that the government would punish Celera (and by implication an entire industry) by curtailing intellectual property rights on genomic discoveries.

Underlying Plaintiffs' speculations are the *unstated assumptions* that the HGP had the power to influence the United States Patent and Trademark Office ("PTO"), and that it would exercise that power in retaliation for Celera's refusal to agree to a collaboration at the December 29 meeting. Plaintiffs had no factual support for either of those unstated assumptions at the time of the Complaint, and they have none at the close of fact discovery. The HGP has never had any legal relationship with the PTO and could not order or direct the PTO to deny Celera's intellectual property rights. Moreover, the undisputed testimony of Dr. Harold Varmus and Dr. Robert Waterston, respected members of the HGP, establishes that no one at the HGP ever asked the U.S. government to punish Celera or change intellectual property law to Celera's detriment.

Furthermore, Plaintiffs' interpretation of the Joint Statement as some sort of directive to the PTO to take adverse actions against Celera is utterly false and directly contradicted by *(i) the language of the Joint Statement itself, (ii) public statements by U.S. government officials; and (iii) the testimony of the Human Genome Project.* Drs. Waterston and Varmus testified that, contrary to Plaintiffs' allegation, the Joint Statement was wholly unrelated

---

[6]     Notwithstanding their own allegation, Plaintiffs refused to respond to a contention interrogatory requesting that Plaintiffs identify all instances in which the U.S. or U.K. governments actually punished Celera on the grounds that, *inter alia*, the terms "punish" and "punishment" are "vague, ambiguous and overly broad."

to the December 29 meeting and long preceded discussions between Celera and the HGP.  In short, the sworn testimony of key members of the HGP confirms that Plaintiffs' retaliation theory is nothing but unfounded speculation.

*The Business Plan Theory*

Recognizing the absurdity of their retaliation theory, Plaintiffs changed direction during discovery and pursued the alternative business plan theory.  Plaintiffs now assert that the description of Celera's business plan in the Prospectus was false and misleading because Celera failed to disclose that it did not reach an agreement to collaborate with the HGP and that its business plan was somehow dependent upon a collaboration.

Plaintiffs' business plan theory is even more implausible than their retaliation theory.  Celera's business plan contemplated the public release of the basic human genome and the sale of subscriptions to an annotated, searchable version of the genome, much like Westlaw or Lexis sells annotated and searchable versions of publicly available case law.  Every witness in this case, *including witnesses from the HGP*, testified that a collaboration with the HGP was never part of Celera's business plan.  Plaintiffs' business plan theory, like their retaliation theory, has no evidentiary support.

There are no disputed material facts and Defendants are entitled to judgment as a matter of law for several reasons.  First, Plaintiffs have failed to identify a false or misleading statement or material omission in the Prospectus – a necessary predicate for any claim under Sections 11 and 12 of the Securities Act of 1933.  Second, the challenged statements in the Prospectus, from which references to the December 29 meeting were allegedly omitted, are protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA" or "Reform Act") and the bespeaks caution doctrine.  Finally, Plaintiffs have failed to establish that Defendants sold stock to any class member – a critical element of Plaintiffs'

Section 12 claim.  For the foregoing reasons, and for the reasons explained more fully below, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Complaint in its entirety.[7]

### STATEMENT OF FACTS[8]

#### A.    The Human Genome Project

The HGP is an international research organization formed in 1990 to sequence the human genome.  (Ex. 7 at 10; Ex. 48)  It is funded by governments and non-profit organizations in the United States, the United Kingdom, Japan, France, and approximately 10 other countries. (Ex. 7 at 12-13; Ex. 48)[9]  The majority of the HGP's sequencing work was done through its five largest sequencing centers, referred to by members of the HGP as the "G-5."  (Ex. 6 at 62; Ex. 7 at 13-14.)  At its inception, the HGP planned to complete the sequencing and assembly of the human genome over a 15-year period at a cost of approximately $3 billion.[10]  (Ex. 3 at 39.)

#### B.    The Celera Genomics Group

PE Corporation formed Celera in 1998 to sequence the human genome and create the definitive commercial source of genomics information for the pharmaceutical, biotechnology

---

[7]    Plaintiffs also assert a control person claim against the Individual Defendants under Section 15 of the Securities Act.  15 U.S.C. § 77o (2004).  Since Plaintiffs' Section 11 and Section 12 claims are deficient as a matter of law, Plaintiffs' Section 15 claim must be dismissed as well.  *See Laser Mortgage Mgmt., Inc. v. Asset Securitization Corp.*, No. 00 CIV. 8100, 2001 WL 1029407, at *12 (S.D.N.Y. Sept. 6, 2001).

[8]    The facts on which Defendants' motion is based, and the evidence showing that there is no genuine dispute as to those facts, are set forth in Defendants' Local Rule 56(a)1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried and the exhibits thereto ("Ex.").

[9]    The Human Genome Project is not a federal agency.  It is a group of research scientists that received grants from, among others, various federal agencies and private charities.

[10]    After the formation of Celera, the HGP accelerated its sequencing efforts on at least two separate occasions.  (Ex. 1 at 36.)

and life science research industries.  (Ex. 1 at 32.)  Celera planned to complete the sequence and

assembly of the human genome faster, more accurately, and at a fraction of the cost of the HGP's

effort – three years at a cost of $300 million for Celera, as compared to the projected 15 years

and $3 billion for the HGP.[11]  (Ex. 3 at 39.)

>    At the time of the Secondary Offering, the foundation of Celera's business plan

was to sequence the human genome and sell valuable genomic, proteomic and related biological

and medical information in the form of an integrated information and discovery system, much

like the business model of Westlaw or Lexis.[12]  (Ex. 1 at 32; Ex. 2 at 23-24.)  Subscribers to

Celera's database purchased the ability to view, browse and analyze genomic data in an

integrated way that assisted scientists and commercial enterprises in accelerating their

understanding of the human genetic code.  (Ex. 1 at 38-39; Ex. 5 at 25-26.)[13]

---

[11]    Celera's ability to sequence the genome faster and cheaper was primarily due to the groups'
different sequencing methods.  The HGP utilized a sequencing strategy known as the "BAC by
BAC" approach, which involved breaking up the human genome into discrete sections of DNA
that are mapped to chromosomes and then sequenced one section at a time.  (Ex. 1 at 36.)  This
method first required HGP scientists to "map" the chromosomes.  Celera utilized a sequencing
strategy developed by Dr. Venter known as the "whole genome shotgun" methodology.  (*Id.* at
40.)  In laymen's terms, the whole genome shotgun strategy involved breaking up the entire
genome into thousands of smaller, manageable pieces, sequencing the individual pieces, and then
reassembling the genome using powerful computers and algorithms.  (*Id.*)

[12]    Westlaw and Lexis collect judicial opinions and other widely available legal information, which
are neither patentable nor otherwise protectable, and organize and annotate the material into
searchable databases.  Similarly, Celera planned to use the raw sequence of the human genome,
which is not patentable, and organize it into a searchable, annotated format.

[13]    As explained in the Prospectus, the sequencing of the human genome laid the foundation for two
additional components of Celera's business plan.  The first component, called "functional
genomics," addresses the issue of which genes are responsible for particular cellular functions.
(Ex. 1 at 34.)  The second component, personalized health/medicine, includes, *inter alia,* the use
of genomic information to individualize the diagnosis of disease and the development of
appropriate treatments.  (*Id.*)

C.     **Data Release Policy**

Recognizing the historic importance of the endeavor, Celera and the HGP each committed to publicly release the raw human genome sequence.  The differences between the data release policies of Celera and the HGP, however, are important in understanding why the allegations in the Complaint make no sense.

The HGP's data release policy was driven by an agreement known as the "Bermuda Accord," which calls for all members of the HGP to deposit within 24 hours all newly-generated DNA sequences into an online genetic database known as GenBank, administered by the NIH.  (Ex. 4 at 61; Ex. 48.)  GenBank data was free of any restrictions, and any member of the public, including Celera, was able to download GenBank data on a daily basis and use it in any way.[14]  The significance of the Bermuda Accord was that it gave Celera complete access to any data developed by the HGP.  (Ex. 2 at 121-22; Ex. 4 at 154-55; Ex. 6 at 147; Ex. 40.)  As a for-profit business, Celera was not party to the Bermuda Accord, and did not obligate itself to make its sequence data available to the HGP.  (Ex. 4 at 154-55.)

