UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| | : |
| | : Master File No. 3:00 CV 705 (CFD) |
| In re PE Corporation Securities Litigation | : |
| | : DECEMBER 21, 2004 |
| | : |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

PURSUANT TO Local Rule 56(a)(1), defendants PE Corporation,[1] Tony L. White, Dennis L. Winger and Vikram Jog (collectively, the "Defendants") submit that there is no genuine issue to be tried as to the material facts set forth below. The evidence establishing these facts includes the Prospectus of which a copy is attached hereto as Exhibit 1 and the other exhibits to this Statement (cited as "Ex.").

## I.    THE EFFORT TO SEQUENCE THE HUMAN GENOME

1.    Celera Genomics ("Celera") was founded by PE Corporation in May 1998 to sequence the human genome and commercialize genomic discoveries. (Ex. 1 at 32.)

2.    The Human Genome Project ("HGP") is an international research organization formed in 1990 to sequence the human genome. (Ex. 7 at 10; Ex. 48.)

3.    Celera planned to sequence the human genome faster, more accurately and at a fraction of the cost of the HGP's efforts. (Ex. 3 at 39; Ex. 20.)

4.    Specifically, Celera planned to complete the sequence in three years for $300 million as opposed to the HGP's plan to complete the sequence in 15 years at an estimated cost of $3 billion. (Ex. 3 at 39.)

5.    Celera and the HGP each committed to publicly release the raw human genome sequence. (Ex. 1 at 12.)

6.    Members of the HGP were bound by an agreement known as the "Bermuda Accord," which called for daily release of all newly-generated DNA sequences into an online genetic database known as GenBank, which anyone could download for any purpose.

---

[1]    PE Corporation is now known as Applera Corporation.

(Ex. 4 at 61; Ex. 48.)  Celera, therefore, had access to all of the HGP's data.  (Ex. 2 at 122-23; Ex. 4 at 154-55; Ex. 6 at 147.)

7. Celera was not party to the Bermuda Accord and was not required to make its sequence data available to the HGP.  (Ex. 4 at 154-55.)

8. Celera planned to publicly release its version of the human genome once it was complete, rather than on a daily basis.  (Ex. 1 at 38; Ex. 3 at 48-49.)

9. Celera honored its commitment to publicly release the human genome sequence.  On February 16, 2001, Celera scientists published a sequence, assembly and initial interpretation of the human genome in the journal *Science*.  (Ex. 45.)

10. The efforts of Celera and the HGP to sequence the human genome were widely publicized.  The HGP often made negative comments in the media concerning Celera and Dr. Venter.  (Ex. 3 at 37-38; Ex. 11.)

11. News articles discussed the possibility that Celera and the HGP would collaborate. For example, the *New York Times* reported in November 1999 that "[t]alk of collaboration has flared among rivals pursuing one of biology's highest goals."  (Ex. 12; *see also* Exs. 13-20.)

12. In the fall of 1999, members of the HGP reached out to Celera to discuss a potential collaboration.  (Ex. 3 at 36-37; Ex. 4 at 35-36; Ex. 5 at 22, 38; Ex. 22.)

13. Both Celera and the HGP believed that a full-scale collaboration agreement was "highly unlikely."  (Ex. 3 at 40, 56, 113-14; Ex. 4 at 67; Ex. 6 at 58-59; Ex. 7 at 41, 46; Exs. 31-33.)

14. Since Celera already had complete access to the HGP's sequence data, it had minimal, if any, commercial interest in pursuing a full-scale collaboration agreement. (Ex. 3 at 39-40; Ex. 4 at 154-55; Ex. 23.)

15. Nonetheless, Celera believed an agreement to cooperate, *i.e.*, lower the press rhetoric and agree to simultaneously submit scientific papers for publication, would be beneficial.  (Ex. 3 at 37, 113.)

## II. THE DECEMBER 29 MEETING WAS NEITHER ADVERSE NOR MATERIAL TO CELERA

16. The "first face to face and first formal discussion" concerning any interactions between the public genome effort and the Celera effort to sequence the human genome" took place on December 29, 1999.  (Exs. 25, 26, 39.)

