**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| In re PE Corporation Securities Litigation | ) ) ) Master File No. 3:00CV705(CFD) ) ) ) February 2, 2005 ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO STRIKE THE EXPERT REPORT OF IVOR R. ELRIFI**

Defendants PE Corporation, Tony L. White, Dennis L. Winger, and Vikram Jog ("Defendants") respectfully submit this Motion to Strike the Expert Report of Ivor. L. Elrifi, ("Elrifi Report") attached hereto as Exhibit A, on the ground that the Elrifi Report is irrelevant to the facts in issue in this litigation.

**PRELIMINARY STATEMENT**

The issue that has been litigated throughout this case, as set forth in the First Amended Complaint ("Complaint"), is straightforward and simple – whether Defendants, under the securities laws, were required to disclose the December 29, 1999 meeting between Celera Genomics Group and the Human Genome Project and the supposed consequences that resulted from an alleged "break down" that occurred at that meeting. This is *not* a patent litigation.

Plaintiffs recently submitted the expert witness report of Ivor R. Elrifi.[1] Rather than opining on the facts that have been pled and developed in this litigation, Elrifi essentially provides yet a new amended complaint, alleging an *entirely new theory* as to why the Registration Statement and Prospectus filed in connection with a Secondary Offering of Celera

---

[1] Defendants do not concede that Elrifi is an expert in genomics sequencing methods or in the patentability of discoveries derived from genomics sequencing.

Genomics Group (the "Prospectus") was false and misleading. Elrifi's brand new theory is that Celera never had a reasonable expectation of acquiring patent protection for gene sequences because of its use of genomic DNA as opposed to cDNA. The patentability of genomic DNA sequences, however, *has never been* an issue in this litigation.

*Nowhere in their original or their amended complaint do Plaintiffs make the allegations opined upon in the Elrifi Report.* Furthermore, Plaintiffs did not explore this area in any of the depositions they conducted. Nor did they request the deposition of anyone involved in Celera's patent group. Simply because the word "patent" appears in both the Complaint and the Elrifi Report does not mean that the Elrifi Report is relevant to the issues that must be resolved in this litigation. Rather, the Elrifi Report is nothing more than a "red herring" – a distraction from the issues in an attempt to hide the numerous flaws in Plaintiffs' case. The underlying purpose of expert testimony is to assist the trier of fact – it is not to give Plaintiffs' another chance to re-plead a defective complaint. Thus, the Elrifi Report must be stricken.

## ARGUMENT

### A. Relevance Is a Threshold Issue The Court Must Consider In Determining The Admissibility of Expert Opinions

An admissible expert opinion, whether based on scientific or other specialized knowledge, see *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), must be both (1) relevant, *i.e.*, probative of a factual issue, and (2) reliable, *i.e.*, "based upon sufficient facts or data" and the product of reliable principles and methods that have been applied to the facts of the case. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93, 597 (1993); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 330 (S.D.N.Y. 2003). Expert opinions are admissible only if the subject matter of the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Supreme

Court explained in *Daubert*, this "goes primarily to relevance," as "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 509 U.S. at 591 (citation omitted); *see also Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("A district court should be particularly mindful of the relevance standard articulated by *Daubert* . . . ."); *Borgognone v. Trump Plaza*, No. 98-CV-6139, 2000 U.S. Dist. LEXIS 4081, at *7 (E.D.N.Y. Mar. 9, 2000) (same).[2]

Relevance is a threshold issue that the court as gatekeeper must determine prior to allowing expert testimony. *Daubert,* 509 U.S. at 592-93. In fulfilling this role, the trial court should look to Rule 401 to determine whether proffered expert testimony is relevant. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (affirming district court decision excluding expert report). Under Rule 401, evidence is relevant if it has "any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added); *see also Amorgianos*, 303 F.3d at 265. The expert report must bear upon a fact in issue in the case to be considered relevant. *See, e.g., Giles v. Rhodes,* No. 94 Civ. 6385, 2000 U.S. Dist. LEXIS 13980, at *12 (S.D.N.Y. Sept. 27, 2000) (expert's opinion on whether plaintiff suffered a neurological injury irrelevant where plaintiff was not claiming a neurological injury). An irrelevant expert report, like any other irrelevant evidence, is inadmissible.[3]

In other words, there must be a "fit" between the expert opinion and the facts in issue in the case in order for an expert opinion to be admissible. *See Amorgianos v. Nat'l R.R. Passenger Corp*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002)

---

[2]    Unreported cases are attached hereto as Exhibit C.

