LEXSEE 2000 USDISTLEXIS 13980

JAMES GILES, Plaintiff, -against- MARTY RHODES, Correction Officer, and N. KITCHEN, Correction Officer, Defendants.

94 Civ. 6385 (CSH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 13980*

September 26, 2000, Decided
September 27, 2000, Filed

**DISPOSITION:** [*1] Plaintiff's motion to exclude report and testimony of defendants' use of force expert Robert Daly granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JAMES GILES, plaintiff: Jeffrey Louis Friesen, Cravath Swaine & Moore, New York, NY.

JAMES GILES, plaintiff, Pro se, Comstock, NY.

For MARTY RHODES, N. KITCHEN, defendants: Tiffany Foo, Robert Abrams, Attorney General of the State of New York, New York, NY.

For MARTY RHODES, defendant: Nicola Grey, Dennis C. Vacco, Attorney General of the State of NY, New York, NY.

**JUDGES:** CHARLES S. HAIGHT, JR., Senior United States District Judge.

**OPINIONBY:** CHARLES S. HAIGHT, JR.

**OPINION:**

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiff instituted this action under *42 U.S.C. § 1983* seeking recovery of damages for injuries that he alleges he suffered from an incident in which excessive force was used by the defendants in violation of the Eighth Amendment. The case is scheduled for trial commencing on October 10, 2000. This Opinion resolves the several motions in limine filed by the parties.

BACKGROUND

The use of force at issue occurred on July 23, 1991 at Sing Sing Correctional Facility where Giles was then, [*2] and continues to be, an inmate. Many of the facts surrounding the incident are undisputed. At about 3:00 in the afternoon, when plaintiff was returning from the prison hospital to his cell block, he was stopped by defendant Officer Rhodes in a corridor known as the 7-Building Bypass. Officer Rhodes questioned Giles about whether he had an escort to return to his cell. After a verbal exchange between Giles and Rhodes, defendant Officer Kitchen approached them and Giles was ordered to put his hands against the wall for a pat frisk. Giles initially complied with this order. After this point the parties' accounts conflict. Giles contends that the officers proceeded, unprovoked, to punch him in the face, throw him to the ground, jump on him and kick him. The defendants in sharp contrast assert that after Giles put his hands against the wall he suddenly turned away, assumed a fighting stance and drew his left hand back as if to hit Officer Kitchen. In response to Giles' aggressive actions, defendants maintain that Officer Rhodes grabbed Giles' upper body in a bear hug and Officer Kitchen grabbed Giles' legs and held him down on the ground. This incident is hereinafter referred to as the [*3] "corridor incident" or the "incident".

While there are significant discrepancies between the two versions, it is common ground that defendants used some physical force on Giles and that when additional officers came to the scene Giles was

handcuffed and brought to the prison emergency room by different officers for evaluation. Another incident involving the use of force against Giles occurred at the emergency room. Once at the hospital, Giles' handcuffs were removed while he was seated. Defendants contend that Giles then became verbally abusive, abruptly stood up and assumed an aggressive stance. Officers Erec Burgess and Robert Randall allegedly grabbed Giles' arms and legs and took him to the floor while another officer replaced the handcuffs on him. Although Giles alleges that he sustained minor injuries to his lips during this incident, Giles does not assert any claim arising from this second use of force. This incident is hereinafter referred to as the "emergency room incident".

According to records of medical examinations shortly after these incidents, Giles suffered bruising, abrasions, contusions and/or discoloration on his left cheek, right eye, scalp, left arm, left shoulder, [*4] left elbow, back, knees, left shin and wrists. The officers involved wrote various reports and memoranda describing these incidents and Giles was charged with numerous rule infractions in four separate notices of discipline. He was found guilty after hearings held on July 29, 1991 of, inter alia, assaulting staff, refusing a direct order, refusing search or frisk and being out of place. Acting pro se, Giles filed this action in July of 1994 naming as defendants Officers Rhodes and Kitchen as well as Commissioner Thomas Coughlin and Superintendent John Keane. On February 18, 1998, Giles consented to the dismissal of Coughlin and Keane. Plaintiff has been represented by counsel since the Fall of 1998.

In pending motions, each party challenges the admission of evidence and testimony by the other side at trial. Defendants seek to preclude the admission of evidence and testimony concerning a notice of discipline filed against Officer Kitchen in an unrelated incident, and the use of two demonstrative exhibits by plaintiff's medical expert, Dr. Isidore Mihalakis. For his part, plaintiff moves to exclude (i) the opinion and testimony of defendants' medical expert, Dr. Robert S. April; [*5] (ii) the testimony of defendants' proposed witness on the subject of prison security procedures, Dr. William J. Connolly; (iii) various reports and memoranda concerning the incidents; (iv) evidence regarding other crimes, wrongs or acts committed by Giles; and (v) the testimony of defendants' use of force expert, Robert Daly.

DISCUSSION

I. Defendants' Motion

A. Notice of Discipline

On October 14, 1992, a "Notice of Discipline" was issued against Officer Kitchen by the New York State Department of Correctional Services ("DOCS") notifying him of his dismissal because of his arrest by the Buffalo police department for an alleged off-duty assault with a weapon on a fellow corrections employee. Although plaintiff does not list this document as a proposed trial exhibit, defendants move to preclude its admission at trial and any testimony concerning it or the incident to which it relates on the ground that it constitutes evidence of an entirely unrelated incident that is intended only to show Kitchen's assaultive character and is therefore inadmissible pursuant to *Fed. R. Evid. 404(b)*. Rule 404(b) provides in relevant part:

> Evidence of other crimes, wrongs, or [*6] acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

In response to defendants' motion, plaintiff states that he has no intention of introducing the disciplinary notice, which is not included on his list of exhibits, and does not refute defendants' argument that this evidence is inadmissible under Rule 404(b). Plaintiff does however argue that he should be permitted to introduce the disciplinary notice and cross-examine witnesses concerning the fight, the suspension and the arrest if any of the defense witnesses "open the door" to those matters. In that event, plaintiff argues that such evidence would not be inadmissible hearsay because it would not be offered to prove the truth of the alleged assault but merely that the notice was issued and Office Kitchen was disciplined.

Defendants' motion to exclude evidence concerning Officer Kitchen's notice of discipline is granted. Information regarding an unrelated assault by one of the defendants is precisely [*7] the sort evidence of other crimes, wrongs or acts that Rule 404(b) makes inadmissible and plaintiff does not disagree. Plaintiff correctly notes that evidence inadmissible under Rule 404(b) may nonetheless be admitted to impeach a witness' credibility if the witness opens up that subject through contrary testimony. See, e.g., *United States v. Pelusio, 725 F.2d 161, 167-68 (2d Cir. 1983)* (cross-examination regarding prior instances in which defendant had been present in a car with a gun was allowed to impeach defendant's credibility in denying that he would never have knowingly entered a car with a shotgun in it). Nonetheless, it would be premature to rule

on plaintiff's request that this evidence should be allowed if defendants "open the door" to it before the Court has actual testimony to consider. To make a ruling now would require me to speculate as to the nature of the testimony that might open the door to the proper admission of this evidence, particularly since plaintiff does not offer an example of what he would consider door-opening testimony. The Court will make a determination as to the admissibility of evidence concerning Officer Kitchen's suspension and [*8] termination for the alleged assault if and when one of defendants' witnesses offers testimony that, according to plaintiff, opens the door to its admission.

2. Demonstrative Exhibits

Plaintiff's exhibit list contains two exhibits that are intended for use by his medical expert, Dr. Isadore Mihalakis, as demonstrative exhibits only. The first is a list of Giles' injuries. The second is an outline of a human body. Defendants object to the use of these exhibits on the grounds that the summary of injuries does not accurately reflect the injuries sustained by Giles during the corridor incident and that the outline of the human body will improperly lead the witness. These objections are without merit.

