LEXSEE 2003 USDISTLEXIS 17623

ROWE ENTERTAINMENT, INC., et al., Plaintiffs, - against - THE WILLIAM MORRIS AGENCY, INC., et al., Defendants.

98 Civ. 8272 (RPP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 17623*

October 2, 2003, Decided
October 3, 2003, Filed

**SUBSEQUENT HISTORY:** [*1] Summary judgment granted by *Rowe Entm't, Inc. v. William Morris Agency, 2005 U.S. Dist. LEXIS 75 (S.D.N.Y., Jan. 4, 2005)*

**PRIOR HISTORY:** *Rowe Entm't, Inc. v. William Morris Agency, Inc., 2003 U.S. Dist. LEXIS 15976 (S.D.N.Y., Sept. 15, 2003)*

**DISPOSITION:** Booking [*2] agency defendants' motion to exclude testimony and report of plaintiffs' expert granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: Rickey Ivie, Ivie, McNeill & Wyatt, Los Angeles, CA.

For Plaintiffs: Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL.

For William Morris Agency, Inc.: Michael Zweig, Helen Gavaris, Loeb & Loeb LLP, New York, NY.

For Creative Artists Agency, Inc.: Jeffrey Kessler, Jeffrey Klein, Weil Gotshal & Manges, LLP, New York, NY.

For Renaissance Entertainment, Inc: Steven M. Hayes, Parcher, Haues & Snyder, P.C., New York, NY.

For Beaver Productions, Inc.: Matthew F. Popp, James A. Cobb, Jr., Emmett, Cobb, Waits & Kessenich, New Orleans, LA.

For Jam Productions: George L. Grumley, James D. Roberts, Piper Rudnick LLP, Chicago, IL.

For Jam Productions: Monica Petraglia McCabe, Piper Rudnick, LLP, New York, NY.

**JUDGES:** ROBERT P. PATTERSON, JR., U.S.D.J.

**OPINIONBY:** ROBERT P. PATTERSON, JR.

**OPINION:**

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Defendants, the William Morris Agency, Inc., Creative Artists Agency, LLC and Renaissance Entertainment, Inc. (collectively, [*3] the "Booking Agency Defendants"), move, pursuant to *Fed. R. Civ. P. 26* and/or *Fed. R. Evid. 702, 703 and 704*, to strike the expert report and to exclude the proposed testimony of Plaintiffs' expert witness, Joe R. Feagin, Ph.D. n1

---

n1 Defendants' motion is entitled, "Motion to Exclude Plaintiffs' Expert Witness, Professor Joe R. Feagin, or alternatively, to exclude Proposed Testimony of Professor Feagin."

---

This action is brought by four black concert promoter agencies, Rowe Entertainment, Inc. ("Rowe"), Lee King Productions ("King"), Summit Management Corporation ("Summit"), and Sung Song Productions

Case 3:00-cv-00705-CFD    Document 129-12    Filed 02/03/2005    Page 2 of 10

Page 2
2003 U.S. Dist. LEXIS 17623, *

("Sung"), against the Booking Agency Defendants, as well as Defendant concert promoters, Jam Productions and Beaver Productions, alleging that a conspiracy exists among defendants to engage in racial discrimination and to boycott and exclude Plaintiffs "from promoting concerts given by all white performers and the most popular black performers" in violation of *42 U.S.C. § § 1981, et seq.* [*4] , and the Sherman Act, *15 U.S.C. § 1.* (Amended Complaint P 5.)

Professor Feagin, a Graduate Research Professor in sociology at the University of Florida, received a Ph.D. from Harvard in 1966 and has published numerous books and articles on the subject of institutional and systemic racism in the United States. (Affidavit of Michael P. Zweig dated December 20, 2002 ("Zweig Aff."), Ex. 2 ("Academic Vitae of Joe R. Feagin").)

On July 31, 2002, Professor Feagin submitted an expert report in connection with this case entitled, "Institutional Racism in the Entertainment Industry: An Opinion Regarding Racial Discrimination in the Promotion of Concert Performances in the United States." (Id., Ex. 1 ("Feagin Report").) n2 He was deposed by Defendants on September 10, 2002, September 20, 2002, and October 15, 2002. (Id., Ex. 3 ("Feagin Dep.").)

