## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE PE CORPORATION SECURITIES LITIGATION | : : : : | Master File No. 3:00CV705(CFD)<br><br>**February 16, 2005** |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
### MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Lead Plaintiffs by their attorneys, pursuant to Local Rule 56(a)(2), hereby object and

respond to Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue To

Be Tried ("Defendants' Statement"), and state material facts as to which plaintiffs contend there

exists a genuine issue to be tried with respect to issues raised by defendants in their Motion for

Summary Judgment.

1.      Celera Genomics ("Celera") was founded by PE Corporation in May 1998 to
sequence the human genome and commercialize genomic discoveries.  (Ex. 1 at 32.)

**Response to Paragraph 1**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment.  Subject to and without waiver of the foregoing objection, plaintiffs

admit this statement.

2.      The Human Genome Project ("HGP") is an international research organization
formed in 1990 to sequence the human genome.  (Ex. 7 at 10; Ex. 48.)

**Response to Paragraph 2**

Admitted.

3.      Celera planned to sequence the human genome faster, more accurately and at a
fraction of the cost of the HGP's efforts.  (Ex. 3 at 39; Ex. 20.)

**Response to Paragraph 3**

Plaintiffs object to this statement to the extent that Celera stated that it could complete the human genome at a "fraction of the cost," on the grounds that it is not a material fact to the motion for summary judgment.

Subject to and without waiver of the foregoing objection, plaintiffs admit that defendants initially believed that Celera would complete the human gene sequence before the HGP. PX 8 at 62[1] ("When we first started Celera we didn't think the other side was going to have one for many years."). In September 1999, however, the HGP announced that it would accelerate the sequencing of the human genome and release a draft in the Spring of 2000. PX 49 (*HGP Leaders Confirm Accelerated Timetable for Draft Sequence*, at (http://www.ornl.gov/sci/techresources/Human_Genome/project/update.shtml).

Plaintiffs dispute that Celera believed that it could sequence the human genome "more accurately" than the HGP, because defendants knew that the genomic DNA generated by Celera's whole genome shotgun ("WGS") sequencing technique, was more cumbersome and susceptible to sequencing errors, as compared to the cDNA generated by Celera's competitors (PX 67 at ¶¶ 22, 41-43)). *See also Id.* ¶¶ 21-22; PX 3 at 17-18, 44, 54, 170 – shotgun method incapable of producing quality results); PX 12 at RW00380 (November 14, 1999 memo from Dr. Lander to Drs. Collins, Levine, Roberts, Varmus and Venter, expressing Dr. Sulston's view that he was not convinced Celera could complete the sequence on their own); PX 14 at RW 00383 (November 21, 1999 email from Dr. Waterston to Dr. Morgan stating that Waterston believed Celera wanted to collaborate to validate their sequence, of which many people were skeptical); PX 6 at 20-21, 42-43) (Dr. Varmus believed that Celera could not complete the whole genome sequence without the HGP's help); PX 13 at RW 000017 – November 19, 1999 email from Dr.

---

[1] References to "PX __" are to exhibits attached hereto. References to "DX__" are to exhibits attached to Defendants' Statement.

2

Varmus to Dr. Waterston stating: "I am not ready to acknowledge that Celera could put the human genome sequence together without the public effort.").

4.      Specifically, Celera planned to complete the sequence in three years for $300 million as opposed to the HGP's plan to complete the sequencing in 15 years at an estimated cost of $3 billion.  (Ex. 3 at 39.)

**Response to Paragraph 4**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment.  Moreover, plaintiffs dispute this statement because defendants knew that Celera's ambitious time and expense goals for completing the human genome sequence were meaningless because Celera's WGS technique was flawed, and thus, Celera was incapable of completing the entire sequence within its projected timeframe or cost.  *See* Response to Paragraph 3, *supra*.

5.      Celera and the HGP each committed to publicly release the raw human genome sequence.  (Ex. 1 at 12.)

**Response to Paragraph 5**

Plaintiffs object to this statement as misleading.  Although Celera had committed to publicly release the human genome sequence, such data would only be released to researchers for free (PX 23 at RW 00320 (Celera would prefer that such exclusivity be indefinite but acknowledge that some compromise some compromise would have to be reached . . . 2005 would be viewed as a compromise."); *see also* PX 4 at 35-36), because Celera wanted to prevent its competitors from reselling sequence data.  *Id.*  Thus, during the negotiations leading up to the December 29 meeting, and at the meeting, Celera demanded exclusive rights to distribute all merged Celera/HGP sequence until at least 2005.  PX 3 at 84; PX 13 at RW 00018 (November 19, 1999 email from Dr. Varmus to Dr. Waterston); PX 15 at RW410 (November 27, 1999 email from Dr. Waterston to Dr. Lander); PX 6 at  135-36; PX 23 at RW 00320 (At the December 29

meeting, defendant White first demanded that the merged HGP/Celera sequencing data be

protected forever, and then, insisted upon exclusive distribution rights over the sequence until at

least 2005); *see also* PX 14 at RW 00383 (November 21, 1999 email from Dr. Waterston to Dr.

Morgan - exclusive rights over the human would give Celera a competitive advantage).

      6.     Members of the HGP were bound by an agreement known as the "Bermuda
Accord," which called for daily release of all newly-generated DNA sequences into an online
genetic database known as GenBank, which anyone could download for any purpose. (Ex. 4 at
61; Ex. 48.) Celera therefore, had access to all of the HGP's data. (Ex. 2 at 122-23; Ex. 4 at
154-55; Ex. 6 at 147).

**Response to Paragraph 6**

      Plaintiffs object to this statement on the grounds that it mischaracterizes the public's

rights to the HGP's data under the Bermuda Accord. Although anyone could download the

HGP's data, the HGP did not want Celera to repackage its free data and resell it to customers on

a restricted basis. Thus, the HGP took steps to prevent Celera from combining the HGP's data

with Celera's for commercial use. On February 18, 2000, prior to the secondary offering that is

the subject of this litigation, senior members of the HGP discussed a proposed draft of a "public

license." PX 62 at RW 00125-42. The license contemplated permitting an "open content license

on use of public HGP data, i.e. free to use it but not free to put restrictions on its use." *Id.* at RW

00126.

