sequence and required HGP's help to validate its sequence (PX 60 (Waterston Exh. 6 at

RW0392)).

46.    The HGP never petitioned any entity affiliated with the U.S. or U.K. government to retaliate against or publish Celera as a result of the inability to reach a collaboration agreement at the December 29 meeting.  (Ex. 6 at 137-38; Ex. 7 at 183-84.)

**Response to Paragraph 46**

Admitted.

47.    The March 14, 2000 joint statement by United States President Bill Clinton and United Kingdom Prime Minister Tony Blair encouraging the public release of human genome data ("Joint Statement") is not evidence that the government retaliated against Celera.  The Joint Statement supports intellectual property protection for genomic discoveries.  It states, in part: "Intellectual property protection for gene-based inventions will also play an important role in stimulating the development of important new health care products."  (Ex. 28.)

**Response to Paragraph 47**

Plaintiffs admit this statement, but dispute that Celera had the ability to obtain any

meaningful intellectual property rights because Celera's WGS technique relied upon genomic

DNA, as opposed to the cDNA that the HGP and Celera's commercial competitors were

generating, was more cumbersome and prone to mistake, and would not allow Celera to comply

with recently enhanced U.S. Patent and Trademark Office guidelines regarding utility and

written descriptions.  PX 65 at ¶¶ 21-22, 41, 42-43.  *See* Response to Paragraph 44, *supra*.

Moreover, the Joint Statement is evidence that it would be impossible for Celera to profit

from patenting genes sequences.

48.    Despite the Joint Statement's clear statement to the contrary, the media misinterpreted the Joint Statement as a "ban" on gene patents, causing stock prices in the entire biotechnology sector, including Celera and its competitors, to decline significantly, as illustrated below:



(Ex. 21; Ex. 55)

**Response to Paragraph 48**

Disputed.  Defendants cite no facts supporting their assertion that the media "misinterpreted the Joint Statement as a 'ban' on gene patents."  Plaintiffs also dispute defendants' contention that the Joint Statement was the sole cause of the decline in Celera's stock price.  While the Joint Statement impacted the entire biotech industry, clarifying statements made two days later had an even greater negative effect on Celera than the rest of the industry, due to leakage of the February 28, 2000 letter and from the HGP.  PX 66 at ¶¶ 18-20, 33. Indeed, Celera's relative stock price declined 49.2% in comparison with . . . general biotech stocks . . . and . . . "26.2% . . . in comparison . . .[to] other genomics stocks after the Joint Statement in the following two weeks. *Id.* at ¶¶ 19-20.  Thus, misinterpretation of the media was only a partial cause for the decline in Celera's stock price.  *Id.* at 18-20, 22.

By April 4, 2000, only 36 days after the Offering, Celera's stock price had fallen to

$73.625, less than one-third of the Offering price. PX 67 at 1. On April 5, 2000, President

Clinton clarified his prior statements by indicating that his comments were not directed towards

Celera's business model. PX 75 1. However, this caused only a temporary rebound in Celera's

stock price. As of April 19, 2000, the day investors brought this action, Celera's stock was only

trading at $77.75. PX 66 at ¶ 35.

49.     Dr. Neal Lane, Director of the President's Office on Science Technology Policy confirmed that the Joint Statement was unrelated to discussions between Celera and the HGP: "I want to make it absolutely clear that [the Joint Statement] has nothing to do with any ongoing discussions between the public and private sector." (Ex. 44 at 2) (emphasis added).

**Response to Paragraph 49**

Plaintiffs admit that defendants have accurately quoted Dr. Lane's statement, but dispute

defendants' emphasis on his statement as not material to the motion for summary judgment.

50.     On March 16, 2000, the United States Patent and Trademark Office ("PTO") issued a press release regarding the Joint Statement entitled "US Patent Policy Unaffected by US/UK Statement on Human Gene Sequence Data." It stated:

> The Patent and Trademark Office (PTO) reaffirmed today that *United States patent policy remains unaffected by Tuesday's historic joint statement* issued by the United States and the United Kingdom urging that 'raw fundamental data on the human genome . . . should be made freely available to scientists everywhere . . . . Genes and genomic inventions that were patentable last week continue to be patentable this week, under the same set of rules.*

(Ex. 29.) (emphasis added) (internal citation omitted).

**Response to Paragraph 50**

Plaintiffs admit this statement, but dispute that Celera had the ability to obtain any

meaningful intellectual property rights because Celera's WGS technique relied upon genomic

DNA, as opposed to the cDNA that the HGP and Celera's commercial competitors were

generating, was more cumbersome and prone to mistake, and would not allow Celera to comply

with recently enhanced U.S. Patent and Trademark Office guidelines regarding utility and

written descriptions. PX 65 at ¶¶ 21-22, 41, 42-43. *See also* Response to Paragraph 44, *supra.*

51.    On April 5, 2000, at the First Session of the Economic Summit, President Clinton
stated:

> ***On the patent thing, you know, Tony Blair and I crashed the market there for a
> day, and I didn't mean to.*** But I think what happened is – when the market's
> recovered, I think what happened is people actually read the statement instead of
> the headlines or whatever. I think in the biotech area, our position ought to be
> clear. General information ought to be in the public domain as much as possible
> about the sequence of the human genome. And where public money contributed
> to massive research on the basic information, we ought to get it out there. ***If
> someone discovers something that has a specific commercial application, they
> ought to be able to get a patent on it.***"

(Ex. 43 at 4.)

**Response to Paragraph 51**

Plaintiffs admit that defendants have accurately quoted President Clinton's statement, but

dispute defendants' added emphasis on the bolded language because defendants knew, but failed

to disclose that Celera was incapable of obtaining any meaningful intellectual property rights

because Celera's WGS technique relied upon genomic DNA, as opposed to the cDNA that the

HGP and Celera's commercial competitors were generating, which was more cumbersome and

prone to mistake, and would not allow Celera to comply with recently enhanced U.S. Patent and

Trademark Office guidelines regarding utility and written descriptions. PX 65 at ¶¶ 21-22, 41,

42-43). *See also* Response to Paragraph 44, *supra.*

52.    The drafting of the Joint Statement preceded discussions between the HGP and
Celera regarding potential interaction. (Ex. 6 at 137-38; Ex. 7 183-84.)

**Response to Paragraph 52**

Admitted.

53.    No one from the HGP contacted the PTO regarding Celera's ability to obtain
intellectual property protection for its genomic discoveries nor sought any change in intellectual
property law. (Ex. 6 at 137-38; Ex. 7 at 183-84.)

**Response to Paragraph 53**

Admitted.

54.    Institutes within the NIH subscribed to Celera's database.  (Ex. 49.)

**Response to Paragraph 54**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment.  Subject to and without waiver of the foregoing objection, plaintiffs

admit this statement.

55.    Celera was awarded a grant from the National Human Genome Research Institute
and another institute within the NIH to sequence the genome of the laboratory rat in
collaboration with Baylor college of Medicine, a primary sequencing center within the HGP.
(Ex. 50.)

**Response to Paragraph 55**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment.  Subject to and without waiver of the foregoing objection, plaintiffs

admit this statement.

