IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE PE CORPORATION SECURITIES LITIGATION | : : : : | Master File No. 3:00CV705(CFD)<br><br>March 11, 2005 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE EXPERT REPORT OF IVOR R. ELRIFI**

Plaintiffs respectfully submit this memorandum in opposition to Defendants' Motion to Strike the Expert Report of Ivor R. Elrifi, which attempts to prevent this Court from considering admissible evidence that is directly relevant to defendants' pending motion for summary judgment.

**PRELIMINARY STATEMENT**

Defendants' motion to strike Dr. Elrifi's expert report (the "Elrifi Report") contains a single baseless argument – that the Elrifi Report alleges an "entirely new theory" of the case, and thus, should be stricken as irrelevant. In truth, defendants' motion is a desperate attempt to prevent this Court from considering the opinions in the Elrifi Report in connection with defendants' summary judgment motion. The specific opinions contained in the Elrifi Report need not have been included in the operative complaint[1] to be admissible in opposition to summary judgment (and at trial), so long as the evidence is relevant to the allegations in the Complaint.

Defendants, knowing that plaintiffs' expert reports were due to be served on December 20, 2004, drafted a summary judgment motion and filed it the day after receiving those expert

---

[1] The operative complaint is plaintiffs' First Amended Consolidated Class Action Complaint (the "Complaint" or "Compl."), Docket No. 3:CV705 (CFD).

reports, even though the deadline for filing the motion was still nearly six months away. Defendants' motion fails to mention the Elrifi Report – an unsurprising fact, as Dr. Elrifi's opinions obliterate several of defendants' arguments.

The opinions in the Elrifi Report bolster the Complaint's allegations, and are relevant to defendants' motion for summary judgment, as they demonstrate that the Celera Genomics Group ("Celera") needed to collaborate with the HGP to successfully develop the gene sequence that would serve as the foundation for Celera's business plan to "develop an integrated information and discovery system." Moreover, Dr. Elrifi's opinions demonstrate that Celera could not successfully "apply for patent protection upon identification of candidate novel genes . . . .," which was another key component of Celera's business strategy. None of this information was disclosed in the prospectus that is the subject of this litigation.

Even if defendants could demonstrate that Dr. Elrifi's opinions are beyond the scope of the Complaint, which they have not, the Court can still consider those opinions in connection with defendants' summary judgment motion. Defendants will in no way be prejudiced by this Court admitting Dr. Elrifi's opinions into evidence because testimony of, and documents produced by, senior members of the Human Genome Project (the "HGP") amply put defendants on notice that the capability and reliability of Celera's whole genome shotgun ("WGS") sequencing methodology, and thus, the foundation of Celera's information business, was at issue. Moreover, during discovery, plaintiffs questioned Celera's President and CEO concerning Celera's ability to execute the intellectual property strategy set forth in the Prospectus. Defendants' assertion of prejudice is further belied by the fact that they have already served the report of their own patent expert and that they will have the opportunity to depose Dr. Elrifi.

Accordingly, defendants' motion to strike should be denied so that the Court can resolve defendants' summary judgment motion (and conduct a trial) on a complete record.

## FACTS RELEVANT TO THIS MOTION[2]

Plaintiffs, on behalf of a putative class of purchasers of Celera tracking stock pursuant, or traceable, to a prospectus (the "Prospectus") filed with the Securities and Exchange Commission on February 28, 2000 in connection with a secondary offering (the "Offering"), allege that the Prospectus contained two general categories of misrepresentations to which Dr. Elrifi's opinions are relevant.

*First*, with respect to Celera's business plan to become the Bloomberg or Lexis-Nexis of genomic information, the Prospectus failed to disclose that Celera needed to collaborate with the HGP to obtain the necessary exclusivity for the human genome sequence that was to serve as the foundation for that business. *See* Compl., ¶ 21 ("Celera's competitive position . . . was dependant upon its ability to protect its database information through patent and copyright protection."); *Id.*, ¶ 46 (Celera needed exclusive rights to the human genome sequence because "public dissemination of the human genome map was a material risk to Celera's business strategy . . . .").

