1

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
```

_____
                                         )
IN RE PE CORPORATION SECURITIES          )
LITIGATION                               )
                                         )
                                         )
Master File No. 3:00CV-705 (CFD)         )
                                         )
_____)

       Videotaped deposition of HAROLD VARMUS held at 430 East 67th Street, New York, New York, on Wednesday, September 15, 2004, commencing at 9:03 a.m., before Peter Ledwith, Legal Video Specialist, and James W. Johnson, Registered Professional Reporter and a Notary Public of the State of New York.

```
                                           2
 1
 2   APPEARANCES:
 3   MILBERG WEISS BERSHAD & SCHULMAN LLP
 4   Attorneys for Plaintiffs
 5       One Pennsylvania Plaza
 6       New York, New York 10119
 7   BY:  CARLOS F. RAMIREZ, ESQ.
 8
 9   SIMPSON THACHER & BARTLETT LLP
10   Attorneys for Defendants
11       425 Lexington Avenue
12       New York, New York 10017-3954
13   BY:  WILLIAM M. REGAN, ESQ.
14        LAURA D. MURPHY, ESQ.
15
16   OFFICE OF THE GENERAL COUNSEL - REGION II
17       26 Federal Plaza, Room 3908
18       New York, New York 10278
19   BY:  JUDY C. WONG, ESQ.
20        Assistant Regional Counsel
21
22   ALSO PRESENT:
23       Anna Leach-Proffer
24       Andre Kachteye
25       Peter Ledwith, Legal Video Specialist
```

```
                                           3
 1
 2
 3       IT IS HEREBY STIPULATED AND AGREED by
 4   and between the attorneys for the respective
 5   parties herein, that the filing and sealing of
 6   the within deposition be waived.
 7       IT IS FURTHER STIPULATED AND AGREED that
 8   all objections, except as to the form of the
 9   question, shall be reserved to the time of the
10   trial.
11       IT IS FURTHER STIPULATED AND AGREED that
12   the within deposition may be sworn to and
13   signed before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17               - oOo -
```

```
                                           4
 1               Varmus
 2       THE VIDEOGRAPHER:  We are going on the
 3   record.  The time is 9:03 a.m. on
 4   September 15, 2004.  This is the videotaped
 5   deposition of Professor Harold Varmus in the
 6   matter of In Re PE Corp. Securities
 7   Litigation, under the jurisdiction of the
 8   District of Connecticut.
 9       This deposition is being held at the
10   Rockefeller Research Lab, 430 East 67th
11   Street, New York, New York.  My name is Peter
12   Ledwith.  I'm the video specialist.  The court
13   reporter is Jim Johnson.  We are from Spherion
14   Deposition Services.  Its office is located at
15   545 Fifth Avenue, New York, New York.
16       May I have an introduction from counsel,
17   please.
18       MR. RAMIREZ:  Carlos Ramirez, from the
19   law firm of Milberg Weiss Bershad & Schulman
20   LLP, for plaintiffs.
21       MR. REGAN:  William Regan, with Simpson
22   Thacher & Bartlett LLP, for all defendants.
23       MS. MURPHY:  Laura Murphy, Simpson
24   Thacher & Bartlett, for all defendants.
25       MS. WONG:  And Judy Wong with the US
```

