1

1    UNITED STATES DISTRICT COURT

2         DISTRICT OF CONNECTICUT

3

4    --------------------------------------X

5    In Re

6         PE CORPORATION

7    SECURITIES LITIGATION        MASTER FILE NO.

8                                 3:00CV-705 (CFD)

9    --------------------------------------X

10

11

12

13         Videotaped deposition of Tony Lee White

14    taken in accordance with the Federal Rules of Civil

15    Procedure at the offices of Applera Corporation, 301

16    Merritt Seven, Norwalk, Connecticut, Before Holly M.

17    Murphy, a Licensed Shorthand Reporter and Notary

18    Public, in and for the State of Connecticut at 9:30 AM

19    on October 20, 2004.

20

21

22

23

24

25

**2**

1  A P P E A R A N C E S :
  ON BEHALF OF THE PLAINTIFF:
2  LEE A. WEISS, ESQ.
  CARLOS RAMIREZ, ESQ.
3  MILBERG WEISS
  ONE PENNSYLVANIA PLAZA
4  NEW YORK, NY 10119
5
  ON BEHALF OF THE DEFENDANT:
6  MICHAEL J. CHEPIGA, ESQ.
  WILLIAM M. REGAN, ESQ.
7  SIMPSON THACHER & BARTLETT
  425 LEXINGTON AVENUE
8  NEW YORK, NY 10017-3954
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1      S T I P U L A T I O N S    .
2
3      IT IS HEREBY STIPULATED AND AGREED by and
4  between counsel representing the parties that each
5  party reserves the right to make specific objections
6  at the trial of the case to each and every question
7  asked of and the answers given thereto by the
8  deponent, reserving the right to move to strike out
9  where applicable, except as to such objections as are
10  direct to the form of the question.
11      IT IS FURTHER STIPULATED AND AGREED by and
12  between counsel representing the respective parties
13  that proof of the official authority of the
14  Commissioner of Deeds before whom this deposition is
15  taken is waived.
16      IT IS FURTHER STIPULATED AND AGREED by and
17  between counsel representing the respective parties
18  that the reading and signing of the deposition by the
19  deponent is NOT WAIVED.
20      IT IS FURTHER STIPULATED AND AGREED by and
21  between counsel representing parties that all defects,
22  if any, as to the notice of the taking of the
23  deposition are waived.
24      Filing of the Notice of Deposition with the
25  original transcript is waived.

**4**

1      THE COURT REPORTER:  To the attorneys from
2  Simpson Thacher, would you like to order a copy of
3  today's transcript?
4      MR. REGAN:  Yes.  And a rough draft, a
5  mini.
6
7      T O N Y   L E E   W H I T E
8  Address 4726 Northside Drive, Atlanta, Georgia,
9  having been duly sworn, was deposed and testified as
10  follows:
11
12      DIRECT EXAMINATION
13  BY MR. WEISS:
14      Q.    Good morning, Mr. White.  I understand from
15  your counsel that you're a little under the weather.
16  I appreciate you still making yourself available.  I
17  just want to make sure that you feel you're okay to go
18  forward with the deposition today?
19      A.    I feel fine.
20      Q.    When did you first meet Craig Venter,
21  approximately?
22      A.    I'm not sure.  It would have been at, I
23  think the first time I met him was at what's called a
24  GSat conference.  It was probably in the '97, '98 time
25  frame, something like that.

**5**

1      Q.    When did PE Corporation first begin
2  discussing the idea of working with Dr. Venter?  Was
3  it before or after you met him?
4      A.    It was after I met him.
5      Q.    Who do you recall first raising the topic
6  that maybe PE Corporation should work with Dr. Venter?
7      A.    It might have been Mike Hunkapiller.  I
8  think maybe that was my recollection.  He was the
9  first person to bring it up.  I believe that's right.
10      Q.    Did PE Corporation approach Dr. Venter
11  about working together or did Dr. Venter approach PE
12  Corporation?
13      A.    I believe we approached him.
14      Q.    Who participated in the decision making
15  process regarding whether or not to approach Dr.
16  Venter?
17      A.    Quite a few people.  I couldn't give an
18  exhaustive list.  I was one of them.  Mike Hunkapiller
19  was one.  I don't recall who else.
20      Q.    What was discussed during those discussions
21  regarding the possible benefits of working with Dr.
22  Venter?
23      A.    The rational was that we wanted to have
24  someone who was accomplished in sequencing, you know,
25  who knew how to run a sequencing operation.  That was

