IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| IN RE PE Corporation Securities Litigation | ) ) ) Master file No. 3.00CV705(CFD) ) ) ) |

## EXPERT REPORT OF DR. IVOR R. ELRIFI

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I hereby submit this expert report as a statement of the opinions I intend to express in the above-captioned action and the bases therefor.

1.    I am a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. I practice intellectual property law in the areas of biotechnology, life sciences and medical devices in the firm's Boston and New York offices. My curriculum vitae is attached hereto as Exhibit A.

2.    I am a member in good standing of the bars of the states of Massachusetts, California and New York and of Ontario, Canada. I am admitted to practice before the United States Court of Appeals for the Federal Circuit. I registered to practice before the United States Patent and Trademark Office (the "USPTO") in 1992 and have done so on a regular basis since that time. My USPTO registration number is 39,529.

3.    I received a Bachelor of Science degree in 1982 in biology and a Ph.D. in 1986 in biology, both from Queen's University in Kingston, Ontario, Canada. I received an LL.B. in 1989 from Osgoode Hall Law School in Toronto, Ontario, Canada.

4.    I have been engaged in the practice of intellectual property law since my graduation from law school in 1989. Upon graduation from law school, I worked as a patent attorney at the law firm of Bereskin and Parr in Toronto, Canada. Thereafter, I worked for five years as an intellectual property attorney at the intellectual property law firm of Fish & Neave in New York City. I subsequently served as patent counsel for Modex Therapeutics in Lausanne, Switzerland and as patent counsel and as general counsel and vice president of CytoTherapeutics, Inc. in Providence, Rhode Island. I have practiced intellectual property law in the area of life sciences and biotechnology at Mintz Levin since January 1998. I have served as co-chair of the firm's Intellectual Property Section since that date. I advise life sciences and medical device companies and research institutions (e.g., universities and hospitals) on intellectual property matters, including patent prosecution and the development and implementation of worldwide patent strategies.

5.    Throughout my legal career, I have prepared and prosecuted patent applications primarily in the areas of life sciences. I have filed, or overseen the filing of, several thousand patent applications with the USPTO and with the equivalent patent agencies in many foreign countries. I have obtained approximately 200 United States patents and several hundred foreign patents on behalf of clients. Based upon my extensive experience as a practitioner before the USPTO and my knowledge of the practice and procedures of the USPTO and the case law relating thereto, I consider myself an expert with regard to the matters within the scope of this report.

6.    I am a member of the American Bar Association, the Canadian Bar Association, the New York Intellectual Property Lawyers Association, the American Intellectual Property Lawyers Association and the Law Society of Upper Canada.

7.    My publications for the past ten years are listed in my curriculum vitae attached hereto as Exhibit A.

8.    I have not testified as an expert at trial. I have given one expert deposition, in the matter of In re Cipro, Master file No. 1:00-MD-1383, United States District Court for the Eastern District of New York.

9.    Mintz Levin is being compensated for my time in this matter at my standard rate of $585 per hour. The firm is being reimbursed for actual expenses. Mintz Levin also is being compensated for the time of others at the law firm who have assisted me in preparing this report at their standard hourly rates. No part of my compensation or of those who have assisted me depends on the outcome of this litigation.

10.    I have been asked to render an expert opinion as to whether PE Corporation had a reasonable expectation of acquiring patent protection for their genomic sequences as asserted in their prospectus issued on February 29, 2000 in connection with a secondary offering of its Celera Genomics Group tracking stock ("Celera Prospectus").

11.    This report is based on the information currently available to me. The documents I reviewed are listed in Exhibit B. I reserve the right to modify the opinions set forth herein based upon any new information that I may receive or learn. I reserve the right to supplement this report should any such new information become available to me and/or in response to the expert reports of defendants' experts. I may develop charts or other visual aids to illustrate my opinions at trial.

## I. <u>Legal Standard For Patentability</u>
### A. The Patenting Process

12.    The USPTO is an agency of the United States government, the purpose of which is to provide a process for registering and protecting inventions and trademarks. Patents are published descriptions of inventions that meet the requirements of 35 U.S.C. § 100, *et seq.* Patents provide the patent holder with the right to prevent others from making, using, or selling the patented invention for a certain number of years in return for allowing their invention to be made public. The issued patents themselves are publicly available documents. The determination as to whether an invention is patentable is made by USPTO examiners who typically are engineers and scientists familiar with technology relevant to the patent applications that they review.

