**Expert Witness Report of Jorge A. Goldstein, Ph.D. , Esq.**

**In re PE Corporation Securities Litigation, Master File No. 3:00CV705(CFD)**

### I.     Introduction

I have been asked by counsel for Defendants to analyze: (i) whether the registration statement and Prospectus (together, the "Prospectus") prepared in connection with PE Corporation's February 2000 secondary public offering (the "the Secondary Offering") accurately described the state of intellectual property law as it existed in early 2000 with respect to genomics-based discoveries; and (ii) whether PE Corporation had a reasonable expectation of obtaining intellectual property protection for its genomics-based discoveries given the state of intellectual property law as it existed in early 2000 and given PE Corporation's choice of sequencing methodology. I have also been asked to evaluate the assertions set forth in the report of Ivor R. Elrifi (the "Elrifi Report") regarding these same issues. This report sets forth my conclusions.

### II.     Summary of My Opinions

A.     The Prospectus accurately describes the state of intellectual property law as it existed in early 2000 with respect to genomics-based discoveries. It thoroughly describes the risks reasonably expected by applicants for genomics-based patent protection before the U.S. Patent and Trademark Office ("USPTO") and before worldwide patent offices; and it accurately describes the risks expected by patent holders in enforcing their patents in the Courts.

B.     In 28 years of practice before the USPTO, I have never seen the USPTO retaliate privately or publicly against an individual applicant for any reason. In particular, I

cannot imagine a scenario in which the USPTO would "retaliate" against a patent applicant for reasons unrelated to the patent application process.

        C.     I have thoroughly examined the public records of the USPTO to evaluate all available information on Celera's filings, prosecution, abandonment, and issuance of patents, and I conclude that Celera's performance in this regard is equal to or better than biotechnology industry standards, with which I am very familiar due to my 28 years of practice in, and study of, the field.

        D.     I have carefully studied the Elrifi Report and it is my opinion that many of its conclusions are unfounded, incomplete, and misleading.

## III.   Qualifications

       My qualifications are described in detail in my resume attached as Exhibit 1. By way of summary, I have been practicing intellectual property law in the biotechnology field since 1978. I am presently a Director at Sterne, Kessler, Goldstein & Fox PLLC. ("Sterne, Kessler"), having founded the biotechnology practice of my firm in 1982. I estimate that in my career I have written, prosecuted, and supervised the writing and prosecution of thousands of patent applications in biotechnology, including in the sub-fields of genetics, genomics, gene-based diagnostics, and gene therapy. I have analyzed and provided analyses and opinions of issued biotech patents too numerous to calculate, litigated biotech patents both as plaintiff's and defendant's counsel, and have served as interference counsel in dozens of biotech interferences. I am the author of about 15 published papers in biotech patent law and have made close to 70 presentations in the field.

I have a Ph.D. in chemistry from Harvard University and my law degree is from George Washington University. In 2003, I received an award from the *Legal Times* of Washington for being a "Leading Lawyer" in intellectual property.

IV.    **Materials Considered**

In preparing this report, I reviewed the following materials.

A.    The Prospectus and Registration Statement.

B.    The Elrifi Report.

C.    First Amended Consolidated Class Action Complaint.

D.    Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

E.    60 Fed. Reg. 36263 (July 14, 1995).

F.    64 Fed. Reg. 71427 (Dec. 21, 1999).

G.    64 Fed. Reg. 71440 (Dec. 21, 1999).

H.    "Revised Interim Utility Guidelines Training Materials" as printed from the USPTO website, Feb. 2005.

I.    66 Fed. Reg. 1092 (Jan. 5, 2001).

J.    The Clinton/Blair joint statement of March 14, 2000.

K.    The USPTO press release 00-17 of March 16, 2000.

L.  The Clinton statement of April 5, 2000 at the White House Conference on the New Economy.

M.  The USPTO databases on patents and published patent applications, visited February 2005, including search results listing Celera, Applera or PE Corporation as assignee, as well as the USPTO's Patent Application Information Retrieval (PAIR) site.

N.  The Manual of Patent Examining Procedure ("MPEP"), Original, 5th Ed. Aug. 1993, latest revision, August 1993, especially section 608.01 (p) ("A. Guidelines for Considering Disclosure of Utility in Drug Cases").

