1

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   - - - - - - - - - - - - - - - - x
 4   In Re:                           :
 5        PE Corporation              : Master File No.
 6        Securities Litigation       : 3:00CV-705 (CFD)
 7   - - - - - - - - - - - - - - - - x
 8
 9   Videotaped deposition of DR. J. CRAIG VENTER, held
10   at the Venter Institute, 9704 Medical Center Drive,
11   4th Floor, Rockville, Maryland, commencing at 10:08
12   a.m., Wednesday, October 13, 2004, before Elizabeth
13   Mingione, Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 22**

1  Q. And how long after you joined the
2  corporation did that first occur?
3  A. I think it first occurred before I
4  joined the organization.
5  Q. And what were the components of that
6  business plan when you first presented it to the PE
7  Corporation board?
8  A. The principal tendered is that the data
9  would be given away once we sequenced the genome.
10 The initial plan was to give it away quarterly into
11 the public databases, and that the business would
12 be based on developing bio informatic tools,
13 computational tools for the interpretation and
14 analysis of the genome to a small extent on gaining
15 intellectual property from unique genes that would
16 have medical importance.
17 Q. Did you indicate who the projected
18 customers of -- for these products would be?
19 A. It was always assumed that it would be
20 the pharmaceutical industry, the biotech industry
21 and academic researchers around the world.
22 Q. Did the board have any comments when you
23 first presented the business plan?
24 A. I'm sure they did.
25 Q. Do you recall any of their comments?

**Page 23**

1  A. I don't recall comments from the first
2  presentations. No.
3  Q. At any time did the board have comments
4  re -- regarding your intellectual property
5  strategy?
6  A. What do you mean by any time?
7  Q. At any time while you were at PE
8  Corporation?
9  A. I don't think anything was raised by the
10 board. There were certainly discussions at the
11 board level.
12 Q. What specific discussions were had
13 regarding intellectual property strategy at the
14 board level with respect to the sequencing of the
15 human genome, the data derived from that?
16     MR. BOURQUE: Objection.
17 A. It really depends on when you are
18 talking about. There was not a consistent
19 discussion.
20 Q. When you first joined Perkin-Elmer
21 Corporation, what discussions were had with the
22 board regarding intellectual property strategy
23 regarding the sequencing of the human genome?
24 A. Well, we were absolutely not going to
25 patent the human genome. And at best we would

**Page 24**

1  get -- have intellectual property on a few hundred
2  human genes.
3  Q. Was that a position you presented to the
4  board?
5  A. Yes.
6  Q. What was the board's response to that
7  position?
8  A. They approved the strategy.
9  Q. Was there anyone on the board who
10 questioned that strategy at that time?
11 A. There was certainly discussion. I don't
12 remember, if you mean by, you know, questioning,
13 objecting to it, no, not to my knowledge.
14 Q. Were alternatives, were alternative
15 intellectual property strategies discussed at the
16 board level?
17 A. During which period?
18 Q. During the period right when you joined
19 the corporation?
20 A. Not that I recall.
21 Q. Were alternative discussions subsequent
22 to when you first joined the company?
23 A. They were discussed at the board member
24 -- the board level. I don't think there was any
25 specific discussion driven by board members other

**Page 25**

1  than the chairman.
2  Q. What alternatives were ultimately
3  discussed at the board level?
4  A. Whether to patent a greater number of
5  genes than I had proposed.
6  Q. Who raised that issue at the board
7  level?
8  A. The chairman raised the issue at the
9  board level.
10 Q. And that would be Mr. White?
11 A. Yes.
12 Q. And did Mr. White offer any reasons as
13 to why the board should discuss whether to patent
14 the greater number of genes?
15 A. I'm sure he did. I think the reasons
16 were ultimately based on the head patent attorney
17 at Celera wanting to patent a greater number of
18 genes.
19 Q. And that was Mr. Millman?
20 A. Yes.
21 Q. Did Mr. Millman ever make a presentation
22 to the board regarding patenting a greater number
23 of genes?
24 A. I think he did. Yes.
25 Q. Were you present for that presentation?

