125

```
1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF CONNECTICUT
2

    IN RE:   PE CORP. SECURITIES LITIGATION
3
                          Master File No. 3:00CV705(CFD)
4
    ---------------------------------
5   THE DEPOSITION OF ROBERT WATERSTON, MD, Ph.D
    VOLUME II
6   Taken on behalf of the Plaintiffs
    September 13, 2004
7   BE IT REMEMBERED THAT, pursuant to the Washington Rules of
    Civil Procedure, the deposition of Robert Waterston, MD,
8   Ph.D, was taken before Judith Ann Robinson, CCR #2171, a
    Certified Shorthand Reporter and a Notary Public for the
9   State of Washington on September 13, 2004, commencing at the
    hour of 9:00 a.m., the proceedings being taken at, Milberg
10  Weiss Law Offices, 1001 Fourth Avenue, Suite #2550, Seattle,
    Washington.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

170

1  Q. Do you know --
2  A. It's a somewhat narrow technical point, which was
3  lost on the press but --
4  Q. Right. Were there other scientists on the human
5  genome project that also shared that skepticism?
6  A. I think that skepticism was broadly shared.
7  Q. Were there respected scientists who believed that
8  Celera could successfully sequence the human genome by the
9  whole genome shotgun method?
10        MR. WEISS: Objection to the form.
11        THE WITNESS: They certainly had people who
12  -- who supported their position. I never had any
13  conversations with -- with anyone who understood the process
14  in detail and supported it.
15  BY MR. REGAN:
16  Q. Are you -- do you know who Dr. Arnold Levine is?
17  A. Yes.
18  Q. Is Dr. Levine a respected scientist in his field?
19        MR. WEISS: Objection to form.
20        THE WITNESS: I would -- he certainly is a
21  respected scientist in his field.
22  BY MR. REGAN:
23  Q. Do you know whether Dr. Levine believed that
24  Celera could successfully sequence the human genome by the
25  whole genome shotgun method?

171

1  A. I don't know. I -- I also don't think he is
2  acquainted in detail with -- with the specifics of the
3  sequencing process.
4  Q. Is it fair to say, in -- that in the fall of 1999,
5  it was a question of scientific debate whether Celera could
6  successfully subsequence genome by the whole genome shotgun
7  method?
8        MR. WEISS: Objection to form.
9        THE WITNESS: It was a debate, sure.
10  BY MR. REGAN:
11  Q. I believe you testified earlier today, you had not
12  read the registration statement that Celera filed, in
13  connection with its secondary public offering; is that
14  correct?
15  A. That's correct.
16  Q. Have you ever read it at any time?
17  A. I don't believe I ever have.
18  Q. Have you ever read the prospectus that Celera
19  filed, in connection with its secondary offering at any
20  time?
21  A. I don't believe I ever did.
22  Q. Have you ever read an annual report on form 10K
23  filed by Celera at any time?
24  A. I don't believe I ever have.
25  Q. Have you ever read a form 10Q, a quarterly report,

172

1  filed by Celera at any time?
2  A. I don't believe I have.
3  Q. Have you ever read an annual report of Celera to
4  its shareholders at any time?
5  A. No. I don't recall that.
6  Q. Did any individual associated with Celera ever
7  described its business plan to you personally?
8  A. I think in a broad sense, it -- it was presumably
9  part of the discussion at Colspring Harbor at the time that
10  Craig and Mike Hunkapiller made their announcement. But it
11  was -- it was mostly a science discussion. It wasn't -- we
12  didn't have an explicit debate about their business plan.
13  Q. Was the discussion you just referred to, a
14  presentation that Craig Venter and Mike Hunkapiller made to
15  an assembled audience or a one-on-one conversation you had?
16  A. It was a group. It was more than a presentation.
17  It was a broad range discussion among the participants.
18  Q. Have you ever had a personal conversation with
19  anyone affiliated at Celera -- anyone affiliated with
20  Celera, in which that person ever described to you what
21  Celera's business plan was?
22  A. I've -- I've only had limited contact. And those
23  discussions were not about the business plan, to my
24  recollection.
25  Q. Dr. Waterston, let me bring your attention to what

173

1  was previously marked as Exhibit 13.
2        MR. WEISS: Just tell me the Bate's range.
3        THE WITNESS: 343.
4        MR. REGAN: Sure. It's 343.
5        MR. WEISS: Thank you.
6  BY MR. REGAN:
7  Q. Do you recall viewing Exhibit 13 during the first
8  day of your deposition testimony?
9  A. I do.
10  Q. Let me see that one second.
11  A. (Witness complies.)
12  Q. Exhibit 13 indicates that -- it's an Email from
13  Francis Collins; is that correct?
14  A. That's correct.
15  Q. And that Email describes certain conversations
16  between Dr. Arnie Levine and Dr. Harold Varmus; is that
17  correct?
18  A. That's what it talks about, yes.
19  Q. Did you personally ever have any discussions with
20  Arnie Levine, regarding the shared principles document?
21  A. I don't recall talking to Arnie before the
22  December 29th meeting about any of this.
23  Q. Did you personally ever have any conversations
24  with Harold Varmus, prior to the December 29th meeting, in
25  which Dr. Varmus described to you his meetings with

13 (Pages 170 to 173)