## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE:  PE CORPORATION SECURITIES LITIGATION | : | Master File No. 3:00CV-705 (CFD) |
| | : | |
| | : | **FEBRUARY 16, 2005** |
| | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 11

    A.    Dr. Venter Joins PE Corporation ......................................................................... 11

    B.    The Human Genome Project.................................................................................. 12

    C.    The Shotgun Method Celera Used To Sequence The Human Genome Was
           Flawed And Unlikely to Yield Significant Intellectual Property Rights ............... 12

    D.    A Collaboration Was Critical For Celera's Business Model .................................. 13

    E.    The Parties Discussed A Collaboration Throughout the Fall of 1999 .................... 14

    F.    The December 29 Meeting....................................................................................... 16

    G.    Celera Intentionally Concealed the December 29 Meeting and the
           Negotiations With the HGP From the Investing Public........................................... 17

    H.    The Offering............................................................................................................ 18

    I.    The Investing Public Reacts to the News of The Failed Collaboration
          Negotiations ........................................................................................................... 20

ARGUMENT ......................................................................................................................... 22

    A.    Summary Judgment Standard ................................................................................. 22

    B.    Plaintiffs Have Identified Materially False And Misleading Statements
          And Omissions In The Prospectus.......................................................................... 22

          1.    There Is No Undisputed Version of the Discussions
                Between the HGP and Celera, Which Culminated in the
                December 29 Meeting................................................................................. 24

          2.    The Prospectus Failed to Disclose Material Adverse Facts
                Regarding Celera's Ability to Execute Its Business Plan............ 25

          a.    The Negotiations Among the HGP and Celera Were
                Material to Celera's Ability to Generate Revenue From Its
                Sequencing Efforts...................................................................... 26

b.  Celera Should Have Disclosed the Breakdown in Negotiations At the December 29 Meeting ....................................30

c.  Celera Could Not Develop Meaningful Intellectual Property ......................................................................................32

C.  The Prospectus Failed to Disclose Material Facts .................................................32

1.  The Prospectus Omitted to Disclose Material Facts Regarding the Failed Collaboration Discussions with the HGP..........................................................................................33

2.  The Prospectus Failed to Disclose That Celera Was Unlikely to Receive Any Meaningful Patent Protection................34

D.  The Materially False And Misleading Statements And Omissions In The Prospectus Are Not Protected by The Safe Harbor Or Bespeaks Caution Doctrine........................................................................................36

1.  Defendants' False And Misleading Statements And Omissions Were Not Accompanied By Meaningful Cautionary Language .................................................................36

2.  Defendants' Material False And Misleading Statements And Omissions Were Made With Full Knowledge Of their Falsity...........................................................................................39

a.  Defendants Failed To Disclose That Collaboration Efforts Broke Down At The December 29 Meeting, Resulting In Celera's Inability To Obtain The Human Genome Sequence For Its Information Business ..........................................39

b.  Defendants Misrepresented Celera's Ability To Obtain Meaningful Intellectual Property ....................................40

E.  A Reasonable Jury Could Find That Defendants Are Statutory Sellers Under Section 12(A)(2) ........................................................................40

1.  Section 12(a)(2) Standard ............................................................41

2.  A Reasonable Jury Could Find That Defendants Are Statutory Sellers Under Section 12(a)(2).......................................43

CONCLUSION.....................................................................................................................45

DOCS\257849v1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re American Bank Note Holographics Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 ...........................................................................................44, 45

*American Mfrs. Mut. Ins. Co. v. American Motorist Ins. Co.*,
  388 F.2d 272 (2d Cir. 1967)...........................................................................25

*AT&T Tel. Co. v. City of New York*,
  83 F.3d 549 (2d Cir. 1996)..............................................................................22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................................22

*In re APAC Teleservices, Inc. Sec. Litig.*,
  1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999) ...........................43

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ........................................................................39

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).........................................................................................33

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988)...............................................................42, 44, 45

*In re Columbia Labs, Inc. Sec. Litig.*,
  144 F. Supp. 2d 1362 (S.D. Fla. 2001) .........................................................37

*In re Columbia Sec. Litig.*,
  155 F.R.D. 466 (S.D.N.Y. 1994) ....................................................................34

*Cortec Indus., Inc. v. Sum Holding, L.P.*,
  949 F.2d 42 (2d Cir. 1991)..............................................................................41

*In re Deutsche Telekom AG Sec. Litig.*,
  2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002)..............................43

*Dorchester Investors v. Peak Trends Trust*,
  2003 U.S. Dist. LEXIS 1446 (S.D.N.Y. Feb. 3, 2003)................................43

*Ehlert v. Singer*,
  245 F.3d 1313 (11th Cir. 2001) ......................................................................37

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992).........................................................................................22

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).........................................................................................23

*Fecht v. Price Co.,*
  70 F.3d 1078 (9th Cir. 1995) ...................................................................37

*Feiner v. SS&C Tech., Inc.,*
  47 F. Supp. 2d 250 (D. Conn. 1999)........................................................42

*Flood v. Kuhn,*
  407 U.S. 258 (1972)...................................................................................9

*Ganino v. Citizens Utils. Co.,*
  56 F. Supp. 2d 222 (D. Conn. 1999)........................................................36

*In re Gas Reclamation, Inc. Sec. Litig.,*
  733 F. Supp. 713, ....................................................................................31

*Greenberg v. Chrust,*
  2002 U.S. Dist. LEXIS 21103 (S.D.N.Y. Nov. 1, 2002)...........................31

