this [sequencing] effort." *Id.* Moreover, Dr. Venter confirmed Celera's goal that "other database providers would be prohibited from providing or selling Celera's data as their own." *Id.*

The market reacted to the news that Celera was seeking commercial protection from the HGP, but that the talks had completely broken down and degenerated into a further public feud. On March 7, 2000, only 8 days after the completion of the Offering, Celera's stock price begun a rapid decline that would continue over the subsequent weeks as a result of investor concerns that Celera could not obtain exclusive rights to the human genome sequence and successfully execute its business plan. PX 66, ¶ 32.

One week later, the fragile nature of Celera's business model was further exposed. On March 4, 2000, President Clinton and Prime Minister Blair made a joint public statement stressing the need for public access to the human genome sequence. While this statement impacted the entire biotech industry, clarifying statements made two days later had an even greater negative effect on Celera than the rest of the industry. *Id.*, ¶¶ 18-20, 33. By April 4, 2000, only 36 days after the Offering, Celera's stock price had fallen to $73.625, less than one-third of the Offering price. *Id.*, ¶ 33. On April 5, 2000, President Clinton clarified his joint statement with Tony Blair by stating that patent protection should still be available for commercially useful genomics discoveries. *Id.*, ¶ 34. As Celera had never disclosed that its WGS sequencing method made it unlikely that it could ever determine the commercial utility of particular gene sequences, President Clinton's comments (in which he also said that he had not meant to impact the stock market) caused a temporary rebound in Celera's stock price. *Id.*, ¶ 34. However, the recovery was short-lived. As of April 19, 2000, the day investors brought this action, Celera's stock was only trading at $77.75. *Id.*, ¶ 35.

-21-

# ARGUMENT

### A.    Summary Judgment Standard

A trial court should act "with caution" in granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact to be tried. Fed. R. Civ. P. 56(c); *see also Anderson*, 477 U.S. at 247. The burden of showing that there is no genuine issue of material fact is on the party seeking summary judgment. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 (1992); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). A defendant meets that burden "when he 'conclusively show[s] that the facts upon which [the plaintiff] relied to support his allegation were not susceptible of the interpretation which he sought to give them.'" *Eastman Kodak,* 504 U.S. at 468 n. 14 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

When deciding a motion for summary judgment, "a district judge must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party." *AT&T Tel. v. City of New York*, 83 F.3d 549, 552 (2d Cir. 1996). "Where material factual disputes exist, the court must allow a jury to resolve the factual disputes." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). Moreover, "[w]hen conflicting inferences can be drawn from the facts . . . summary judgment is inappropriate." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979).

### B.    Plaintiffs Have Identified Materially False And Misleading Statements And Omissions In The Prospectus

Section 11 of the Securities Act provides a right of action to persons who purchase a registered security when materially false or misleading information is included in, or material

information is omitted from, a registration statement or prospectus.[7] Section 11 was designed "to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Liability under Section 11 is "virtually absolute, even for innocent misstatements." *Id.* at 382 (footnote omitted). Plaintiffs need not prove fraud, motive, intent, knowledge or scienter. *Huddleston*, 459 U.S. at 381-82; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976) (congressional policy underlying Section 11 was to create liability for materially false or misleading statements or omissions regardless of fault). Similarly, Section 12(a)(2) imposes liability on sellers of securities by means of a prospectus "which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).

Defendants incorrectly argue now as they did in support of the motion to dismiss that was denied by the Court that plaintiffs' case is based on a single "omission" lacking any facts supporting the materiality and misleading nature of the omission. Def. Br. at 22. However, the evidence demonstrates that the Prospectus failed to disclose the following material facts which rendered the statements in the Prospectus regarding Celera's information business materially false and misleading: (1) the exclusive right to data through an agreement with the HGP and through patents was critical to Celera's business plan; (2) Celera had engaged in discussions and negotiations with the HGP regarding a potential collaboration since early October 1999, which

---

[7] Section 11 makes an issuer, its directors, and signers of a registration statement liable if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

had culminated in the December 29 meeting; (3) the December 29 meeting was a disaster for Celera in that it could no longer reasonably expect to have exclusive distribution rights for human genome sequence data for any significant period of time; and (4) the accelerated pace of the HGP's sequencing efforts had drastically shrunk the potential period during which Celera could be the sole distributor of a draft of the human genome. Additionally, while discussing Celera's intellectual property strategy, and incorporating several purported risk factors indicating generally that the failure to obtain intellectual property rights could materially impact Celera's business, the Prospectus' failed to disclose that Celera's WGS sequencing methodology made it extremely unlikely that Celera would obtain useful patents of genomic sequencing data.

> **1.    There Is No Undisputed Version of the Discussions Between the HGP and Celera, Which Culminated in the December 29 Meeting**

Defendants claim that the "undisputed evidence" contradicts plaintiffs' contentions regarding the collaboration negotiations with the HGP. However, defendants' so-called undisputed evidence consists mostly of the testimony of the Individual Defendants and other Celera officers. As described above, the e-mails circulated among members of the HGP, along with the testimony of the HGP witnesses (and even certain testimony from Celera witnesses), supports plaintiffs allegations and often directly contradicts the self-serving testimony of Celera witnesses regarding every aspect of the negotiations. For example, defendants assert that a collaboration with the HGP was not necessary for their information business. However, the HGP witnesses testified, and plaintiffs' expert has confirmed, that Celera's sequence -- the foundation of its information business -- was flawed and could not be completed without collaborating with the HGP. Then, defendants claim that a collaboration was never discussed, even though there is substantial documentary evidence and testimony from both HGP and Celera witnesses evidencing collaboration discussions.

