## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| In re PE Corporation Securities Litigation | ) <br> ) <br> ) **Master File No. 3:00CV705(CFD)** <br> ) <br> ) **FIRST AMENDED CONSOLIDATED** <br> ) **CLASS ACTION COMPLAINT** <br> ) <br> ) August 20, 2001 |

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class (the "Class") consisting of all persons other than defendants who purchased the common stock of PE Corporation Celera Genomics Group ("Celera" or the "Company") in a secondary public offering of Celera common stock conducted by PE Corporation ("PE") on or about February 29, 2000 (the "Secondary Offering").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended (the "Securities Act") [15 U.S.C. §§ 77k, 77l(2) and 77o].

3.    This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and 28 U.S.C. §§ 1331 and 1337.

4.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). The acts and conduct complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

5.    In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

6.    Lead Plaintiffs David Berlin and Vinh Voung purchased common stock pursuant to the materially false and misleading Prospectus (defined below), and were damaged thereby.

7.    Defendant PE is a Delaware corporation with its principal executive offices at 761 Main Avenue, Norwalk, Connecticut. PE conducts its businesses through its subsidiaries, Celera and PE Biosystems. Celera generates, sells and supports genomic information and related information management and analysis software. The Company also discovers, validates and licenses proprietary gene products, genetic markets and information concerning genetic variability.

8. (a)  The individuals named as defendants herein (the "Individual Defendants") served, at all times material to the claims set forth herein, as senior officers and/or directors of PE in the positions set forth opposite their names as follows:

| Name | Position |
| --- | --- |
| Tony L. White | Chairman of the Board of Directors, President and Chief Executive Officer |
| Dennis L. Winger | Senior Vice President and Chief Financial Officer |
| Vikram Jog | Corporate Controller |

Each of the Individual Defendants named herein signed, personally or by attorney-in-fact, the Company's Registration Statement.

(b)     Defendant White also serves as the Chief Executive Officer of Celera.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

9.     Plaintiffs brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons other than defendants who purchased the common stock of Celera in the Secondary Offering of Celera common stock conducted by PE. Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

10.     The members of the Class are so numerous that joinder of all members is impracticable. PE sold 4.37 million shares of Celera common stock to members of the investing public in the Secondary Offering. The precise number of class members is unknown to plaintiffs at this time but are believed to number in the thousands. In addition, the names and addresses of the class members can be ascertained from the books and records of Celera or its transfer agent.

11.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

12.     Plaintiffs' claims are typical of the claims of the other members of the Class because plaintiffs' and all the class members' damages arise from and were caused by the

same false and misleading representations and omissions made by or chargeable to defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

13.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether the prospectus and registration statement issued by defendants to the investing public in connection with the Secondary Offering omitted and/or misrepresented material facts about Celera and its business; and

(c)    The extent of injuries sustained by members of the Class and the appropriate measure of damages.

15.    The names and addresses of the record owners of the shares of Celera common stock purchased during the Class Period are available from Celera's transfer agent and the underwriters to the Secondary Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

16.    Celera describes itself as a "recognized leader in the generation, sale and support of genomic information and enabling data management and analysis software." Genomics is the study of all the genetic information of a species. Scientists believe that genes may play a role in the progression or regression of diseases. Thus, in theory, once scientists have fully sequenced the human genome and have discovered which genes play a role in specific diseases, pharmaceutical companies will be able to use the genetic information to develop better and more effective drugs to treat disease. Celera has represented that it believes that "the healthcare and life sciences industry will rely on SNP analysis [a process for measuring the association of a genotype and a disease] to improve the efficacy and safety of pharmaceuticals and the development of more reliable tests for diseases with known genetic traits."

17.    Celera reportedly began sequencing the human genome in September 1999. The Company announced in January 2000 that it had compiled 90% of the human genome. Celera reportedly initiated its mapping of the human genome after it completed sequencing the genome of Drosophila (fruit fly).

18.    In addition to Celera, other companies, both public and private have been working to sequence the human genome. The most significant undertaking is being made by the Human Genome Project, a worldwide coordinated effort to sequence the human genome sponsored by governments and nonprofit organizations in the United States, England, Japan and France, among other nations. In the United States, the majority of the public funding for the Human Genome Project is provided through the National Institute of Health ("NIH").

