IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE PE CORPORATION SECURITIES LITIGATION | : Master File No. 3:00CV705(CFD) : : July 1, 2005 |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs David Berlin and Vinh Vuong, by and through their counsel, submit this memorandum of law in further support of their opposition to Defendants' Motion for Summary Judgment.

**PRELIMINARY STATEMENT**

On April 4, 2005, the Court granted Plaintiffs' Motion to Compel the Testimony of Dr. Francis Collins, a third-party witness who at all relevant times was, and is, the Director of the Human Genome Research Institute, National Institutes of Health ("NIH"). On June 15, 2005, pursuant to this Court's Order, plaintiffs deposed Dr. Collins, the lead negotiator for the Human Genome Project (the "HGP") in its discussions with the Celera Genomics Croup ("Celera") in the fall of 1999 regarding a collaboration to sequence the human genome.

Consistent with the documentary evidence and testimony previously submitted by plaintiffs in opposition to defendants' summary judgment motion, Dr. Collins's testimony flatly contradicts the self-serving testimony of Celera witnesses upon which defendants' motion is based, and thus, bolsters plaintiffs' arguments in opposition to summary judgment. Dr. Collins's

testimony confirms that there are numerous issues of material fact, which are only appropriately resolved by the fact finder.[1] Accordingly, this Court should deny defendants' motion.

## ARGUMENT

### I. Dr. Collins's Testimony Confirms That Celera Sought A Monopoly Over The Human Genome Sequence

Defendants argue that "[t]here is no evidence that Celera needed a collaboration 'to gain a monopoly over the human genome map' or that Tony White saw a monopoly as crucial to Celera's business." *See, e.g.,* Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("D. Reply") at 10. Rather, defendants insist that exclusive rights to the human genome "was not a component of Celera's business plan," and that defendant White suggested exclusivity "solely in response to the HGP's collaboration proposal." *See, e.g.,* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("D. Mem.") at 16, 26, 30; D. Reply at 10, 12. In response, plaintiffs cited numerous pieces of evidence in the factual record directly contradicting defendants' argument and supporting their claim that Celera needed a monopoly over the human genome map to gain a competitive advantage and to enable Celera to recover its massive investment in Celera's sequencing efforts. Opp. Mem. at 3, 6-7, 10, 13. Indeed, plaintiffs asserted that exclusivity was so important to Celera that it was the primary topic of the collaboration discussions throughout the Fall of 1999 (*Id.* at 3, 14-17) and at the December 29 meeting. *Id.* at 6, 17.

---

[1] A complete recitation of the facts supporting plaintiffs' arguments is set forth in Plaintiffs' Statement of Disputed Facts, [Docket No. 133], filed in connection with Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Mem."). [Docket No. 144].

Dr. Collins's testimony confirms that Celera needed exclusivity to obtain a monopoly over the human genome and sought such exclusivity in its negotiations with the HGP. As described by Dr. Collins:

> And I do recall him [defendant White] using the word monopoly on several occasions as an important goal for Celera. I will tell you that's a word which stirred considerable anxiety on the part of the Human Genome Project representatives.

Transcript of deposition of Francis Collins, Ph.D., M.D. (June 15, 2005) ("Collins Tr.") at 74. Dr. Collins also explained that Celera was attempting to achieve its desired monopoly through the negotiations with the HGP:

> Q. Do you recall what specifically Mr. White said with regard to monopoly as an important goal for Celera?
>
> A. I don't recall the exact wording but the -- the word monopoly certainly stuck in my mind. And the implication was that Celera would be best served by having a monopoly on genome information.
>
> Q. Did Mr. White indicate how he planned to obtain a monopoly?
>
> A. Well, it was part of a conversation about having a limitation on access to the merged dataset or a prolonged and perhaps indefinite period of time except under Celera's terms.

*Id.* at 97-98.

