1

1          THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF CONNECTICUT

2

3    In Re:  PE Corporation Securities Litigation

4

           Master File No:  300CV705 (CFD)

5    _____

6

7          The videotaped deposition of FRANCIS COLLINS,

8    Ph.D, M.D., was held on Wednesday, June 15, 2005,

9    commencing at 12:37 p.m. at the Offices of NIH, 31

10   Center Drive, Building 21, Room 2C-19, Bethesda,

11   Maryland, before Steven Poulakos, Notary Public in and

12   for the State of Maryland.

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  Steven Poulakos

2

```
1  APPEARANCES:
2         LEE A. WEISS, ESQUIRE
           SANFORD P. DUMAIN, ESQUIRE
3          SHANNON L. HOPKINS, ESQUIRE
           Milberg, Weiss, Bershad & Schulman
4          One Pennsylvania Avenue
           New York, NY  10119
5          On behalf of Plaintiff
6
           WILLIAM M. REGAN, ESQUIRE
7          LAURA D. MURPHY, ESQUIRE
           Simpson, Thacher & Bartlett, LLP
8          425 Lexington Avenue
           New York, NY  10017
9          On behalf of Defendants
10
           PAUL J. ROBERTSON, ESQUIRE
11         On behalf of the U.S. Department of
           Health & Human Services, Office of the
12         General Counsel, Public Health Division
13
14  ALSO PRESENT:  BARBARA M. MCGAREY, BARBARA P. FULLER,
           and ALICE BROWN
15
16  THE VIDEOGRAPHER: Hans Jorgensen
17
18
19
20
21
22
23
24
```

3

```
1          THE VIDEOGRAPHER:  On the record at
2  12:37 p.m., Wednesday, June 15th, 2005.  This is a
3  videotaped deposition of Dr. Francis Collins taken by
4  Lee Weiss, Esquire, with offices at One Pennsylvania
5  Avenue, New York, New York.
6          The caption of the case is PE Corporation
7  Securities Litigation, master file number 300CV705
8  (CFD).
9          The video is being held at the National
10 Institutes of Health, Washington, D.C.  I'm Hans
11 Jorgenson, videographer from Gore Brothers Reporting
12 and Video.  The Court Reporter is Steven Poulakos also
13 with Gore Brothers.
14         Counsel, please introduce themselves.
15         MR. WEISS:  Lee Weiss; Milberg, Weiss,
16 Bershad & Schulman for the Plaintiff.
17         MR. REGAN:  Bill Regan with Simpson,
18 Thacher & Bartlett for all of the Defendants.
19 Whereupon,
20         DR. FRANCIS COLLINS, M.D.,
21 called as a witness, having been first duly sworn to
22 tell the truth, the whole truth and nothing but the
23 truth, was examined and testified as follows:
24         EXAMINATION BY MR. WEISS:
```

4

```
1      Q    Good afternoon, Dr. Collins.
2          MR. ROBERTSON:  Excuse me, Counsel.  Before
3  you start, I wanted to introduce myself and also lay
4  down the initial ground rules for testimony here for
5  Dr. Collins.  My name is Paul Robertson.  I'm the
6  senior attorney with the U.S. Department of Health and
7  Human Services.
8          I'm here representing Dr. Collins in his
9  official capacity as the director of the National Human
10 Genome Institute.  Mr. -- Dr. Collins is here to
11 testify as to the facts surrounding any real and/or
12 alleged negotiations between Celera and the National
13 Institution -- National Institutes of Health.
14         He's here pursuant to a court order and
15 also pursuant to the regulations found at 45 CFR
16 Part 2.
17         And, counsel, go ahead.
18         BY MR. WEISS:
19     Q    Have you ever had your deposition taken
20 before, Dr. Collins?
21     A    No.
22     Q    Just a couple of ground rules.  First, as
23 you can see, there's a court reporter taking down your
24 testimony today.  So your answers must be verbal.  The
```

5

```
1  court reporter can't take down a nod or anything else
2  like that.
3          Additionally, the court reporter can only
4  take down one person at a time.  So I will try not to
5  talk over you and I will ask you to do the same.
6          The most important thing is that you
7  understand my questions.  I do not want you to answer
8  any of my questions if you do not understand them.  If
9  you feel that you need clarification, please ask me for
10 clarification.  If you need me to repeat the question,
11 I'm happy to do so.  If you don't ask me for
12 clarification, I'm going to assume that you understand
13 the question.
14         Is that acceptable to you?
15     A    Yes.
16     Q    If at any time you need to take a break,
17 please let me know and we will be happy to accommodate
18 you.
19         My understanding from your counsel is that
20 he and you are available until 6:30 today.  We will try
21 and get this done as quickly as possible.  Defense
22 counsel is going to want to ask some questions too.
23 The federal rules of civil procedure allow for
24 depositions of up to seven hours and we will reserve
```

2 (Pages 2 to 5)

6

1  those rights. But I anticipate that we will be able to
2  finish by 6:30.
3     A    I -- I -- I appreciate that and might I
4  even plead that we try for 6:00 because I have to be
5  downtown at an event at 7:00 and you never know what's
6  that going to look like on the road.
7     Q    I will certainly do my best and I'm sure
8  defense counsel will do the same.
9          Did you do anything to prepare for today's
10 deposition?
11    A    I looked over quite briefly the collection
12 of documents that were submitted by NIH as part of the
13 Freedom of Information Act request but not in any
14 particular great detail.
15    Q    Did you speak to anyone about your
16 deposition today?
17    A    I spoke to my counsel and to Barbara
18 McGarey and to my staff person Barbara Fuller.
19    Q    Did you speak to anyone else who was
20 involved in the negotiations between the public HGP and
21 Celera in the fall of 1999 regarding your deposition?
22    A    I had a very brief conversation several
23 months ago with Bob Waterston who indicated he had been
24 deposed. He did not really tell me the nature of what

7

1  happened. I had another very brief conversation with
2  Harold Varmus. And I was given a copy of Dr. Varmus's
3  deposition which I scanned through quite briefly. It's
4  quite lengthy.
5     Q    Did -- did your scanning of Dr. Varmus's
6  deposition refresh your recollection in any way as to
7  the events that occurred in the fall of 1999 or early
8  2000?
9     A    Yes and no. It's a very long document and
10 there were clearly areas where he wasn't quite clear
11 what happened. So I wouldn't say it was an enormous
12 help.
13    Q    Was there anything that occurred during
14 your conversation with Dr. Waterston that refreshed
15 your recollection about the event that occurred in late
16 1999 or early 2000?
17    A    No.
18    Q    When did you review the documents that were
19 produced pursuant to the Freedom of Information Act
20 request?
21    A    This morning.
22    Q    Do those documents refresh your
23 recollection regarding the events that occurred in late
24 1999 or early 2000?

