LEXSEE 2001 US DIST LEXIS 10975

**KRISTEN L. GERENTINE, Plaintiff, -v.- UNITED STATES OF AMERICA; GREGORY R. DAHLBERG, Acting Secretary of the Army; DEPARTMENT OF THE ARMY; WILLIAM F. CONDRON, JR., Individually; DAYTON M. CRAMER, Individually; ANGELA WILLIAMS-SOLOMON, Individually, Defendants.**

00 Civ. 0813 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2001 U.S. Dist. LEXIS 10975*

August 1, 2001, Decided
August 2, 2001, Filed

**DISPOSITION:** [*1] Individual Defendants' motion for summary judgment dismissing Plaintiff's common law claims granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For plaintiff: Peter J. Cresci, Atkins Ekblom Guarrara, New York, NY.

For defendants: Meredith E. Kotler, Ass't United States Attorney, New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINIONBY:** JOHN S. MARTIN, JR.

**OPINION:**

OPINION and ORDER

JOHN S. MARTIN, Jr., District Judge:

Kristen Gerentine ("Plaintiff") brings this action against the Department of the Army (the "Army") for employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e* et. seq., and against the United States for damages under the Federal Tort Claims Act ("FTCA"), *28 U.S.C. §§ 2671*-80. Plaintiff also brings common law claims for defamation against Lieutenant Colonel William Condron ("Condron"), Colonel Dayton Cramer ("Cramer"), and Major Angela Williams-Solomon ("Williams-Solomon") (collectively the "Individual Defendants"), and for intentional infliction of emotional distress against the Army, Cramer, and Williams-Solomon. At this time, the Individual Defendants move to dismiss the common [*2] law tort claims against them under Rule 12(b)(1), Rule 12(c), and Rule 56. Alternatively, the Individual Defendants seek to substitute the United States as sole defendant for these claims. For the reasons set forth below, the Individual Defendants' motion for summary judgment dismissing Plaintiff's common law claims is granted.

I. BACKGROUND

The following facts n1 are culled from Plaintiff's deposition testimony and attached exhibits, and from Defendants' Rule 56.1 submission, to which Plaintiff submitted no opposition. n2 In 1989, Plaintiff obtained employment at the United States Military Academy at West Point. In November 1995, she assumed a position as a "legal technician," which is akin to a court reporter, in the Office of the Staff Judge Advocate ("OSJA"). In addition to transcribing disciplinary proceedings involving cadets, Plaintiff was responsible for preparing case files and documenting the results of the proceedings.

n1 This recitation of facts is not intended to express any opinion, one way or the other, on Plaintiff's remaining Title VII and FTCA claims against the Army and the United States. [*3]

Case 3:00-cv-00705-CFD   Document 160-2   Filed 07/25/2005   Page 2 of 7

Page 2
2001 U.S. Dist. LEXIS 10975, *

n2 The list of "Genuine Issues of Material Fact" embedded within Plaintiff's opposing brief is not presented in the proper form.

Plaintiff claims that in December 1995, Defendant Condron, then Chief of the Administrative Law Division of the OSJA, required that she stay at work in order to assist with a hearing despite the fact that inclement weather had closed the campus and most non-essential employees had gone home. Condron offered to let Plaintiff stay at his home if she was unable to navigate the roads. Plaintiff declined this offer and a military court reporter took her place for the rest of the day.

After this incident, Plaintiff alleges that Condron engaged in a pattern of harassing behavior aimed at retaliating against her for rejecting what she viewed as a sexual advance. For example, she claims that on one occasion Condron reprimanded her for lateness, but did not reprimand another employee; told other supervisors at a meeting that Plaintiff had been making personal calls; refused her request on one occasion to extend the lunch break for a hearing so that she could attend a luncheon, [*4] and ordered her to sit in her chair; commented in front of her that he "didn't want to dick with any of the cadets;" refused on one occasion to allow her to work overtime; required her on one occasion to do additional work during a hearing deliberation when she was typically required only to stand by and await a decision; denied her request for six months' maternity leave, although another employee was allowed maternity leave in excess of the standard twelve weeks; and commented after Plaintiff returned from maternity leave that "your body is in real good shape for just having a baby."