Celera planned to release its data when it completed the sequencing and assembly of the human genome, rather than on a daily basis.[15]  (Ex. 1 at 38.)  The Prospectus described Celera's data release policy as follows:  "[a]fter completion of sequencing and assembly, the Celera Genomics group expects to release a detailed ordered consensus human genome assembly.  The data that the Celera Genomics group releases publicly will be available . . . via its web site."  (*Id.*)

---

[14]     HGP's commitment to the Bermuda Accord was widely publicized in the media long before the Secondary Offering.  (*See, e.g.*, Ex. 10.)  *See also* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, Dec. 29, 2003, at 16-19.

[15]     Dr. Venter testified that the public release of the human genome was a fundamental condition of his agreement to join PE Corp. and form Celera in 1998.  (Ex. 3 at 13, 47.)

### D.    Media Coverage of the Effort to Sequence the Human Genome

The efforts of Celera and the HGP to sequence the human genome were among the most widely publicized events in scientific history, and are chronicled in thousands of news articles and at least two books. (*See, e.g.,* Exs. 10-20, 52, 53.)[16] The media portrayed Celera and the HGP as being in a "race" to sequence the human genome, with the possibility of Nobel prizes being awarded to the "winner." (Ex. 6 at 40.) While there was competition between Celera and the HGP for scientific attribution, Celera did not believe the HGP was a commercial competitor or that the outcome of the "race" was important to its business plan. (Ex. 1 at 49; Ex. 2 at 123; Ex. 4 at 29.)

### 1.    Adversarial Rhetoric

Due to the competition for scientific attribution, scientists affiliated with the HGP often made negative comments in the media concerning Celera and Dr. Venter. For example, Dr. Collins stated that he believed Dr. Venter's whole genome shotgun method would produce a "Mad Magazine" version of the human genome. (Ex. 11.) Celera perceived these negative press statements as unwarranted and not in the best interest of science. (Ex. 3 at 37-38.)[17]

### 2.    Media Coverage of Discussions Concerning Possible Celera/HGP Interactions

Although the media coverage of the effort to sequence the human genome was inaccurate and over-simplified in many respects, news outlets correctly reported that Celera and the HGP discussed potential interactions, and that those discussions had not resulted in an agreement due to the HGP's data release policy. The discussions were reported in several

---

[16]    A search in Lexis' "all news" database for articles containing the terms "Celera" and "Human Genome Project" in 1999 and 2000 produces 2,321 results.

national news sources well before the Secondary Offering.  (Exs. 12-20.)[18]  The *New York Times*,

for example, reported in November 1999 that "[t]alk of collaboration has flared among rivals

pursuing one of biology's highest goals" but that their "desire to collaborate [was] tempered by

rival agendas, especially on the question of access to the DNA data, and personal

disagreements."  (Ex. 12.)  Other publications contained similar descriptions of the relationship

between Celera and the HGP:

- "Yet, negotiations on joining the efforts have stalled, largely over when and how results would be released."  (Ex. 13.)

- "[T]he public consortium is negotiating with its private rival to pool efforts."  (Ex. 14.)

### E.    Discussions Concerning Possible Interactions Between Celera and the HGP

#### 1.    Fall 1999 Contacts

Beginning in the fall of 1999, there were a series of informal contacts between

Celera and the HGP regarding a range of possible interactions between the two organizations.

(Ex. 4 at 36-37; Ex. 5 at 38; Ex. 6 at 76.)  The Complaint wholly mischaracterizes these events.

#### a.    Conversations with Dr. Eric Lander

In the fall of 1999, Dr. Eric Lander, director of the Whitehead Institute for

Biomedical Research, one of the HGP's "G-5" sequencing centers, began contacting Celera

representatives to determine whether there was a way to reduce the negative media rhetoric and

---

[17]    Dr. Venter testified that he spent a great deal of his time rebutting comments made by members of the HGP "who felt they were in competition with the Celera initiative and continually attacked it, my team, myself, my organization [in] the press."  (Ex. 3 at 37-38.)

[18]    *See also* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, Dec. 29, 2003, at 19-20; Defendants' Post-Hearing Memorandum of Law in Further Opposition to Plaintiffs' Motion for Class Certification, May 13, 2004, at 3-7.

whether there was any basis for interactions between Celera and the HGP. (Ex. 2 at 29-30; Ex. 3 at 36-37; Ex. 4 at 35-36; Ex. 5 at 22-23.)

The interaction that Dr. Lander initially wanted to explore was a full-scale collaboration by which Celera and the HGP would agree to share sequence and backup data, to merge their respective versions of the human genome sequence, and to publish a single, joint scientific paper analyzing the merged genome. (Ex. 22.) Since Celera already had complete access to the HGP's sequence data, it had minimal, if any, commercial interest in pursuing a full-scale collaboration agreement. (Ex. 2 at 121-23; Ex. 3 at 39-40; Ex. 4 at 154-55; Ex. 23; Ex. 40.) Instead, Celera made clear to Dr. Lander that it was only interested in pursuing a simple cooperation agreement whereby Celera and the HGP would agree to publish their scientific papers analyzing the human genome simultaneously, and refrain from making negative statements about each other to the media. (Ex. 23.)

### b.    Conversations with Dr. Harold Varmus

Dr. Harold Varmus was the former director of the NIH, and a key member of the HGP team. In the fall of 1999, Dr. Varmus decided to leave the NIH and accept a position as President of Memorial Sloan-Kettering Cancer Center. (Ex. 4 at 47-49.) Dr. Arnold Levine was a Celera Scientific Advisory Board member, a friend of Dr. Varmus, and the President of Rockefeller University (which is located across the street from Sloan-Kettering). (*Id.*) On December 10, 1999, Drs. Varmus and Levine met at Dr. Levine's office to discuss possible interactions between their respective institutions, Sloan-Kettering and Rockefeller University. (Ex. 4 at 48; Ex. 6 at 75, 77-78.) At that meeting, Dr. Levine and Dr. Varmus discussed their belief that the rhetoric between Celera and the HGP in the press was embarrassing and bad for science. (Ex. 4 at 48; Ex. 6 at 76.) Dr. Varmus asked if a face-to-face meeting might be helpful. (Ex. 6 at 126-27.) Dr. Levine agreed that a meeting might help reduce the rhetoric. (*Id.*)

- 13 -

### 2.    The First Face-to-Face Meeting

The first formal meeting between Celera and the HGP was scheduled for December 29, 1999 at the Hyatt Hotel near Dulles Airport outside of Washington, D.C. (Ex. 39.) The Complaint grossly mischaracterizes every aspect of the meeting. The undisputed facts demonstrate that: (1) Celera never wanted a full scale collaboration with the HGP; (2) Celera only wanted to reduce the adversarial media rhetoric between the two sides; and (3) the December 29 meeting was simply one in a series of discussions between Celera and the HGP.

### a.    The "Shared Principles" Document

Before the December 29 meeting, the HGP drafted a document it called "Shared Principles" that (a) described scientific principles that, according to the document, were shared by Celera and the HGP and (b) proposed terms for a full-scale collaboration. (Ex. 27.) In reality, these "shared" principles were "shared" only by members of the HGP, and not by Celera. (Ex. 3 at 92-93, 98, 100; Ex. 4 at 63-64, 137; Ex. 7 at 47, 71.)

On December 28, 1999, the HGP emailed the "Shared Principles" to Celera for the first time, together with a proposed agenda for the next day's meeting. (Ex. 27.) Dr. Venter and others were surprised and angered by the document because it suggested that Celera had already agreed to certain principles or terms regarding a collaboration. (Ex. 3 at 100; Ex. 4 at 137.) Dr. Levine "didn't understand who shared these principles. They hadn't been openly discussed with [Celera]." (Ex. 4 at 63.) Dr. Venter recalled, "[t]hey weren't principles that were shared – [Dr. Collins] was sharing them with us. They weren't joint principles." (Ex. 3 at 98.)

Dr. Venter flatly rejected the HGP's "Shared Principles" document and proposed agenda. (Ex. 7 at 72; Ex. 26; Ex. 34.) He told the HGP what he had already told Dr. Lander – (1) that it was "a little late in the game" to achieve a full blown collaboration, particularly given the persistent adversarial comments made to the press by the HGP and (2) that Celera preferred a

simple cooperation agreement whereby the two sides would agree to a "cease fire" in the press and would publish their scientific papers simultaneously.  (Ex. 4 at 64-65; Ex. 26; Ex. 34.)