17. The December 29 meeting was insignificant to Celera.  (Ex. 2 at 74; Ex. 3 at 87; Ex. 4 at 73.)

18. The following eight individuals were present at the December 29 meeting (Ex. 6 at 103.):

    HGP Representatives:

    - Dr. Harold Varmus, the director of the National Institutes of Health ("NIH") from 1993 through 1999. (Ex. 6 at 12, 23.)

    - Dr. Francis Collins, the director of the National Human Genome Research Institute, which carries out the role of the NIH in the HGP. (*Id.* at 12.)

    - Dr. Robert Waterston, the director of the Genome Sequencing Center at Washington University Medical Center, a principal sequencing center within the HGP. (Ex. 7 at 13-14.)

    - Dr. Martin Bobrow, a member of the Wellcome Trust's Board of Governors. (Ex. 47.)

    Celera Representatives:

    - Mr. Tony White, the President and CEO of Applera Corporation. (Ex. 2 at 21.)

    - Dr. Craig Venter, the President of Celera from 1998 through January 2002. (Ex. 3 at 18.)

    - Dr. Arnold Levine, a member of Applera Corporation's Board of Directors and Celera's Scientific Advisory Board. (Ex. 4 at 8, 13.)

    - Dr. Paul Gilman, Celera's Director of Policy and Planning from 1998 through 2001. (Ex. 5 at 9.)

19. Celera believed the purpose of the December 29 meeting was to discuss ways to reduce the adversarial media rhetoric. (Ex. 3 at 56-57, 90; Ex. 4 at 58, 62, 151; Ex. 5 at 87.)

20. Celera did not seek to enter into a full-scale collaboration agreement at the December 29 meeting. (Ex. 4 at 64-66; Ex. 26; Ex. 34.)

21. On December 28, 1999, Dr. Collins sent Celera a document drafted by the HGP entitled "Shared Principles," and a proposed agenda for the December 29 meeting. (Ex. 7 at 47, 71; Ex. 27.)

22. Before the meeting, Dr. Venter expressly rejected the agenda and "Shared Principles" document. He proposed an alternative agenda to "see if publication of the respective genome efforts could be coordinated" and "whether more extensive scientific

collaborations . . . should be considered." (Ex. 3 at 98; Ex. 4 at 63; Ex. 7 at 72; Ex. 26; Ex. 34.)

23.    At the December 29 meeting, Tony White stated that if Celera was going to give the HGP access to data paid for by Celera shareholders, Celera would need to receive a substantial benefit in return. (Ex. 2 at 55-56, 122; Ex. 6 at 104-105, 108; Ex. 7 at 81, 92.)

24.    Tony White suggested that such a benefit might be a commercial embargo of the merged data for a period of five to ten years. (Ex. 2 at 57, 121-23.)

25.    This suggestion regarding an exclusivity period was made solely in response to the HGP's collaboration proposal. (Ex. 3 at 118-19; Ex. 5 at 32-33, 83-85.)

26.    It was not a component of Celera's business plan, and it was not a suggestion that Mr. White believed would be acceptable to the HGP. (Ex. 2 at 58, 122; Ex. 3 at 118-19, 123, 149.)

27.    The purpose of Mr. White's suggestion was to make clear to the HGP that their collaboration proposal was unreasonable. (Ex. 2 at 122.)

28.    Members of the HGP rejected this suggestion, as Celera knew they would. (Ex. 2 at 58, 122; Ex. 6 at 116-17.)

29.    The meeting ended without an agreement as to cooperation or collaboration, but with the expectation that the parties would continue to discuss the issues. (Ex. 4 at 143-44; Ex. 7 at 86.)

30.    After the meeting, Dr. Collins sent Dr. Gilman a draft press release regarding the meeting to provide to any news organization that inquired about the meeting. The draft press release confirms that the HGP believed there was nothing material to disclose about the meeting:

> On December 29, 1999, individuals from the public international Human Genome Project and Celera Genomics Corp. [sic] met to explore the possibility of scientific collaboration on sequencing the human genome. No further information about these complex discussions will be available for some time.

(Ex. 37.)

31.    Celera felt that there was nothing to disclose about the December 29 meeting:

- Dr. Levine's "own sense was that since nothing was accomplished by the meeting there was nothing to disclose." (Ex. 4 at 74.) "It was my general opinion at that

point that, since there was no conclusion to the meeting and no substance that came from the meeting, that there was no announcement that would be made." (*Id.* at 144.)