[3]    Plaintiffs bear the burden of establishing the admissibility of the Elrifi Report by a preponderance of the evidence. *See* Fed. R. Evid. 702 advisory committee's note.

3

("*Daubert*'s second criterion of 'fit' is essentially a requirement of relevance . . . ."); *Koppell v. N.Y. State Board of Elections*, 97 F. Supp. 2d 477, 480 (S.D.N.Y. 2000) (trial court must determine "whether the expert's reasoning or methodology can be properly applied to the facts before the court."). "A proffered expert opinion may fail to meet the fit requirement if it relates to 'facts or data that have not been adequately established in the case.'" *Amorgianos*, 137 F. Supp. 2d at 163 (citation omitted). For example:

> The study of the phases of the moon . . . may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However . . . evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*Daubert*, 509 U.S. 591.

Absent some "fit," the Court may strike an expert opinion in its entirety. *See DuPont Flooring Sys., Inc. v. Discovery Zone, Inc.,* No. 98 Civ. 5101, 2005 U.S. Dist. LEXIS 81, at *3 (S.D.N.Y. Jan 5, 2005) (striking entire expert report on the grounds that it was irrelevant and unreliable). Based on this standard, the Elrifi Report, described below, is irrelevant and should be stricken.[4]

---

[4] Even if the Court found that the Elrifi Report contained limited relevance, it should still strike the report on the ground that its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595. Since the Elrifi Report is so unrelated to the issues in this litigation, the report's opinions, if admitted, would confuse a jury and serve as a distraction from the issues that must be determined. *See Rowe Entm't, Inc. v. The William Morris Agency,* No. 98 Civ. 8272, 2003 U.S. Dist. LEXIS 17623, at *22 (S.D.N.Y. Oct. 3, 2003) (excluding expert report where it would confuse the jury).

### B. There is No "Fit" Between the Elrifi Report and the Facts in Issue in This Litigation

Plaintiffs allege that Defendants failed to disclose in the Prospectus a single meeting that took place on December 29, 1999 between Celera and the Human Genome Project ("HGP"), where the two groups failed to reach an agreement to collaborate on the sequencing of the human genome. Complaint at ¶ 39(c). Plaintiffs further allege that Defendants should have disclosed the "aggressive and punitive government action that would inexorably follow the failed negotiations." *Id.* at ¶¶ 30; 39(e). Thus, Plaintiffs have put essentially two facts in issue: (1) whether the December 29 meeting was a "break down" of negotiations between Celera and the HGP and (2) whether Celera faced retaliatory and punitive government action following the December 29 meeting. These are the only issues that are pled in the Complaint and the issues that Plaintiffs explored during discovery.[5]

The Elrifi Report, on the other hand, offers a highly detailed and technical explanation of the differences in patentability of gene sequences derived from genomic DNA versus cDNA – two terms that have never been uttered by Plaintiffs in this litigation. It provides a number of opinions on "whether PE Corporation had a reasonable expectation of acquiring patent protection for their genomic sequences as asserted in their prospectus issued on February 29, 2000 in connection with a secondary offering of its Celera Genomics Group tracking stock." Elrifi Report at ¶ 10. It concludes that "Celera faced a very significant barrier to obtaining patent protection for its genomic DNA sequences" due to its use of genomic DNA as opposed to cDNA. *Id.* at ¶ 47. The Elrifi Report contains the following additional irrelevant opinions:

---

[5] *See* Defendants' Motion for Summary Judgment ("Summary Judgment Motion") at 6-7. During discovery, Plaintiffs also raised the issue of whether Celera's business plan was somehow dependent upon a collaboration with the HGP. *Id.* at 7-8.