It is appropriate and fairly commonplace for an expert witness to use demonstrative exhibits to make his testimony more understandable to a lay jury. "[A] demonstrative exhibit is merely used to illustrate oral testimony and has no probative value in itself." *Maiocco v. Greenway Capital Corp., 1998 U.S. Dist. LEXIS 836, *26, No. Civ. A. 97- MC-0053, 1998 WL 48557, *9* (E.D.Pa. Feb. 2, 1998). Defendants have not argued that these exhibits will not serve the proper purpose of aiding Dr. Mihalakis [*9] in explaining his testimony. Their contention that the summary is not an accurate portrayal of Giles' injuries is not a reason to prevent its use by Dr. Mihalakis to explain his opinion. Proper use of the exhibit turns on whether the summary accurately reflects Dr. Mihalakis' testimony and opinion about the injuries sustained by Giles, not defendants' view of the extent and causation of his injuries.

Defendants' arguments appear to reflect three concerns, none of which requires exclusion of the exhibits. To the extent defendants are concerned that the jury will be inclined to accept the exhibits as probative of the salient factual issues, that concern will be allayed by an instruction to the jury that the exhibits are not substantive evidence. To the extent defendants are concerned about the accuracy of the exhibits' reflection of Dr. Mihalakis' testimony, that may be explored through cross-examination. As for defendants' concern that the human body outline will be used to improperly lead Dr. Mihalakis' testimony, plaintiff explains that it will be used by Dr. Mihalakis himself to mark the areas of Giles' body which were injured and will therefore not be used to improperly lead him. [*10] Because I perceive no legitimate basis to exclude these demonstrative exhibits, defendants' motion is denied.

II. Plaintiff's Motions

A. Testimony of Dr. April

Plaintiff moves to exclude the testimony and report of defendants' medical expert, Dr. Robert April, a neurologist. Dr. April's opinion, as stated in his report and confirmed in his deposition testimony, is that the July 23, 1991 incidents "did not result in any permanent neurological residua. There was no documentary evidence of craniocerebral injury, alteration of consciousness, concussion, or any other kind of structural abnormality in the brain, spinal cord or peripheral nervous system." Declaration of Jeffrey L. Friesen ("Friesen Decl."), Ex. H at 2.

Giles objects to this report and testimony as irrelevant under Fed. R. Civ. P. 402 n1 because plaintiff does not claim that he suffered any neurological damage from the corridor incident. Although Giles' pro se complaint alleged that he suffered dizziness and brain damage, plaintiff represents that he "has abandoned that claim" and will not be arguing that he suffered any neurological injury at trial. See Reply Memorandum in Support of Motion to Exclude [*11] Opinion of Dr. April at 1. Because the state of his neurological health will not be in issue at trial, plaintiff argues that Dr. April's report and testimony, which relates exclusively to that subject, is entirely irrelevant and therefore inadmissible. Defendants oppose the motion solely on the basis that they dispute that Giles will not press a claim of neurological injury at trial. They nonetheless concede that if "there is absolutely no testimony or evidence relating to a head injury" Dr. April's testimony "would not be needed." Defendants' Memorandum of Law in Opposition ("Opp.") at 4 n.2.

n1 Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. *Evidence which is not relevant is not admissible.* (Emphasis added).

There is no controversy here. Defendants' skepticism as to whether a neurological injury [*12] is claimed is without basis. Defendants supply no reason to doubt plaintiff's representations to the Court that he no longer seeks damages for any neurological injury. That representation is supported by plaintiff's Pre-Trial Statement which does not list any neurological injury in the thorough description of injuries he claims to have suffered as the result of the use of force by Kitchen and Rhodes. If plaintiff's neurological health is not in issue, which plaintiff avows, then Dr. April's testimony is not only not needed, as defendants concede, it is not relevant.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401*. In order for an expert's testimony to qualify as relevant it must assist the trier of fact to determine any fact at issue in the case. *Fed. R. Evid. 702*. Dr. April's report relates only to the subject of whether Giles suffered neurological damage as a result of the July 23, 1991 incidents. That subject is not in issue because plaintiff will not claim a neurological injury at trial. Dr. April's [*13] report is therefore not relevant to any central issue of fact in this case and would therefore serve no purpose. An irrelevant expert report, like any irrelevant testimony, is not admissible. Cf. *United States v. Onumonu, 967 F.2d 782, 786 (2d Cir. 1992)* ("expert testimony must be relevant") (citing *Fed. R. Evid. 401, 402*); *United States v. Oneida Research Services, Inc., 1998 U.S. Dist. LEXIS 1601*, No. 97- CR-373, 1998 WL 59453, *2 (N.D.N.Y. Feb. 9, 1998) (Pooler, J.) (excluding irrelevant expert evidence). Accordingly, plaintiff's motion to exclude Dr. April's testimony and report is granted. n2

- - - - - - - - - - - - - - - - - -

n2 It follows from this analysis that plaintiff is precluded from asserting any claim for neurological injury at the trial. It would not be fair to allow plaintiff to take defendants by surprise at trial by reneging on the disclaimers described in text, thereby forcing defendants to locate Dr. April to testify, perhaps at the cost of a continuance of the trial.

B. Testimony of William Connolly

Plaintiff next [*14] moves to exclude the testimony of William Connolly on the basis that the untimely disclosure of his name and the failure to disclose the substance of his testimony violates *Fed. R. Civ. P. 26(a)* and seriously prejudices plaintiff's case.

Resolution of this motion turns on whether Connolly will testify as an expert or a fact witness, a subject about which the parties disagree. The characterization of Connolly as a fact or an expert witness is crucial because defendants have failed to comply with the requirements of *Fed. R. Civ. P. 26(a)(2)(A)* and (a)(2)(B) to timely disclose the identity of all expert witnesses along with a written report from each expert containing a "complete statement of all opinions to be expressed and the basis and reasons therefor". If Connolly is an expert witness, defendants' failure to comply with Rule 26(a) subjects his testimony to preclusion.

Connolly is presently the Deputy Superintendent of Security at Sing Sing where he has worked since 1997. He has had extensive experience working within the New York State DOCS. Defendants named him as a witness for the first time in their Pre-Trial Statement filed in March of 2000, five months after the Court's deadline [*15] for disclosing expert witnesses, and have not furnished an expert report. Plaintiff subsequently deposed Connolly. In his deposition, Connolly testified that he was entirely unaware of the facts of the case and unfamiliar with Giles, did not work at Sing Sing at the time of the incident, did not know the substance of his intended trial testimony, and stated that he considered himself an expert on Sing Sing's security procedures. The following excerpts are illustrative:

> Q: Deputy Connolly, what do you intend to testify about at the trial?
>
> A: I have no idea. You called me as a witness. I didn't know anything about this until the other day when I was asked to be a witness.
>
> * * *
>
> Q: So then you intend to testify as an expert witness on Sing Sing security procedures?
>
> MS. GREY: Objection as to the term "expert".
>
> Q: You can answer the question.
>
> A: I intend to do what I'm paid to do. If the Attorney General calls me as a witness, I will review the documents and do what I do normally. If you want to classify me as an expert, I don't know. This is a difficult situation because I have no idea what this whole case is about.