> n2 In response to Defendants' motion, Maria P. Sperando, lead counsel for Plaintiffs, by affidavit dated January 13, 2003, states, "Attached hereto as Exhibit 1 is a true and correct copy of Dr. Joe R. Feagin's expert report dated July 31, 2000 [sic]." (Declaration of Maria P. Sperando, dated January 13, 2003 ("Sperando Aff.").) Exhibit 1 contains in heavy black print interlineated suggestions to strengthen Dr. Feagin's Report. Although Ms. Sperando has advised the Court that she does not know who wrote the suggestions, they are obviously from an attorney familiar with the case, e.g., "Feagin should Torch CAA on this one." (Sperando Aff., Ex. 1 at 21.) The Court does not consider Sperando's Exhibit 1 in connection with this motion to exclude.

[*5]

The Defendants argue that Professor Feagin's opinions are not relevant, are not reliable, and would prejudice Defendants in violation of *Rule 403 of the Federal Rules of Evidence.*

**Professor Feagin's Report** n3

> n3 *Rule 26(a)(2)(B)* of the Federal Rules of Civil Procedure requires that an expert report be "a complete statement of all opinions to be expressed and the basis and reasons therefor" including "the data or other information considered by the witness in forming the opinions." *Fed. R. Civ. P. 26(a)(2)(B)* (emphasis added). Accordingly, Plaintiffs' suggestions that Professor Feagin may give additional grounds for his opinions at trial are rejected as violating the Federal Rules of Civil Procedure. The "duty to disclose information concerning expert testimony is intended to allow 'opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses.'" *Lamarca v. United States, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1999)* (alteration in original) (quoting *In re Kreta Shipping SD, 181 F.R.D. 273, 275 (S.D.N.Y. 1998)).* Absent substantial justification or a showing of harmlessness, expert testimony exceeding the bounds of the expert's report must be excluded pursuant to *Rule 37(c)(1). Kreta, 181 F.R.D. at 275.* Since Plaintiffs have not suggested any ground for permitting Professor Feagin to expand his testimony beyond his Report, this Opinion and Order is confined to the admissibility of Professor Feagin's opinions as set forth in the Report.

[*6]

**a) Professor Feagin's Expertise in the Race Discrimination Field.**

Professor Feagin's Report reveals that, since 1974, he has conducted research and analyses of racial relations and has published seventeen books and dozens of articles that deal directly and centrally with various aspects of racial discrimination in the United States. (Feagin Report at 2.) He is also a past president of the 13,000 member American Sociological Association. (Id. at 3.)

Professor Feagin states he was asked to prepare a report that:

> (1) "examines what my own research and the related social science literature tell us about racial discrimination in regard to African Americans," and
>
> (2) "then ... assesses the extent to which I see that racial discrimination reflected in the reported experiences of African American promoters as described in the

Case 3:00-cv-00705-CFD   Document 129-12   Filed 02/03/2005   Page 3 of 10

Page 3
2003 U.S. Dist. LEXIS 17623, *

amended complaint and other Rowe, et al. v. William Morris, et al. case materials."

(Feagin Report at 3.)

In the Report Prof. Feagin states his opinion as follows:

> Based on my long-term research on racial bias and discrimination targeting African Americans in the United States, on the amended complaint, and on the statistics [*7] and other case materials, I have come to the professional opinion that the accounts and incidents recounted by the black promoters in these case materials for the concert promotion industry constitute racial bias and exclusionary discrimination. Furthermore, in my professional opinion these accounts and incidents are more than a matter of a few isolated instances, but rather indicate well-institutionalized and systemic racial discrimination.

(Id.)

> This racial discrimination is generated by, and centered in, the operations of a white-dominated concert promotion network. While the case materials that I have reviewed do not reveal a written agreement on the part of whites in the concert promotion business to exclude African American promoters, these case materials do indicate that powerful whites operate informally, through what they themselves term the "concert promoting fraternity" and the "good old boy network," to exclude black promoters from almost all of the more significant business opportunities in the concert promotion industry.

(Id.)

Professor Feagin's Report then consists of a section entitled, "Institutionalized Racial Prejudice and Discrimination, [*8] " pointing out that over the last few decades, he and other social scientists have found: that race prejudice and racial discrimination are institutional and systemic and exist today in many aspects of United States society, including business and other societal sectors; that racist attitudes, racial stereotypes and racial jokes are still commonplace; that "discriminatory practices by white managers, white owners and other whites remain commonplace" in the rental housing area in the form of openly discriminatory policies, misinformation about housing and differential treatment; that "deliberate and unconscious discriminatory actions of white businesspeople frequently limit or channel black success in business"; that racial practices by whites largely account for data that show that in private business sector minority enterprises, even when size, age and type of industry are controlled for, are only half as likely to sell to other firms or similar white, male-owned firms; and that "entrenched networks, not firm capacity differences, are at the root of these differentials in market access. (Feagin Report at 4-9.)

b) The Concert Promotion Business.