      7.     Celera was not party to the Bermuda Accord and was not required to make its
sequence data available to the HGP. (Ex. 4 at 154-55.)

**Response to Paragraph 7**

      Admitted. However, defendants knew that Celera would be unable to develop the

necessary human genome sequence that would serve as the foundation for Celera's information

platform because the WGS method Celera was using was flawed. Thus, Celera needed the

HGP's data and assistance to complete its sequence. *See* Response to Paragraph 3, *supra*.

8.      Celera planned to publicly release its version of the human genome once it was complete, rather than on a daily basis.  (Ex. 1 at 38; Ex. 3 at 48-49.)

**Response to Paragraph 8**

Plaintiffs object to this statement as misleading.  Although Celera had committed to publicly release the human genome sequence, such data would only be released to researchers for free because Celera wanted to prevent its competitors from reselling sequence data.  *See* Response to Paragraph 5, *supra*.  Moreover, defendants knew that Celera would be unable to develop the necessary human genome sequence that would serve as the foundation for Celera's information platform because the WGS method Celera was using was flawed.  Thus, Celera needed the HGP's data and help to complete its sequence.  *See* Response to Paragraph 3, *supra*.

9.      Celera honored its commitment to publicly release the human genome sequence. On February 16, 2001, the Celera scientists published a sequence, assembly and initial interpretation of the human genome in the journal of Science.  (Ex. 45.)

**Response to Paragraph 9**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment because the publication occurred well after the Secondary Offering was completed on February 29, 2000.

Subject to and without waiver of this objection, plaintiffs dispute this statement because, as Celera admits in the publication, it did not release the entire human genome sequence, but rather only the portion it had completed.  DX at 45 ("Here we report the penultimate milestone along the path toward that goal, a *nearly complete sequence* of the euchromatic portion of the human genome.") (emphasis added).

10.     The efforts of Celera and the HGP to sequence the human genome were widely publicized.  The HGP often made negative comments in the media concerning Celera and Dr. Venter.  (Ex. 3 at 37-38; Ex. 11)

**Response to Paragraph 10**

5

Plaintiffs object to this paragraph on the grounds that it is not a material fact to the

motion for summary judgment. Subject to and without waiver of the foregoing objection,

plaintiffs admit that Celera and the HGP's sequencing efforts were widely publicized and that the

HGP's comments identified by defendants may be perceived as "negative."

11.     News articles discussed the possibility that Celera and the HGP would collaborate.
For example, the New York Times reported in November 1999 that "[t]alk of collaboration has
flared among rivals pursuing one of biology's highest goals." (Ex. 12; see also Ex. 13-20).

**Response to Paragraph 11**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment. Moreover, plaintiffs dispute defendants' characterization of these news

articles as "discuss[ing]" a potential collaboration between Celera and the HGP because the news

articles cited in defendants' summary judgment brief do not provide any details about the

collaboration, and thus, hardly "discussed" it.[2] Rather, these articles only briefly mention that

collaboration negotiations existed. *See, e.g.,* DX 12 (Nicholas Wade, *Talk of Collaboration on*

*Decoding of the Genome*, THE NEW YORK TIMES, Nov. 14, 1999, at 1) ("Dr. Francis Collins . . .

said that continuing discussions were exploring the possibility of collaboration . . . ."); DX 14

(Todd Ackerman, Public, *Private Gene Mappers May Pool Their Efforts*, THE HOUSTON

CHRONICLE, Dec. 14, 1999, at 1) ("public consortium is negotiating with its private rival to pool

efforts."); DX 17 (*Human Genome Rivals May Unite*, ASSOCIATED PRESS, Nov. 14, 1999, at 1)

("The public and private rivals racing to decode the human genetic blueprint are discussing

collaborating on the effort . . . .").

12.     In the fall of 1999, members of the HGP reached out to Celera to discuss a
potential collaboration. (Ex. 3 at 36-37; Ex. 4 at 35-36; Ex. 5 at 22, 38; Ex. 22.)

---

[2] Discuss is defined as: "1, talk about; debate. 2, speak or write about; explain." Jean L.
McKechnie, Webster's New Universal Unabridged Dictionary (Jorset & Baber 1983).

**Response to Paragraph 12**

Disputed.  Dr. Richard Roberts, the Chairman of Celera's Scientific Advisory Board, first reached out to Dr. Waterston, head of one of the major labs participating in the HGP, in the Fall of 1999 to discuss a potential collaboration, because defendants knew, given the HGP's acceleration of its human genome sequencing, that Celera needed the exclusive right to commercially distribute a merged HGP/Celera sequence to achieve its stated information business plan.  PX 34 at FC 0003 (October 3, 1999 email from Dr. Waterston to Dr. Collins – stating that on October 2, 1999, Dr. Roberts, Chairman of Celera's Scientific Advisory Board, contacted Dr. Waterston at the HGP about "reaching some kind of accord with Celera . . . .").

13.    Both Celera and the HGP believed that a full-scale collaboration agreement was "highly unlikely."  (Ex. 3 at 40, 56, 113-14; Ex. 4 at 67; Ex. 6 at 58-59; Ex. 7 at 41, 46, Exs. 31-33.)

**Response to Paragraph 13**

Disputed.  At various points throughout the negotiations, representatives of both Celera and the HGP believed that a collaboration agreement would be beneficial to both sides and was possible to achieve.  PX 73 at CG04073-74 (November 16, 1999 email to Gilman stating that Celera believed by that a formal collaboration with the HGP would inure to its benefit); PX 41 at WI00001 (October 4, 1999 email from Dr. Roberts to Dr. Lander stating that Dr. Roberts thought a collaboration between the HGP and Celera was "an excellent initiative").  Moreover, both parties' desire to collaborate is  evidenced by the numerous positive communications during the Fall of 1999.  PX 4 at 33-34 (numerous meetings held in Fall of 1999 discussing potential collaboration); PX 39 at FC00037 (November 17, 1999 letter from Venter to Collins informing the HGP of its continued desire to collaborate); PX 6 at 85 (December 10, 1999 meeting between Dr. Varmus and Dr. Levine to discuss "the basic elements of possible collaboration."); PX 3 at 64; PX 17 at  RW 00343 (December 13, 1999 email from Dr. Collins to Drs. Waterston, Lander,

Varmus and others stating that Dr. Varmus had outlined "the basic elements of the possible collaboration with Dr. Levine, and that Dr. Levine had responded that he thought Dr. Varmus's proposal was reasonable and that he would confer with senior management at Celera about the proposal); PX 18 at RW00338 (December 23, 1999 email from Dr. Collins to members of the HGP, outlining draft statement, "Today, representatives of the public international Human Genome Project and Celera Genomics Corp. met to explore models of possible collaboration on sequencing the human genome. No further information about these discussions will be made available until they have concluded.").