56.    Celera received gene patents since the Joint Statement.  (Ex. 51.)

**Response to Paragraph 56**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment.

Plaintiffs also dispute that Celera had the ability to obtain any meaningful intellectual

property rights because Celera's WGS technique relied upon genomic DNA, as opposed to the

cDNA that the HGP and Celera's commercial competitors were generating, was more

cumbersome and prone to mistake, and would not allow Celera to comply with recently

enhanced U.S. Patent and Trademark Office guidelines regarding utility and written descriptions.

PX at 65 ¶¶ 21-22, 41, 42-43.  *See also* Response to Paragraph 44, *supra*.

32

57.     Celera's business plan at the time of the Secondary Offering was to publicly release the raw human genome sequence and sell subscriptions to an annotated, searchable version of the genome to pharmaceutical companies and academics, much like Westlaw or Lexis sells annotated, searchable versions of publicly-available case law.  (Ex. 1 at 38-39; Ex. 2 at 23-24).

**Response to Paragraph 57**

Disputed.  As stated in the Prospectus, the human genome sequence was the "foundation" for Celera's business plan – to develop and "integrated information and discovery system" that Celera would to market to its customers.  PX 2 at 3.  Due to the pressure Celera was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business, Celera needed to collaborate with the HGP, and to have exclusive rights to commercially distribute the resulting sequence to have a potentially viable platform for its information products.  *See* Response to Paragraph 14, *supra*.

Celera faced two major hurdles to achieving its business plan, which it could only resolve through a collaboration with the HGP.  First, numerous senior scientists in the HGP believed the WGS technique employed by Celera to sequence the human genome was flawed and incapable of producing quality sequence data.  *See* Response to Paragraph 44, *supra*.  Second, Celera needed exclusive rights to the combined sequence because otherwise,  the human genome sequence would be available for repackaging and resale to Celera's competitors and Celera would have no competitive advantage.  *See* Response to Paragraph 14, *supra*.

The Prospectus failed to disclose the foregoing facts and that collaboration negotiations had terminated at the December 29 meeting, such that there was no reasonable chance Celera would be able to obtain desperately needed excusive rights to a merged HGP/Celera sequence. *See* Responses to Paragraphs 33, 34, *supra*.

58.     Celera was "absolutely not going to patent the human genome."  (Ex. 3 at 23.)

**Response to Paragraph 58**

33

Disputed.  While Celera was not going to patent raw human genome sequences, Celera's

stated business plan consisted of two components, one of which was based upon revenue from

the licensing of intellectual property:

> The Celera Genomics group's commercial success will be affected by, ***but is not directly dependent on, the ability to obtain patent protection on genes, polymorphisms and proteins discovered*** by it and/or by the Celera Genomics group's customers on their own behalf and by collaborators. The Celera Genomics group plans to seek intellectual property protection, including copyright protection, for the information and discovery system including its content, the software and methods it creates to manage, store, analyze and search novel information.

PX 2 at 47 (emphasis added).  Additionally, the Prospectus contained numerous purported risk

factors regarding Celera's ability to obtain patent protection, (*Id.* at 11-12, 47), which is an

admission of materiality of Celera's ability (or lack thereof) to obtain intellectual property rights.

Plaintiffs dispute that Celera believed that it could sequence the human genome "more

accurately" than the HGP because defendants knew that the genomic DNA generated by Celera's

WGS sequencing technique was more cumbersome and susceptible to sequencing errors, as

compared to the cDNA generated by Celera's competitors.  *See* Response to Paragraph 3, *supra*.

Moreover, defendants also did not disclose in the Prospectus that this component of its business

strategy would not be profitable because there was very little, if any value, in obtaining patents

on gene sequences, (PX 5 at 23-24), and there were very little, if any, unique genes left to be

discovered and patented.  *Id.* at 125-26; PX 8 at 110-11 (at the time of the secondary offering,

Celera did not have the ability to locate commercially useful genes).  *See also* Response to

Paragraph 44, *supra*.

59.     A collaboration with the HGP was never part of Celera's business plan.  (Ex. 5 at 35-36.)

**Response to Paragraph 59**

34

Disputed. As stated in the Prospectus, the human genome sequence was the "foundation" for Celera's business plan – to develop an "integrated information and discovery system" that Celera would to market to its customers. *See* Response to Paragraph 14, *supra*. Due to the pressure Celera was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business collaboration was critical to Celera's business plan and ability to have a potentially viable platform for its information products. *Id.*

60.     Since Celera already had complete access to the HGP's sequence data, it had minimal, if any, commercial interest in pursuing a full-scale collaboration agreement. (Ex. 2 at 121-23; Ex. 3 at 30-40; Ex. 4 at 154-55; Ex. 23; Ex. 40.)

**Response to Paragraph 60**

Plaintiffs object to this statement on the grounds that it mischaracterizes the public's rights to the HGP's data under the Bermuda Accord. Although anyone could download the HGP's data, the HGP would not allow Celera to repackage its free data and resell it to customers on a restricted basis. Accordingly, Celera did not necessarily have unfettered access to resell the HGP's data. *See also* Response to Paragraph 6, *supra*.

61.     Exclusive access to a merged version of the human genome was not an element of Celera's business plan. (Ex. 2 at 57-58; Ex. 3 at 118-19, 123, 149.)

**Response to Paragraph 61**

Disputed. Due to the pressure Celera was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business, exclusivity through collaboration was critical to Celera's business plan and ability to have a potentially viable platform for its information products. HGP scientists identified the following critical reasons why Celera needed exclusivity to have a potentially viable platform for its information products: (1) it would soon have obtained nearly all of the

35

commercial value possible from its shotgun sequencing effort, (PX 61 at RW 00302 – December

3, 1999 email from Dr. Waterston to Dr. Collins); (2) it needed to validate its sequence, about

which many people were already skeptical, (PX 14 at RW 00383 – November 21, 1999 email

from Dr. Waterston to Dr. Morgan), PX 60 (Waterston Ex. 7 at RW 00392 – memo from Dr.

Waterston to Dr. Morgan), PX 25 at RW 00272 – January 6, 2000 email from Dr. Collins to Dr.

Sulston)); (3) it needed to gain a monopoly over the human genome map, (PX 14 at RW 00383 –

November 21, 1999 email from Dr. Waterston to Dr. Morgan), to obtain a significant

competitive advantage over other commercial database suppliers, (PX 13 at RW 00018 –

November 19, 1999 email from Dr. Varmus to Dr. Waterston), PX 64 at FC0132 – Dr. Collins's

handwritten notes)); and (4) could not complete the human genome sequence without the HGP's

help.  PX 6 at 42-43; PX 13  at RW 000017 (November 19, 1999 email from Dr. Varmus to Dr.

Waterston).

     Moreover, exclusivity was so critical to Celera's business plan that it was the topic of

many discussions between the parties during the Fall of 1999 and consumed the majority of the

discussions at the December 29 meeting.  PX 3 at 49, 84; PX 13 at RW00018 (November 11,

1999 email from Dr. Varmus to Dr. Waterston); PX 11 at RW 00028 (March 18, 1999 note from

Maria Freire to Dr. Collins); PX 6 at 135-36); PX 22 RW00160-166 (Dr. Waterston's

handwritten notes indicate the majority of the December 29 meeting was devoted to discussing

exclusivity).