Plaintiffs further allege that the Prospectus failed to disclose that negotiations in the Fall of 1999 between the HGP and Celera regarding such a collaboration, culminated in a meeting between senior officials from both sides on December 29, 1999, ending in disaster for Celera. Compl., ¶ 40 (the Prospectus "failed to disclose discussions between the Company and the Human Genome Project or that those discussions had broken off in December 1999."); *see also*

---

[2] A complete recitation of the facts relevant to defendants' motion for summary judgment is set forth in Plaintiffs' Statement of Disputed Facts filed in connection with Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

*Id.*, ¶¶ 39, 46. By the end of the meeting it was apparent that Celera would be unable to achieve the necessary foundation for its information business. *Id.*

The Elrifi Report reveals that even before Celera began to sequence the human genome, defendants knew that Celera could not successfully implement its information business strategy without collaborating with the HGP because the WGS sequencing method was incapable of producing a quality, commercially viable gene sequence that could serve as the foundation for this business. *See, e.g.,* Exh. 9 (Elrifi Rep., ¶¶ 21-22).

**Second**, with respect to Celera's intellectual property business strategy, the Prospectus stated that Celera planned "to apply for patent protection upon identification of candidate novel genes, novel gene fragments and their biological function or utility." Exh. 1 (Prosp., p. 48). The Prospectus also contained the following purported risk factors, which served to emphasize the importance of Celera's patenting strategy:

> The granting of patents on genomic discoveries is uncertain worldwide and is currently under review and revision in many countries. Moreover, publication of information concerning partial gene sequences prior to the time that the Celera Genomics group applies for patent protection based on the full-length gene sequences or different partial gene sequences in the same gene may affect the Celera Genomics group's ability to obtain patent protection.

Compl., ¶ 42 (quoting Exh. 1 (Prosp., p. 48)).

> CELERA GENOMICS' COMPETITIVE POSITION MAY DEPEND ON PATENT AND COPYRIGHT PROTECTION, WHICH MAY NOT BE SUFFICIENTLY AVAILABLE
>
> The Celera Genomics group's ability to compete and to achieve profitability may be affected by its ability to protect its proprietary technology and other intellectual property. . . . Patent law affecting Celera Genomics' business, . . . is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter....Copyright law currently provides uncertain protection regarding the copying and resale of factual data. As such, Celera Genomics is uncertain whether it could prevent such copying or resale. Changes in copyright and patent law could either expand or reduce the extent to which the Celera Genomics group and its customers are able to protect their intellectual property.

Compl., ¶ 47 (quoting Exh. 1 (Prosp., pp. 11-12)).

> PUBLIC DISCLOSURE OF GENOMICS SEQUENCE DATA COULD JEOPARDIZE CELERA'S INTELLECTUAL PROPERTY PROTECTION AND HAVE AN ADVERSE EFFECT ON THE VALUE OF OUR PRODUCTS AND SERVICES.
>
> The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. Such disclosures might limit the scope of the Celera Genomics group's claims or make subsequent discoveries by Celera or its customers related to full-length genes unpatentable. While the Celera Genomics group believes that the publication of sequence data will not preclude it or others from being granted patent protection on genes, there can be no assurance that such publication has not affected and will not affect the ability of Celera or its customers to obtain patent protection.

Compl., ¶ 48 (quoting Exh. 1 (Prosp., p. 12)).

Plaintiffs alleged that these statements were false and misleading because, among other things, Celera failed to disclose that "the true risks of Celera's ability to obtain patent protection for its genomic discoveries were significantly greater than represented" (Compl., ¶ 47); and "the Company's ability to implement its 'strategy' of sequencing the human genome and patenting discoveries . . . was problematic at best and certainly subject to increased risk and uncertainty . . . " beyond those disclosed. *Id.,* ¶ 39(f).