```
                                           5
 1               Varmus
 2   Department of Health & Human Services,
 3   representing Dr. Varmus.
 4       THE VIDEOGRAPHER:  Will the court
 5   reporter please swear in the witness.
 6   H A R O L D  V A R M U S,  called as a
 7   witness, having been first duly sworn by a
 8   Notary Public, was examined and testified
 9   under oath as follows:
10       MS. WONG:  This is Judy Wong, Assistant
11   Regional Counsel of the United States
12   Department of Health and Human Services.
13   Again, I'm representing Dr. Varmus, who is
14   testifying as an ex-employee of the department
15   pursuant to the regulations at 45 CFR Part II,
16   also known as the department's 2E regulations.
17       Pursuant to those regulations, the
18   department has agreed to allow Dr. Varmus'
19   testimony, provided that the deposition be
20   limited to Dr. Varmus' personal knowledge of
21   negotiations between Celera and The Human
22   Genome Project pertaining to the collaboration
23   or potential collaboration on completing the
24   map of the human genome.
25       MR. RAMIREZ:  Great.
```

18

Varmus
1  
2   Q. Do you recall whether you knew what type
3   of sequencing method he was using at that time?
4   A. I do recall that, because I did have at
5   least one interaction with him with Mike
6   Hunkapiller, who was involved in developing the new
7   Perkin Elmer machines that were going to accelerate
8   and did accelerate -- and this is a very important
9   development -- did accelerate the, the pace at
10  which sequencing could be done.
11  Q. Mike Hunkapiller, was he -- how did you
12  know him?
13  A. I knew him when he worked with Lee Hood
14  a long time ago in California, and I didn't have to
15  know him for that occasion to occur, but, as it
16  happens, we had met in the past.
17  Q. He was a scientist as well?
18  A. He's an, I believe he would call himself
19  an engineer, but he'd worked with Lee Hood many
20  years at Cal Tech.
21  Q. And who is Lee Hood, just briefly?
22  A. Lee Hood is currently a professor in
23  Seattle, but is, Lee Hood is a very well known
24  molecular biologist who I've known since the 1970s.
25  Q. Where would you have met Dr. Venter and

19

Varmus
1  
2   Mike Hunkapiller when you discussed the
3   conversations you just testified to?
4   MR. REGAN: Objection to the form.
5   A. Yes, I don't know how relevant this is
6   to the discussion, but certainly at least one
7   occasion was at the NIH, in my office at the NIH.
8   Q. And this is where you would have
9   discussed with, you would have had a conversation
10  with Mike Hunkapiller and Dr. Venter?
11  A. Right.
12  Q. Do you recall a timeframe?
13  A. At about the time that there was a
14  public announcement of Celera's formation and
15  interest in the human genome, and I don't, I can't
16  tell you exactly what the date was.
17  Q. Would this have been close to when
18  certain conversations began between the public
19  effort, The Human Genome Project, and Celera, or
20  would it have been prior to that?
21  A. Oh, no, before.
22  MR. REGAN: Objection to the form.
23  A. It would be sometime prior to that.
24  Q. Were you aware that Dr. Venter was using
25  what was called or referred to or known as the

20

Varmus
1  
2   shotgun method of sequencing the human genome?
3   A. Of course.
4   MR. REGAN: Objection to the form.
5   A. He, he had been adv -- he had been
6   advocating that method for some time, because he
7   used that method for sequencing bacterial genomes
8   and others.
9   Q. What was your opinion as to the efficacy
10  of that method?
11  MR. REGAN: Objection to the form.
12  MS. WONG: I don't see the relevance of
13  that, actually, to the human --
14  MR. RAMIREZ: I think this is all going
15  to lead up to the collaboration talks, and I
16  think if you'll allow me a little more time I
17  think you'll see the relevance of it.
18  MS. WONG: Your personal opinions,
19  that's --
20  MR. RAMIREZ: We want your personal
21  opinion.
22  A. Sure, and I, I can -- I saw the benefits
23  of sequencing simple genomes that way. I was
24  dubious about whether whole genome sequencing can
25  be used to assemble the sequences of a genome that

21

Varmus
1  
2   was not just as large as the human genome, but that
3   had as many repeated sequences, because repeated
4   sequences pose a serious problem in trying to
5   assemble a, the products of the whole genome
6   shotgun sequencing without doing careful cloning
7   and mapping.
8   Q. Did you ever discuss your opinion on the
9   method that Dr. Venter was using with Dr. Venter?
10  A. Not in great depth. I suspect that we
11  had some, we may have had some conversation about
12  it, but, but I can't recall it directly.
13  Q. Did there ever come a time during mid to
14  late '99 when you became involved in discussions
15  with other members of The Human Genome Project
16  regarding a possible collaboration with
17  Dr. Venter's company Celera?
18  A. Yes.
19  MR. REGAN: Objection to the form.
20  Q. And when do you recall you became
21  involved?
22  A. Sometime -- and these are, these are
23  dates that I am prompted to remember by some of the
24  material that we prepared for, in response to the
25  subpoena -- sometime in the middle of November.

6 (Pages 18 to 21)

Page 42