2 (Pages 2 to 5)

SPHERION DEPOSITION SERVICES
(212) 490-3430

110

1    A.    No.
2        MR. WEISS: Let's take a quick break here.
3    I don't think I have much left.
4        (Whereupon there was a brief recess in the
5    proceedings.)
6    BY MR. WEISS:
7    Q.    With respect to the patenting issue we
8    discussed earlier and the difference of opinion
9    between Mr. Millman and Dr. Venter, to your knowledge
10   did Celera have the ability to locate commercially
11   useful genes at the time of the dispute between -- not
12   dispute, but the different opinions voiced by
13   Dr. Venter and Mr. Millman?
14   A.    Based on my understanding of the
15   technology, I would think not. But I'm really not
16   qualified to answer that.
17       MR. WEISS: Mark this as Exhibit 16.
18       (Whereupon, Plaintiff's Exhibit No. 16 was
19   marked for identification.)
20   BY MR. WEISS:
21   Q.    For identification, Exhibit 16 bears Bates
22   range CG000031 through 154. Before we get to the
23   prospectus, Mr. White, at the time of the two opinions
24   voiced by Mr. Millman and Dr. Venter, did Celera have
25   the ability to determine the functionality of a

112

1    a sentence, I think it's the second to last complete
2    sentence.
3        It says: Celera Genomics group's ability to
4    retain its existing customers and attract new
5    customers is heavily dependent upon the completion of
6    the sequencing and assembly of the human genome within
7    the expected time frames.
8        Was that an accurate statement at the time to
9    your knowledge?
10   A.    At the time?
11   Q.    Yes.
12   A.    Yes.
13   Q.    Why was Celera's ability to retain its
14   customers and attract new customers heavily dependent
15   upon timely completion of the sequencing?
16   A.    Because our customers, we create an
17   expectation with our customers that's what we
18   were going to do.
19   Q.    Did you know at this point what expectation
20   Celera's customer had for the completion of the
21   sequencing and assembly of the genome?
22   A.    I don't really recall, no.
23   Q.    Turn to the bottom of page 38 of the
24   prospectus which is 00068. If you could just take a
25   moment to read the paragraph that starts on that page

111

1    particular gene?
2    A.    I don't think so. I think that there were
3    gene families that people had theories about that
4    we're pretty early in the technology at that point.
5    Q.    Did Celera have that capacity by the time
6    of the secondary offering?
7    A.    It's not like flipping a switch. It's an
8    evolving science. So I would say by the time of the
9    secondary offering, it evolved a little bit. But no.
10       I don't think that's, you can't just look at
11   a gene and say, "Oh, I know what it does." Hell, you
12   still can't do that.
13   Q.    Starting on page eight of the prospectus
14   which is CG00038, there's a listing of risk factors in
15   connection with the offer.
16   A.    Yes.
17   Q.    Did you play any role in the drafting of
18   those risk factors?
19   A.    I reviewed the drafts. I didn't draft it.
20   Q.    Do you recall making any specific --
21   A.    No.
22   Q.    Let me just finish. Any specific comments
23   regarding any specific risk factors?
24   A.    No.
25   Q.    Turn to the bottom of page eight. There's

113

1    and includes the top of the following page that
2    begins: The Celera Genomics group intends.
3    A.    Okay.
4    Q.    That paragraph talks about integrating
5    Celera's proprietary information with information from
6    external sources.
7        What external sources were contemplated at
8    this time?
9    A.    I believe they were external sources such
10   as other publicly available data bases like GenBank
11   for example.
12   Q.    If you turn to page 40 of the prospectus,
13   page 00070 and take a moment to read the paragraph
14   regarding access to comprehensive genomic sequence
15   information unavailable elsewhere?
16   A.    All right.
17   Q.    Was a component of Celera's business model
18   at this time providing its customers with access to
19   comprehensive genomic sequence information unavailable
20   elsewhere?
21   A.    Yes, I think so.
22   Q.    What type of genomic sequence information
23   would that be?
24   A.    The sequences that we derived from our
25   sequencing efforts and the assembly of the genome that

29 (Pages 110 to 113)