13.    An invention can be patented only if it is a "new and useful process, machine, manufacture, or composition of matter" or a "useful improvement thereof." 35 U.S.C. § 101.

14.    The process of determining the patentability of the invention is called the "prosecution" of a patent application. During the prosecution process, the examiner evaluates each of the claims to determine whether they meet the statutory requirements. To assist with this evaluation process, the applicant is required to provide the examiner with any information that would be material to the examiner during that process, including the existence of prior art, the existence of another application claiming the same invention or any other information that a reasonable examiner would consider important in deciding whether to allow an application to issue. 37 C.F.R. § 1.56.

15.    The applicant is informed of the examiner's determinations in an Office Action and, in response to an Office Action, may present arguments to the examiner about why claims should be allowed, make amendments to the claims in order to meet the examiner's concerns or cancel claims that cannot be made patentable. Those claims that are allowed by the examiner at the end

of the prosecution process become the claims of the issued patent. Once a patent has issued, the USPTO's record of the prosecution of the patent, also called the "patent file history," becomes a public document, available for inspection and copying by the public.

## B. Patentability of Genomic Nucleic Acid Sequences

16.     Before the Celera Prospectus issued in February 2000, the USPTO had been revising its guidelines for issuing patents relating to gene sequences. The USPTO published revised utility examination guidelines in 1995. *See* 60 FR 36263. In December 1999, the USPTO published another set of guidelines for satisfying the utility requirement (the "1999 Utility Guidelines"). 64 FR 71440, Dec. 21, 1999. The 1999 Utility Guidelines raised the bar for patentable utility of gene sequences, by requiring that patent applicants show specific, credible, and substantial utility for all subject matter, including gene sequences. *See* 1999 Utility Guidelines.

17.     The requirement for "specific utility" in the context of a nucleic acid sequence (or gene) requires that the patent applicant know what the gene does (i.e., what protein that DNA encodes, and what the function of that protein is), as contrasted to a general utility applicable to the broad class of the invention. In the past, patenting of a gene sequence was allowed based on general claims such as using the gene sequence as a probe, simply as a means to find another nucleic acid sequence. Under the 1999 Utility Guidelines, such a general use as a probe would, absent other information, be insufficient to establish a specific utility. Similarly, a general statement of diagnostic utility, such as detecting an unspecified disorder, would ordinarily be insufficient absent a disclosure of what condition can be diagnosed.[1] *See* 1999 Utility Guidelines. The requirement for "substantial utility" requires that, in addition to knowing what a gene sequence

---

[1]  For all patent applications, the requirement for "credible utility" requires that the patent applicant make a claim that is believable based on the current state of the art. For example, the prevention of aging via systemic treatment is not credible in view of contemporary knowledge in the art.

does, the patent applicant disclose a real-world use in the patent application for the gene

sequence. Examples of real-world uses include use of the gene as a diagnostic or a treatment for

a particular disease. *See* 1999 Utility Guidelines.

18.     Under U. S. patent law, the patent applicant must also comply with the written

description requirements of the first paragraph of 35 U.S.C. § 112. To satisfy the written

description requirement, the patent applicant must demonstrate that they "had possession of the

invention at the time of filing." In gene cases, this is typically interpreted as requiring the

applicant to set forth in the patent application the correct or substantially correct sequence of the

gene or protein for which patent protection is sought. Revised Written Description Guidelines,

64 FR 71427, 1999.

## II. Factual Basis for Opinion

19.     The facts discussed below relate to genomic DNA sequences (and the substantial

difference between genomic DNA and cDNA sequences), and the technology used by Celera to

obtain genomic DNA.

### A.    Genomic DNA and Celera's Technology

20.     Genomic DNA sequences are those obtained by sequencing an organism's chromosomes,

which make up its genome. In the case of humans, the vast majority of chromosomal or genomic

DNA does not code for protein. In fact, only about 3-5% of human chromosomal DNA encodes

protein. The discovery and patenting of DNA sequences that encode protein is generally

important to companies such as Celera because such DNA sequences are the basis for key

commercial products.