## V.  <u>Compensation</u>

Sterne, Kessler, Goldstein & Fox PLLC is being compensated for my time in this matter at my standard rate of $600.00 per hour.  The firm is being reimbursed for actual expenses.  Sterne, Kessler is also being compensated for the time of others at the law firm who have assisted me in preparing this report at their standard hourly rates.  No part of my compensation or of those who have assisted me depends on the outcome of this litigation.

## VI.  <u>Prior Testimony/Publications</u>

In the last four years, I have not testified or been deposed as an expert witness. All of my publications are listed in my resume attached as Exhibit 1.

## VII.  <u>Opinions and Bases</u>

**A.** *The Prospectus accurately describes the state of intellectual property law as it existed in early 2000 with respect to genomics-based discoveries. It thoroughly describes the risks reasonably expected by applicants for genomics-based patent protection before the USPTO and before worldwide patent offices; it accurately describes the risks expected by patent holders in enforcing their patents in the Courts.*

      *1.*       *The state of intellectual property law in early 2000 with respect to genomics-based discoveries.*

In order to be patentable, an invention, including a gene-based invention, needs to comply with the requirements of Title 35 of the United States Code, as interpreted by the Courts, particularly the U.S. Court of Appeals for the Federal Circuit (CAFC), and its predecessor court, the Court of Customs and Patent Appeals (CCPA). Basically, an invention, to be patentable, needs to be novel, nonobvious, useful, and needs to be described and enabled so that one of skill in the art can readily reproduce it. The USPTO is the federal agency in charge of examining patent applications to ensure that they comply with these requirements as a condition for issuance of a patent. The USPTO proceedings are controlled by 37 C.F.R. 1, *et seq.*

I will discuss in this report the two requirements for patentability known as the Utility Requirement and the Written Description Requirement.

      *a.*       *The Utility Requirement*

The standards of utility for all inventions, including pharmaceutical and gene-based inventions, are provided by the statute, 35 U.S.C. § 101, and by seminal cases such as *Brenner v. Manson*, 383 US 519, (1966) (utility must be definite and in currently available form not merely for further investigation); *Nelson v. Bowler*, 626 F.2d 853 (CCPA 1980) (adequate proof of pharmacological activity constitutes practical utility); *Cross v. Iizuka*, 224 USPQ 739 (Fed. Cir. 1985) (*in vitro* utility is sufficient to comply with the practical utility requirement); *In re Brana*, 51 F.3d 1560 (Fed. Cir. 1995) (rejection of claims for lack of utility improper where the claims did not suggest an inherently unbelievable undertaking or involve implausible scientific principles). These cases and others laid the foundation over many years for the standards that utility needs to be substantial, credible, and specific, and that mere experimentation or research is not sufficient utility.

The USPTO will periodically publish guidelines for interpreting the law and materials for training its examiners in the examination process. The USPTO also will periodically update the MPEP which is useful to the examiners and to the public in the patent examination process. Neither the MPEP, the guidelines, nor the training materials carry the force of law. The USPTO recognizes this clearly in all of its materials, commenting that it *interprets* the existing law in its guidelines and in the MPEP. These materials admit that they "are not intended to, nor do they, have the force and effect of law. As such they are not substantive rules creating the rights or obligations of any party." *See*, *e.g.*, 60 Fed. Reg. 36263. The CAFC has confirmed many times that the MPEP is not the law and is not binding on the Court. *Litton Systems Inc. v. Whirlpool Corporation*, 728 F.2d 1423 (Fed. Cir. 1984).

The USPTO periodically responds to public concerns about how it interprets the laws of patentability. It then may modify its interpretations by republishing the MPEP sections involved,

by issuing guidelines on specific topics for notice and comment, and then refining their interpretation after hearing from the public. Changes in interpretations are brought about by changes in technology or changes in case law. These changes reflect only a change in interpretation by the USPTO, not a change in the law itself.

For years, the utility requirement has been interpreted in the MPEP (*see e.g.*, Section 608.01(p), page 600-40 *et seq.*, MPEP 1993). In the late 80's/early 90's the interested public - *i.e.* the pharmaceutical and biopharmaceutical industry primarily - became concerned because USPTO examiners were issuing rejections for lack of utility in drug cases that were stricter than warranted by the case law and by the USPTO's own MPEP. The examiners were requiring utility proofs akin to clinical data of the type typically required by the Food and Drug Administration. In October 1994, the USPTO held hearings in San Jose, California and Arlington, Virginia, during which the public raised these concerns. In 1995, the USPTO promulgated the "Utility Examination Guidelines," 60 Fed. Reg. 36263 to clarify its interpretation. These resulted in a relaxation of the USPTO's interpretation and the more ready acceptance of *in vitro* data for utility proofs (as had been otherwise previously allowed by the case law).