7 (Pages 22 to 25)

**Page 122**

1  Q. So you don't know whether Dr. Waterston
2  was referring to the raw sequence data or he was
3  referring to something else?
4  A. I don't know what he was referring to.
5  Q. And do you know in Tony White's response
6  whether he was referring to the raw sequence data
7  or he was referring to something else?
8  A. I don't know.
9  Q. Did anyone else other than Tony White
10 and Dr. Waterston weigh in on -- during this
11 debate?
12 A. I'm not sure at that stage you would
13 call it a debate. If what's happening tonight with
14 the presidential candidates represents a debate, it
15 was more at that stage relatively disruptive. If
16 it wasn't a shouting match, it was pretty close to
17 it. So it was not a productive, cordial dialogue.
18 Q. What else do you recall taking place at
19 the December 29 meeting?
20 A. Those are the dominant features. That's
21 certainly what stuck in my mind at the meeting and
22 the, you know, the aftermath from it. I didn't see
23 anything that happened at the meeting that
24 certainly changed my belief that there was no
25 genuine interest on some people's parts there on

**Page 123**

1  the public effort to have this go forward at all.
2       The, quote, public effort was a, I think
3  as you know, a very diverse group of people. Some
4  had very honorable intentions. Some in my view had
5  very dishonorable intentions.
6       And I don't want to attribute negative
7  attributes to everybody that was at the meeting,
8  but I think the gist of what happened was, you
9  know, that they felt they could go back and say
10 that they tried to have a meeting with us and it
11 didn't work out because Tony White made
12 unreasonable demands.
13 Q. Do you know if anyone on the public
14 effort side had had discussions with anyone at
15 Celera prior to the December 29 meeting where the
16 concept of a period of exclusivity for Celera
17 regarding the sequencing data was discussed?
18 A. I don't recall that. As I said, it was
19 not part of our business plan, you know. But there
20 were so many, you know, there was hundreds of
21 scenarios that were always being thrown out and
22 discussed, so, you know.
23      There could have been something that was
24 offered by the public thinking that's what we
25 wanted. Obviously, you know, these same people

**Page 124**

1  portrayed our business plan as trying to patent all
2  the human genes. So there wasn't a large degree of
3  understanding of the business model that we had to
4  give the data away for free.
5  Q. Was part of the Celera business model,
6  and I think you said this earlier, was patenting
7  some genes?
8  A. Yes.
9  Q. And I believe there was a number that it
10 was going to be patenting hundreds of genes. Is
11 that correct?
12 A. The number I think was approximately 200
13 was the number that was in our initial paper in
14 Science outlining events. That was a very
15 arbitrary number, meant to signal that patenting
16 genes was not particularly a major strategy of the
17 company.
18 Q. And you said the number was arbitrary.
19 Was there any basis that led to the derivation of
20 this number?
21 A. It wasn't all the genes, it wasn't none
22 of the genes. It was to represent a very small
23 fraction of the human genome. At that time, Incyte
24 and human genome scientists were claiming they had
25 patented on the order of 300,000 human genes.

**Page 125**

1       So the number of 200 in that context
2  seemed like it signaled that it was not a major
3  part of the business strategy.
4  Q. And who made the decision to use the 200
5  figure?
6  A. I did.
7  Q. And did you have any specific genes in
8  mind when you came up with this figure?
9  A. No specific genes. Specific categories
10 of genes were ones I think that were described in
11 the science paper, ones where they would lead in a
12 very short order to a new medical treatment or a
13 new diagnostic that was not going to be speculative
14 patenting.
15 Q. And did you have any reason to think
16 that there would be somewhere near 200 of these
17 genes ultimately that Celera could patent?
18 A. Well, it was so hard to tell, the EST
19 method that I had developed was being so widely
20 used by human genome scientists, by Incyte by the
21 U.S. Government, by Merck; and there was so many
22 tens of thousands of genes being patented, it was
23 unclear whether there would be any unique genes
24 left to be discovered that were patentable that fit
25 the criteria that we had that could lead in an

**Page 126**

1  obvious way to a medical breakthrough or
2  diagnostic.
3    Q.  When you say tens of thousands of genes
4  were being patented, do you mean provisional patent
5  applications were being filed with respect to that
6  many genes?
7    A.  I think my understanding with Incyte and
8  human genome scientists and others is they were
9  filing actual patent applications. I know that for
10 a fact with human genome scientists, because they
11 were genes that I had discovered at Tiger where
12 they had filed some of the supposedly largest
13 applications in history.
14   Q.  At some point was it the case that
15 Celera had filed over 6,000 provisional patent
16 applications for genes?
17   A.  I recall the number was around 6,500
18 provisional applications. And the reason for that
19 was on the few single gene applications we had,
20 there was a very low success rate because as those
21 went through the patent office, there were so many
22 prior art applications of whether they were ESTs
23 from other companies that had knocked out those
24 genes already from being patentable, that Robert
25 Millman argued that if we even filed provisional

**Page 127**

1  applications on 6,000 or so, we had 12 months to
2  reduce those to a set that we thought could go
3  forward.
4          And with the attrition rate, we saw one
5  out of ten to one out of twenty, we thought that
6  with a year get us down to less than the 200 that
7  we stated. I think in reality we ended up with
8  just a handful of gene patents out of that 6,500.
9    Q.  When you say you ended up with just a
10 handful of gene patents, do you mean you only
11 ultimately filed the patent applications for a
12 handful or those were all that were approved?
13   A.  I'm not sure of the exact number that
14 turned into very specific full-length patents with
15 biological information. I know that Celera
16 received very few actual gene patents.
17   Q.  Do you recall, getting back to the
18 December 29 meeting, do you recall giving a
19 presentation as to where Celera was in its human
20 sequencing at that point?
21   A.  I don't recall but I read from the
22 agenda that was one of the things that was planned.
23   Q.  Do you recall if Dr. Collins gave a
24 update as to where the public effort was with
25 respect to its sequencing effort?