*In re Globalstar Secs. Litig.,*
  2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 15, 2003) ....................30, 36

*Harris v. IVAX Corp.,*
  182 F.3d 799 (11th Cir. 1999) ................................................................37

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983).................................................................................23

*Hotel Emples. & Rest. Emples. Union v. City of N.Y. Dept. of Parks &*
  *Recreation,*
  311 F.3d 534 (2d Cir. 2002).......................................................................9

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.,*
  159 F.3d 723 (2d Cir. 1998)................................................................36, 37

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,*
  936 F.2d 759 (2d Cir. 1991).....................................................................37

*Milman v. Box Hill Sys. Corp.,*
  72 F. Supp. 2d 220 (S.D.N.Y. 1999).....................................................42, 45

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,*
  2003 U.S. Dist. LEXIS 21858 (S.D.N.Y Dec. 4, 2003) ............................31

*In re Nortel Networks Corp., Sec. Litig.,*
  238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................................................36, 39

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
  98 F.3d 2 (2d Cir. 1996)...........................................................................30

*Pinter v. Dahl,*
  486 U.S. 622 (1988)..............................................................................41, 44

*Provenz v. Miller,*
   102 F.3d 1478 ...........................................................................................22, 31

*In re Prudential Sec. Ltd. P'ships Litig.,*
   930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................22, 36, 37, 39

*Robbins v. Moore Med. Corp.,*
   788 F. Supp. 179 (S.D.N.Y. 1992) ...........................................................33

*Robertson v. Seidman & Seidman,*
   609 F.2d 583 (2d Cir. 1979).......................................................................22

*SEC v. Texas Gulf Sulphur Co.,*
   410 F.2d 833 (2d Cir. 1968).......................................................................33

*Sellman v. Baruch College of City University,*
   482 F. Supp. 475 (S.D.N.Y. 1979) ..............................................................9

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996)1 ....................................................................33

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
   2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001)...........................43

*TSC Indus., Inc. v. Northway,*
   426 U.S. 438 (1976)..................................................................................32

*In re Taxable Municipal Bonds Litig.,*
   1994 U.S. Dist. LEXIS 13851 (E.D. La. Sept. 26, 1994) ............................31

*In re Twinlab Corp. Sec. Litig.,*
   103 F. Supp. 2d 193 (S.D.N.Y. 2000)........................................................42

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991).....................................................................36

*Virginia Bankshares, Inc. v. Sandberg,*
   501 U.S. 1083 (1991)................................................................................37

*Wilson v. Saintine Exploration & Drilling Corp.,*
   872 F.2d 1124 (2d Cir. 1989).....................................................................42

*In re Xerox Corp. Sec. Litig.,*
   165 F. Supp. 2d 208 (D. Conn. 2001).....................................................36, 39

## FEDERAL STATUTES

15 U.S.C. § 771(a)(2)...................................................................................23

15 U.S.C. § 77k.............................................................................................30

15 U.S.C. § 77k(a) ........................................................................................23

## PRELIMINARY STATEMENT

This case presents the classic circumstance for resolution by a trier of fact – a key set of events about which there is sharply divergent testimony. Nevertheless, defendants make their obligatory summary judgment motion for the sole purpose of delaying this action and unnecessarily increasing the burden on the putative class. As demonstrated below, with respect to every relevant issue concerning the negotiations between the Human Genome Project (HGP)[1] and Celera, defendants have willfully ignored the testimony of, and documents produced by, the senior members of the HGP. Similarly, defendants ignore their own statements about the importance of intellectual property rights to Celera's business model and the reality, as confirmed by plaintiffs' biotechnology intellectual property expert, that Celera's sequencing method (whole genome shotgun (WGS)) was highly unlikely to deliver any valuable intellectual property.

In a nutshell, defendants' argument is that, before investing approximately **$1 billion** in a public offering of Celera stock, class members would not have cared to know that Celera and the HGP had a crucial meeting the week between Christmas and New Year's just two months earlier that had ended disastrously for Celera. It is only through a gross distortion of the factual record that defendants can even attempt to support their arguments. Once the Court examines the complete evidentiary picture, there will be no doubt that defendants' motion is utterly devoid of merit and that plaintiffs have developed sufficient evidence of material factual disputes to have a jury decide whether defendants violated the Securities Act of 1933 (the "Securities Act").

---

[1] The HGP is a worldwide coordinated effort to sequence the human genome, sponsored by the government and nonprofit organizations in the United States, the United Kingdom, Japan and France, amongst other nations. The National Institute of Health ("NIH") is the primary U.S. funding source of the HGP.

Defendants' brief, relying principally on the self-serving testimony of Celera officers and directors, rewrites history to shoehorn the facts to fit their principal argument – that the negotiations between the parties in the Fall of 1999, which culminated with the December 29, 1999 meeting among senior Celera executives and senior members of the HGP (the "December 29 meeting"), were "a relatively minor side show" that did not need to be disclosed in the prospectus that is the subject of plaintiffs' claims. However, the evidentiary record is replete with facts contradicting each of defendants' one-sided assertions.

**A Collaboration Was Critical For Celera's Business Model**

The prospectus disseminated in connection with the secondary offering (the "Offering") by defendant PE Corporation of the Celera Genomics Group ("Celera") tracking stock (the "Prospectus") that is the subject of this action described the human genome sequence on which Celera was working as the "foundation" for the development of the "integrated information and discovery system" that Celera intended to market to its customers. Celera, through the integrated information and discovery system, envisioned itself as the Lexis-Nexis or Bloomberg of genomics data. However, even before it began to sequence the human genome, Celera was facing two major problems, which it could only resolve through a collaboration with the HGP.