-24-

Defendants further contend that the December 29 meeting was not the culmination of the collaboration discussions, even though HGP witnesses testified that the meeting was scheduled only after defendant White, Dr. Venter and Dr. Levine had agreed that the elements of the collaboration, as outlined by the HGP, were reasonable. PX 17, at RW00343. Finally, defendants state that the December 29 meeting was not disastrous for Celera, as the parties continued to negotiate, and ultimately came to an agreement. In contrast, the record reveals that the December 29 meeting ended with Celera knowing that the HGP would not agree to a collaboration on Celera's terms, the parties had virtually no further collaboration communications, that Celera's CEO did not see any value to further meetings if the HGP would not acquiesce to Celera's demands, and that the "agreement" to which defendants refer was arranged by a U.S. government official who had not participated in the collaboration discussions, and wholly unrelated to those discussions. Naturally, only the trier of fact can weigh and evaluate this contradictory testimony. *See American Mfrs. Mut. Ins. Co. v. American Motorist Ins. Co.*, 388 F.2d 272, 279 (2d Cir. 1967) (denying summary judgment when depositions presented conflicting testimony).[8]

### 2.    The Prospectus Failed to Disclose Material Adverse Facts Regarding Celera's Ability to Execute Its Business Plan

The two principal sources of revenue identified in the Prospectus were: (1) Celera's information business, purportedly modeled on Lexis-Nexis and Bloomberg, and (2) intellectual property for novel gene sequences. PX 2 at 26, 32. For this plan to succeed, Celera needed the exclusive right to commercially distribute a viable genomic sequence that would be the

---

[8] If the Court concludes that plaintiffs have not provided sufficient conflicting evidence on any of the foregoing issues, pursuant to Fed. R. Civ. P. 56(f), it should permit plaintiffs to depose Dr. Collins. *See* Affidavit of Sanford P. Dumain, submitted herewith.

DOCS\257849v1

foundation of the information business, and the ability to patent commercially valuable gene sequences. However, at the time of the Offering, Celera had no expectation that it would ever be able to obtain either of these.

**a.    The Negotiations Among the HGP and Celera Were Material to Celera's Ability to Generate Revenue From Its Sequencing Efforts**

Defendants assert that Celera's business plan was not dependent upon a collaboration with the government, as Celera's plan was to become the Bloomberg or Lexis-Nexis of human genomic information. Besides the fact that the only real support for this proposition is the self-serving testimony of Celera witnesses, this argument is a red herring, which obscures the true issue. The Prospectus describes how "the sequencing of the human genome" provides "the foundation for the additional components of Celera's business." These "additional components" were the tools and data that Celera was purporting to offer in its information business. Thus, without a valuable sequence, which, as discussed above, it could only obtain through collaboration with the HGP, Celera's business model could not hope to succeed, in the same way that Bloomberg could not function without accurate financial data.[9]

Defendants' contention that Celera's information business model did not require any data exclusivity is belied by the actions of its CEO. If, as defendants claim, "[w]hat was important was . . . the software, the ability to analyze the sequence . . ." (which is, in any event, contradicted by that acknowledgement in the Prospectus that the business model could not

---

[9] Defendants contend that Celera did not need to collaborate with the HGP because Celera had free access to the HGP's data, through which it could generate its own merged sequence, through the Bermuda Accord, pursuant to which the members of the HGP were required to release their data free to the public. Def. Br. at 15. However, the Bermuda Accord did not necessarily allow Celera to resell this data. Indeed, prior to the Offering, members of the HGP were working on a license agreement for this data that would restrict its resale. PX 71 at RW00125-RW00132.

-26-

function without a viable sequence as its foundation), and not the sequence data itself, Celera

would not have demanded exclusive rights to distribute the human genome sequence during

collaboration negotiations with the HGP -- including at the December 29 meeting. Moreover, it

would not matter if competitors were "reselling Celera's data." Def. Br. at 26. However,

defendant White made clear at the December 29 meeting, Celera would not agree to let other

database providers resell its data, or any merged data that resulted from HGP/Celera

collaboration. Indeed, by the time of the meeting, Celera, knowing that its WGS sequence could

not support its business model without merging it with the HGP data, and having lost its

temporal advantage over the HGP, was desperate to make an agreement with the HGP that would

allow Celera to be the exclusive distributor of human genome sequencing information for a

material period of time.[10]  Naturally, this is not a component of the Bloomberg or Lexis-Nexis

business models, as those companies do not own (and cannot prevent the resale of) the financial

data or case law and other legal source material that is available on their web sites.

Defendants assert that prior to the December 29 meeting, the parties were skeptical that

an agreement to collaborate could be reached. Def. Br. at 24-25. However, the balance of the

evidence supporting this contention relates to sentiments early in the negotiation process, or does

not relate to the December 29 meeting.[11]  In contrast, the parties' conduct leading up to the

---

[10] Moreover, defendants' admission that shareholders would not receive a sufficient return
without exclusivity (Def. Br. at 26, 30), confirms that exclusivity was critical to Celera's
business plan. *See also* PX 61 at RW00302 (Dec. 12, 1999, email from Waterston to Collins
explaining that PE needed exclusive rights to the sequence because they "will soon have gotten
just about all they are going to get of commercial value from the shotgun sequencing effort.
The[y] recognize they have a redundant effort which will return little on further investment").

[11] For example, defendants cite several e-mails wherein Dr. Waterston expresses his skepticism
regarding a potential collaboration. However, Dr. Waterston stated that based upon the HGP's
discussions with Celera, he ultimately came to believe that the parties could enter into a formal
collaboration. PX 3 at 64.

DOCS\257849v1

meeting reflects that the representatives of the HGP and Celera thought that a collaboration was possible.