19.     Following the Company's announcement in January 2000 that it had mapped 90% of the human genome, NIH announced that it had reallocated funding in order to further accelerate the Human Genome Project's sequencing effort and to attempt to achieve a "working draft" of the genome by Spring 2000. Thus, Celera was in a "race" with the Human Genome Project to complete the map of the human genome. The outcome of the race was significant to Celera because the Human Genome Project intended to make its findings publicly available, while Celera intended to license its findings to customers on a commercial basis.

20.     Celera has publicly stated that its business strategy is to sequence the human genome and then "use the genomic information derived from its genomic sequencing program as a platform upon which to develop an integrated information and discovery system" that it can license to pharmaceutical companies who are developing new drugs. The Company has stated that its primary source of revenue will come from selling access to its information through subscriptions, collaborative services and licensing its intellectual property.

21.     Celera's competitive position, therefore, was dependent upon its ability to protect its database information through patent and copyright protection. Thus, the Company's commercial success would, in large part, be directly affected by its ability to obtain patent protection on genes, polymorphisms and proteins discovered by it.

22.     The price of Celera common stock rose sharply over the months prior to the Secondary Offering as investors became excited about the prospects for companies engaged in genomic research in general, and Celera's reported success in sequencing the human genome, in particular. On September 14, 1999, Celera common stock traded for $17.875 per share and by February 28, 2000, had risen to $239.00 per share – an increase of 1300%.

23.    On the heels of this sharp price increase, on February 29, 2000, PE sold 4.37 million shares of Celera common stock to the public in the Secondary Offering, as described below in detail, at a price of $225 per share, thereby generating proceeds of $944 million.

**Celera Engages In Discussions With Human
Genome Project Regarding Collaborating On
Completing Sequencing Of The Human Genome**

24.    At the same time that Celera and the Human Genome Project appeared publicly to be in a race to map the human genome, they were engaged in discussions to combine their efforts in order to finish the project more quickly. Those discussions ultimately broke off because the parties were unable to come to an agreement concerning Celera's demands that it have exclusive rights to the human genome map for an extended period of time. The discussions between Celera and the Human Genome Project were not widely known by the public and were never referenced in any fashion in the Company's public filings or press releases and certainly were not disclosed in the Prospectus for the Secondary Offering.

25.    According to a report in the Los Angeles Times, on March 6, 2000, Celera and the Human Genome Project had ongoing discussions concerning their proposed collaboration that culminated in a meeting on December 29, 1999, at Dulles International Airport in Washington, D.C. The article set forth the nature of the discussions between the parties, stating in pertinent part as follows:

> According to people familiar with the negotiations between the two sides, scientific leaders including Varmus, a Nobel prize winner and then still head of NIH, concluded that Celera's techniques were proving so effective that the publicly funded effort had to consider cooperating with the firm.
>
> The sticking point was over how quickly deciphered portions of the code would be released. Leaders of the publicly funded effort wanted to continue their practice of immediate release with no

- 7 -

strings attached.  Celera wanted limits on release to rival commercial users.

The public side's bargainers arrived at a crucial Dec. 29 meeting at Dulles International Airport thinking they had the outline of an agreement in hand.

* * *

The major elements of the deal envisioned by the public side's negotiators included granting Celera exclusive rights over the merged public and private data for six to 12 months and arranging for the two sides jointly to write a scientific paper announcing completion of the code's deciphering.

"I thought we were carrying the basis for compromise," said Dr. Robert H. Waterson, director of the publicly funded sequencing center at Washington University in St. Louis.

But according to both sides, the bargaining quickly broke down.

According to the report, Celera wanted at least five years of exclusive rights to license the data produced by the merging of the two sides' efforts to commercial users, including any future improvements to the data.

26.    It was thus apparent to Celera that the Human Genome Project, as well as the governments supporting that project (most notably, the United States and the United Kingdom), was vigorously opposed to the type of broad sweeping protection that Celera demanded in the negotiations.  Celera's ability, therefore, to obtain protection from the immediate release of the human genome code, in the face of such opposition, was very attenuated and subject to increased and substantial risk.  Indeed, given the reaction of the representatives from the Human Genome Project to the cessation of negotiations, Celera was at an increased and substantial risk that the United States and United Kingdom would take aggressive and punitive actions against Celera in order to ensure immediate and free access to the map of the human genome and its variants.