## II. Dr. Collins Testified That Celera And The HGP Engaged In Extensive Collaboration Discussions Throughout The Fall of 1999

Defendants argue that "a collaboration with the HGP was never a component of Celera's business plan." D. Mem. at 7, 13, 30; D. Reply at 8. Defendants also attempt to downplay the significance of collaboration discussions, which occurred throughout the Fall of 1999, by characterizing them as "informal" (D. Mem. at 12) and claiming that the purpose of the discussions was to focus on an agreement "to reduce rhetoric and simultaneously publish scientific papers." *Id.* at 12-13, 26. In response, plaintiffs cited to overwhelming record

3

evidence demonstrating that the parties engaged in extensive, sensitive discussions about a potential collaboration throughout the Fall of 1999, which involved major high-ranking officials from both sides. Opp. Mem. at 4-5, 14.

Dr. Collins's testimony is wholly consistent with plaintiffs' position. According to Dr. Collins, Celera and the HGP began discussing a potential collaboration in the Fall of 1999 (Collins Tr. at 15), and related negotiations continued throughout the remainder of 1999. *See, e.g.*, Collins Tr. at 23-24 (by November 14, 1999, sensitive collaboration discussions between officials at Celera and the HGP, in which Dr. Collins was personally involved, were ongoing); *Id.* at 16-19 (around mid-November 1999, Dr. Lander drafted a document "which attempted to outline a possible framework for collaboration," based upon his prior discussions with Dr. Levine and Dr. Venter, amongst others, which eventually became the "shared principles" document); *Id.* at 42 (Drs. Levin and Varmus were engaged in collaboration discussions in the fall of 1999).[2]

### III.  Dr. Collins Asserted That The Purpose Of The December 29 Meeting Was To Discuss The Elements of a Possible Collaboration

#### A.  Dr. Collins's Testimony Confirms That The Purpose Of The December 29 Meeting Was To Discuss The Elements Of The Shared Principles Document

Defendants rely solely on self-serving testimony from Celera officials to support their contention that the December 29 meeting was arranged to discuss toning down the adversarial public rhetoric between the parties, not a potential collaboration. However, according to Dr. Collins, up until the eve of the December 29 meeting, he and other HGP officials believed, based upon their discussions with senior Celera representatives, that a collaboration was possible and that the main purpose of the December 29 meeting was to discuss such a collaboration. Collins

---

[2] *See also* Opp. Mem. at 14-16.

4

Tr. at 59-62. Dr. Collins testified that on the eve of the meeting, he sent a proposed agenda and a document entitled "Shared Principles" to Celera officials. *Id.* Dr. Collins stated that he and other HGP officials were shocked to learn through a telephone conversation with Dr. Venter on December 28 and in a December 29 e-mail from Dr. Venter prior to the meeting that members of the Celera negotiating team had serious concerns with the Shared Principles document and the proposed meeting agenda. *Id.* Indeed, Dr. Collins testified that those documents were consistent with the parties' prior discussions throughout the Fall of 1999. *Id.* at 62 ("I was under the impression that these principles . . . were principles that had been generally endorsed by both sides and at least most of them would not be seen as particularly controversial. So I was surprised by the strong reaction.").

    **B.**    **The Negotiations Culminating in the December 29 Meeting Did Not Center on Limiting the Public Rhetoric Between Celera and the HGP**

The numerous meetings and conversations between representatives of Celera and the HGP in the Fall of 1999 to discuss a potential collaboration completely undermines defendants' contention that the purpose of the December 29 meeting was solely to reduce adversarial media rhetoric. Opp. Mem. at 4, 16. Indeed, Dr. Collins did not recall any time during that the parties' negotiations in the Fall of 1999, that Celera ever indicating to HGP officials that Celera was merely looking to tone down the rhetoric, versus a full-blown collaboration. Collins Tr. at 22-23. *See also* Opp. Mem. at 16, 28.

Moreover, Dr. Collins stated that the principal topic discussed at the December 29 meeting was the potential collaboration between Celera and the HGP and Celera's demand for an unreasonable period of exclusivity for the combined human genome sequence. Collins Tr. at 75 (Celera's exclusivity requirements were "a major part of the discussion" at the December 29 meeting).

Finally, Dr. Collins recalled that during the December 29 meeting, defendant White stated that in his opinion, the adversarial public rhetoric had been "positive" for Celera's stock value. Collins Tr. at 72 ("I do recall and it's documented here. Tony White expressed the opinion that maybe [the rhetoric] had not been such a bad thing.").