8

1     A    A bit. Although, again, I had only a brief
2  time to look through them. That's a very large file.
3     Q    Were there any specific topics about which
4  your recollection was refreshed?
5     A    I paid particular attention to the letter
6  that was sent by myself, Dr. Varmus, Dr. Waterston and
7  Dr. Bobrow to Celera on February 28 because that I
8  thought was going to be a good way to recall some of
9  the substance of those discussions. That's really the
10 only document I looked at in any particular depth.
11    Q    Did that letter refresh your recollection
12 regarding specific events that had occurred prior to
13 when you sent that letter?
14    A    It was helpful.
15         MR. WEISS: Please mark this document as
16 Collins Exhibit 1.
17         (Whereupon, a document was marked as
18 Deposition Exhibit Number 1.)
19         BY MR. WEISS:
20    Q    Dr. Collins, please take the time you need
21 to review what has been marked as Collins Exhibit 1.
22 For identification Collins Exhibit~1 bears Bates number
23 FC00003.
24         Have you seen that document before?

9

1     A    I don't recall it.
2     Q    Are you aware that documents bearing the
3  Bates range that begins with FC were produced by your
4  counsel pursuant to the Freedom of Information request?
5     A    Yes.
6     Q    Do you know how -- how these documents were
7  transmitted to your counsel, whether it was hard copy
8  or electronically?
9     A    I do not know.
10    Q    Do you still use the same computer system
11 that you used in 1999 at -- at work?
12    A    It's probably a new computer but it's the
13 same e-mail.
14    Q    Do you recall receiving this e-mail?
15    A    I do not.
16    Q    Do you have any reason to believe that you
17 did not receive it?
18    A    No.
19    Q    What was your position at the government in
20 October of 1999?
21    A    As now, I was director of the National
22 Human Genome Research Institute.
23    Q    Did you have any other positions within the
24 government at that time?

3 (Pages 6 to 9)

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

10

1    A    No.
2    Q    Did there come a time where you obtained
3  other positions within the government?
4    A    No.
5    Q    As director of the National Human Genome
6  Research Institute what was your role with respect to
7  the Human Genome Project?
8    A    The Human Genome Project was an
9  international collaborative evident involving six
10  countries and 20 laboratories. But NIH was the lead
11  agency in terms of the funding and in terms of the
12  management. And as the director of the institute at
13  NIH primarily responsible for the Human Genome Project
14  it was my role to serve as the project manager overall
15  for the international effort.
16    Q    And the National Human Genome Research
17  Institute is an institute of the National Institutes of
18  Health?
19    A    Right. One of 27 such institutes and
20  centers that make up the NIH.
21    Q    And who did you report to in the -- at the
22  NIH in the fall of 1999?
23    A    The NIH director, Dr. Harold Varmus.
24    Q    Do you recall Dr. Waterston reporting to --

11

1  informing you that he had been contacted by Dr. Rich
2  Roberts?
3    A    I don't recall that.
4    Q    Do you recall becoming involved in
5  discussions that included yourself, Dr. Waterston and
6  others in the fall of 1999 regarding a possible
7  collaboration with Celera?
8    A    Yes.
9    Q    How did you become involved in those
10  discussions?
11    A    Initially I spoke with Eric Lander. I
12  don't recall the date or even precisely the month. And
13  learned that he had had an initial conversation with
14  Mike Hunkapiller of Applera and subsequently with
15  Craig Venter about the possibility of some cooperative
16  plan. Dr. Lander had carried these conversations only
17  a few steps and wanted me to be brought into that loop.
18  And subsequent to that others involved in the
19  international Human Genome Project such as
20  Dr. Waterston also became involved.
21    Q    Do you know whether your conversation with
22  Dr. Lander was before or after the date of
23  Dr. Waterston's e-mail which is October 3, 1999?
24    A    I don't know.

12

1    Q    What were the few steps that Dr. Lander had
2  taken that you referenced in your earlier answer?
3    A    As I recall, he had met with Mike
4  Hunkapiller where they had a conversation about the
5  possible ways in which the public and the private
6  projects might try to work together recognizing that
7  both were making progress.
8         Subsequent to that, as I recall, a meeting
9  was arranged with Dr. Venter also attended and that was
10  further explored. I don't recall at that point what
11  the possible framework for such a collaboration was nor
12  how specific it was. These were, I think, pretty
13  general conversations.
14    Q    Had data release been discussed, to your
15  knowledge, by the time that Dr. Lander informed you
16  about the discussions?
17    A    Yes.
18         MR. REGAN: Objection to the form.
19         You can answer. The objection is just for
20  the record unless your counsel directs you not to
21  answer the question.
22         THE WITNESS: Data release was very
23  prominent in all of these discussions given that in
24  many ways this was the central difference between the

13

1  public and the private efforts. The public project
2  having decided quite formally back in 1996 to make all
3  data available within 24 hours of its generation. And
4  the private effort for obvious reasons not being in a
5  position to necessarily do that kind of open data
6  sharing. So it was obvious to anyone who was following
7  this that any kind of collaborative effort would have
8  to deal with this very significant difference.
9         BY MR. WEISS:
10    Q    At the time Eric Lander contacted you that
11  we are discussing, did you have a view as to what type
12  of data sharing would be required for there to be a
13  collaborative effort?
14         MR. REGAN: Objection to the form.
15         THE WITNESS: I thought it was going to be
16  very difficult to come up with strategy that would
17  satisfy the needs of both groups.
18         BY MR. WEISS:
19    Q    Did you have a specific opinion as to
20  what -- what type of strategy would -- would satisfy
21  you?
22         MR. REGAN: Objection to the form.
23         MR. WEISS: What's the objection?
24         MR. REGAN: Dr. Collins personally or the

4 (Pages 10 to 13)

14

1  HGP?
2        MR. WEISS:  Him, personally.  What would
3  satisfy him.
4        THE WITNESS:  I felt very strongly that the
5  principles the Human Genome Project had adopted about
6  open data access were the most appropriate ones for
7  encouraging scientific utilization and benefiting the
8  public.  So I was loathed to consider any major retreat
9  from those principles.  My mind was open to the
10  possibility of some modest consideration of a temporary
11  delay of some sort so long as it did not damage the
12  ultimate public good of the enterprise.  But it was not
13  clear to me how that could be achieved.
14        Let me say that we -- I would not have
15  considered an acceptable outcome that publicly
16  generated data would be constrained as to its release.
17  We would need to stick to that principle.
18        The question was:  If there was a merging
19  of the two datasets, could the merged dataset live with
20  a less than immediate open and free access?
21  BY MR. WEISS:
22     Q    At the time that Eric Lander informed you
23  about his conversations with Dr. Venter and Mike
24  Hunkapiller, was the -- was a merged dataset between