In June 1997, Plaintiff filed an Equal Opportunity Employment ("EEO") complaint describing the above actions and claiming that she was the victim of sexual harassment. (Kotler Decl. Ex. D-18.) n3 In November 1997, Plaintiff filed a second EEO complaint alleging that she had been retaliated against for filing her first complaint. (Kotler Decl. Ex. D-31.) Plaintiff claimed that Condron, who was now her second level supervisor, and Defendant Williams-Solomon, Chief of the Criminal Law Special Actions Division and Plaintiff's immediate supervisor, had penalized her for reporting to work late on two occasions, [*5] despite the fact that she had received permission to report late on one occasion and was not in fact late on the other occasion; verbally counseled her for errors made by another employee who was not counseled in the same fashion; subjected her for two weeks to progress-reporting requirements; and orally reprimanded her for insubordination in relation to an incident involving a spirit banner featuring the words "The Devil Made Me Do It," which referred to an upcoming Army v. Duke football game and upon which Plaintiff had written "What's Your Excuse?"

n3 Where the documents attached to Tab D of Meredith Kotler's Declaration have been marked as defense exhibits, the citation number refers to that exhibit number, e.g. Kotler Decl. Ex. D-18. Where the document has not been so marked, it will be identified by date and author, e.g. Kotler Decl. Ex. D, 2/2/98 Cramer Statement.

In January 1998, Plaintiff and Condron continued to experience difficulty as a result of her refusal to speak to him and as a result of an incident [*6] in which Plaintiff felt that Condron stood too close to her. (Kotler Decl. Ex. B at 263-70.) After a series of memos and meetings, Plaintiff was informed that she would be verbally counseled on January 30, 1998. (Kotler Decl. Ex. B at 275; Ex. D, 2/2/98 Cramer Statement; Ex. D, 2/20/98 Solomon Statement.)

Sometime during the last week of January 1998, Condron discovered that the computer files contained on his hard drive, which had been mistakenly placed on the shared network, had been accessed and that those files beginning with the letters "g" through "v" had been deleted. Several weeks prior to this discovery, Plaintiff had been told by another employee that Condron's files were available for general access. Thereafter, Plaintiff accessed Condron's files several times without permission and read documents that she believed pertained to her. Plaintiff printed out at least one of these documents, which was entitled "gerentine-rudeness." Plaintiff also advised other employees that Condron's documents could be opened, and she attempted to show a couple of employees how this could be done.

On January 30, 1998, Plaintiff was escorted to Defendant Cramer's office, who was the Staff Judge [*7] Advocate. Cramer advised Plaintiff that she was suspected of deleting Condron's files and that her computer would be taken away. Plaintiff was placed on administrative leave with pay.

In its formal investigations, the Army discovered a list of recently opened files on Plaintiff's computer with names such as "rude" and "verbcoun." However, after further investigation, the Army found that it could not determine who had accessed Condron's hard drive because the computer had not been activated, and that it was impossible to tell from analyzing Plaintiff's computer whether she was the one who deleted Condron's files. (Kotler Decl. Ex. D, 3/3/98 Winsor Mem.) Investigators found that the list of documents with names such as "rude" and "verbcoun" had been deleted from Plaintiff's

computer, and she admitted to them that she had transferred the files to floppy disk and deleted them from her hard drive, although Plaintiff claimed they were personal files. Despite the fact that Plaintiff agreed to produce the documents in order to prove they were not Condron's, she later informed investigators that she had improperly transferred the files to the floppy disk and they were lost.