### b.    The December 29 Meeting

As could be expected given the above-described email exchange, the December 29, 1999 meeting was brief and unproductive.  Plaintiffs deposed six of the eight participants in the meeting, and their recollections were consistent.  After initial introductions, Dr. Collins introduced the terms of a full-scale collaboration that would be acceptable to the HGP.  (Ex. 5 at 80.)  Those terms included:  (i) an agreement by Celera to give the HGP access to its data and algorithms; (ii) an agreement by Celera to "merge" its data with the HGP's data; (iii) an agreement by Celera to publish a joint scientific paper analyzing the merged product; and (iv) an agreement by Celera to deposit the merged data set in GenBank after a short period of exclusivity lasting six months to a year.  (Ex. 27.)  The HGP's proposal did not indicate what consideration Celera would receive for any of these agreements.

Celera representatives responded immediately and negatively to the HGP's proposal.  As they had previously indicated, Celera had no commercial interest in a formal collaboration.  (Ex. 3 at 108-09, 111-12.)  Celera reminded the HGP that due to HGP's adherence to the Bermuda Accord, Celera already had access to the HGP's data.  (Ex. 4 at 154-55.)  Drs. Waterston and Varmus of the HGP testified that Tony White believed that the HGP's proposal was unreasonable because it did not protect the interests of Celera's shareholders:

- "Several times during the meeting Tony White said – brought up whether anything – whether – whether what we were talking about was going to be a benefit to the shareholders.  And – and that was – and several times said that that was his principal responsibility."  (Ex. 7 at 81.)

- "[Tony White] was constantly referring back to whether it was good for the shareholders or not."  (*Id.* at 92.)

- "[When Tony White spoke at the meeting,] there was a more overt recognition that, that the company was, you know, beholden to its stockholders, that the company had a large investment and that the intellectual property was extremely valuable . . . ." (Ex. 6 at 104-05.)

- "[W]hen Tony arrived he made clear that he, you know, he was, he was representing the business interests of the company . . . ." (*Id.* at 108.)

Mr. White responded to the HGP's proposal by stating that Celera's shareholders would need to receive a substantial benefit from any collaboration agreement with the HGP. (Ex. 2 at 55-56.) Mr. White suggested that such a benefit might be, for example, a period of exclusive access to a merged version of the genome for five to ten years. (*Id.* at 57.) This suggestion regarding an exclusivity period was made solely in response to the HGP's collaboration proposal. (Ex. 3 at 118-19; Ex. 5 at 32-33, 83-85.) It was not a component of Celera's business plan, and it was not a suggestion that Mr. White believed would be acceptable to the HGP. (Ex. 2 at 58, 122; Ex. 3 at 118-19, 123, 149.) The purpose of Mr. White's suggestion was to make clear to the HGP that their collaboration proposal was unreasonable. (Ex. 2 at 122.)

As Mr. White expected, representatives of the HGP found his suggestion of a five to ten year exclusivity period unacceptable given the HGP's commitment to the Bermuda Accord. (*Id.*; Ex. 6 at 116-17.) The meeting ended without an agreement as to cooperation or collaboration.

### 3.     Subsequent Discussions

Following December 29, Celera and the HGP continued to have sporadic discussions regarding potential interactions. (Ex. 4 at 143-44, 160-61.) For example, Tony White and Francis Collins spoke in a lengthy teleconference on January 22, 2000. (Ex. 35.) During that call, Mr. White reiterated that the HGP's proposed collaboration did not benefit

Celera in any way.  (*Id.*; Ex. 2 at 74.)  In January and February 2000, Dr. Collins repeatedly called Dr. Venter to explore the HGP's proposed collaboration.  (Ex. 7 at 109; Ex. 36.)

Discussions continued in March and April.  (Ex. 3 at 156, 178.)  Dr. Ari Patrinos, director of the DOE's segment of the HGP, arranged for several meetings between Dr. Collins and Dr. Venter.  (*Id.*)  As a result of Dr. Patrinos' efforts, Celera and the HGP agreed that they would jointly announce the completion of a draft assembly of the human genome, and that the two sides would simultaneously submit their papers for scientific publication.  (*Id.* at 178-79; Ex. 5 at 52.)[19]  Thus, contrary to Plaintiffs' allegations of a "break down" and "aggressive and punitive actions," the discussions between Celera and the HGP were actually successful in achieving an agreement to simultaneously publish their scientific papers.

### F.    Celera's Secondary Offering

Celera commenced its Secondary Offering two months after the December 29 meeting.  On February 29, 2000, Celera filed an SEC Form S-3 for 4.37 million shares of stock in a secondary public offering at $225 per share.  (Ex. 1.)  The Prospectus described in great detail Celera's business, the history of the effort to sequence the human genome, and 49 specific risks that might harm Celera's business.  (*Id.* at 8-20, 32-39.)[20]  Critically, the Prospectus

---

[19]    In accordance with this agreement, a ceremony was held at the White House on June 26, 2000 to announce the completion of a draft sequence and assembly of the human genome.  (Exs. 41, 42.) Celera and the HGP published scientific papers analyzing the human genome in *Science* and *Nature*, respectively, on February 16, 2001.  (Exs. 45, 46.)

[20]    The full text of the 49 risk factors is set forth in Exhibit 1 at pp. 8-20.  The Complaint raises a key question:  How could Celera have disclosed the alleged "omission" in this case?  If Celera disclosed every business meeting in which important issues were discussed, the Prospectus would have been thousands of pages long and inundated shareholders with unimportant information.  If Celera disclosed what Plaintiffs allege, that the December 29 meeting resulted in a break down of negotiations between Celera and the HGP, and that the U.S. government was likely to punish Celera as a result, this disclosure would have proven to be inaccurate because Celera continued discussions and reached an agreement with the HGP, and the U.S. government never attempted to punish Celera.

specifically disclosed the above-described discussions that Plaintiffs contend were omitted, stating that Celera "*has sought to coordinate its efforts with those funded by the U.S. government.*" (*Id.* at 49.) (emphasis added).

        The Prospectus also disclosed that from its inception, Celera never planned to monopolize or patent the genome, *but rather planned to publicly release the genome itself*. Indeed, the Prospectus disclosed that "[t]he Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data." (*Id.* at 12.) And Celera honored its commitment to publicly release the raw human genome sequence. (Ex. 54.) On February 16, 2001, Celera scientists published an accurate assembly and initial interpretation of the human genome in the journal *Science*. (Ex. 45.) These facts directly refute Plaintiffs' allegations that: (i) Celera "believed, above anything else, that maintaining exclusive rights to the human genome map was the most important aspect of its business strategy;" (Compl. at ¶ 48.) (ii) Celera needed to "obtain protection from the immediate release of the human genome code;" (*Id.* at ¶ 26.) and (iii) "public dissemination of the human genome map was a material risk to Celera's business strategy." (*Id.* at ¶ 46.)

        In addition, contrary to Plaintiffs' claim that the Prospectus understated the risks to Celera's business plan, data release policy, and intellectual property needs, as shown in the table below, the Prospectus actually contains a multitude of detailed, narrowly tailored disclosures regarding these risks:

| **THE PROSPECTUS DISCLOSES:** |
| --- |
| CELERA GENOMICS' COMPETITIVE POSITION MAY DEPEND ON PATENT AND COPYRIGHT PROTECTION, WHICH MAY NOT BE SUFFICIENTLY AVAILABLE – The Celera Genomics group's ability to compete and to achieve profitability may be affected by its ability to protect its proprietary technology and other intellectual property . . . . [Intellectual property protection] is likely to become more important to its business as it expands into the area of functional genomics, in that Celera |

Genomics would be able to prevent competitors from making, using or selling any of its technology for which it obtains a patent. Patent law affecting Celera Genomics' business . . . is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter . . . . Moreover, the Celera Genomics group may be dependent on protecting, through copyright law or otherwise, its databases to prevent other organizations from taking information from such databases and copying and reselling it. Copyright law currently provides uncertain protection regarding the copying and resale of factual data. As such, Celera Genomics is uncertain whether it could prevent such copying or resale. Changes in copyright and patent law could either expand or reduce the extent to which the Celera Genomics group and its customers are able to protect their intellectual property. (Ex. 1 at 11-12.)