- Dr. Gilman did not believe disclosure of the meeting was necessary "[b]ecause there hadn't been any significant points of progress and the issues involved were very complicated." (Ex. 5 at 97.)

- Dr. Venter "saw nothing to issue a press release about." (Ex. 3 at 98.) "I think our position was there was nothing to announce. And if there's nothing to announce, why have a press release? We never put out a press release announcing we were talking to a company like Incyte for acquisition and merger things. That would be pretty foolish to do. It would be equally foolish here." (*Id.* at 105, 153.)

32.   The HGP never issued a press release describing the December 29 meeting. (Ex. 7 at 139.)

33.   After the December 29 meeting, Celera and the HGP continued to believe that there was a way to reach an agreement regarding an interaction between the two sides. (Ex. 3 at 155; Ex. 4 at 82; Ex. 5 at 91; Ex. 7 at 104, 113; Ex. 38.)

34.   There were a number of contacts between Celera and the HGP after the December 29 meeting. (Ex. 4 at 143-44; 160-61.)

35.   Dr. Collins spoke with Tony White on January 22, 2000 to explore possible dates for a second face-to-face meeting. Mr. White reiterated Celera's position that the HGP's proposed collaboration did not benefit Celera. (Ex. 35.)

36.   Dr. Collins attempted to contact Dr. Venter in January and early February 2000 to discuss a follow-up meeting. (Ex. 7 at 109; Ex. 36.)

37.   In April and May 2000, Dr. Venter engaged in multiple conversations with Dr. Ari Patrinos, the director of the Department of Energy sequencing center, a primary sequencing center within the HGP. (Ex. 3 at 156.)

38.   Drs. Venter, Collins and Patrinos met many times in the Spring of 2000 to discuss coordination of efforts. As a result of these meetings, Celera and the HGP reached an agreement to jointly announce the completion of the draft assembly of the human genome and to simultaneously submit their scientific papers analyzing the human genome for publication. (Ex. 3 at 178.)

39.   On June 26, 2000, President Clinton announced the completion of the first survey of the human genome. Both Dr. Collins and Dr. Venter were invited to (and did) speak at the White House announcement. (Exs. 41, 42.)

40.    On February 16, 2001, Celera and the HGP's scientific papers describing the genome were simultaneously published in *Science* and *Nature*, respectively.  (Exs. 45, 46.)

## III.    CELERA'S SECONDARY OFFERING

41.    On February 29, 2000, PE Corporation sold 4.37 million shares of Celera common stock to the public at a price of $225 per share (the "Secondary Offering").  (Ex. 1.)

42.    The Prospectus for the Secondary Offering disclosed that:

> The Celera Genomics group does not believe it is competing with the U.S. government's efforts to sequence the human genome, and ***has sought to coordinate its efforts with those funded by the U.S. government***.  The acceleration of the Human Genome Project may assist the Celera Genomics group in its own sequencing and assembly effort.

(*Id.* at 49.) (emphasis added).

43.    The Prospectus also disclosed that Celera was going to publicly release its version of the genome:

> The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data.  (*Id.* at 12.)
>
> ***After completion of sequencing and assembly, the Celera Genomics group expects to release a detailed ordered consensus human genome assembly***.  The data that the Celera Genomics group releases publicly will be available, in a searchable format, via its web site.  (*Id.* at 38.) (emphasis added).

44.    The Prospectus further disclosed that Celera's ability to obtain intellectual property protection was uncertain.  (*Id.* at 11-12, 38, 48.)

45.    The Prospectus contained 49 specific risks that might harm Celera's business, including:

- **Celera Genomics' business plan is unique and expanding.**  No organization has ever attempted to combine in one business organization all of the Celera Genomics group's businesses . . . .  The creation of a genomics database . . . has a number of risks, including pricing and volume issues, technology and access concerns, computer security, pursuit of key scientific goals and protection of intellectual property.  (*Id.* at 8.)

- **Celera Genomics' business plan depends heavily on timely completion of the sequencing and assembly of the human genome.** The Celera Genomics group's efforts to complete the sequencing and assembly of the human genome are not yet complete. Some genomic scientists have criticized the Celera Genomics group's sequencing strategy, known as "whole genome shotgun sequencing," as having limitations when applied on a large scale in sequencing the human genome. Others have stated that the human genome cannot be sequenced using whole genome shotgun sequencing. (*Id.* at 8.)