5

- "[T]he bar for the patentable utility for genomic DNA sequences is much higher than the bar for other types of DNA sequences, including cDNA sequences. It is also my opinion that genomic DNA cannot be patented simply by sequencing it." *Id.* at ¶ 37.[6]

- "As I noted above, there are structural differences in genomic DNA versus cDNA resulting in several important differences between sequencing genomic DNA and cDNA. These important differences created significant additional hurdles for Celera compared to commercial competitors using cDNA as the starting material for sequencing." *Id.* at ¶ 41.

- "Because Celera had a more cumbersome process, it had a lower expectation of being first to sequence any one gene and obtain a patent on that gene and the protein encoded thereby." *Id.* at ¶ 42.

- "Because Celera had a much higher likelihood of mistake in predicting the coding nucleic acid sequence and predicted amino acid sequence derived therefrom, for a "real" protein using genomic DNA sequences . . . Celera had a significantly higher hurdle in satisfying the USPTO written description requirement for its genomic DNA sequences (and proteins encoded thereby) compared to commercial competitors using cDNA as the starting material." *Id.* at ¶ 43.

- "It is my opinion that Celera's use of [the whole genome assembly algorithm] and [compartmentalized shotgun assembly] methods did not generate patentable genomic DNA sequences for the majority of the thousands of sequences in the human genome, absent other functional evidence." *Id.* at ¶ 46.

These conclusions, true or not, clearly do not "fit" with the allegations in the Complaint.[7] *See, e.g., Baker v. Urban Outfitters, Inc.,* 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003) (excluding expert report as irrelevant where opinion did not address a fact in issue and was a "sort of 'apples and oranges' comparison"); *City of New York v. Coastal Oil New York, Inc.,*

---

[6] Plaintiffs throughout this case have ignored the fact – deliberately or otherwise – that Celera's business plan at the time of the Secondary Offering did not involve the patenting of gene sequences whose utility was not known. *See* Summary Judgment Motion at 31.

[7] Defendants' will not address here the merits of these opinions since they are irrelevant to this litigation. Defendants' expert will address the multiple inaccuracies contained in the Elrifi Report. However, Defendants cannot ignore one glaring oversight in the Elrifi Report – Celera has in fact received a substantial number of gene patents. *See* Summary Judgment Motion, Ex. 51.

No. 96 Civ. 8667, 2000 U.S. Dist. LEXIS 798, at *3-4 (S.D.N.Y. Jan. 31, 2000) (excluding expert report whose conclusions were irrelevant to plaintiffs' claims). Even if the Court accepts every opinion in the Elrifi Report as true, a point Defendants absolutely do not concede, this case is no closer to resolution than before the Elrifi Report was submitted. *See, e.g., Amorgianos,* 137 F. Supp. 2d at 163 ("where there is expert testimony that a given substance can cause a certain condition, but an exposed plaintiff complains of a different condition, the expert's opinion, even if reliable, does not fit the facts of the case, is not helpful to the trier of fact, and thus, is inadmissible").

Elrifi's conclusions are puzzling since Plaintiffs have *never* alleged that: (a) Celera's patenting strategy and method of sequencing made it more difficult to obtain patent protection on gene sequences; (b) Celera's data was inferior to other types of DNA data; or (c) Celera's strategies and methods were inadequately disclosed in the Prospectus. The Complaint and deposition transcripts are silent on these issues. In fact, nowhere in the Complaint or the transcripts of the depositions of Celera employees taken during fact discovery in this case will the Court find the terms "cDNA" or "genomic DNA." Conversely, nowhere in the Elrifi Report will the Court find the terms "Human Genome Project," "December 29 meeting," "Joint Statement," or punitive government action. *See* Deposition Word Indices, attached hereto as Exhibit B.