Case 3:00-cv-00705-CFD   Document 129-11   Filed 02/03/2005   Page 5 of 16

Page 5
2000 U.S. Dist. LEXIS 13980, *

Friesen Decl., Ex. B at 6-7. [*16]

Plaintiff argues that this testimony squarely demonstrates that Connolly will give expert testimony on the subject of prison security procedures. Defendants disagree. They contend that Connolly is not an expert but a fact witness who will "provide testimony relating to policy and procedures relating to security throughout the New York State DOCS[,] not whether these particular defendants acted in conformity with these procedures." Opp. at 15. They maintain that such testimony is relevant to establish the standard use of force practices so that the jury can assess whether defendants' actions were objectively reasonable in this case.

The admission of expert testimony is governed by *Fed. R. Evid. 702*. Under this rule:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Fed. R. Evid. 701*, which governs opinion testimony by lay witnesses, currently provides:

> If the witness is not testifying as an expert, the witness' [*17] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Rule 701 does not strictly apply in the case at bar because defendants do not seek to admit the "opinion" or "inference" of Connolly based on his perception. In fact, they explain that Connolly will not provide his opinion as to whether the defendants adhered to proper security standards. Opp. at 15. His expected testimony appears to be confined to a description of New York State DOCS and Sing Sing security policy and procedures. The question is thus not whether as a lay witness he should be permitted to give an opinion, a matter for Rule 701, but whether he should be considered a lay witness at all.

Although Rule 702 establishes a baseline for the qualification of testimony as expert testimony and Rule 701 articulates the guidelines for opinion testimony by a lay witness may give, no rule of evidence or governing authority establishes a test for determining whether to characterize particular testimony as lay testimony [*18] as opposed to testimony subject to the strictures of Rules 702 and 26(a). However, I find guidance in making this determination from a number of cases, including a Second Circuit decision, which have identified the distinction between lay testimony and expert testimony as turning upon whether a witness' testimony requires specialized knowledge and expertise.

In *Brady v. Chemical Construction Corp., 740 F.2d 195 (2d Cir. 1984)*, appellants contended that a private investigator should not have been allowed to testify at trial because he testified as an expert although he was listed as a fact witness. The Second Circuit rejected that argument, concluding that the witness did not testify as an expert because he "detailed the facts that he personally had learned during his investigation of Brady and the conclusions he had reached. His conclusions did not require any specialized knowledge and could have been reached by any ordinary person. *He thus testified as a lay witness*." *Id. at 200* (emphasis added). The Fifth Circuit, citing *Brady*, has held that "a person may testify as a lay witness only if his opinions or inferences do not require any specialized [*19] knowledge and could be reached by any ordinary person." *Doddy v. Oxy USA, Inc., 101 F.3d 448, 460 (5th Cir. 1996)*.

One court in this district recently applied this distinction in determining that two proposed defense witnesses were, contrary to the defendants' position, expert witnesses whose testimony would be barred due to non-compliance with Rule 26(a). See *In re Matter of the Complaint Illusions Holdings, Inc., 189 F.R.D. 316 (S.D.N.Y. 1999)*. *Illusions* involved a negligence claim arising from a scuba diving accident. Defendants listed two witnesses who knew nothing about the facts and circumstances of the case but purported to know much about scuba diving. Plaintiff argued that their testimony was expert testimony and sought to exclude it. The court held that the testimony of the witnesses, concerning "scuba diving training methods, procedures for scuba diving, and their opinions about currents, water temperature, visibility, and certain dive sites in the British Virgin Islands," was expert testimony as it was "clearly based on 'specialized knowledge' (i.e., their diving expertise)". *Id. at 320*. As such it was excluded because [*20] defendants had failed to comply with the Rule 26(a) disclosure requirements.

A proposed amendment to Rule 701 lends force to the legitimacy of these criteria for distinguishing between lay and expert testimony. The amendment which will take effect December 1, 2000 places a third limitation upon the use of lay opinion testimony. To be admissible currently, lay opinions or inferences must be (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 6 of 16

Page 6
2000 U.S. Dist. LEXIS 13980, *

testimony or the determination of a fact in issue. The amendment adds that such testimony be:

> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The Advisory Committee Notes explain that this amendment is intended to:

> eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope [*21] of Rule 702. *By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . by simply calling an expert witness in the guise of a layperson.* (Citation omitted; emphasis added.)

Although Rule 701 does not govern here, the substance of the amendment and its stated rationale provide useful guidance for the determination of whether particular testimony should be categorized as lay or expert. Based on the cited cases, the definition of expert testimony under Rule 702, and the new limitation on Rule 701 lay opinion testimony, it is evident that testimony cannot be characterized as lay if it is based on experience, training or specialized knowledge rather than on the particularized, personal knowledge of the witness. n3

> n3 I may appropriately consider Advisory Committee Notes to the amendment to Rule 701, although the amendment has not yet taken effect. The Notes identify and describe a currently existing abusive practice under the Rules of Evidence, namely, "proffering an [undisclosed] expert in lay witness clothing." I may be guided by that concern in precluding comparably disguised expert testimony in the case at bar.

[*22]

Applying this distinction, I have no difficulty determining that Connolly's testimony is that of an expert. His deposition makes clear that he knows nothing about the facts of this case and that he was not assigned to Sing Sing until 1997, six years after the incident occurred. Connolly regards himself an expert on the matter of DOCS and Sing Sing security procedures. Defendants suggest that Connolly will testify about policies and procedures on the use of force in the New York State DOCS, knowledge which he has acquired in his over 20 years with that agency. That is paradigmatic expert testimony. It is founded not on his personal knowledge about the facts of this case but rather on the specialized knowledge he has developed on use of force standards in his years of experience in the correctional system.

Because Connolly's testimony is properly characterized as expert, the strictures of Rule 26(a) apply. It is not disputed that defendants have failed to comply with those disclosure requirements. They have not provided a report by Connolly, they did not disclose his identity until five months after the deadline for doing so established by Magistrate Judge Katz, and neither Connolly [*23] nor the defendants have revealed the nature of Connolly's testimony. Pursuant to *Fed. R. Civ. P. 37(c)(1)*:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

In this case, the violation is prejudicial. It is not a matter of an untimely disclosure; it is a matter of complete lack of disclosure. To date, plaintiff still has no idea what the substance of Connolly's testimony will be and cannot therefore adequately prepare to challenge it. It would entirely thwart the purpose of Rule 26(a) to allow Connolly to give what would amount to surprise testimony at trial. Accordingly, I grant plaintiff's motion to bar his testimony.

Even if I were to characterize Connolly's testimony as lay testimony and it did not therefore run into Rule 26(a) difficulties, it would be inadmissible for another reason: I fail to see its relevance. Defendants maintain that Connolly's testimony is necessary to establish use of force standards so that the jury can evaluate whether [*24] the use of force by these defendants was reasonable. But, that is not the issue here. The dispositive issue in this case is whether Kitchen and Rhodes protectively took Giles down as they say, or savagely beat him, as Giles says. The question is whose story to believe, not whether the amount of force defendants say

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 7 of 16

Page 7
2000 U.S. Dist. LEXIS 13980, *

they used conformed with policy. That does not appear to be a matter of dispute. Accordingly, Connolly's testimony concerning what would be an appropriate use of force is inadmissible because it does not bear upon the central issues in this case.

C. Hearsay Documents Prepared by Corrections Officers

Plaintiff moves to exclude thirteen documents prepared or containing information supplied by correction officers involved in the July 23, 1991 incidents and four documents entitled "Superintendent's Hearing Disposition" prepared by officers involved in the four hearings on Giles' misbehavior reports resulting from the incidents. Plaintiff contends that these documents are inadmissible hearsay that do not qualify under the hearsay exception for business records established by *Fed. R. Evid. 803(6)* because they lack sufficient indicia of reliability.

*Fed. R. Evid. 803(6)* [*25] provides an exception from the rule against the admission of hearsay for:

> A memorandum . . . of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity . . . *unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.* (Emphasis added.)