Professor Feagin's Report then [*9] turns to his conclusion of "Institutionalized Discrimination in the Concert Promotion Business."

(1) In his first heading, "The Whiteness of the Talent Agencies and Concert Promotion Business," he finds that:

> The statistical data on the concert promotion sector of the entertainment industry are indicative of continuing and institutionalized patterns of racial exclusion and discrimination. As reported in the amended complaint (pp. 25-26), the data on major concerts examined for June 1998 to May 1999 show that black promoters promoted *not a single white concert;* whites got 100 percent of the contracts for these major concerts. Black entrepreneurs promoted only three percent of the many black concerts in this period, with white promoters promoting the other 97 percent. n4

(Feagin Report at 9.)

> n4 The statistical data referred to is a study by Plaintiffs, not an independent study of major concerns or a study by Professor Feagin.

Professor Feagin then cites to the deposition of Bill Cosby, the [*10] actor entertainer, as support for the conclusion that there are only a small number of black promoters, and to the Light (Rob Light of CAA) deposition for the fact that CAA hired the first African American talent agent in its music department after this lawsuit was filed. (Id.) He concludes that African Americans have been excluded from serving as agents with the major white-controlled talent firms. Finding these statistics extremely skewed in favor of whites,

Case 3:00-cv-00705-CFD   Document 129-12   Filed 02/03/2005   Page 4 of 10

Page 4
2003 U.S. Dist. LEXIS 17623, *

Professor Feagin states that "given the historical role of African Americans in the U.S. entertainment industry, this nearly complete exclusion of African Americans in the promotion of major concerts and as major agents is especially striking and signals well-institutionalized racial discrimination." (Feagin Report at 10.)

(2) In the Report's next heading "'Good Old Boy' Networks: An Overview," he notes the prevalence of "good old boy" or "buddy-buddy" networks in American business found in his study of African Americans engaged in the construction and related industries in the Miami-Dade area. Citing another study, Professor Feagin comments on "the tendency for white men to choose to associate more with other white men [*11] leaves minorities and women again disadvantaged." (Id. at 10 (citations omitted).) Professor Feagin then notes that he has "also conducted several studies of African American businesspeople that uncovered recurring examples of discrimination similar to those reported in the amended complaint and other case materials." (Id. at 10-11.) He also states that "African American respondents have frequently explained how white businesspeople in the critical business networks often act to exclude, impede or restrict participation of black businesses." (Id. at 11 (citations omitted).)

(3) In the next heading entitled, "The White Fraternity: The Concert Promotion Business," Professor Feagin cites to: (i) the deposition testimony of a white owner of a major concert promotion firm, Alex Cooley, in which Mr. Cooley brought up the "good old boy network," as one of the important reasons why black promoters have so little access in promoting white artists and testified that "it's easier to call somebody you know" (id. at 12); (ii) the deposition testimony of Bruce Wavra, a white promoter who described "what he terms 'the concert promoting fraternity' as a source of information and power [*12] in today's music business," who share a common interest (when asked who were members of the fraternity, Wavra provided a long list of white promoters and agencies before later remembering some black promoters) (id. at 12-13); and (iii) the deposition testimony of white promoter, Ronald Delsener, as an admission "that African Americans are not given an equal opportunity in the promotion of white contemporary artists" (id. at 13). Professor Feagin concludes that "this informal old boy network retains control of the concert promotion industry and excludes African American promoters from most important concert promotion opportunities." (Id. at at 13.)

Citing the Amended Complaint (P 87(k)), Professor Feagin quotes its allegation concerning Plaintiff Fred Jones being denied a multi-year exclusive contract to promote at the Mud Island facility in Memphis and concludes this exclusion was "because of the intervention of white talent agencies and a white promoter (Beaver Productions)," who is now the predominant promoter in Memphis. (Id. at 13-14.) Citing Jones's deposition testimony that there has been an institutional pattern of discrimination against black promoters since [*13] 1971, Professor Feagin concludes that Jones was shut out of the much local promotion business despite initial favorable negotiation with the city because of the aforesaid intervention of white talent agencies and Beaver Productions. (Id. at 14; see also Jones Dep. at 596-597, 982.)