On December 22, 1999, Dr. Levine, based upon positive feedback from defendant White and Dr. Venter, informed the HGP that Celera was comfortable that the elements of the Shared Principles document, as outlined by Dr. Varmus, could form the framework of a collaboration); PX 63 at FC01114 (Dr. Collins handwritten notes stating that after a December 22, 1999 meeting, Celera informed the HGP it was open to collaboration and "[n]o one saw [sic] show stopper").

Dr. Waterston testified that that overall, he was optimistic that Celera and the HGP could reach an agreement. PX 3 at 46-47. Moreover, as the time drew closer to the December 29 meeting, members of the HGP believed that, based upon their discussions with Celera, a positive outcome was possible in achieving a collaboration with Celera. *Id.* at 64. Indeed, at no time during the Fall 1999 negotiations, did Celera ever inform the HGP that they did not want to collaborate. PX 3 at 73.

14.     Since Celera already had complete access to the HGP's sequence data, it had minimal, if any, commercial interest in pursuing a full-scale collaboration agreement (Ex. 3 at 39-40; Ex. 4 at 154-55; Ex. 23).

**Response to Paragraph 14**

Disputed.  As stated in the Prospectus, the human genome sequence was the "foundation" for Celera's business plan – to develop an "integrated information and discovery system" that Celera would to market to its customers.  PX 2 at 3.  Due to the pressure Celera was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business, (PX 65 at ¶¶ 22, 41-43), senior HGP scientists identified the following critical reasons why Celera needed collaboration to have a potentially viable platform for its information products: (1) would soon have obtained nearly all of the commercial value possible from its shotgun sequencing effort, (PX 61 at RW 00302 – December 3, 1999 email from Dr. Waterston to Dr. Collins); (2) needed to validate its sequence, about which many people were already skeptical, (PX 14 at RW 00383 – November 21, 1999 email from Dr. Waterston to Dr. Morgan), PX 60 at RW 00392 – memo from Dr. Waterston to Dr. Morgan), PX 25 at RW 00272 – January 6, 2000 email from Dr. Collins to Dr. Sulston)); (3) needed to gain a monopoly over the human genome map, (PX 14 at RW 00383 – November 21, 1999 email from Dr. Waterston to Dr. Morgan), to obtain a significant competitive advantage over other commercial database suppliers, (PX 13 at RW 00018 – November 19, 1999 email from Dr. Varmus to Dr. Waterston), PX 64 at FC0132 – Dr. Collins handwritten notes)); and (4) could not complete the human genome sequence without the HGP's help.  PX 6 at 42-43; PX 13 at RW 000017 (November 19, 1999 email from Dr. Varmus to Dr. Waterston).

15.     Nonetheless, Celera believed an agreement to cooperate, i.e., lower the press rhetoric and agree to simultaneously submit scientific papers for publication, would be beneficial. (Ex. 3 at 37, 113.)

**Response to Paragraph 15**

Disputed.  Throughout the Fall of 1999, culminating in the December 29, 1999 meeting, the parties were discussing a potential collaboration between Celera and the HGP to combine

efforts to sequence the human genome, not an agreement merely to "lower the press rhetoric." *See* Response to Paragraph 13.

Moreover, at no time during the Fall 1999 negotiations did Celera ever indicate to members of the HGP that it was merely looking for a simple agreement to "tone down the rhetoric," versus a more extensive collaboration. PX 3 at 73 (Celera never indicated to the HGP members that it was merely looking for a simple agreement to "tone down the rhetoric."); PX 26 at RW00238 - January 23, 2000 email from Dr. Collins to Drs. Bobrow, Varmus and Waterston stating his view that the primary purpose of the December 29 meeting was to form a collaboration).

Celera's CEO, defendant White, did not believe that reducing the rhetoric would benefit Celera, as he stated at the December 29 meeting that he believed the rhetoric was "positive" for Celera's stock value. PX 64 at FC00129 (Dr. Collins' handwritten notes); *Id.* at FC00134 ("Discord has been unfortunate (Tony [White] disagrees"); PX 8 at 31-32 (defendant White admitting he had not assigned anyone with the responsibility of reducing the rhetoric between Celera and the HGP).

16.     The "first face to face and first formal discussion" concerning any interactions between the public genome effort and the Celera effort to sequence the human genome" took place on December 29, 1999. (Exs. 25, 26, 39.)

**Response to Paragraph 16**

Disputed. The December 29 meeting was not the first face-to-face meeting between Celera and the HGP regarding a potential collaboration. Senior members of the HGP and senior Celera officers and Scientific Advisory Board members had face-to-face meetings regarding collaboration throughout the Fall of 1999. PX 4 at 33-34; PX 34 at FC 0003 (October 3, 1999 email from Dr. Waterston to Dr. Collins); PX 5 at 36-37 (Dr. Lander met with Dr. Venter during the Fall 1999 to discuss collaboration); PX 4 at 22, 30, 37 (Dr. Lander met with Celera's

Scientific Advisory Board where they discussed collaboration); PX 6 at 85 (testifying that at a

December 10, 1999, Dr. Varmus met with Dr. Levine and verbally outlined "the basic elements

of the possible collaboration," which were the same elements set forth in the Shared Principles).[3]

17.     The December 29 meeting was insignificant to Celera.  (Ex. 2 at 74; Ex. 3 at 87;
Ex. 4 at 73.)

**Response to Paragraph 17**

Disputed.  The December 29 meeting was significant to Celera because a collaboration

with the HGP was critical to Celera's stated business plan.  *See* Response to Paragraph 14, *supra*.