     62.    Co-lead plaintiff Vinh Vuong has neither met nor spoken to any of the Individual
Defendants in this case and has neither met nor spoken to any Celera employee at any time.  (Ex.
8 at 28-29.)

**Response to Paragraph 62**

     Plaintiffs object to this statement on the grounds that it is not a material fact to the motion

for summary judgment.  Subject to and without waiver, plaintiffs admit this statement.

63.    Mr. Vuong purchased his Celera stock at his own initiative through an on-line trading website. (Id. at 33-34.)

**Response to Paragraph 63**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment. Subject to and without waiver, plaintiffs admit this statement.

64.    Co-lead plaintiff David Berlin purchased Celera stock at the urging of his broker. (Ex. 9 at 49.)

**Response to Paragraph 64**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment. Subject to and without waiver, plaintiffs admit this statement.

65.    Mr. Berlin has never had any conversations with any Celera representative. (*Id.*)

**Response to Paragraph 65**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment. Subject to and without waiver, plaintiffs admit this statement.

66.    Neither Mr. Vuong nor Mr. Berlin reviewed a copy of the Prospectus before deciding to purchase Celera stock. (Ex. 8 at 43-44; Ex. 9 at 57-59.)

**Response to Paragraph 66**

Plaintiffs object to this statement on the grounds that it is not a material fact to the motion for summary judgment because Section 11 of the Securities Act of 1933, a strict liability statute, does not require plaintiffs to have relied upon the Prospectus. All that is required is that the prospectus or registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

## PLAINTIFFS' STATEMENT OF DISPUTED FACTS

Pursuant to Local Rule 56(a)(2), plaintiffs David Berlin and Vinh Vuong submit that there are genuine issues of fact to be tried as to the material facts set forth below.

**A.    Celera Needed to Gain A Monopoly Over the Human Genome Sequence In Order To Gain a Competitive Advantage and Carry Out Its Stated Business Plan**

68.    In late 1997, the Perkin-Elmer Corporation (now known as PE Corporation), engaged in discussions with Dr. Venter concerning the formation of a company to sequence the human genome.  PX 5 at 9.

69.    Ultimately, Dr. Venter agreed to join Perkin-Elmer because "[i]t was the only opportunity I had to sequence the human genome."  *Id.* at 13.

70.    During his negotiations with Perkin-Elmer, Dr. Venter insisted that any genomic sequence data he generated be made publicly available for free.  *Id.* at 13-14.

71.    Perkin-Elmer's CEO, defendant White, ultimately consented to this upon the condition that Dr. Venter devise a business plan that was compatible with the free release of the sequence data.  PX 5 at 13-15 ("And the basic charge I had, was given, was if I was going to release the human genome after sequencing it for free, I had to come up with a business strategy that would work").

72.    None of Dr. Venter's compensation was tied to future revenues earned from the sequencing business.  *Id.* at 16-17.

73.    When PE Corporation first decided to create a genomics business, the Company believed that the HGP would not complete the sequence "for many years."  PX 8 White Tr. at 62.

74.    After Celera's announcement of its goal to sequence the human genome, the NIH announced, in March 1999, its intention to accelerate its completion date for sequencing the entire human genome to 2003.  PX 2 at p. 36.

75.     The HGP took steps to prevent Celera from combining the HGP's data with Celera's for commercial use, and on February 18, 2000, prior to the secondary offering that is the subject of this litigation, senior members of the HGP discussed a proposed draft of a "public license" (PX 62 at RW 00125-RW 00142), which contemplated permitting an "open content license on use of public HGP data, i.e. free to use it but not free to put restrictions on its use." *Id.* at RW 00126.

76.     On March 16, 1999, the NIH announced that it would produce at least 90% of the human genome sequence in a "working draft" form by spring of 2000. PX 51 at 1 (M2 Presswire, March 16, 1999).

77.     In September 1999, Celera began sequencing the human genome map. PX 52 (Celera Genomics Completes Sequencing Phase Of Drosophila Genome Project; Sequencing of Human Genome Begins. Business Wire, September 9, 1999).

78.     In September 1999, the senior scientists working on the HGP confirmed that they were on schedule to produce the working draft of the human genome sequence by spring 2000. PX 49 at 1 (HGP Leaders Confirm Accelerated Timetable for Draft Sequence) (http://www.ornl.gov/sci/techresources/Human_Genome/project/update.shtml).

79.     During the Fall 1999, the HGP began generating human genome sequence data, which it made accessible to the public on a daily basis, at an accelerated pace. PX 4 at 36 (discussing that the HGP began generating larger volumes of data, which it made public on a daily basis, in light of new sequencing technology that had come online).

80.    Accordingly, Celera had to adjust its data release plans to keep up with that of the HGP.  PX 4 at CG013514 (October 27, 1999 email from Dr. Venter to Dr. Gilman and others stating - "Genomics is rapidly changing and evolving.  The speed up in the public program has changed and is constantly changing our [Celera's] data release plans.").

**B.    Celera's WGS Sequencing Technique, Which Relied Upon Genomic DNA, Made Its Sequencing Technique More Prone To Errors and Made It Highly Unlikely That Celera Could Obtain Meaningful Intellectual Property**

81.    Celera WGS technique used genomic DNA for its sequencing efforts.  PX 65, ¶¶ 21-22.

82.    Genomic DNA is the "raw" fundamental information that forms a person's genetic make up.  *Id.*, ¶ 23.

83.    The vast majority of human "genomic DNA does not code for protein."  *Id.*

84.    Many of Celera's competitors were using cDNA for their sequencing efforts.  *Id.*, ¶ 22.

85.    cDNA is refined DNA from which it is easier and faster to discover patentable proteins.  *Id.*, ¶¶ 24-29.

86.    The discovery and patenting of DNA sequences that encode protein is generally important to companies such as Celera because such DNA sequences are the basis for key commercial products.  *Id.*, ¶ 20.

87.    The type of DNA used by Celera to sequence the human genome, as opposed to that used by its competitors, created additional hurdles to finding patentable genomic discoveries and left Celera at a commercial disadvantage.  *Id.*, ¶ 41.

88.    Using DNA, as opposed to cDNA, made it more difficult to satisfy the then recently strengthened USPTO utility guidelines for claims on genomic DNA sequences.  *Id.*, ¶ 30.

89.     The 1999 Utility Guidelines raised the bar for patentable utility of gene sequences, by requiring that patent applicants show specific, credible, and substantial utility for all subject matter, including gene sequences. *Id.*, ¶ 16.

90.     Because Celera used raw genomic DNA to sequence the human genome, its process was more cumbersome, more prone to error, and it was less likely that Celera would be first to sequence any particular gene and, identify its specific utility such that it could obtain patent rights. *Id.*, ¶ 43.