Indeed, as the Elrifi Report explains, the WGS method was not suitable for generating meaningful intellectual property, because it generated genomic DNA as opposed to cDNA used by Celera's commercial competitors. Exh. 9 (Elrifi Rep., ¶¶ 41-12). Structural differences in DNA as compared to cDNA made gene sequencing and assembly of the sequence more difficult and susceptible to mistake (*Id.*, ¶ 43) and made it less likely that Celera could satisfy the recently revised 1999 U.S. Patent and Trademark office guidelines. *Id.*, ¶16.[3]

---

[3] Testimony from senior officials of Celera, including the Company's own President and CEO, admit that Celera could not produce quality sequence data without help from the HGP as a result

# ARGUMENT

A.   **The Opinions In The Elrifi Report Are Admissible, Relevant Evidence Appropriately Considered In Ruling Upon Summary Judgment**

   1.   **Standard Governing The Admissibility Of Expert Testimony On Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court, in deciding a motion for summary judgment, must consider all material put forth by a party that would be admissible into evidence, including

---

of the flawed sequencing method Celera used. *See, e.g.,* Exh. 3 (Venter Tr. 23-24 - testifying that he opposed the gene patenting prong of Celera's business strategy because, "at best [Celera] would get - - have intellectual property on a few hundred human genes."); *Id.* at 125-26 (testifying that there were very few unique genes to be discovered and patented); Exh. 5 (White Tr. at 110-11 - admitting that at the time of the secondary offering, Celera did not have the ability to locate commercially useful genes).

Moreover, documents and testimony from senior HGP scientists, expressing wide-spread concerns that Celera could not produce quality sequence data without the HGP's help, confirms Dr. Elrifi's opinions. *See* Exh. 2 (Waterston Tr. at 17-18, 44, 54, 170); Exh. 7 at RW 00383 (Nov. 21, 1999 email from Waterston to Dr. Morgan stating that Waterston believed Celera wanted to collaborate to validate their sequence, of which many people were skeptical); Exh. 6 at RW 000017 (Nov. 19, 1999 email from Dr. Varmus to Dr. Waterston stating: "I am not ready to acknowledge that Celera could put the human genome sequence together without the public effort."); Exh. 4 (Varmus Tr. at 20-21, 42-43) (testifying that he "was dubious about whether whole genome sequencing can be used to assemble the sequences of [the human] genome" and that he did not believe that Celera could complete sequencing the human genome without help from the HGP); Exh. 8 at RW 00380 (Dr. John Sulston stated in a memo that, in his view, he was not convinced that Celera had the capability or commitment to sequence the human genome); *see also* Exh. 9 (Elrifi Rep., ¶ 40 - "As discussed above, the predictive value of Celera's computational methods to derive information from genomic DNA is questionable because there is a large variance in accuracy between different computational methods for genomic DNA analysis. *Indeed, Dr. Craig Venter, Celera's former president agrees that this is the case.*") (citing Venter et al. Science 291(5507):1304-1351, at 1317) (emphasis added).

the Elrifi Report. *Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344, 346-47 (D. Conn. 2003) (finding plaintiff's expert's opinion admissible evidence in ruling on summary judgment).

The Supreme Court has held that an expert's opinion is admissible, pursuant to Fed. R. Evid. 702, if the opinion is both reliable and relevant.[4] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Graham v. Playtex Prod.s, Inc.*, 993 F. Supp. 127, 129 (N.D.N.Y. 1998).[5] Defendants' motion does not challenge Dr. Elrifi's qualifications or any of his opinions. The motion is based solely upon relevance.

An expert's opinion is relevant if it "has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The trial judge should only exclude expert opinions that do not "assist the trier of fact in understanding or determining a fact in issue – essentially . . . whether the expert's testimony 'fits' the facts of the case." *Graham*, 993 F. Supp. at 130 (citing *Daubert*, 509 U.S. at 591).