```
 1              Varmus
 2   effort."
 3          What were your reasons for believing
 4   that, or for not wanting to acknowledge that,
 5   Celera could put the human genome sequence together
 6   without the public effort?
 7          MR. REGAN: Objection to the form.
 8      A.  Well, as I mentioned before, I had my
 9   doubts about whether the assembly of a shotgun
10   sequencing effort would allow correct assembly
11   without using the public sequence, which, of
12   course, was deposited in public databases, so it
13   was readily available to Celera.
14      Q.  What were the differences in the method
15   used by Celera and that being used by The Human
16   Genome Project? The layman's brief version.
17      A.  Well, the major difference was that
18   Celera was sequencing randomly, just grabbing
19   pieces of DNA out of the entire genome and
20   sequencing them in the hopes that by sequencing
21   enough that they would be able to assemble the
22   whole sequence by looking at overlapping sequences,
23   whereas The Human Genome Project had begun with an
24   extensive effort to map the genome, to isolate
25   pieces of large pieces of the genome and sequencing
```

Page 43

```
 1              Varmus
 2   them in their entirety and assembling the sequence
 3   based on a scaffold of, an intellectual scaffold,
 4   if you will, of, of sequence that had already been
 5   mapped to chromosomes and -- with clones being
 6   mapped in relation to each other.
 7          Now, that information, of course, was in
 8   public databases and was accessible to
 9   investigators anywhere, private or public sector.
10      Q.  Did you ever change your opinion that in
11   fact they couldn't put their sequence together
12   without the public effort?
13          MR. REGAN: Objection to the form.
14      A.  It's still an arguable issue, and it's
15   been argued in scientific journals right up until
16   last year.
17      Q.  But you haven't changed your opinion?
18          MR. REGAN: Objection to the form.
19      A.  I remain skeptical.
20      Q.  It says, the next paragraph starts out,
21   "After our talk last night I am especially anxious
22   that today we achieve clarity on two points: The
23   reasons the collaboration would be in our interests
24   and the reasons we would have to reject it."
25      A.  Mm hmm.
```

Page 44

```
 1              Varmus
 2      Q.  Why were you anxious that you needed to
 3   receive clarity on those two points?
 4          MR. REGAN: Objection to the form.
 5      A.  I would say I'm -- "anxious" could be
 6   interpreted in two ways.
 7          I think I was eager that we become clear
 8   about those issues, because if we were to have a
 9   conversation we'd like to know that, I think we'd
10   want to enter that conversation, as you would any
11   negotiation, with a clear understanding of what a
12   collaboration would, how that would benefit The
13   Human Genome Project and what would be the reason
14   that we as a group would consider sufficient to
15   terminate the discussions.
16      Q.  At this time, do you recall if it was
17   your belief that only Celera really stood to gain
18   from a collaboration and not The Human Genome
19   Project?
20          MR. REGAN: Objection to the form of the
21   question.
22      A.  I don't understand the question.
23      Q.  Was it your belief at this time that the
24   only side which really stood to gain from a
25   potential collaboration was Celera and not The
```

Page 45

```
 1              Varmus
 2   Human Genome Project?
 3      A.  No.
 4          MR. REGAN: Objection to the form of the
 5   question.
 6      A.  Both sides would have something to gain,
 7   just solely on, just restricting our attention to
 8   the public relations issues. Both sides were
 9   certainly suffering from the way in which the
10   pursuit of the genome was being portrayed in the
11   press.
12      Q.  If we can go down to the next e-mail, it
13   appears to be an e-mail from Eric Lander to Francis
14   Collins, and to you as well, and it starts out,
15   "Dear Francis and Harold."
16          If you could go to the third paragraph,
17   it starts out with the sentence, "It would be good
18   for us to discuss these notes soon and then to have
19   me circulate them to Celera before our call on
20   Saturday."
21          Do you recall what notes Eric Lander was
22   referring to in this particular sentence?
23          MR. REGAN: Objection to the form.
24      A.  Well, I would assume -- all right, I
25   can't -- I can't be sure, but I would assume that
```

12 (Pages 42 to 45)