21.     According to its February 12, 2001 press release, Celera began its attempt to sequence

the human genome on September 8, 1999, using the whole genome shotgun (hereafter "WGS")

technique.[2] According to the February 12, 2001 press release, a key feature of Celera's

sequencing method is that both ends of each fragment of DNA are sequenced (paired-end

sequencing).[3] Celera then attempted to assemble the millions of sequences representing billions

of letters of genetic code into the proper order using a whole genome assembly algorithm

(hereafter "WGA") or a second assembly method, the compartmentalized shotgun assembly

(hereafter "CSA").[4] These methods resulted in the reconstruction of the linear sequence of the

23 pairs of human chromosomes.

22.    Celera used genomic DNA for its sequencing efforts, as compared to many of its

commercial partners, which were using cDNA (discussed in detail below).

---

[2] The WGS technique involves the random shearing of the chromosomes comprising the human genome into millions of fragments, generally in the range of 2,000 to 50,000 nucleotides in length. Each fragment is inserted (cloned) into a plasmid vector without regard to nucleotide sequence and the resulting vector is inserted into *E. coli* bacteria to generate clonal populations, wherein many bacteria produce the same fragment-containing vector in order to generate sufficient quantities for sequencing.

[3] Sequencing of the fragment can be paired-end, meaning that primers that anneal to the plasmid vector are extended into the fragment sequence from both ends of the plasmid, or the sequencing can use Sequence Tagged Sites (STSs), which are physically mapped sequences contained within the genome, as primer sites. A wide spectrum of varying sized fragments cloned into the vector is important in maximizing coverage of the genome.

[4] With the WGA method the entire genome is assembled simultaneously, while in the CSA method the genome data is divided into segments or compartments, which are then assembled. These methods result in the reconstruction of the linear sequence of the 23 pairs of human chromosomes. The WGA generally has fewer breaks (regions without known sequence) while the CSA generally has a few percent greater coverage of the genome. Comparison of the two methods of analysis provides a means of internal validation. Another validation method is to "shred" an externally-derived sequence database (*e.g,* GenBank) by randomly fragmenting the sequences into smaller regions (generally under 1kb) and overlaying these fragments over the assembly derived using WGA and/or CSA.

### B.     cDNA and Genomic DNA Sequencing Technology

23.     There is a significant difference between genomic DNA and cDNA. Genomic DNA is the "raw" fundamental information contained in a person's genetic complement. Genomic DNA contains distinct partial pieces of coding DNA (exons) that are scattered between non-coding sequences (introns) on the genomic DNA. As noted above, in the case of humans, the vast majority of genomic DNA does not code for protein. During protein expression, the non-coding information in genomic DNA is removed by an "editing" process, called transcription, that edits or splices out the introns to form messenger RNA ("mRNA") which is the direct message used to make protein during translation.

24.     cDNA is artificially synthesized from mRNA. The use of cDNA enables one to determine that at least that cDNA, in fact, was actively transcribed in the tissue or cell from which the DNA/mRNA was obtained. The same cannot be said for genomic DNA – there is no ability to determine, by looking at the genomic sequence itself, whether that sequence is actively transcribed in that cell or tissue.

25.     These structural differences in genomic DNA versus cDNA result in several important differences between sequencing genomic DNA and cDNA. First, there is a very significant increase in the amount of information to sequence when the starting material for sequencing is genomic DNA. Genomic DNA is generally obtained by breaking up the genome into smaller fragments and placing them in vectors, but these fragments can still be very large, 10,000

nucleotides (a structural component of DNA or RNA represented by a letter A, T, C, and G) or more. In contrast, cDNAs are generally smaller, such as 3,000 to 10,000 nucleotides or less.[5/]

26.    In addition, genomic DNA is double-stranded and so the protein-encoding information may be on either strand, which requires more computational effort. Also, as there is a pair of each human chromosome (other than the X and Y chromosomes), each DNA sequence is essentially duplicated. Since cDNA is derived from single stranded mRNA, the correct strand is known. Genomic DNA is also more difficult to sequence because it contains many more repetitive elements. These elements also make assembling the sequenced fragments more difficult. Also, there is significant secondary structure in genomic DNA that often prevents the enzyme that sequences the DNA from functioning properly.