In the late nineties, the USPTO received complaints about the filing of patent applications claiming gene fragments (known as Expressed Sequence Tags, or "ESTs"). Many of these filings provided no utility for these ESTs other than as chromosome markers (*i.e.*, no biological function other than locating their place in a chromosome was provided in these applications). This had started in 1991 with the National Institutes of Health (NIH) filing of applications on thousands of ESTs with utility based on their use as chromosome markers. After receiving numerous rejections for lack of utility from the USPTO, the NIH abandoned all of these EST

applications. In 1997, the USPTO announced that notwithstanding the abandonment of the NIH cases, ESTs could still be patentable. So, the USPTO issued another set of Utility Examination Guidelines and a request for comments dealing with application of the utility requirement to ESTs, genes, *etc. See* 64 Fed. Reg. 71440. This formed the basis for the "Revised Utility Examination Guidelines" of 1999.

In fact, in 2001, the USPTO promulgated yet another version of the Utility Examination Guidelines. *See* 66 Fed. Reg. 1092. This revision dealt with 23 comments from the public about the examination of claims to genes and sequences from the point of view of utility. Most of the comments were requests to make it *harder* to patent genes based on a variety of objections, including utility. Most of these objections (if not all of them) were *not* adopted by the USPTO, which maintained a careful interpretation of the utility requirement consistent with the statute and the case law.

In sum, the legal standards for examination of the utility of gene-based inventions did not change in 1995, 1999 or 2001. The legal standards change only if the courts or the Congress say so. At times of rapid technology change, the USPTO's interpretation of the legal standards may be adjusted, becoming more relaxed at times (1995 or 2001) and stricter at other times (1999). The USPTO interpretations, however, are always subject to the law.

The USPTO's interpretations of the utility requirements, proposed in 1995, 1999 and 2001, were fully consistent with the case law as it had always been and as it evolved. Utility had been judged under the "substantial," "specific," and "credible" standards for years, and the USPTO did not (could not) change that. How these standards would apply to gene sequences

was to be interpreted, and even that interpretation was subject to change, but the underlying legal standards had not changed.

b.     *Written Description Requirement*

As noted above, another one of the requirements for patentability is the so called written description requirement, 35 U.S.C. 112, 1st paragraph.  Under this requirement, an invention needs to be described "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ".  As with the utility requirement, there is a long line of case law that has interpreted the written description requirement.  One of such cases was decided by the CAFC in 1997, *Regents of the University of California v. Eli Lilly*, 119 F3d 1559 (Fed. Cir. 1997), *cert. denied*, 523 US 1089 (1998).

The *Lilly* decision dealt with how much description of a gene had to be provided to obtain a claim.  It also dealt with how many variants of the insulin gene had to described in a specification in order to obtain a broad claim drawn to the insulin gene generally.

The USPTO, in responding to the *Lilly* decision in 1998, requested comments on its proposed interpretation of the case and issued a set of "Interim Guidelines on the Written Description Requirement."  *See* 63 Fed. Reg. 32639.  The USPTO published the "Revised Interim Guidelines" in 1999.  64 Fed. Reg.  71427.

These 1999 Guidelines did not change the law, as they could not.  In its Guidelines, the USPTO acknowledges that these do not have the "force and effect of law." *Id.*, at 71434.  The USPTO addressed 35 comments received in response to its 1998 Interim Guidelines, ranging from the number of species necessary to be described for a genus, "comprising" language in EST

claims, functional language, actual reduction to practice, etc. Nothing is said about genomic vs. cDNA gene sequences in any of the written description guidelines or comments.

In sum, in 1997 *Lilly* tightened the standards for obtaining broad patent protection for genes generally based on a stricter written description requirement. The 1999 USPTO Revised Interim Guidelines on written description did not change the law any further, as they could not. The Guidelines were promulgated only to interpret and apply the 1997 *Lilly* decision.

2.   *The Prospectus' Description of Celera's Patent Strategy and the Applicable Law*

The Prospectus, at page 48, states that Celera Genomics' then current plan was to apply for patent protection "upon the identification of candidate novel genes, novel gene fragments and their biological function or utility." This reflects a proper understanding of the utility requirements for gene-based inventions at the time, *i.e.*, that gene fragments without function or utility would not be patentable.