**Page 128**

1    A.  I do tend to remember that he started
2  with a presentation of some type. Yes.
3    Q.  What do you recall of that presentation?
4    A.  It was just a typical Francis
5  presentation of the rosy view of the public
6  sequencing effort.
7    Q.  Do you recall forming the opinion that
8  Dr. Collins was not being truthful with respect to
9  where the public sequencing effort was?
10   A.  I don't think I formed that opinion at
11 that meeting.
12   Q.  Was there any discussion at the meeting
13 as to how to deal with press inquiries regarding
14 the meeting, if those were received?
15   A.  I think, because the meeting
16 degenerated, I'm not sure we ever got to that
17 point.
18   Q.  Approximately how long was the meeting?
19   A.  I've just seen in these different memos
20 the estimates of it. My recollection, it barely
21 lasted 45 minutes, but I honestly don't know. At
22 times it seemed to last forever, and then it seemed
23 to be over very quickly.
24         I certainly remember feeling worse off
25 leaving the meeting than I felt going into the

**Page 129**

1  meeting.
2    Q.  Was there any discussion at the meeting
3  of Celera's business model?
4    A.  I don't remember specifically. It
5  wouldn't surprise me if it came up in the
6  introductory materials, but the outline that's in
7  this document certainly lists that as one of the
8  items. This meeting and my view of it is really
9  dominated by the strong emotional exchanges at the
10 end of the meeting that basically ended the meeting
11 and caused the further problems. So the polite
12 details at the front I think have long ago
13 disappeared.
14   Q.  When -- how did the meeting end? Did
15 someone walk out or was there an agreement to end
16 the meeting? How did it end?
17   A.  With a bang, not a whimper. I think
18 after the extremely strong disagreements, I don't
19 remember if Tony White walked out or insisted that
20 we walk out, but I think it ended very
21 dramatically, you know. It was clear after the
22 exchange between him and Waterston that it wasn't a
23 likely cordial, collaborative agreement that was
24 likely to be achieved there.
25   Q.  Do you recall anything else that Tony

33 (Pages 126 to 129)

## Carroll, Barbara

**To:** James McMahon
**Subject:** RE: charelston

Great - we can play golf at Seabrook where we played - it is cheaper because we are members and it is a private club. But if Jim wants to play a Kiawah Course we could do that too. Talk to you next week!
Barb

> -----Original Message-----
> **From:** James McMahon [mailto:jmcmahon4097@charter.net]
> **Sent:** Thursday, March 31, 2005 12:36 PM
> **To:** Carroll, Barbara
> **Subject:** Re: charelston
>
> Barb, I'm so excited you'll be there! We'll be there late Monday afternoon or early evening. Maybe we can play golf on Tuesday. I'll call you next week and we can discuss it. I really want jim to see the house because he has heard me talk so much about it!! I'm not sure where we staying yet,we will be mopving around,because sometime on Wednesday we may head up to North myrtle beach. We'll talk next week, can't wait!!
> Paula
>
>> ----- Original Message -----
>> **From:** Carroll, Barbara
>> **To:** James McMahon
>> **Sent:** Thursday, March 31, 2005 10:37 AM
>> **Subject:** RE: charelston
>>
>> Paula - This is amazing. Our renters are leaving tomorrow. And we may be renting our house again starting May 1 for 1 year to 18 months. So Bob, his father and I are driving down April 14th and coming back the 23rd. Other friends of ours are also going to be there that week. We would LOVE to get together with you and Jim! What a coincidence! Let me know your plans. We still have 2 more bedrooms if you want to stay! I'm excited!
>> Barb
>>
>>> -----Original Message-----
>>> **From:** James McMahon [mailto:jmcmahon4097@charter.net]
>>> **Sent:** Wednesday, March 30, 2005 6:00 PM
>>> **To:** Carroll, Barbara
>>> **Subject:** charelston
>>>
>>> Barb,  How are you doing?  Jim and I are going to be in the Carelston area for a few days in April, on the 18th.  Any chance you're going to be there so we can get together and maybe even play some golf??  Let me know!  Paula(Note new email address) jmcmahon4097@charter.net

3/31/2005