First, numerous senior scientists in the HGP believed the WGS technique employed by Celera to sequence the human genome was flawed and incapable of producing quality sequence data. For example, Dr. Harold Varmus, the Director of the NIH until January 1, 2000, upon whose testimony defendants rely in their motion, stated that he did not believe that Celera could generate a viable sequence without the assistance of the HGP. Similarly, plaintiffs' biotechnology expert, whose report is not even mentioned in defendants' motion papers, explains that the WGS technique makes both the gene sequencing and the assembly of the sequence more difficult and susceptible to error than the method employed by the HGP and Celera's

-2-

competitors.[2] Thus, Celera needed to collaborate with the HGP to validate its sequence data, and to develop a commercially viable sequence that could form the foundation of its information business.

Second, the genomics industry believed that Celera's expertise was in sequencing, not information delivery. If the human genome sequence was available for repackaging and resale by Celera's competitors, who specialized in information delivery, Celera would have no competitive advantage and nothing to show for the massive amounts of money that it had already begun to spend on its sequencing effort. Thus, Celera pursued a collaboration with the HGP that would allow Celera to be the sole commercial distributor of the human genome sequence for an extended period of time.

Celera's self-serving contention that the sequence was not relevant to its business model is belied by its conduct in its negotiations with the HGP, and particularly the actions of its CEO, defendant Tony White. Celera's exclusive rights to distribute sequence data for commercial use was the key issue throughout the collaboration discussions. Ultimately, this issue was the focus of the parties' discussions at the December 29 meeting, which broke down after defendant White, in a desperate attempt to realize value for the hundreds of millions of dollars of investors' money that Celera had already begun to spend on sequencing the human genome, insisted that there could be no collaboration unless Celera retained the exclusive rights to distribute the merged HGP/Celera sequence commercially for at least 3 to 4 years.

---

[2] Defendants opted to file their motion for summary judgment the day after receiving plaintiffs' expert reports. As defendants were under no time pressure to file their motion (the Court had set the deadline for filing summary judgment motions at 45 days after the close of expert discovery), the inescapable inference is that they intentionally opted not to address plaintiffs' expert's testimony in their brief. Thus, while defendants' brief pretends that the record does not contain any expert analysis of Celera's sequencing methodology, and the ability of that methodology to generate any meaningful intellectual property rights, that is simply not the case.

**The Parties Discussed A Collaboration Throughout the Fall of 1999**

Defendants contend that Celera engaged in negotiations with the HGP in the Fall of 1999

solely to find a way to reduce the adversarial public rhetoric among the parties, and that it was

not pursuing a collaboration. However, the following evidence flatly contradicts that assertion:

- On November 17, 1999, Celera informed the HGP of its continued desire to collaborate.

- At no time during the Fall 1999 negotiations did Celera ever indicate to members of the HGP that it was merely looking for a simple agreement to co-submit and "tone down the rhetoric," versus a more extensive collaboration.

- Celera's CEO had not assigned anyone with the responsibility of reducing the rhetoric between Celera and the HGP, nor had he instructed anyone at Celera to communicate with the HGP regarding the issue of reducing the rhetoric.

- At the December 29 meeting, Celera's CEO stated that he believed that the rhetoric had been "positive" for Celera's stock value.

Moreover, on two separate occasions in December 1999, Celera representatives informed

the HGP that they were comfortable with the elements of the collaboration that had been put

forth by the HGP. On December 10, 1999, Dr. Harold Varmus, the Director of the National

Institutes of Health, the leading provider of funds to the HGP, had a meeting with Dr. Arnold

Levine, a member of Celera's Scientific Advisory Board, during which Dr. Varmus outlined "the

basic elements of the possible collaboration." Dr. Levine responded that he thought Dr.

Varmus's proposal was reasonable and that he would confer with senior management at Celera

about the proposal. On December 22, 1999, Dr. Levine informed Dr. Varmus that he had

presented Dr. Varmus's proposal to defendant White, Celera's CEO, and Dr. Craig Venter,

Celera's President, and that neither of them had seen a "showstopper." The December 29

meeting was scheduled only after Dr. Levine had indicated that defendant White and Dr. Venter

were comfortable with the collaboration framework outlined by Dr. Varmus.

-4-

**The December 29 Meeting Was the Culmination of the Collaboration Discussions**

Defendants claim that the December 29 meeting was an "exploratory and general" conversation. In addition to the meeting between Drs. Varmus and Levine discussed above, prior to the December 29 meeting, senior HGP scientists had already had numerous substantive discussions with Celera's Scientific Advisory Board and Dr. Venter about the elements of a collaboration. Additionally, on November 19, 1999, Dr. Francis Collins rejected an invitation from Dr. Venter to visit Celera's sequencing facility, telling Dr. Venter that such a visit would be awkward, "since we all know that some sensitive negotiations about the human sequence are underway."[3] Further, the following evidence reveals that Celera officers and Scientific Advisory Board members had numerous internal discussions regarding the potential collaboration that Celera was discussing with the HGP and that Celera was in favor of such a collaboration:

- An October 28, 1999 email from Dr. Roberts to Dr. Venter where Dr. Roberts discussed the mechanics of a collaboration between Celera and the HGP to sequence the human genome.