Throughout the negotiations, Celera led the HGP to believe that negotiations for a collaboration were on track. At no time during these negotiations did Celera ever communicate to the HGP, as defendants suggest (Def. Br. at 26), that it did not want to collaborate and only wanted to meet to "reduce the rhetoric" between the parties. PX 3 at 73 (testifying that at no time during the Fall 1999 negotiations did Celera indicate that it was merely looking for a simple agreement to co-submit and "tone down the rhetoric," versus a more extensive collaboration). To the contrary, Celera representatives, including Drs. Venter and Levine, consistently voiced their support for a collaboration. PX 39 at FC0037, PX 37 at FC00021.[12] Defendants' claim that Celera was solely interested in reducing the rhetoric between the parties is further undermined by the fact that defendant White admitted at the meeting that he believed that the rhetoric did not hurt the Company, as it had been *positive* for shareholder value. PX 64 at FC000129. As defendant White claims that his primary focus as CEO was always on his shareholders, it is unreasonable to contend that he would pursue a strategy to minimize a positive impact on Celera's value.

Further, communications that led to the December 29 meeting completely undermine defendants' assertion that the parties did not believe a collaboration could occur. On December 10, 1999, Dr. Varmus outlined the HGP's plan for collaboration, which was set forth in the Shared Principles, to Dr. Levine, who responded that he thought the proposal was "reasonable."

---

[12] Defendants misrepresent Dr. Waterston's testimony to support their argument. While Dr. Waterston was initially skeptical that a collaboration could be successfully negotiated, by the time of the December 29 meeting, he was "optimistic" that an agreement could be reached. PX 3 at 46:1-3.

-28-

Then, one week before the meeting, Dr. Levine stated that he had reported the HGP's proposal to defendant White and Dr. Venter, and that neither of them saw any element of the proposal as a "showstopper." PX 63 at FC 00114. As the foregoing facts contradict the testimony of Drs. Levine and Venter, relied upon by defendants, at a minimum, there are issues of fact regarding the parties' mindsets entering the December 29 meeting.

Finally, defendants' contention flies in the face of logic and common sense. Defendants fail to explain why, with only one-week notice, four senior HGP scientists and Celera's CEO, defendant White, and President, Dr. Venter, would agree to meet in between Christmas and New Year's, at a location which required several of the participants to fly to the meeting, if no one thought the meeting had any purpose. Moreover, Paul Gilman, Celera's Director of Policy and Planning, was asked to cut his vacation short, so that he could attend the meeting. At a minimum, plaintiffs are entitled to the common sense inference that these facts demonstrate the importance of the meeting. *See, e,g,, Winiarski v. Conn. Dep't of Pub. Health*, 273 F. Supp 2d 189, 191 (D. Conn. 2003) (plaintiffs opposing summary judgment are entitled to logical inferences). Indeed, it is hard to imagine that a reasonable jury would fail to appreciate the importance of the meeting given these circumstances. [13]

---

[13] Defendants take Dr. Varmus' testimony (that the December 29 meeting, and the negotiations leading to the meeting, were not the dominant events in his life) out of context. As of January 1, 2000, Dr. Varmus was stepping down as Director of the NIH to become President of Rockefeller University. PX at 75. Thus, his testimony obviously refers to this momentous event in his professional life, rather than the importance of the meeting. In fact, that Dr. Varmus would still attend the December 29 meeting, in the midst of changing positions and cities, speaks volumes as to his perception of the meeting's significance.

**b.    Celera Should Have Disclosed the Breakdown
in Negotiations At the December 29 Meeting**

Celera contends that because the parties were not able to reach any agreement, the

meeting, and the negotiations leading up to it, did not need to be disclosed. However, as

discussed above, an agreement to collaborate with the HGP was critical to the success of

Celera's business. Thus, the HGP's rejection of Celera's attempt to gain exclusivity for a

merged data product for any significant period of time was clearly material. Similarly, the self-

serving testimony of Celera's witnesses that the meeting was unimportant is no basis for

summary judgment, in the face of substantial evidence indicating the important of a collaboration

to Celera.

Recognizing that the collaboration discussions, and the adverse result of them, were

material, defendants weakly claim that collaboration negotiations were "expressly disclose[d] in

the Prospectus," (Def. Br. at 22), and "repeatedly discussed in major national news publications."

Def. Br. at 11-12, 26.

Section 11 of the Securities Act, creates liability for any prospectus or registration

statement that contains "an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading."  15

U.S.C. § 77k.  Thus, as here, "'[a] prospectus will violate federal securities laws if it does not

disclose 'material objective factual matters' or buries those matters beneath other information, or

treats them cavalierly.'"  *In re Globalstar Secs. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist.

LEXIS 22496, at *30 (S.D.N.Y. Dec. 15, 2003) (quoting *DeMaria v. Andersen*, 318 F.3d 170,

180 (2d Cir. 2003)) (citations omitted); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5

(2d Cir. 1996) (citations omitted).  Recognizing that news articles cannot cure material omissions

and misstatements in the Prospectus, defendants have already made clear that they have not, and

-30-

do not intend here, to assert a "'truth on the market' defense, which is only applicable to cases brought under Section 10(b) of the Securities Exchange Act of 1934, not under Section 11 or Section 12 of the Securities Act." PX 71 at 2 (Ex. A to Defendants' Motion for Leave to File Sur-reply in Further Opposition to Plaintiffs' Motion for Class Certification).[14]

Moreover, the general language in the Prospectus upon which defendants rely -- that "Celera Genomics group . . . has sought to coordinate its efforts with those funded by the U.S. government" (Prosp. at 49) -- is obviously insufficient, as it does not discuss a single fact regarding Celera's need for collaboration or the failed collaboration.[15]

---

[14] In any case, articles from the press are generally insufficient disclosure under the federal securities laws. *See Provenz*, 102 F.3d at 1493 (in reversing district court's grant of summary judgment, holding "[w]e do not think that these [analyst reports and articles] 'effectively counterbalanced' defendants' false and misleading statements."); *Taxable Mun. Bonds*, 1994 U.S. Dist. LEXIS 13851, at *15-16 (E.D. La. Sept. 26, 1994) (denying summary judgment motion because criticism in press articles was not sufficient to have "dispelled any misstatements and omissions allegedly made by the defendants."). Here, the news articles upon which defendants further rely to assert the collaboration negotiations were disclosed, are just as vague, and accordingly, insufficient to have adequately conveyed the truth to the public. *See, e.g.*, DX 12 ("Dr. Francis Collins . . . said that continuing discussions were exploring the possibility of collaboration . . . ."); DX 14 ("public consortium is negotiating with its private rival to pool efforts."); DX 17 ("The public and private rivals racing to decode the human genetic blueprint are discussing collaborating on the effort . . . .").