- 8 -

27.    The power of the U.S. and U.K. governments to stop or impede a party from obtaining patent or copyright protection for genomic data was (and is ) very substantial. In fact, since 1995, the U.S. Patent Office toughened its standards on basic biological discoveries in the area of genomics by requiring companies seeking patents to meet a three part test: a product must be new, non-obvious compared with something that existed before and must show industrial applicability. Thus, the collapse of negotiations between Celera and the Human Genome Project created a very volatile situation in which the U.S. and U.K. governments would take whatever steps they could to prevent Celera from reaching its goal of stalling the release of the human genome code and obtaining patent and copyright protection for its genomic discoveries.

28.    Moreover, it was highly unlikely that the Human Genome Project would want to give Celera exclusive rights to the human genome map for five years after it had already invested $3 billion, and 12 years of research and labor, to advance the mapping effort. It was fairly clear that the reason why the various government entities had made such a large investment in the first place was to benefit the public by facilitating genetic research, which could then be used to develop medical treatments. However, granting Celera exclusive rights to the human genome map would limit, if not completely eliminate, the purpose for which the project was commenced by limiting the ability of researchers and clinicians to obtain free genomic information. In fact, in addition to wanting exclusive rights to the human genome map, Celera had already filed provisional patent applications for 6,500 new gene fragments by November 1999. Thus, it was apparent that granting Celera exclusive rights to the human genome map would not only impede medical research and interfere with clinical practice, but it would also drive up the cost of health care. Accordingly, it was no surprise that the government did not want

to give Celera exclusive rights to genomic information which they felt would serve a greater purpose in the public arena than in the hands of a private company.

29.    Following the publication of the article in the Los Angeles Times, the price of Celera common stock declined from $247.00 per share, on March 6, 2000, to $189.00 per share on March 13, 2000.

30.    Then, on March 14, 2000 -- a mere two weeks after the Secondary Offering -- the aggressive and punitive government action that would inexorably follow the failed negotiations between Celera and the Human Genome Project materialized. On that date, former President Clinton of the United States and Prime Minister Tony Blair from the United Kingdom issued a major, joint statement in which they reiterated the position of their respective governments that all information about gene sequencing and the human genome should be publicly available, stating in pertinent part, as follows:

> We applaud the decision by scientists working on the human genome project to release raw fundamental information about the human DNA sequence and its variants rapidly into the public domain, and we commend other scientists around the world to adopt this policy.

This announcement made it clear that the enormous power of the U.S. and U.K. governments would be brought to bear to oppose any efforts to obtain exclusive rights to the sequencing of the human genome for any protracted period of time and to obtain patent and copyright protection of information obtained from the sequencing. Clearly this was a logical and necessary conclusion to the intractable negotiating stance that Celera took in its discussions with the Human Genome Project.

31.    In response to this announcement, the price of Celera common stock plunged from $189 per share to $119.9375 -- almost 50% less than the price that investors had

paid in the Secondary Offering which was completed 14 days earlier. As a result of this announcement, investors finally appreciated the substantial risks and uncertainties surrounding Celera's business strategy of sequencing the human genome and obtaining patent and copyright protection for its genomic discoveries — two of the most powerful and important governments in the world were opposed to the patent and copyright protection Celera would necessarily need to become a commercial success. Moreover, the Company's future efforts to obtain patents for discoveries derived from the human genome code would be fraught with the heightened risk and uncertainty created by the power of those governments. On Friday, August 17, 2001, Celera stock closed at $26.21, just two dollars off the 52 week low of $24.

## The Prospectus Issued In Connection With The Secondary Offering Was Materially False And Misleading

32.     On or about February 29, 2000, PE filed with the SEC a final Form S-3 Registration Statement (the "Registration Statement") for the Secondary Offering.

33.     On or about February 29, 2000, the prospectus (the "Prospectus") with respect to the Secondary Offering and which forms part of the Registration Statement became effective and PE sold, through the underwriters, the Celera common shares being offered.

34.     In the Secondary Offering, PE sold 3.8 million shares of Celera common stock at a price of $225.00 per share. Additionally, 570,000 Celera common shares were purchased from PE by the underwriters upon the exercise of an over-allotment option. The gross proceeds of the Secondary Offering, including the exercise of the over-allotment, were approximately $944 million.