### IV. Dr. Collins's Testimony Verifies That Collaboration Negotiations Culminated At The December 29 Meeting

Defendants argue that the December 29 meeting was one in a series of discussions that purportedly continued after the meeting. Def. Mem. at 16-17; 26. In contrast, the factual record demonstrates that collaboration negotiations culminated at the December 29 meeting because the parties could not agree on the length, if any, of an exclusivity period for Celera. Opp. Mem. at 5, 17.

According to Dr. Collins, the period of exclusivity was the one area with respect to which the HGP was not willing to budge because the HGP believed that "the public is best served if sequence data is available through everybody without restrictions." Collins. Tr. at 25. Dr. Collins described Celera's unwillingness to decrease its exclusivity demand to something significantly less than five years as a "deal breaker." *Id.* at 81. Thus, in Dr. Collins's opinion, by the time the December 29 meeting was over, given how far apart Celera and the HGP were on an agreement regarding exclusivity period, unless Celera's position changed drastically, it was clear that a collaboration was essentially impossible. *Id.* at 84 ("[I]f the positions that we had heard on December 29th were, in fact, immovable, then there didn't appear to be any real chance of a positive outcome to this collaborative model.").

Defendants contend that a January 22, 2000 telephone conference between Dr. Collins and Tony White demonstrates that negotiations continued after December 29, 2999. D. Mem. at 16-17. In contrast, Dr. Collins testified that the sole purpose of the call was to determine

6

whether Celera's position at the December 29 meeting were "hardened." Collins Tr. at 84. Indeed, according to Dr. Collins, if Celera's position was hardened, there could be no collaboration because "what [the HGP] had heard on December 29th would not provide a workable framework." *Id.* at 89. As defendant White "gave no indication of any willingness to moderate the Celera perspective" during the telephone conversation, this can hardly be considered further negotiations.

Desperate to lessen the significance of the undisclosed December 29 meeting, defendants disingenuously assert that meetings among Drs. Venter, Collins and another government official, Dr. Ari Patrinos, in the Spring of 2000, were a continuation of the collaboration discussions that occurred in the Fall of 1999 and culminated at the December 29 meeting. D. Mem. at 17, 26 ("[d]iscussions continued in March and April" and, as a result of those discussions, "Celera and the HGP agreed that they would jointly announce the completion of a draft assembly of the human genome . . ."). However, Dr. Collins testified that he initiated these discussions (Collins Tr. at 92), that they had nothing to do with collaboration (*Id.* at 92-93), and that "it would be fair to say it was a totally different model at a different time." *Id.* at 93.

## CONCLUSION

Based on the testimony of Dr. Collins set forth herein, and for the reasons set forth in plaintiffs' memorandum in opposition to defendants' motion for summary judgment, the Court should deny defendants' motion in its entirety.

Dated: July 1, 2005

          **HURWITZ, SAGARIN**
          **& SLOSSBERG, LLC**

          By: _____
          J. Daniel Sagarin (CT04289)
          David A. Slossberg (CT13116)
          Brian C. Fournier (CT16272)
          147 N. Broad Street, P.O. Box 112
          Milford, CT 06460
          (203) 877 – 8000

          *Plaintiffs' Liaison Counsel*

          **MILBERG WEISS BERSHAD**
          **& SCHULMAN LLP**

          Sanford P. Dumain (CT08138)
          Lee A. Weiss (CT21345)
          Shannon L. Hopkins
          One Pennsylvania Plaza
          New York, NY 10119
          (212) 594-5300

          *Plaintiffs' Lead Counsel*

**Certificate of Service**

    This is to certify that a copy of the foregoing was mailed, first class mail on July 1, 2005 to:

Stanley A. Twardy, Jr., Esq.
Thomas D. Goldberg, Esq.
Terence J. Gallagher, Esq.
Day, Berry & Howard, LLP
One Canterbury Green
Stamford, CT 06901

Michael J. Chepiga, Esq.
Robert A. Bourque, Esq.
William M. Regan, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954

_____
J. Daniel Sagarin