15

1  Celera and the public data under consideration?
2        MR. REGAN:  Objection to the form.
3        THE WITNESS:  I believe that was one of
4  several broad, general possibilities without recalling
5  or knowing what the specificity was.
6  BY MR. WEISS:
7     Q    After you spoke with Dr. Lander who else on
8  the public side was brought into the discussions?
9     A    As the leader of the international effort I
10  felt considerable responsibility that if something as
11  significant as this was going to be explored it was
12  critical to bring other parties into that discussion.
13  I would not want to have been in a position to have in
14  any way pulled the rug out from under my own team.
15        So without recalling the dates -- certainly
16  one date I do recall because it was the day my first
17  granddaughter was born, by November 19th of 1999 in
18  anticipation of a phone call, the following day the
19  leaders of the so-called G5 -- which included Lander,
20  Waterston, Gibbs, Jane Rogers and Elbert Branscomb as
21  well as Michael Morgan who played a very significant
22  role of overseeing genome research for the Wellcome
23  Trust -- were brought into this discussion and briefed
24  about the possibility that we might try to explore some

16

1  collaborative model.
2  BY MR. WEISS:
3     Q    Please explain for the record what was or
4  what is the G5.
5     A    It was a shorthand term to simply refer to
6  the five largest genome centers that were involved in
7  sequencing the human genome.  There were 20 altogether
8  but five of them accounted for about 85 percent of the
9  capacity.  And those were the centers at the Whitehead
10  Institute; at the Washington University in St. Louis;
11  at Baylor College of Medicine; at the Department of
12  Energy's Joint Genome Institute, the JGI; and at the
13  Sanger Center now called the Sanger Institute in the
14  United Kingdom.
15     Q    Do you know what precipitated the
16  November 20th, 1999, conference call you just referred
17  to?
18     A    As I recall at that point there had been
19  conversations between Lander, Hunkapiller and Venter.
20  It seemed that there was interest on -- on both sides
21  to exploring the possibility of some collaborative or
22  at least cooperative model.  It seemed time to bring
23  others into that conversation.  And so a tentative plan
24  was made to try to have an initial conference call to

17

1  discuss that.
2        MR. WEISS:  Please mark this document as
3  Collins Exhibit 2.
4        (Whereupon, a document was marked as
5  Deposition Exhibit Number 2.)
6  BY MR. WEISS:
7     Q    Dr. Collins, please take the time you need
8  to familiarize yourself with what has been marked as
9  Exhibit 2.  For identification Collins Exhibit 2 bears
10  Bates number range -- Bates number FC00021.
11        Have you seen this document before?
12     A    I don't recall it.
13     Q    Do you have any reason to doubt that you
14  received this e-mail from Eric Lander?
15     A    No reason to doubt it.
16     Q    Does this document refresh your
17  recollection in any way as to events that occurred in
18  November of 1999?
19     A    A little bit.  It doesn't put them into
20  sharp focus.
21     Q    How does it refresh your recollection?
22     A    Well, certainly from this document Eric was
23  also discussing this with Arnie Levine, another member
24  of the Celera board who became involved in the December

5 (Pages 14 to 17)

18

1  meeting. And clearly Eric was making a recommendation
2  about how to proceed to the next step, a recommendation
3  which didn't quite happen that way.
4      Q    If you look at the third paragraph of the
5  document it says: I have agreed try to write down a
6  brief statement of the basic understandings that we
7  have discussed to date as a framework for discussions
8  to flush them out.
9          Do you see that?
10     A    Uh-huh.
11     Q    You have to answer in words.
12     A    Yes.
13     Q    Thank you.
14         Do you recall Dr. Lander writing such a
15 statement?
16     A    Yes.
17     Q    And did that statement eventually become
18 the document that was entitled Shared Principles?
19     A    After many, many revisions, yes.
20     Q    And what was your understanding of what
21 Dr. Lander was trying to accomplish by generating this
22 document?
23     A    Eric Lander is a very skilled negotiator.
24 Once taught a course at the Harvard Business School on

19

1  the topic of negotiation. He clearly had already had
2  conversations with Hunkapiller, with Venter and with
3  Levine. He was volunteering to put down in a written
4  form where he felt the discussions had led to in terms
5  of common ground that hopefully everyone would agree to
6  as a foundation for going further.
7          I appreciated his willingness to do that
8  since he had been part of discussions that I had not
9  been a party to. And that seemed like a very good
10 idea.
11         MR. WEISS: Please mark this as Collins
12 Exhibit 3.
13         (Whereupon, a document was marked as
14 Deposition Exhibit Number 3.)
15         BY MR. WEISS:
16     Q    Again, Dr. Collins, please take the time
17 you need to familiarize yourself with the documents
18 that's been marked as Collins Exhibit 3. For
19 identification it bears Bates range FC00016 through 18.
20     A    All right.
21     Q    Have you seen this document before?
22     A    I don't recall it, but I recognize my
23 handwriting on it.
24     Q    Does this document refresh your

20

1  recollection in any way about the event that occurred
2  in November of 1999?
3      A    It refreshes my recollection of the
4  specific details in this version of Eric's document
5  which attempted to outline a possible framework for
6  collaboration.
7      Q    And is this document a version of the
8  statement that is referred to by Dr. Lander in
9  Exhibit 2?
10     A    I believe it is.
11     Q    Did you review a version, at least a
12 version of this statement prior to the November 20th
13 conference call that you referenced earlier?
14     A    I, certainly, from my own handwritten
15 comments on here must have reviewed this.
16     Q    If you could take a look at page FC0017 of
17 Collins Exhibit 3. And a little before the bullet
18 points at the bottom it says: The media will carry a
19 license that protects Celera from the data on the media
20 being transferred to and incorporated in commercial
21 databases competing with Celera's business as a
22 database supplier.
23         Do you see that?
24     A    Yes.

21

1      Q    Did you have an understanding of Celera's
2  business plan in mid-November 1999?
3      A    Perhaps a general understanding. Not a
4  specific one.
5      Q    And how would you develop that general
6  understanding?
7      A    That Celera intended to recover their
8  investment and hopefully make a profit by limiting
9  access to the sequence data that they had produced
10 to -- in some way, that would result in -- in an income
11 extreme.
12     Q    What was the basis for your understanding
13 at that time?
14     A    I think public statements by Dr. Venter.
15         MR. WEISS: Please mark this as Collins
16 Exhibit 4.
17         (Whereupon, a document was marked as
18 Deposition Exhibit Number 4.)
19         BY MR. WEISS:
20     Q    Dr. Collins, please review the document
21 that has been marked as Collins Exhibit 4 which, for
22 identification, bears Bates number FC00022.
23         Have you seen this document before?
24     A    I don't recall it.