During its investigations, [*8] the Army did obtain several statements from other employees to the effect that Plaintiff had accessed Condron's files, had showed others how to do the same, and had criticized him for being stupid enough to leave his files available for all to see. Although the results of the formal investigations were inconclusive, an investigative report indicated that Plaintiff should have realized that some of the files contained sensitive information and that she should have reported the fact that they were available for public access to her superiors. (Kotler Decl. Ex. D, 3/3/98 Winsor Mem.) However, investigators did not feel that Plaintiff had engaged in actual misconduct, although her actions were certainly unwise.

In addition to two formal investigations by the Army, the OSJA conducted its own internal investigation. Accordingly, after questioning Plaintiff and other employees, Williams-Solomon prepared a report recommending that Plaintiff be terminated. (Kotler Decl. Ex. D-56.) The report, issued on April 30, 1998 (the "April 1998 Report"), indicated that Plaintiff had misused government property; impeded the investigation by improperly deleting files from her hard drive; improperly accessed [*9] secure files in contravention of an employee directive that Plaintiff had been given in November 1997; knowingly made false and malicious statements about Condron in order to destroy his reputation; and refused to answer questions during an interview with Williams-Solomon about the investigation. The report also indicated that Plaintiff's "presence in this office is like a cancerous sore or infection."

On May 13, 1998, Cramer issued a report in which he agreed with Williams-Solomon's analysis and recommended that Plaintiff be terminated (the "May 1998 Report"). (Kotler Decl. Ex. D-58.) On June 30, 1998, Cramer sent a letter to Plaintiff advising her of his recommendation (the "June 1998 Letter"). (Kotler Decl. Ex. D-59.) On November 3, 1998, Plaintiff was informed that the Chief of Staff at West Point had elected to terminate her as of November 13, 1998. (Kotler Decl. Ex. D-65.) In the alternative, the Chief of Staff offered to suspend Plaintiff's removal and to reassign her out of the OSJA to the first available position of the same grade in exchange for withdrawing her EEO complaints. Plaintiff did not accept this offer.

On November 17, 1998, Plaintiff complained to an EEO counselor [*10] but did not file a formal complaint. On November 20, 1998, the Chief of Staff withdrew his decision to terminate Plaintiff. (Kotler Decl. Ex. D-66.) Plaintiff was reassigned into the Directorate of Resource Management ("DRM") effective November 23, 1998. Plaintiff did not report to the DRM that day, and although her time to report was extended to December 7, 1998, she failed to report for work on that day either. At this time Plaintiff remained on administrative leave with pay. On December 8, 1998, Plaintiff filed an administrative appeal of her termination with the Merit Systems Protection Board ("MSPB"), which was later dismissed for lack of jurisdiction because the decision to terminate her had been rescinded. Plaintiff did not appeal that decision. That same month Plaintiff also filed a complaint against Cramer with the Florida Bar Association stating that he had made false statements in his June 1998 Letter in which he proposed her removal. On or about February 19, 1999, Plaintiff reported for work at the DRM. She resigned one year later in February 2000. In April 2000, Plaintiff filed a third EEO complaint alleging constructive discharge from the DRM.

In this action, filed in [*11] February 2000, Plaintiff brings Title VII claims for sexual harassment, hostile work environment, retaliation, and constructive discharge against the Army, along with an FTCA claim against the United States for negligence, negligent supervision, and wrongful termination, inter alia. Plaintiff also brings a claim for defamation against Condron, Cramer, and Williams-Solomon, and a claim for intentional infliction of emotional distress against the Army, Cramer, and Williams-Solomon.