The granting of patents on genomic discoveries is uncertain worldwide and is currently under review and revision in many countries. Moreover, publication of information concerning partial gene sequences prior to the time that the Celera Genomics group applies for patent protection based on the full-length gene sequences or different partial gene sequences in the same gene may affect the Celera Genomics group's ability to obtain patent protection . . . . Currently, the U.S. Patent and Trademark Office requires an adequate disclosure of a specific and substantial utility, such as gene function, in order to support the patentability of a gene sequence. (*Id.* at 48.)

The Celera Genomics group cannot ensure that any changes to, or interpretations of, the patent laws will not adversely affect its patent position. The Celera Genomics group anticipates that there will be significant litigation in the industry regarding genomic patent and other intellectual property rights . . . . If Celera Genomics does not prevail in a patent litigation dispute, it may be required to pay damages or royalties or to take measures to avoid any future infringement, or Celera may not be able to stop a competitor from making, using, or selling similar products or technology. (*Id.*)

The Celera Genomics group believes that current efforts by some companies to obtain data made publicly available for the purpose of private resale may continue, and that the need to protect the value of its information while honoring its intention to share this data with the research community will affect its data disclosure strategy. (*Id.* at 38.)

As is abundantly clear from these examples and contrary to the allegations in the Complaint, the Prospectus contained many cautionary statements concerning the ability of Celera to obtain the intellectual property protection necessary to follow through on its future business plans. No fair-minded reader of the Prospectus could conclude otherwise.

### G.     The March 14 Joint Statement By President Clinton and Prime Minister Blair

Two weeks after the Secondary Offering, President Bill Clinton and Prime Minister Tony Blair issued the Joint Statement. The Joint Statement supported intellectual property protection for genomic discoveries:

> To realize the full promise of this research, raw fundamental data on the human genome, including the human DNA sequence and its variations, should be made freely available to scientists everywhere.  Unencumbered access to this information will promote discoveries that will reduce the burden of disease, improve health around the world, and enhance the quality of life for all humankind.  ***Intellectual property protection for gene-based inventions will also play an important role in stimulating the development of important new health care products***.

> We applaud the decision by scientists working on the Human Genome Project to release raw fundamental information about the human DNA sequence and its variants rapidly into the public domain, and we commend other scientists around the world to adopt this policy.

(Ex. 28.) (emphasis added).[21]   Despite the Joint Statement's clear statement to the contrary, the media misinterpreted the Joint Statement as a "ban" on gene patents, causing stock prices in the entire biotechnology sector, including Celera and its major competitors, to decline significantly. (Ex. 55.)  Two days after the Joint Statement (and before Plaintiffs filed the Complaint), the PTO issued a press release confirming that the Joint Statement had no effect on intellectual property law.  (Ex. 29.)  Two weeks after the Joint Statement (and also before Plaintiffs filed the Complaint), President Clinton retracted any negative inference in the Joint Statement and assured the public that the Joint Statement ***had no impact on United States patent policy***.  (Ex. 43.)

Members of the HGP testified that the drafting of the Joint Statement preceded the discussions between Celera and the HGP in the fall of 1999.  When asked if the purpose of the Joint Statement was to punish or retaliate against Celera as a result of Celera's unwillingness to agree to a collaboration at the December 29 meeting, Dr. Varmus testified that "the conversations [concerning the Joint Statement] that I had been involved in earlier in 1999 long

---

[21]     Plaintiffs misleadingly cite only the last paragraph of the Joint Statement, wholly ignoring the preceding paragraph, which directly contradicts the allegations in the Complaint.  *See* Compl. at ¶ 30.

preceded any discussions I'm aware of about collaboration." (Ex. 6 at 133.) Similarly, Dr.

Waterston testified that there was no causal relationship between the Joint Statement and the

December 29 meeting. (Ex. 7 at 182.)

<u>**ARGUMENT**</u>

Defendants are entitled to summary judgment under the standards established by

Federal Rule of Civil Procedure 56 and the United States Supreme Court. Summary judgment

"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c). "The substantive law will identify which facts are material. Only disputes over

facts that might affect the outcome of the suit under governing law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986).

Once a properly supported motion for summary judgment has been made, the

non-moving party has the burden of presenting "specific facts showing that there is a genuine

issue for trial." *Id.* at 250 (citation omitted). On issues where the party opposing summary

judgment has the burden of proof (in this case the existence of a misrepresentation or misleading

omission), the moving party may simply point out the absence of evidence on the issue, and the

motion should be granted if the opposing party does not adduce evidence sufficient to permit a

reasonable jury to decide the issue in its favor. *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986);

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

The party opposing summary judgment "may not rely on conclusory allegations

or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). The

applicable standard is similar to the standard for a motion for directed verdict after trial, *i.e.*,

whether a reasonable jury could fail to return a verdict for the moving party. *Anderson,* 477 U.S.

at 250-51. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## I.    PLAINTIFFS HAVE FAILED TO IDENTIFY A FALSE OR MISLEADING STATEMENT IN THE PROSPECTUS

Plaintiffs' fundamental burden under Sections 11 and 12 is to identify a material misrepresentation or a misleading omission in Celera's Prospectus. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991). Plaintiffs must establish facts to indicate how or why any alleged representations were false or misleading. *See In re Alliance Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171, 190 (S.D.N.Y. 2003) (dismissing Section 11 claim where plaintiffs failed to offer any evidence that the statement contained in the prospectus was false or misleading); *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) (plaintiffs cannot "assert vaguely that a false and misleading impression was created"). Here, Plaintiffs do not allege any misstatements. They bring only an omissions case, but they fail to identify any facts to show how any alleged omission is material or misleading.

### A.    The Discussions Regarding Potential Interactions Between Celera And The HGP Were Disclosed In The Prospectus

The first major defect in the Complaint – and a recurring one – is that it repeatedly *ignores* disclosures in the Prospectus that are inconsistent with Plaintiffs' claims. Most significantly, Plaintiffs assert that the discussions between Celera and the HGP "certainly were not disclosed in the Prospectus for the Secondary Offering." (Compl. ¶ 24.) Yet, as noted above, the Prospectus expressly discloses that Celera has sought to coordinate its efforts with those of the HGP. (Ex. 1 at 49.) For this reason alone, no reasonable jury could find in

Plaintiffs' favor because the alleged omission was plainly disclosed in the Prospectus.  Put another way, there was no material omission.

**B.      The December 29 Meeting Was Neither Material Nor Adverse**

The Complaint must also be dismissed because the December 29 meeting, even if omitted from the Prospectus, was neither material nor adverse to Celera.  Section 11 and Section 12 impose liability only if the Prospectus:  (1) contained an untrue statement of material fact or (2) omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  15 U.S.C. § 77k (2004); 15 U.S.C. § 77l(a)(2) (2004).  To be actionable, an omission must be *material*.  The standard for determining materiality of an omitted fact is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Alliance Pharm. Corp.*, 279 F. Supp. at 188.  The securities laws do not require management to bury shareholders with trivial details.  *TSC Indus., Inc.*, 426 U.S. at 448-49; *Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 333 (D. Conn. 2001), *aff'd* 34 Fed. Appx. 408 (2d Cir. 2002).

When determining whether a prospectus failed to disclose a material fact, the prospectus must be read as a whole.  *Id*. at 331.  The "central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context would have misled a reasonable investor about the nature of the [securities]."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

The evidence in this case establishes that Plaintiffs' alleged omission was wholly immaterial and unimportant, and that the Complaint relies on a characterization of the December 29 meeting that is wholly inconsistent with the facts.

1.      **Before the December 29 Meeting, Both Celera and the HGP Believed That A Collaboration Agreement Was Highly Unlikely**

Before the December 29 meeting, both Celera and the HGP thought that an agreement of any type was "highly unlikely" given the adversarial and disparaging comments that had been made in the media for much of the preceding two years.  For example, Dr. Waterston testified that prior to the December 29 meeting, both he and Dr. Sulston (director of the Sanger Centre, the U.K. component of the HGP) were "very skeptical" of an interaction with Celera.  (Ex. 7 at 41, 45; Ex. 32.)  Dr. Varmus, then the director of NIH, shared this skepticism. (Ex. 6 at 58-59.)  Similarly, Dr. Waterston informed the HGP by email that he preferred *not to collaborate with Celera*, but would prefer "staying the course and dealing with Celera as we are rather than joining them and having to deal with them as collaborators."  (Ex. 7 at 46; Ex. 31.)