- **The genomics industry is intensely competitive and evolving**. There is intense competition among entities attempting to sequence segments of the human genome and identify genes associated with specific diseases and develop products and services based on these discoveries. Celera Genomics faces competition in these areas from genomic, pharmaceutical, biotechnology and diagnostic companies, academic and research institutions and government or other publicly funded agencies, both in the United States and abroad. (*Id.* at 9.)

- **Celera Genomics' competitive position may depend on patent and copyright protection, which may not be sufficiently available.** The Celera Genomics group's ability to compete and to achieve profitability may be affected by its ability to protect its proprietary technology and other intellectual property . . . Patent law affecting Celera Genomics' business . . . is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter. Patents may not issue from patent applications that the Group may own or license . . . Copyright law currently provides uncertain protection regarding the copying and resale of factual data. As such, Celera Genomics is uncertain whether it could prevent such copying or resale. Changes in copyright and patent law could either expand or reduce the extent to which the Celera Genomics group and its customers are able to protect their intellectual property. (*Id.* at 11-12.)

- **Public disclosure of genomics sequence data could jeopardize Celera's intellectual property protection and have an adverse effect on the value of our products and services.** The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. Such disclosures might limit the scope of the Celera Genomics group's claims or make subsequent discoveries by Celera or its customers related to full-length genes unpatentable. While the Celera Genomics group believes that the publication of sequence data will not preclude it or others from being granted patent protection on genes, there can be no assurance that such publication has not affected and will not affect the ability of Celera or its customers to obtain patent protection. (*Id.* at 12.)

7

## IV.    THE DECEMBER 29 MEETING DID NOT LEAD TO RETALIATORY OR PUNITIVE GOVERNMENT ACTION

46.    The HGP never petitioned any entity affiliated with the U.S. or U.K. government to retaliate against or punish Celera as a result of the inability to reach a collaboration agreement at the December 29 meeting.  (Ex. 6 at 137-38; Ex. 7 at 183-84.)

47.    The March 14, 2000 joint statement by United States President Bill Clinton and United Kingdom Prime Minister Tony Blair encouraging the public release of human genome data ("Joint Statement") is not evidence that the government retaliated against Celera.  The Joint Statement supports intellectual property protection for genomic discoveries.  It states, in part:  "Intellectual property protection for gene-based inventions will also play an important role in stimulating the development of important new health care products."  (Ex. 28.)

48.    Despite the Joint Statement's clear statement to the contrary, the media misinterpreted the Joint Statement as a "ban" on gene patents, causing stock prices in the entire biotechnology sector, including Celera and its competitors, to decline significantly, as illustrated below:



(Ex. 21; Ex. 55.)

49.    Dr. Neal Lane, Director of the President's Office on Science and Technology Policy confirmed that the Joint Statement was unrelated to discussions between Celera and the HGP:  "***I want to make it absolutely clear that [the Joint Statement] has nothing to do with any ongoing discussions between the public and private sector.***"  (Ex. 44 at 2.) (emphasis added).

50.    On March 16, 2000, the United States Patent and Trademark Office ("PTO") issued a press release regarding the Joint Statement entitled "US Patent Policy Unaffected By US/UK Statement on Human Gene Sequence Data."  It stated:

> The Patent and Trademark Office (PTO) reaffirmed today that ***United States patent policy remains unaffected by Tuesday's historic joint statement*** issued by the United States and the United Kingdom urging that 'raw fundamental data on the human genome . . . should be made freely available to scientists everywhere . . . . **Genes and genomic inventions that were patentable last week continue to be patentable this week, under the same set of rules.**

(Ex. 29.) (emphasis added) (internal citation omitted).

51.    On April 5, 2000, at the First Session of the Economic Summit, President Clinton stated:

> ***On the patent thing, you know, Tony Blair and I crashed the market there for a day, and I didn't mean to.*** But I think what happened is -- when the market's recovered, I think what happened is people actually read the statement instead of the headlines or whatever. I think in the biotech area, our position ought to be clear. General information ought to be in the public domain as much as possible about the sequencing of the human genome. And where public money contributed to massive research on the basic information, we ought to get it out there. ***If someone discovers something that has a specific commercial application, they ought to be able to get a patent on it***."

(Ex. 43 at 4.)