Plaintiffs have consistently alleged that Celera's difficulty in obtaining patent protection, if any, was a result of the HGP's desire to punish Celera after the alleged "break down" that occurred at December 29 meeting. For example, the Complaint alleges:

> ***[G]iven the position of the Human Genome Project, Celera's ability to protect its sequencing of the human genome and to obtain patent protection on genomic discoveries were subject to increasing risk and uncertainty*** . . . because absent some

> compromise with the Human Genome Project, the position of the U.S. and U.K. governments was (and would be) that there should be no patent or copyright protection of the human genome and its variants, and *that those governments had enormous power to prevent Celera from obtaining the patent and copyright protection for the genomic discoveries and data critical to its business plan*.

Complaint at ¶ 39(d) (emphasis added); *see also id*. at ¶¶ 27, 39(e), 39(f). Plaintiffs allege that the Prospectus should have disclosed that the HGP would punish Celera by blocking its ability to obtain gene patents:

> The Prospectus purported to describe certain risks associated with the Company's future ability to patent its discoveries, but failed to disclose that the Human Genome Project and the U.S. and U.K. governments were in favor of making genomic data publicly available immediately after its discovery. Thus, the *desire of the U.S. and U.K. governments to block or impede such patents was an infinitely greater risk than that described in the Prospectus*.

*Id.* at ¶ 43 (emphasis added); *see also id.* at ¶¶ 44, 47. The Complaint, however, does not allege that the Prospectus should have disclosed Celera's likelihood of receiving patents on gene sequences derived from genomic DNA rather than cDNA – the entire focus of the Elrifi Report. If Plaintiffs wanted to put Celera's sequencing methods and patenting strategy in issue, they should have done so in the Complaint or during fact discovery. In fact, Plaintiffs were given full access to Celera's patents applications filed between September 1, 1999 and April 18, 2000, the discovery cut off date, yet Plaintiffs did not mark or authenticate any of these documents at depositions or question a single witness about any of these patent applications.[8]

Quite simply, the Elrifi Report has nothing to do with the allegations in the Complaint. It raises the question of whether Plaintiffs intended the report simply to provide false spin and manipulate the fact finder in this case. *See Rowe Entm't*, 2003 U.S. Dist. LEXIS 17623,

---

[8] Elrifi did not even review the patent applications provided to Plaintiffs. *See* Elrifi Report, Ex. B (documents and information Elrifi considered in reaching his conclusions).

at *22 (granting defendants' motion to exclude where irrelevant expert report would "interject substantial unfair prejudice" and "confuse the jury by directing its attention from the issues in this case."). Defendants should not have to bear the burden and expense of coming forth with an expert to rebut the Elrifi Report and opine on issues that will not assist in the resolution of this case.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion to strike the entire expert report of Ivor. R. Elrifi, and grant such other and further relief as the Court deems just and proper.

DEFENDANTS PE CORPORATION,
TONY L. WHITE, DENNIS L. WINGER
and VIKRAM JOG

By: _____
Stanley A. Twardy, Jr. (ct05096)
Thomas D. Goldberg (ct04836)
Terence J. Gallagher (ct22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
(203) 977-7300
(203) 977-7301 (fax)

and

Michael J. Chepiga (ct01173)
Robert A. Bourque (ct05269)
William M. Regan (ct25100)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Their Attorneys

## **CERTIFICATION**

      This is to certify that a copy of the foregoing was sent by first class mail this 2nd day of February, 2005, to:

| | |
|---|---|
| J. Daniel Sagarin, Esq. | Sanford P. Dumain, Esq. |
| Hurwitz, Sagarin & Slossberg, LLC | Carlos F. Ramirez, Esq. |
| 147 N. Broad Street | Milberg Weiss Bershad & Schulman LLP |
| P.O. Box 112 | One Penn Plaza – 49th Floor |
| Milford, CT 06460 | New York, NY 10119 |
|    Liaison Counsel |    Lead Counsel for Plaintiffs |

_____
Terence J. Gallagher