The touchstone of admissibility under Rule 803(6) is reliability. "'The principal precondition to admission of documents as business records pursuant to *Fed. R. Evid. 803(6)* is that the records have sufficient indicia of trustworthiness to be considered reliable.'" *Romano v. Howarth, 998 F.2d 101, 108 (2d Cir. 1993)* (quoting *Saks Int'l, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir. 1987))*. Following this precept, courts have consistently declined to admit incident reports prepared by prison guards involved in altercations with prisoners because of the self-serving nature of such reports in light of the writer's inherent motivation to be less than accurate.

*Bracey v. Herringa, 466 F.2d 702 (2d Cir. 1972)*, [*26] is instructive. Bracey was a prisoner who brought a claim of excessive force against several prison guards. On the defendants' motion for summary judgment the district court admitted numerous "conduct reports" describing the incident at issue written by the defendants and other prison guards, and granted summary judgment in favor of defendants. The Second Circuit reversed. The court held that the documents did not qualify for admission as business records because the prison guards' incentive to be less than forthcoming about the incident made the reports self-serving and unreliable. *Id. at 705*. Central to this holding was the court's recognition that the accountability of prison guards "under *42 U.S.C. § 1983* for physical beatings of prisoners, deprivation of medical care, or deprivation of hygienic conditions, has been established for enough years that it can safely be assumed at least some guards write their reports on such occurrences with that possibility in mind." *Id. at 704* (footnotes omitted).

In its analysis, Bracey relied on the Second Circuit and Supreme Court decisions in *Hoffman v. Palmer, 129 F.2d 976 (2d Cir. 1942)*, [*27] aff'd *318 U.S. 109, 87 L. Ed. 645, 63 S. Ct. 477 (1943)*, which excluded an accident report written by a railroad employee that was offered by the railroad in defense of a collision case. The Second Circuit determined that the report was not an admissible business record, noting that "by its very nature [the report] is dripping with motivations to misrepresent." *129 F.2d at 991*. In affirming, the Supreme Court reasoned that "the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business". *318 U.S. at 113*.

In a more recent case involving a claim of use of excessive force by a prisoner, the Second Circuit excluded a progress report written by a prison nurse that recorded statements made by a prison guard describing a conversation the guard had with the plaintiff concerning the cause of his injury. See *Romano v. Howarth, 998 F.2d 101 (2d Cir. 1993)*. The Second Circuit held that the guard's statements were not admissible under Rule 803(6) because they lacked "the requisite degree of trustworthiness [*28] essential to the business records exception." *Id. at 108*. Significantly, the court recognized that "even if the defendants could establish that the officers had a business duty to report accurately to the nurses, there is still a dark cloud hovering over this particular business record: the officer's motive to fudge the truth of what really happened in Romano's cell." *Id.*

In another excessive force case in this district, *Lewis v. Velez, 149 F.R.D. 474, 486 (S.D.N.Y. 1993)*, the court held that incident reports generated by correction officers were not admissible under Rule 803(6) because they lacked reliability. As the court reasoned:

> Where reports of inmate beatings show a lack of reliability and trustworthiness due

to the self-interest of the correction officers responsible for the records, such records are inadmissible. *Bracey, 466 F.2d at 704-05*. Self-interest functions strongly in the case at hand, where correction officers involved could be subject to disciplinary action, including dismissal, for using excessive force and could, furthermore, be brought up on criminal charges or incur civil liability. The fact that, [*29] as the defendants point out, correction officers receive strict instructions to make their reports truthfully does not diminish the motives that undermine the trustworthiness of such reports.

Id. at 486 (citation omitted).

These cases are indistinguishable from the case at bar. The twelve challenged memoranda and reports describing the July 23 incidents were all prepared by the corrections officers involved. The "Unusual Incident Report" was prepared with information supplied by officers involved. The four "Superintendent's Hearing Disposition" reports incorporate and rely on the testimony of officers involved in the incidents at issue. Even if these documents are prepared in the regular course of business, their reliability is questionable because the writers or the sources of the information clearly had an interest in self-preservation that might have led them to provide a less than accurate rendition of the incidents that were being described. The ineluctable lesson of Bracey, Hoffman and Romano is that incident reports and memoranda such as these prepared by or relying on the testimony self-interested officers have insufficient indicia of trustworthiness to [*30] be admissible under the business records exception. Plaintiff's motion is accordingly granted. n4

n4 The Unusual Incident Report is dated July 24, 1991 and consists of four pages. See Declaration in Opposition ("Decl. Opp.") at Ex. D. The first page contains a description of the incidents from the officers' perspectives, laying the blame on Giles. The second page contains a brief continuation of the information on the first page, a description of the injuries sustained by Giles, the officers involved and a nurse who treated Giles, and a list of proposed disciplinary charges to be brought against Giles. The last two pages contain summary information about each of the individuals involved, stating the injuries they received, the force they are alleged to have used and, in Giles case, his role as the perpetrator.

Although Giles moves to preclude admission of the entire report by defendants, he lists the second page of the report as one of his own intended trial exhibits. Defendants contend that it is "disingenuous" for Giles to argue that the report does not qualify as an admissible business record when he will seek to admit one page of it. Opp. at 25. Defendants' argument is untenable.

Plaintiff explains that he intends to introduce the second page of the report not as a business record but under the medical record exception to the hearsay rule. Defendants do not challenge the admissibility of page two on under that exception. They instead argue that if one page is admitted, the entire report should be admitted for the sake of "completeness." But they offer no support for this contention. It cannot be gainsaid that portions of a document may constitute inadmissible hearsay while others do not, as in the case of the Unusual Incident Report. The principle of completeness embodied by *Fed. R. Evid. 106* "does not compel admission of otherwise inadmissible hearsay evidence". *Phoenix Associates III v. Stone, 60 F.3d 95, 103 (2d Cir. 1995)* (internal quotations omitted). I have already held that the Unusual Incident Report cannot be admitted under the business records exception to the hearsay rule. Accordingly, the rule of completeness may not become a vehicle for its admission merely because one of its pages qualifies under a different exception.

[*31]

D. Evidence of Other Crimes, Wrongs and Acts by Giles

Plaintiff moves to preclude the admission of evidence and cross-examination of Giles concerning his prior convictions, the fact that he is presently incarcerated, his prison disciplinary record, the discovery of alcohol in his cell after the July 23 incidents and details concerning the emergency room incident.

1. Disciplinary Record

Giles has been disciplined for several infractions in addition to the charges stemming from the July 23 incidents. Although the precise nature of all of his infractions has not been described by the parties, plaintiff explains that some of them relate to violent behavior or disobedience. Giles argues that evidence concerning his disciplinary record at Sing Sing is precisely the sort of

Case 3:00-cv-00705-CFD   Document 129-11   Filed 02/03/2005   Page 9 of 16

Page 9
2000 U.S. Dist. LEXIS 13980, *

evidence that is inadmissible under Rule 404(b) because it would serve the purpose of demonstrating only that he is a person of bad and aggressive character who acted in conformity with that character on July 23, 1991. Giles further contends that none of the exceptions established by Rule 404(b) applies. For example, officers Kitchen and Rhodes testified that they were not familiar with Giles or his disciplinary [*32] record prior to the corridor incident and therefore his record could not be used to show that knowledge of plaintiff's propensity for violence made defendants' use of force reasonable. In addition, because Giles denies that he provoked the use of force, his motive is not in issue and therefore the admission of disciplinary records of his past violent behavior is not warranted to disprove the likelihood of accidental provocation on his part. Plaintiff additionally argues that his disciplinary record may not be used to impeach his credibility under 608(b) n5 because, with three exceptions, the infractions do not bear upon his character for truthfulness.