(4) In the next heading, "Other Examples of Networking and Exclusion," the Report quotes certain allegations in the Amended Complaint (PP 32-34, 39-40) as examples of networking and exclusion by white agencies and white promoters, particularly to the allegations that black promoters nurtured black artists in the '70's and '80's, only to be excluded as promoters by the white talent agencies when the black artists became famous. (Feagin Report at 14-16.) Professor Feagin concludes that this treatment of black promoters is contrary to industry practice based on the Amended Complaint's allegation that "while it has long been customary in the concert promotion industry for white promoters to continue promoting the concerts of highly popular artists whose concerts they handled prior to such artists having become star performers, different standards have been applied to black promoters." ( [*14] Id. at 16.) Professor Feagin states the Amended Complaint descriptions are "similar to accounts of restriction or exclusion that [he has] gotten in interviews with numerous African American business people." (Id.) He also states that:

> Severe restriction of access to, or exclusion from, important business-generating and business-information networks is a commonplace problem reported by black businesspeople across the United States. This problem is more than a matter of racial bigotry, for it is an example of well-institutionalized discrimination reminiscent in some ways of the recent era of blatant and overt segregation, an era that ended only in the late 1960's.

(Id.)

(5) In the next heading, "Limiting Black Businesses to Less Profitable or Desirable Arenas," Professor Feagin states that in other studies:

> I have had a number of African American respondents describe how whites try to

Case 3:00-cv-00705-CFD    Document 129-12    Filed 02/03/2005    Page 5 of 10

Page 5
2003 U.S. Dist. LEXIS 17623, *

limit their businesses to predominantly black constituencies, less desirable business areas, or very small projects--a type of business "ghettoization.["] I have had professionals describe how more powerful white firms and companies try to channel black firms to [*15] black clients or exclude them from joint ventures.

(Feagin Report at 17.)

The Report then states, "we see examples of this type of channeling discrimination in the accounts in the amended complaint ... where black promoters have been restricted by white-controlled talent agencies to handling, almost entirely, less well known black artists." (Id.)

(6) In the next heading, "Discrimination in Information," the Report states that, just as Plaintiff Bozeman and the Black Promoters Association were excluded from timely and accurate information by Cara Lewis of WMA (Amended Complaint P 87(c)), African American business people in Professor Feagin's research studies describe "how whites use misinformation, late information, or related tactics to deflect black businesspeople or to effectively exclude them from contracts." (Feagin Report at 17.)

(7) In the heading entitled, "Creating Financial Hurdles," the Report states that African American business people often report that white companies, suppliers and bonding firms set financial barriers. As two example of this tactic, Professor Feagin recites the accounts (1) in the Amended Complaint (P 87(f)) of Plaintiff Rowe being told [*16] by Defendant CAA that a minimum guarantee of $ 225-275,000 per show was required, whereas later Rowe found out the minimum guarantee was $ 150-175,000 per show and (2) in the Light deposition that a better set of financial terms were offered to a white promotion firm than he offered to one of the plaintiffs. (Feagin Report at 18-19.)

(8) In the following heading entitled, "Hand-picked Minority Firms," the Report states that several research studies, including Professor Feagin's own, had found that "large white firms sometimes select inexperienced (or even 'fronting') minority firms in order to look better to the public in their own business practices" (Feagin Report at 19-20), and that an example suggesting this practice is in the Amended Complaint's allegation that "defendants, acting in concert, 'engaged' a company called Magic Johnson Enterprises," an inexperienced minority firm, "*in lieu* of engaging any of the Plaintiffs." (Id. at 19; Amended Complaint P 87(d).)

(9) In the next heading entitled, "Promises But No Work," the Report states that, in his research studies, Professor Feagin has found that numerous black business people report that they often receive oral promises [*17] of business from white firms that were later reneged (Feagin Report at 20), such as the Amended Complaint's allegation that WMA had welched on a promise of business to the Black Promoter Association (Amended Complaint PP 87(c), 88).

(10) In the next heading entitled, "Getting Contracts Only with Pressure," the Report states that, in Professor Feagin's Miami/Dade study and in other studies on African American businesses, African American business people reported that pressure to set aside programs requiring the use of minority firms did work and that without that pressure there would have likely been no contracts. (Feagin Report at 20-21.) He goes on to cite two examples from the amended complaint where "the threat of external pressure was important in getting a few contracts for the black promoters." (Id. at 21; Amended Complaint PP 87(f), 87(l), 87(o); Light Dep. at 521-524.)