During the December 29 meeting, members of the HGP and Celera discussed making an

announcement concerning the collaboration.  PX 3 at 89-90.  Celera ultimately elected to conceal

the collaboration negotiations and the adverse outcome of the December 29 meeting from the

investing public because "[t]o say that we are meeting would mean that we at Celera would have

to explain to our investors and customers what this is all about and how it will and/or will not

affect them."  PX 4 at 96-97, 99; PX 33 at RW 00470 (January 5, 2000 email from Dr. Collins to

Dr. Waterston stating that "I personally think the position advocated by Paul [Gilman] and Craig

[ Venter] [not to publicly disclose the December 29 meeting] is a mistake.  Our credibility could

be damaged.").

---

[3] Defendants have placed relevant facts surrounding Dr. Collins involvement in the collaboration
negotiations at the forefront of their summary judgment motion.  While plaintiffs are confident
that the testimony and documentary evidence they have developed in discovery is readily
sufficient to show that there are issues of fact, the deposition of Dr. Collins would bolster
plaintiffs' arguments.  As set forth in the affidavit of Sanford P. Dumain, pursuant to Rule 56(f),
and plaintiffs' motion to compel Dr. Collins's deposition, Dr. Collins engaged in conduct, which
is highly relevant to issues raised by defendants' summary judgment motion.  Since defendants
have relied upon facts about which Dr. Collins has firsthand knowledge, if the Court does not
determine that plaintiffs have raised triable issues of fact in opposition to the motion on the
existing record (which plaintiffs believe they readily have) it should allow plaintiffs to depose
Dr. Collins and to supplement the record with his testimony.

Moreover, the fact that defendants and other high-ranking Celera officials attended the December 29 meeting, which was held with only one week's notice in between Christmas and New Year's at a location requiring Celera's CEO to travel to the meeting, demonstrates that defendants believed that the December 29 meeting was important. PX 6 at 103.

18.     The following eight individuals were present at the December 29 meeting (Ex. 6 at 103):

HGP Representatives:

- Dr. Harold Varmus, the director of the National Institute of Health ("NIH") from 1993 through 1999. (Ex. 6 at 12, 23.)

- Dr. Francis Collins, the directors of the National Human Genome Research Institute, which carries out the role of the NIH in the HGP. (*Id.* at 12.)

- Dr. Robert Waterston, the director of the Genome Sequencing Center at Washington University Medical Center, a principal sequencing center within the HGP. (Ex. 7 at 13-14.)

- Dr. Martin Bobrow, a member of the Welcome Trust's Board of Governors. (Ex. 47.)

Celera Representatives:

- Mr. Tony White, the President and CEO of Applera Corporation. (Ex. 2 at 21.)

- Dr. Craig Venter, the President of Celera from 1998 through January 2002. (Ex. 3 at 18.).

- Dr. Arnold Levine, a member of Applera Corporation's Board of Directors and Celera's Scientific Advisory Board. (Ex. 4 at 8, 13.)

- Dr. Paul Gilman, Celera's Director of Policy and Planning from 1998 through 2001. (Ex. 5 at 9.)

**Response to Paragraph 18**

Admitted. Mr. White was also Chairman of defendant PE Corporation's Board of Directors. PX 2 at 53.

19.     Celera believed the purpose of the December 29 meeting was to discuss ways to reduce the adversarial media rhetoric. (Ex. 3 at 56-57.)

**Response to Paragraph 19**

Disputed. Neither defendants or the HGP thought that the primary purpose of the December 29 meeting was about "toning down the rhetoric." Throughout the Fall of 1999, up to and including the December 29 meeting, representatives of Celera officials and the HGP engaged in negotiations regarding a collaboration. PX 3 at 159 ("I believe Dr. Lander saw the . . . [Shared Principles document] . . . and was generally in favor of . . . ." it); *Id.* at 47 (Waterston's understanding was that the Shared Principles document "was really the basis of the meeting."); PX 20 at RW 00458 (December 29, 1999 email from Dr. Waterston to Dr. Collins stating "[w]e had clearly been led to believe that joint publication was at the heart of what was to be done."); PX 17 at RW 00343 (December 13, 1999 email from Dr. Collins to Drs. Waterston, Lander, Varmus and others stating "the basic elements of the possible collaboration were outlined verbally [to Levine] by Harold"); PX 57 at RW00355 (Dec. 4, 1999 email from Dr. Collins to Drs. Varmus, Waterston and Bobrow providing revised Shared Principles document); PX 45 at CG004139 (email to Dr. Gilman, defendant White and others from Dr. Roberts outlining issues for negotiation); PX 58 at FC00021 (November 12, 1999 email from Dr. Lander to Dr. Collins stating that he discussed the elements of a potential collaboration with Dr. Levine); PX 17 at RW 00343 (during a meeting on December 10, 1999, Dr. Levine indicated that he thought that the proposal for a collaboration reported to him by Dr. Varmus was reasonable and that he would confer with Celera principals concerning the proposal); PX 63 at FC00114 (Dr. Collins's handwritten notes on Dec. 22, 1999 stating "AL [Arnie Levine] talked with TW [defendant White] and CV [Craig Venter]. No one saw [sic] show stopper"); PX 3 at 47 (December 29 meeting was only scheduled after Celera indicated that it was comfortable that the elements of the Shared Principles document could form the framework of a collaboration).

13

At no time during the Fall 1999 negotiations did Celera ever indicate to members of the HGP that it was merely looking for a simple agreement to "tone down the rhetoric." PX 3 at 73; *See also* Response to Paragraph 15, *supra.*

Moreover, defendant White never assigned anyone to try to reduce the rhetoric because, as he stated at the December 29 meeting, he believed the rhetoric was "positive" for Celera's stock value. PX 64 at FC00129 (Dr. Collins's handwritten notes); *Id.* at FC00134; PX 8 at 31-32 (admitting he had not assigned anyone with the responsibility of reducing the rhetoric between Celera and the HGP).