91.     Celera's sequencing process was more susceptible to mistake, thereby making it more difficult for Celera to meet the USPTO's "written description requirement for its genomic DNA sequences (and proteins encoded thereby) compared to commercial competitors using cDNA as the starting material." *Id.*

**C.     Celera Needed to Collaborate With The HGP To Develop a Commercially Viable Sequence**

92.     The senior members of the HGP identified Celera's likely motive in seeking a collaboration with the HGP. PX 61 at RW 00302 (December 3, 1999 email from Dr. Waterston to Dr. Collins stating: "I am getting more outside feedback about the situation – the speculation on why Celera is pushing this now is that PE recognizes that they have or will soon have gotten just about all they are going to get of commercial value from the shotgun sequencing effort. The[y] recognize that they have a redundant effort which will return little on further investment. This makes the most sense to me of any explanations I have heard"); PX 13 at RW 00018 (November 19, 1999 email from Dr. Lander noting that "Celera would be trying to gain a significant advantage over commercial database suppliers by preventing them from sucking up their data").

93.     Many senior scientists working on the HGP were skeptical as to Celera's ability to sequence the human genome using the WGS methodology. PX 3 at 17-18, 44, 54, 170.

94.     Dr. John Sulston, Director of The Wellcome Trust Sanger Institute, one of the HGP's major sequencing labs, was not convinced that Celera had the capability or commitment to sequence the human genome. PX 12 at RW00380 (November 14, 1999 memo from Dr. Lander to Drs. Collins, Levine, Roberts, Varmus and Venter, expressing Dr. Sulston's view that he was not convinced Celera could complete the sequence on their own).

95.     Dr. Waterston believed that Celera was looking to collaborate with the HGP in sequencing the human genome because such a collaboration would validate their sequence, about which many people were already skeptical. PX 14 at RW 00383 (November 21, 1999 email from Dr. Waterston to Dr. Morgan stating that Dr. Waterston believed Celera wanted to collaborate to validate their sequence, of which many people were skeptical); PX 60 Waterston Ex. 7 at RW 00392 – memo from Dr. Waterston to Dr. Morgan) PX 24 at RW 00272 (January 6, 2000 email from Dr. Collins to Dr. Sulston).

96.     Even if Celera's method could prove useful in sequencing the genome, Celera's WGS data would yield a sequence that would require further analysis by scientists to reach the level of quality achieved by the other government genomic sequencing efforts to date. PX 3 at 54.

97.     By gaining exclusive rights over the commercial use of the human genome sequence, Celera sought to gain a monopoly over the human genome map, which would give them an advantage over its competitors. PX 14 at RW 00383 (November 21, 1999 email from Dr. Morgan to Dr. Waterston).

42

98.    Defendant White saw the possibility of a monopoly over the gene sequence as crucial to Celera's business.  PX 62 at FC0132 (Dr. Collins's handwritten notes).

99.    Celera could not completely sequence the human genome without help from the HGP.  PX 6 at 42-43; *Id.* at 20 21 ("I was dubious about whether whole genome sequencing can be used to assemble the sequences of [the human] genome."); PX 13 at RW 000017 (November 19, 1999 email from Dr. Varmus to Dr. Waterston stating: "I am not ready to acknowledge that Celera could put the human genome sequence together without the public effort.").

**D.    Defendants Knew That Celera Was Not Capable of Carrying Out The Gene Patenting Component of The Company's Stated Business Plan**

100.    The Prospectus highlighted the gene patenting prong of Celera's business plan. PX 2 at 48 ("The Celera Genomics group's current plan is to apply for patent protection upon the identification of candidate novel genes, novel gene fragments and their biological function or utility"); Id. ("During later stages of assembly and gene annotation, Celera may seek broader patent protections of its discoveries.  Such an approach will be utilized to establish commercial applications and patentable utility for such SNP discoveries").

101.    In June 1999, Robert A. Millman, an intellectual property attorney at Celera, made a presentation to Celera's Board of Directors during which he advocated that Celera devote substantial time and effort to obtaining patents on gene sequences.  PX 47 at CG025779.

102.    Celera knew that there was very little, if any value, in obtaining patents on gene sequences.  PX 5 at 23-24 (Dr. Venter opposed Mr. Millman's plan arguing that "at best we would get – have intellectual property on a few hundred human genes."); *see also Id.* at 28, 63, 124 - Celera knew that it could only patent up to, at most, 200 genes).

103.    Dr. Venter informed defendant White on several occasions that a business strategy that sought to patent genes would prove unsuccessful. PX 5 at 27-28 ("Q: What was – did you discuss, with Tony White, Mr. Millman's suggestion that Celera should be patenting more genes? A: I wouldn't call it a suggestion. It was much firmer than that. And yes, we had several discussions on the issue. . . . Q: Did you try to convince him [defendant White] that Mr. Millman was wrong? A: Yes."); *id.* at 28 ("My position was always consistent, that we should not be doing that [patenting more genes"]).

104.    Celera did not believe that patenting would be a significant source of revenue. PX 8 at 103 ("Generally he [Craig Venter] felt that patenting these genes was probably not cost effective and a good idea to do it.").

105.    Celera knew that there were very little, if any, unique genes left to be discovered and patented. PX 5 at 125-26 ("Well, it was so hard to tell, the EST method that I had developed was being so widely used by human genome scientists, by Incyte, by the U.S. Government, by Merck; and there were so many tens of thousands of genes being patented, it was unclear whether there would be any unique genes left to be discovered that were patentable that fit the criteria that we had that could lead in an obvious way to a medical breakthrough or diagnostic").

106.    At the time of the secondary offering, Celera did not have the ability to locate commercially useful genes. PX 8 at 110-11.

107.    In the end, Celera received "very few actual gene patents." PX 5 at 127.

108.    A search and review of over 200 Celera patent applications by plaintiffs' expert, Dr. Ivor Elrifi, confirmed that "a very significant percentage had been rejected for lack of utility or have been abandoned." PX 65, ¶ 44.

44

**E.    After The HGP Confirmed Its Accelerated Timetable, Celera Contacted the HGP To Discuss a Collaboration**

109.    On October 2, 1999, Dr. Richard Roberts, Chairman of Celera's Scientific Advisory Board, contacted Dr. Waterston by telephone to discuss "reaching some kind of accord with Celera that would get the public and private efforts to work together." PX 34 at FC 00003 (October 3, 1999 email from Dr. Waterston to Dr. Collins – stating that on October 2, 1999, Dr. Roberts had contacted Dr. Waterston at the HGP about "reaching some kind of accord with Celera . . . .").

110.    During the October 2, 1999 telephone conversation, Dr. Roberts had "probed to see what would be required from my standpoint for some cooperative effort," to which Dr. Waterston responded that "data release was at the core of it." *Id.*

111.    After speaking with Dr. Roberts, Dr. Waterston informed Dr. Collins that Celera might be motivated to collaborate to sequence the human because "[t]hey must feel vulnerable for some reason . . . ." *Id.*

112.    As early as October 1999, Dr. Roberts discussed with Dr. Venter the mechanics of a "collaboration" between Celera and the HGP to sequence the human genome.   PX  36 at CG 004158-59 (email from Dr. Roberts to Dr. Gilman stating: "Once the collaboration is underway and Celera has accumulated sufficient data to provide useful feedback to the HGP, we will share that knowledge so as to allow the HGP to focus on areas best suited to a BAC-by-BAC approach.   . . . If the collaboration is going as well as we hope, then we anticipate earlier visits and more lenient policies will be possible.").