"Exclusion of expert testimony is a 'drastic remedy.'" *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829, at *11-12 (S.D.N.Y. Dec. 11, 2002) (quoting *McNerney v. Archer Daniels*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995)); *see also* Fed. R. Civ. P. 702 advisory committee notes ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."). Indeed, "'A trial judge should . . . deem . . . evidence inadmissible only when the methodology underlying such evidence is sufficiently invalid to render the evidence incapable of

---

[4] Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto . . . ."

[5] Admissibility is established by a preponderance of the evidence. *Daubert*, 509 U.S. at 593.

helping the fact finder determine a fact in dispute.'"); *Pepe & Hazard v. Jones*, No. (X02)CV960151601S, 2002 Conn. Super. LEXIS 3023, at *17 (Sept. 11, 2002) (quoting *State v. Porter*, 241 Conn. 57, 89 n.31 (May 20, 1997)).

The opinions contained in the Elrifi Report are clearly relevant to defendants' motion for summary judgment, as they directly concern the two categories of misrepresentations in the Prospectus.

### 2. Plaintiffs' Allegations Regarding Celera's Information Business

Plaintiffs allege that Celera needed a collaboration with the HGP to derive the gene sequence that would serve as the foundation for Celera's plan to "develop an integrated information and discovery system." Compl., ¶¶ 20, 39(c), 42, 48. In their summary judgment motion, defendants dispute plaintiffs' allegation. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("D. SJ Mem.") at 15 ("Celera had no commercial interest in a formal collaboration"); *Id.* at 30 ("The undisputed evidence confirms that a collaboration with the HGP was never a component of Celera's business plan."); *see also Id. at* 5, 7, 9, 26. Dr. Elrifi explains, however, that the WGS sequencing method Celera was using to derive its gene sequences was unreliable and susceptible to mistakes, and thus, could not generate the necessary foundation for Celera's information business. Exh. 9 (Elrifi Rep., ¶¶ 28, 41-43). This bolsters plaintiffs' allegations, as it explains why a collaboration was necessary for Celera. Accordingly, Dr. Elrifi's opinions are highly relevant and should be considered by this Court in ruling upon summary judgment.

### 3. Plaintiffs' Allegations Regarding Celera's Inability To Obtain Intellectual Property Rights

Defendants speciously claim that the Elrifi Report alleges an "entirely new theory" of the case, and thus should be stricken as irrelevant, merely because the evidence supporting Dr.

Elrifi's opinions did not specifically appear in the Complaint. D. Mem. at 6-7. However, evidence need not have been included in the Complaint to be admissible in opposition to summary judgment (or at trial), so long as the evidence is relevant to an allegation in the Complaint. *See Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) (on summary judgment court should consider evidence outside the pleadings); *Equal Employment Opportunity Comm'n v. New Cherokee Corp.*, 829 F. Supp. 73, 76 (S.D.N.Y. 1993) (affidavits and exhibits outside of pleadings are appropriate for consideration on motion for summary judgment); *Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807 (7th Cir. 1973) (reversing dismissal and ordering new trial finding that the district court erred in refusing to admit relevant evidence of defendants' fraudulent conduct beyond the three specific acts alleged in the complaint); *In re Info. Res. Sec. Litig.*, No. 89 C 3772, 1992 U.S. Dist. LEXIS 8384, at *10-11 (N.D. Ill. June 12, 1992) (holding that accounting theories contained in the report of plaintiffs' expert were evidence with respect to claims raised in the complaint, not new claims).[6]

---

[6] Defendants' cases are inapposite. Two of the cases they cite are wholly inapplicable because the subject expert reports were stricken on reliability, not relevance, grounds. *See Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175 (E.D.N.Y. 2001); *Koppell v. New York State Bd. of Elec.s*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000). D. Mem. at 3-4.