27.    Second, there is a much higher likelihood of mistake in predicting the amino acid sequence of a "real" protein using genomic DNA sequences. Only a small percentage of genomic DNA contains protein sequence information; and the large remainder is repetitive elements. The protein information in genomic DNA, known as exons, is often separated by large amounts of non-coding DNA, known as introns. If genomic DNA is used as the starting material, this redundant information in the introns has to be artificially spliced out using one or more computer programs – which have significant limitations in their predictive ability. This makes the process of identifying protein-encoding regions of genomic DNA inefficient and difficult.

28.    The Celera Prospectus stated that the first component of Celera's business strategy was to sequence the human genome. Celera Prospectus at 32. This involves the sequencing of

---

[5/] It is usually difficult to sequence an entire genomic DNA fragment in a single sequencing run. Genomic DNA can be sequenced by using either multiple internal primers, which takes time, or by making smaller fragments with overlapping sequences, each of which must be sequenced individually. Conversely, the entire cDNA sequence may be obtained in a single sequencing run.

genomic DNA. The Prospectus further states that the sequencing of the human genome lays the foundation for any additional components of the business. Celera Prospectus at 32. The 1999 Revised Interim Utility Guidelines Training Materials illustrate that a DNA sequence itself, without any accompanying functional data, lacks utility and, therefore, is not patentable. The utility requirement thus requires more than the mere description of the DNA sequence. It requires a specific, substantial, and credible utility.

29.     For claims to cDNA sequences that encode proteins, this utility requirement can be met by showing that the cDNA encodes a protein with a specific function, or that the encoded protein has a high degree of homology (similarity of sequence) to a protein with a known function.

30.     For claims to genomic DNA sequences, it has been more difficult to satisfy the utility requirement. By definition, genomic DNA sequences do not encode proteins, as the coding exons are scattered among the non-coding introns within the genomic DNA. Complex computer algorithms are used to determine the coding regions within the genomic DNA, so that the description of the genomic DNA by itself does not instruct the skilled artisan how to code for a protein. Accordingly, function associated with an encoded protein generally cannot be ascribed to genomic DNA.

### C.     The Risk Disclosures Of Celera's Competitors

31.     The Celera Prospectus identified purported risks associated with Celera's ability to obtain patents. *See* Celera Prospectus at 11. It stated that "Patent law affecting Celera Genomics' business, particularly gene sequences, polymorphisms and protein expression, is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter." *Id.*

32.     The Celera Prospectus did not disclose the higher utility standard described above for

obtaining patents on gene sequences invented by using genomic DNA as the starting material.

33.     In contrast, other genomics companies in SEC filings made around the same time as the

Celera Prospectus specifically disclosed that a new standard of utility was now in place for

examination of patent applications relating to gene sequences and explained that the new

standard could impact their ability to obtain patents.

34.     For example, in a Form S-3, dated March 17, 2000, CuraGen included the following

risk factor regarding the utility requirement: "On December 21, 1999, the PTO issued Revised

Interim Utility Guidelines and Revised Interim Written Description Guidelines reflecting the

Office's current understanding regarding statutory written description and utility requirements for

patentability.  Should the PTO finalize these guidelines and make them effective, the

implementation of these guidelines may impact the issuance of our pending U.S. patent

applications."  CuraGen Form S-3, March 17, 2000, at 9.

35.     In its Form S-3, filed on March 24, 2000, Human Genome Sciences also disclosed the

utility requirement, stating that "[t]he patent positions of biotechnology firms generally are

highly uncertain and involve complex legal and factual questions that will determine who has the

right to develop a particular product.  No clear policy has emerged regarding the breadth of

claims covered in biotechnology patents.  There have been, and continue to be, intensive

discussions on the scope of patent protection for both partial gene sequences and full-length

genes.  There have also been proposals for review of the appropriateness of patents on genes and

partial gene sequences.  The Patent and Trademark Office has recently proposed new guidelines

on the written description and utility requirements for patents.  The biotechnology patent

situation outside the U.S. is even more uncertain and is currently undergoing review and revision

in many countries. These proposals and other changes in patent laws in the U.S. and other countries may result in changes in, or different interpretations of, the patent laws which might allow others to use our discoveries or develop and commercialize our products." Human Genome Sciences Form S-3, March 24, 2000, at 13.