Also at page 48, the Prospectus states that "currently the United States Patent and Trademark Office requires an adequate disclosure of *a specific and substantial utility* such as gene function in order to support the patentability of a gene sequence." (emphasis added) This reflects the correct understanding of the legal standards as well as the USPTO's interpretation of the standards. As noted above, the USPTO utility guidelines 1999 properly reflected, in their use of a three part analyses based on credible, specific, and substantial utility, the legal standards that go back as far as the Supreme Court's decision in *Brenner v. Manson* in 1966. The fact that the Prospectus did not mention the 1999 "Revised Interim Utility Guidelines" by name does not mean that it did not correctly enunciate the legal standards.

3.    *The Patent-Related Risks Disclosed in the Prospectus*

At page 11, the Prospectus describes that "patent law affecting Celera Genomics' business, particularly gene sequences, polymorphisms and protein expression is uncertain, and as a result, the Group is uncertain as to its ability to prevent competitors from developing similar subject matter."

At page 12, the Prospectus states that public disclosure of genomics sequence data "could jeopardize Celera's intellectual property protection . . .".  In this section, Celera admits that such disclosures "might limit the scope of [its] claims or make subsequent discoveries by Celera or its customers related to full length genes unpatentable."

Also at page 12, Celera states that it "may infringe intellectual property rights of third parties and may become involved in expensive intellectual property litigation."  Such litigation may be expensive, may be unfavorable, and an unobtainable license might be needed.  All of these risks are carefully described.

At page 48, the Prospectus accurately states that due to certain court decisions "patent claims to a partial sequence may not cover a full length sequence inclusive of that partial sequence."

These four sections as well as several others go to great lengths to describe then existing or potential risks associated with the filing, obtaining, licensing, and otherwise enforcing patents on gene-based inventions.  Based on my 28 years of experience and expertise in biotechnology patent law, it is my opinion that no fair-minded reader of the Prospectus would be misled about the patent risks in this field.  It is also my opinion that these risks were not understated.

B. *In 28 years of practice before the USPTO, I have never seen the USPTO retaliate privately or publicly against an individual applicant for any reason. In particular, I cannot imagine a scenario in which the USPTO would "retaliate" against a patent applicant for reasons unrelated to the patent application process.*

Defendants' counsel requested that I read the first amended consolidated complaint and comment on the plaintiffs' allegations that because the alleged collapse of negotiations between Celera and the Human Genome Project, the United States government would take whatever steps it could to prevent Celera from obtaining patent protection for its genomic discoveries. This allegation is also made at paragraph 38(e) of the Complaint where plaintiffs state that "it was highly likely that Celera would face aggressive and punitive action by the United States and the United Kingdom governments, among others, that would make it much more difficult than disclosed for Celera to obtain patent or copyright protection for its genomic discoveries."

Never in my experience of 28 years in dealing with the USPTO have I ever heard of such an unlikely notion.  I have interacted with USPTO personnel, from mailroom clerks, to examiners, to judges, to assistant commissioners and deputy commissioners, hundreds of times. At no time did any USPTO personnel indicate to me directly or indirectly that an individual applicant might be singled out for retaliatory treatment due to reasons totally unrelated to the merits of their applications pending before the USPTO.  Nor have I ever observed or experienced such behavior.

C. *I have thoroughly examined the public records of the USPTO to evaluate all available information on Celera's filings, prosecution,*

*abandonment, and issuance of patents, and I conclude that Celera's*

*performance in this regard is equal to or better than biotech industry*

*standards, with which I am very familiar due to my 28 years of practice*

*in, and study of, the field.*

I performed a search on the USPTO patent and published patent applications databases using the search terms "Celera," "Applera," and/or "PE Corporation" as assignee. For the patent database search of "PE Corporation" as assignee, I limited the search results to those patents, whose application filing dates were equal to or later than May 1, 1998, the date Celera was formed. This search identified 406 published patent applications that (1) had issued, (2) were allowed, (3) were still pending, or (4) were abandoned. I also performed a search of the patent database using the search term "Celera" as attorney of record to confirm that I had a complete listing of all patent applications prosecuted at Celera.