- As of November 16, 1999, Celera believed that a formal collaboration with the HGP would inure to its benefit. and on November 17, 1999, Celera informed the HGP of its continued desire to collaborate.

- Dr. Richard Roberts thought that a potential collaboration between Celera and the HGP was "an excellent initiative and the right way forward for science."

---

[3] Dr. Collins was the Director of the National Genome Research Institute, the U.S. government's contributor to the HGP. Although Dr. Collins was the HGP's primary negotiator regarding a potential collaboration with Celera, defendants have joined the U.S. government in opposing plaintiffs' motion to compel Dr. Collins' testimony, which has recently been referred to Magistrate Judge Smith. While the government's stated motivation is to prevent Dr. Collins from spending time away from his work for the government, defendants' motive is clearly to prevent plaintiffs from developing additional testimony raising triable issues of fact. While plaintiffs are confident that the existing evidentiary record warrants the denial of defendants' summary judgment motion, out of an abundance of caution, pursuant to Fed. R. Civ. P. 56(f), plaintiffs have submitted the affidavit of Sanford P. Dumain ("Dumain Aff."), which explains why Dr. Collins's deposition will bolster plaintiffs' opposition to the summary judgment motion.

DOCS\257849v1

- Throughout the Fall of 1999, numerous meetings were held among Celera employees during which the potential collaboration with the HGP were discussed. Gilman Tr. at 33-34.

**At The Time of the December 29 Meeting, the HGP Was Optimistic That A Collaboration Could Be Achieved**

Defendants also assert that prior to the December 29 meeting, all HGP representatives thought that a collaboration with Celera was highly unlikely. However, the testimony and actions of the HGP witnesses flatly contradict defendants' contention, as the December 29 meeting was scheduled only after Celera indicated that it was comfortable that the elements of the Shared Principles document could form the framework of a collaboration. Moreover, as the time drew closer to the December 29 meeting, members of the HGP believed that, based upon their discussions with Celera, a positive outcome was possible in achieving a collaboration with Celera.

**Celera Demanded The Right to Be the  Exclusive Commercial Distributor of the Human Genome Sequence**

Defendants claim that Celera never demanded exclusivity rights to the human genome sequence, because there was no single version of the sequence. However, as discussed above, Celera needed to create a single sequence by merging its sequence with that of the HGP, and to prevent its competitors from repackaging and reselling that sequence, to effectively execute its business model. Further, the evidence shows that Celera always intended to prevent commercial competitors from reselling the sequence data in any form. (Ex. 3 at 149-50). Moreover, during the negotiations with the HGP, and at the December 29 meeting, Celera demanded that it have exclusive rights to distribute all merged Celera/HGP sequence until at least 2005.

**The December 29 Meeting Was Disastrous for Celera**

Defendants contend that the December 29 meeting was a non-event that did not focus on a proposed collaboration. However, the testimony of HGP witnesses, and the notes taken by HGP witnesses and e-mails among the HGP meeting participants,[4] belie that contention.

Specifically, while a minimal agreement merely to cooperate was discussed briefly, the bulk of the meeting focused on a potential collaboration. Consistent with its need to merge its sequence with that of the HGP, and then monopolize the joint sequence, Celera, through defendant White, proposed that the parties merge their data, such that there would only be one human genome sequence for the foreseeable future. Additionally, Celera insisted that once the merged product was created, the HGP stop its sequencing efforts. In order to insure that it was the sole distributor of the merged sequence, defendant White insisted that Celera have the exclusive right to sell the merged sequence in perpetuity. When the HGP responded that the period of exclusivity could not be indefinite, defendant White offered to compromise by having Celera's exclusivity end by 2005, which was then five years away.

The HGP's positions were diametrically opposed to those of Celera. With regard to exclusivity, the HGP scientists would not even consider a period ending in 2003 (let alone 2005), as they believed that by December 2000, the HGP could create a sequence without Celera that would be similar to the merged HGP/Celera sequence. Moreover, the HGP would not agree to stop its sequencing efforts or to give Celera any exclusive rights to any improved sequence that was generated from the merged sequence. In the words of Dr. Waterston, "[t]he more broadly

---

[4] Dr. Collins took detailed notes at the December 29 meeting and he either sent or received virtually all of the over 100 e-mails produced by the government and the members of the HGP. *See* Dumain Aff., ¶¶ 8, 10. Thus, his testimony would clearly aid the record regarding the issues relevant to the resolution of defendants' motion.

-7-

Celera interprets its rights as exclusive distributor the more difficult any extended exclusivity arrangement becomes for the public HGP." Thus, by the end of the meeting it was clear that Celera was not going to be able to obtain the monopoly position it so desperately needed.

**The December 29 Meeting Was the End of the Collaboration Discussions**

Defendants claim that the discussions between Celera and the HGP did not break down at the December 29 meeting, but that the parties continued to have meaningful discussions in 2000. However, the participants in the meeting did not believe that there was any real possibility of a collaboration, or any other meaningful agreement, by the end of the December 29 meeting. As aptly stated by Dr. Collins in an e-mail sent to the other HGP meeting participants on the morning after the meeting, "[e]ven an optimist (like the four of us) would have to say this is a long shot."

Defendants also contend that the parties' continued discussions in 2000 ultimately led to a joint announcement at the White House concerning the completion of the human genome sequence. In fact, the following evidence reveals the parties never had any meaningful discussions regarding collaboration after the December 29 meeting:

- On January 22, 2000, defendant White told Francis Collins that he did not see any reasons for a second face-to-face meeting between Celera and the HGP.