[15] Moreover, it is well-established that "'[w]hen a corporation does make a disclosure -- whether it be voluntary or required -- there is a duty to make it complete and accurate.'" *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 02 Civ. 0767 (LBS), 2003 U.S. Dist. LEXIS 21858 at *13 (S.D.N.Y Dec. 4, 2003) (citations omitted); *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 725 (S.D.N.Y. 1990) (once a party makes partial disclosures, it has a "'duty to disclose whatever additional information is necessary to rectify the misleading statements.'") (citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989)); *Greenberg v. Chrust*, No. 01 Civ. 10080 (RWS), 2002 U.S. Dist. LEXIS 21103, at * 7 (S.D.N.Y. Oct. 31, 2002) (citation omitted). Accordingly, by raising Celera's supposed coordination attempts with the HGP, the Prospectus was required to disclose that materials facts regarding the failed collaboration discussions.

-31-

c.    **Celera Could Not Develop Meaningful Intellectual Property**

As discussed above, Celera's WGS sequencing technique made it highly speculative that Celera would be able to comply with recently enhanced USPTO guidelines regarding the patenting of gene sequences. Further, at the time Celera issued the Prospectus, defendants knew that there were very few, if any, patentable genes remaining. PX 8 at 110-11. PX 5 at 125-26 ("it was unclear whether there would be any unique genes left to be discovered that were patentable . . ."). Indeed, Dr. Venter testified that he had informed defendant White of Celera's inability to patent genes on several occasions prior to issuing the Prospectus, (PX 5 at 27-28). Nevertheless, the Prospectus led investors to believe that the Company's business plan was based, in part, on its ability to generate a substantial amount of revenue from patenting gene sequences.

C.    **The Prospectus Failed to Disclose Material Facts**

Defendants would like this Court to believe that, as a matter of law, defendants were free to omit from the Prospectus the need for Celera to collaborate with the HGP and that the attempts to do so were a disaster. In other words, defendants contend that when investors who are members of the putative class invested approximately **one billion dollars** in the Offering, it would not have made any difference at all in their investment decisions whether or not the Prospectus had reported the true and complete facts surrounding the December 29 meeting and all that led up to it. Defendants' position is patently absurd.

As an initial matter, determining materiality involves fact intensive issues which are not appropriate for summary judgment. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Information is material "if there is a substantial likelihood" that disclosure of the truthful information "would have been viewed by the reasonable investor as having significantly altered

-32-

the total mix of information available." *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).

The law is well-established that a duty to disclose information exists when such disclosure is

necessary to make statements made, whether voluntary or mandatory, not misleading. *SEC v.*

*Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir. 1968); *Robbins v. Moore Med. Corp.,*

788 F. Supp. 179, 184 (S.D.N.Y. 1992). This duty is heightened in the context of a public

offering. *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1202 (1st Cir. 1996) ("Indeed, in the

context of a public offering, there is a strong affirmative duty of disclosure.") (citing *Ernst &*

*Ernst,* 425 U.S. at 195 (the Securities Act "was designed to provide investors with full disclosure

of material information concerning public offerings").

### 1.    The Prospectus Omitted to Disclose Material Facts Regarding the Failed Collaboration Discussions with the HGP

The Prospectus contains numerous statements about Celera's information business plan,

(PX 2 at 31-41). *Id.* at 49. By discussing Celera's purported business plan in detail in the

Prospectus, Celera had a duty to ensure those statements about the business plan were complete

and not materially false and misleading.[16] In order to make the statements not misleading,

Celera was required to, but did not, disclose that the plan to use its human genome sequence as

the foundation for its information business relied upon the successful development of that

sequence, for which Celera needed to collaborate with the HGP, and that negotiations regarding

such a collaboration had completely broken down at the December 29 meeting.

Defendants argue that their failure to disclose the adverse December 29 meeting, and the

collaboration negotiations that culminated with that meeting, was not material because it was not

---

[16] Celera's general statement that it had sought to coordinate its efforts with the HGP (Prospectus at 49) also gave rise to a duty to disclose all material facts regarding the failed collaboration discussions with the HGP.

"adverse to Celera" (Def. Br. at 23) and defendants' otherwise considered it a "non-event." Def. Br. at 25. However, numerous documents, testimony and other facts prove that the December 29 meeting and a collaboration with the HGP were material because Celera's business model hinged on a successful collaboration. At the very least, there are disputed facts in the record requiring a trial on this issue.

Defendants' conduct confirms that the collaboration negotiations, and the adverse result of the December 29 meeting, were material to Celera. Indeed, the fact that Celera's highest ranking officials, including defendant White, Celera's CEO, attended the December 29 meeting and continuously participated in collaboration negotiations with the HGP throughout the fall of 1999, is, itself, proof that defendants believed the December 29 meeting and collaboration was important. *See In re Columbia Sec. Litig.*, 155 F.R.D. 446, 484 (S.D.N.Y. 1994) (rejecting defendants' argument that their misstatements regarding negotiations of a merger were immaterial where plaintiffs evidence' demonstrated the highest corporate officials were involved in the negotiations).[17] Additionally, defendants admitted their intent to conceal the collaboration negotiations and the outcome of the December 29 meeting from Celera's investors. PX 4 at 96-97, 99; PX 33 at 8 RW 00470. ("[t]o say that we are meeting would mean that we at Celera would have to explain to our investors and customers what this is all about and how it will and/or will not affect them.").