35.     The Prospectus was materially false and misleading for several reasons.

36.     The Prospectus described Celera in highly positive terms. For example, page 3 of the Prospectus states in pertinent part as follows:

Since its formation, Celera Genomics has become the recognized leader in the generation, sale and support of genomic information and enabling data management and analysis software. Celera Genomics' customers use the information for commercial applications in the pharmaceutical and life sciences industries. The specific applications include target identification, drug discovery, and drug development.

37.     The Prospectus described the Company's "strategy" going forward as follows:

There are three components to the Celera Genomic group's strategy of delivering valuable genomic, proteomic and related biological and medical information in the form of an integrated information and discovery system. The first component, the sequencing of the human genome, lays the foundation for the two additional components, functional genomics and personalized health/medicine. The system will include increasing layers of functional information, such as gene and protein expression data, comparative data from other model organisms, such as DROSOPHILA (fruit fly) and mouse, genetic variation and, ultimately, linkage to medical associations. Users of the system will have the ability to view, browse and analyze the data in an integrated way that should assist scientists and commercial enterprises in accelerating their understanding of the human genetic code. The Group anticipates using its genomic and proteomic data as a platform upon which to develop related databases, software tools, and services. The Group anticipates that this biological data, together with such databases, tools and services, will become a comprehensive scientific and medical resource for a wide range of customers, including companies in the pharmaceutical and biotechnology industries and ultimately, physicians and individuals.

38.     The Prospectus described the Company's business plan, in pertinent part, as follows:

The Celera Genomics group's mission is to become the definitive source of genomic, proteomic and related biological and medical information that will facilitate a better understanding of human biological processes and accelerate future improvements in health care. The Celera Genomics group intends to use the genomic information derived from its human genome sequencing program as a platform upon which to develop an integrated information and discovery system.

The Celera Genomics group believes that its information platform, along with the assay and services systems it will develop, will be used by pharmaceutical, biotechnology, diagnostic and other private enmities and academic and other life science research institutions. The Celera Genomics group will seek to make its discovery and information system the fundamental resource in molecular medicine for acceleration of the development of new drugs and targeted diagnostics.

39.    The statements referenced above in ¶¶ 36-38 were materially false and misleading when issued as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and misleading, including:

(a)    that the Company had engaged in, and was continuing to engage in, discussions with the Human Genome Project concerning collaborating on completing the mapping of the human genome;

(b)    that the Human Genome Project's position during those discussions was that Celera should only have exclusive rights to the data for six months to one year while Celera was demanding five years of exclusivity;

(c)    that the discussions between the Human Genome Project and Celera had broken down in December 1999 over the issue of how long Celera would have exclusive rights to the data;

(d)     that, given the position of the Human Genome Project, Celera's ability to protect its sequencing of the human genome and to obtain patent protection on genomic discoveries were subject to increasing risk and uncertainty -- far beyond the general risks associated with obtaining patent and copyright protection — because absent some compromise with the Human Genome Project, the position of the U.S. and U.K. governments was (and would be) that there should be no patent or copyright protection of the human genome and its variants, and that those governments had enormous power to prevent Celera from obtaining the patent and copyright protection for the genomic discoveries and data critical to its business plan;

(e)     that, given the collapse of the negotiations with the Human Genome Project, it was highly likely that Celera would face aggressive and punitive actions by the U.S. and U.K. governments, among others, that would make it much more difficult than disclosed for Celera to obtain patent or copyright protection for its genomic discoveries and database information, including genes, polymorphism and proteins, and Celera would be unable to implement the business plan described in the Prospectus; and

(f)     based on the foregoing, the Company's ability to implement its "strategy" of sequencing the human genome and patenting discoveries derived from that information was problematic at best and certainly subject to increased risk and uncertainty far beyond the risks and uncertainties described in the Prospectus.

40.     The Prospectus purported to describe the Company's relationship with NIH and the research strategies being employed by the Human Genome Project, but failed to disclose the discussions between the Company and the Human Genome Project or that those discussions had broken off in December 1999. For example, page 36 of the Prospectus states in pertinent part as follows:

> After the announcement by the Celera Genomics Group of its
> goals, the NIH and one private foundation announced their
> intention to accelerate the projected completion date for
> sequencing the entire human genome to 2003. The NIH
> subsequently announced its decision to reallocate funding in order
> to further accelerate the Human Genome Project's sequencing
> effort and to attempt to achieve a "working draft" of the genome by
> the spring of 2000.