6 (Pages 18 to 21)

22

1    Q    Do you recall communicating to Eric Lander
2    and Harold Varmus the information as contained in this
3    document?
4    A    I don't recall it.
5    Q    Do you have any reason to believe that you
6    did not send this e-mail to Drs. Varmus and Lander?
7    A    No.
8    Q    Do you recall the conversation with Craig
9    Venter that is discussed in this e-mail?
10   A    Only in a rather foggy way.
11   Q    What do you recall of that conversation?
12   A    That he called me at home, as it indicates
13   here, and we had a general conversation about the
14   possibility of some successful negotiation. I don't
15   recall any other details.
16   Q    The last sentence of the first paragraph
17   states: I responded to such an invitation, was most
18   kind, but that it might be slightly awkward to visit at
19   this time since we all know that some sensitive
20   negotiations about the human sequence are underway.
21        Do you recall refusing an invitation of
22   Dr. Venter for that reason at this time?
23   A    I don't recall. I can only see the words
24   on the page.

23

1    Q    Does this document refresh your
2    recollection as to whether public effort and Celera
3    were in sensitive negotiations as of November 14th,
4    1999?
5         MR. REGAN: Objection to the form.
6         THE WITNESS: I think I've already stated
7    that those discussions were going on prior to this
8    date.
9         BY MR. WEISS:
10   Q    Does this document refresh your
11   recollection as to whether you and Dr. Venter discussed
12   a possible merge, merging of the Celera and public data
13   at this time?
14   A    Ask the question again. I'm not sure I
15   quite followed you.
16   Q    Does this document refresh your
17   recollection as to whether you had a conversation with
18   Dr. Venter at this time regarding the merging of Celera
19   data and public data?
20   A    It does refresh my memory, yes.
21   Q    How does it refresh your memory in that
22   regard?
23   A    In that, as I stated, I have only the
24   foggiest recollection of the phone call. And this copy

24

1    of an e-mail provides some more substance as to what
2    happened.
3    Q    Do you have any reason to believe that
4    anything in this e-mail is inaccurate?
5         MR. REGAN: Objection to the form.
6         THE WITNESS: I have no reason to believe
7    that.
8         MR. WEISS: Please mark this as Collins
9    Exhibit 5.
10        (Whereupon, a document was marked as
11   Deposition Exhibit Number 5.)
12        BY MR. WEISS:
13   Q    Dr. Collins, please review what has been
14   marked as Collins Exhibit 5. For identification
15   Collins Exhibit 5 bears Bates range RW00017 through 18.
16        Have you seen this document before?
17   A    No.
18   Q    Have you seen any of the e-mails that are
19   set forth on this document before?
20   A    I don't recall it.
21   Q    Have you had the opportunity to review the
22   e-mail message from Eric Lander to yourself and
23   Dr. Varmus that starts halfway down on page RW00017?
24   A    I just read it.

25

1    Q    Do you have any reason to believe that you
2    did not receive that e-mail from Dr. Lander?
3    A    No.
4    Q    At the bottom of that page Dr. Lander
5    addresses you and says: In your e-mail you raise a
6    concern about granting Celera a, quote, monopoly,
7    unquote, and about whether we could get them to release
8    the data with no restrictions on use by other database
9    suppliers.
10        Do you see that?
11   A    Yes.
12   Q    Do you recall raising that concern?
13   A    I do not.
14   Q    Do you recall ever having that concern?
15   A    Certainly.
16   Q    What was the nature of that concern?
17   A    I think it reflects my general sense that
18   the public is best served if sequence data is available
19   through everybody without any restrictions.
20   Q    Earlier I believe you testified that you
21   would -- you would be open to some modest
22   restriction -- you would have been open to -- at that
23   time -- to a modest restriction on a merged Celera HGP
24   dataset; is that correct?

7 (Pages 22 to 25)

26

1    A    That's correct.
2    Q    At that time, if -- did you have an opinion
3  as to whether, if the dataset was merged and there was
4  some restriction, whether the public effort should
5  continue sequencing?
6         MR. REGAN:  Objection to the form.
7         THE WITNESS:  Recognizing that a merged
8  dataset would still be a draft and that the goal was
9  ultimately to obtain a finished sequence, it would have
10 been unthinkable for the public project not to imagine
11 their mandate to continue.
12        BY MR. WEISS:
13   Q    Do you have any personal view at this time
14 as to what would have been an acceptable time period
15 restriction on the merged dataset?
16        MR. REGAN:  Objection to the form.
17        THE WITNESS:  I don't recall.
18        MR. WEISS:  Please mark as Collins
19 Exhibit 6.
20        (Whereupon, a document was marked as
21 Deposition Exhibit Number 6.)
22        MR. ROBERTSON:  Can we go off the record
23 for a moment?
24        (A discussion was held off the record.)

27

1         BY MR. WEISS:
2    Q    Just to clarify, we just had a discussion
3  as to what is meant when I asked Dr. Collins for his
4  personal opinion.  And everyone has come to the
5  consensus that that means Dr. Collins' personal opinion
6  as director of the NHGRI and as a scientist.  But it
7  does not reflect what his opinion is of what others at
8  the NHGRI thought at that time.
9         Dr. Collins, please take the time you need
10 to review Collins Exhibit 6 which is Bates range
11 FC00048.
12   A    Okay.
13   Q    Have you seen this document before?
14   A    I don't recall it.
15   Q    Do you recall making the comments to
16 Dr. Lander that are set forth in the e-mail that begins
17 about a third of the way down the page?
18   A    Not specifically.
19        MR. REGAN:  Objection to form.
20        BY MR. WEISS:
21   Q    Does this document refresh your
22 recollection in any way as to comments you made
23 regarding Dr. Lander's statement that he drafted?
24        MR. REGAN:  Objection to the form.

28

1         THE WITNESS:  Yes.  In that it reflects
2  comments also noted in my handwriting in the Exhibit 3
3  that we've already looked at.
4         BY MR. WEISS:
5    Q    Do you have any reason to believe that you
6  did not send this e-mail to Dr. Lander?
7    A    No.
8    Q    Do you recall receiving Dr. Lander's
9  response?
10   A    I do not.
11   Q    Do you have any reason to believe that you
12 did not receive Dr. Lander's response?
13        MR. REGAN:  Objection to the form.
14        THE WITNESS:  No.  We can't do that
15 generically.
16        BY MR. WEISS:
17   Q    I think we are going to have to do it
18 document by document.  I'm hoping you'll remember some
19 of them and we won't have to --
20   A    It's been six years almost.
21   Q    At the end of item number 5 in your e-mail
22 it says:  I would argue that the protection should be
23 for the annotation not the raw sequence itself.
24        Do you see that?