As set forth in her Second Amended Complaint, Plaintiff's defamation claim against the Individual Defendants refers specifically to Williams-Solomon's April 1998 Report proposing Plaintiff's removal and its publication to unspecified supervisors and co-workers; Cramer's May 1998 Report proposing Plaintiff's removal and its publication to other unspecified supervisors; Cramer's June 1998 Letter to Plaintiff proposing her removal and its publication to unspecified supervisors and co-workers; and statements by Condron in January 1998 to unspecified supervisors and co-workers accusing Plaintiff of deleting his hard drive. n4 Plaintiff's intentional infliction of emotional distress claim likewise targets [*12] Cramer's and Williams-Solomon's actions in causing Plaintiff to be transferred out of the OSJA; which eventually led to her constructive discharge from the DRM. n5

n4 Plaintiff's Second Amended Complaint also describes an incident in which Cramer called

Case 3:00-cv-00705-CFD    Document 160-2    Filed 07/25/2005    Page 4 of 7

Page 4
2001 U.S. Dist. LEXIS 10975, *

a staff meeting shortly after Condron's hard drive was deleted and informed the assembled company that Plaintiff was the guilty party. (Sec. Am. Comp. P 33.) However, in her deposition testimony, Plaintiff states that no one person was named as a possible suspect at that meeting. (Kotler Decl. Ex. C, at 60-62.)

n5 Plaintiff's EEO complaint alleging constructive discharge appears to be based on her placement in a non-competitive position without upward mobility.

Based on these allegations, the Individual Defendants move here to dismiss the claims against them, arguing that the claims are preempted both by Title VII and by the Civil Service Reform Act (the "CSRA"), 5 U.S.C. § 1101 et. seq., or alternatively that they are barred by [*13] the one-year statute of limitations contained in N.Y. C.P.L.R. 215(3).

In an affidavit submitted in opposition to the Individual Defendants' motion, Plaintiff claims that additional defamatory statements were made in the spring and summer of 1999. (Cresci Ver. Ex. 1.) Plaintiff claims that in the spring of 1999, Williams-Solomon showed others her May 1998 Report; in the spring of 1999, Cramer showed others his June 1998 Letter to Plaintiff proposing her removal; and on unspecified dates, Condron orally accused Plaintiff of unspecified acts, presumably her alleged deletion of his hard drive. Plaintiff does not specify upon which dates these statements or documents were issued to third parties, nor does she indicate the circumstances under which they occurred. Similarly, she vaguely refers to statements by others that allegedly reveal the Individual Defendants' attempts to mount a "smear" campaign against Plaintiff, but she provides no concrete details.

II. DISCUSSION

Plaintiff's Second Amended Complaint as it relates to her claims for defamation and intentional infliction of emotional distress seeks to hold the Individual Defendants liable for tortious behavior in relation to their [*14] investigation of the computer incident, based primarily on their written statements recommending Plaintiff's removal in the spring of 1998, and in relation to Plaintiff's subsequent transfer to another position. In opposition to the Individual Defendants, motion, Plaintiff argues that the Individual Defendants have misconstrued the allegations in the Second Amended Complaint, and that the events described in Plaintiff's newly submitted affidavit indicate that the "publication" of the defamatory statements occurred in the spring of 1999, well within the one-year statute of limitations for intentional torts. In addition, Plaintiff argues that the Individual Defendants were acting outside the scope of their employment in the Spring of 1999 because Cramer had been reassigned to Virginia in July 1998 and Condron and Williams-Solomon had been transferred to other posts by May 1999.

Despite the fact that Plaintiff's affidavit describes events in the spring of 1999 that are not pleaded in the Second Amended complaint, Plaintiff has not formally requested to amend her complaint. However, there is some authority for the proposition that new issues raised for the first time in an affidavit in [*15] opposition to a motion for summary judgment can be considered by the court and in effect incorporated into the complaint or answer. See, e.g., *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993); *Seaboard Terminals Corp. v. Standard Oil Co.*, 104 F.2d 659, 660 (2d Cir. 1939); *Livingston v. Bev-Pak, Inc.*, 112 F. Supp. 2d 242, 247 n.3 (N.D.N.Y. 2000) (noting disapproval of this practice where the plaintiff attempts to raise new claims). Because the Individual Defendants move for summary judgment and to dismiss the claims for lack of subject matter jurisdiction, a motion which is treated in a similar fashion to a motion for summary judgment, see *John Street Leasehold v. Capital Mgmt. Res.*, 154 F. Supp. 2d 527, 2001 U.S. Dist. LEXIS 3643, 2001 WL 310629, at *2 (S.D.N.Y. 2001), the Court will construe Plaintiff's affidavit as a motion to amend the Second Amended Complaint. Such a motion, however, must be denied.