The HGP representatives were skeptical that an agreement could be reached because they knew before December 29 that their collaboration proposal would be unacceptable to Celera.  Prior to the meeting, Dr. Waterston wrote to his HGP colleagues expressing his concern that "Celera will find the demands we make for data and distribution of the data too much."  (Ex. 33.)  Dr. Waterston testified that his statement meant that:  "It's pretty straightforward, that we were asking that – that any sequence data that was a result of the collaboration would be more broadly accessible and more broadly distributed than what was acceptable to Celera."  (Ex. 7 at 176.)

Representatives of Celera were equally skeptical of the value of any agreement with the HGP.  Dr. Levine "didn't think it was possible to have a deal."  (Ex. 4 at 67.)  Dr. Venter "felt it was very highly unlikely" that Celera could agree on a collaboration with the HGP (Ex. 3 at 40.) because "there had been too much water under the bridge with continued . . . attacks from [the HGP] that would make collegial interactions necessary for true scientific

- 24 -

collaboration probably unlikely to be able to take place." (*Id.* at 56.)  Dr. Venter was "not sure there was a single person at Celera . . . [who] thought the chance of a full, integrated, cooperative, collaborative, joint, scientific publication . . . was at all possible at this stage of the game." (*Id.* at 113-14.)

> ### 2.     Consistent With Their Expectations, Celera and the HGP Agreed That The December 29 Meeting Was A Non-Event

All six participants at the December 29 meeting who were deposed in this action agreed that the December 29 meeting was a non-event.  According to Dr. Waterston, the meeting "hadn't produced anything useful." (Ex. 7 at 119.)  Dr. Varmus described the discussions more generally as "not the dominant events in my life at that time." (Ex. 6 at 90.)

On the Celera side, Dr. Levine testified that "nothing was accomplished by the meeting" and therefore "there was nothing to disclose." (Ex. 4 at 74.)  Dr. Levine added "there was no conclusion to the meeting and no substance that came from the meeting." (*Id.* at 144.)  Dr. Gilman confirmed that "there hadn't been any significant points of progress" at the meeting (Ex. 5 at 97) and that "there really had been no substantive proposal made that was acceptable from the point of view of Celera." (*Id.* at 102.)  Mr. White testified that discussions with the HGP were "not a big deal" to Celera.  (Ex. 2 at 74.)  Dr. Venter summarized the discussions with the HGP as "a relatively minor side show." (Ex. 3 at 87.)

> ### 3.     The Complaint Mischaracterizes Every Aspect of the December 29 Meeting

As shown in the table below, Plaintiffs' allegations regarding what happened at the December 29 meeting are directly and completely contradicted by undisputed evidence:

| Plaintiffs' Allegations | Undisputed Evidence |
|---|---|
| *Plaintiffs allege that Celera and the HGP were "engaged in discussions to combine their efforts" to sequence the human genome. Compl. at ¶¶ 24, 39(a).* | • Celera engaged in discussions with the HGP to find a way to reduce the adversarial media rhetoric (Ex. 2 at 29-30; Ex. 3 at 36-37; Ex. 4 at 35-36, 48; Ex. 6 at 76.);<br>• Celera was not interested in "combining" its efforts with the HGP because Celera already had the HGP's data as a result of the Bermuda Accord (Ex. 2 at 121-22; Ex. 4 at 154-55; Ex. 6 at 147); and<br>• Celera considered an agreement to reduce rhetoric and simultaneously publish scientific papers. (Ex. 3 at 36-37; Ex. 5 at 22; Exs. 23, 26.). |
| *Plaintiffs allege that the discussions between Celera and the HGP "culminated" in the December 29 meeting. Compl. at ¶ 25.* | • The December 29 meeting was an "exploratory and general" conversation (Ex. 25.); and<br>• The December 29 meeting was the "first face to face" meeting between Celera and the HGP. (Exs. 26, 39.). |
| *Plaintiffs allege that the discussions between Celera and the HGP "broke off" and "collapsed" at the December 29 meeting. Compl. at ¶¶ 24, 39(e).* | • Celera and the HGP continued their sporadic and informal discussions long after the December 29 meeting (Ex. 4 at 143-44, 160-61.);<br>• Francis Collins and Tony White discussed potential interactions on January 22, 2000 (Ex. 2 at 74; Ex. 35.);<br>• Dr. Venter discussed potential interactions with Francis Collins and Ari Patrinos at multiple meetings in March and April 2000 (Ex. 3 at 178.); and<br>• Celera and the HGP ultimately agreed to (i) jointly announce the completion of the human genome sequence at a White House ceremony and (ii) publish their scientific papers analyzing the human genome simultaneously. (*Id.*; Ex. 5 at 52.). |
| *Plaintiffs allege that the discussions between Celera and the HGP broke off because Celera "demanded that it have exclusive rights to the human genome map for an extended period of time." Compl. at ¶¶ 24, 39(b),(c).* | • Celera never demanded that it have exclusive rights to the human genome sequence because there is no such thing as one single "human genome sequence." As of December 1999, there was (1) Celera's version of the genome, (2) the HGP's version of the genome, and (3) some theoretical discussions regarding the possibility of a "merged" version of the genome (Ex. 4 at 154-55.);<br>• At the December 29 meeting, Celera responded to the HGP's proposal by indicating that *if* Celera agreed to *merge* its sequence with the HGP's sequence, then Celera required exclusive rights to the *merged product* for a period of years to protect its shareholders' investment (Ex. 2 at 55-56.);<br>• If no agreement was reached, the HGP could do whatever it wanted with its version of the sequence, and Celera could do whatever it wanted with its version (Ex. 4 at 154-55.); and<br>• Celera always planned to release its sequence to academics, but wanted to prevent commercial competitors from reselling Celera's data. (Ex. 3 at 149-50.) |
| *Plaintiffs allege that the discussions between Celera and the HGP "were not widely known by the public." Compl. at ¶ 24.* | • The discussions between Celera and the HGP were repeatedly discussed in major national news publications. (Exs. 12-20.)<br>• The Prospectus disclosed that Celera and the HGP had sought to coordinate their efforts. (Ex. 1 at 49.) |

| Plaintiffs' Allegations | Undisputed Evidence |
|---|---|
| *Plaintiffs allege that the HGP arrived at the December 29 meeting "thinking they had the outline of an agreement in hand." Compl. at ¶ 25.* | • As discussed in Section I(B)(1), *supra,* prior to the meeting, all HGP representatives thought a collaboration agreement with Celera was highly unlikely. |

### C. The December 29 Meeting Did Not Lead to Retaliatory or Punitive Government Action

Under Plaintiffs' "retaliation theory," the HGP would cause the U.S. Patent and Trademark Office or some other unspecified government entity to "retaliate" against Celera by denying Celera intellectual property protection because Celera and the HGP did not reach an agreement at the December 29 meeting.

Three facts completely refute Plaintiffs' theory.  <u>First</u>, the undisputed testimony of HGP witnesses confirms that ***the government did not retaliate against Celera***.  Dr. Varmus testified that at no time did he, or any other HGP member to his knowledge, ever petition any entity affiliated with the U.S. or U.K. governments to retaliate or punish Celera as a result of the December 29 meeting.  (Ex. 6 at 137-38.)  Dr. Varmus also testified that neither he, nor any other HGP member to his knowledge, ever asked the PTO to change intellectual property law in any way as a result of the December 29 meeting.  (*Id.*)  Similarly, Dr. Waterston testified that neither he, nor any other HGP member to his knowledge, ever sought to punish or retaliate against Celera, or sought any change in intellectual property law.  (Ex. 7 at 183-84.)

<u>Second</u>, the Complaint *assumes* that the HGP had the legal power or authority to cause the PTO to deny Celera's intellectual property rights – an untenable claim given that Celera's intellectual property rights are protected under the U.S. Constitution, federal statutory

law, and PTO regulatory guidelines.[22]  The HGP – a group of research scientists – does not have

any power to amend the U.S. Constitution, repeal federal statutes, or change federal regulations.