52.    The drafting of the Joint Statement preceded discussions between the HGP and Celera regarding a potential interaction. (Ex. 6 at 131-33; Ex. 7 at 182; Ex. 30.)

53.    No one from the HGP contacted the PTO regarding Celera's ability to obtain intellectual property protection for its genomic discoveries nor sought any change in intellectual property law. (Ex. 6 at 137-38; Ex. 7 at 183-84.)

54.    Institutes within the NIH subscribed to Celera's database. (Ex. 49.)

55.    Celera was awarded a grant from the National Human Genome Research Institute and another institute within the NIH to sequence the genome of the laboratory rat in collaboration with Baylor College of Medicine, a primary sequencing center within the HGP. (Ex. 50.)

56.    Celera received gene patents since the Joint Statement. (Ex. 51.)

## V.    THE DECEMBER 29 MEETING HAD NO EFFECT ON CELERA'S BUSINESS PLAN

57.    Celera's business plan at the time of the Secondary Offering was to publicly release the raw human genome sequence and sell subscriptions to an annotated, searchable version of the genome to pharmaceutical companies and academics, much like Westlaw or Lexis sells annotated, searchable versions of publicly-available case law. (Ex. 1 at 38-39; Ex. 2 at 23-24.)

58.    Celera was "absolutely not going to patent the human genome." (Ex. 3 at 23.)

59.    A collaboration with the HGP was never part of Celera's business plan. (Ex. 5 at 35-36.)

60.    Since Celera already had complete access to the HGP's sequence data, it had minimal, if any, commercial interest in pursuing a full-scale collaboration agreement. (Ex. 2 at 121-23; Ex. 3 at 39-40; Ex. 4 at 154-55; Ex. 23; Ex. 40.)

61.    Exclusive access to a merged version of the human genome was not an element of Celera's business plan. (Ex. 2 at 57-58; Ex. 3 at 118-19, 123, 149.)

## VI.    CELERA AND THE INDIVIDUAL DEFENDANTS DID NOT SELL STOCK TO THE LEAD PLAINTIFFS

62.    Co-lead plaintiff Vinh Vuong has neither met nor spoken to any of the Individual Defendants in this case and has neither met nor spoken to any Celera employee at any time. (Ex. 8 at 28-29.)

63.    Mr. Vuong purchased his Celera stock at his own initiative through an on-line trading website. (*Id.* at 33-34.)

64.    Co-lead plaintiff David Berlin purchased Celera stock at the urging of his broker. (Ex. 9 at 49.)

65.    Mr. Berlin has never had any conversations with any Celera representative. (*Id.*)

66.    Neither Mr. Vuong nor Mr. Berlin reviewed a copy of the Prospectus before deciding to purchase Celera stock. (Ex. 8 at 43-44; Ex. 9 at 57-59.)

DEFENDANTS PE CORPORATION,
TONY L. WHITE, DENNIS L. WINGER
and VIKRAM JOG

By: _____

    Stanley A. Twardy, Jr. (ct05096)
    Thomas D. Goldberg (ct04836)
    Terence J. Gallagher (ct22415)
    Day, Berry & Howard LLP
    One Canterbury Green
    Stamford, CT 06901
    (203) 977-7300
    (203) 977-7301 (fax)
    tdgoldberg@dbh.com(e-mail)

    Michael J. Chepiga (ct01173)
    Robert A. Bourque (ct05269)
    William M. Regan (ct25100)
    Simpson Thacher & Bartlett LLP
    425 Lexington Avenue
    New York, NY  10017
    (212) 455-2000
    (212) 455 2502 (fax)
    mchepiga@stblaw.com (e-mail)

Their Attorneys

11

## **CERTIFICATION**

This is to certify that a copy of the foregoing was sent by first class mail this 21st day of December, 2004, to:

| | |
|---|---|
| J. Daniel Sagarin, Esq. | Sanford P. Dumain, Esq. |
| Hurwitz & Sagarin, LLC | Carlos F. Ramirez, Esq. |
| 147 N. Broad Street | Milberg Weiss Bershad & Schulman LLP |
| P.O. Box 112 | One Penn Plaza – 49th Floor |
| Milford, CT 06460 | New York, NY 10119 |
| | |
| Liaison Counsel | Lead Counsel for Plaintiffs |

_____
Terence J. Gallagher