> n5 Rule 608(b) provides in relevant part:
>
> (b) **Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . .

[*33]

Defendants do not oppose plaintiff's argument that his disciplinary record is inadmissible under 404(b). Nor do they argue that evidence of Giles' disciplinary record fits within any of the exceptions of 404(b)'s proscription on the use of character evidence. In fact, they do not even address that aspect of plaintiff's motion. Their only argument with respect to the use of plaintiff's disciplinary record is that they should be allowed to introduce evidence of three infractions which relate to Giles' veracity: plaintiff was found guilty of giving false statements or information in incidents that occurred on January 4, 1992, February 29, 1992, and November 9, 1992.

Plaintiff concedes that Rule 608(b) allows defendants to cross-examine him with respect to these three charges because they clearly involve untruthfulness. However plaintiff argues that defendants' inquiry should be limited to whether Giles was in fact disciplined on those occasions for violating the prison rule against furnishing false statements or information. Plaintiff contends that because that limited information is sufficient to impeach Giles' credibility, defendants should be prohibited from delving into the underlying [*34] details of the infractions which could cause Giles to suffer undue prejudice that substantially outweighs any additional probative value of that information.

Plaintiff's motion is granted. The evidence of his disciplinary infractions is quintessential 404(b) character evidence that has no place in this litigation and defendants do not dispute this. Moreover, with the three exceptions described below Giles' disciplinary history may not be inquired into on cross-examination of Giles or examination of any other witness.

The parties are in accord that the three infractions in 1992 involving veracity are a proper subject of inquiry in cross-examining him for the purpose of impeaching his credibility under Rule 608(b). However, I agree with plaintiff that the details of the infractions must not be revealed. One incident involved Giles placing a dummy in his cell, leaving his cell without authorization to play football in the recreation yard and then giving a false name and identification number to a corrections officer when he was caught. Another involved Giles' lying to an officer about where his cell was located so that he could enter another area without authorization. The last involved [*35] Giles' asking a guard to escort him to the emergency room under the pretense of submitting to a TB test, and then refusing to take the test once he arrived.

Even a brief explanation of the context of the rule violations would involve details that paint a picture of a disobedient Giles in his interactions with corrections officers, which is of course behavior central to this case. Although the details of these incidents may be somewhat more probative of Giles' character for truthfulness than the simple fact that he was found guilty of making false statements, their revelation may cause the jury to improperly believe that Giles is a troublemaker who refuses to play by the rules and therefore was not an innocent party in the incident in suit. The details provide a disquieting window into Giles' prison life and could lead the jury to draw unfair parallels between his behavior on those occasions and his behavior on July 23, 1991. While it is certainly appropriate to reveal the fact that Giles was found guilty of making false statements on three occasions in order to challenge his credibility, the danger of creating unfair prejudice in the minds of the

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 10 of 16

Page 10
2000 U.S. Dist. LEXIS 13980, *

jury substantially outweighs any additional [*36] probative value the details of the infractions are likely to provide. Accordingly, upon balancing the probative and prejudicial value of the details of the veracity infractions, I will limit defendants' cross-examination of Giles regarding these incidents to inquiry as to whether he was charged with and found guilty on these occasions of providing false statements or information to prison officials.

Defendants seem to contend, citing only to Rules 608 and 405, that they should be allowed to introduce extrinsic evidence concerning these incidents as a method of impeaching Giles. Opp. at 17. This argument is misguided. First, contrary to defendants' contention, Rule 608(b) explicitly prohibits the use of extrinsic evidence to attack the witness' credibility. Second, although defendants cite to *Fed. R. Evid. 405*, that rule has no application here. Rule 405(b) provides in substantial part:

> **Specific instances of conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Nowhere do defendants argue that Giles' character or [*37] any trait thereof is an essential element of any claim or defense in this case. In *Hynes v. Coughlin, 79 F.3d 285 (2d Cir. 1996)*, the Second Circuit rejected an analogous argument that a prisoner's disciplinary records were admissible under 405(b) in an excessive force case. The court noted that defendants cited Rule 405 as support for the admission of the records and explained that "Rule 405, however, deals only with the methods by which character may be proven once it has been determined that character evidence is admissible under Rule 405(a). Since the character evidence proffered here was not admissible under rule 404, Rule 405(a) is inapplicable." *Id. at 293* (citation omitted). I reach the same conclusion here. Defendants have not argued that evidence of a pertinent trait of character of Giles is relevant and admissible under Rule 404(a), and just as in Hynes, this Court has found this evidence inadmissible under 404(b). Accordingly, defendants' reliance on Rule 405(a) to admit the documentary evidence of Giles' veracity infractions is wholly unavailing. Defendants will not be allowed to introduce any extrinsic evidence concerning these [*38] three incidents.

2. Convictions

Plaintiff has three felony convictions on his record. In 1969 he was convicted of possession of a weapon and sentenced to two years' imprisonment. In 1971, he was convicted of robbery and manslaughter and was incarcerated on those charges until 1981. Plaintiff is presently serving eight concurrent sentences of 15 years to life and a sentence of 10 years to life resulting from a conviction in August 1982 for armed robbery and possession of a weapon. Plaintiff moves to preclude the admission of any evidence, or inquiry on cross-examination, concerning his three convictions and the fact that he is presently incarcerated.

Rule 404(b), discussed above, governs the admissibility of evidence of prior criminal conduct. Rule 609 governs the use of prior convictions for impeachment purposes. Under Rule 609, evidence that a witness has been convicted of a crime punishable by more than one year in prison is admissible subject only to the prejudice/probative balancing test of Rule 403. Crimes involving dishonesty or false statements are automatically admissible for impeachment purposes without consideration of their prejudicial value. If more than ten years [*39] have elapsed from the later of the date of conviction or the date of the witness' release from prison, evidence of the conviction is admissible only if the probative value of the conviction substantially outweighs its prejudicial effect.

Giles argues that evidence of his prior convictions would be used to show his propensity for violence and his general bad character and is therefore inadmissible under Rule 404(b). Giles further contends that evidence of his convictions may not be used to impeach his credibility under Rule 609. Because none of the convictions involve crimes of veracity, they are not automatically admissible under Rule 609(a)(2) but are subject to a balancing of their probative value and prejudicial effect. Plaintiff argues that the danger of unfair prejudice arising from evidence of his convictions is high because there is a strong likelihood that the jury would conclude from his convictions that he is an aggressive and disruptive man and that he acted in conformity with those traits by provoking the incident on July 23, 1991.

Defendants do not attempt to refute plaintiff's argument that evidence concerning the convictions, or the fact that he is currently incarcerated, [*40] should not be admitted. In fact, they explain that they do not intend to introduce evidence concerning the underlying details of his convictions. Citing Rule 609(a)(1), they state that they merely "intend to cross examine plaintiff as to the fact that he is a convicted felon and the length of his sentence." Opp. at 23. Although they do not identify which conviction they intend to question him

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 11 of 16

Page 11
2000 U.S. Dist. LEXIS 13980, *

about, presumably they mean his 1982 conviction for which he is presently serving time.

As the proponents of this evidence, it is incumbent upon defendants to show that the fact and length of his 1982 felony conviction is a proper subject for impeachment under Rule 609(b). They have not done so. Defendants do not rebut plaintiff's argument that the prejudicial value of the fact of his conviction substantially outweighs any probative value on the subject of his credibility. Nor do they explain how the length of his sentence has any impeachment value at all. They also fail to address plaintiff's argument that the fact that plaintiff is presently incarcerated (which would be the logical inference from revealing the life tenure of his sentence) is entirely irrelevant to any issue in this case [*41] including plaintiff's credibility.