(11) In the following heading entitled, "Racial Prejudice and Stereotyping Backstage," the Report states that "as the research studies cited above clearly demonstrate, much racial discrimination by white Americans is well-institutionalized, yet the key decisions generating much racial discrimination are [*18] often taken behind closed doors. Such behind-the-scenes decision-making is indicated in concepts like the 'concert promoting fraternity.'" (Feagin Report at 22.) Professor Feagin then gives an example of an interview with a black business person (in another field of endeavor) about her view that there had been an attempt to exclude her and then states:

> Two current research studies, including one that I am currently conducting, are beginning to demonstrate what the aforementioned opinion surveys only suggest: That there is still much blatant prejudice and stereotyping among white Americans, including among well-educated white Americans, but is mostly expressed in backstage settings, such as among white friends and buddies.

(Id. at 22-23.)

He then cites as examples the account of Fred Jones in his deposition that he overheard the word "nigger" used by an unidentified white promoter and by the acknowledgment by a white executive at his deposition (Wavra Dep. at 121-163) that a white promoter had made racist jokes in his presence. (Feagin Report at 22-24.) He notes that the Amended Complaint states that black

promoters have experienced disrespect. (Id. at 23 [*19] ; Amended Complaint P 88.)

(12) In the last heading entitled, "The Accumulating Consequences of Institutional Discrimination," Professor Feagin states that the damaging economic effects on black Americans often have "multiplier effects" and "amplifying effects" with serous economic and health consequences as shown by the effect on plaintiff Rowe alleged in the Amended Complaint (P 87(p)) and create stress-related negative health consequences, hypertension, chronic headaches, chest pains, lack of energy to participate in community organizations, and serious bouts of depression. (Feagin Report at 24-25.) Professor Feagin saw similar frustration and sense of limitation due to race during his review of Plaintiffs' depositions. (Id.)

(13) The general conclusion reached in Professor Feagin's Report is:

> As described by the African American promoters in the amended complaint and other lawsuit materials, there is no free and competitive market in the concert promotion business.

(Id. at 26.)

Professor Feagin also concludes:

> The accounts in the amended complaint and the statistics and other data in the record strongly indicate that equality of business opportunity [*20] does not currently exist in the concert promotion business in the United States ... Based on my extensive and longterm research on the racial bias and discrimination targeting African Americans in the United States, on the amended complaint, and on other case materials, I have come to the professional opinion that the accounts and incidents recounted by the black promoters for the concert promotion industry are similar to accounts and incidents described by many other African American businesspeople and that they thus constitute serious racial mistreatment and discrimination. Furthermore, I conclude that these accounts and incidents are more than a matter of a few isolated instances but rather demonstrate knowing, commonplace, continuing, and institutionalized discrimination in the operations of the U.S. concert promotion business.

(Feagin Report at 26-27.)

**Discussion**

*Rules 702 of the Federal Rules of Evidence* govern the admissibility of testimony by experts. n5 *Rule 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by [*21] knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed. R. Evid. 702.*

**Relevancy of Institutionalized Discrimination**

> n5 Although *Rules 703 and 704* are also applicable, *Rule 703* is principally applicable to the issue of whether facts or the data upon which an expert bases an opinion need be admissible in evidence. *Fed. R. Evid. 703. Rule 704* does permit expert opinions on the ultimate issue before the jury, but, the Advisory Committee Notes point out, existing "provisions afford ample assurance against the admissions of opinions which would merely tell the jury what results to reach, somewhat in the manner of the oath helpers of an earlier day." *Fed. R. Evid. 704* advisory committee's note.

First, much of Professor [*22] Feagin's proposed testimony, as stated in the conclusion to his Report, that the statistics, accounts and incidents he has reviewed in the Amended Complaint, and the related case materials "demonstrate knowing, commonplace, continuing and institutionalized discrimination in the operations of the U.S. concert promotion business" (Feagin Report at 23) is not relevant to the issues to be tried. This case is not a class action. Instead, it charges that the four black promoter Plaintiffs n6 were the subject of racially discriminatory acts by the three white Booking Agency Defendants and the two white promoter Defendants who constitute only a portion of the U.S. concert business. (See Amended Complaint PP 67, 71.) Thus, the conclusion by Professor Feagin of institutionalized

discrimination in the United States concert promotion industry is not relevant to the issues in Plaintiffs' case and would only serve "to interject substantial unfair prejudice into the case" and confuse the jury by directing its attention from the issues in this case. n7 [*23] *Collier v. Bradley University*, 113 F. Supp. 2d 1235, 1242 (C.D. Ill. 2000).