20.     Celera did not seek to enter into a full-scale collaboration agreement at the December 29 meeting. (Ex. 4 at 64-66; Ex. 26; Ex. 34.)

**Response to Paragraph 20**

Disputed. Celera always intended to enter into a full-scale collaboration with the HGP and contacted the HGP about entering into negotiations to collaborate as early as October 2, 1999. PX 34 FC 0003. Dr. Collins's handwritten notes from the December 29 meeting indicate that the main focus of the meeting was a full-scale collaboration. PX 22 at RW00160-166 (Dr. Waterston's handwritten notes indicate the majority of the December 29 meeting was devoted to discussing the exclusive commercial distribution rights to the merged HGP/Celera sequence that Celera was seeking); *see also* Responses to Paragraphs 15 and 19, *supra.*

21.     On December 28, 1999, Dr. Collins sent Celera a document drafted by the HGP entitled "Shared Principles," and proposed agenda for the December 29 meeting. (Ex. 7 at 47, Ex. 27.)

**Response to Paragraph 21**

Admitted.

22.     Before the meeting, Dr. Venter expressly rejected the agenda and "Shared Principles" document. He proposed an alternative agenda to "see if publication of the respective genome efforts could be coordinated" and "whether more extensive scientific collaborations . . . should be considered." (Ex. 3 at 98; Ex. 4 at 63; Ex. 7 at 72; Ex. 26; Ex. 34.)

**Response to Paragraph 22**

Admitted.  PX 40 at CG004165 (December 29, 1999 email from Venter to Collins and cc.

Varmus).  However, Celera's conduct throughout the Fall of 1999 was totally inconsistent with

Dr. Venter's rejection of the Shared Principles document on December 28 1999.  PX 39 at

FC0037 – November 17, 1999 letter from Dr. Venter to Dr. Collins informing the HGP on

November 17, 1999 of Celera's continued desire to collaborate); PX 6 at 85 (testifying that Dr.

Varmus outlined for Dr. Levine "the basic elements of the possible collaboration" and that there

was "no doubt they [basic elements outlined] reflected the Shared Principles document we've

already discussed."); PX 63 at FC0114 (Dr. Collins's December 22, 1999 handwritten notes

stating that after a December 22, 1999 conference call between Celera and the HGP, Dr. Levine

informed the HGP that "AL [Arnie Levine] talked with TW [defendant White] and CV [Craig

Venter].  No one saw [sic] show stopper.").

23.    At the December 29 meeting, Tony White stated that if Celera was going to give
the HGP access to data paid for by Celera shareholders, Celera would need to receive a
substantial benefit in return.  (Ex. 2 at 55-56, 122; Ex. 6 at 104-105, 108; Ex. 7 at 81, 92.)

**Response to Paragraph 23**

Admitted.

24.    Tony White suggested that such a benefit might be a commercial embargo of the
merged data for a period of five to ten years.  (Ex. 2 at 57, 121-23.)

**Response to Paragraph 24**

Admitted.  However, at the December 29 meeting defendant White first demanded that

Celera have exclusive distribution rights to the merged HGP/Celera sequencing data forever.

Later in the meeting, defendant White was only willing to lessen Celera's demand for exclusive

commercial distribution rights for the merged sequence until 2005.  PX 23 at RW 00320.  *See*

*also* Response to Paragraph 5, *supra*.

25.    This suggestion regarding an exclusivity period was made solely in response to the HGP's collaboration proposal. (Ex. 3 at 118-19; Ex. 5 at 32-33, 83-85.)

**Response to Paragraph 25**

Disputed. Due to the pressure it was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business, Celera needed to collaborate with the HGP to have a potentially viable platform for its information products. *See* Response to Paragraph 14, *supra.* Moreover, in November 1999, Celera had already proposed to the HGP that it have exclusive rights to distribute the merged sequence commercially through 2005. PX 15 at RW 00410 (November 27, 1999 email from Dr. Lander to Dr. Waterston – outlining "important issues to be negotiated," including the time period for exclusivity); PX 3 at 58-59.

26.    It was not a component of Celera's business plan, and it was not a suggestion that Mr. White believed would be acceptable to the HGP. (Ex. 2 at 58, 122; Ex. 3 at 118-19.)

**Response to Paragraph 26**

Disputed. Defendant White insisted upon exclusivity because it was critical to the "foundation" of Celera's business – to develop the "integrated information and discovery system" that Celera would market to its customers. *See* Response to Paragraph 14, *supra.* Accordingly, since Celera's expertise was in sequencing, not information delivery, Celera would have no competitive advantage if the human genome sequence were available to competitors for repackaging and resale.

Moreover, Celera's conduct during negotiations with the HGP, particularly that of defendant White, contradicts defendants' assertion that exclusivity of the sequence was not important to Celera's business model. Indeed, exclusivity was the central focus of discussions at the December 29 meeting. PX 22 at RW00160-166 ( Dr. Waterston's handwritten notes indicate the majority of the December 29 meeting was devoted to discussing exclusivity); PX 23 at

RW00320 (At the December 29 meeting, defendant White required exclusivity for a minimum of five to ten years); PX 4 at 82 (same); PX 8 at 57 ("I seem to recall saying that if they were going to use our data that it would have to be embargoed, that any product of that access would be embargoed commercially for many years."); *See also* Response to Paragraph 14, *supra.*

27.    The purpose of Mr. White's suggestion was to make clear to the HGP that their collaboration proposal was unreasonable. (Ex. 2 at 122.)

**Response to Paragraph 27**

Disputed. Defendant White insisted upon exclusivity because it was critical to the "foundation" of Celera's business – to develop an "integrated information and discovery system" that Celera would market to its customers. *See* Response to Paragraph 14, *supra.* Accordingly, since Celera's expertise was in sequencing, not information delivery, Celera would have no competitive advantage if the human genome sequence was available to competitors for repackaging and resale.

28.    Members of the HGP rejected this suggestion, as Celera knew they would. (Ex. 2 at 58, 12; Ex. 6 at 116-17).

**Response to Paragraph 28**

Plaintiffs admit that the HGP rejected Celera's proposal for an exclusivity period extending at least until 2005. PX 6 at 110.