45

113.     Dr. Roberts thought that a potential collaboration between Celera and the HGP was "an excellent initiative and the right way forward for science." PX 41 at WI00001 ( October 4, 1999 email from Dr. Roberts to Dr. Lander stating that Dr. Roberts thought a collaboration between the HGP and Celera was "an excellent initiative").

114.     During the Fall 1999, Dr. Eric Lander met with Dr. Venter to discuss a collaboration between Celera and the HGP. PX 5 at 36-37; PX 4 at 22.

115.     Subsequent to meeting with Dr. Venter, on October 13, 1999, Dr. Eric Lander met with Celera's Scientific Advisory Board, during which both sides discussed entering into a collaboration with the Human Genome Project. PX 4 at 30, 37.

116.     There were a number of informal contacts that took place between Celera and members of the HGP during which a potential collaboration was discussed. PX 4 at 38.

117.     During the negotiations with the HGP, Celera insisted on receiving exclusive rights over the commercial use of the human genome sequence until 2005. PX 3 at 49, 84; PX 13 at RW 00018 (November 19, 1999 email from Dr. Varmus to Dr. Waterston); PX 6 135-36 (testifying that "if the public effort did not continue and there was no publicly available sequence, this would be of benefit to Celera.").

118.     Celera knew, as far back as early October 1999, that the HGP was looking to do more than just "tone down the rhetoric." PX 45 at CG004139 (October 7, 1999 email to Dr. Gilman, defendant White and others from Dr. Roberts stating "Here is the draft document from Eric I have sent it to the SAB [Scientific Advisory Board]. It attempts to scope out the main issues that need to be addressed if we are to engage in a Celera-HGP collaboration.").

46

119.    On November 12, 1999, Dr. Lander reported that he had discussed the elements of a potential collaboration with Dr. Levine. PX 37 at FC 00021 ("I just spoke to Arnie Levine, who is always a delight to deal with. His sense (reflecting internal discussions at Celera) is that: (i) there is enough common ground about the spirit of an acceptable agreement to think we can do it, and (ii) the time is right to have a discussion with them (Craig, Arnie, maybe Mike and Tony White) and us (you, Harold, me and any one else essential").

120.    During his conversation with Dr. Levine, Dr. Lander agreed to create an outline of the negotiations between Celera and the HGP to date. *Id.* ("I have agreed to try to write down a brief statement of the basic understandings that we have discussed to date, as a framework for discussions to flesh them out").

121.    Dr. Lander set out the principles for a collaboration between Celera and the HGP, based upon the discussions between representatives for the parties during the Fall of 1999 in a document entitled "Shared Principles." PX 57 at RW00355 (email from Dr. Collins to Drs. Varmus, Waterston and Bobrow providing revised Shared Principles document); PX 19 at RW 00191-92 (December 28, 1999 proposed Shared Principles document).

122.    As of November 16, 1999, Celera believed that a formal collaboration with the HGP would inure to its benefit. PX 73 at CG004073-74 (November 16, 1999 email to Gilman stating that "Celera continues to believe, as we have said in the past, that collaboration with the public human genome project would be mutually productive. Recent discussions with NIH have been informal; we remain open to continuing these and moving them towards such a formal agreement").

123.    By letter dated November 17, 1999 from Dr. Venter to Dr. Collins, Celera

informed the HGP of its continued desire to collaborate. *Id.* ("Celera continues to believe, as we

have said in the past, that a collaboration with the public Human Genome Project would be

mutually productive and beneficial to attaining both of our goals").

124.    In an e-mail from Dr. Lander to Drs. Collins and Varmus, dated November 17,

1999, Dr. Lander noted, "[W]hile they [Celera]do agree that they will remove all restrictions at

some date, they are thinking more like 2005." PX 13 at RW0018.

125.    By November 19, 1999, the HGP and Celera were engaged in sensitive

negotiations. PX 38 at FC00022 (November 19, 1999 e-mail from Dr. Francis Collins to Drs.

Waterston and Lander stating: "Craig Venter called me . . . to invite me to Celera . . . . I

responded that such an invitation was most kind, but that it might be slightly awkward to visit at

this time – since we all know that some sensitive negotiations about the human sequence are

underway").

126.    Throughout the Fall of 1999, numerous meetings were held among Celera

employees during which the potential collaboration with the HGP was discussed. PX 4 at 33-34.

127.    As of November 27, 1999, based upon its discussions with Celera representatives,

the HGP representatives believed that "important issues to be negotiated" with Celera included:

1) Confirmation of limitations on merged data; 2) Time period before the merged data becomes

free of limitations ("FC wants only as long as HGP would take to produce the data: Mid 2001?

Celera's starting position was 2005"); 3) Access to data during the preparation of paper. PX 15

at RW 00410 (November 27, 1999 email from Lander to Waterston – outlining "important issues

to be negotiated," including the time period for exclusivity); PX 3 at 58-59.

### F. The December 29 Meeting Was Scheduled After Celera's Representatives Indicated That They Were Prepared to Negotiate A Formal Collaboration With The HGP

128.    On December 10, 1999, Dr. Varmus met with Dr. Levine at which time Dr. Varmus outlined "the basic elements of the possible collaboration," which were embodied in the Shared Principles.  PX 6 at 85 ("no doubt they [basic elements outlined] reflected the "Shared Principles" document we've already discussed"); *Id.* (noting with regards to his conversation with Dr. Levine throughout the Fall of 1999, "I think it's reasonable to assume that these ["Shared Principles"] would have been the topics I would have highlighted as a matter of discussion."); PX 3 at 64; PX 17 at RW 00343 (December 13, 1999 email from Collins to Waterston, Lander, Varmus and others stating "Harold [Varmus] met with Arnie Levin on Friday . . . The basic elements of the possible collaboration were outlined verbally by Harold.").

129.    During that December 10, 1999 meeting, Dr. Levine indicated that he thought that the proposal for a collaboration reported to him by Dr. Varmus was reasonable  and that he would confer with Celera principals concerning the proposal.  PX 17 at RW 00343.

130.    During its discussions with Dr. Lander in the Fall of 1999, Celera was generally in accord with the issues raised by the HGP regarding a potential collaboration.  PX 3 at 63 ("That the kinds of discussions, the points that we'd raised in our discussions, at least as portrayed by Eric to Craig and back to me, seemed – seemed to be on the right – on a reasonable track").

131.    In light of the progress of the negotiations, by December 13, 1999, the HGP expanded the group of people that would be involved in, or informed of, any further negotiations with Celera and the HGP to collaborate to sequence the human genome.  PX 3 at 64; PX 17 at RW 00343 (December 13, 1999 email from Dr. Collins to Drs. Waterston, Lander, Morgan, Varmus and others).

49

132.    On December 22, 1999, twelve of the highest ranking officials in the HGP participated on a conference call to discuss the progress of the negotiations with Celera.  PX 44 RW 00342 (December 20, 1999 email from NIH employee Mark Guyer to 11 participants from the HGP, including Drs. Collins, Varmus and Waterston stating: "Francis has asked that we arranged [sic] for a conference call to update you on recent events in the attempt to develop a G5 proposal for collaboration with Celera.  The update will include a report on the discussion last week between Arnie Levine and Harold Varmus"); PX 18 at RW00338 (December 23, 1999 email from Dr. Collins to members of the HGP, stating: "Thanks for your participation in yesterday's conference call about possible next steps in exploring a collaborative effort with Celera.").