In the remaining cases defendants cite, the subject expert reports were stricken on both reliability and relevance grounds because, unlike here, the expert opinions did not support the claims. *See, e.g., Amorgianos v. National R.R. Passenger, Corp.*, 137 F. Supp. 2d 147 (E.D.N.Y.), *aff'd*, 303 F.3d 256, 270 (2d Cir. 2002) (finding that the articles the expert relied upon did not contain any evidence of the neurological effects of *short-term* xylne exposure, which was plaintiff's claim); *Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101 (SHS), 2005 U.S. Dist. LEXIS 81, at *4-7 (S.D.N.Y. Jan. 4, 2005) (striking expert report because the claim it supported had been dismissed); *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003) (striking expert report, which opined on pricing commissioned photographs, rather than existing photographs, which were at issue); *Borgognone v. Trump Plaza*, No. 98-CV-6139, 2000 U.S. Dist. LEXIS 4081, at *14-15 (E.D.N.Y. Mar. 9, 2000) (finding expert report asserting a 9% grade in the floor of the shower as a cause of plaintiff's injury irrelevant where the plaintiff was not standing on the grade when he fell); *City of New York v. Coastal Oil New York, Inc.*, No. 96 Civ. 8667 (RPP), 2000 U.S. Dist. LEXIS 798, at *4 (S.D.N.Y. Jan. 28, 2000) (expert report

Thus, plaintiffs were not required to plead in the Complaint, the scientific evidence in Dr. Elrifi's opinions as long as those opinions are relevant to plaintiffs' allegations, which they are. Indeed, the Complaint plainly alleges that Celera would be unable to patent new gene sequences. Similarly, the opinions in the Elrifi Report, discussed above, explain that Celera would be unable to patent new gene sequences because the WGS method that Celera was using made it unlikely that Celera could comply with recently enhanced USPTO guidelines.

### B.    The Court Can Consider New Issues On Summary Judgment

Even if this Court finds that the Elrifi Report does contain new issues, which it should not, it is well settled in the Second Circuit that the Court should consider new issues in ruling upon a summary judgment motion because "an issue presented for the first time in a motion for summary judgment may be considered and treated as an amendment of the complaint . . . ." *Neri v. Coughlin*, No. 92 Civ. 7890 (SS), 1993 U.S. Dist. LEXIS 15892, at *20 (S.D.N.Y. Oct. 27, 1999) (citations omitted); *Gerentine v. United States of America*, No. 00 Civ. 0813 (JSM), 2001 U.S. Dist. LEXIS 10975, at *14-15 (S.D.N.Y. Aug. 1, 2001) ("new issues raised for the first time in an affidavit in opposition to a motion for summary judgment can be considered by the court and in effect incorporated into the complaint or answer.") (citations omitted); *Seaboard Terminals Corp. v. Standard Oil Co.*, 104 F.2d 659, 660 (2d Cir. 1939); *Salahuddin v. Coughlin*, 781 F.2d 24 (2d Cir. 1986).[7]

---

opining that "rack" prices are not an indicator of market prices irrelevant where plaintiffs alleged fraudulent manipulation of rack prices).

[7] Courts in other circuits have followed this same reasoning. *See, e.g., In re Bertram Zweibon*, 565 F.2d 742, 748 (D.C. Cir. 1977); *Johnson v. Mateer*, 625 F.2d 240, 242 (9th Cir. 1980) (where the issues that are raised in opposition to a motion for summary judgment are outside the scope of the complaint, "[t]he district court should have construed the affidavit as a request pursuant to Rule 15(b) of the Fed. R. Civ. P. to amend the pleadings . . . .") (citations omitted); 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §§ 2721-22 at 365 (1998)

### C. Admission Of Dr. Elrifi's Expert Opinions Would Not Prejudice Defendants

Defendants erroneously argue that even if the Court finds that the Elrifi Report is relevant to the facts in the case, it should nevertheless be struck because its probative value is outweighed by the danger of unfair prejudice. D. Mem. at 4, n. 4. However, defendants fail to articulate any such prejudice.

Rather, in making their argument, defendants turn a blind eye to allegations in the Complaint, described above, of which defendants were clearly aware as far back as 2001, describing the unlikelihood that Celera would be able to patent new gene sequences. Moreover, defendants ignore numerous documents and testimony obtained during discovery from Celera's own CEO as well as senior HGP officials, further putting them on notice that the capability and reliability of Celera's gene patenting strategy was at issue and that plaintiffs intended to support the Complaint's allegations with this evidence. *See* n.3, *supra*. Indeed plaintiffs questioned both Celera's CEO and President regarding Celera's intellectual property strategy.