36.     In contrast to the disclosures by CuraGen and Human Genome Sciences, the Celera Prospectus did not disclose the increased bar for satisfying utility for gene sequences, nor did it discuss the higher hurdle for satisfying the utility requirement when sequencing genomic DNA compared to sequencing cDNA.

### III.     Opinions

#### A.     Patentability of Genomic DNA Sequences

37.     Based on the facts recited above, it is my opinion that the bar for patentable utility for genomic DNA sequences is much higher than the bar for other types of DNA sequences, including cDNA sequences. It is also my opinion that genomic DNA cannot be patented simply by sequencing it.

38.     In 1999, the USPTO issued training guidelines to its Examiners to help implement the 1999 Guidelines. One method described in the training guidelines for satisfying the utility requirement is to assign a function to a given gene sequence based upon homology to a prior art gene sequence. Although the USPTO did not adopt a *per se* rule rejecting homology-based assertions of utility, the USPTO has been allowing the use of homology data to satisfy the utility requirement in only very limited circumstances. When an applicant can show a high degree of homology (>95%) to a protein having an accepted utility, only then can utility be found. When a homology-based assertion of utility is presented in the absence of other data to show utility, the USPTO will reject the claims as not satisfying utility.

39.    Since genomic DNA sequences do not encode functional proteins (absent removal of the introns), any homology-based assertions in patent applications relating to genomic DNA sequences could not include homology to a protein having an accepted utility. Such a homology-based assertion of a genomic sequence would not be sufficient to meet the utility requirement for patentability. As discussed below, it is this type of homology-based assertion that is present in many of the Celera genomic DNA applications.

40.    As discussed above, the predictive value of Celera's computational methods to derive information from genomic DNA is questionable because there is a large variance in accuracy between different computational methods for genomic DNA analysis. Indeed, Dr. Craig Venter, Celera's former president, agrees that this is the case. *See* Venter *et al.* Science 291(5507):1304-1351, at 1317. Further, the use of genomic DNA carries the weakness that it alone, absent other evidence of the function of the gene, says nothing about whether that gene is active in the organism being studied and whether it has any biological relevance. This information would be necessary in order to invent a drug from that gene (or its protein product) or a drug directed against that gene (or its protein product). Thus, failure to obtain patents because Celera could not comply with the utility requirement would have had a direct negative impact on Celera's ability to license those genes (and/or proteins they encode) to pharmaceutical partners.

41.    As I noted above, there are structural differences in genomic DNA versus cDNA resulting in several important differences between sequencing genomic DNA and cDNA. These important differences created significant additional hurdles for Celera compared to commercial competitors using cDNA as the starting material for sequencing.

42.    Because there is a very significant increase in the amount of information to sequence when the starting material for sequencing is genomic DNA (*see supra* ¶ 25), Celera was at a

competitive disadvantage compared to commercial competitors using cDNA as the starting

material for sequencing.  Sequencing genomic DNA required far more raw sequence to be

identified, and far more computational power to assemble – in short the Celera process was much

less efficient than the cDNA approach of its competitors.  Further, as I noted above (*see* supra ¶

26), Celera's process not only required sequencing of all the introns as well as exons, it also

required far more computational processing to eliminate the "nonsense" strand information.  This

too made their process less efficient.  Inefficiency in gene sequencing was problematic.  This is

because under U.S. patent law, the first party to make an invention is the party entitled to the

patent.  The race to sequence the human genome truly was a race – and efficient methodology

conferred a competitive advantage (namely a higher likelihood of being the first to sequence any

given gene and its protein product) to those using cDNA.  Because Celera had a more

cumbersome process, it had a lower expectation of being first to sequence any one gene and

obtain a patent on that gene and the protein encoded thereby.  Failure to get patents because

Celera was the second to invent the sequence would have a direct negative impact on Celera's

ability to license those genes (and/or proteins they encode) to pharmaceutical partners.

43.     Finally, to meet the written description requirements, requires that the patent applicant

demonstrate that they "had possession of the invention at the time of filing."  Because Celera had

a much higher likelihood of mistake in predicting the coding nucleic acid sequence and predicted

amino acid sequence derived therefrom, for a "real" protein using genomic DNA sequences (*see*

*supra*¶¶ 26 and 27), Celera had a significantly higher hurdle in satisfying the USPTO written

description requirement for its genomic DNA sequences (and proteins encoded thereby)

compared to commercial competitors using cDNA as the starting material.  Failure to get patents

because Celera could not comply with the written description requirement would have a direct

negative impact on Celera's ability to license those genes (and/or proteins they encode) to pharmaceutical partners.