I divided the published patent applications into two groups, group one was related to DNA or protein sequences (270 total applications, *see* attached Exhibit 2) and group two included all other published patent applications (136 total applications, *see* attached Exhibit 3). The remainder of this analysis focuses solely on Group 1 applications, which are gene or protein related applications. By using the USPTO Patent Application Information Retrieval (PAIR) site, I determined the prosecution status of each published application.

First and foremost, my research revealed that Celera has obtained 149 patents based on nucleic acid or protein sequences. A complete list of these patents is attached as Exhibit 4. Of these 149, 141 or 94.6% are patents on isolated human genes derived from the sequencing of the

human genome. In my opinion, this is a remarkable record of patents for a company founded only in 1998.

Second, a more detailed analysis of Celera's 137 published patent applications that have been finally disposed of (the total number of issued, allowed plus abandoned applications), revealed that 118 or 86.1% of those have been allowed or issued. In my experience, that is better than the biotech industry average.

Third, in the interest of completeness, I examined the nature of the rejections in the remainder of published patent applications that have not been finally disposed of (*i.e.*, applications that are still in the prosecution process). Celera currently has 133 published applications still in prosecution. Of those 133, 63 have been examined by the USPTO and 30 or 47.6% of the examined applications have unresolved rejections for lack of utility. Out of the 30 unresolved rejections for lack of utility, 12 or 40% are initial rejections. In my experience, this is not unusual for patent applications in biotechnology where I normally see somewhere between 70% and 90% of initial rejections to be for lack of utility and/or lack of enablement. Also in my experience, most of these rejections can eventually be overcome with arguments and/or supplemental data, as supported by the fact that Celera has an 86.1% success rate.

    **D.**    *I have carefully studied the Elrifi Report and it is my opinion that many of its conclusions are unfounded, incomplete, and misleading.*

I have no disagreement with paragraphs 12-15 of the Elrifi Report, which generally deal with an introduction to the patent examination system. I do, however, have basic disagreements with many of the remaining paragraphs either because they are based on incorrect and/or

incomplete assumptions, or because they reach wrong and, in many instances, misleading conclusions. I will now review and comment on individual paragraphs.

**Paragraph 16.** The Elrifi Report asserts that the 1999 Utility Guidelines "raised the bar for patentable utility of gene sequences by requiring patent applicants to show specific, credible and substantial utility including gene sequences." As I have explained above, the 1999 Guidelines were just an interpretation of existing law and did not (and could not) change the standards or raise the legal bar.

**Paragraph 17:** The Elrifi Report states that "specific utility" for a nucleic acid sequence requires the patent applicant to know what the gene does. I disagree that this is always the case. If the nucleic acid sequence binds at or close to a known gene in a chromosome it could be used as a diagnostic probe even without knowing what the nucleic acid sequence encodes. The Elrifi Report states that "in the past, patenting a gene sequence was allowed based on general claims such as using the gene sequence as a probe, simply as a means to find another nucleic acid sequence." From this sentence, it would appear that the USPTO has allowed and issued patents on gene sequences with no more described utility than as a probe. It is unclear and unsupported in the Elrifi Report how many such patents had issued. My best educated assumption is that there are none or extremely few. There surely were patent applications pending, such as the notorious NIH applications on thousands of ESTs. There was a lot of public debate about the utility requirements and whether they would be met by such applications. In fact, the NIH applications *were rejected by the PTO for lack of utility in the early to mid 90s,* and the NIH abandoned the applications. So, the statement that "patenting of a gene sequence was allowed based on general claims," is unfounded and probably false.

**Paragraphs 18 and 43**: The Elrifi Report states that to comply with the written description requirements in gene cases, the applicant must set forth "the correct or substantially correct sequence of the gene or protein for which patent protection is sought." The Elrifi Report does not accurately set forth the correct state of the law on written description for gene sequences. In 2002, the CAFC decided *Enzo Biochem Inc. v. Gen-Probe Inc.*, 296 F.3d 1316 (Fed. Cir. 2002), and held that the long-standing practice in biotechnology patent law to satisfy the written description requirement by depositing a microbiological material in a depository was acceptable. In cases where no biological material is available for deposit, it is correct to conclude that if the described sequence is grossly incorrect, any determination of function or utility based on homology comparisons (a comparison of the similarity of sequences) may be incorrect. But, even if parts of a long sequence contain errors, other parts may be sufficient to reach conclusions about function based on homology comparisons.