- Subsequent to January 22, 2000, Dr. Collins attempted, but was unable, to set up a meeting, conference call or telephone call with anyone from Celera.

- In the first 2 weeks of February 2000, Dr. Collins' assistant placed more than 6 calls to Dr. Venter, none of which was returned.

Moreover, the joint announcement was not the culmination of negotiations that began during the Fall of 1999 but instead was the parties' last minute attempt to avoid public embarrassment.[5]

---

[5] Defendants acknowledge that this announcement was the result of meetings between Drs. Venter and Collins in March and April 2000. Def. Br. at 17. This is another reason why

**Intellectual Property Rights Were A Significant Component of Celera's Business Model**

The Prospectus stated that Celera planned "to apply for patent protection upon the identification of candidate novel genes, novel gene fragments and their biological function or utility," and that "[d]uring late stages of assembly and gene annotation, Celera may seek broader patent protection of its discoveries." Moreover, Celera's President stated that Celera intended to seek patents for several hundred gene sequences. Only two months prior to the Offering, the U.S. Patent and Trademark Office (USPTO) had issued Revised Interim Utility Guidelines and Revised Interim Written Description Guidelines. Defendants failed to disclose that Celera's WGS technique generated genomic DNA, as opposed to the cDNA that the HGP and Celera's commercial competitors were generating, which made it unlikely to yield any commercially valuable patents pursuant to these guidelines. Specifically, due to structural differences between the two types of DNA, genomic DNA was unlikely to identify the utility of a particular gene and it was more likely to contain errors in the sequence, which would prevent Celera from satisfying the recently revised utility and written description requirements.

Defendants attempt to downplay the importance of intellectual property rights to Celera's business model, yet the Prospectus identifies the licensing of intellectual property as one of Celera's "primary revenue sources" and contains several purported risk disclosures explaining

---

plaintiffs should be permitted to depose Dr. Collins. In any case, a book written by an author with unfettered access to Dr. Venter during the relevant time period supports plaintiffs' contention. PX 70 at 347-351. This book can be judicially noticed. *See, e.g., Hotel Emples. & Rest. Emples. Union v. City of N.Y. Dept. of Parks & Recreation*, 311 F.3d 534, n.1 (2d Cir. 2002) ("We agree that the descriptions and history of Lincoln Center set forth in Young's authoritative text are an appropriate candidate for judicial notice.") *Cf. Flood v. Kuhn,* 407 U.S. 258, 260-62 (1972) (taking judicial notice of various authoritative books on baseball); *Sellman v. Baruch College of City University*, 482 F. Supp. 475, n. 9 (S.D.N.Y. 1979) ("Although the parties did not offer this book [Baruch College Bulletin: Undergraduate Programs 1979-80], with their moving papers, the Court takes judicial notice of its contents.") (citing Fed. R. Evid. 201).

-9-

that Celera's inability to obtain patents could adversely impact its business materially. Naturally, the Prospectus would not have included these risk factors if the inability to obtain patents was immaterial. Moreover, these risk factors were themselves materially misleading because they purported to disclose hypothetical risks when, in fact, those adverse facts already existed.

By December 2002, having never generated any income from its information platform or through the licensing of intellectual property, Celera abandoned the genomics business it had described in detail in the Prospectus.

**Defendants Cannot Avoid Liability For the Misstatements in the Prospectus**

The statements in the Prospectus about the information component of Celera's business were materially false and misleading because defendants failed to disclose that Celera needed to collaborate with the HGP, and to obtain exclusive commercial distribution rights for the collaborative sequence, in order to have the necessary foundation for that business, and that Celera had failed in its efforts to obtain the collaboration and distribution rights from the HGP. Additionally, the statements in the Prospectus about Celera's intellectual property strategy were materially false and misleading because the genomic DNA generated by Celera's sequencing methodology made it highly speculative that Celera could obtain any valuable patents pursuant to recently enhanced USPTO guidelines.

Defendants seek to rely on the PSLRA's safe harbor and the bespeaks caution doctrine to shield themselves from liability for the materially false and misleading forward-looking statements in the Prospectus. However, because they failed to disclose the known adverse impacts of the collapse of the discussions with the HGP and Celera's inability to obtain meaningful patent protection, the statements in the Prospectus are not protected.

Defendants also argue that the investing public was aware of Celera's discussions with the HGP due to a single, vague sentence in the Prospectus -- Celera "has sought to coordinate its

efforts with those funded by the U.S. government" – and a few news articles containing equally broad language. However, this desperate attempt to avoid the strict liability imposed by the Securities Act for defendants' failure to disclose material adverse facts is wholly unpersuasive. None of the language identified by defendants comes close to alerting the investing public of the true adverse facts.

Finally, defendants have regurgitated the already rejected argument from their motion to dismiss that they are not statutory sellers under Section 12 of the Securities Act. In the absence of any new facts or intervening case law, neither of which defendants offer, the Court need not reconsider its prior decision. Nevertheless, under applicable Second Circuit precedent, the facts that defendants signed the Prospectus and participated in its creation are readily sufficient to qualify them as statutory sellers.