### 2. The Prospectus Failed to Disclose That Celera Was Unlikely to Receive Any Meaningful Patent Protection

As discussed above, the Prospectus contains several statements that revenue from patents was an important component of Celera's business plan. Additionally, the Prospectus contained

---

[17] Contrary to defendants' contention, at no time did the HGP think that Celera indicated that it did not want to collaborate. PX 3 at 73.

numerous supposed risk factors indicating that the inability to obtain patents could materially affect Celera's business. Defendants had a duty ensure that these statements were complete and not misleading.

In order to make the statements in the Prospectus not materially false and misleading, defendants needed to, but did not, disclose that Celera's WGS technique was generating data that would not permit Celera's patent applications for any purported gene sequences to comply with recently revised USPTO guidelines regarding utility and written descriptions. Rather than directly addressing Celera's inability to obtain valuable patents, defendants merely contend that no disclosure was necessary regarding Celera's ability to obtain patent protection for gene sequences, because that was never a part of Celera's business plan. Def. Br. at 31. However, in addition to Celera's express statements to the contrary in the Prospectus, this assertion is belied by the risk factors in the Prospectus, concerning Celera's ability to obtain patent protection. PX 2 at 11-12; *see also* Def. Br. at 18-19. Certainly, defendants cannot argue that they opted to include risk factors about immaterial events in the Prospectus. Such an argument would be an admission that the Prospectus falsely describes the materiality of the intellectual property component of Celera's business. As described by plaintiffs' damages expert:

> However, it is my understanding that Celera's sequencing strategy was unlikely to yield successful patents[18] or royalties and that "reach through" rights which would extend the value of such patents were not supported or supportable.[19] This information was not disclosed in the Prospectus and, if disclosed, would have fundamentally altered investor's perceptions of the value of both Celera and other genomics companies in the year after the secondary offering on February 29, 2000. PX 66 at 11.

---

[18] PX 8 at 103-104, *See also*, PX 65 at 1-20.

[19] PX 7 at 115; PX 3 at 51.

Finally, the significant drop in Celera's stock price after the failed collaboration efforts

with the HGP were disclosed is further proof that collaboration with the HGP to obtain exclusive

rights to the human genome was important to investors.  Courts routinely find that a substantial

drop in stock price after the release of information concerning the issuer company is material.

*See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (stock movement relevant in

determining materiality), *cert denied*, 502 U.S. 813 (1991); *Ganino v. Citizens Utils. Co.*, 56 F.

Supp. 2d 222, 227 (D. Conn. 1999) ("another indication of materiality is the market's response to

the alleged misinformation.").

**D.     The Materially False And Misleading Statements And Omissions In
        The Prospectus Are Not Protected by The Safe Harbor Or Bespeaks
        Caution Doctrine**

The PSLRA's safe-harbor provision limits liability for statements that are: (1) forward-

looking; (2) accompanied by meaningful cautionary language; and (3) made without knowledge

of their falsity.  *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218-19 (D. Conn. 2001); *In re

Globalstar*, 2003 U.S. Dist. LEXIS 22496, at *25; *In re Nortel Networks Corp., Sec. Litig.*, 238

F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (safe-harbor provisions apply to forward-looking

statements only).  Similarly, the common law bespeaks caution doctrine protects statements that,

considered in their entirety, "clearly bespeak caution."  *Xerox*, 165 F. Supp. 2d at 219.

**1.     Defendants' False And Misleading Statements And Omissions
        Were Not Accompanied By Meaningful Cautionary Language**

The PSLRA's safe harbor and the common law bespeaks caution doctrine will only apply

if there is accompanying cautionary language that "precisely address[es] the substance of the

specific statements or omissions being challenged."  *In re Prudential Sec. Ltd. P'ships Litig.*, 930

F. Supp. 68, 72 (S.D.N.Y. 1996); *Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d

723, 729 (2d Cir. 1998) (the cautionary language "must relate directly to that by which plaintiffs

claim to have been misled.") (citations omitted). *See also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("Not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other whatever is misleading will remain materially so, and liability should follow."). Indeed, even seemingly specific risk disclosures are misleading if the actual risks are significantly greater than those portrayed in the Prospectus. *In re Prudential*, 930 F. Supp. at 72. Rather both the existence and the magnitude of the risk must be specifically disclosed for the statements to truly "bespeak caution." *See Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995).[20]

Defendants concede that the Prospectus failed to mention any details about negotiations between Celera and the HGP to obtain exclusive rights to the human genome at the disastrous December 29 meeting. Def. Br. at 35. Yet, defendants still contend that, "[t]he Prospectus contained meaningful cautionary language regarding these risks." *Id*. This argument is significantly undermined by the fact that defendants cannot, and do not, cite any specific

---

[20] Defendants inappropriately rely on two cases from the Eleventh Circuit (Def. Br. at 34), which applies a much more liberal definition of what constitutes sufficient cautionary language. *See In re Columbia Labs, Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1369 (S.D. Fla. 2001) ("The Eleventh Circuit has taken an even more liberal approach" in defining sufficient cautionary language). While the cases cited by defendants only require a defendant to disclose factors "relating to" the alleged false statement or omission (*see Harris v. IVAX Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (alleged misleading statements and omissions accompanied by cautionary language *similar* to the risks realized protected); *Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) (same)), the Second Circuit's standard described above requires a defendant to *precisely* address the risk. *See, e.g., Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (cautionary language "must relate directly to that by which plaintiffs claim to have been misled.") (citations omitted). Even under the Eleventh Circuit's more liberal definition, defendants' material false and misleading statements and omissions would not be protected be the safe-harbor or bespeaks caution doctrine because the purported cautionary language did not alert investors about known material adverse facts.