With respect to the NIH's efforts, the Prospectus further stated that:

> The NIH recently announced a program relying, in part, on Human
> Genome Project data to address the absence of polymorphism
> information. The Celera Genomics Group believes that the NIH's
> funded efforts to generate significant amounts of information will
> be limited by its sequencing and polymorphism detection
> strategies.

The Prospectus, thus, was materially false and materially misleading because it did not disclose

the failed negotiations with the Human Genome Project, nor did it discuss that the Project would

not permit that Celera obtain exclusive rights to the human genome map for more than 6 months

to 1 year; four years less than what Celera desired.

　　　　41.　　A section of the Prospectus entitled "Collaborations And Other Genomic

Programs" purported to describe Celera's collaborations with other companies and research

efforts. The Prospectus, however, made no mention of the discussions with the Human Genome

Project or the fact that the Company had broken off discussions with the Human Genome Project

because they could not agree over the period of time Celera would have exclusive rights to the

data.

　　　　42.　　A section of the Prospectus entitled "Patents, Licenses and Franchises"

purported to describe the risks and uncertainties surrounding the Company's future efforts to

patent its genomic discoveries. For example, the Prospectus stated:

- 15 -

> The granting of patents on genomic discoveries is uncertain worldwide and is currently under review and revision in many countries. Moreover, publication of information concerning partial gene sequences prior to the time that the Celera Genomics group applies for patent protection based on the full-length gene sequences or different partial gene sequences in the same gene may affect the Celera Genomics group's ability to obtain patent protection.

The Prospectus, however, was completely silent as to the views of the Human Genome Project – a worldwide collaborative effort supported by the U.S. and the U.K., among others – as to the ability to maintain exclusive rights to such data. Indeed, based on the discussions with the Human Genome Project, the Prospectus should have disclosed that the Human Genome Project was willing as part of a compromise to give Celera exclusive rights to genomic data for six months to a year; but that, absent a compromise, the Human Genome Project and its backers, including the U.S. and U.K. governments, would not concede granting Celera exclusive rights for more than a year. Maintaining exclusive rights to this information was material to Celera's business strategy. First, it would continue to fuel their genomic database subscription business, whereby Celera would grant companies the right to access their genetic databases for a subscription fee. Second, Celera would be able to keep important genomic information away from its competitors and thereby stifle other private efforts to discover genomic information.

43.     The Prospectus purported to describe certain risks associated with the Company's future ability to patent its discoveries, but failed to disclose that the Human Genome Project and the U.S. and U.K. governments were in favor of making genomic data publicly available immediately after its discovery. Thus, the desire of the U.S. and U.K. governments to block or impede such patents was an infinitely greater risk than that described in the Prospectus.

44.     Similarly, the Prospectus purported to advise investors that the Company might be subject to future changes in patent law, but failed to mention that the Human Genome Project and the U.S. and U.K. governments would vigorously contest purported patents on genomic discoveries:

> The Celera Genomics group cannot ensure that any changes to, or interpretations of, the patent laws will not adversely affect its patent position. The Celera Genomics group anticipates that there will be significant litigation in the industry regarding genomic patent and other intellectual property rights.

45.     A section of the Prospectus entitled "Competition" mentioned the U.S. government's efforts to map the human genome stating in pertinent part as follows:

> The Celera Genomics group does not believe it is competing with the U.S. government's efforts to sequence the human genome, and has sought to coordinate its efforts with those funded by the U.S. government. The acceleration of the Human Genome Project may assist the Celera Genomics group in its own sequencing and assembly effort.

This statement was materially false and misleading for the reasons stated in ¶ 39.

46.     In a section entitled "Risk Factors" the Prospectus purported to warn of the risks in investing in Celera common stock. The Prospectus, however, failed to mention that the Company had been in discussions with the Human Genome Project and had broken off those talks after the Human Genome Project rejected Celera's demands for exclusivity. Thus, public dissemination of the human genome map was a material risk to Celera's business strategy which should have been disclosed.