29

1    A    Yes.
2    Q    Do you know what that is referring to?
3    A    Well, again, if there was going to be a
4  limitation on access to the information, the general
5  principles of the international Human Genome Project
6  had always been that the raw sequence was most
7  appropriately made accessible to all.  And I was simply
8  endorsing that principle in this particular situation.
9    Q    At this time was the merged product that
10 was being discussed -- would that have been raw
11 sequence or an annotated merged product?
12   A    That's not clear.
13   Q    At this time were you aware of any position
14 Celera or anyone affiliated with Celera had taken
15 regarding how long a merged -- they would need or want
16 exclusivity for a merged product?
17        MR. REGAN:  Objection to the form.
18        THE WITNESS:  I don't recall.
19        BY MR. WEISS:
20   Q    Do you ever recall anyone at Celera taking
21 a position that it wanted exclusivity over a merged
22 product until the year 2005?
23        MR. REGAN:  Objection to the form.
24        THE WITNESS:  I do recall that but not at

8 (Pages 26 to 29)

30

1  this point.
2        BY MR. WEISS:
3    Q    At what point do you recall that occurring?
4    A    That was raised at the December 29th
5  meeting, the face-to-face meeting with representatives
6  of Celera. And it may have been raised before that. I
7  just don't recall.
8        MR. WEISS: Please mark this as Collins
9  Exhibit 7.
10        (Whereupon, a document was marked as
11  Deposition Exhibit Number 7.)
12        BY MR. WEISS:
13    Q    Dr. Collins, please take a look at what
14  have been marked as Exhibit 7 which bears Bates range
15  RW00359 through 361.
16    A    All right.
17    Q    Have you seen this document before?
18    A    I don't recall it.
19    Q    Do you recall sending Bob Waterston a
20  version of the statement that had been drafted by Eric
21  with the bold - with the bold -- with all capitalized
22  comments that are set forth in Exhibit Number 7?
23        MR. REGAN: Objection to the form.
24        THE WITNESS: I don't recall it.

31

1        BY MR. WEISS:
2    Q    Do you have any reason to believe that you
3  did not send the e-mail on document 7 to -- on
4  Exhibit 7 to Dr. Waterston?
5    A    No.
6    Q    Turn to page RW00360 of the document. And
7  if you could take the time to review the all
8  capitalized comment about a little bit more than
9  two-thirds the way down that begins that protection.
10        Do you see that?
11    A    Yes, I do.
12    Q    Do you recall making that comment?
13    A    It's consistent with my opinion at that
14  time.
15    Q    Do you recall communicating to anyone else
16  that -- this view as to what the opening position of
17  the public side should be?
18        MR. REGAN: Objection to the form.
19        THE WITNESS: I don't recall the order of
20  events. Again, this was very much a part of the
21  discussions on December 29th.
22        BY MR. WEISS:
23    Q    Earlier you referenced a November 20th,
24  1999 conference call. What do you recall transpired

32

1  during that call?
2    A    If I have the date right, there was a call
3  on November 19th with a number of the Human Genome
4  Project representatives in anticipation of a conference
5  call with Celera on the 20th.
6        Several of the Human Genome Project
7  participants were just then receiving information such
8  as Lander's document about a possible framework and had
9  a number of concerns. There was no clear agenda for
10  the conference call on November 20th.
11        And I made the decision that it would be
12  best to delay that call. And I called Dr. Venter
13  shortly after the call with my own team to suggest that
14  we would put that off until there had been a bit more
15  time for discussion amongst the leaders of the
16  genome -- the international Human Genome Project about
17  how to proceed. I felt I needed to give them more time
18  to come up to speed on the conversation.
19    Q    Are there any particular members of the
20  Human Genome Project that you're thinking of when you
21  say you needed to give them more time to get up to
22  speed?
23    A    Well, Bob Waterston, Michael Morgan, John
24  Sulston. I would also include Richard Gibbs and Elbert

33

1  Branscomb. The GS. To be honest, I don't recall
2  whether Branscomb and Gibbs were involved in that
3  conference call on the 19th. I'm pretty sure that
4  Morgan and Sulston and Waterston were.
5    Q    Who were supposed to be the participants on
6  Celera's behalf in the November 20th call?
7    A    Besides Dr. Venter I am not sure. I can't
8  remember.
9    Q    Who scheduled the November 20th call with
10  Celera?
11    A    I don't recall who started that.
12        MR. WEISS: Please mark this as Exhibit 8.
13        (Whereupon, a document was marked as
14  Deposition Exhibit Number 8.)
15        BY MR. WEISS:
16    Q    Please take a look at what has been marked
17  as Exhibit 8 which bears Bates range FC0058 through 93.
18  I will tell you that while you're free to review the
19  whole document, from page 88 to the end is an
20  attachment that is the same as the text. And if you
21  read your e-mail you'll see that you said in the e-mail
22  that you were attaching the document and putting it in
23  text.
24    A    Okay.

34

1    Q    Have you seen this document before?
2    A    I don't recall it.
3    Q    Does this document refresh your
4  recollection regarding any events that happened in the
5  fall of 1999?
6    A    Yes. It provides details of what was
7  happening in the run up to the face-to-face meeting at
8  the end of December.
9    Q    Does this document refresh your
10 recollection as to anything that occurred subsequent to
11 November 19th and before December 6th as to what was
12 going on during that time period?
13   A    Yes. It documents the kind of discussions
14 that the leaders of the Human Genome Project were
15 having about the possibility of a collaborative model
16 with Celera.
17   Q    Does this refresh your recollections as to
18 any discussions in which you participated subsequent to
19 November 19th and before December 6th?
20   A    Yes, I do. I knew that there were
21 significant interactions going on during this time.
22 This document supplies some details that I would not
23 have been able to recall.
24   Q    And what are those details?

35

1    A    Well, specifically that there was a
2  conference call on Monday December 6th. And that in
3  preparation for that we distributed both the document
4  that had been circulating for sometime describing the
5  possible shared principles and -- and also some
6  commentary in the second half of this about important
7  issues to be negotiated.
8    Q    Do you have any reason to believe that you
9  did not send the e-mail that is Exhibit 8?
10   A    No.
11       MR. ROBERTSON: Can we go off the record
12 for a second?
13       (A discussion was held off the record.)
14       BY MR. WEISS:
15   Q    Dr. Collins, your counsel has pointed out
16 that this e-mail does not have a from field at the top
17 of the e-mail. And you've indicated that you can
18 explain that as it's consistent with a practice that
19 you engaged in. Can you please explain that for the
20 record?
21   A    I occasionally print out an e-mail before
22 sending it in which case it doesn't show the from line.
23   Q    But you have no reason to believe that you
24 didn't send this after printing it, do you?