The Supreme Court has indicated that leave to amend a pleading should be freely granted absent a showing of undue prejudice, undue delay, bad faith, futility or dilatory motive. See *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). [*16] Several of these exceptions are present here. First, the Second Circuit has indicated that *Fed. R. Civ. P. 8* requires that a complaint alleging defamatory statements be "detailed and informative enough" to give the defendant "sufficient notice of the communications complained of to enable him to defend himself." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (quotations omitted). Although the Second Amended Complaint is itself somewhat vague, any reasonable reading of its allegations leads to the conclusion that Plaintiff's claims arise from the events of 1998. n6 Nothing is said about any actions taken in 1999, one year after the relevant events. As a result, Defendants were not put on notice of these alleged tortious acts of 1999 as they conducted the extensive discovery that has already taken place in this case, and are therefore prejudiced by the omission. n7 See *Kuczynski v. Ragen Corp.*, 732 F. Supp. 378, 381 (S.D.N.Y. 1989) ("Pleadings may not be amended to add an entirely new set of operative facts if the original complaint did not provide fair notice to the defendant. . . ."); cf. *Kelly, 806 F.2d at*

46; *Johnson v. Mateer,* 625 F.2d 240, 242 (9th Cir. 1980). [*17]

> n6 Plaintiff specifically pleads that Williams-Solomon "publicized" her report on April 30, 1998, (Sec. Am. Comp. P 39), and that Condron's oral statements were made on or about January 30, 1998, (Sec. Am. Comp. P 58.) Plaintiff's new theory of publication also contradicts her own deposition testimony, in which she states that the various reports were shown to others at the time that they were issued in 1998. (Kotler Decl. Ex. C at 182-95, 227-28, 231-32.) Plaintiff expressly disclaims any knowledge of a later publication.
>
> n7 It is disingenous in the extreme for Plaintiff to accuse Defendants of "bastardizing" the definition of defamation and of making misrepresentations to the Court when Plaintiff's Second Amended Complaint contains absolutely no reference to these later defamatory events.

Second, Plaintiff had knowledge of these alleged facts when she filed her Original Complaint in February 2000, not to mention when she filed her First Amended Complaint in April 2000 and her Second Amended Complaint in [*18] March 2001. (*Cresci Ver. Ex. 1 P 4.*) Thus, this is not a case in which a plaintiff discovered new facts through the discovery process that support her claims. Rather, these new facts were submitted as a last-ditch attempt to preserve Plaintiff's tort claims in light of the overwhelming evidence of preemption and untimeliness put forth by the Individual Defendants in their motion. As such, there is an element of bad faith in Plaintiff's untimely bid to add them now. See *Berman v. Parco,* 986 F. Supp. 195, 217-19 (S.D.N.Y. 1997); *Bymoen v. Herzog, Heine, Geduld, Inc.,* 1991 U.S. Dist. LEXIS 7169, No. 88 Civ. 1796, 1991 WL 95387, at *1-2 (S.D.N.Y. May 28, 1991).