In fact, at the same time Plaintiffs allege that the PTO would deny protection for Celera's

genomic discoveries, the PTO was actually in the process of adopting examination guidelines

that *expressly endorsed the patentability of genomic discoveries.  See* Utility Examination

Guidelines, 66 Fed. Reg. 1092, 1093 (Jan. 5, 2001).

Plaintiffs apparently contend that the HGP might have tried to influence United

States patent policies because the United States provided some of the funding for the HGP, and

that because the PTO is a United States government agency, the PTO could deny Celera

protection for its intellectual property.  Using this fallacious logic, the HGP could also have

caused the U.S. Post Office to cease delivery of Celera's mail, or caused the Internal Revenue

Service to deny Celera any benefits offered under the tax code.  Neither of these "possibilities"

for "governmental retaliation" is disclosed in the Prospectus – but like the potential for

retaliation by the PTO, neither of these "possibilities" is legally tenable and there is no evidence

whatsoever that they were even contemplated, let alone pursued.

Finally, the single "fact" that Plaintiffs offer to show that the United States

government retaliated against Celera is the Joint Statement itself.  With respect to the Joint

Statement, Dr. Varmus testified that there was no connection to the December 29 meeting, and

that the concept of the Joint Statement was developed long before discussions began between

---

[22]    Article I, section 8, clause 8 of the Constitution states "[t]he Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  Congress has utilized this power by adopting patent laws, which provide, *inter alia,* "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor[e]."  *See* 35 U.S.C. § 101 (2004).

Celera and the HGP.  (Ex. 6 at 131-33; Ex. 30.)  Dr. Waterston likewise confirmed that there was

no causal relationship between the December 29 meeting and the Joint Statement.  (Ex. 7 at 182.)

The public record – which Plaintiffs deliberately ignore – reveals the true

meaning of the Joint Statement and refutes Plaintiffs' absurd theory.  On March 16, 2000, the

PTO issued a press release stating in straightforward terms that the Joint Statement did not

change patent law or policy:

> The Patent and Trademark Office (PTO) reaffirmed today that
> ***United States patent policy remains unaffected by Tuesday's
> historic joint statement*** issued by the United States and the United
> Kingdom urging that raw fundamental data on the human genome .
> . . should be made freely available to scientists everywhere . . . .
> ***Genes and genomic inventions that were patentable last week
> continue to be patentable this week, under the same set of rules.***

(Ex. 29.) (emphasis added) (internal citation omitted).  On April 5, 2000, President Clinton

issued a statement confirming that the Joint Statement was not intended to imply that the United

States did not support patents for genomics discoveries.  President Clinton stated:

> ***On the patent thing, you know, Tony Blair and I crashed the
> market there for a day, and I didn't mean to.***  But I think what
> happened is – when the market's recovered, I think what happened
> is people actually read the statement instead of the headlines or
> whatever.  I think in the biotech area, our position ought to be
> clear.  General information ought to be in the public domain as
> much as possible about the sequencing of the human genome.  And
> where public money contributed to massive research on the basic
> information, we ought to get it out there.  ***If someone discovers
> something that has a specific commercial application, they ought
> to be able to get a patent on it***.

(Ex. 43 at 4.) (emphasis added).  Additionally, on the day the Joint Statement was issued, Dr.

Neal Lane, President Clinton's Science Advisor, made clear that the Joint Statement was not

related to discussions between Celera and the HGP:  "I want to make it absolutely clear that this

- 29 -

statement has nothing to do with any ongoing discussions between the public and private sector."
(Ex. 44 at 2.)

###### D.    The December 29 Meeting Had No Effect on Celera's Business Plan

Plaintiffs' "business plan" theory is much less clear from the face of the
Complaint, though it is equally unmeritorious in fact. In questioning various witnesses, Plaintiffs
have implied that the description of Celera's business plan in the Prospectus is false and
misleading because it did not disclose that Celera needed, but did not achieve, a collaboration
with the HGP to effectively implement its business plan.

The undisputed evidence confirms that a collaboration with the HGP was never a
component of Celera's business plan. Celera's business plan was most frequently analogized to
Westlaw or Lexis. As described in the Prospectus, Celera planned to sell subscriptions to its own
annotated, searchable genomics database to pharmaceutical companies and academic
researchers. The HGP witnesses testified that no representative of Celera ever indicated that a
collaboration with the HGP was a component of Celera's business plan. (Ex. 6 at 135; Ex. 7 at
179.) Additionally, Drs. Venter, Levine, and Gilman testified that a collaboration with the HGP
was never a component of Celera's business plan. (Ex. 3 at 39-40; Ex. 4 at 155; Ex. 5 at 35-36.)

At the December 29 meeting, Tony White responded to the HGP's proposal by
indicating that the only way Celera would consider giving the HGP access to Celera's data and
creating a merged version of the human genome was if Celera received exclusive rights to the
merged product for a period of years. (Ex. 2 at 55-56.) Mr. White suggested this exclusivity
period to make clear to the HGP that Celera considered the HGP's proposal unreasonable and
did not intend to give away its data without receiving sufficient consideration for its shareholders
in return. (*Id.* at 55-56, 122.) Plaintiffs erroneously assert that Mr. White's proposal at the
December 29 meeting indicates that Celera needed, but did not receive, exclusive rights to the

human genome. As noted above, Plaintiffs' assumption is misguided. Celera already had

unfettered access to all HGP data, which was published daily. Mr. White's response concerned

only what Celera would require *if* Celera and the HGP were going to reach an agreement on

collaboration. Absent such agreement, the HGP was free to use its version of the genome in any

way it saw fit, and Celera was free to use its version of the genome as it desired.

Plaintiffs also assert that Celera planned to patent the human genome, and that the

December 29 meeting somehow hampered Celera's plan. Plaintiffs' allegation is frivolous.

Celera never intended to patent the human genome. (Ex. 3 at 23.) As the Prospectus makes

crystal clear, Celera always planned to – and in fact did – publicly release the raw human

genome sequence.[23] (Ex. 1 at 12; Ex. 54.) As Dr. Levine testified, "[t]he sequence itself was

never a very important component of the business plan. The sequence would have been made

public whether Celera finished before, the same time or after. What was important was the

acting upon the sequence, the software, the ability to analyze the sequence, the annotation of the

sequence, and that was the heart of the business plan." (Ex. 4 at 29-30.)

## II.  THE CHALLENGED STATEMENTS ARE PROTECTED BY THE REFORM ACT SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

Regardless of whether the Prospectus adequately disclosed the December 29

meeting, summary judgment must be granted for Defendants because the statements in the

Prospectus that Plaintiffs challenge as misleading qualify for protection under the safe harbor

---

[23]    Plaintiffs have appeared puzzled as to why Celera would not agree to give the HGP access to Celera's data if Celera planned to release that data publicly. The reason is that the HGP wanted Celera to release its data without restrictions of any type in accordance with the Bermuda Accord. Data released under the Bermuda Accord could be downloaded, repackaged and resold by commercial competitors of Celera, which was obviously unacceptable. (Ex. 24.) Celera planned to (and in fact did) publicly release its raw sequence data, but with restrictions that prevented commercial competitors from re-packaging and re-selling data paid for by Celera shareholders. (Ex. 3 at 149-50.) To this day, academic researchers can freely access Celera's version of the human genome on Celera's website. (Ex. 54.)

provisions of the PSLRA.  15 U.S.C. § 77z-2 (2004).  Under the PSLRA safe harbor, certain

forward-looking statements may not form the basis of claims under Sections 11 and 12(a)(2) of

the Securities Act.  The purpose of the safe harbor is to reduce the "muzzling effect" of potential

liability and encourage issuers to make forward-looking disclosures to investors regarding

management's expectations for future performance.  *Harris v. Ivax Corp.*, 182 F.3d 799, 806

(11th Cir. 1999) (citations omitted).

       To gain the protection of the safe harbor, a statement must be forward-looking

and *either*:  (i) accompanied by cautionary statements *or* (ii) made without actual knowledge that

the statement is false or misleading.  *See* 15 U.S.C. § 77z-2(c); *Alliance Pharm. Corp.*, 279 F.