Disclosing the fact of plaintiff's felony conviction and his sentence carries a strong risk of unfairly prejudicing plaintiff because the jury might infer from its length and his felon status that he must have committed a serious and possibly violent crime. This could in turn lead the jury to unfairly equate his crime with his conduct on July 23, 1991. In my view, this risk of unfair prejudice outweighs the slight, if not non-existent, probative value arising from the fact of his conviction for a crime which does not involve dishonesty and the complete lack of impeachment value in disclosing the length of plaintiff's 1982 sentence. For these reasons, and because defendants do not oppose plaintiff's request to exclude evidence of the 1969 and 1971 convictions, I grant plaintiff's motion in its entirety.

3. Presence of Alcohol in Plaintiff's Cell

In the afternoon of July 23, 1991, shortly after the emergency room incident, prison guards searched Giles room and discovered three containers of liquid that tests later determined contains alcohol. This discovery resulted in a disciplinary charge against Giles on which he was found guilty after a hearing. [*42] Plaintiff contends that this evidence should be excluded under 404(b) because it constitutes evidence of prior bad conduct of Giles intended to demonstrate his bad and disobedient character.

For their part, defendants argue that this evidence is necessary to corroborate Officer Rhodes' testimony that he smelled alcohol on Giles' breath at the time of the corridor incident. This evidence is necessary, they say, because "Plaintiff will obviously claim that he did not have alcohol that day and defendants should be permitted to establish that they were correct to smell alcohol because plaintiff, in fact, was keeping alcohol in his cell." Opp. at 22-23. Although defendants do not say so explicitly, presumably they mean to suggest that the evidence is offered for an acceptable purpose other than showing plaintiff's bad character, i.e., plaintiff's opportunity to drink alcohol on the day in question.

Defendants' argument lacks foundation. Plaintiff represents that he "does not intend to deny that he had alcohol on his breath at the time of the July 23, 1991 incident." Letter from Jeffrey L. Friesen dated May 16, 2000. With that admission, defendants' sole justification for admitting this [*43] evidence falls away. Assuming that alcohol on plaintiff's breath has any bearing on the use of force in this case, a matter of dispute between the parties, the fact that alcohol was discovered in Giles' cell is certainly not probative of any fact in issue once plaintiff has conceded that he indeed smelled of alcohol. Since plaintiff intends to admit that he had alcohol on his breath, how or where he got the alcohol is irrelevant. Admitting evidence of that discovery would serve only to paint Giles as a rule violator, an impermissible purpose under 404(b). Accordingly, I grant plaintiff's motion to exclude evidence of the discovery of alcohol in his cell on July 23, 1991. n6

> n6 If at trial plaintiff recants his admission of alcohol-laden breath and denies it, this evidence will become admissible.

4. Emergency Room Incident

Whether or not to admit evidence of the events that occurred in the emergency room where Giles was taken for evaluation after the corridor incident is another point of contention between [*44] the parties. The reports, memoranda, notice of discipline and testimony of corrections officers that describe the incident contend that as soon as plaintiff's handcuffs were removed while he was sitting in a chair in the emergency room, he abruptly stood up, pushed the chair back and took a "fighting stance". Officers Randall and Burgess (who had escorted him to the emergency room) allegedly grabbed Giles by the arms and legs in a bear hug and took him to the floor. The reports further state that Giles was "verbally abusive and combative" during the incident. See, e.g., Unusual Incident Report at 1-2, Decl. Opp. at Ex. D. Officers Burgess and Randall allege that they suffered injuries during this use of force. Plaintiff maintains that he suffered minor injuries to his lips from this incident but does not claim damages for any injuries arising from this use of force.

Plaintiff argues that admitting evidence of the details of this incident is impermissible under Rule 404(b) because it constitutes evidence of wrongful conduct intended to demonstrate plaintiff's combative nature in order to persuade the jury that he initiated the use of force at the corridor in much the same way. [*45]

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 12 of 16

Page 12
2000 U.S. Dist. LEXIS 13980, *

Defendants, on the other hand, argue that evidence of this incident is necessary to prove that plaintiff's injuries were not exclusively the result of the corridor incident but also of this second incident which plaintiff instigated. In other words, defendants contend that this evidence is necessary to prove their defense of an intervening cause for plaintiff's alleged injuries. In reply, plaintiff does not dispute that defendants should be allowed to proffer their intervening cause defense, but argues that their defense does not give them license to admit documents and testimony about aspects of the incident that do not relate to causation.

Having considered the parties arguments, I conclude that it would not be fair to keep from the jury the fact that another use of force occurred in the emergency room after the corridor incident. Defendants should be allowed to show that all or some of Giles' injuries were caused during the later incident and, perforce, not by them. However, there is a serious risk of unfairly biasing the jury against Giles through the admission of testimony and evidence that he was the aggressor in that incident. Learning that Giles behaved aggressively in the [*46] emergency room might improperly lead the jury to disbelieve Giles' explanation of what occurred in the corridor based on conduct that has no bearing upon that incident. Moreover, what precipitated the use of force in the emergency room is simply not relevant to the causation of Giles' injuries.

Accordingly, in order to minimize the risk of prejudice from disclosure of plaintiff's role in the incident, while maximizing the probative value of the evidence on the causation of plaintiff's injuries, I will limit the admission of evidence (to the extent not already excluded) and testimony to the following: the fact that officers in the emergency room used force against Giles, what actions that use of force entailed, and what the alleged injuries to Giles were as the result of that use of force.

With respect to the documentary evidence that relates to this incident, see Letter from Jeffrey Friesen dated September 11, 2000, plaintiff has no objection to the admission of six of the documents which are medical records that reflect Giles' injuries listed in defendants' trial Exhibit E. Because there is no objection to their admission and I see no reason to exclude them, these documents [*47] are admissible. Plaintiff does object to the incident reports and hearing dispositions related to the incident. But I have already ruled these documents inadmissible hearsay as discussed in Part II(C), supra. Plaintiff also objects to defendants' trial Exhibit F-4, a "Request for Urinalysis Test" on Giles dated July 23, 1991 which states in pertinent part that: "For no apparent reason, inmate assaulted officer, at time [sic] incident inmate appeared intoxicated." This document is irrelevant to the issue of causation of plaintiff's injuries and its allegations are quite prejudicial. Defendants have given no reason to justify its admission. It will accordingly be excluded.

E. Testimony of Robert Daly

Plaintiff moves to exclude the report and testimony of defendants' expert witness on the use of force, Robert Daly. Daly is presently the director of a correctional facility in South Carolina. From 1973 to 1995 he worked in various capacities in the legal division of the New York City DOCS. He retired in 1995 as acting first deputy commissioner. For many years he taught a course on the use of force at the training academy for the New York City DOCS. He has also taught college [*48] and post-graduate courses on corrections and criminal justice. Daly testified during his pre-trial deposition that during his years with the New York City DOCS he prosecuted and investigated many use of force incidents.

Daly's written report prepared for this case is ten pages long and contains many subsections. After stating his qualifications, the materials he reviewed, and the legal cases he consulted, the report explains the standards governing the use of force. According to Daly, "the amount of force used must be reasonable under the circumstances and should not go beyond that which is required to subdue the inmate. In addition, mechanical restraints may be used to control a violent inmate." Friesen Decl. Ex I at p. 1. The report then instructs that the "legal standard" governing excessive force cases requires the following inquiry: "was force applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"? Id.