n6 Other black promoters elected not to join in, or withdrew from the action.

n7 For a similar discussion, see statements of trial judge about proposed testimony by Professor Feagin which is excluded based on danger of prejudice in NAACP, et al. v. Florida State Dep't of Corrections, (00 Civ. 100-0c-10 (GRJ) (Nov. 4, 2002)). (Zweig Aff., Ex. 13 at 18-20.)

### The Report's Specific Findings

Insofar as Professor Feagin's Report and proposed testimony is based on his finding of specific actions of alleged racial discrimination against Plaintiffs, it still fails to meet the requirements of *Rule 702*. The Report does not contain or rely upon any original sociological research, any surveys or statistical analysis or testing studies about the concert promotion business performed independently by Professor Feagin or by persons acting under his direction. The Report does not reflect that Professor Feagin has conducted [*24] a previous study in either the entertainment or concert promotion industries, nor does his resume show he has an academic background in either industry. Instead, he bases his opinion on allegations in the Amended Complaint and on certain other case materials provided by Plaintiffs' counsel, such as Plaintiffs' depositions and on a limited number of other depositions (see, e.g., id. at 8-9, 20-21, 132-33, 160-61, 176, 165-166, 271-273) to conclude that the accounts and incidents in the concert promotion industry recounted by the Plaintiffs are similar to accounts and incidents by other African American business people described to him and other researchers. In essence, Professor Feagin concludes that those accounts by Plaintiffs "constitute serious racial mistreatment and discrimination" since similar complaints by black businesspeople in other fields of endeavor were made in previous studies. (Feagin Report at 26-27.) n8

n8 Almost all of these earlier studies, upon which the Report relies, appear to be opinion surveys of how black business people view the industry in which they are competing, e.g., "I have also conducted several studies of African American businesspeople that uncovered recurring examples of discrimination ...." (Feagin Report at 10.) "In an early 1990s study of African American businesspeople ... I found numerous respondents describing the white 'buddy-buddy' networks ... as the black businesspeople have experienced it ...." (Feagin Report at 11.) "In several research studies involving interviews with African Americans across the United States, I have also found numerous African Americans businesspeople describing how white businesspeople have the power to deny black businesspeople not only business but also access to the most important business networks ...." (Feagin Report at 11.) "A commonplace problem reported by African Americans in business ...." (Id. at 12.) " Similar to accounts of restriction or exclusion that I have gotten in interviews with numerous African American businesspeople ... across the United States." (Id. at 16) "[A] field study by Sharon Collins involved 76 interviews with leading black executives ...." (Id. at 17.) "In my research studies of African American businesspeople, I have found numerous respondents describing ..." (Id.) "In my previous field research, African American businesspeople often report ...." (Id. at 18.) "In my field research studies, I have had numerous black business people report ..." (Id. at 20.) "In my Miami-Dade study and other research on African American firms ... I have had numerous African American businesspeople report ...." (Id.)

[*25]

Such testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue. In essence, it is little more than testimony that the Amended Complaint states a cause of action and that those allegations show that Plaintiffs have been subject to racial discrimination. That Professor Feagin and others have received similar accounts of how black business people perceive they have been discriminated against is not admissible evidence. Not only would such evidence violate the hearsay rule, it would also run counter to the restrictions enunciated in *Rules 403 and 404(b)* of the Federal Rules of Evidence. While how African American business people perceive they have been excluded or discriminated against is important in sociological studies aimed at educating our society on how to eliminate actions by whites that are perceived by blacks as racism, such survey studies cannot provide evidence that the acts of the Defendants in this case constituted racially discriminatory acts.

Furthermore, to allow such testimony would undercut the jury's reliance on the Court's charge when the jury is called upon to apply the charge to the facts in evidence. To have an "expert" [*26] testify that the facts alleged in the Amended Complaint amount to racial discrimination, or to testify that certain deposition testimony constitutes racial discrimination, would (1) invade the province of the jury to determine whether those facts were, in actuality, acts of racial discrimination, see *Fed. R. Evid. 704* advisory committee's note, and (2) "invade the province of the court to determine the applicable law and to instruct the jury as to that law," see *Federal Aviation Admin. v. Landy, 705 F.2d 624, 632 (2d Cir. 1983)*.