Plaintiffs dispute defendants' assertion that Celera "knew" the HGP would reject their proposal for exclusivity. *See* Response to Paragraph 26, *supra.*

29.    The meeting ended without an agreement as to cooperation or collaboration, but with the expectation that the parties would continue to discuss the issues. (Ex. 4 at 143-44; Ex. 7 at 86.)

**Response to Paragraph 29**

Plaintiffs admit that no agreement was reached at the conclusion of the December 29 meeting.

Plaintiffs dispute the portion of this statement asserting that the parties expected discussions would continue after the December 29 meeting. The testimony of HGP witnesses, and the notes taken by HGP witnesses and e-mails among the HGP meeting participants, clearly indicate that by the end of the December 29 meeting, none of the participants believed that there was any real possibility of a collaboration, or other meaningful agreement. PX74 at RW 00326 (December 29, 1999 email from Dr. Collins to other HGP participants stating "[e]ven an optimist (like the four of us) would have to say this is a long shot."); PX 3 at 97 – testifying that he was very skeptical that there would be a collaboration between the parties, and that "people were generally discouraged about the possibility of – of a collaboration or a constructive – of something more constructive.").

30.    After the meeting, Dr. Collins sent Dr. Gilman a draft press release regarding the meeting to provide to any news organization that inquired about the meeting. The draft press release confirms that the HGP believed there was nothing material to disclose about the meeting:

> On December 29, 1999, the individuals from the public international Human Genome Project and Celera Genomics Corp. [sic] met to explore the possibility of scientific collaboration on sequencing the human genome. No further information about these complex discussion will be available for some time.

(Ex. 37.)

**Response to Paragraph 30**

Plaintiffs admit that it appears from the face of this email that Dr. Collins' secretary (Cathy Yarbrough), sent Dr. Gilman a draft press release after the December 29 meeting as quoted above. PX 33 at RW 00470 (January 5, 2000 email from Dr. Collins to Dr. Waterston, containing forward of proposed press release).

Plaintiffs dispute defendants' statement that "the HGP believed there was nothing material to disclose about the meeting." This statement intentionally ignores Dr. Collins' subsequent email to Dr. Waterston, which clearly indicates that he thought the collaboration

negotiations, including the December 29 meeting, should be publicly disclosed.  PX 33 at

RW00470 ("I personally think the position advocated by Paul and Craig is a mistake.  Our

credibility could be damaged.").  In any event, Dr. Collins's view is irrelevant to the issue of

whether defendants are liable under Section 11 of the Securities Act of 1933 for failing to

disclose material adverse facts in the Prospectus that were necessary to make the statements

therein complete and not misleading.

31.    Celera felt that there was nothing to disclose about the December 29 meeting:

- Dr. Levine's "own sense was that since nothing was accomplished by the meeting there was nothing to disclose." (Ex. 4 at 74.)  "It was my general opinion at that point that, since there was no conclusion to the meeting and no substance that came from the meeting, that there was no announcement that would be made." (*Id.* at 144.)

- Dr. Gilman did not believe disclosure of the meeting was necessary "[b]ecause there hadn't been any significant points of progress and the issues involved were very complicated." (Ex. 5 at 97.)

- Dr. Venter "saw nothing to issue a press release about." (Ex. 3 at 98.)  "I think our position was there was nothing to announce.  And if there's nothing to announce, why have a press release?  We never put out a press release announcing we were talking to a company like Incyte for acquisition and merger things.  That would be pretty foolish to do.  It would be equally foolish here." (*Id.* at 105, 153.)

**Response to Paragraph 31**

Disputed.  While defendants accurately (albeit selectively and incompletely), quote the

testimony of their own witnesses, Celera elected to conceal the collaboration negotiations, and

the December 29 meeting and its disastrous result from the investing public.  PX 4 at 96-97, 99;

PX 33 at RW 00470 ("To say that we are meeting would mean that we at Celera would have to

explain to our investors and customers what this is all about and how it will and/or will not affect

them").

32.    The HGP never issued a press release describing the December 29 meeting.  (Ex.
7 at 139.)

19

**Response to Paragraph 32**

Admitted.

33.    After the December 29 meeting, Celera and the HGP continued to believe that there was a way to reach an agreement regarding an interaction between the two sides. (Ex. 3 at 155; Ex. 4 at 82; Ex. 5 at 91; Ex. 7 at 104, 113; Ex. 38.)

**Response to Paragraph 33**

Plaintiffs object to this statement because it mischaracterizes the cited testimony of Dr.

Waterston. Following the December 29 meeting, the parties, including Dr. Waterston, did not

believe a full collaboration was possible. PX 3 at 106; *Id.* at 97 (testifying that he was very

skeptical that there would be a collaboration between the parties, and that "people were generally

discouraged about the possibility of – of a collaboration or a constructive – of something more

constructive."); PX 74 at RW 00326 (December 30, 1999 email from Dr. Collins to other HGP

participants  stating "[e]ven an optimist (like the four of us) would have to say this is a long

shot."); PX 27 at RW 261 (On January 22, 2000, defendant White explicitly told the HGP that

Celera did not want to continue collaboration discussions); PX 3 at 97; PX 27 at RW 00246 (

February 16, 2000 email from Dr. Collins to Drs. Varmus, Waterston and Bobrow stating,

"[o]ver the past two weeks I have made repeated efforts to reach Craig Venter . . . My assistant

has placed more than a half dozen phone calls without success."); PX 28 at RW0200 – February

22, 2000 email from Dr. Collins to Drs. Waterston, Varmus and Lander, among others, stating

"[s]ince the meeting of December 29, 1999 with Celera, there have been no indications that the

positions expressed there, and outlined in previous e-mails, have changed.").

34.    There were a number of contacts between Celera and the HGP after the December 29 meeting. (Ex. 4 at 143-44; 160-61.)

**Response to Paragraph 34**

Plaintiffs object to this statement as vague because it does not describe the "contacts" or identify the time period to which it is referring.