133.    On December 22, Dr. Levine informed the HGP that defendant White and Dr. Venter were open to the collaboration outlined by Dr. Varmus to Dr. Levine earlier in the month. PX 63 at FC00114 (Dr. Collins handwritten notes stating "AL [Arnie Levine] talked with TW [defendant White] and CV [Craig Venter].  No one saw [sic] show stopper").[4]

---

[4] Dr. Varmus did not believe that the December 29 meeting was a dominant event in his life because, among other things, he was in the process of leaving his position at the NIH and moving to New York to head Sloan-Kettering Memorial Hospital.  PX 6 Varmus Tr. at 89 ("It probably should be said that at the time there were many other things going on in my life.  Not only was I moving; I turned 60 that weekend and I spent the weekend in a celebration of that birthday at Cold Spring Harbor, and, you know, I was moving and going through a significant life transition and preparing for a farewell party at NIH from – you know, many of these memories are obscured by other more emotional events.").

134.    The December 29 meeting was scheduled after Celera indicated that it was comfortable that the elements of the Shared Principles document could form the framework of a collaboration.  PX 3 at 47 ("Well, my understanding was that – that I think Celera had see, if not the specifics, at least had been made aware of some of the substance of the – of what we were writing [i.e., the "Shared Principles" document].  And – and that was – that was really the basis of the meeting").

135.    On December 22, 1999, Dr. Varmus spoke with Drs. Levine and Venter, at which time they set up the December 29 meeting.  PX 18 at RW 00338 – December 23, 1999 email from Dr. Collins to Drs. Waterston, Lander, Varmus and others informing them of the December 29 meeting).

136.    As the time drew closer to the December 29 meeting, members of the HGP believed that, based upon their discussions with Celera, a positive outcome was possible in achieving a collaboration with Celera.  PX 3 at 64.

137.    At no time during the Fall 1999 negotiations did Celera ever indicate to members of the HGP that it was merely looking for a simple agreement to co-submit and "tone down the rhetoric," versus a more extensive collaboration.  PX 3 at 73.

138.    Moreover, Celera's CEO had not assigned anyone with the responsibility of reducing the rhetoric between Celera and the HGP, (PX 8 at 31), nor had he instructed anyone at Celera to communicate with the HGP regarding the issue of reducing the rhetoric.  *Id.* at 32.

**G.    The December 29 Meeting Was A Disaster for Celera**

139.    On the evening before the December 29, 1999 meeting, Dr. Collins forwarded the "Shared Principles" to members of the Celera negotiating team document.  PX 20 at RW 00458 (December 28, 1999 email from Waterston to Collins (discussion Waterston's disappoint with Celera's reaction to the proposed "Shared Principles" document).

51

140.    In an E-mail from Craig Venter to members of the HGP dated December 29, 1999, Dr. Venter wrote, "As we discussed yesterday afternoon we have serious concerns about several aspects of your proposed agenda and "Shared Principals" [sic]. PX 40 at CG004165 (December 29, 1999 email from Dr. Venter to Dr. Collins).

141.    Members of the HGP were surprised by Dr. Venter's response based on the terms of a proposed collaboration that had been discussed by both sides for the better part of the Fall of 1999. PX 3 at 133 ("I think everybody was taken – taken aback  [by Celera's response to the Shared Principles document] by it to some extent."). *See also id.* at 159 ("I believe that Dr. Lander saw the – the – the – document we had produced . . . and – and was generally in favor of – though his thought – I mean, he did not – I don't recall him expressing concerns that it distorted the nature of his conversations [with Celera]."); PX 20 at RW 00458 (December 28, 1999 email from Waterston to Collins stating: "I am quite disappointed by this turn of events. We had clearly been led to believe that joint publication was at the heart of what was to be done. Now in a few hours time, we are shifting to an agenda completely different from what we had agreed upon to one of Craig's making.  The principles that he had worked over I feel are still worth pursuing and in my case are the only ones that we have had the change to explore fully among our colleagues."); PX 3 at 132 ( "Because I had the impression that representatives from Celera had – had – had seen or discussed or somehow had been informed of the substance of what were we talking about.  And I thought they were in generally in agreement with the content").

142.    The December 29 meeting began cordially with Dr. Collins outlining the reasons for entering into a collaboration.  PX 3 at 79; PX 22 at RW00160 (Dr. Waterson's handwritten notes); PX 64 at FC00128 (Dr. Collins's handwritten notes).

52

143. The tenor of the meeting changed as soon as defendant White arrived. PX 6 at 104.

144. Defendant White first stated that Celera could only enter into a collaboration with the HGP if it received exclusive rights to commercially distribute a merged sequence indefinitely, and he then stated that exclusivity would have to run through at least 2005. PX 23 at RW00320 - "Celera would prefer that such exclusivity by indefinite but acknowledged that some compromise on this would have to be reached. ... 2005 was viewed as a compromise."); PX 8 at 57 ("I seem to recall saying that if they were going to use our data that it would have to be embargoed, that any product of that access would be embargoed commercially for many years.").

145. The HGP responded that it would be willing to give Celera exclusivity for a period of six months. PX 3 at 98.

146. In addition, Celera demanded that any merged data be available solely via the internet through a Celera portal. PX 72 at RW00229).

147. Defendant White testified was "not going to do anything or agree to do anything or even consider anything that would transfer value for [sic] my shareholders to my competition or anybody else." PX 8 at 56); *Id.* at 72 ("[I]f there was data from our efforts used in a merged sequence, that would improve the quality of the sequence then therefore [sic] would be one that I think our people would have the commercial rights to.").

148. The HGP would not assent to defendant White's conditions. PX 6 (Varmus Transcript) at 110 ("the conditions Tony was placing on [a] collaboration were going to be unacceptable to us").

53

149.    Dr. Venter asserted at the meeting that he was not "going to do something stupid to lose investment [value] and any advantages" by allowing commercial users access to their genomic data.  PX  5 at 86-87.

150.    In addition, Celera warned that in the event of a collaboration between the parties, it would strongly oppose the HGP's production and release of any sequence data outside of the collaboration.  PX 3 at 100 ("[O]nce the data was generated for a merged product, that the public effort would cease."); PX 23 RW00319 (December 29, 1999 email from Dr. Waterston to Dr. Collins, stating: "Indeed PE/Celera were strongly opposed to further production and releases of sequence data to the public domain outside the collaboration.").

151.    During the meeting, defendant White indicated that he was not interested in reducing the rhetoric. PX 64 at FC00134 (Dr. Collins's handwritten notes stating, "Discord has been unfortunate (Tony [White] disagrees").

152.    By the end of the meeting, it was clear to members of the HGP that it was unlikely that Celera would agree to give up exclusivity for a period of less than five years (PX 3 at 85), and they were very skeptical that there would be a collaboration between the parties.  PX 3 at 97 ("people were generally discouraged about the possibility of – of a collaboration or a constructive – of something more constructive").; *see also* PX 22 at RW 00326 (December 30, 1999 e-mail from Dr. Collins to Drs. Waterston and Varmus commenting on achieving a collaboration with Celera, "Even an optimist (like the four us) would have to say this is a long shot.").