Courts in similar circumstances have rejected such arguments. For example, in *Sunstrand*, 488 F.2d at 811-12, the court emphasized that defendants knew from discovery in the case that "events other than those detailed in the complaint were a subject of suit." The court then held that "the fruits of discovery, in particular, provide a wealth of information relevant to discerning the breadth of a complaint." *Id.*; *see also Info. Res.*, 1992 U.S. Dist. LEXIS 8384, at *10-11 (accounting theories contained in expert report were evidence with respect to claims raised in the complaint, not new claims).

---

("The formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented in other material offered by the parties . . . .").

Moreover, any purported prejudice will readily be cured, as defendants will have the opportunity to depose Dr. Elrifi prior to trial. *RMED*, 2002 U.S. Dist. LEXIS 23829, at *13 (citing *Grdinich v. Bradlees*, 187 F.R.D. 77, 79 (S.D.N.Y. 1999) (stating that prejudice can be alleviated by allowing the allegedly prejudiced party to depose the expert)); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional appropriate means of attacking" evidence).[8] Notably, defendants have not sought to depose Dr. Elrifi prior to filing their summary judgment reply (in fact, at defendants' suggestion, the parties postponed the deposition of Dr. Elrifi, which would have occurred prior to the submission of their reply, pending the outcome of this motion).[9]

---

[8] Defendants erroneously rely upon *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, No. 908 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623, at *22 (S.D.N.Y. Oct. 2, 2003), to support their contention that they would be prejudiced if the Court considers the Elrifi Report. D. Mem. at 8-9. There, unlike here, the court excluded expert testimony as prejudicial because the expert's opined on discrimination in the concert promotion industry when the issue in the case was not a class action, but rather charged only three white Booking Agency defendants and two white promoters, who constituted "only a portion of the U.S. concert business" with discrimination. *Id.* Here, the Elrifi Report opines directly on several central issues in this case – whether Celera was capable of producing quality and commercially viable gene sequences without the HGP's assistance and whether Celera could obtain meaningful intellectual property protection.

[9] Defendants assert that they should not have to bear the cost of opposing Dr. Elrifi's supposedly irrelevant report. D. Mem. at 9. However, rather than seeking to stay their time for serving responsive expert reports, defendants have recently served the report of their intellectual property expert. Thus, defendants have already voluntarily borne the costs that they are asking the Court to help them avoid.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike the Expert Report of Ivor R. Elrifi should be denied in all respects.

By: _____
J. Daniel Sagarin (CT04289)
David A. Slossberg (CT13116)
Brian C. Fournier (CT16272)
**HURWITZ, SAGARIN
& SLOSSBERG, LLC**
147 N. Broad Street, P.O. Box 112
Milford, CT 06460
(203) 877 – 8000

**Plaintiffs' Liaison Counsel**

Sanford P. Dumain (CT08138)
Lee A. Weiss (CT21345)
Carlos F. Ramirez (CT25340)
Shannon L. Hopkins
**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**Plaintiffs' Lead Counsel**

# CERTIFICATION

This is to certify that a copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Strike the Expert Report of Ivor R. Elrifi was served by first class mail, on March 11, 2005, on the following:

| | |
|---|---|
| Stanley A. Twardy, Jr., Esq. | Michael J. Chepiga, Esq. |
| Thomas D. Goldberg, Esq. | Robert A. Bourque, Esq. |
| Terence J. Gallagher, Esq. | William M. Regan, Esq. |
| Day, Berry & Howard LLP | Simpson Thacher & Bartlett LLP |
| One Canterbury Green | 425 Lexington Avenue |
| Stamford, CT 06901 | New York, NY 10017 |
| | |
| Counsel for Defendants | Counsel for Defendants |

_____
Brian C. Fournier