### B.    Celera's Failed Patenting Strategy

44.    Celera's difficulty in satisfying the utility requirement demonstrates the weakness in its genomic DNA data. Celera has many patent applications that either currently stand rejected for lack of utility or have been abandoned. Accordingly, these applications have not yet satisfied the utility requirement. In preparing this opinion, I have reviewed numerous examples of Celera published patent applications directed to genomic DNA sequences. I performed a search of the USPTO published patent application database using the search terms "Applera" or "Celera" as assignee. This search located over 200 Celera published applications. Of these few hundred applications, a very significant percentage have been rejected for lack of utility or have been abandoned.

45.    These applications disclose genomic DNA sequences, computational algorithms for predicting where the coding sequences would be located within these sequences, and predicted gene sequences based on the computational algorithms. In each of the reviewed applications, there is no data supporting an actual function of the predicted gene sequence. The only data showing the biological functions of these sequences is predicted from computer-generated data, and includes homology to known or unknown proteins, domain analysis, predictions regarding single nucleotide polymorphisms (SNPs), and tissue expression predictions.

46.    It is my opinion that Celera's use of WGA and CSA methods did not generate patentable genomic DNA sequences for the majority of the thousands of sequences in the human genome, absent other functional evidence.

## Conclusion

47.     In summary, Celera faced a very significant barrier to obtaining patent protection for its

genomic DNA sequences (and the proteins predicted to be encoded thereby).  First, the

patentability guidelines for gene sequences had recently been strengthened.  Second, Celera's use

of genomic DNA, which was substantially different than cDNA significantly increased the risk

and uncertainty that Celera could obtain patents due to (a) failure to meet the utility requirements

of the patent statute, (b) failure to be the first to invent, and (c) failure to meet the written

description requirements.


Dated:  December 20, 2004                                  _____
                                                                              Dr. Ivor R. Elrifi

## CERTIFICATION

This is to certify that a copy of the foregoing was served on December 20, 2004, by hand delivery and via Federal Express, to the following:

Stanley A. Twardy, Jr.  
Thomas D. Goldberg  
Terence J. Gallagher  
Day, Berry & Howard LLP  
One Canterbury Green  
Stamford, CT 06901  

Counsel for Defendants  

Via Federal Express  

Michael J. Chepiga  
Robert A. Bourque  
William M. Regan  
Simpson Thacher & Bartlett LLP  
425 Lexington Avenue  
New York, NY 10017  

Counsel for Defendants  

By Hand Delivery  

Carlos F. Ramirez

## EXHIBIT A

## CURRICULUM VITAE

IVOR R. ELRIFI
Mintz, Levin, Cohn, Ferris Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts

666 Third Avenue
New York, New York

<u>Experience</u>

1998-present:  **Attorney**, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA
-- Co-Chair, Intellectual Property Group, Mintz Levin
-- Member, Executive Committee, Firm Policy Committee.

1996-1998:  **General Counsel, Vice President and Secretary (1997-1998), and Patent Counsel and Assistant Secretary (1996-1997)**, CytoTherapeutics, Inc., **Patent Counsel**, Modex Therapeutiques, S.A.
Work for CTI and Modex includes patent strategy counseling, due diligence, licensing, patent litigation, opinion work, oppositions, worldwide patent prosecution, searches, partnering and business development, securities and corporate law issues, general litigation, employment law issues, arbitration.

1991-1996:  **Attorney**, Fish & Neave
Patent work including client counseling, due diligence, licensing, litigation, opinion work, oppositions, prosecution (worldwide), and searches in the biotechnology, chemical and medical fields.

1989-1991:  **Attorney**, Bereskin & Parr
Patent licensing, litigation opinion work, prosecution, and searches primarily in the biotechnology, chemical and medical fields.