**Paragraphs 23-27**: The Elrifi Report goes on at length about the known differences between genomic and cDNA sequences. The Report's false assumption seems to be that Celera was somehow expecting that it could elucidate function or utility directly from its genomics sequences. It is surprising to assume that a sophisticated team headed by scientists such as Dr. J. Craig Venter would reach such conclusions. In fact, I examined three issued U.S. patents of Celera, chosen at random, to investigate how they addressed the "problem" of predicting utility from genomics sequences. Not surprisingly, Celera uses computational tools known in the art to identify intron and exon sequences and reaches conclusions about utility based on cDNA sequences. *See, e.g.*, U.S. Patent 6,825,022, US Patent 6,756,213, and 6,740,504.

**Paragraph 28**: The Elrifi Report juxtaposes a statement in the Prospectus that sequencing the human genome lays the foundation for "any additional components of the

business," with a description that DNA sequences by themselves without any functional data lack utility and are therefore not patentable. The Report therefore creates the false impression that Celera was planning to file patent applications on DNA sequences without annotation of function or utility. As noted above in Section VII.A.2, such was not the plan of Celera, which stated in its Prospectus that it planned to file applications upon finding of function or utility.

**Paragraph 29:** While I generally agree with the statements made in paragraph 29, I note that the Elrifi Report here agrees that no data is needed in order to satisfy the utility requirement other than homology comparisons. This contradicts the Report's statement in paragraph 28 that DNA sequences "without any functional data" are not patentable. I also note that the statement in paragraph 29 is in full accord with Example #10 given by the USPTO in its "Revised Interim Utility Guidelines Training Materials." This example shows that high similarity with known sequences is a "well established utility" and a utility rejection should not be made.

**Paragraph 30:** *See* response to paragraphs 23-27.

**Paragraph 31:** *See* Section VII.A.3. above., where I describe more completely all of the risk disclosures in the Celera Prospectus and not just the one mentioned in this paragraph.

**Paragraph 32:** As noted above, the USPTO utility guidelines did not change the legal standards (as they could not). The 1999 Guidelines reflected nothing more than the USPTO's understanding of existing legal standards and were published to clarify and settle public debate on the utility requirements for gene sequences or fragments of unknown function. Significantly, the USPTO Guidelines did not address any different interpretation for the patentability of genomic sequences as compared to cDNA sequences. Moreover, as also noted above, Celera's

Prospectus accurately described the legal standards for the patentability of gene-based inventions.

**Paragraphs 33-35:** I disagree with the Elrifi Report's statement that other genomics companies in SEC filings "specifically disclosed that a new standard of utility was now in place" at the USPTO. The SEC filings for Curagen and Human Genome Sciences (HGS) cited in the Elrifi Report at paragraphs 34 and 35 do not even use the word "standards." As quoted, the Curagen filing discusses the USPTO's "current understanding" regarding the utility requirements and the HGS filing discusses the "proposed new guidelines on written description and utility requirements." Both filings suggest that the proposed new guidelines as well as other changes in patent laws in the US and abroad may result in changes or interpretations which might affect the ability to obtain patent protection for their products. This is exactly the description of patent-related risks described in Celera's Prospectus (*see* Section VII.A.3 above).

**Paragraph 36:** As discussed above, the 1999 Utility Guidelines did not "increase the bar" with respect to the utility requirement. Instead, the 1999 Guidelines reaffirmed that the USPTO would continue applying existing legal standards as rigorously as they had done previously, as exemplified by their rejection in the mid-1990s of the NIH patent applications on thousands of ESTs. Colleagues in the field with whom I discussed the Guidelines after they were first published agreed with my interpretation that the legal standards had not changed, but that the USPTO had simply clarified their historical interpretation of the utility requirement. Also as noted, the legal standards were correctly disclosed in the Prospectus.

**Paragraph 37:** Contrary to the assertion in the Elrifi Report, there is no increased bar for patentable utility for genomic DNA sequences than for other types of sequences. The utility bar

is the same for all inventions. Those of skill at the time obviously knew that genomics sequences needed to be processed further with available software tools to derive cDNA sequences that could then be easily used for homology comparisons. And it is equally obvious that Celera scientists knew that as well, as evidenced by the three randomly selected patents cited above in Section VII, D (response to paragraphs 23-27). Moreover, the Elrifi Report suggests that genomic DNA could be patented simply by sequencing it. This, however, is not what the Prospectus says when it indicates clearly that sequences will be patentable once Celera determines function or utility.