Based on the foregoing, this action should proceed to trial swiftly, so that a trier of fact can weigh the competing evidence. Thus, defendants' motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

### A.    Dr. Venter Joins PE Corporation

In late 1997, the Perkin-Elmer Corporation (now known as PE Corporation), the leading manufacturer of gene sequencers, engaged in discussions with Dr. Venter concerning the formation of a company to sequence the human genome. PX 5 at 9. Ultimately, Dr. Venter agreed to join Perkin-Elmer because "[i]t was the only opportunity I had to sequence the human genome." PX 5 at 13. Indeed, by this time, Dr. Venter, through his own institute (The Institute for Genomic Research) had unsuccessfully tried on numerous occasions to obtain public funding for an attempt to sequence the human genome and did not have any funding options on the horizon. PX 5 at 141-144.

-11-

During his negotiations with Perkin-Elmer, Dr. Venter insisted that any genomic sequence data he generated be made publicly available for free. PX 5 at 13, 14. Perkin-Elmer's CEO, defendant White, ultimately consented to this upon the condition that Dr. Venter, a scientist who had never worked for a private for-profit corporation and who admittedly agreed to join Perkin-Elmer because it was his only opportunity to sequence the human genome (and potentially obtain a Nobel Prize), devise a business plan that was compatible with the free release of the sequence data. PX 5 at 13-15. Notably, none of Dr. Venter's compensation was tied to future revenues earned from the sequencing business. PX 5 at 16, 17.

**B.     The Human Genome Project**

Long before Dr. Venter joined Celera, the HGP had begun an ambitious program to sequence the human genome. PX 49 at 1-3. When Celera announced its plans to sequence the human genome, in May 1998, the Company did not believe that the HGP would complete its sequence "for many years" after Celera had completed its map of the human genome. PX 8 at 62. In September 1999, however, HGP scientists announced that they would release a working draft of the human genome sequence by Spring 2000. PX 49. Accordingly, Celera's anticipated position as the leading provider of human genome sequence data was in jeopardy before its sequencing efforts had even begun.

**C.     The Shotgun Method Celera Used To Sequence
         The Human Genome Was Flawed And Unlikely
         to Yield Significant Intellectual Property Rights**

Numerous senior scientists at the major laboratories that comprised the HGP believed that Celera's genome sequencing shotgun method was incapable of producing quality sequence data. PX 3 at 17-18, 44, 54, 170. For example, Dr. Varmus stated that he "was dubious about whether whole genome sequencing can be used to assemble the sequences of [the human] genome," (PX 6 at 20-21) and that he did not believe that Celera could complete sequencing the

-12-

human genome without help from the HGP. PX 6 at 42-43; PX 13 at RW 000017 ("I am not ready to acknowledge that Celera could put the human genome sequence together without the public effort.").

Moreover, Celera used genomic DNA[6] for its sequencing efforts as compared to cDNA used by its competitors. Expert Report of Dr. Ivor Elrifi (the "Elrifi Report"), PX 65 at ¶¶ 21-22. cDNA is refined DNA from which it is easier and faster to discover patentable proteins. *Id.*, ¶¶ 24-29. The DNA that Celera used to sequence the human genome, as opposed to cDNA, also created significant additional hurdles to finding patentable genomic discoveries and left Celera at a commercial disadvantage. *Id.* ¶ 41. For example, in 2000, recently enhanced USPTO requirements were stricter for genomic DNA (*Id.*, ¶ 16) and sequencing raw genomic DNA is also more cumbersome and susceptible to mistake as compared to cDNA. *Id.*, ¶ 43.

**D.    A Collaboration Was Critical For Celera's Business Model**

Due to the pressure it was facing from the accelerated HGP sequencing efforts and the risks that its sequence data would not provide the necessary foundation for its information business, Celera needed to collaborate with the HGP to have a potentially viable platform for its information products. Senior HGP scientists identified several critical reasons why Celera needed to collaborate, which were 1) because Celera recognized that it had or would soon have gotten just about all it was going to get of commercial value from the shotgun sequencing effort (PX 16 at 1 (RW 00302)); 2) to validate Celera's sequence, about which many people were already skeptical (PX 3 at 00383; RW 00392; RW00372 ); 3) to gain a monopoly over the human genome map (PX 6 at 00383), which would give it a significant advantage over

---

[6] Genomic DNA is the "raw" fundamental information that form a person's genetic make up. Elrifi Report, PX 65 at ¶ 23.

competing commercial database suppliers (PX 13 at RW 00018), and which defendant White

saw as crucial to Celera's business (PX 64 at FC00132); and 4) because Celera could not

completely sequence the human genome without help from the HGP.  PX 6 at 42-43; PX 13 at

RW 000017.

    E.      **The Parties Discussed A Collaboration Throughout the Fall of 1999**

On October 2, 1999, shortly after the HGP announced its plans to have a draft human

genome sequence by the Spring of 2000, Dr. Richard Roberts, Chairman of Celera's Scientific

Advisory Board, contacted Dr. Waterston, the head of one of the principal sequencing labs in the

HGP, about "reaching some kind of accord with Celera that would ***get the public and private***

***efforts to work together***."  PX 5 at 1 (FC 00003).  Dr. Roberts thought that a potential

collaboration between Celera and the HGP was "an excellent initiative and the right way forward

for science."  PX 41 at 1 (WI00001).  Shortly thereafter, Dr. Eric Lander, a senior scientist at a

major HGP lab, met with Celera's Scientific Advisory Board to discuss a possible collaboration.

PX 4 at 30; 37.  PX 7 at 1; PX 55 at 1-3.