Moreover, *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (Def. Br. at 22, 34), is not applicable because there, unlike here, plaintiff conceded that the prospectus contained cautionary language.

-37-

cautionary language addressing the risks arising from the already failed collaboration negotiations. Rather, defendants only generally cite to their own self-serving "Statement of Facts" to support their argument. *Id.* at 35, 37.

Defendants' argument is further belied by the fact that they can only point to three out of forty-nine purported risk factors that even discuss Celera's business plan. Def. Br. at 34-35. These three risk factors purportedly warn that: (1) Celera's "business plan is unique and expanding;" (2) Celera faced potential competition from other companies; and (3) others may seek to publicly disclose the human sequence data. *Id. See also* Exh. 1, Risk Factors 2, 6 and 15.[21] None of these meaningfully address any of the following material undisclosed adverse facts about Celera's failure to obtain exclusivity from collaboration negotiations with the HGP at the December 29 meeting (which itself was not disclosed): (1) collaboration negotiations between Celera and HGP broke down at the December 29 meeting when the parties could not agree on the exclusivity of the human genome map (PX 3 at 97); (2) Celera needed exclusivity to profitably execute its stated business plan and gain a competitive advantage (PX 13 at RW00018, PX 16 at 1 RW00302); (3) repackaging of Celera's human sequence data threatened the viability of its business plan (PX 5 at 13); and (4) Celera could not complete the human genome sequence and required HGP's help to validate its sequence (PX 60 at RW0392).[22]

---

[21] The remainder of the risk factors concern entirely unrelated issues. Exh. 1 at 8-20 (identifying risk factors).

[22] The cases cited by defendants do not support their position. In *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 8 (2d Cir. 1996), the court dismissed plaintiffs' claim because the risk that a fund manager might incorrectly choose investment assumptions, of which plaintiff complained, *were disclosed*. In *Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004), plaintiffs' section 11 claim was dismissed, in part, because, unlike here, the complaint's allegations revealed that defendants' statements were mere puffery not giving rise to a securities law violation.



2.    **Defendants' Material False And Misleading Statements And
      Omissions Were Made With Full Knowledge Of their Falsity**

Knowingly false statements are not protected by the PSLRA's safe harbor or the

bespeaks caution doctrine. *Xerox*, 165 F. Supp. 2d at 219.  "No degree of cautionary language

will protect material misrepresentations or omissions where defendants knew their statements

were false when made." *In re Nortel Networks Corp., Sec. Litig.*, 238 F. Supp. 2d 613, 628

(S.D.N.Y. 2003) (quoting *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 22, 231 (S.D.N.Y.

1999)).  Here, no cautionary language would have been sufficient because defendants knew at

the time they issued the Prospectus that the aforementioned omissions rendered the challenged

statements materially false and misleading.  *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109,

1115 (9th Cir. 1989), *cert. denied*, 496 U.S. 943 (1990) ("There is a difference between knowing

that any product-in-development may run into a few snags, and knowing that a particular product

has already developed problems . . . . "); *In re Prudential*, 930 F. Supp. at 72 ("The doctrine of

bespeaks caution provides no protection to someone who warns his hiking companion to walk

slowly because there might be a ditch ahead when he knows with near certainty that the Grand

Canyon lies one foot away").

a.    **Defendants Failed To Disclose That Collaboration
       Efforts Broke Down At The December 29 Meeting,
       Resulting In Celera's Inability To Obtain The Human
       Genome Sequence For Its Information Business**

Defendants do not, and cannot, deny that the Prospectus did not disclose the importance

of a collaboration with the HGP to the execution of Celera's information business.  Similarly,

defendants do not deny that the Prospectus did not disclose the details of negotiations with the

HGP to obtain exclusive right to the human genome sequence, culminating in the disastrous

December 29 meeting.  Defendants also failed to disclose that, at that meeting, negotiations had

completely broken off, and there was no hope of a future collaboration.  Nor did they disclose

-39-



that negotiations failed because Celera insisted on having exclusive rights to the parties' joint

genome sequencing until at least 2005. Thus, none of the statements in the Prospectus is

protected under the safe harbor or the bespeaks caution doctrine, because all of the foregoing

adverse facts were known by defendants at the time the Prospectus was disseminated.

<b>b.    Defendants Misrepresented Celera's Ability To Obtain<br>Meaningful Intellectual Property</b>

By electing to ignore plaintiffs' biotechnology expert's report, defendants do not dispute

that the Prospectus did not disclose that Celera's WGS technique made it highly unlikely that

Celera would be able to satisfy the USPTO's recently enhanced utility and written description

guidelines. Defendants also do not dispute that the Prospectus failed to disclose that there were

very few genes remaining to be patented and that Celera's technique did not allow it to identify

the function of any particular gene. As defendants knew all of the foregoing facts at the time the

Prospectus was disseminated, none of the statements regarding Celera's intellectual property

strategy is entitled to the protection of the safe harbor or the bespeaks caution doctrine.[23]

<b>E.    A Reasonable Jury Could Find That Defendants Are Statutory Sellers<br>Under Section 12(A)(2)</b>

Despite the fact that defendants have not cited to a single fact developed in discovery, or

cited a single case decided after the Court's resolution of their motion to dismiss, defendants

again try to convince this Court that they are not statutory sellers under Section 12(a)(2) because

---

[23] Defendants' reliance on *In re Aegon N.V. Sec. Litig.*, No. 03. Civ. 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) and *In re Columbia Labs,* 144 F. Supp. 2d 1362, 1368-69 (S.D. Fla. 2001), is misplaced. The *Aegon* court found that, unlike here, plaintiffs had failed to provide specific facts alleging defendants knew their earnings forecasts were false and that even if they did know, the forecasts were accompanied by meaningful cautionary language. Similarly, the plaintiff in *Columbia Labs* conceded that defendants did not know the statements were false when made and thus, the safe harbor applied. *Id.* at 1370.

they did not directly sell shares of Celera stock to plaintiffs.[24]  Def. Br. at 38.  Rather, defendants

contend that since they sold shares of Celera stock to their underwriters who then in turn sold

those shares to plaintiffs, the underwriters, not defendants, were the true sellers of Celera stock.