47.     The Prospectus contained a boilerplate warning concerning the risk that Celera might not be able to obtain patent or copyright protection for its discoveries, stating in pertinent part as follows:

- 17 -

CELERA GENOMICS' COMPETITIVE POSITION MAY
DEPEND ON PATENT AND COPYRIGHT PROTECTION,
WHICH MAY NOT BE SUFFICIENTLY AVAILABLE

The Celera Genomics group's ability to compete and to achieve
profitability may be affected by its ability to protect its proprietary
technology and other intellectual property. While Celera
Genomics is currently primarily dependent on revenues from
access fees to its databases and discovery information systems,
obtaining patent protection is likely to become more important to
its business as it expands into the area of functional genomics, in
that Celera Genomics would be able to prevent competitors from
making, using or selling any of its technology for which it obtains a
patent. Patent law affecting Celera Genomics' business,
particularly gene sequences, polymorphisms and protein expression
is uncertain, and as a result the Group is uncertain as to its ability
to prevent competitors from developing similar subject matter.

* * *

Moreover, the Celera Genomics group may be dependent on
protecting, through copyright law or otherwise, its databases to
prevent other organizations from taking information from such
databases and copying and reselling it. Copyright law currently
provides uncertain protection regarding the copying and resale of
factual data. As such, Celera Genomics is uncertain whether it
could prevent such copying or resale. Changes in copyright and
patent law could either expand or reduce the extent to which the
Celera Genomics group and its customers are able to protect their
intellectual property.

These statements were materially false and misleading because the true risks to Celera's ability to

obtain patent protection for its genomic discoveries were significantly greater than represented.

Because the Human Genome Project, as well as the U.S. and U.K. governments, opposed the

patenting of the human genome and its variants, the risks associated with patenting "gene

sequences, polymorphisms and protein expression" were significantly more "uncertain" than

described in the Prospectus. The U.S. and U.K. governments' position also posed a risk to

Celera's ability to obtain protection from the "copying and resale of its factual data," which

- 18 -

would necessarily include data relating to the map of the human genome, by other organizations. Accordingly, the power of those governments to block patents and copyrights was an infinitely greater risk to Celera's business plan, and thus its ability to earn a profit, than anything set forth in the Prospectus.

48.    The Prospectus also purported to warn of the risks that the Human Genome presented to the Company, but failed to disclose the failed talks between the parties, stating in pertinent part as follows:

> PUBLIC DISCLOSURE OF GENOMICS SEQUENCE DATA COULD JEOPARDIZE CELERA'S INTELLECTUAL PROPERTY PROTECTION AND HAVE AN ADVERSE EFFECT ON THE VALUE OF OUR PRODUCTS AND SERVICES
>
> The Celera Genomics group, the federally funded Human Genome Project and others engaged in similar research have committed to make available to the public basic human sequence data. Such disclosures might limit the scope of the Celera Genomics group's claims or make subsequent discoveries by Celera or its customers related to full-length genes unpatentable. While the Celera Genomics group believes that the publication of sequence data will not preclude it or others from being granted patent protection on genes, there can be no assurance that such publication has not affected and will not affect the ability of Celera or its customers to obtain patent protection. Customers may conclude that uncertainties of such protection decrease the value of the Celera Genomics group's information products and services and as a result, Celera may be required to reduce the fees it charges for such products and services.

This statement was materially false and misleading for the reasons set forth in ¶ 39 above. It was also materially false and misleading because it failed to mention that Celera itself believed, above anything else, that maintaining exclusive rights to the human genome map was the most important aspect of its business strategy. In fact, exclusivity was important enough to Celera that it was willing to foreclose collaborating with the largest human genome discovery effort in the

world; a collaboration which would have undoubtedly sped up the time it would take Celera to map the human genome. Moreover, exclusivity was critical enough to Celera's business strategy that it was willing to alienate countless government entities involved in the Human Genome Project by choosing not to cooperate with the publicly funded effort; a move which could only jeopardize Celera's ability to seek patent protection for its genomic discoveries from the governments involved in the publicly funded effort.

## BASIS OF ALLEGATIONS

49.    Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of Celera's SEC filings, regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### [Against All Defendants For Violations Of Section 11 Of The Securities Act]

50.    Plaintiffs repeat and reallege each and every allegation contained above.

51.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all defendants.