36

1    A    No.
2    Q    Did -- after the November 19th conference
3  call and before this document was sent out, did members
4  of the Human Genome Project comment on the shared
5  principles?
6        MR. REGAN: Objection to the form.
7        THE WITNESS: I don't have a specific
8  recollection of the substance of this conference call,
9  nor could I absolutely confirm that it happened, but
10 obviously the intent here was to obtain comment.
11       BY MR. WEISS:
12   Q    Do you have a recollection that there --
13 that after the November 20th conference call when
14 Celera was canceled that there was another conference
15 call with members of the Human Genome Project prior to
16 anyone from the public side engaging in further
17 discussions with Celera?
18       MR. REGAN: Objection to the form.
19       THE WITNESS: I don't know.
20       MR. WEISS: Please mark this as Exhibit 9.
21       (Whereupon, a document was marked as
22 Deposition Exhibit Number 9.)
23       BY MR. WEISS:
24   Q    Dr. Collins, please review Exhibit 9 which

37

1  is Bates range FC00095 through 97.
2    A    Okay.
3    Q    Is there anything on page FC00095 [sic],
4  which is the first page, that refreshes your
5  recollection as to the December 6th, 1999, telephone
6  conference?
7    A    Yes. It provides a fairly detailed
8  perspective on the part of Dr. Waterston about some of
9  the issues that I presume must have been discussed on
10 this conference call on December 6th.
11   Q    Do you have any independent recollection
12 that has been refreshed by this document regarding as
13 to what was discussed on December 6th?
14   A    I'm afraid prior to reading this e-mail I
15 would not have been able to tell you much about that
16 call or even that it had occurred.
17   Q    Does this e-mail refresh your recollection
18 that the call occurred?
19   A    Yes.
20   Q    Does it refresh your recollection as to
21 anything that was discussed during the call?
22   A    Yes.
23   Q    How does it refresh your recollection?
24   A    It certainly suggests that a detailed

10 (Pages 34 to 37)

38

1  discussion went on about the shared principles'
2  document and some of the areas that were still in need
3  of clarification if we were going to go forward with
4  the collaborative model.
5      Q      Does this document -- does this page of
6  Exhibit 9 refresh your recollection as to any --
7  anything you said during the December 6th conference
8  call?
9      A      I don't know that it's particularly
10  pointing to any of my own comments. It seems to be
11  primarily a summary of Dr. Waterston's concerns based
12  upon the conversation as a whole without attributing to
13  any specific concern to a specific person.
14      Q      I agree with you that it doesn't attribute
15  anything to you. But my question is: Is there
16  anything in here that refreshes your recollection as to
17  anything you said during the December 6th telephone
18  conference?
19      MR. ROBERTSON: Objection, asked and
20  answered.
21      THE WITNESS: I don't recall.
22      Oh, you objected so I don't have to answer.
23      MR. ROBERTSON: You already answered.
24      THE WITNESS: Very good.

39

1      BY MR. WEISS:
2      Q      Does this document -- does this page of the
3  document refresh your recollection as to any decisions
4  that were made regarding future actions during the
5  December 6th conference call?
6      A      Only in that it suggests a further
7  refinement of the terms of negotiation would be needed
8  before my colleagues were comfortable with the plan.
9      Q      If you could take a look at pages FC0096
10  [sic] and 97.
11      A      Yes, I've read them already.
12      Q      Do those pages refresh your recollection in
13  any way as to what occurred during the December 6th,
14  1999, conference call?
15      A      Only in a general sense that they comment
16  upon what happened during that call from the
17  perspective of another participant, Richard Gibbs.
18      Q      Do you recall receiving any of the e-mails
19  that compromise Exhibit 9?
20      A      No, I do not.
21      Q      Do you have any reason to believe that you
22  did not receive them?
23      A      Not at all.
24      Q      Is that your handwriting on page FC0096 --

40

1  FC00096?
2      A      I believe it is.
3      Q      Can you read for the record what your
4  handwriting says?
5      A      It says: Okay, but not know.
6      Q      Do you know what you meant by that comment?
7      A      I meant that the suggestion that Dr. Gibbs
8  was making a good one but probably could be put off
9  a bit and instead focus on the more pressing issues.
10      Q      What were the more pressing issues at this
11  time?
12      A      The structure of the overall collaborative
13  model particularly regarding issues such as timing of
14  data release.
15      Q      By this time had you participated in any
16  discussions with any Celera representatives regarding
17  this structure of an overall collaborative model?
18      A      This is now December 7th. No, other than a
19  brief conversation with Dr. Venter on November 19th at
20  which time we had decided to delay the conference call.
21      Q      And that's the only communication with
22  Celera you recall having regarding these issues prior
23  to December 7th?
24      A      That's the only one I recall.

41

1      MR. WEISS: Please mark this as Exhibit 10.
2      (Whereupon, a document was marked as
3  Deposition Exhibit Number 10.)
4      MR. REGAN: Can we go off the record one
5  second?
6      (A discussion was held off the record.)
7      BY MR. WEISS:
8      Q      Dr. Collins, please take a look at has been
9  marked as Exhibit 10 which is Bates number FC00102.
10      A      Okay.
11      Q      Have you seen this document before?
12      A      I don't recall it.
13      Q      Do you recall ever -- do you recall Michael
14  Morgan ever communicating these views to you in any
15  fashion?
16      A      This is very consistent with the
17  perspective Dr. Morgan took throughout the course of
18  the Genome Project particularly with respect to data
19  access. Wellcome Trust was very prominent in leading
20  the discussions way back in 1996 that led to the
21  conclusion that data access ought to be immediate and
22  they maintained that perspective throughout.
23      Q      Is the handwriting on the document your
24  handwriting?

11 (Pages 38 to 41)

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

42

1    A    It appears to be.
2    Q    Do you recall making the handwritten
3 notations on this document?
4    A    I don't recall it.
5    Q    If you could, look at the second to the
6 last paragraph on the page.
7    A    Yes.
8    Q    Does that refresh your recollection as to
9 anything that occurred on the December 6th conference
10 call?
11    A    Again, I don't recall that particular
12 conference call having occurred.  But the e-mail is
13 obviously helpful in putting in front of me information
14 that I had forgotten.
15    Q    Does that paragraph refresh your
16 recollection regarding a discussion among the members
17 of the public Human Genome Project that Harold Varmus
18 and Arnie Levine should have exploratory talks?
19    A    I certainly recall that Harold and Arnie
20 were involved at about this time as individuals that
21 were held in greatest esteem in the scientific
22 community and who then became involved in attempting to
23 catalyze the face-to-face meeting and to try to prepare
24 for it in a way that provided an optimum chance for

43

1 success.
2    Q    Did you participate in discussions among
3 the members of the Human Genome Project where it was
4 decided that Harold Varmus should contact Arnie Levine
5 to discuss these issues?
6    A    I don't recall.
7    Q    But do you recall that Harold Varmus and
8 Arnie Levine ultimately had exploratory talks?
9    A    Yes.
10    Q    Towards the top of the document it says:
11 The comments below, therefore, are made with the
12 assumption that Eric Lander's interpretation that only
13 data known exclusively to Celera would be subject to
14 such condition is incorrect and that the condition
15 would apply to all data in the merged set.
16         Do you see that?
17    A    Yes.
18    Q    Do you recall that issue being raised by
19 Dr. Morgan?
20    A    I don't recall it.
21    Q    Do you recall that issue being raised by
22 anyone on the public side?
23    A    In the sense that data release was a
24 critical part of the discussions and that any model

44

1 which constrained release of the public data would have
2 been considered unacceptable by most of us.  Yes, I
3 certainly recall that being repeatedly referred to.
4    Q    By this time, and the date of the e-mail is
5 December 7th, 1999, had the public effort discussed
6 possible restrictions on the release of a merged
7 dataset?
8    A    Yes, in that in the course of the
9 conversations amongst the G5 that predated this, the
10 possibility of allowing a period of perhaps six months
11 to a year, as documented in one of the documents we've
12 just looked at, for the merged dataset was under
13 consideration.  That did not in any way suggest that
14 the public data on its own would no longer be
15 immediately accessible.  Only the merged dataset would
16 have such potential restriction.
17    Q    Were you aware at this time of any Celera
18 position regarding restrictions on the merged dataset?
19    A    No.
20    Q    Did you participate in any discussions
21 prior to a meeting between Dr. Varmus and Dr. Levine
22 regarding what Dr. Varmus should discuss with
23 Dr. Levine?
24    A    I don't recall.