Third, incorporating the new allegations into the Second Amended Complaint would be futile because they are lacking in merit. To overcome objections of futility, the plaintiff must merely show that it has "at least colorable grounds for relief." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir. 1984). Plaintiff does not meet this burden because her new allegations are woefully vague and her supporting exhibits reveal them to be wholly unsubstantiated. As [*19] noted above, Plaintiff does not allege specific dates nor describe the circumstances under which the Individual Defendants allegedly defamed Plaintiff in the spring of 1999. According to her affidavit, Plaintiff bases most of her new allegations on deposition testimony that she read in June 1999, in which Cramer and Condron testified in the EEOC case of another employee who was also represented by Plaintiff's counsel in this case. However, in his deposition, Cramer states only that on unspecified dates he informed others, including his boss, that a complaint had been filed against him, although it is not clear that he is even referring to Plaintiff's complaint. (Cresci Ver. Ex. 3.) Condron's deposition testimony contains absolutely no reference to having spoken about Plaintiff with any other individual after the initial investigation. (Cresci Ver. Ex. 4.)

Plaintiff also states in her affidavit that as a result of her review of the other employee's case, she learned that the Individual Defendants "made telephone calls, faxed documents, sent electronic mail messages, [and] wrote letters. . . ." that pertained to her. Again, she provides no particulars. Finally, Plaintiff accuses the [*20] Individual Defendants of having "purloined" their reports from the workplace, but she does not specify how or when this purloining took place. The only relevant evidence submitted in support of this claim is Cramer's submission to the Florida Bar of Williams-Solomon's April 1998 Report and his own June 1998 Letter in defense of the allegations filed against him by Plaintiff. (Cresci Ver. Exs. 8-10.) Thus, not only are these newly submitted allegations too vague to meet the specificity requirements of Rule 8, see *Kelly,* 806 F.2d at 46, but they are based upon entirely dubious evidence. n8

> n8 In addition, it would appear that any allegations based on the re-publication of the April 1998 Report, May 1998 Report, and June 1998 Letter, would be time-barred under New York's single-publication rule. See *Stockley v. AT&T Info. Servs., Inc.,* 687 F. Supp. 764, 767-68 (E.D.N.Y. 1988).

In sum, to allow Plaintiff to assert entirely new, and at the same time entirely deficient, factual bases [*21] for her tort claims near the close of discovery and after the Individual Defendants have filed their motion, particularly where she had knowledge of those facts all along, would substantially prejudice the defendants and essentially extinguish the already-minimal requirement of notice pleading. See *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir. 1985). Accordingly, the Court will not sua sponte incorporate these new allegations into the Second Amended Complaint, and only the events surrounding the computer investigation and Plaintiff's reassignment in 1998 will be considered here.

Plaintiff did not pursue her administrative remedies in regard to the computer investigation or her transfer to

Case 3:00-cv-00705-CFD    Document 160-2    Filed 07/25/2005    Page 6 of 7

Page 6
2001 U.S. Dist. LEXIS 10975, *

the DRM. n9 Thus, she seeks to hold the Individual Defendants liable for their actions through common law tort claims. However, Title VII supplies the sole method of redress for federal employees complaining of acts of employment discrimination or retaliation. See *Brown v. General Servs. Admin.*, 425 U.S. 820, 829-35, 96 S. Ct. 1961, 1966-69, 48 L. Ed. 2d 402 (1976); *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996). [*22] Thus, where the challenged actions fall within the purview of Title VII's remedial framework, federal employees may not seek an end-run around Title VII's administrative requirements by masquerading their discrimination claims as tort claims. See *Mathis v. Henderson*, 243 F.3d 446, 450-51 (8th Cir. 2001); *Pfau v. Reed*, 125 F.3d 927, 932-34 (5th Cir. 1997), reinstated by 167 F.3d 228 (1999); *Hampton v. I.R.S.*, 913 F.2d 180, 183 (5th Cir. 1990); *Mannion v. Attorney General*, 2000 U.S. Dist. LEXIS 16247, No. 3:00 CV 418, 2000 WL 1610761, at *1-2 (D. Conn. Oct. 3, 2000).

> n9 Apparently, Plaintiff's administrative MSPB appeal of the Chief of Staff's removal decision incorporated an allegation that she was removed as the result of discrimination. As noted above, the appeal was dismissed because Plaintiff's removal was rescinded.