Supp. at 192; *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 440-41

(S.D.N.Y. 2001) (corresponding provision under the Securities Exchange Act of 1934).  Here,

summary judgment must be granted for both reasons – Plaintiffs challenge forward-looking

statements that are clearly accompanied by cautionary statements *and* Plaintiffs have no evidence

that any statements in the Prospectus were made with actual knowledge of falsity.

    **A.**    **The Allegedly Misleading Statements Are Forward-Looking**

       The safe harbor includes statements concerning a company's business plan.  *See*

15 U.S.C. § 77z-2(i)(1)(B) ("The term 'forward-looking statement' means – (B) a statement of

the plans and objectives of management for future operations, ***including plans or objectives***

***relating to the products or services of the issuer.***") (emphasis added); *In re Aegon N.V. Sec.*

*Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004).  All of the

statements challenged by Plaintiffs are forward-looking statements concerning Celera's proposed

business plan and thus fall within the definition of forward-looking statements.  For example, the

Prospectus states:

- "[Celera] **intends** to use the genomic information derived from its human genome sequencing program as a platform upon which **to develop** an integrated information and discovery system" (Compl. ¶ 38) (emphasis added);

- "[Celera] **anticipates** that [its] biological data, together with [its] databases, tools and services, **will become** a comprehensive scientific and medical resource" (*Id.* at ¶ 37) and the company "**will seek** to make its … system the fundamental resource in molecular medicine for acceleration of the development of new drugs and targeted diagnostics" (*Id.* at ¶ 38) (emphasis added);

- "[O]btaining patent protection **is likely to become** more important to [Celera's] business as it expands into the area of functional genomics" (*Id.* at ¶ 47) (emphasis added);

- "[Celera] does not **believe** it is competing with the U.S. government's efforts to sequence the human genome," and the "acceleration of the [HGP] **may** assist [Celera] in its own sequencing and assembly effort" (*Id.* at ¶ 45) (emphasis added); and

- "[Celera] cannot ensure that any changes to, or interpretations of, the patent laws **will not** adversely affect its patent position," and "Public disclosure of genomics sequence data **could** jeopardize Celera's intellectual property protection and have an adverse effect on the value of [its] products and services," (*Id.* at ¶¶ 44, 48) (emphasis added).

Indeed, Plaintiffs concede that the Prospectus describes "the Company's 'strategy' **going forward.**" Compl. ¶ 37 (emphasis added).[24]

---

[24] Plaintiffs also contend that the following statement is materially false and misleading: "[Celera] has become the recognized leader in the generation, sale and support of genomic information and enabling data management and analysis software." *Id.* at ¶ 36. However, nowhere in the Complaint do Plaintiffs explain why this statement is false and misleading. In addition, at most, this statement is immaterial as a matter of law because it is mere "puffery." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations").

**B.     Celera's Forward-Looking Statements Are Protected by Both Prongs of the Safe Harbor**

The PSLRA established two independent bases for protecting forward-looking statements. First, a forward-looking statement is protected if it is accompanied by meaningful cautionary language. In the alternative, a forward-looking statement is protected if Plaintiffs fail to establish that Defendants had actual knowledge that the forward-looking statements were false when made. Each prong of the "safe harbor" independently compels dismissal of the Complaint.

**1.     The Forward Looking Statements Are Accompanied by Meaningful Cautionary Statements**

The challenged statements are accompanied by the requisite "meaningful cautionary language." The PSLRA safe harbor requires only that the cautionary language mention "important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 77z-2(c)(1)(A)(i). "It does not require that the prospectus . . . list *all* factors that might influence the company's financial future." *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) (emphasis added). Indeed, "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807; *accord I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (disclosure in a prospectus is not a rite of confession or exercise of common law pleading.) (quotation omitted).

The Prospectus is replete with cautionary language regarding the risks associated with the development of Celera's business plan. In fact, on the very first page of the "Risk Factors" section in the Prospectus, Celera expressly warned that its "business plan is unique and expanding" and that:

> No organization has ever attempted to combine in one business
> organization all of the Celera Genomics group's businesses . . . . The
> creation of a genomics database, and the offering of functional genomics
> and personalized health/medicine databases and capabilities targeted at a
> wide variety of customers, from pharmaceutical companies to university
> researchers, has a number of risks, including pricing and volume issues,
> technology and access concerns, computer security, pursuit of key
> scientific goals and protection of intellectual property.

(Ex. 1 at 8.)  The Prospectus then detailed the specific risks associated with development and

implementation of Celera's proposed business plan.  (*Id.* at 8-20.)

Despite the Prospectus' thirteen pages disclosing some 49 risk factors, Plaintiffs

allege that the Prospectus was materially misleading because it failed to mention the December

29 meeting and the risks that the meeting posed for Celera's intellectual property rights and

business plan.  The Prospectus contained meaningful cautionary language regarding these risks.

*See* Statement of Facts, Section F, *supra*.

Furthermore, the Prospectus explicitly warned that "the federally funded [HGP]

and others engaged in similar research have committed to make available to the public basic

human sequence data."  (Ex. 1 at 12.)  In addition, the Prospectus recognized that Celera faced

competition "from genomic, pharmaceutical, biotechnology and diagnostic companies, academic

and research institutions and government or other publicly-funded agencies, both in the United

States and abroad."  (*Id.* at 9.)  In fact, Celera, through its Prospectus, even discussed the

interplay between the HGP's public disclosures and Celera's ability to obtain patent protection

by explaining that the HGP's disclosure of data "might limit the scope of [Celera's] claims or

make subsequent discoveries by Celera or its customers related to full-length genes

unpatentable," and that "there can be no assurance that such publication has not affected and will

not affect the ability of Celera or its customers to obtain patent protection."  (*Id.* at 12.)

Thus, potential investors were plainly on notice that while Celera sought "to make [its proprietary systems] the fundamental resource in molecular medicine" (*Id.* at 38.), it could also expect difficulties in obtaining intellectual property protection and faced competition from organizations that planned to publicly disclose certain genomic data. Therefore, as a result of Celera's cautionary statements, Plaintiffs' claims are statutorily barred by the PSLRA's "safe harbor" provision. *See, e.g., Aegon N.V.*, 2004 WL 1415973, at *14 (dismissing claims against defendant where challenged statements were "forward-looking statements protected by the PSLRA's safe harbor provision"); *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1368-69 (S.D. Fla. 2001) (same).

### 2. Plaintiffs Have Not Established that the Forward-Looking Statements Were Made With Actual Knowledge of Falsity

Alternatively, Plaintiffs' claims should be dismissed under the "safe harbor" for the independent reason that Plaintiffs have no evidence that Celera made the challenged forward-looking statements with *actual* knowledge that they were false or misleading. 15 U.S.C. § 77z-2(c)(1)(B). In order to preclude the application of the safe harbor, Plaintiffs "must plead, 'in great detail', 'all the facts' forming the basis for their belief that [Celera] made the forward-looking statements with actual knowledge that they were false." *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1070 (N.D. Cal. 2001) (citation omitted); *see also Alliance Pharm. Corp.*, 279 F. Supp. 2d at 193 (summary judgment appropriate where plaintiffs failed to offer any evidence that defendants knew the statement at issue was false when made).

Plaintiffs can offer no evidence that Celera possessed the requisite actual knowledge that any challenged statement was false or misleading at any time. Absent proof of actual knowledge, Plaintiffs' Section 11 and 12(a)(2) claims are barred by the PSLRA's safe harbor provision for forward-looking statements. *See id.*

C.    **Celera's Forward-Looking Statements Are Protected By the Bespeaks Caution Doctrine**

The common law "bespeaks caution" doctrine provides an alternative, independent basis for summary judgment.  *In re Corning Sec. Litig.*, No. 01-CV-6580, 2004 WL 1056063, at *13 n.8 (W.D.N.Y. Apr. 9, 2004).  Under that doctrine, a misrepresentation or nondisclosure will be deemed immaterial if surrounded by cautionary language sufficiently specific to render reliance on the misrepresentation unreasonable.  *See id.*; *Alliance Pharm. Corp.*, 279 F. Supp. 2d at 192-93 (when a prospectus bespeaks caution of the very risk plaintiffs complain was not disclosed, a plaintiff cannot successfully claim that the forward-looking statement was misleading).  Therefore, "[l]iability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.'"  *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir. 1996).