The report describes the typical procedure in the performance of pat-frisks, such as the one to which Giles was directed to submit in the corridor, and postulates that:

> If the inmate moves toward the officer [*49] and cocks his arm or clenches his fist, the officer will anticipate an attack and move to restrain the inmate before he (the officer) is attached. *I believe that is what happened in the first use of force incident in the corridor.*

Id. at p. 2 (emphasis added). The report goes on to describe how an inmate is generally handled in an emergency room setting and states that:

> Inmates do not strike out from a seated position. If an inmate in a seated position suddenly stands, pushes his chair back and assumes a fighting stance, the officer

will anticipate an attack and take preventative action to avoid being struck. *I believe that is what happened in the second use of force incident in the emergency room.*

Id. at p. 3 (emphasis added).

Daly represents that he has "seen a number of inmates who were in fights with other inmates or subdued by staff" and "many pictures of inmates taken after they were in fights." Id. at p. 5. In his experience, the injuries that one would expect to see from the type of attack Giles describes include, "a broken nose, a fractured jaw", "deep facial lacerations", "loss of teeth, or a split lip" and "broken ribs or bones [*50] .... Those were not the type of injuries the nurse described and treated" in this case. Id. Daly goes on to describe, on the other hand, the typical injuries that an inmate might suffer from being restrained on the ground as Officers Kitchen and Rhodes contend happened in this case. In Daly's view, "if the inmate attempts to struggle to avoid being cuffed or if he attempts to get up and pressure has to be applied to keep him on the ground some minor injuries would be expected. .... *Such injuries are consistent with the type of force the officers reported in this case.*" Id. at p. 6 (emphasis added).

Having stated all of this, the report concludes with the following "Opinion":

> It is my professional opinion that the type of injuries noted by the nurse who examined the inmate and the type of treatment rendered are consistent with an inmate who is struggling on the ground attempting to avoid being cuffed. In this case, there were two consecutive incidents and more than the usual number of abrasions and contusions would result.
>
> The injuries and treatment noted by the nurse are inconsistent with an inmate who has been hit an kicked in the face, stomped in the face [*51] and beaten all over his body with a baton.

Id. at p. 7.

This opinion as to the inconsistency between plaintiff's injuries and the claimed use of force, which I will call the "injury opinion," is the only opinion contained in his report. But in his deposition Daly appeared to expand on his report by adding his opinion concerning whether Officers Kitchen and Rhodes used reasonable force in this case. After testifying in detail concerning the legal framework governing use of force cases, Daly was asked by plaintiff's counsel, "Is it your opinion in this case the officers acted properly?" Daly responded, "It is. I think their actions withstand the scrutiny you apply when you use this standard." Friesen Decl. Ex. C. at p. 49. I will call this opinion the "reasonable force opinion".

Giles moves to exclude these opinions for three principal reasons. First, he argues that because Daly has had no medical training, he is not qualified to opine on the causation of Giles' injuries. Second, Giles argues that the injury opinion does not rest on a reliable foundation and should therefore be excluded because the fact that Daly has in the past witnessed or seen pictures of inmates who [*52] were in fights or restrained by guards does not constitute adequate methodology for a conclusion that Giles' injuries were caused by the amount of force Officers Kitchen and Rhodes say they used. Finally, Giles contends that Daly's reasonable force opinion is prohibited because it constitutes a legal opinion that usurps the function of the jury.

In response, with respect to the reasonable force opinion defendants seem to suggest that, despite his deposition testimony, Daly will not be opining as to whether the defendants' use of force was reasonable. Although they cryptically claim that based on his experience Daly "can testify as to the proper use of force in a correctional setting," defendants appear to acknowledge that Daly's opinion and testimony will be limited to the subject of his report, to wit: whether plaintiff's injuries are consistent with his description of the use of force, on the one hand, or that of the defendants, on the other.

Whether defendants acknowledge the proposition or not, I conclude that Daly may not give an opinion as to whether the defendants' use of force was reasonable or proper within the governing legal standards. Rule 704(a) provides in pertinent [*53] part that "testimony in the form of an opinion or an inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Nonetheless, it is well accepted that expert testimony is not admissible when it states an ultimate legal conclusion or communicates a legal standard to the jury. *Taylor v. Evans*, 1997 U.S. Dist. LEXIS 3907, No. 94 Civ. 8425, 1997 WL 154010, *2 (S.D.N.Y. April 1, 1997). "Generally the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (internal quotations omitted). In this regard, the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 14 of 16

Page 14
2000 U.S. Dist. LEXIS 13980, *

In Hygh, a § 1983 excessive force case, the Second Circuit excluded the opinion of plaintiff's law enforcement expert which contained legal conclusions that the court held crossed the line into inadmissible territory, [*54] including the witness' definition of "deadly physical force." But what the court found "far more troubling" was the expert's testimony that defendant's conduct was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper." Id. at 364. The court held that this testimony supplied the "ultimate legal conclusion entrusted to the jury." As the court recognized:

> We have held that an expert's testimony that a defendant was "negligent" should not have been allowed. We see no significant distinction in Cox's conclusory condemnations of Jacobs' actions here, which, in the language of the advisory committee, "merely [told] the jury what result to reach."

Id. (citations omitted). In Duncan, the Second Circuit said of Hygh:

> The ultimate issue before the jury was whether the defendant used excessive force. In holding that the expert's testimony was impermissible, this Court found that the witness went beyond simply making factual conclusions and instead asserted "conclusory condemnations . . . [which] merely told the jury what result to reach."

42 F.3d at 102.

That analysis [*55] resonates in the case at bar. Daly's deposition testimony that Officers Rhodes and Kitchen "acted properly" in this case and that their actions "withstand [] scrutiny" under the legal standards is almost identical to the expert testimony the Second Circuit found objectionable in Hygh. This opinion in effect tells the jury that they must decide that the defendants acted properly and therefore cannot be held liable for plaintiff's injuries. This is an improper subject for expert testimony.

Although defendants seem to agree that Daly will not be testifying as to the reasonableness of their actions, their position remains somewhat murky. Regardless of defendants' position on the matter, I conclude that Daly may not testify as to the reasonableness or propriety of the defendants' actions in this case. In addition, the portions of his report that recite the governing legal standards regarding the use of force must be stricken and he will not be allowed to testify on that subject. It is my function, not Mr. Daly's, to charge the jury on these matters. They have no place in his report or testimony. United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988) (expert witness' [*56] opinions were inadmissible "because they were calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law") (internal quotations omitted). Nor is their relevance readily apparent. If Daly's opinion and testimony will be limited to whether Giles' injuries are consistent with his story, as defendants assert, then his musings on the standards of reasonableness should not be necessary for that opinion.

That brings us to the opinion actually contained in Daly's report -- the injury opinion. Defendants dispute plaintiff's characterization of it as an opinion on the physical cause of Giles' injuries. Defendants assert that Daly will not be testifying as to medical causation, but rather as to whether Giles' injuries are consistent with his use of force allegations. Defendants further argue that Daly's many years of experience in investigating claims of excessive force and witnessing and viewing pictures of injuries resulting from use of force incidents furnishes an adequate basis upon which to provide that opinion.

Defendants' characterization of the injury opinion establishes a distinction without a difference. Regardless of [*57] the terminology used, implicit in Daly's opinion are conclusions about the causation of Giles' injuries; more specifically, what actions caused them. The thrust of the opinion is that the beating that Giles claims he endured could not have resulted in the injuries he suffered. Indeed, Daly's deposition testimony confirms that his opinion implicates questions of medical causation. At his deposition Daly testified in detail about the likely cause of a number of the plaintiff's injuries. The following colloquy is revealing:

> Q: I am going to go through the injuries to the extent we can read them under "nature of injury." I am going to ask you for each one whether you have an expert opinion on what caused them.
>
> A: Yes.
>
> Q: The first injury is the one contusion to the left cheek red and discolored, sir, do you have an expert opinion on what caused the injury?