In *Kidder Peabody & Co., Inc. v. IAG International Acceptance Group, 14 F. Supp. 2d 391 (S.D.N.Y. 1998)*, Judge Haight faced a similar motion to preclude this type of expert testimony. Judge Haight reviewed the standard to be applied in the Second Circuit, noting that an expert could not testify as to what the parties did or said to each other, as to what the parties knew, believed or understood, or facts that have no support in the evidence. *Id. at 398*. He then assumed, as does this Court, that the plaintiff's witnesses would testify in accordance with the statements in the expert report upon which [*27] the expert relies. Id. Judge Haight then concluded that the thrust of the expert report would be that plaintiff acted reasonably by relying on another party's advice. n9 *Id*. Similarly, here the main thrust of Professor Feagin's testimony would be that the Plaintiffs' testimony about each of the allegations in the Amended-Complaint or contained in the depositions reviewed by Professor Feagin constitutes racial discrimination. Accordingly, Professor Feagin's testimony would, as Judge Haight found, "'embrace an ultimate issue to be decided by the trier of fact,' a function sanctioned by *Rule 704(a), so long as* those opinions do not 'merely tell the jury what result to reach,' an effect explicitly condemned by the Advisory Committee Notes ... [or] usurp the trial judge's function of instructing the jury on the law." *Id. at 398* (emphasis added) (citations omitted).

n9 Whether it was reasonable for plaintiff to act on this person's advice was a key issue in the case.

Judge Haight concluded [*28] that the expert opinion crossed the line into these forbidden territories. In doing so, he reviewed the Second Circuit's summary of the general principles of admissibility of expert opinions, stated in United States v. Duncan:

Generally, the use of expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

*42 F.3d 97, 101 (2d Cir. 1994)* (emphasis added) (citations omitted); [*29] *Kidder Peabody, 14 F. Supp. 2d at 399*.

As Judge Haight pointed out, in Duncan, the Second Circuit (1) held admissible the testimony of an IRS agent investigating a complicated land and tax fraud scheme with respect to certain factual conclusions, but who had not "expressed an opinion as to whether Duncan was guilty of the offense charged" and (2) distinguished its prior opinion in *United States v. Scop, 846 F.2d 135*, modified, *856 F.2d 5 (2d Cir. 1988). Kidder Peabody, 14 F. Supp. 2d at 399* (citations omitted).

In Scop, a securities-fraud case, the Second Circuit found reversible error in the trial court's permitting an SEC investigator with no personal knowledge of the facts to characterize the defendant's conduct as "fraudulent" in language that tracked the governing statute. In particular, the Court "found the SEC investigator's testimony particularly objectionable because his stated conclusions were not based on personal knowledge, but on his assessment of the testimony and credibility of other witnesses." [*30] *Duncan, 42 F.3d at 101*. Furthermore, the Court "found that the investigator encroached on the exclusive province of the jury in weighing witness veracity." *Id*. Professor Feagin's proposed testimony would similarly encroach on the exclusive province of the jury in weighing witness veracity.

In allowing the expert testimony, the Duncan court also distinguished *Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992)*, pointing out that in Hygh the expert went beyond making factual conclusions and instead asserted conclusory condemnations (that the defendant's conduct was not justified and not warranted under the

Case 3:00-cv-00705-CFD    Document 129-12    Filed 02/03/2005    Page 9 of 10

Page 9
2003 U.S. Dist. LEXIS 17623, *

circumstances), which in effect "merely told the jury what result to reach." *Id. at 364* (citations omitted). Here, Professor Feagin's proposed testimony is that the Plaintiffs' testimony about the Defendants' acts constitute race discrimination, an issue the jury will be asked to reach.

Thus, Professor Feagin's Report and his proposed testimony are akin to the testimony found objectionable in [*31] *Scop* and in *Hygh* and found objectionable by Judge Haight in *Kidder Peabody*. The proposed testimony is conclusory and would invade both the province of the Court and the jury. In short, admission of the testimony would serve to confuse the issues and mislead the jury in violation of *Rule 403* and would "merely tell the jury what result to reach." *Fed. R. Evid. 704* advisory committee's note.