In any case, the only communication regarding the failed collaboration negotiations between the December 29 meeting and February 28, 2000, when the HGP representatives sent Celera a formal letter declaring the end of the negotiations, was a single telephone conversation between Dr. Collins and defendant White, where Dr. Collins inquired as to whether Celera was going to significant reduce its unreasonable exclusivity demands, such that further negotiations would be worthwhile; PX 29 at RW 00152; PX 27 at RW 00261 (January 22, 2000 phone call between Dr. Collins and defendant White, where White explicitly reiterated that Celera did not wish to continue talks for collaborating to sequence the human genome). Moreover, Dr. Venter intentionally avoided contact with the HGP after the December 29 meeting. PX 27 at RW 00246 (February 16, 2000 email from Dr. Collins to Drs. Varmus, Waterston and Bobrow stating, "[o]ver the past two weeks I have made repeated efforts to reach Craig Venter . . . My assistant has placed more than a half dozen phone calls without success.").

35.     Dr. Collins spoke with Tony White on January 22, 2000 to explore possible dates for a second face-to-face meeting. Mr. White reiterated Celera's positions that the HGP's proposed collaboration did not benefit Celera. (Ex. 35.)

**Response to Paragraph 35**

The exhibit cited by defendants is a December 28, 1999 email from Dr. Waterston to Dr. Collins, which was written three weeks before the purported January 22, 2000 phone call. Assuming defendants intended to cite PX 27 at RW 00261, plaintiffs admit the communication referred to in this statement occurred, but dispute that the next meeting between the parties would have been only the second face-to-face meeting between the parties to discuss collaborating. *See* Response to Paragraph 16, *supra.* Moreover, during the conversation, defendant White reiterated Celera's demand for exclusivity over the merged sequence until 2005

21

because that was crucial for the foundation of Celera's information business. *See* Response to

Paragraph 14, *supra.*

36.    Dr. Collins attempted to contact Dr. Venter in January and early February 2000 to
discuss a follow-up meeting. (Ex. 7 at 109; Ex. 36.)

**Response to Paragraph 36**

Plaintiffs admit that Dr. Collins unsuccessfully attempted to contact Dr. Venter in early

February 2000 to determine whether Celera was going to significantly reduce its exclusivity

demand, such that a future meeting would even be worthwhile. PX 25 at RW00238 (January 23,

2000 email from Dr. Collins to Drs. Bobrow, Varmus and Waterston, reporting on his failed

attempt to engage in further negotiations); PX 27 at RW 00246 (February 9, 2000 e-mail from

Dr. Collins to Dr. Venter, stating, "I have been trying to set up a phone call between us. . . .

Basically, I wanted to follow up on the Dec. 29 meeting about possible collaborative efforts

between the public consortium and Celera); PX 27 at RW 00246 (February 16, 2000  email from

Dr. Collins to Varmus, Waterston and Bobrow, stating, "Over the past two weeks I have made

repeated efforts to reach Craig Venter, to see whether the sentiments expressed to me by Tony

White on January 22 are accurate and final positions on the possibility of collaboration.  My

assistant has placed more than a half dozen phone calls without success.").

37.    In April and May 2000, Dr. Venter engaged in multiple conversations with Dr.
Ari Patrinos, the director of the Department of Energy sequencing center, a primary sequencing
center with the HGP. (Ex. 3 at 156.)

**Response to Paragraph 37**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment. Subject to and without waiving the foregoing objection, plaintiffs admit

this statement.

38.    Drs. Venter, Collins and Patrinos met many times in the Spring of 2000 to discuss
coordination of efforts.  As a result of these meetings, Celera and the HGP reached an agreement

to jointly announce the completion of the draft assembly of the human genome and to simultaneously submit their scientific papers analyzing the human genome for publication. (Ex. 3 at 178.)

**Response to Paragraph 38**

Plaintiffs object to this statement because it is not a material fact to the motion for summary judgment.

Moreover, Dr. Venter's appearance on the cover of Time alongside of Dr. Collins was not the culmination of negotiations that began during the Fall of 1999 but instead was the parties' last minute attempt to avoid public embarrassment. The book, *The Genome War*, explains Celera's decision to end the months of animosity between the Company and the HGP:

> Venter sighed, 'Look,' he said. 'Everybody wants a clear-cut win. But we ain't gonna get it. We've go three choices. Either we ignore them and risk getting slaughtered, or we continue to treat it as a race and try to rush something together and publish before they do. But that means abandoning our own standards, and in the meantime we get crushed by their announcement anyway. You know what the third choice is.'

*See* PX 70 (The Genome War, How Craig Venter Tried to Capture the Code of Life and Save the World, James Shreeve, *The Genome War, How Craig Venter Tried to Capture the Code of Life and Save the World*, at 346 (Alfred A. Knopf 2004). *Id.* So the least damage is in holding hands and crossing the line together," said [Gene] Meyers [of Celera]. "There's no damage," Venter said. "I don't see how we lose this way"). *Id.*

39.    On June 26, 2000, President Clinton announced the completion of the first survey of the human genome. Both Dr. Collins and Dr. Venter were invited to (and did speak) at the White House announcement. (Exs. 41, 42).

**Response to Paragraph 39**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment. *See also* Response to Paragraph 39, *supra* ( regarding announcement of

Joint Statement).

40.    On February 16, 2001, Celera and the HGP's scientific papers describing the
genome were simultaneously published in Science and Nature, respectively.  (Exs. 45, 46.)

**Response to Paragraph 40**

Plaintiffs object to this statement as not relevant to this motion for summary judgment, as

the article to which defendants cite was published approximately one year after the completion of

the Secondary Offering.

41.    On February 29, 2000, PE Corporation sold 4.37 million shares of Celera
common stock to the public at a price of $225 per share (the "Secondary Offering").  (Ex. 1.)

**Response to Paragraph 41**

Admitted.

42.    The Prospectus for the Secondary Offering disclosed that:

The Celera Genomics group does not believe it is competing with the U.S.
government's efforts to sequence the human genome, and ***has sought to
coordinate its efforts with those funded by the U.S. government.*** The
acceleration of the Human Genome Project may assist the Celera Genomics group
in its own sequencing and assembly effort.  (*Id.* at 49) (emphasis added).