**H.    Celera Intentionally Concealed The Collaboration Negotiations and The Disastrous December 29 Meeting**

153.    On December 22, 1999, members of the HGP agreed that they would make available a statement following the December 29 meeting announcing that the HGP and Celera were exploring the possibility of a collaboration. PX 18 at RW00338 (December 23, 1999 email from Dr. Collins to members of the HGP, outlining draft statement, "Today, representatives of the public international Human Genome Project and Celera Genomics Corp. met to explore models of possible collaboration on sequencing the human genome.  No further information about these discussions will be made available until they have concluded.").

154.    During the December 29 meeting, members of the HGP and Celera discussed making an announcement concerning the collaboration.  PX 3 at 89-90; PX 22 at RW 00164 (Waterston handwritten notes).

155.    Subsequent to the December 29 meeting, Dr. Gilman was involved in discussions with the HGP concerning whether the negotiations leading up to, and the actual, December 29 meeting should be disclosed to the public.  PX 5 at 96-7 ("I know there was discussions about a potential press release. . .  I know that, if I recall, Paul Gilman was involved in discussions."); *Id.* at 151 (". . . I mentioned that Paul Gilman was involved in discussions with them about one, and that we were pretty adamant that we saw no positive value in having any kinds of press release [regarding the December 29 meeting"].

156.    Celera ultimately elected to conceal that the December 29 meeting had occurred, and to conceal any of the details of the December 29 meeting or the negotiations leading to the meeting, and asked the HGP not to disclose these facts either.  PX 4 at 96-97, 99); PX 33 at RW 00470 (January 5, 2000 email from Dr. Collins to Dr. Waterston forwarding an e-mail from Dr. Gilman: "To say that we are meeting would mean that we at Celera would have to explain to our investors and customers what this is all about and how it will and/or will not affect them").

**I.    No Collaboration Negotiations Occurred After the December 29 Meeting**

157.    The collaboration negotiations ended at the December 29 meeting.  PX 3 at 97 ("Q: Do you recall what your opinion was at the end of the December 29th meeting as to whether there was likely to be an agreement among the parties regarding collaboration?  I was skeptical that there would be one. . . . I think – I think it was.  I think people were generally discouraged about the possibility of – of a collaboration or a constructive – of something more constructive.").

158.    On January 22, 2000, Dr. Collins contacted defendant White to see if Celera had decided to significantly weaken its exclusivity demand, such that further collaboration talks would be productive, but defendant White indicated that Celera would not change its position. PX 25 at RW00238 (January 23, 2000 e-mail from Dr. Collins to Drs. Bobrow, Varmus and Waterston, reporting on his failed attempt to engage in further negotiations, "My goal in the phone call was to explore possible dates for a second face-to-face meeting, not to get involved in any actual negotiations.  But Tony was in a bearish mood.  He was upset about an article in the Jan. 20 Nature (which I have still not seen), and not at all convinced that there was any point in another meeting.") .

159.    Dr. Collins unsuccessfully tried to contact Dr. Venter to see if Celera intended to change its position. PX 27 at RW 00246 (February 9, 2000 e-mail from Dr. Collins to Dr. Venter, stating, "I have been trying to set up a phone call between us. . . . Basically, I wanted to follow up on the Dec. 29 meeting about possible collaborative efforts between the public consortium and Celera. You previously referred me to Tony White, and he and I spoke at some length a couple of weeks ago. I must say that it was a rather discouraging call."); PX 27 at RW 246 (February 16, 2000 e-mail from Dr. Collins to Drs. Varmus, Waterston and Bobrow, stating, "Over the past two weeks I have made repeated efforts to reach Craig Venter, to see whether the sentiments expressed to me by Tony White on January 22 are accurate and final positions on the possibility of collaboration. My assistant has placed more than a half dozen phone calls without success.").

**J.     The Individual Defendants Participated in the Drafting of the Prospectus and the Road Show for the Secondary Offering**

160.    Each of the Individual Defendants signed the Registration Statement. PX 1 at II-2.

161.    Defendants Winger, White and Jog participated in drafting and/or reviewing the Prospectus and Registration Statement. PX 10 at 40-41); PX 8 at 95; PX 9 at 49:5-17).

162.    Defendants Winger and White were significantly involved in road shows to promote the sale of Celera stock. PX 10 at 64 (testifying that he and defendant White were "deeply involved in the road show"); PX 8 at 94, 105.

163.    At the road shows, defendants discussed Celera's intended future revenue sources. PX 10 at 68 (at the road show, "we simply discussed what would be the potential sources of revenue").

**K.     The Secondary Offering**

164.    On or about February 29, 2000, defendant PE Corporation filed the Registration

Statement with the Securities and Exchange Commission, incorporating the Prospectus, in

connection with the secondary offering.  PX 2 at ¶¶ 32-33.

165.    In the secondary offering, defendant PE Corporation sold 3.8 million shares of

Celera stock at $225.00 per share, realizing $944 million in gross proceeds from the Offering,

which was comprised of $820.3 million in net proceeds and an underwriter's over-allotment

option for $123.2 million.  PX 2 at 5.

**1.     The Prospectus Described Celera's Information Business As
Its Primary Source of Revenue**

166.    The Prospectus explained that Celera's human genome sequence was the

"foundation" and "platform" for its planned integrated information and discovery system.  *See,*

*e.g. Id.* at 32 ("There are three components to the Celera Genomic group's strategy of delivering

valuable genomic, proteomic and related biological and medical information in the form of an

integrated information and discovery system. The first component, the sequencing of the human

genome, lays the foundation for the two additional components, functional genomics and

personalized health/medicine . . . The Group anticipates using its genomic and proteomic data as

a platform upon which to develop related databases, software tools, and services").  *Id.* at 4

("The Celera Genomics group intends to use the genome information derived from its human

genome information sequencing program as a platform upon which to develop an integrated

information and discovery system").

167.    The Prospectus contained numerous statements asserting that Celera's primary

revenue would be derived from "selling access to information" through its information platform.

*Id.* at 31, 38, 41.

58

## 2.     The Prospectus Highlighted Celera's Intellectual Property Strategy

168.    Celera's Prospectus informed investors that its business plan involved "apply[ing] for patent protection upon the identification of candidate novel genes, novel gene fragments and their biological function or utility." PX 2 48.