<u>Education</u>

| | | |
|---|---|---|
| LL.B | Osgoode Hall Law School, Toronto, Canada | 1989 |
| Ph.D. (Biology) | Queen's University at Kingston, Canada | 1986 |
| B.Sc. (Biology) | Queen's University at Kingston, Canada | 1982 |

<u>Admissions and Memberships</u>

State Bars of Massachusetts, California and New York; Ontario, Canada
Court of Appeals for the Federal Circuit
United States District Courts: EDNY, SDNY, DMass
United States Patent and Trademark Office (Reg. No. 39,529)
Law Society of Upper Canada

American Intellectual Property Lawyers Association;
New York Intellectual Property Lawyers Association
American Bar Association
Canadian Bar Association

## Law-Related Publications:

Elrifi, I.R.and Triano, N., *International Patent Applications - Key Strategies for Business in a Global Economy*, 10 Intellectual Property Litigation Reporter 19 (2003). (Also appeared in Entertainment Industry Litigation Reporter, Software Law Bulletin and The Metropolitan Corporate Counsel.)

Elrifi, I. R. and Triano, N., *SARS and Patents: Incompatible or Partners In Combating the Disease,* 19 Pharmaceutical Litigation Reporter 12 (2003). (Also appeared in Intellectual Property Litigation Reporter.)

Elrifi, I. R. and Triano, N., *Know All The Rules When Applying For International Patents*, Boston Business Journal, June 13, 2003.

Curtin, J. P., Elrifi, I.R., and Gates, M., *Intellectual Property Disclosure Control And Audit Procedures After Sarbanes-Oxley*, The Metropolitan Corporate Counsel 19 (2003).

Elrifi, I. R., *Genetically Enhanced Profits: Don't Let Fears of Bioengineered Foods Stop You From Doing Business*, 7 Corp. Couns. 51 (2000).

Elrifi, I. R., A Comparison of Crop Insurance in the United States and Canada, 13 J. Agric. Tax'n & L. 99 (1991).

Elrifi,I. R., Protection of the Ozone Layer: A Comment on the Montreal Protocol, 35 McGill L.J. 387 (1990).

Elrifi, I. R., *What's DAT - Amstrad revisited: Canadian copyright law and digital audio tape players.* 14 Canadian Business Law Journal 405 (1988).

## Law-Related Presentations:

"Intellectual Property Considerations in Japan," January 8, 2004, Symposium on Business Opportunities in Japan for Life Sciences Companies, Boston, MA.

"Increased Scrutiny of IP Assets in Life Science Financing,", International Symposium on Bio-Inspired Engineering, December 8, 2003, Haifa, Israel (delivered by PowerPoint remotely).

"Introduction and Overview of the Market - The U.S. Perspective,", November 19, 2002, iir-Life Sciences International Biotech Conference, London, England.

"Patenting and Intellectual Property," November 14, 2002, BioIreland, Dublin, Ireland.

"U.S. Patent Law Developments in Biochemistry and Molecular Biology," October 21, 2002, International Meeting of the Federation of European Biochemical Societies, Istanbul, Turkey.

Presentation on IP Due Diligence Requirements, *Licensing Executives Society*, Annual Meeting, September 24, 2002, Chicago, IL.

"Inventorship Disputes:  Lessons for Early Stage Companies,"  March 20, 2002, Israel Biotechnology Conference, Tel-Aviv, Israel.

"The Legal Framework:  The European and American Ways,"  March 5, 1999, Conference on technology transfer from Public to Private Domain: Scientific, Legal and Ethical Aspects, University of Lausanne, Lausanne Switzerland, March 5, 1999;

"How Patents Are Obtained And Used," Lecture Series, Brown University, Providence, Rhode Island (1999, 2000, 2002, Feb 2004).

# EXHIBIT B

**Documents and information considered:**

(1)  First Amended Consolidated Class Action Complaint;

(2)  PE Corporation Celera Genomics Group Prospectus.

(3)  Celera February 12, 2001 press release

(4)  Venter *et al.* Science 291(5507):1304-1351;

(5)  35 U.S.C. § 100, *et seq.*;

(6)  37 C.F.R. § 1.56;

(7)  1995 Revised Utility Examination Guidelines, 60 FR 36263;

(8)  Revised Interim Utility Guidelines, 64 FR 71440;

(9)  Revised Written Description Guidelines, 64 FR 71427, 1999;

(10)  Manual of Patent Examining Procedures;

(11)  CuraGen Form S-3, March 17, 2000;

(12)  Human Genome Sciences Form S-3, March 24, 2000.

LIT 1495247v1