Paragraph 38: In this paragraph, the Elrifi Report admits that utility can be satisfied based upon homology searching. This is a proper interpretation of one of the 13 examples provided as illustrations in the USPTO Training Materials. In fact, this example (Example #10) provides a hypothetical where an unknown sequence has 95% homology to known ligase enzymes. The conclusion in this example is that a utility rejection should not be made because there is "a well-established utility" for the new sequence. The last two sentences of paragraph 38 reach unwarranted conclusions. The Elrifi Report is incorrect in concluding that utility can *only* be found if a homology of greater than 95% is found. The 95% value arises out of one illustrative example, but the USPTO does not have a hard numerical rule. The Report is also incorrect in concluding that when a homology based assertion is presented in the absence of other data, the USPTO will reject the claims as not satisfying utility. First, this conclusion flies in the face of the last paragraph of Example #10, which, based on homology comparison analyses, concludes that a "utility rejection should not be made." Secondly, the Report fails to explain that after a rejection for lack of utility and during prosecution of the patent application, an applicant has plenty of occasions to submit supplementary proof in the form of sworn

declarations with data or expert opinions to confirm the utility deduced from homology searching in the patent specification as filed. Finally, several comments accompanying the 2001 Guidelines, which superseded the 1999 Interim Guidelines, are at odds with the Elrifi Report. For example, Comment #19 made it clear that the use of computer based analyses to derive a credible utility based on homology is acceptable and "the asserted utility must be accepted by the examiner unless the office has sufficient evidence or sound scientific reasoning to rebut such an assertion." 66 Fed. Reg. at 1096. In the same comment, the USPTO states that if the initial application does not describe a well-established utility "the burden shifts to the applicant to provide evidence supporting a well-established utility." And finally, negating the Elrifi Report's alleged 95% cut off, Comment #19 states "there is no *per se* rule regarding homology and each application must be judged on its own merits."

**Paragraph 39:** *See* responses to paragraphs 37 and 38.

**Paragraphs 40–41:** *See generally*, responses to paragraphs 37 and 38. In addition, the Elrifi Report in paragraph 40 implies that the use of genomic DNA "carries the weakness" of saying nothing about whether a gene is active or has biological relevance. From this, the Elrifi Report reaches a conclusion that drugs could not be invented, that patents could not obtained and that Celera's ability to license would suffer "a direct negative impact." This line of reasoning is confusing at best. It is evident from reading the Prospectus that Celera's business plan is based on much more than the patenting of complete genes. For example, the plan relies as much if not more on the ability to generate diagnostic correlations between SNPs (single nucleotide polymorphisms) present in the genome and disease. It is also self-evident that scientists at Celera and on their Scientific Advisory Board would know how to derive cDNA sequences from which utility could be established.

**Paragraph 42:** The reasoning in this paragraph is based on a faulty assumption, *i.e.*, that because Celera chose to sequence the entire human genome, it would somehow fall behind in obtaining priority for its inventions. This assumption is faulty for multiple reasons, all of which are well-described in the Prospectus. For example, Celera was the only commercial entity sequencing the entire genome and thus was not in a race with other "competitors" to the patent office. Celera was sequencing genes that no one had previously identified or was even searching for contemporaneously. Celera describes that it has the largest civilian computer in the world, thus having the ability to resolve such issues as introns, sequencing efficiency and "nonsense" information.

**Paragraph 43:** *See* response to paragraph 42 and Section VII.A.1(b), above regarding the written description requirement.

**Paragraphs 44-47:** It is ironic that this section of the Elrifi Report is entitled "Celera's Failed Patenting Strategy" when even a cursory look at the USPTO databases indicates that Celera has obtained nearly 150 patents in less than 5 years. Paragraph 44, in describing the methodology used to reach the conclusions about Celera's patent strategy, unfortunately uses terms such as "many patent applications," "numerous examples," or "very significant percentage." Given these vague terms, it is impossible to understand the analysis conducted in the Elrifi Report or the bases for its conclusions. In order to better understand the results of Celera's patenting strategy, I carried out independent searches as described above in Section VII.C. The results from these searches indicate that, far from being a "failed" strategy, Celera's strategy has been quite successful. In sum, the Elrifi Report's ultimate conclusions set forth in paragraphs 46 and 47 are not supportable based on the 147 gene and protein related patents issued to Celera.

Dated:  February 10, 2005

Jorge A. Goldstein, Ph.D., Esq.

365663_1.DOC