On November 12, 1999, Dr. Lander and Dr. Levine, a member of Celera's Scientific

Advisory Board, continued the collaboration discussions. PX 31 at FC00021.  Dr. Levine stated

that the discussions had advanced such that an agreement was feasible and that the necessary

principals who could make such an agreement (among others, defendant White and Dr. Venter)

should be brought into the discussions.  *Id.* at FC00021.  Dr. Lander agreed to create a document

containing the basic points of agreement among the parties and the framework for discussions to

formalize a collaboration agreement.  *Id.* at FC00021.  Shortly thereafter, Dr. Lander created a

document, ultimately entitled "Shared Principles," which included the elements of a potential

collaboration between the HGP and Celera.  *Id.* at FC00021. Where the parties had differing

-14-

views on a particular element of the collaboration, the Shared Principles set forth each side's position. PX 12 at RW00380-00382.

Throughout the Fall of 1999, numerous meetings were held among Celera employees during which the potential collaboration with the HGP was discussed. PX 4 at 33-34. By mid-November, Celera believed that a formal collaboration with the HGP would inure to its benefit (PX 31 at CG04073-74) and it informed the HGP of its continued desire to collaborate. PX 37 at FC00037.

By November 19, 1999, the HGP and Celera were engaged in sensitive negotiations. PX 38 at FC00022. As of November 27, 1999, based upon its discussions with Celera representatives, the HGP believed that "important issues to be negotiated" with Celera included the time period during which Celera would have exclusive rights to distribute merged HGP/Celera data (the HGP's position was that exclusivity should exist only for as long as it would have taken the HGP to produce the sequence without Celera (estimated at this time to be 2001), while Celera's position was that it wanted exclusivity until 2005). PX 15 at RW00410; PX 3 at 58-59.

On December 10, 1999, Dr. Varmus met with Dr. Levine. At this meeting, Dr. Varmus outlined "the basic elements of the possible collaboration," which were the same elements set forth in the Shared Principles. PX 6 at 85. Dr. Levine responded that he thought Dr. Varmus' proposal was reasonable and that he would confer with senior management at Celera about the proposal. PX 17 at RW00343. Dr. Levine described the proposal to Dr. Venter and defendant White, neither of whom thought that a collaboration was unworkable. PX 63 at FC00114.

On December 22, 1999, Dr. Levine, based upon positive feedback from defendant White and Dr. Venter, informed the HGP that Celera was comfortable that the elements of the Shared

Principles document, as outlined by Dr. Varmus, could form the framework of a collaboration.
Based upon this representation, the parties scheduled the December 29 meeting. PX 18 at
RW00338. By this time, members of the HGP believed that, based upon their discussions with
Celera, a positive outcome was possible in achieving a collaboration. PX 3 at 64.

**F.     The December 29 Meeting**

On the evening before the December 29, 1999 meeting, Dr. Collins forwarded to
members of the Celera negotiating team the Shared Principles document, along with a proposed
agenda for the meeting that was consistent with the parties' prior discussions. PX 20 at
RW00458. In a telephone conversation that same day, and in an e-mail the following morning,
Dr. Venter, who could not specifically recall whether he discussed a response with anyone,
including defendant White, informed Dr. Collins that Celera had serious concerns with the
Shared Principles and the proposed agenda. PX 40 at CG004165. Dr. Venter offered an
alternative agenda that focused on discussing "cooperative interactions" in addition to a more
extensive scientific collaboration. *Id.* at CG004165.

Members of the HGP were completely surprised by Celera's complete reversal of its
positions, as the Shared Principles reflected the terms of a proposed collaboration that had been
discussed by both sides for most of the Fall of 1999, and because at no time during those
negotiations did Celera ever indicate to members of the HGP that it was merely looking for a
simple agreement to "tone down the rhetoric," versus a more extensive collaboration. PX 3 at
73. In sharp contrast to Dr. Venter's e-mail, defendant White admitted that he had not assigned
anyone with the responsibility of reducing the rhetoric between Celera and the HGP, (PX 8 at
31), nor had he instructed anyone at Celera to communicate with the HGP regarding the issue of
reducing the rhetoric. *Id.* at 32. In fact, at no time during the Fall of 1999 negotiations did

-16-

Celera ever indicate to members of the HGP that it was merely looking for a simple agreement to "tone down the rhetoric." PX 3 at 73.

Despite Dr. Venter's position, the principal topic discussed at the meeting was Celera's exclusive right to distribute a merged Celera/HGP sequence. PX 3 at RW00018; PX 6 at 135-136. Celera's position was that the HGP should merge its data with Celera's and stop its sequencing efforts. PX 3 at 100. Celera also wanted the exclusive right to distribute the merged product for commercial use through at least 2005. PX 3 at RW00018; PX 6 at 135-136. When the HGP countered that it would not agree to stop sequencing, or to such a long period of exclusivity, the talks quickly turned acrimonious and came to a rapid conclusion. *See* PX 6 at 104.

There were no meaningful discussions about toning down the public rhetoric at the meeting. Indeed, defendant White stated during the meeting that he believed the rhetoric had been "positive" for Celera's stock value. PX 64 at FC00134 (Dr. Collins's handwritten notes stating, "Discord has been unfortunate (Tony [White] disagrees").

### G.   Celera Intentionally Concealed the December 29 Meeting and the Negotiations With the HGP From the Investing Public

During the December 29 meeting, members of the HGP and Celera discussed making an announcement concerning the collaboration. PX 3 at 89-90, 164. However, Celera was "pretty adamant that we saw no positive value in having any kind of press release [regarding the December 29 meeting]." PX 5 at 151. On January 4, 2000, in an e-mail to members of the HGP, Paul Gilman of Celera acknowledged that Celera intended to conceal the negotiations and the December 29 meeting from the investing public: "[t]o say that we are meeting would mean that we at Celera would have to explain to our investors and customers what this is all about and how it will and/or will not affect them." PX 4 at 96-97, 99; PX 33 at RW 00470.