*Id.*  This argument must fail again because it ignores undisputed material facts establishing

defendants' liability under Section 12(a)(2) according to well-established Second Circuit

precedent.

### 1.    Section 12(a)(2) Standard

Section 12(a)(2) imposes liability on those who sell securities by means of a prospectus

"which includes an untrue statement of material fact or omits to state a material fact necessary in

order to make the statements, in the light of the circumstances under which they were made, not

misleading." 15 U.S.C. § 77l(a)(2).  A seller is one who either passes title of the securities to the

buyer or one who successfully *solicits* the purchase, motivated at least in part by a desire to serve

his own financial interests or those of the securities owner.  *Pinter v. Dahl*, 486 U.S. 622, 642-

647 (1988).[25]  In extending liability to those who *solicit* stock sales, the Supreme Court in *Pinter*

explained, "[t]he solicitation of a buyer is perhaps the most critical stage of the selling

transaction" because it is "the stage at which an investor is most likely to be injured . . . by being

persuaded to purchase securities without full and fair information." *Id.* at 646-647.

---

[24] This Court has already rejected this same argument in defendants' Motion to Dismiss the First
Amended and Consolidated Class Action Complaint under applicable Second Circuit law.

[25] The Private Securities Litigation Reform Act of 1995 amended Section 12 of the Securities
Act by inserting "(a) In General.-" before the text of Section 12 as it previously existed, and by
adding subsection "(b) Loss Causation . . ." Consequently, references to the civil liability
provisions, which prior to 1996 were to Sections 12(1) and 12 (2), are now to Sections 12 (a) (1)
and 12 (a) (2). The Second Circuit has extended the *Pinter* definition of a statutory seller to
Section 12(a)(2) because "the language of §§ 12(1) and 12(2) is identical." *Cortec Indus., Inc. v.
Sum Holding, L.P.*, 949 F.2d 42, 49 (2d Cir. 1991) (applying the *Pinter* analysis to claims arising
under § 12(2)).

Following *Pinter*, the Second Circuit has repeatedly imposed statutory seller liability under the second *Pinter* prong on one who: (1) solicits stock sales; and (2) is motivated by a desire to serve his own financial interests or those of the securities owner, *regardless* of whether title to shares has passed pursuant to a firm commitment underwriting.[26] *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 204 (S.D.N.Y. 2000). In *Twinlab*, defendants moved to dismiss plaintiffs' Section 12 claim, in part, because they sold the stock at issue by firm commitment underwriting. There, as here, defendants argued that they were insulated from Section 12 liability because they lacked privity with plaintiff stock purchasers. *Id.* The court rejected defendants' argument, holding that "*Twinlab's* privity argument is substantially undercut by development of the law in this circuit following the Supreme Court's decision in Pinter." *Id.*[27]

---

[26] Defendants reliance upon *Feiner* and *Credit Suisse* for the proposition that plaintiffs who purchase stock in a firm commitment underwriting only have standing to sue the underwriters from whom they purchased the stock is disingenuous and completely mischaracterizes the findings in those cases. Def. Br. at 38. Indeed, both the *Feiner* and *Credit Suisse* courts specifically recognized that plaintiffs need not purchase the stock directly from the company to have standing under Section 12(a)(2), if the defendants *actively solicited* plaintiffs' purchase. *Feiner v. SS&C Tech., Inc.*, 47 F. Supp. 2d 250, 254 (D. Conn. 1999); *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001). Specifically, the *Credit Suisse* court, in dismissing plaintiffs' 12(a)(2) claim, found plaintiffs who purchased their stock directly from the underwriters had no standing as to the officer defendants because plaintiffs alleged only "bald allegation[s] of solicitation." *Credit Suisse*, 2001 WL 300733, at *10. The *Feiner* court found that certain plaintiffs had no standing to sue the underwriters because those plaintiffs did not directly purchase their stock from the underwriters, without even addressing plaintiffs' standing as to the company's officers. *Feiner*, 47 F. Supp. 2d at 254.

[27] *See also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *Milman*, 72 F. Supp. 2d at 229-230; *Feiner*, 47 F. Supp. 2d at 254.

-42-

### 2.    A Reasonable Jury Could Find That Defendants Are Statutory Sellers Under Section 12(a)(2)

In connection with the Offering, each of the Individual Defendants actively solicited the sale of Celera stock because they: (i) signed the Company's Registration Statement; (ii) actively participated in the preparation of the false and misleading prospectus; (iii) actively participated in road shows promoting the sale of Celera stock; and (iv) were motivated to serve their own financial interest. Each of these factors is sufficient to establish defendants' status as statutory sellers under Section 12(a)(2).