52.    The Registration Statement for the Secondary Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to

- 20 -

make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

53.     PE is the registrant for the Secondary Offering. The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

54.     As issuer of the shares, PE is strictly liable to plaintiffs and the Class for the misstatements and omissions.

55.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

56.     Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

57. Plaintiffs acquired Celera shares issued pursuant to, or traceable to, and in reliance on, the Registration Statement.

58.     Plaintiffs and the Class have sustained damages. The value of Celera shares has declined substantially subsequent to and due to defendants' violations.

59.     At the times they purchased Celera shares, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to March 14, 2000. Less than one

year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that plaintiffs filed this action. Less than three years elapsed from the time that the securities upon which this Count is brought were <u>bona fide</u> offered to the public to the time plaintiffs filed this action.

### COUNT II

**[Against All Defendants For Violations Of
Section 12(a)(2) Of The Securities Act]**

60.     Plaintiffs repeat and reallege each and every allegation contained above.

61.     This Count is brought by plaintiffs pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Celera shares in connection with, and traceable to, the Secondary Offering.

62.     Defendants were sellers and offerors of the shares offered pursuant to the Prospectus.

63.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

64.     The defendants owed to the purchasers of Celera shares, including plaintiffs and other class member purchasers of Celera shares, the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering materials, including the Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants knew of, or in the exercise of reasonable care should

-  22  -

have known of, the misstatements and omissions contained in the Secondary Offering materials as set forth above.

65.     Plaintiffs and other members of the Class purchased or otherwise acquired Celera shares pursuant to and traceable to the defective Prospectus. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

66.     Plaintiffs, individually and representatively, hereby offer to tender to defendants those securities which plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their Celera shares are entitled to recissory damages.

67.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act. Accordingly, plaintiffs and members of the Class who hold Celera shares purchased in the Secondary Offering have the right to rescind and recover the consideration paid for their Celera shares and, hereby elect to rescind and tender their Celera shares to the defendants sued herein. Plaintiffs and Class members who have sold their Celera shares are entitled to recissory damages.

68.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT III

### [Against The Individual Defendants For Violations of Section 15 of the Securities Act]

69.     Plaintiffs repeat and reallege each and every allegation contained above.

70.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

71.     Each of the Individual Defendants was a control person of Celera by virtue of their position as directors and/or senior officers of Celera. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Celera.

72.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

B.    declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

C.    awarding plaintiffs and other members of the Class damages together with interest thereon;

D.    awarding plaintiffs and the Class rescission on Count II to the extent they still hold Celera shares, or if sold, awarding recissory damages in accordance with Section 12(a)(2) of the Securities Act;

E.    awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

F.    awarding plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

THE PLAINTIFFS

By: _____

J. Daniel Sagarin ct04289
Elias A. Alexiades ct03543
HURWITZ & SAGARIN, LLC
147 N. Broad Street, P.O. Box 112
Milford, Connecticut 06460
(203) 877 - 8000

**Liaison Counsel**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
Sanford P. Dumain
Carlos F. Ramirez
One Penn Plaza
49th Floor
New York, New York 10119
(212) 594-5300

**Lead Counsel for Plaintiffs**

**SPECTOR, ROSEMAN &**
  **KODROFF, P.C.**
Robert M. Roseman
Jeffrey L. Kodroff
1818 Market Street, Suite 2500
Philadelphia, PA 19103

**BARRACK, RODOS & BACINE**
Daniel E. Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

**RABIN & PECKEL LLP**
Marvin L. Frank
275 Madison Avenue
New York, NY 10016

**LAW OFFICES OF**
  **ROBERT P. SUGARMAN**
Robert P. Sugarman
50 Charles Lindbergh Blvd.
Suite 400
Uniondale, NY 11553

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
Shane T. Rowley
270 Madison Avenue
New York, NY 10016

**SCHATZ & NOBEL, P.C.**
Andrew M. Schatz
Jeffrey S. Nobel
330 Main Street, 2nd Floor
Hartford, CT 06106

**Counsel for Plaintiffs**

## Certificate of Service

This is to certify that a copy of the foregoing was mailed, first class mail on August 20, 2001 to:

Thomas D. Goldberg, Esq.
Stanley A. Twardy, Jr., Esq.
Day, Berry & Howard, LLP
One Canterbury Green
Stamford, CT  06901

Michael J. Chepiga, Esq.
Kevin D. Lewis, Esq.
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY  10017-3954

J. Daniel Sagarin