45

1         MR. WEISS:  Let's mark this as Exhibit 11.
2         (Whereupon, a document was marked as
3 Deposition Exhibit Number 11.)
4         BY MR. WEISS:
5    Q    Dr. Collins, please take a look at what has
6 been marked as Exhibit 11 which is Bates number
7 RW00343.
8    A    Okay.
9    Q    Have you seen this document before?
10    A    I don't recall it.
11    Q    Do you recall communicating with anyone in
12 any fashion about a meeting between Harold Varmus and
13 Arnie Levine in mid-December?
14    A    I certainly recall that there was such a
15 conversation, that the intent of the conversation was
16 to prepare for a possible face-to-face meeting.  I
17 don't recall the other details.
18    Q    Does this document refresh your
19 recollection as to whether members of the public HGP
20 agreed that Harold Varmus should meet with Arnie Levine
21 to discuss with him whether a face-to-face meeting was
22 a good idea?
23    A    I have a general recollection that there
24 was enthusiasm for the idea of Harold and Arnie getting

12 (Pages 42 to 45)

46

1  involved.
2      Q    Does this document refresh your
3  recollection as to any discussions regarding what
4  Dr. Varmus should discuss with Dr. Levine?
5      A    No.
6      Q    Does this document refresh your
7  recollection as to what occurred at the meeting between
8  Dr. Varmus and Dr. Levine?
9          MR. REGAN:  Objection to the form.
10         THE WITNESS:  I have a general recollection
11  that they had a fairly brief conversation without
12  getting into the details.
13         BY MR. WEISS:
14     Q    What is the basis of your recollection that
15  their conversation was fairly brief?
16     A    Well, I know that that was a point at which
17  Harold was in the process of moving from his position
18  as NIH director to take a position in New York and that
19  the main reason for his visit was, therefore, not
20  focused on this issue.
21     Q    Are you really speculating that the
22  conversation regarding this issue was fairly brief?
23         MR. REGAN:  Objection to form.
24         THE WITNESS:  My recollection is that was

47

1  the story I heard.
2          BY MR. WEISS:
3      Q    At this time what were the basic elements
4  of a collaboration that had been discussed by the
5  members of the HGP?
6          MR. REGAN:  Objection to the form.
7          THE WITNESS:  As we've discussed this
8  statement of shared principles was the basic framework
9  although it had gone through many revisions and there
10  were many points of uncertainty about details that had
11  not been resolved or written down in that document.
12         MR. WEISS:  Let's mark this as Exhibit 12.
13         (Whereupon, a document was marked as
14  Deposition Exhibit Number 12.)
15         BY MR. WEISS:
16     Q    Dr. Collins, please take a look at what has
17  been marked as Exhibit 12 which is Bates number
18  RW00342.
19     A    Okay.
20     Q    Have you seen this document before?
21     A    I don't recall it.
22     Q    Do you recall setting up a conference call,
23  the conference call that's on Wednesday December 22nd
24  with other members of the HGP?

48

1      A    I don't specifically recall it but such
2  conference calls were regularly organized by NHGRI.
3      Q    Do you recall setting up a conference call
4  with other members of the HGP to discuss what had
5  occurred at the meeting between Harold Varmus and Arnie
6  Levine?
7      A    I don't specifically recall it.
8      Q    Do you recall participating in a conference
9  call with members of the HGP where the meeting -- where
10  a meeting between Harold Varmus and Arnie Levine was
11  discussed?
12     A    I don't specifically recall it.
13         MR. WEISS:  Please mark this as Exhibit 13.
14         (Whereupon, a document was marked as
15  Deposition Exhibit Number 13.)
16         BY MR. WEISS:
17     Q    Dr. Collins, please review Exhibit 13 which
18  is Bates number FC00114.
19     A    Okay.
20     Q    Have you seen this document before?
21     A    I don't recall it.
22     Q    Is that your handwriting on the document?
23     A    Yes, it is.
24     Q    Does your review of the document refresh

49

1  your recollection that you created this document?
2      A    It certainly does.
3      Q    Does this document refresh your
4  recollection about a conference call that occurred on
5  December 22nd, 1999?
6      A    I have only the faintest recollection of
7  the call.  So none of what's in these notes brings back
8  an independent recollection of the details.
9      Q    Do you recall ever being made aware that
10  Arnie Levine talked to Tony White and Craig Venter
11  after his meeting with Dr. Varmus?
12     A    I do recall that there was a contact from
13  Arnie to members of the Celera top leadership.  I don't
14  recall outside of these notes exactly what happened.
15     Q    Do these notes refresh your recollection as
16  to what you were aware of that happened?
17     A    Again, the notes say that Arnie Levine
18  talked with TW, Tony White, and CV, Craig Venter.  I
19  had no reason to doubt that these notes exactly what happened.
20     Q    Do you know who communicated that
21  information that lead you to writing it down?
22     A    Harold Varmus.
23         MR. REGAN:  Objection to form.
24         BY MR. WEISS:

13 (Pages 46 to 49)

50

```
 1      Q    Does this refresh your recollection as to
 2   whether there was a conference call where Harold Varmus
 3   reported on his meeting with Arnie Levine?
 4      A    I would not have remembered that Harold was
 5   on such a call but this clearly indicates that he was.
 6      Q    Were these notes taken during a conference
 7   call with members of the HGP?
 8          MR. REGAN:  Objection to the form.
 9          THE WITNESS:  My style in such a conference
10   call was to write out for myself an agenda at the top
11   of the page and then take notes on the actual events
12   lower down.  Using that model, what you see is, Roman
13   Numeral I, II, III, IV would have been my notes to
14   myself about what I wanted to cover in the call.  And
15   then beginning further down where the arrow is notes
16   from the conversation that occurred during the
17   conference call.
18      BY MR. WEISS:
19      Q    So this format is consistent with your
20   regular business practice regarding conference calls?
21      A    Yes.
22      Q    In the middle of the page it says:  AL
23   talked -- actually maybe you could read me what -- what
24   that line of the document says.
```