Notwithstanding Title VII's broad preemptive scope, some courts have held that a tort claim will lie against a federal employer, including [*23] an individual supervisor, if the supervisor's actions exceed conduct that constitutes traditional workplace behavior and is not properly characterized as an employment-related act, for example physical abuse, death threats, or rape. See, e.g., *Brock v. United States*, 64 F.3d 1421, 1422-24 (9th Cir. 1995) (focusing on claims that cause "highly personal" harm); *Wallace v. Henderson*, 138 F. Supp. 2d 980, 984-86 (S.D. Ohio 2000); *Stewart v. Thomas*, 538 F. Supp. 891, 895-97 (D.D.C. 1982). It is not necessary here to either adopt or reject this approach. The starting point in all of these cases is to ask whether the challenged actions constitute the type of workplace discrimination subject to redress under Title VII, or whether the plaintiff seeks to recover for injuries separate from those she suffered as an employee. Because Plaintiff's claims fall within the former category, the question of how to treat claims that fall into the latter category is irrelevant.

Plaintiff's defamation claims center on reports prepared by her supervisors which detail their conclusions about her role in the deletion of Condron's hard drive, and on Condron's [*24] conversations with others to the same effect. Similarly, Plaintiff's intentional infliction of emotional distress claim challenges the Individual Defendants' actions in investigating the computer incident, recommending her removal, and causing her transfer to the DRM where she was eventually forced to resign. Plaintiff states numerous times in her deposition that these actions by the Individual Defendants were part and parcel of the plot to retaliate against her because she had filed prior EEO complaints. n10 (Kotler Decl. Ex. C at 67, 75, 167, 182-83, 225-26, 233-34.) She also notes that her appeal of the Chief of Staff's termination decision incorporated a claim that the termination was the result of discrimination. Thus, based on Plaintiff's own allegations of discriminatory motive, the Individual Defendants were clearly engaging in the type of workplace behavior that is redressable under Title VII when they attempted to identify which employee committed a breach of security and recommended Plaintiff's termination based on evidence compiled by various Army investigators. See *Stenson v. Sorkin*, 1989 U.S. Dist. LEXIS 7586, No. 87 Civ. 5806, 1989 WL 79405, at *2-3 (S.D.N.Y. July 11, 1989). Indeed, [*25] by attempting to move the time-frame of the alleged torts to one year after the computer imbroglio, when the Individual Defendants were no longer employed at West Point, Plaintiff tacitly acknowledges that her claims as pleaded directly relate to her allegations of workplace discrimination and retaliation.

> n10 In her Second Amended Complaint, Plaintiff refers to their actions as a "calculated conspiracy." (Sec. Am. Comp. P 32.)

As noted, Plaintiff did not pursue her administrative remedies with respect to the allegedly retaliatory investigation and her resulting transfer. Because those claims are preempted by Title VII, she cannot pursue them as tort claims against her individual supervisors. However, Plaintiff has exhausted her administrative remedies with respect to her constructive discharge claim, and her Second Amended Complaint includes such a claim. Thus, at least some of the actions that Plaintiff challenges here may be redressable as part of Plaintiff's Title VII suit against the Army. Plaintiff's claims [*26] against the Individual Defendants for defamation and intentional infliction of emotional distress are dismissed. n11

> n11 In light of this conclusion, the Court will not reach Defendants' preemption argument under the CSRA, nor is there need to specifically address the statute-of-limitations defense, which Plaintiff tacitly concedes has expired.

III. CONCLUSION

For the foregoing reasons, the Individual Defendants' motion for summary judgment dismissing the tort claims against them is granted. In accordance with instructions issued at a previous conference before the Court, discovery on Plaintiff's remaining claims will conclude sixty days from the date of this opinion and Order.

**SO ORDERED.**

Dated: New York, New York

August 1, 2001

JOHN S. MARTIN, JR., U.S.D.J.