As demonstrated above, Statement of Facts, Section F, *supra,* the Prospectus contained ample and specific cautionary language which "bespoke caution" regarding Celera's "unique and expanding" business plan.  (Ex. 1 at 8.)  The extensive cautionary language here renders the sole alleged omission "immaterial" as a matter of law.  *See, e.g.*, *Rombach*, 355 F.3d at 173 (affirming dismissal of Securities Act claims where statements at issue were "optimistic statements protected by the 'bespeaks caution' doctrine and the PSLRA's safe harbor."); *Olkey*, 98 F.3d at 5 (affirming dismissal of Securities Act claims where "the prospectus[] when read in [its] entirety [is] not overly sanguine but instead 'bespeak[s] caution'").

III.    **PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT DEFENDANTS ARE SECTION 12 SELLERS**

Section 12(a)(2) of the 1933 Act creates a cause of action against "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order

to make the statements . . . not misleading . . . *to the person purchasing such security from him*."

15 U.S.C. § 77l (emphasis added).  In *Pinter v. Dahl,* 486 U.S. 622 (1988), the Supreme Court

held that Section 12 imposes liability only on defendants who (1) pass title, "or other interest," in

a security to a plaintiff, or (2) "successfully solicit[] the purchase [of a security], motivated at

least in part by a desire to serve [their] own financial interests or those of the securities owner."

*Pinter*, 486 U.S. at 642, 647.

### A.    Celera and the Individual Defendants Did Not Pass Title to Plaintiffs

Celera and the individual defendants are not sellers under the first prong of the

*Pinter* test, as they did not pass title to the Celera stock to Plaintiffs.  There can be no dispute that

the underwriting at issue here was a "firm commitment underwriting."[25]  In a firm commitment

underwriting, "the issuer of the securities sells all of the shares to be offered to one or more

underwriters . . . . Investors thus purchase shares in the offering directly from the underwriters

(or broker-dealers who purchase from the underwriters), not directly from the issuer."  *Shaw v.*

*Digital Equip. Corp.,* 82 F.3d 1194, 1215 (1st Cir. 1996); *see also Credit Suisse First Boston*

*Corp. v. ARM Fin. Group.,* No. 99 CIV 12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28,

2001).  In cases involving firm commitment underwritings, plaintiffs have standing under

Section 12(a)(2) to sue only the underwriters from whom they purchased securities.  *See Feiner*

*v. SS&C Tech., Inc.,* 47 F. Supp. 2d 250, 254-55 (D. Conn. 1999); *Credit Suisse,* 2001 WL

300733, at *10 ("Given that [defendant] conducted its offering through a firm-commitment

---

[25]    Companies can distribute their securities by means of a firm commitment underwriting or through
an underwriter that undertakes to use "best efforts."  In contrast to a "firm commitment," the
"best efforts" underwriter "instead of buying the issue from the company and reselling it as
principal, sells it for the company as agent."  Louis Loss & Joel Seligman, *Fundamentals of
Securities Regulation* 85 (5th ed. 2004).  Therefore, in a "firm commitment" underwriting the
underwriter acts as a principal earning a profit.  In a "best efforts" arrangement the underwriter
acts as an agent earning a commission.  *Id.* at 75.

underwriting, plaintiffs here did not purchase directly from [defendant] and thus lack standing under the first prong of *Pinter*.").

As the Prospectus makes clear, the Secondary Offering was done pursuant to a "firm commitment" underwriting agreement. (Ex. 1 at 94-95.) ("Under the terms and subject to the conditions in an underwriting agreement dated the date of this prospectus, ***the underwriters . . . have severally agreed to purchase, and PE Corporation has agreed to sell to them***, severally, the number of shares of Celera Genomics stock indicated below.") (emphasis added). Because Plaintiffs did not purchase securities directly from Celera or the individual defendants, neither Celera nor the individual defendants are sellers under *Pinter*'s first prong.

### B.   Celera and the Individual Defendants Did Not Solicit the Purchase Of Celera Shares

Under *Pinter*, "sellers" may include not only those who pass title, but also those "who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner." *Credit Suisse,* 2001 WL 300733, at *9 (citations omitted). To survive a motion for summary judgment, a plaintiff must come forward with evidence demonstrating a direct and active participation in the solicitation of the immediate sale. *See, e.g., Pinter,* 486 U.S. at 644, 646 (describing solicitors as individuals who "urged the buyer to purchase" and who were "participants in the selling transaction."). A company's mere participation in preparing the prospectus does not subject it to Section 12 liability. *Id.* at 651 n.27; *see Wilson v. Saintine Exploration & Drilling Corp*., 872 F.2d 1124, 1126 (2d Cir. 1989) ("After *Pinter,* . . . collateral participants . . . are now not statutory sellers because they did not solicit the sales in question."), *superseded by statute on other grounds, as stated in Fisk v. SuperAnnuities, Inc.,* 927 F. Supp. 718, 729 (S.D.N.Y. 1996).

Here, the evidence demonstrates that Lead Plaintiffs never had any contact with Defendants. Vinh Vuong testified that he has never met or spoken to any of the Individual Defendants or any Celera employee. (Ex. 8 at 28-29.) Vuong purchased his Celera stock at his own initiative through an on-line trading website. (*Id.* at 33-34.) Similarly, David Berlin testified that he purchased Celera stock at the urging of his broker, and has never had any conversations with any Celera representative. (Ex. 9 at 49.) Neither Vuong nor Berlin reviewed a copy of the Prospectus before deciding to purchase Celera stock. (Ex. 8 at 43-44; Ex. 9 at 57-59.) Accordingly, no Defendant could have "solicited" co-lead plaintiffs' purchases.

## CONCLUSION

Plaintiffs have been given a full opportunity to investigate the facts and substantiate their claim. They should not be permitted to proceed to trial based on distortions, mischaracterizations, and unsubstantiated speculations. For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and grant such other and further relief as the Court deems just and proper.

DEFENDANTS PE CORPORATION,
TONY L. WHITE, DENNIS L. WINGER
and VIKRAM JOG

OF COUNSEL:

Michael J. Chepiga (ct01173)
Robert A. Bourque (ct05269)
William M. Regan (ct25100)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

By: _____
Stanley A. Twardy, Jr. (ct05096)
Thomas D. Goldberg (ct04836)
Terence J. Gallagher (ct22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
(203) 977-7300

- 40 -

## Appendix A

| Celera Participants | HGP Participants |
|---|---|
| Mr. Tony White, the President and CEO of Applera Corporation. | Dr. Harold Varmus, the director of the National Institutes of Health from 1993 through 1999. |
| Dr. Craig Venter, the President of Celera from 1998 through January 2002. | Dr. Francis Collins, the director of the National Human Genome Research Institute, an institute within the NIH.  Dr. Collins reported to Dr. Varmus. |
| Dr. Arnold Levine, a member of Applera Corporation's Board of Directors and Celera's Scientific Advisory Board. | Dr. Robert Waterston, the director of the Genome Sequencing Center at Washington University Medical Center, one of the HGP's "G-5" sequencing centers. |
| Dr. Paul Gilman, Celera's Director of Policy and Planning from 1998 through 2001. | Dr. Eric Lander, the director of the Whitehead Institute for Biomedical Research, one of the HGP's "G-5" sequencing centers. |
| | Dr. Ari Patrinos, former Associate Director for Biological and Environmental Research, United States Department of Energy, one of the HGP's "G-5" sequencing centers. |
| | Dr. Richard Gibbs, Director of the Human Genome Sequencing Center at the Baylor University College of Medicine in Houston, Texas, one of the HGP's "G-5" sequencing centers. |
| | Dr. John Sulston, Director of The Wellcome Trust Sanger Center, the United Kingdom component of the HGP and one of the HGP's "G-5" sequencing centers. |
| | Dr. Martin Bobrow, a representative of The Wellcome Trust, the principal financier of the United Kingdom component of the HGP. |

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was sent by first class mail this 21st day of December, 2004, to:


J. Daniel Sagarin, Esq.              Sanford P. Dumain, Esq.
Hurwitz & Sagarin, LLC               Carlos F. Ramirez, Esq.
147 N. Broad Street                  Milberg Weiss Bershad & Schulman LLP
P.O. Box 112                         One Penn Plaza – 49th Floor
Milford, CT 06460                    New York, NY 10119

    Liaison Counsel                      Lead Counsel for Plaintiffs




_____
                Terence J. Gallagher