A: Yes.

Q: What is that opinion?

A: I believe that would have been caused by the inmate's face coming into contact with the concrete, which is what the floor of . . . Sing Sing is or from an officer holding the inmate's head down as they tried to cuff him. In either the first or the second incident.

Q: [*58] What is the basis for that opinion?

A: I have seen a number of inmates who were on the ground being cuffed in use of force situations. If the inmate is trying to get up to avoid being cuffed or to continue a violent act against the officers, the officers are going to push him to the ground and try to hold him to the ground and the inmate is typically in a face down situation with his face on the ground.

And as they roll around on a concrete floor, it is fairly easy to have a mark on the face caused by the inmate's face coming into contact with the floor as they are rolling around and as the officers are trying to keep him on the ground to cuff him.

Daly Dep. At 68-69. To be sure, Daly's ultimate opinion in his report is couched in terms of whether the injuries are consistent with plaintiff's story, but an essential component of that opinion, as his testimony makes clear, is his conclusion concerning what actions caused Giles' injuries.

Plaintiff argues that only experts who are qualified to opine on the subject of medical causation -- such as forensic pathologists -- should be allowed to testify on the complex matter of injury causation and that Daly's testimony, lacking [*59] the sort of methodology used by experts in that field, amounts to sheer speculation. Defendants furnish two principal arguments in opposition. First, they argue that Daly will not be testifying as to causation of the injuries and therefore his qualifications on that subject are not in issue. I have already rejected that argument.

Second, defendants assert that they are not offering Mr. Daly as a medical expert but as a "use of force expert." Opp. at 12. That argument entirely misses the point. Regardless of the label they attach to Daly's category of expertise, the question is whether he is qualified to testify on the subject he intends to opine about. There can be no doubt that Daly's opinion is rooted in the causation of Giles' injuries. The question is whether Daly should be allowed, based on his involvement in use of force investigations and experience in the use of force, to opine about what caused those injuries when he concededly lacks any expertise in the area of medical causation. I conclude that he cannot.

*Fed. R. Evid. 702* permits opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education". It is the trial court's [*60] function to determine as a threshold matter whether a proffered expert is qualified to testify under the rule. See, e.g., *Arnold v. Dow Chemical Co., 32 F. Supp. 2d 584, 587 (S.D.N.Y. 1999)*. If the witness is determined competent to testify as an expert based on his education or experience in the relevant field, *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)* places upon the trial judge "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." In evaluating whether the testimony of a qualified expert is reliable, "the court must assess whether the reasoning or methodology underlying the test is scientifically valid and can properly be applied to the facts at issue. The court may consider such factors as the ability to be tested, peer review and publication, potential rate of error, and the general acceptance in the scientific community." *Deere v. Goodyear Tire and Rubber Co., 175 F.R.D. 157, 163 (N.D.N.Y. 1997)* (citations omitted).

Having considered the parties' arguments, and mindful that as the proponents of [*61] Daly's expert testimony defendants bear the burden of demonstrating that it is competent and reliable, see, e.g., *Union Bank of Switzerland v. Deutsche Financial Services Corp., 2000 U.S. Dist. LEXIS 1481, No. 98 Civ. 3251, 2000 WL 178278, *8 (S.D.N.Y. Feb. 16, 2000)*, I have no trouble concluding that Daly is not qualified as an expert in the field of injury causation and therefore is not competent to give the proffered injury opinion. Although "liberality and flexibility in evaluating qualifications should be the rule [and] the proposed expert should not be required to satisfy an overly narrow test of his own qualifications," *Lappe v. American Honda Motor Co., 857 F. Supp. 222, 226 (N.D.N.Y. 1994)*, aff'd, *101 F.3d 682 (2d Cir. 1996)*, I find that Daly does not have even the minimal education, training or experience required to satisfy this standard. Whatever expertise he may have developed during his experience investigating use of force cases, it is not expertise in assessing, with any degree of certainty, the causation of physical injuries.

Case 3:00-cv-00705-CFD    Document 129-11    Filed 02/03/2005    Page 16 of 16

Page 16
2000 U.S. Dist. LEXIS 13980, *

Daly has no medical training, has no specific training on the mechanisms of injuries and has never before testified [*62] concerning that subject. As plaintiff points out, there is a branch of medicine that specializes in determining the causation of injuries -- forensic pathology. Plaintiff has retained a forensic pathologist in this case to give his opinion with regard to what caused plaintiff's injuries. Instead of a medical expert, defendants proffer the testimony of Daly, a law enforcement official who has seen in person or in pictures many injured prisoners, but has never been trained to evaluate what specifically caused the bruises, cuts and broken bones he has seen. There is nothing in Daly's background to make him any more qualified than the average lay juror to given an opinion on whether, for example, the bruises on Giles' cheek were caused by contact with a cement floor or a punch in the face. That is a conclusion which requires specific medical training and experience of the sort Daly lacks. Accordingly, I hold that Daly is not competent to give an opinion concerning whether Giles' injuries were caused by a beating or a routine take-down and therefore his testimony and report on that subject are inadmissible.

Moreover, any such opinion would not pass muster under Daubert. Daubert [*63] held that Rule 702 imposes a special obligation on the trial court to serve as the gatekeeper to determine both the relevance and reliability of expert scientific testimony. Defendants argue that Daly's opinion need not meet the reliability threshold set forth in Daubert because Daubert applies only to scientific testimony, not to testimony involving other specialized expertise in the nature of Daly's. That is plainly wrong. The Supreme Court in *Kumho Tire Co., Ltd v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999),* held that the Daubert's gatekeeping obligation applies not only to scientific testimony but to all expert testimony. Accordingly, contrary to defendants' argument, those factors that the Supreme Court identified in Daubert as bearing upon the reliability of expert testimony, such as testing, peer review and general acceptance of the technique, also apply here. Daly has furnished no particular methodology in reaching his conclusion except reliance on his experience investigating use of force cases. This is not the sort of reliable foundation that Daubert envisions.

Defendants have not made any effort to demonstrate [*64] that this methodology is medically valid, generally accepted in the field of injury causation or is anything more than a hunch or speculation based on untested and unreliable reasoning. As the gatekeeper charged with ensuring the reliability of expert testimony, I cannot allow this testimony to be presented to the jury.

CONCLUSION

For the reasons discussed above, I resolve the parties' outstanding in limine motions as follows. Defendants' motion to exclude evidence of Officer Kitchen's notice of discipline is granted. Defendants' motion to exclude two demonstrative exhibits intended for use by plaintiff's medical expert is denied. I grant plaintiff's motions to exclude the report and testimony of defendants' medical expert, Dr. Robert April, and the testimony of William Connolly. Plaintiff's motion to exclude 17 documents prepared by or containing information supplied by corrections officers involved in the July 23, 1991 incidents is granted. Plaintiff's motion to exclude evidence of and testimony concerning his disciplinary record is granted; however, defendants' may cross-examine plaintiff concerning the three occasions on which he was disciplined for violating the prison [*65] rule against furnishing false statements or information. Plaintiff's motion to exclude evidence of or testimony concerning his prior convictions and the fact that alcohol was found in his cell is granted. Plaintiff's motion to exclude evidence concerning the details of the emergency room incident is granted; however, I will allow testimony concerning the fact that a use of force occurred, what that force entailed and what injuries Giles sustained. Finally, I grant plaintiff's motion to exclude the report and testimony of defendants' use of force expert, Robert Daly.

It is SO ORDERED.

Dated: New York, New York

September 26, 2000

CHARLES S. HAIGHT, JR.

Senior United States District Judge