Professor Feagin's proposed testimony also does not meet the three-part test of *Rule 702*. First, the Report does not purport to rely on "sufficient facts or data" since it is based solely on the accounts in the Amended Compliant and the depositions of a limited number of witnesses. It does not attempt to concern itself with the Defendants' evidence, and its support, based on literature about African American experiences and Professor Feagin's earlier studies in other areas of commerce, is anecdotal. In short, the Plaintiffs have not shown that the opinions expressed by Dr. Feagin are the result of a scientific study or consist of technical knowledge which will assist the trier of fact to understand the evidence or determine a fact in issue. Thus, the testimony does not meet the standard [*32] set forth in *Rule 702*.

Second, an opinion based only on those few instances cited by Professor Feagin from the case materials has not been shown by Plaintiffs to be the product of reliable principles. Plaintiffs have not shown that Professor Feagin's testimony meets the factors in *Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, as modified by *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. Under the so-called Daubert framework, a district court must determine whether (1) the expert would testify to valid scientific, technical or other specialized knowledge, and (2) his testimony will assist the trier of fact. *Daubert, 509 U.S. at 592; Fed. R. Evid. 702*. "The admission of expert testimony from technical fields is governed by the same concerns and criteria as the admission of scientific expert testimony," but with respect to technical testimony, "the Supreme Court in Kumho Tire explained that the Daubert 'gatekeeper' factors had to be adjusted to fit the facts of the particular case at issue, with the goal of testing the [*33] reliability of the expert opinion." *United States v. Brumby, 217 F.3d 905, 911 (7th Cir. 2000)*.

Daubert identified four specific factors which the trial court may consider in determining reliability. These considerations are: (1) "whether [the theory or technique] can be (and has been) tested," *Daubert, 509 U.S. at 593*, (2) "whether the theory or technique has been subjected to peer review and publication," *id.*, (3) "in the case of a particular scientific technique ... the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation," *id. at 594*, (4) whether the theory or technique has "general acceptance" in the scientific community. *Id.*

(1) *Whether the theory can be tested.* Plaintiffs suggest that the method of validating Professor Feagin's conclusions would be only a review of the Amended Complaint, the deposition transcripts furnished Professor Feagin, which were primarily Plaintiffs' depositions. In the Court's view, this is an unsatisfactory method of testing an expert's conclusions.

(2) *Whether the expert's opinion has been subject* [*34] *to peer review or been published.* Plaintiffs maintain certain of the literature relied on by Professor Feagin has been subject to peer review. However, Professor Feagin's methodology in the Report which concludes, based on interviews contained in studies of other industries, that the same conditions exist in a unrelated industry based on reading the complaint and a limited number of depositions has not been shown to have been subject to peer review as an accepted methodology.

(3) *When a particular technique is used, that technique's rate of error.* In this case, there is no evidence showing that Professor Feagin's technique or methodology can be tested for rate of error.

(4) *The extent of the acceptance of the theory in the relevant scientific community.* Finally, no evidence has been presented that Professor Feagin's method of reviewing the allegations of the Amended Complaint and case materials selected by Plaintiffs' attorneys and comparing those accounts to accounts of other African Americans complaining of conditions in other unrelated industries studied by him or other sociologists is a generally accepted method in the sociological community upon which [*35] to offer an expert opinion that the testimony to be offered in support of the allegations in the Amended Complaint and depositions supplied to Professor Feagin constitute acts of race discrimination.

The trial court is to use its discretion to determine what are reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the particularities of the case before it. *Kumho, 526 U.S. at 158* ("*Rule 702* grants the district judge the discretionary authority, reviewable for its abuse, to determine

Case 3:00-cv-00705-CFD   Document 129-12   Filed 02/03/2005   Page 10 of 10

Page 10
2003 U.S. Dist. LEXIS 17623, *

reliability in light of the particular facts and circumstances of the particular case."). In this case, Professor Feagin's proposed testimony does little to assist the trier of fact. Based on the evidence presented at trial, the trier of fact will be able to assess whether Plaintiffs have proved that a "good old boy" network operated intentionally to exclude Plaintiffs as black promoters from representing white artists and black artists once they became prominent.

In short, Professor Feagin's proposed testimony does no more than plaintiffs' counsel will do in arguing their case to the jury. See [*36] *Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 530(S.D.N.Y. 2001)* (finding no "justification for the admission of expert testimony" when it "does no more than counsel ... will do in argument").

Accordingly, the Booking Agency Defendants' motion to exclude the testimony of Dr. Feagin and his expert report is granted.

IT IS SO ORDERED.

Dated: October 2, 2003

Robert P. Patterson, Jr.

U.S.D.J.