**Response to Paragraph 42**

While plaintiffs admit that defendants have accurately quoted from a portion of the

Prospectus, plaintiffs object to defendants' emphasis on the language within the quotation as

inaccurate and misleading because the Prospectus failed to disclose any details concerning

Celera's need to collaborate with the HGP to develop the sequence that the Prospectus described

as the "foundation" of Celera's information business, the negotiations between the HGP and

Celera regarding a collaboration, and that the negotiations had terminated at the conclusion of

the disastrous December 29, 1999 meeting.  *See* Response to Paragraph 3, *supra*.

24

43.    The Prospectus also disclosed that Celera was going to publicly release its version of the genome:

> The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. (*Id.* at 11-12.)
>
> ***After completion of sequencing and assembly, the Celera Genomics group expects to release a detailed ordered consensus human genome assembly.*** The data that the Celera Genomics group releases publicly will be available, in a searchable format, via its web site.  (*Id.* at 38.) (emphasis added).

**Response to Paragraph 43**

While plaintiffs admit that defendants have accurately quoted from a portion of the Prospectus, plaintiffs object to defendants' emphasis on the language within the quotation as inaccurate and misleading because the Prospectus failed to disclose any details concerning Celera's need to collaborate with the HGP to develop the sequence that the Prospectus described as the "foundation" of Celera's information business, the negotiations between the HGP and Celera regarding a collaboration, and that the negotiations had terminated at the conclusion of the disastrous December 29, 1999 meeting.  *See* Response to Paragraph 5, *supra*.  Additionally, the Prospectus failed to disclose that Celera had demanded exclusive rights to distribute all merged Celera/HGP sequence until at least 2005, and that the HGP had rejected that demand.  *Id.*

44.    The Prospectus further disclosed that Celera's ability to obtain intellectual property protection was uncertain. (*Id.* at 11-12, 38, 48.)

**Response to Paragraph 44**

While the Prospectus contained several purported risk factors regarding Celera's ability to obtain intellectual property, the Prospectus failed to disclose that Celera was highly unlikely to obtain any meaningful intellectual property rights because Celera's WGS technique relied upon genomic DNA, as opposed to the cDNA that the HGP and Celera's commercial competitors were generating, which was more cumbersome and prone to mistake, and would not allow Celera

to comply with recently enhanced U.S. Patent and Trademark Office guidelines regarding utility and written descriptions. PX 65 at ¶¶ 21-22, 41, 42-43.

Moreover, defendants knew before the secondary offering that Celera was highly unlikely to obtain valuable patents on gene sequences. PX 5 at 27-28 (Dr. Venter testifying that he informed defendant White on several occasions that a business strategy that sought to patent genes would prove unsuccessful); PX 8 at 103 (testifying that "[g]enerally he [Craig Venter] felt that patenting these genes was probably not cost effective and not a good idea to do it."); *Id.* at 110-11 (at the time of the secondary offering, Celera did not have the ability to locate commercially useful genes).

45.    The Prospectus contained 49 specific risks that might harm Celera's business, including:

- **Celera Genomics' business plan is unique and expanding.** No organization has ever attempted to combine in one business organization all of the Celera Genomics group's businesses. . . . The creation of a genomics database . . . has a number of risks, including pricing and volume issues, technology and access concerns, computer security, pursuit of key scientific goals and protection of intellectual property. (*Id.* at 8.)

- **Celera Genomics' business plan depends heavily on timely completion of the sequencing and assembly of the human genome.** The Celera Genomics group's efforts to complete the sequencing and assembly of the human genome are not yet complete. Some genomic scientists have criticized the Celera Genomics group's sequencing strategy, known as "whole genome shotgun sequencing," as having limitations when applied on a large scale in sequencing the human genome. Others have stated that the human genome cannot be sequenced using whole genome shotgun sequencing. (*Id.* at 8.)

- **The genomics industry is intensely competitive and evolving.** There is intense competition among entities attempting to sequence segments of the human genome and identify genes associated with specific diseases and develop products and services based on these discoveries. Celera Genomics faces competition in these areas from genomic, pharmaceutical, biotechnology and diagnostic companies, academic and research institutions and government or other publicly-funded agencies, both in the United States and abroad. (*Id.* at 9.)

- **Celera Genomics' competitive position may depend on patent and copyright protection, which may not be sufficiently available.** The Celera Genomics

group's ability to compete and to achieve profitability may be affected by its ability to protect its proprietary technology and other intellectual property. . . Patent law affecting Celera Genomics' business . . . is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter. Patents may not issue from patent applications that the Group may own or license. . . Copyright law currently provides uncertain protection regarding the copying and resale of factual data. As such, Celera Genomics is uncertain whether it could prevent such copying or resale. Changes in copyright and patent law could either expand or reduce the extent to which the Celera Genomics group and its customers are able to protect their intellectual property. (*Id.* At 11-12.)

- **Public disclosure of genomics sequence data could jeopardize Celera's intellectual property protection and have an adverse effect on the value of our products and services.** The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. Such disclosures might limit the scope of the Celera Genomics group's claims or make subsequent discoveries by Celera or its customers related to full-length genes unpatentable. While the Celera Genomics group believes that the publication of sequence data will not preclude it or others from being granted patent protection on genes, there can be no assurance that such publication has not affected and will not affect the ability of Celera or its customers to obtain patent protection. (*Id.* at 12.)

**Response to Paragraph 45**

While plaintiffs admit that defendants have accurately quoted portions of the Prospectus, plaintiffs dispute that the purported risk factors contained in the Prospectus' meaningfully addressed any of the following material undisclosed adverse facts about Celera's failure to obtain exclusivity from collaboration negotiations with the HGP at the December 29 meeting: (1) collaboration negotiations between Celera and HGP broke down at the December 29 meeting when the parties could not agree on the exclusivity of the human genome map (PX 3 at 97); (2) Celera needed exclusive rights to commercially distribute a merged HGP/Celera sequence to execute its stated business plan and gain an advantage over its competitors (PX 13 at RW00018, PX 61 at RW00302); (3) repackaging of sequence data by competitors threatened the viability of Celera's business plan (PX 5 at 13)); and (4) Celera could not complete the human genome