169.    Celera's Prospectus also stated: "During later stages of assembly and gene annotation, Celera may seek broader patent protections of its discoveries. Such an approach will be utilized to establish commercial applications and patentable utility for such SNP discoveries." *Id.*

170.    Celera's Prospectus set forth numerous risks that might threaten its patenting strategy, even though those "risks" had already come to fruition:

| |
|---|
| [C]ompetitors may obtain patent protection or other intellectual property rights that would limit Celera Genomics' rights or its customers' ability to use Celera Genomics' products to commercialize therapeutic, diagnostic or agricultural products. PX 2 at 9). |
| The Celera Genomics group's ability to compete and to achieve profitability may be affected by its ability to protect its proprietary technology and other intellectual property. While Celera Genomics is currently primarily dependent on revenues from access fees to its databases and discovery and information systems, *obtaining patent protection is likely to become more important to its business as it expands into the area of functional genomics*, in that Celera Genomics would be able to prevent competitors from making, using or selling any of its technology for which it obtains a patent.  Patent law affecting Celera Genomics' business, particularly gene sequences, polymorphisms and protein expression, is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter. Patents may not issue from patent applications that the Group may own or license. *Id.* 11). |
| [T]he Celera Genomics group may be dependent on protecting, through copyright law or otherwise, its databases to prevent other organizations from taking information from such databases and copying and reselling it. Copyright law currently provides uncertain protection regarding the copying and resale of factual data. As such, Celera Genomics is uncertain whether it could prevent such copying or resale. Changes in copyright and patent law could either expand or reduce the extent to which the Celera Genomics group and its customers are able to protect their intellectual property. *Id.* |
| The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. *Such disclosures might limit the scope of the Celera Genomics group's claims or make subsequent discoveries by Celera . . . related to full-length genes unpatentable.*  While the |

Celera Genomics group believes that the publication of sequence data will not preclude it or others from being granted patent protection on genes, there can be no assurance
that such publication has not affected and will not affect the ability of Celera or its customers to obtain patent protection. PX 2 at 12.

There has been substantial litigation regarding patents and other intellectual property rights in Celera Genomics' industry. The Group may become a party to patent litigation or proceedings at the U.S. Patent and Trademark Office to determine its patent rights with respect to third parties which may include subscribers to Celera Genomics' database information services. Interference proceedings may be necessary to establish which party was the first to discover such intellectual property. Celera Genomics may become involved in patent litigation against third parties to enforce the Group's patent rights, to invalidate patents held by such third parties, or to defend against such claims. *Id.*

The Celera Genomics group's *business and competitive position is dependent, in part, upon its ability to protect its database information, proprietary gene sequence methods, software technology and the novel genes it identifies. The Celera Genomics group's commercial success will be affected by, but is not directly dependent on, the ability to obtain patent protection on genes, polymorphisms and proteins discovered by it* and/or by the Celera Genomics group's customers on their own behalf and by collaborators. The Celera Genomics group plans to seek intellectual property protection, including copyright protection, for the information and discovery system including its content, the software and methods it creates to manage, store, analyze and search novel information. *Id.* at 47.

The granting of patents on genomic discoveries is uncertain worldwide and is currently under review and revision in many countries. *Moreover, publication of information concerning partial gene sequences prior to the time that the Celera Genomics group applies for patent protection based on the full-length gene sequences or different partial gene sequences in the same gene may affect the Celera Genomics group's ability to obtain patent protection.* PX 2 at 48.

The Celera Genomics group *can not [sic] ensure that any changes to, or interpretations of, the patent laws will not adversely affect its patent position. Id.* at 48.

**L.    The Investing Public Reacts To News of the Failed Collaboration**

171.    On February 28, 2000, the day before the Secondary Offering, the HGP sent

Celera a letter formally confirming the end of the parties' attempts to collaborate, based

principally on Celera's demand for exclusivity regarding a merged sequence. PX 29 at

RW00152.

172.    Before Celera responded the letter from the HGP, the letter's contents began to leak into to the press. PX 53 at 1 (Peter G. Gosselin and Paul Jacobs, *Rush to Crack Genetic Code Breeds Trouble; Science: Public-Private Rift Arises After Company Seeks Exclusive Rights in Exchange for Sharing Expanding Data*, L.A. TIMES, Mar. 6, 2000, at A1 (disclosing the existence and details of the December 29 meeting and that "according to both sides, the bargaining quickly broke down."). Disclosure of the failed collaboration instantly caused Celera's stock price to begin a rapid decline that would continue over the subsequent weeks as a result of investor concerns that Celera could not obtain exclusive rights to the human genome and successfully execute its business plan. PX 66 at ¶¶ 18-20; 32-35..

173.    On March 14, 2000, merely two weeks after the Offering, President Clinton and Prime Minister Tony Blair issued a joint statement reiterating their view that all data about gene sequencing should be made publicly available. PX 30 (Weekly Compilation Presidential Documents, *Joint Statement by President Clinton and Prime Minister Tony Blair of the United Kingdom*, 2000 WL 13130761 (Mar. 14, 2000). In response to the announcement, Celera's stock price declined from $189 per share to $119.9375 per share, nearly 50% of the offering price of $225 per share paid by investors in the Offering only two weeks earlier. PX 67 Bloomberg stock chart.

174.    By April 4, 2000. Celera's stock price had fallen to $73.625 per share, a 67% decrease from the Offering price of $225.00 per share and a 45% decline relative to the industry Composite index. *Id.*

175.    The stock continued its decline as a result of investor's concerns about Celera's inability to obtain exclusive rights to the human genome and accordingly, successfully execute its business plan.

61

176.    By April 19, 2000, the day investors brought their action against the Company,

Celera's stock had declined to $77.750.  *Id.*

177.    In December 2002, Celera abandoned its failed genomics business model and

adopted a business model that focuses on the development of "diagnostics and pharmaceuticals."

PX 5 at 175; PX 8 at 117) (Celera has abandoned the business plan it sold investors in the

secondary offering).

**M.    The Joint Announcement in the Spring of 2000 Was Unrelated To the Failed
        Collaboration Negotiations**

178.    Dr. Venter's appearance on the cover of Time alongside of Dr. Collins was not

the culmination of negotiations that began during the Fall of 1999 but instead was the parties'

last minute attempt to avoid public embarrassment.  The book, The Genome War, explains

Celera's decision to end the months of animosity between the Company and the HGP:

> Venter sighed, 'Look,' he said.  'Everybody wants a clear-cut win.  But we ain't
> gonna get it.  We've go three choices.  Either we ignore them and risk getting
> slaughtered, or we continue to treat it as a race and try to rush something together
> and publish before they do.  But that means abandoning our own standards, and in
> the meantime we get crushed by their announcement anyway.  You know what
> the third choice is.'
>
> So the least damage is in holding hands and crossing the line together," said
> [Gene] Meyers [of Celera].
>
> "There's no damage," Venter said.  "I don't see how we lose this way."

PX 70 at 346 (James Shreeve, *The Genome War, How Craig Venter Tried to Capture the*

*Code of Life and Save the World* (Alfred A. Knopf  2004)).

179.    Indeed, the parties' appearance on the cover of Time was merely meant to signal that the media war was over. *Id.* at 351 ("If your asking whether I'm opposed to sharing the cover with you, the answer is no, not at all." Venter said. "We want to emphasize burying the hatchet."); *see also id.* at 350 (reporting on President Bill Clinton's anger over the "public battling over the genome" and the President's mandate to his Science Advisor Neal Lane to, "Fix this . . . [and g]et these guys together.").

By _____

David A. Slossberg (CT13116)
Brian C. Fournier (CT16272)
HURWITZ, SAGARIN
  & SLOSSBERG, LLC
147 N. Broad Street, P.O. Box 112
Milford, CT 06460
(203) 877 – 8000

**Plaintiffs' Liaison Counsel**

**-and-**

Sanford P. Dumain (CT08138)
Lee A. Weiss (CT21345)
Carlos F. Ramirez (CT25340)
Shannon L. Hopkins
**MILBERG WEISS BERSHAD**
  **& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**Plaintiffs' Lead Counsel**