-17-

The parties never had any meaningful discussions regarding collaboration after the December 29 meeting.  On January 22, 2000, defendant White told Dr. Collins that he did not see any reasons for a second face-to-face meeting between Celera and the HGP.  PX 25 at RW00238.  Subsequent to January 22, 2000, Dr. Collins attempted, but was unable, to set up a meeting, conference call or telephone call with anyone from Celera. PX 24 at RW00271.   In the first 2 weeks of February 2000, Dr. Collins's assistant placed more than 6 calls to Dr. Venter, none of which was returned. PX 27 at RW00246.

**H.    The Offering**

On or about February 29, 2000, defendant PE Corporation filed the Registration Statement with the Securities and Exchange Commission, incorporating the Prospectus, in connection with the Offering.  PX 2 at  ¶¶ 32-33.  Each of the Individual Defendants signed and participated in the preparation of the Prospectus.  PX 1 at ¶¶ 8, 63.

In the Offering, defendant PE Corporation sold 3.8 million shares of Celera stock at $225.00 per share, realizing $944 million in gross proceeds from the Offering, which was comprised of $820.3 million in net proceeds and an underwriter's over-allotment option for $123.2 million.  PX 2 at 5.

The Prospectus explained that Celera's human genome sequence was the "foundation" and "platform" for its planned integrated information and discovery system. *See, e.g., Id.* at 32 ("There are three components to the Celera Genomic group's strategy of delivering valuable genomic, proteomic and related biological and medical information in the form of an integrated information and discovery system. The first component, the sequencing of the human genome, lays the foundation for the two additional components, functional genomics and personalized health/medicine . . . The Group anticipates using its genomic and proteomic data as a platform upon which to develop related databases, software tools, and services"). *Id.* at  4 ("The Celera

-18-

Genomics group intends to use the genome information derived from its human genome information sequencing program as a platform upon which to develop an integrated information and discovery system"). Moreover, the Prospectus contained numerous statements asserting that Celera's primary revenue would be derived from "selling access to information" through its information platform. *Id.* at 31, 38, 41. Nowhere did the Prospectus disclose that to have a commercially valuable sequence that could serve as the foundation for its information platform, Celera needed, but had no expectation of obtaining, the exclusive right to distribute merged HGP/Celera sequencing data.

The Prospectus described Celera's purported "competitive advantages," (*Id.* at 40) without disclosing that it needed, but had failed in its attempt to obtain, a collaboration with the HGP to obtain the competitive advantages. The Prospectus also downplayed the threat of competition from the HGP and, consistent with defendants' intent to conceal the failed negotiations with the HGP from the investing public, failed to disclose the disastrous December 29 meeting, or a single fact regarding the negotiations with the HGP:

> The Celera Genomics group does not believe it is competing with the U.S. government's efforts to sequence the human genome, and has sought to coordinate its efforts with those funded by the U.S. government. The acceleration of the Human Genome Project may assist the Celera Genomics group in its own sequencing and assembly effort.

*Id.* at 49.

The Prospectus also highlighted the intellectual property component of Celera's business strategy by describing Celera's plan "to apply for patent protection upon the identification of candidate novel genes, novel gene fragments and their biological function or utility," and Celera's intent to eventually "seek broader patent protection of its discoveries." *Id.* at 48. Additionally, the Prospectus contained numerous purported risk factors outlining potential

-19-

material adverse impacts upon Celera's business if it was unable to obtain intellectual property

protection (which protection defendants already knew Celera was highly unlikely to obtain). *Id.*

## I.     The Investing Public Reacts to the News of The Failed Collaboration Negotiations

By mid-February 2000, the members of the HGP had concluded that it needed to put a

formal end to its negotiations with Celera, as Celera had been essentially uncommunicative since

the December 29 meeting, other than a telephone discussion in January between defendant White

and Dr. Collins, during which defendant White repeated his insistence that Celera needed to have

exclusive rights to distribute the merged product commercially for at least 3 to 4 years, and

preferably longer. PX 3 at 49, 84.  On February 28, 2000, the HGP participants at the December

29 meeting sent the Celera meeting participants a detailed letter outlining the history of the

collaboration negotiations and seeking to confirm that Celera was not going to sharply reduce its

unreasonable exclusivity demand such that further discussions would be worthwhile.  PX 29 at

RW00152.  Specifically, the letter reiterated the HGP's position that granting Celera an extended

period of exclusivity "would be inconsistent with the internationally agreed principle of open

access," and it expressed concern about Celera's intent to monopolize the commercial uses of the

human genome sequence. *Id.*

Several days later, the U.K.'s Wellcome Trust, one of the major HGP labs, provided the

letter to the press.  PX 3 at 154.  Before Celera responded to the letter, on March 6, 2000, the *Los*

*Angeles Times* reported that the parties had met on December 29, 1999 and that talks had quickly

broken down.  PX 66.  The following day, Celera, through Dr. Venter, sent a responsive letter,

which it simultaneously released to the press.  PX 46 at RW00143.  While paying lip-service to

the desire to freely distribute the sequence, Dr. Venter's letter made it clear that Celera was

pursuing "a dissemination model that is fair and reasonable" based upon "the costs and value of

-20-