*First*, that the Individual Defendants signed the registration statement (Regis. Stmt at II-2), incorporating the false and misleading Prospectus is sufficient to constitute solicitation under Section 12(a)(2). *See In re Deutsche Telekom AG Sec. Litig.*, 00 Civ. 9475 (SHS), 2002 U.S. Dist. LEXIS 2627, at *14 (S.D.N.Y. Feb. 20, 2002) ("[W]hile the nature of a prospectus itself is to solicit the purchase of securities, it is those who sign the registration statement that accompanies the prospectus who are deemed solicitors").[28]

*Second*, each of the Individual Defendants testified that he participated in drafting and/or reviewing the Offering's Prospectus and registration statement.  PX 10 at 40:13-16, 41:4-5; PX 8 at 95:4-5; PX 9 at 49:5-17.  Courts in the Second Circuit routinely find that a defendant who participates in preparing the false and misleading prospectus, as defendants here admit, is liable as a statutory seller under Section 12(a)(2).  *See, e.g., Twinlab*, 103 F. Supp. 2d at 205 (mere

---

[28] *See also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 U.S. Dist. LEXIS 14761, at *23 (S.D.N.Y. Sept. 20, 2001) ("A person who signs a registration statement is deemed to have solicited the purchase of the offered securities"); *In re APAC Teleservices, Inc., Sec. Litig.*, No. 97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908, at * 11 (S.D.N.Y. Nov. 19, 1999); *Dorchester Investors v. Peak Trends Trust*, 99 Civ. 4696, 2003 U.S. Dist. LEXIS 1446, at *6 (S.D.N.Y. Feb. 3, 2003) ("the signing of a registration statement is significant for purposes of finding that a [person] is a seller, even in the context of a firm commitment underwriting").



participation in preparation of misleading prospectus is sufficient solicitation under Section

12(a)(2)); *Capri*, 856 F.2d at 478 (allegations that party "prepared and circulated the prospectus

to plaintiffs, and that the prospectus omitted material facts which significantly affected the risk

undertaken by the investors" sufficient to allege solicitation).

 *Third*, defendants Winger and White testified that they were significantly involved in

road shows to promote the sale of Celera stock.  PX 10 at 64:4-22 (testifying that he and

defendant White were "deeply involved in the road show"); PX 8 at 94:24-25, 105:3-13.  At

these road shows, defendants discussed Celera's intended future revenue sources.  PX 10 at

68:14-25 (at the road show, "we simply discussed what would be the potential sources of

revenue.").  Participation in road shows to promote the sale of Celera stock constituted

solicitation under Section 12(a)(2).  *See In re Am. Bank Note Holographics Sec. Litig.*, 93 F.

Supp. 2d 424, 438 (S.D.N.Y. 2000) (allegations that defendant participated in "preparation of the

false and misleading Registration Statement and Prospectus" and in 'road shows' to promote

stock liable under Section 12(a)(2)).[29]

 *Finally*, defendants were financially motivated to solicit the stock sales, because Celera

would receive $944 million in gross proceeds from the Offering, comprised of $820.3 million in

---

[29] Defendants rely on a single footnote in *Pinter* and one other case, *Wilson*, 872 F.2d at 1126, for the proposition that their participation in the preparation of the false and misleading Prospectus does not establish Section 12(a)(2) liability.  Def. Br. at 39.  However, these cases only hold that persons who "'participate in soliciting the purchase,'" by *ministerial acts* such as mailing the solicitation documents at defendants' request, are not liable for their participation. *Pinter*, 486 U.S. at 651 (the purchaser of securities "does not, in any meaningful sense, 'purchas[e] the security'" from "professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services . . . ."); *Wilson*, 872 F.2d at 1126 (finding defendants' lawyers, whose only participation was the ministerial act of "mailing a copy of the private placement memorandum" to plaintiff at defendants' request, were not liable under Section 12((2)).  As discussed above, defendants performed more than just ministerial functions by signing the registration statement and actively participating in the preparation of the false and misleading Prospectus and road show.

DOCS\257849v1

net proceeds and an underwriter's "over-allotment option" for $123.2 million. PX 2 at 5. Thus, not only did defendants receive a substantial financial benefit from the net proceeds of the sale, but also an additional financial incentive to insure all of the shares were sold in the Offering. *Id.* A reasonable jury could find that Celera's substantial financial gain from the sale of Celera stock satisfies the second criterion of the second *Pinter* prong. *See, e.g., Milman*, 72 F. Supp. 2d at 229-30 (Section 12 claim stated where company profited from offering and solicited sale of stock pursuant to firm commitment).

Defendants, in a last ditch effort to convince the Court they did not actively solicit the sale of Celera stock, argue that "no Defendant could have 'solicited' co-lead plaintiffs' purchases" because defendants had no direct contact with Lead Plaintiffs Vuong or Berlin. Def. Br. at 40. Defendants do not cite a single case supporting their argument and completely ignore well-grounded Second Circuit law, which does not require that the seller have personal contact with the purchaser under Section 12(a)(2). *See Capri*, 856 F.2d at 478 (holding Murphy and GCC liable under Section 12(a)(2), even though they had no direct communications with the plaintiff) . . . ."); *Am. Bank Note Holographics*, 93 F. Supp. 2d at 439 and n. 4 (personal solicitation of the plaintiff by the defendant not required where significant involvement in the solicitation is found).

DOCS\257849v1

## CONCLUSION

For the reasons set forth herein, the Court should deny defendants' motion for summary

judgment in its entirety.

Respectfully submitted,

By _____

David A. Slossberg (CT13116)
Brian C. Fournier (CT16272)
**HURWITZ, SAGARIN
   & SLOSSBERG, LLC**
147 N. Broad Street, P.O. Box 112
Milford, CT 06460
(203) 877-8000

**Plaintiffs' Liaison Counsel**

-and-

Sanford P. Dumain (CT08138)
Lee A. Weiss (CT21345)
Carlos F. Ramirez (CT25340)
Shannon L. Hopkins
**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**Lead Counsel for Plaintiffs**

DOCS\257849v1