51

```
 1      A    AL talked with TW and CV.  No one saw a
 2   show-stopper.
 3      Q    Do you remember anyone using the phrase
 4   show-stopper in any of your calls with other members of
 5   the Human Genome Project during this time?
 6      A    I don't recall the use of that word.
 7      Q    Is that a word that you frequently use?
 8      A    Occasionally.
 9      Q    Does this document refresh your
10   recollection as to any events that occurred in December
11   of 1999 other than anything that you've testified to so
12   far?
13      A    I don't believe beyond what's already been
14   discussed.
15      Q    About two-thirds of the way down the page
16   it says no press coverage and then there's an arrow and
17   it says risky; is that correct?
18      A    That's what it says.
19      Q    Do you know what is meant by that?
20      A    I'm not entirely clear.
21      Q    Do you recall any discussions with other
22   members of the HGP regarding press coverage of any of
23   the interaction between Celera and the HGP during this
24   time period?
```

52

```
 1          MR. REGAN:  Objection to form.
 2          THE WITNESS:  I recall a general sense that
 3   it would be a mistake to have any kind of press
 4   coverage of the fact that there were discussions going
 5   on, as is often the case when you're engaged in
 6   sensitive negotiations.  Looking at this again I
 7   suspect this also was intended to say that if Varmus
 8   was going to visit Celera it would be unfortunate to
 9   have press coverage of that.  I can't be sure of that.
10      BY MR. WEISS:
11      Q    Two lines below no press coverage it says
12   hope for -- and correct me if I'm wrong -- hope for a
13   meeting with many of the principals in the next one to
14   two weeks; is that correct?
15      A    That's correct.
16      Q    Does that refresh your recollection as to
17   whether there was a conference call with members of the
18   HGP where a meeting with Celera principals was
19   discussed?
20          MR. REGAN:  Objection to the form.
21          THE WITNESS:  Only in a general way in that
22   that clearly was a topic of great interest at that
23   point.  And it would have not gone forward without such
24   a discussion.
```

53

```
 1      BY MR. WEISS:
 2      Q    Did a conference call among the members of
 3   the HGP precipitate the December 29th meeting?
 4          MR. REGAN:  Objection to the form.
 5          THE WITNESS:  Precipitate is too strong a
 6   word.  I think there was a sense extending well before
 7   this that any serious ability to negotiate a
 8   collaborative model would require a face-to-face
 9   meeting with the principals.
10      BY MR. WEISS:
11      Q    Did the -- did a -- an HGP conference call
12   directly lead to the scheduling of the December 29th
13   meeting?
14          MR. REGAN:  Objection to the form.
15          THE WITNESS:  I think it was one step on
16   that path.
17      BY MR. WEISS:
18      Q    Who on the HGP side ultimately made the
19   decision to schedule a face-to-face meeting with
20   Celera?
21          MR. REGAN:  Objection to the form.
22          THE WITNESS:  My recollection is that that
23   was a joint decision.  That's the way we did things.
24   This was not an autocratic arrangement.
```

14 (Pages 50 to 53)

54

1    MR. WEISS: Please mark this as Exhibit 14.
2    (Whereupon, a document was marked as
3 Deposition Exhibit Number 14.)
4    BY MR. WEISS:
5    Q    Dr. Collins, please review Exhibit 14 which
6 is Bates range RW00338 through 340.
7    A    All right.
8    Q    Have you seen this document before?
9    A    I don't recall it.
10    Q    Do you recall communicating to other
11 members of the Human Genome Project in any fashion that
12 a meeting had been scheduled with representatives from
13 Celera in late December 1999?
14    A    I don't recall the details. I certainly
15 recall such a meeting being scheduled and that it would
16 have been critical for all of the major leaders of the
17 Human Genome Project to have input into that.
18    Q    Does this document refresh your
19 recollection in any way as to any events that
20 transpired in December of 1999?
21    A    I certainly recall that the decision was
22 made about who would represent the Human Genome Project
23 at this meeting and that that was arrived at only about
24 a week before the meeting, and this document refreshes

55

1 that memory. It was to be myself and Harold Varmus,
2 Waterston and Martin Bobrow.
3    Q    Who made that decision?
4    A    It was made jointly by the group on that
5 conference call.
6    Q    When you say that conference call, are you
7 referring to the December 22nd conference call?
8    A    Yes. Yes, the 22nd.
9    Q    Does this document refresh your
10 recollection as to anything that was discussed on the
11 December 22nd conference call regarding what should
12 occur at the meeting?
13    A    Only in the most general sense. I do
14 recall that the group was concerned that we not drill
15 down into highly specific details before coming to some
16 sense of agreement about the general principles.
17    Q    When you say highly specific details,
18 highly specific details regarding what?
19    A    Such as issues of how much coverage would
20 each group provide, how would the actual data transfer
21 be handled, et cetera.
22    Q    Have you had the opportunity to review the
23 third paragraph of the e-mail that begins it is agreed?
24    A    I've just read it.

56

1    Q    Do you recall having discussions regarding
2 a -- making a statement available following the meeting
3 with Celera?
4    A    In a general sense I recall it.
5    Q    What do you recall of those discussions?
6    A    That it was highly likely, with as many
7 people involved in planning for this meeting, that it
8 would come to the attention of the press. You'll have
9 to remember this was a time when the press was
10 extremely interested in what was happening with regard
11 to the public project and Celera. And it was the
12 considered opinion of the Human Genome Project
13 leadership that it would be better to put out a brief
14 statement about that instead of having uncertainty and
15 rumors flying about or perhaps misinformation.
16    Q    At the beginning of that paragraph where it
17 says it is agreed, who -- who made that agreement?
18    A    That would reflect a joint decision of the
19 people who were on that conference call.
20    Q    Do you recall sending a version of the
21 shared principles to other members of the Human Genome
22 Project in anticipation of the December 29th meeting?
23    A    So, again, in this -- at this point the
24 shared principle document had gone through several

57

1 revisions. And the people involved that had a -- sort
2 of leadership roles in the Human Genome Project had
3 already seen it and -- and commented upon it. As you
4 can see from this document it was sent around once
5 again in a new version that I had edited.
6    MR. WEISS: Why don't we take a short break
7 here. It should be less than five minutes unless you
8 need more time.
9    (A short break was taken.)
10    MR. WEISS: Please mark this as Exhibit 15.
11    (Whereupon, a document was marked as
12 Deposition Exhibit Number 15.)
13    BY MR. WEISS:
14    Q    Dr. Collins, please take a look at what has
15 been marked as Collins Exhibit 15 which bears Bates
16 range CG004165 through 4168.
17    A    All right.
18    Q    Turning to the e-mail message that begins
19 on CG004166. Do you see that?
20    A    Yes.
21    Q    Do you recall sending this message?
22    A    I do.
23    Q    Have you seen this message before?
24    A    I imagine I must have because I do recall

15 (Pages 54 to 57)